IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUINTEZ CEPHUS,

       Plaintiff,

    v.                                   Case No. 3:21-cv-0126

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
LAUREN HASSELBACHER, in her
individual and official capacity, and
REBECCA BLANK, in her individual
and official capacity,

       Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff***
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

    A.  Plaintiff's Background.............................................................................. 2

    B.  The Night of April 21-22, 2018.............................................................. 3

    C.  UW-Madison admits its mistake ............................................................ 9

ARGUMENT ................................................................................................... 10

    I. LEGAL STANDARD.............................................................................. 10

    II.  PLAINTIFF SUFFICIENTLY ALLEGES A TITLE IX CLAIM ............ 12

        A.  The investigation was skewed against Plaintiff as a male accused
and in favor of the female accusers,
despite Plaintiff's actual innocence .......................................... 14

        B.  Defendants' gender-biased statements and endorsements....................... 18

        C.  UW Was Under Pressure to Favor and Protect Female Students and
Aggressively Prosecute and Punish Male Students. .................................. 20

        D.  Defendants employed a gender biased, trauma-informed approach......... 24

    III. PLAINTIFF PLAUSIBLY ALLEGES A STIGMA-PLUS    DUE PROCESS
VIOLATION ................................................................................. 26

        A.  Defendants Expelled Plaintiff Without Due Process. ............................... 27

        B.  Defendants Disclosed Information That Harmed Plaintiff's Reputation.. 30

        C.  Defendants' Actions Interfered with Plaintiff's Liberty to Pursue the Career
of His Choice ........................................................................... 31

        D.  The Individual Defendants Are Not Entitled to Qualified Immunity. ...... 32

    IV. THERE IS NO BASIS TO DISMISS PLAINTIFF'S STATE LAW  CLAIMS WITH
PREJUDICE ................................................................................. 34

CONCLUSION................................................................................................ 35

i

# TABLE OF AUTHORITIES

## Cases

*Alam v. Miller Brewing Co.*, 709 F.3d 662 (7th Cir. 2013) ........................................................ 11

*Albiero v. City of Kankakee*, 122 F.3d 417 (7th Cir.1997) ........................................................ 11

Allahverdi v. Regents of University of New Mexico,
2006 WL 131380 (D.N.M. Apr. 25, 2006) ........................................................ 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................ 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 11

*Cannon v. Bernstein*, 2013 U.S. Dist. LEXIS 141865 (E.D. Mich. 2013) ........................................................ 33

*Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188 (7th Cir. 1993) ........................................................ 11

*Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374 (D.N.J. Nov. 17, 2016), *adhered to on denial of reconsideration*, No. CV 16-471 (KM) (JBC), 2017 WL 1508177 (D.N.J. Apr. 25, 2017), *and aff'd in part, remanded in part*, 699 F. App'x 129 (3d Cir. 2017) ... 23

*Doe v. Amherst Coll.*, 238 ~.Supp.3d 195 (D. Mass. 2017) ........................................................ 24

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ........................................................ 15, 20

*Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019) ........................................................ 13, 19

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ........................................................ 11, 20, 23

*Doe v. Cummins*, 662 F. Appx. 437 (6th Cir. 2016) ........................................................ 33

*Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336 (S.D. Fla. 2017) ........................................................ 24

*Doe v. Marymount U.*, 297 F. Supp. 3d 573 (E.D. Va. Mar. 14, 2018) ........................................................ 13, 14

*Doe v. Miami U.*, 882 F.3d 579 (6th Cir. 2017) ........................................................ 20, 23

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ........................................................ passim

*Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205 (M.D. Fla. 2019) ........................................................ 24

*Doe v. Syracuse Univ.,*No. 5:19-CV-1467 (TJM) (ATB), 2020 WL 2513691 (N.D.N.Y. May 15, 2020) ........................................................ 25

*Doe v. Syracuse*, 2019 WL 2021026 (N.D.N.Y. May 8, 2019) ........................................................ 18

*Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado,* 255 F. Supp. 3d 1064 (D. Colo. 2017) ........................................................................................... 25

*Doe v. Washington & Lee U.*, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015) ........................ 20, 24

*Doe. v. Univ. of Colorado*, 255 F. Supp. 3d 1064 (D. Colo. 2017) ............................................ 33

*Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005) ....................................................................... 26

*E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773 (7th Cir. 2007) .................................. 10

*Erickson v. Pardus*, 551 U.S. 89 (2007) .................................................................................... 10

*Ex Parte Young*, 209 U.S. 123 (1908) .................................................................................. 32, 33

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) ....................................................................... 33

*Forseth v. Vill. of Sussex*, 199 F.3d 363 (7th Cir. 2000) ........................................................... 11

*Johnson v. Marian Univ.*, 829 F. App'x 731 (7th Cir. 2020) ................................................ 21, 26

*Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904 (7th Cir. 1991) ............................... 34

*Mann v. Vogel*, 707 F.3d 872 (7th Cir. 2013) ........................................................................... 28

*Marcure v. Lynn*, 992 F.3d 625 (7th Cir. 2021) ........................................................................ 11

*Matthews v. Eldridge*, 424 U.S. 319 (1976) ............................................................................. 28

*McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873 (7th Cir. 2012) .......................................... 12

*Menaker v. Hofstra Univ.,* 935 F.3d 20 (2d Cir. 2019) .............................................................. 23

*Mondovi Dairy Sys., Inc. Emp. Benefit Plan v. Blue Cross Blue Shield of Wisconsin*, No. 15-CV-826-JPS, 2016 WL 109965 (E.D. Wis. Jan. 8, 2016) ................................................................ 10

*MSA Realty Corp. v. State of Ill.,* 990 F.2d 288 (7th Cir. 1993) ............................................... 33

*Mutter v. Rodriguez*, 700 F. App'x 528 (7th Cir. 2017) ............................................................ 34

*Neal v. Colorado State Univ.-Pueblo*, No. 16-CV-873 (RM) (CBS), 2017 WL 633045 (D. Colo. Feb. 16, 2017) ............................................................................................................. 20, 24, 28

*Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397 (N.D.N.Y. 2019) ............................................ 24

*Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001 (D. Colo. 2019) at 1013 ............... 25

*Palka v. Shelton*, 623 F.3d 447 (7th Cir. 2010) ........................................................................ 30

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510 (7th Cir. 2015) ................................................................................................................................. 35

*Shepard v. Irving*, 77 F. App'x 615 (4th Cir. 2003) ................................................................... 33

*Starobin v. Northridge Lakes Dev. Co.,* 94 Wis. 2d 1 (1980) .................................................... 30

*Townsend v. Vallas,* 256 F.3d 661 (7th Cir. 2001) .............................................................. 26, 31

*Wells v. Xavier Univ.*, 7 F.Supp.3d 746 (S.D. Ohio 2014) ........................................................ 24

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) .......................................................... 14, 19

## Statutes

20 U.S.C. § 1681 ......................................................................................................................... 12

42 U.S.C. § 1983 ......................................................................................................................... 34

Wis. Stat. § 16.007 ...................................................................................................................... 34

Wis. Stat. § 775.01 ...................................................................................................................... 34

## Regulations

34 C.F.R. § 106.45 ...................................................................................................................... 26

## Rules

Fed. R. Civ. P. 12 .................................................................................................................... 1, 11

Fed. R. Civ. P. 8 .......................................................................................................................... 10

## INTRODUCTION

Plaintiff Quintez Cephus hereby submits this memorandum of law in opposition to the motion to dismiss Plaintiff's Complaint (ECF No. 10, hereinafter "Moving Br.") filed by Defendants, Board of Regents of the University of Wisconsin System ("UW-Madison" or "the University"), Lauren Hasselbacher ("Hasselbacher"), and Rebecca Blank ("Blank") (collectively "Defendants").

As set forth in substantial detail in Plaintiff's sixty-six-page complaint, Defendants subjected Plaintiff to a gender-biased, fundamentally unfair disciplinary process that violated Title IX of the Education Amendments of 1972, deprived Plaintiff of his Constitutional Due Process rights, and violated the written policies of the University. Defendants intentionally ignore or misrepresent large portions of the Complaint providing considerable factual detail and instead cherry-pick a handful of allegations which they attempt to isolate from the totality of the circumstances and claim are insufficient on their own. Such a tactic is unavailing at this stage in the litigation. The Complaint, and the facts alleged therein, taken as a whole and viewed in the light most favorable to Plaintiff, as they must be, sufficiently set forth factual allegations providing a plausible basis for the causes of action alleged.

Defendants assert multiple times throughout their motion that Plaintiff "pled himself out of court." However, Defendants miss the mark. Defendants attempt to argue facts that are not in the Complaint in order to dispute the allegations therein, which is not permitted at this stage in the litigation. Based on the allegations contained in the Complaint, which are presumed to be true for the purposes of a Fed. R. Civ. P. 12(b)(6) motion, Plaintiff has adequately pleaded violations of the Due Process Clause of the United Stated Constitution, Title IX of the Education Amendments

of 1972, as well as state law breach of contract and promissory estoppel. Defendants' motion should be denied.

## STATEMENT OF FACTS

A full accounting of the facts underlying Plaintiff's claims can be found in the Complaint. For the court's convenience, the pertinent facts are as follows:

### A.    Plaintiff's Background.

Plaintiff grew up in a disadvantaged area of Macon, Georgia, and was raised by a single mother and grandmother alongside two siblings. Compl. ¶ 97. Plaintiff attended an underperforming public school and, due to his quiet demeanor and eagerness to learn, his school guidance counselor felt that he would be hindered by the school's culture and educational opportunities and suggested that he apply to a college preparatory school. *Id.* Plaintiff's mother worked two jobs and often had no other option but to drop Plaintiff off at school late, so the preparatory school's basketball coach took Plaintiff under his wing and picked Plaintiff up for school every day at 6:00 a.m., which allowed him to excel both academically and athletically. Compl. ¶ 98. Plaintiff's exceptional athletic abilities were noticed by UW-Madison, and Plaintiff was recruited to be a wide receiver for the University's football team with the class of 2020. Compl. ¶ 99.

While attending UW-Madison, and until Complainant 1 and Complainant 2 (the "Complainants") falsely accused him of sexual misconduct, Plaintiff had a bright future ahead, projected to be a high pick in the National Football League ("NFL") draft. Compl. ¶¶ 1-2, 97-100. Plaintiff's aspirations were sidelined, however, when UW-Madison wrongly found him responsible for sexual assault and sexual harassment relating to a consensual sexual encounter that the Complainants apparently later regretted. Compl. ¶¶ 118, 198. As a result of the University's deficient, gender-biased, and deliberately one-sided disciplinary process, which violated its own

policies and state and federal regulations, Plaintiff was expelled from the University, hindering his ability to practice and compete with the University's football team, thereby impacting his position in the NFL draft. Compl. ¶ 198.

**B.      The Night of April 21-22, 2018.**

On April 21, 2018, Plaintiff went bowling with two of his teammates, Teammate 1 and Teammate 2. Compl. ¶ 102. Teammate 1 brought along Complainant 1, who he was "on-again, off-again" dating. *Id.* While bowling, Complainant 1 insisted upon "setting up" Plaintiff with her friend, Complainant 2, and Teammate 2 with her other friend, Friend 1. *Id*. Later that night, Complainant 1 and Plaintiff exchanged Instagram messages and text messages, arranging for Complainant 1 and her friends to meet Plaintiff and Teammate 2 at a local bar. Compl. ¶ 103. When they met at the bar, Complainant 2 was immediately drawn to Plaintiff and was extremely physical with him, telling him to kiss her in the bar, which he refused to do, and trying to put her hand down Plaintiff's pants. Friend 1 also spent time with Teammate 2, leaving Complainant 1 by herself. Compl. ¶¶ 104-105. Complainant 1 texted Teammate 1 multiple times trying to get him to come to the bar, but he stood her up. Given Teammate 1's past of not remaining loyal to Complainant 1, she was, on information and belief, upset that Teammate 1 was once again cheating on her. Compl. ¶¶ 104.

Complainant 2 then suggested that they go have a "sleepover," so Plaintiff, Complainant 2, Complainant 1, Teammate 2, and Friend 1 left the bar and Plaintiff drove them back to Plaintiff and Teammate 2's apartment. Compl. ¶¶ 105-106. While leaving the bar and upon arrival at Plaintiff's apartment, Complainant 1 and Complainant 2 were fully awake and oriented, lively, coherent, able to walk with steady gait, did not stumble, and did not appear incapacitated in any way. Compl. ¶ 106. Indeed, Complainant 1 was even able to give Teammate 2, a six-foot tall football player, a *piggyback ride without stumbling*. Compl. ¶ 106. Additionally, while walking

3

ahead of the group and holding hands with Plaintiff, Complainant 2 looked back at Complainant 1 and Friend 1 and made a "victory" sign with her hand as they headed to Plaintiff's apartment. Compl. ¶ 106.

Upon entering Plaintiff's apartment, Plaintiff showed Complainant 1 and Complainant 2 around, and Friend 1 went with Teammate 2 into Teammate 2's room. Compl. ¶ 107. Complainant 2 walked into Plaintiff's room and gestured with her hand for Plaintiff to come in. *Id.* Complainant 1 was going to be by herself in the living room if Plaintiff went into his room with Complainant 2, so Plaintiff asked Complainant 1 if she wanted to come into his room. *Id.* Plaintiff then walked into his room and Complainant 1 freely followed. *Id.* Complainant 1 and Complainant 2 proceeded to remove their own clothes, and both engaged in sexual intercourse with Plaintiff. Compl. ¶ 108. Both Complainant 1 and Complainant 2 were active participants and asked Plaintiff to retrieve a condom before engaging in intercourse, and Plaintiff put on a new condom before he had intercourse with Complainant 1 and Complainant 2.

After the encounter, Roommate 2 came to Plaintiff's room and took a picture of the two girls in Plaintiff's room. Compl. ¶ 111. Complainant 1 immediately got up and began yelling at Roommate 2 and Plaintiff about the photo. Compl. ¶ 112. Complainant 1 then meticulously showed Plaintiff and Teammate 2 how to delete the photo from the "recently deleted" folder on the phone, clearly aware of her surroundings and in full control of her faculties. Compl. ¶ 114.

Complainant 1, apparently upset and embarrassed at her own infidelity to Teammate 1, and jealous that Plaintiff was giving Complainant 2 more attention, then left the room, stating that Plaintiff and Teammate 2 were going to think she was a "slut;" Plaintiff told her to calm down. Compl. ¶ 115-116. Complainant 1 then urged Complainant 2 to get out of Plaintiff's bed by pulling her arm and saying, "are you going to have sex with someone that just talked to me like that?"

4

Compl. ¶ 117. Complainant 1 and Complainant 2 then got into an argument, which was not uncommon in their friendship dynamic, and this argument prompted Complainant 2 to get out of Plaintiff's bed and leave. Compl. ¶ 118. Complainant 2, despite later claims of being incapacitated, was able to navigate a steep and winding back staircase out of Plaintiff's apartment, find her way back to the street, and order herself an Uber to her dorm room utilizing a smartphone application. Compl. ¶ 119. Notably, Complainant 1 chose to voluntarily stay in Plaintiff's apartment. *Id.*

Plaintiff was concerned about Complainant 2 and searched his apartment building to find her. Compl. ¶ 120. When Plaintiff could not find Complainant 2, he advised Complainant 1, Friend 1, and Roommate 2 that they needed to leave. Compl. ¶ 121. Plaintiff and Roommate 2 then drove Complainant 1 and Friend 1 back to their dorm rooms, looking for Complainant 2 to make sure that she was not walking alone on the street. Compl. ¶¶ 121-122. Friend 1 lived in the same dorm room as Complainant 2, so she took Plaintiff and Roommate 2 to Complainant 2's room to ensure that Complainant 2 made it home safely. Compl. ¶ 123. Complainant 2 was in her room, and she spoke with Plaintiff for a few minutes before exchanging phone numbers with him, upon which she texted him a heart and a kiss face emoji. Compl. ¶ 123.

When Complainant 1 arrived back at her dorm however, she was visibly upset following her argument with Complainant 2. Compl. ¶ 124. A student who lived on the same floor approached Complainant 1 in the hallway, and initially Complainant 1 said that nothing was wrong, but after being pried for information by the student, she eventually fabricated that she had been sexually assaulted by Plaintiff. *Id.* The student then called the police himself, and the police drove Complainant 1 to the hospital for a sexual assault examination. Compl. ¶¶ 124-125. When Complainant 1 was in the hospital, she texted Complainant 2 a string of text messages, claiming

that Plaintiff had sexually assaulted both of them, and eventually convinced Complainant 2 to go along with her story. Compl. ¶ 128.

On April 22, 2018, the Madison Police Department executed a search warrant of Plaintiff's apartment and informed him that the Complainants accused him of sexually assaulting them the night prior. Compl. ¶ 130. The next day, on April 23, 2018, Complainant 1's father contacted the University, alleging that Plaintiff had sexually assaulted his daughter. Compl. ¶ 131. Plaintiff retained criminal defense attorney Stephen Meyer ("Meyer") on April 27, 2018. Compl. ¶ 133.

On May 24, 2018, over one month after the alleged incident, Complainant 1 submitted a written statement to the University alleging that Plaintiff sexually assaulted her. Compl. ¶ 136. The statement contained the incorrect date of the alleged incident. *Id*. Complainant 2 did not submit a statement to the University, but rather, Hasselbacher merely showed Complainant 2 the statement that Complainant 1 wrote and asked Complainant 2 to "confirm the accuracy of the statement to the best of her recollection." Compl. ¶¶ 136-137.  Plaintiff did not receive formal notice of the allegations from the University until May 28, 2018, five full weeks after the University first became aware of the allegations against Plaintiff. Compl. ¶ 138.

On June 6, 2018, Meyer advised Defendant Hasselbacher of critical, exculpatory information obtained by law enforcement, but which was no yet available to Plaintiff, including toxicology reports, security camera footage, a forensic examination of Plaintiff's phone, and the results of the search warrant of Plaintiff's apartment. Compl. ¶ 145. Hasselbacher stated that while Plaintiff could provide relevant information to the investigation, her intention was to interview Plaintiff "when [she was] nearing the conclusion of the investigation," treating Plaintiff's statement as a mere afterthought. *Id*. Accordingly, Plaintiff requested that Hasselbacher stay the proceedings until the close of the criminal matter as the evidence obtained in that matter would be

critical to the University proceedings as well. Compl. ¶ 159. However, the University refused to stay the proceedings and continued with the investigation, despite Plaintiff's inability to fully participate in the investigation, as speaking to the University investigators would force Plaintiff to abdicate his Fifth Amendment rights in the concurrent criminal matter, the consequences of which were obviously much more serious than a University proceeding. Compl. ¶¶ 160-163.

On or around October 9, 2018, Defendant Hasselbacher issued the Final Investigative Report and provided it to the Office of Student Conduct and Community Standards for decision-making. Compl. ¶ 171. Notably, the Final Investigative Report was one-sided and created solely to garner a finding of responsibility against Plaintiff. For example, Defendant Hasselbacher felt it appropriate to attach the Dane County Criminal Court Complaint - a document that was not created by the University, was created for the express purpose of prosecuting Plaintiff, and was deliberately written to include only inculpatory evidence in order to initiate the criminal proceedings. Compl. ¶¶ 172-173. At the same time, Defendant Hasselbacher refused to accommodate Plaintiff's request to attach his Motion to Dismiss the Criminal Complaint and the accompanying documents submitted on Plaintiff's behalf in the criminal proceeding. Compl. ¶ 174. Additionally, Hasselbacher allowed the Complainants to cherry-pick evidence to be included in the report, including blatantly incomplete text message strings, but never asked the Complainants for their phone records, which would have clearly shown them collaborating on their claims and also would have undermined their version of events from the night in question. Compl. ¶ 282.

On October 30, 2018, based on the completely one-sided and deliberately skewed investigative report, Assistant Dean Ervin Cox issued a letter finding it more likely than not that Plaintiff was responsible for sexual assault and sexual harassment regarding both Complainants.

7

Compl. ¶ 177. According to the finding letter, Cox enlisted two unidentified colleagues to review and analyze the Final Investigative Report with him and reach the determination of responsibility, in violation of University Policy. Compl. ¶ 178. The matter was then referred to a hearing.

Plaintiff requested that the hearing take place during the Spring semester, rather than over winter break. Compl. ¶ 181. However, Cox stated that the Complainants did not want to wait until the Spring semester and unilaterally elevated their wishes over Plaintiff's, in direct contravention to University policy. Compl. ¶ 182. Cox then scheduled the hearing for January 15, 2019, a date on which Plaintiff's chosen advisor would not be available; Cox then refused to reschedule the hearing for a date when Plaintiff would be able to attend with his advisor. Compl. ¶ 183. Because of the University's deliberate scheduling of the hearing on a date when Plaintiff's Title IX advisor was not available, Plaintiff had to scramble to have someone else appear at the hearing with him, and ended up asking one of his criminal attorneys to step in. Compl. ¶ 185. As his counsel made clear to the Panel, however, she was not familiar with the Title IX process. Compl. ¶ 186. Further, the University, without notice, reneged on a previous agreement with Plaintiff to permit him to have a support person at the hearing separate from his advisor. Compl. ¶ 188. In sum, the University deliberately scheduled the hearing to accommodate only the girls' requests and preclude Plaintiff from receiving the assistance and support that he was promised and entitled to.

The University further hamstrung Plaintiff's defense and violated its own policies and relevant state regulations by refusing to permit his attorney to cross-examine the witnesses. Compl. ¶¶ 186-191. Instead, they directed Plaintiff's counsel to submit her questions through the hearing Chairperson, who then materially altered the questions and presented them in a way that directly instructed the Complainants on how to best answer in order to prove their claims. Compl. ¶¶ 191-

194. Additionally, throughout the hearing, Cox repeatedly cited to the Criminal Court Complaint, despite its obviously skewed and one-sided nature. Compl. ¶ 189.

As a result of the University's biased and flawed investigation and hearing, the hearing panel found Plaintiff responsible for sexual assault and sexual harassment with respect to both Complainants and Plaintiff was expelled from the University. Compl. ¶ 198. Plaintiff timely filed an appeal to Defendant Blank, however, Blank merely rubberstamped the findings of the hearing panel. Compl. ¶¶ 199-200. Plaintiff submitted a request for review to the Board, which was summarily denied. Compl. ¶¶ 201-202.

**C.    UW-Madison admits its mistake**

On August 2, 2019, after a week-long criminal trial in which Plaintiff was able to present the extensive, material, exculpatory evidence—which the University previously knew existed, but refused to wait for—Plaintiff was acquitted on all charges. Compl. ¶¶ 205-206. In fact, the evidence so plainly demonstrated Plaintiff's innocence that the jury deliberation only took a mere thirty minutes. Compl. ¶ 206.

Following the acquittal, Plaintiff petitioned the University for readmission. Compl. ¶ 208. Faced with the abundant evidence clearly demonstrating Plaintiff's innocence, and that the girls had fabricated their story entirely, Defendant Blank reversed Plaintiff's expulsion and readmitted Plaintiff to the University on August 21, 2019. Compl. ¶ 209. The University statement announcing Plaintiff's readmission expressly noted that the information that was relied upon in making the decision to readmit Plaintiff was the same evidence that the University knew existed and could have had if the University had stayed the proceedings, as Plaintiff had repeatedly requested (and as they knew directly from Taffora's conversations with the District Attorney). *Id.* However, the statement also asserted that "there were findings of responsibility of the student non-academic misconduct code that were upheld," without specifying what was reversed or what was upheld. *Id.*

9

Because of the University's wrongful findings and expulsion, based on a knowing and deliberate refusal to wait for exculpatory evidence or even attempt to question the female Complainants' credibility, Plaintiff was removed from the football team for almost eight months, severely impacting his ability to develop his skills and be in top shape for the professional recruiting season that would follow.  Moreover, even though he was acquitted in his criminal trial, the University's false and wrongful initial findings and expulsion, and its deliberately vague readmission statement asserting that Plaintiff was still responsible for violations, severely tainted Plaintiff's reputation and created hesitation in the NFL to draft him.  As a result, even though Plaintiff did ultimately re-join the football team and was drafted to the NFL, he was drafted many rounds later than scouts had initially predicted, resulting in a material loss of salary and potential lifetime earnings. Compl. ¶¶ 213-216.

## ARGUMENT

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires simply that a Complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "To state a plausible claim, a plaintiff is not . . . required to plead specific facts or details." *Mondovi Dairy Sys., Inc. Emp. Benefit Plan v. Blue Cross Blue Shield of Wisconsin*, No. 15-CV-826-JPS, 2016 WL 109965, at *3 (E.D. Wis. Jan. 8, 2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Rather, a Complaint need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Notice-pleading "does not impose a probability requirement" on the plaintiff. *Alam v. Miller Brewing Co*., 709 F.3d 662, 666 (7th Cir. 2013).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the moving party bears the burden of showing that no claim has been stated. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). In reviewing the motion, "the district court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Capitol Leasing Co. v. F.D.I.C*., 999 F.2d 188, 191 (7th Cir. 1993). In that regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Alam*, 709 F.3d at 666 (quoting *Twombly*, 550 U.S. at 556). "A complaint may not be dismissed unless it is impossible to prevail 'under any set of facts that could be proved consistent with the allegations." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (quoting *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997)). Even where "the facts a plaintiff alleges in a complaint may turn out to be self-serving and untrue," a court at the motion-to-dismiss stage "is not engaged in an effort to determine the true facts." *Doe v. Columbia Univ*., 831 F.3d 46, 48 (2d Cir. 2016). "If the complaint is found sufficient to state a legal claim, the opposing party will then have ample opportunity to contest the truth of the plaintiff's allegations and to offer its own version" through discovery. *Ibid*.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim demonstrates facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In assessing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint in the light most favorable

11

to the plaintiffs, accepting as true all well-pleaded facts, and drawing reasonable inferences in the plaintiffs' favor." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012). Thus, the court's "task is not to determine what allegations are supported by the evidence but to determine whether [Plaintiff] is entitled to relief if everything that he says is true." *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019). In the instant case, accepting the allegations in the Complaint as true and construing them in the light most favorable to Plaintiff, as this court must, he has plausibly alleged each cause of action.  Defendants' motion should be denied.

## II.   PLAINTIFF SUFFICIENTLY ALLEGES A TITLE IX CLAIM

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." Title IX may be violated by the imposition of university discipline where gender was a motivating factor. In order to state a claim under Title IX, the Plaintiff's allegations need simply to "raise a plausible inference that the university discriminated against him "on the basis of sex." *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019).[1]

As courts in the Seventh Circuit have acknowledged, "[s]uch allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Doe v.*

---

[1] While several different types/theories of Title IX claim have developed through the case law in other jurisdictions over the years, such as "erroneous outcome" and "selective enforcement", the Seventh Circuit recently rejected the notion of "superimpose[ing] doctrinal tests on the statute," holding that "All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Purdue*, 928 F.3d at 667. Defendants devote much of their brief to arguing that Plaintiff has failed to allege an "erroneous outcome" claim and analyzing cases addressing that doctrinal test. Moving Br. at 29.  However, Plaintiff has not alleged erroneous outcome here, and Defendants' entire argument to that effect is a red herring.

*Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), *aff*'d, 933 F.3d 849 (7th Cir. 2019). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 586 (E.D. Va. Mar. 14, 2018). In *Purdue*, the Seventh Circuit held that where the plaintiff alleged pressure on the school to aggressively pursue sexual misconduct claims against men, coupled with evidence of procedural flaws and unsupported, biased decision-making in his specific disciplinary process, those allegations collectively sufficed to state a claim for relief. *Doe v. Purdue Univ.*, 928 F.3d at 670.

In this case, Plaintiff sufficiently and plausibly alleges that he was discriminated against by UW-Madison on the basis of sex.  Specifically, he alleges: (i) UW-Madison was under pressure from both the federal government and the student body to aggressively pursue sexual assault claims made by women against men, and to protect female students from male students (Compl. ¶ 283); (ii) UW-Madison officials publicly embraced and perpetuated gender stereotypes that women are victims of sexual assault and men are perpetrators (*Id.*); (iii) Defendants violated UW-Madison policy in a way that consistently favored the female complainants and prejudiced Plaintiff as the male accused (Compl. ¶ 285); (iv) Defendants took the female students' claims at face value and made no effort to question their credibility – to the contrary, UW-Madison constructed its "investigation" and adjudication in a way designed to support and bolster the female students' claims and railroad Plaintiff (such as showing Complainant 2 Complainant 1's statement and asking her to confirm it, rather than interviewing Complainant 2 and assessing the consistency of their stories) (Compl. ¶ 283); (v) UW-Madison knew that there was relevant, exculpatory evidence that would be available at the close of Plaintiff's criminal trial but refused to wait and deliberately plowed forward on a one-sided and deficient record in order to find Plaintiff responsible and prove

its dedication to protecting female students on campus (Compl. ¶ 282); and (vi) Plaintiff was actually innocent, as demonstrated by the exculpatory evidence that eventually resulted in his readmission (*Id.*).  Plaintiff amply alleges a Title IX violation and Defendants' motion should be denied.

In their brief, Defendants misleadingly and dishonestly cherry-pick from Plaintiff's allegations and mischaracterize many of the claims in an attempt to escape the reality that Plaintiff plausibly alleges gender bias in accordance with relevant precedent. By way of example, Defendants attempt to isolate the alleged facts in the Complaint and then claim that each one *standing alone* is insufficient to allege gender bias. This effort to isolate and mischaracterize Plaintiff's allegations is fundamentally flawed: Plaintiff's allegations cannot be taken in a piecemeal fashion, but rather, must be taken as a whole. Moreover, the Complaint must be evaluated based on the actual allegations as written, which are presumed to be true and interpreted in the light most favorable to Plaintiff—not based on Defendants' distorted and factually inaccurate interpretations of the allegations. Taken in its entirety, Plaintiff's Complaint more than satisfies the Seventh Circuit standard for stating a plausible Title IX claim.

### A.   The investigation was skewed against Plaintiff as a male accused and in favor of the female accusers, despite Plaintiff's actual innocence

As courts routinely recognize, a plaintiff may cast articulable doubt on the outcome of a university sexual misconduct proceeding in a number of ways, including but not limited to: pointing out procedural flaws in the investigatory and adjudicative process; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Doe v. Marymount U.*, 297 F. Supp. 3d at 584; *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). A university's denial of the opportunity for cross-examination in

a case where credibility is at stake is also a fact sufficient to cast articulable doubt on the accuracy of the outcome. *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018).

Defendants incredibly attempt to claim that the only fact Plaintiff alleged casting doubt on UW-Madison's findings was the fact that he was precluded from testifying at the disciplinary proceedings pending the outcome of the criminal trial, stating "[e]ven if this fact *alone* was sufficient to cast doubt on the accuracy of the initial findings…" (emphasis added). However, it is clear that Plaintiff sets forth a myriad of both procedural and substantive flaws which cast doubt on the accuracy of UW-Madison's decision finding him responsible for sexual assault. By way of example, and not limitation: (i) deeming the Complainants' stories as credible from the beginning and failing to ask adequate questions going to credibility; (ii) giving more weight to the Complainants' stories in the final analysis and finding of responsibility; (iii) relying on inconsistent, hearsay statements from the Complainants; (iv) asking Complainant 2 to corroborate Complainant 1's initial statement instead of asking Complainant 2 for her own statement; (v) failing to take into consideration the timing of the complaint and motivations of the Complainants to make false statements; (vi) only collecting evidence which the Complainants deemed significant, allowing Complainants to cherry-pick evidence to submit, and failing to independently seek out relevant evidence; (vii) failing to apply the presumption of innocence, and instead, presuming Plaintiff guilty from the start; (viii) drawing adverse conclusions against Plaintiff for not testifying at the hearing, while not drawing adverse conclusions against Complainants for failing to hand over relevant evidence; (ix) including the one-sided Criminal Court Complaint in the Final Investigative Report, while not including Plaintiff's motion to dismiss; (x) complying with the Complainants' wishes in scheduling a hearing date, thereby denying Plaintiff of the advisor of his choice; (xi) Hasselbacher's clear conflict of interest; (xii) failing to interview

15

Plaintiff for four months, despite having spoken to the Complainants; and (xiii) the Chairperson's refusal to permit Plaintiff's advisor to cross-examine the Complainants at the hearing, instead forcing Plaintiff to submit his proposed questions and then manipulating them in ways that changes the meaning and purpose of the questions and clearly indicated to Complainants the best way to answer to support their (false) claims. Compl. ¶ 282. And of course, UW-Madison's own reversal of Plaintiff's sanction and some of the findings makes it quite evident that UW-Madison reached the wrong outcome in the fist place, and not only that, but ***acknowledged that its original outcome was not correct***. Compl. ¶ 209. Defendants' attempt in their moving papers to claim that Plaintiff did not sufficiently allege a wrongful finding, when UW-Madison itself acknowledged that the original findings were wrongful, is nothing short of absurd.

Defendants also assert that "the initial outcome of the disciplinary hearing can only be attributed to [Plaintiff's] conscious decision not to provide testimony or evidence." Moving Br. at 30. As an initial matter, Defendants improperly attempt to assert facts not in the pleadings by assuming that Plaintiff even *had* possession of evidence that could have been provided to the University prior to the close of the investigation, which is a false statement. *See* Declaration of Quintez Cephus, dated June 4, 2021, enclosed herewith ("Cephus Decl.") ¶ 16. At the motion to dismiss stage, such an argument is unavailing. Moreover, by making this argument, Defendants again *admit* that the initial outcome was erroneous. While Defendants state numerous times that Defendant has "pled himself out of court," Defendants themselves cannot even sidestep their own wrongdoings. By overturning the initial expulsion and reinstating Plaintiff as a student at the University, Defendants themselves admitted that their flawed investigation and proceedings resulting in a wrongful, erroneous finding of responsibility.

Additionally, Defendants claim that Plaintiff's allegations regarding Defendant Hasselbacher, the lead investigator on Plaintiff's case, serving as a women's advocate is immaterial. In the same breath, Defendants claim that Plaintiff pleads no facts demonstrating gender bias "in his specific case." Defendants miss the mark completely. In his Complaint, Plaintiff alleges that Hasselbacher (i) had a dual role, which included ensuring that the University was Title IX compliant; and (ii) had a background in Women's Studies and extensive career experience as an advocate for female victims of sexual assault and domestic violence. Hasselbacher's past experience, combined with her motivation to accept as true any complaints brought by female students as UW-Madison's Title IX Coordinator, caused her to view the evidence through a gender-biased lens.

As alleged in the Complaint, gender bias can be inferred from the actions of Hasselbacher during the investigation, including, but not limited to: (i) Hasselbacher immediately issued a no contact order between Plaintiff and the Complainants after receiving the allegations from Complainant 1's father and before speaking to the Complainants or notifying Plaintiff of the allegations against him (Compl. ¶¶ 131-134); (ii) Hasselbacher waited five weeks after receiving the allegations to notify the Plaintiff (Compl. ¶ 138); Hasselbacher failed to collect individual statements from the Complainants prior to issuing the notice of charge, but rather only showed Complainant 2 the statement written by Complainant 1 and asked her to "confirm the accuracy of the statement" (Compl. ¶ 137); (iii) Hasselbacher refused to acknowledge the fact that there would be critical exculpatory evidence available to her at the close of the criminal matter and refused to stay the proceedings until such evidence became available (Compl. ¶¶ 144-147); (iv) when she did proceed forward with the investigation, Hasselbacher waited nearly four months to interview Plaintiff, treating his testimony as a mere afterthought compared to those of the female

17

Complainants (Compl. ¶ 160); (v) Hasselbacher allowed the Complainants to cherry-pick what evidence and text messages to hand over and failed to question the Complainants regarding the text messages that were clearly missing; and (vi) Hasselbacher chose to include the one-sided Criminal Complaint Form in the Final Investigative Report but refused to include Plaintiff's Motion to Dismiss the Criminal Complaint as well. Compl. ¶¶ 172-174.

Defendants attempt to minimize Hasselbacher's background, but the fact of the matter is that throughout the investigation, Hasselbacher's actions were tainted by her background as a women's advocate, and her experience precluded her from conducting an adequate, impartial investigation. Instead, Plaintiff was presumed guilty from the start as a male accused. Hasselbacher's conflict of interest was therefore far from merely being "pro-victim" and instead favored the female complainants from inception of the complaint. Accordingly, Hasselbacher's background as a women's advocate contributed to a gender-biased investigation and a wrongful finding of responsibility. *See Doe v. Syracuse*, 2019 WL 2021026 at **7**-8 (N.D.N.Y. May 8, 2019).

Contrary to Defendants' assertion, there is more at issue here than Plaintiff's *single* contention that he was not able to speak at the university disciplinary hearing in light of the parallel criminal trial. As set forth above, there were numerous alleged flaws in the investigation and adjudication that Defendants again choose to ignore in an attempt to mislead the Court and misstate the allegations in the Complaint. Given the multitude of allegations set forth in the Complaint, Plaintiff has satisfied if not exceeded showing an articulable doubt in the outcome of the proceeding.

### B.   Defendants' gender-biased statements and endorsements

Throughout their brief, Defendants ignore huge swaths of Plaintiff's detailed factual allegations and instead focus on a small number of self-serving claims in an attempt to mislead the

Court. However, Defendants cannot merely choose the allegations that suit them and demand dismissal by ignoring the rest of the substance of the pleadings.

In reality, Plaintiff's Complaint sets forth numerous gender biased statements made and/or condoned by Defendants, including but not limited to: (i) UW-Madison Police Department's campus-wide "Don't Be That Guy" campaign, painting males, and only males, as perpetrators of sexual assault (Compl. ¶ 72); (ii) Defendant Blank's public support and endorsement of the "Don't Be That Guy" campaign in the Task Force Report (Compl. ¶ 73); (iii) UW-Madison's sexual misconduct training which featured "re-enactment" videos that portrayed only males as perpetrators of sexual assault (Compl. ¶ 79); (iv) Defendant Blank's statement in the Task Force Report in the recommendations section, which stated, "Addressing potential perpetrators must remain a priority. Continue to engage *men* as allies to prevent gender-based violence." (Compl. ¶ 73) (v) statements from Sam Johnson, the head of the UW-Madison violence prevention program, indicating that males are the perpetrators of sexual assault (Compl. ¶ 89); and (vi) UW-Madison's formation of a six-week educational program for males only, to understand their masculinity in order to prevent sexual violence (Compl. ¶ 90).

These are precisely the type of statements by "pertinent" university officials that support a claim of gender bias. *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019); *see also Yusuf v. Vassar College*, 35 F.3d at 715. Moreover, these statements embracing and endorsing gender bias and gender-based views on complainants and respondents were made by UW employees who were directly involved in *Plaintiff's specific case*. For example, Defendant Blank *decided Plaintiff's appeal*. (Compl. ¶ 199). Blank condoned the notions that males are the perpetrators of sexual assault and have to be educated as to how to prevent sexual misconduct and violence, and even explicitly recommended that males be the target

of such sexual misconduct training. From Defendant Blank's statements and actions, as well as the trainings and campaigns across campus, it can be reasonably inferred that the procedures put in place were effectuated with a gender-biased motive against male respondents and that Plaintiff's case specifically was infected by gender bias.

### C.   UW Was Under Pressure to Favor and Protect Female Students and Aggressively Prosecute and Punish Male Students.

Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students by over-correcting, provides a "backdrop" for gender bias. *Baum*, 903 F.3d at 586-587 (external pressure combined with hearing board's credibility determinations in favor of females raised plausible inference of gender bias); *see also Neal v. Colorado State Univ.-Pueblo*, No. 16-CV-873 (RM) (CBS), 2017 WL 633045, at *12 (D. Colo. Feb. 16, 2017) (allegations that university under OCR pressure to enforce "Dear Colleague Letter" in a gender-skewed manner sufficient to plead gender bias); *Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017) (plausible inference of gender bias where *inter alia* university faced pressure to zealously "prosecute" male respondents after facing lawsuit by female student); *Columbia U.*, 831 F.3d at 58 (gender bias inferred where university was motivated to accept female accusation of sexual assault and reject male's claim of consent to avoid further public criticism that it did not protect female students). As detailed below, taking the allegations of the Complaint as true, and drawing all reasonable inferences in Plaintiff's favor, the totality of the circumstances alleged in the Complaint raise a plausible inference that the outcome of Plaintiff's disciplinary proceeding was motivated by gender bias. *See Doe v. Washington & Lee U.*, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015).

As stated by the Seventh Circuit, the 2011 DCL "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim." *Doe v. Purdue Univ.*, 928 F.3d at 669). Likewise, Plaintiff's Complaint describes in great detail how the 2011 DCL effectively required colleges and universities, including UW-Madison, through the threat of cutting off federal funding, to adopt disciplinary procedures for sexual misconduct allegations that minimized the rights of respondents and focused on victim advocacy, specifically addressing the need to protect *women and girls*. (Compl. ¶¶ 24-50). In the Complaint, Plaintiff alleges that: (i) the 2011 DCL sounded a "call to action" grounded in the unfounded statistic that 1 in 5 women are victims of completed or attempted sexual assault while in college (Compl. ¶ 27); (ii) relying on this false statistic, the DCL minimized due process protections for the accused (Compl. ¶ 28); and (iii) the White House subsequently issued a report that also relied on the false statistic and focused on protecting *women* from sexual assault (*Id.*). These are the very same type of allegations that the Seventh Circuit found relevant and supportive of gender bias in *Purdue*.

Defendants rely heavily on the Seventh Circuit decision in *Johnson v. Marian Univ.*, 829 F. App'x 731 (7th Cir. 2020); however, that case is clearly distinguishable. First, *Johnson* was not decided on a motion to dismiss, but rather occurred at the *summary judgment* stage of the proceedings. Moreover, the court in *Johnson* explicitly stated that it had acknowledged that "this sort of background can be relevant for assessing Title IX sex discrimination claims." *Johnson v. Marian Univ.*, 829 F. App'x at 732. Defendants cite the fact that a plaintiff "cannot rely on such generalized information *alone*," and attempt to claim that such is the case here. By doing so, Defendants attempt to manipulate the information before the Court. Plaintiff does not rely *only* on the DCL or threat of losing funds, but rather, uses it as support for Plaintiff's Title IX claim in a

section *clearly* entitled "background" *in addition to* Plaintiff's myriad particularized allegations. These are precisely the types of allegations found sufficient to state a Title IX claim in by the Seventh Circuit in *Purdue*.

Defendants' assertion that Plaintiff's use of the DCL to support an inference of gender bias has been "flat out rejected" is a misstatement of the law – in fact, the opposite is true. Accordingly, Defendants' argument regarding the 2011 DCL fails.

By way of further background and evidence of UW-Madison's motive to skew the disciplinary process in favor of women and against men, Plaintiff also alleges that: (i) four female students filed separate OCR complaints against UW-Madison from 2015 to 2016 claiming that the University failed to adequately respond to their allegations of sexual misconduct against a male student (Compl. ¶ 47); (ii) while the OCR investigations were underway in 2016, OCR investigators attended on-campus events and directly engaged with students to assess the University's compliance and consequently assess the University's eligibility for federal funding (Compl. ¶ 49); and (iii) at least three of the OCR investigations remain pending to date (Compl. ¶ 50).

Plaintiff further alleges: (i) throughout 2015 and 2016, student advocacy groups criticized the University for a "lack of follow-through" on complaints of sexual assault and called for increased expulsions for perpetrators of sexual assault (Compl. ¶ 76); (ii) in response, the University implemented an online training, which raised awareness for *men e*specially to take steps in preventing sexual assault (Compl. ¶¶ 78-79); (iii) Only after immense female student outrage and newly implemented training focused on men did the University hire Hasselbacher as its Title IX Coordinator in 2017 (Compl. ¶ 83); and (iv) the UW Police launched a campaign aimed at male students called "Don't Be That Guy" to raise awareness surrounding sexual assault.

The allegations set forth above clearly allege that UW-Madison was pressured to take an aggressive stance against males accused of sexual misconduct in order to avoid a potential loss of federal funding or prosecution and repair its reputation for failing to adequately respond to allegations of sexual assault against males. As further alleged in the Complaint, Plaintiff was used as a scapegoat by the University to demonstrate in a high-profile way its commitment to aggressively pursuing allegations of sexual assault against males. Compl. ¶ 1.

These precise types of allegations have been held sufficient to preclude dismissal under Rule 12. As the Second Circuit has made abundantly clear,

> [W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination.... [W]here a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a prima facie case of sex discrimination.

*Menaker v. Hofstra Univ.,* 935 F.3d 20, 33 (2d Cir. 2019); *See also, e.g., Columbia*, 831 F.3d at 57 ("[I]t is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."); *Miami Univ.*, 882 F.3d at 593 (allegations "showing a potential pattern of gender-based decision-making"); *Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374, at *12 (D.N.J. Nov. 17, 2016), *adhered to on denial of reconsideration*, No. CV 16-471 (KM) (JBC), 2017 WL 1508177 (D.N.J. Apr. 25, 2017), *and aff'd in part, remanded in part*, 699 F. App'x 129 (3d Cir. 2017) ("[I]t is no more than a commonsense inference that the public's and the

policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight."); *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 416 (N.D.N.Y. 2019) ("[A] reasonable inference could be drawn that the Investigator, the University Conduct Board, the Appeals Board, and other University officials were motivated to appease OCR by siding with Roe ... ."); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1210-11 (M.D. Fla. 2019) (investigation "amidst a clamor of public and campus scrutiny over its treatment of sexual assault complaints by female students" created "circumstantial evidence of bias"); *Doe v. Amherst Coll.*, 238 ~.Supp.3d 195, 223 (D. Mass. 2017) (allegations that university was trying to "appease" a biased, student-led movement); *Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336, 1340-42 (S.D. Fla. 2017) (allegations that university was reacting to "pressure from the public and the parents of female students" to punish males); *Neal v. Colorado State Univ.-Pueblo*, 2017 WL 633045, at *14 (D. Colo. Feb. 16, 2017) (allegations of "gender-skewed implementation of the 2011 DCL, pressure to avoid DOE investigation and loss of federal funding, procedural shortcomings," and Title IX employee bias); *Doe v. Washington & Lee Univ.*, No. 14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university's disciplinary procedures amount to "a practice of railroading accused students," combined with pressure from the OCR and involvement of potentially biased employee in disciplinary process); *Wells v. Xavier Univ.*, 7 F.Supp.3d 746, 751 (S.D. Ohio 2014) (allegations suggested that university was "reacting against him[ ] as a male" in response to a Department of Education investigation).

### D. Defendants employed a gender biased, trauma-informed approach

Defendants also attack Plaintiff's allegation that the University employed a trauma-informed approach throughout the investigation and adjudication of the claims against Plaintiff, asserting that it falls under the umbrella of "pro-victim" bias, but not gender bias. However,

Defendants cite virtually no supporting case law for their assertion. Moving Br. at 32-33.  To the contrary, many courts have recognized trauma-informed approaches to investigations give rise to an inference of gender bias. *See*; *Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1013 (D. Colo. 2019) at 1013; *Doe v. Syracuse Univ.,* No. 5:19-CV-1467 (TJM) (ATB), 2020 WL 2513691, at *9 (N.D.N.Y. May 15, 2020).

Defendants' argument that their actions were, if anything, pro-*victim* rather than pro-*female*, is unavailing. First, if the procedures have a pro-victim bias, they are not neutral and impartial; second, the repeated presumption at UW-Madison, as pleaded in Plaintiff's Complaint, is that females are the "victims" and males are the "perpetrators." (Compl. ¶ 79). As such, Defendants' victim-centered process is, in reality, biased against males and in favor of females. Moreover, Defendants' distinction between pro-victim and pro-female bias is nothing more than a hypothesis, which requires this court to view the facts in the light least favorable to Plaintiff; to wit, the Defendants are essentially conceding that there was evidence of bias but asking this court to conclude that the bias was based upon a permissible, non-protected class rather than a protected class. That is not the standard on a Rule 12 motion. Further, while some courts have, in the past, embraced this unfounded argument, its continued viability is highly questionable. *See e.g. Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado,* 255 F. Supp. 3d 1064, 1076 (D. Colo. 2017) ("if enforcement officials are regularly presented with a scenario involving the same two potential classifications—nurse and female, taxi driver and ethnic minority, sexual assault suspect and male—there must come a point when one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally."). Moreover, the continued viability of the "anti-respondent, but not anti-male" "distinction" is dead in the water in light of the recently revised Title IX regulations,

which expressly prohibit bias in favor of "complainants" generally as such is considered by the Department of Education to be indicative of gender-bias. *See* 34 C.F.R. § 106.45(b)(8) (prohibiting the "decision-maker" from having "a conflict of interest or bias for or against complainants or respondents generally").

Defendants cite *Johnson* for the proposition that a trauma-informed approach demonstrates a pro-victim bias, but not gender bias. Moving Br. at 33. However, Defendants' argument is inapposite. *Johnson* at no point discussed a trauma-informed approach to the investigation, but rather merely dealt with specific statements made by a university official that used the word "violation" rather than "allegation" when discussing the allegations with the respondent. *Johnson v. Marian Univ.*, 829 F. App'x 731, 733 (7th Cir. 2020). Defendants once again fail to support their argument with adequate case law, failing to meet their burden and mandating denial of their motion.

## III.   PLAINTIFF PLAUSIBLY ALLEGES A STIGMA-PLUS DUE PROCESS <u>VIOLATION</u>

To state a stigma-plus claim, a plaintiff must show "that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held," without due process of law. *Doe v. Purdue Univ.*, 928 F.3d at 661. "[W]hen a state actor casts doubt on an individual's 'good name, reputation, honor or integrity,'" and such reputational harm impeded the individual's "liberty interest to pursue the occupation of his choice." that plaintiff has a stigma-plus claim. *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (quoting *Townsend v. Vallas,* 256 F.3d 661, 669 (7th Cir. 2001).

In *Purdue*, the Seventh Circuit held that the plaintiff student sufficiently stated a stigma-plus claim when he alleged that he was wrongfully found responsible for sexual misconduct, expelled from school, and the school disclosed its finding to the ROTC, thereby impacting his

ability to pursue a career in the navy. *Purdue*, 928 F.3d at 662–63 ("After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year.  And it was this official determination of guilt . . . that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it. John has satisfied the 'stigma plus' test." (citations omitted)).

In the instant case, Plaintiff alleges that he was wrongfully found responsible for sexual assault, expelled from UW-Madison without due process, and that such expulsion and the University's subsequent public statements affirming that Plaintiff was responsible for sexual misconduct even after being readmitted, collectively deprived him of his liberty interest in his good name, reputation, and career. Compl. ¶ 243.  In accordance with Seventh Circuit precedent, this is sufficient to state a claim for relief.

Contrary to Defendants' assertions, Plaintiff has sufficiently alleged a due process violation. Defendants spend a considerable amount of time mischaracterizing Plaintiff's claims and arguing against a procedural due process claim that Plaintiff never made. Instead, Plaintiff's claim falls under, and satisfies, the "stigma plus" test.

### A.      Defendants Expelled Plaintiff Without Due Process.

As a result of UW-Madison's investigation, Plaintiff faced severe sanctions, including expulsion, and was, therefore, entitled to heightened due process protections. Disciplinary proceedings require more stringent procedures because, unlike academic proceedings that involve qualitative evaluations, disciplinary proceedings "bear a reasonable resemblance to traditional judicial and administrative factfinding." *Allahverdi v. Regents of University of New Mexico*, 2006

WL 131380 at *14 (D.N.M. Apr. 25, 2006). *See also Neal*, 2017 WL 633045 at **24 ("Due process for disciplinary proceedings is more extensive than for academic decisions").

Procedural due process requires, at a minimum, notice and an opportunity to be heard. *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976). Whether or not due process has been afforded depends on the facts and circumstances of the particular case. "Higher courts consistently admonish that due process jurisprudence cannot be applied woodenly." *Neal*, 2017 WL 633045 at **25 (D. Co. Feb. 16, 2017) (collecting cases). Whether the State has provided sufficient procedures is determined by balancing the competing interests involved: (i) the private interest affected by the official action; (ii) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (iii) the State's interest including any fiscal and administrative burden. *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013). Defendants do not address these factors in their motion to dismiss and as such they fail to meet their burden.

Where, as here, a plaintiff faces disciplinary action that carries significant long-term consequences—such as suspension or expulsion—then his private interest is "exceptionally robust" compared to the burden on the State in providing adequate due process protections. *Neal*, 2017 WL 633045 at **19-20. Here, as a result of being accused of sexual misconduct, Plaintiff faced the possibility of a long-term suspension or expulsion as an outcome of the University's investigation. In fact, Plaintiff was expelled from the University and suffered a change in legal status as a result. *See Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019). For these reasons, Plaintiff had an "exceptionally robust" interest, as compared to the University's, which warranted heightened due process protections.

Plaintiff alleges that his right to due process was violated when:

    a.    Defendants denied Plaintiff a meaningful opportunity to be heard, as Hasselbacher deliberately waited until Plaintiff was hamstrung by the parallel criminal investigation to invite him for an interview;

    b.    Defendants denied Plaintiff an opportunity to be heard by refusing to stay the hearing in light of the pending parallel criminal prosecution, essentially punishing Plaintiff for exercising his Fifth Amendment privilege and forcing him to choose between his Fifth Amendment right and his ability to participate in UW's process;

    c.    Defendants denied Plaintiff a meaningful opportunity to present evidence in his own defense, as they knew that substantial, relevant, exculpatory evidence would be available after the criminal trial, but deliberately forged ahead without this evidence;

    d.    Defendants denied Plaintiff a meaningful opportunity to be heard and violated his rights as clearly established by Chapter 17 to have his advisor cross-examine the witnesses at his hearing;

    e.    Defendants denied Plaintiff an opportunity to be heard by a neutral arbiter, as the hearing board members went out of their way to rephrase Plaintiff's proposed cross-examination questions in ways that changed their meaning and were improperly beneficial to Complainants;

    f.    Defendants denied Plaintiff an opportunity to be heard by a neutral arbiter, as Dean Cox invited two unidentified individuals to interfere with the decision-making process, ultimately sending the case out for a hearing based on the opinions of undisclosed and potentially biased/conflicted individuals.

Compl. ¶ 266.

Overall, Defendants deprived Plaintiff of his basic due process rights throughout the investigation and adjudication of the Complainants' complaints, including but not limited to, his right to a fair adjudication, his right to a meaningful opportunity to be heard, his right to be heard

by an impartial factfinder, to question his accuser, and to challenge the credibility of his accuser and other adverse witnesses. *Id*.

**B.      Defendants Disclosed Information That Harmed Plaintiff's Reputation.**

Contrary to Defendants' assertion, Defendants did disclose information regarding Plaintiff's disciplinary process. "The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010).

Here, the University published an entire standalone public statement surrounding Plaintiff's disciplinary matters on August 19, 2019. The statement explained that Plaintiff's expulsion was being lifted, but that *there were still findings of the student non-academic misconduct code that were upheld*. This statement was posted online and was emailed to the entire student population. The statement can still be found online to this day. Through this publication, the fact that Plaintiff had been found responsible was projected not only to the entire University, but also to the nation at large. Given the context of the proceedings, the University's statement and lack of clarification as to what charges were upheld and what charges were vacated, can be reasonably understood to lead the public to the conclusion that Plaintiff, despite the lifted expulsion, had *still* been found responsible for sexual assault and/or sexual harassment. *See Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10 (1980) (stating that the proper inquiry is "whether a communication is capable of a defamatory meaning.").

Defendants publicly disclosed information to the nation regarding the sexual assault finding for which Plaintiff was originally expelled. Therefore, Plaintiff has satisfied the disclosure requirement of the stigma-plus claim.

### C.   Defendants' Actions Interfered with Plaintiff's Liberty to Pursue the Career of His Choice

Defendants claim that because Plaintiff is employed with the National Football League, he has failed to demonstrate a deprivation of his career interests. However, Defendants in this argument downplay the *millions of dollars* that Defendants' actions caused him. A second-round draft pick versus a fifth-round draft pick are essentially entirely different careers when it comes to career earnings. Defendants seek to hide behind the curtain that they readmitted Plaintiff and made everything better. However, they fail to acknowledge that by the time Plaintiff was back playing football for the 2019-2020 season, the damage to Plaintiff's future had already been done.

The Seventh Circuit has noted that the Defendants' actions must have "had the effect of blacklisting the employee from employment in comparable jobs." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001). "In such cases, the employee's good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field." *Id.*

The word "virtually" is used as a modifier for the word "impossible." Defendants seem to argue that employment conclusively precludes a stigma plus claim. However, if that was the case, the Court would have merely used the word impossible. According to Merrian-Webster, virtually, by definition, means "almost entirely; NEARLY." *Virtually*, *Merriam-Webster Online* (emphasis in original). Clearly, there is a *possibility* that the Plaintiff will be able to obtain employment, albeit not necessarily likely. Hence, the fact that Plaintiff did obtain employment does not summarily preclude Plaintiff's claim as Defendants appear to suggest.

Plaintiff, in his Complaint, cites numerous articles about the impact of sexual assault allegations on the ability of a collegiate athlete to get drafted in the NFL draft. Domestic abuse or sexual assault allegations, especially *uncleared* sexual assault allegations as a result of the

31

University's public statement, undoubtedly have the effect of blacklisting the athlete. By way of example and not limitation, Plaintiff cites articles demonstrating that: (i) a projected third-round draft pick went undrafted due to sexual assault allegations; (ii) after Sean Oakman's sexual assault allegations, regardless of whether the allegations were false or if he was acquitted, "teams still look at him as a bad apple and nobody really wants that in an organization"; and (iii) one projected top-15 draft pick went undrafted after being questioned by the police in connection to the murder of his ex-girlfriend, even though he was not a suspect. Compl. ¶ 233 n.8.

Accordingly, while Plaintiff was able to obtain employment, it was highly against the odds and indeed, *virtually* impossible. Even when Plaintiff did obtain employment, however, it was at the cost of millions of dollars. But for the University's wrongful expulsion of Plaintiff, depriving him of months of practice and games with the football team, and its subsequent public statement indicating that Plaintiff was still guilty of sexual misconduct, Plaintiff would have been drafted in an earlier round, and would have had the opportunity to make millions of dollars more. However, Plaintiff was essentially blacklisted from this opportunity and was drafted in the fifth round, only due to his extraordinary talent. Plaintiff was deprived of millions of dollars at the hands of UW-Madison. The University's wrongful expulsion and dissemination of the allegations and findings against Plaintiff forced him to be virtually untouchable by NFL scouts and viewed as a "bad apple" that many teams did not want to associate with due to stigma that sexual assault findings carry.

### D.     The Individual Defendants Are Not Entitled to Qualified Immunity.

Applying the well-established rule of *Ex Parte Young*, 209 U.S. 123 (1908)—that the Eleventh Amendment permits suits against state officers for prospective injunctive relief—the Eleventh Amendment is no bar to a student's claim against state university officials for the vacating of disciplinary records after being found guilty of sexual misconduct through proceedings

that violated due process. *See Doe v. Cummins*, 662 F. Appx. 437, 444 (6th Cir. 2016) ("Because Doe I and Doe II are seeking prospective equitable relief, their claims are not barred by the Eleventh Amendment. . . . If successful, . . . the individual defendants would merely be compelled to remove the negative notation from appellants' disciplinary records that resulted from the allegedly unconstitutional disciplinary process."); *see also Doe v. Purdue Univ.,* 928 F.3d 652, 666-67 (7th Cir. 2019) (student found guilty of sexual assault through procedures allegedly violating due process could sue for an "injunction ordering university officials to expunge the finding of guilt from his disciplinary record"); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (negative entries in a student's university records presented a continuing violation sufficient to overcome Eleventh Amendment immunity); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (request to expunge grade from record is not barred by Eleventh Amendment); *Doe. v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1081-82 (D. Colo. 2017) (Eleventh Amendment does not bar student alleging due process violations in sexual misconduct proceedings from seeking an order that his "disciplinary record be expunged" and that "any and all records pertaining to the investigation be destroyed"); *Cf. Cannon v. Bernstein*, 2013 U.S. Dist. LEXIS 141865 (E.D. Mich. 2013) (inmate's claim for "expungement of his disciplinary file" was "not barred by the Eleventh Amendment"); *see also MSA Realty Corp. v. State of Ill.,* 990 F.2d 288, 291 (7th Cir. 1993) ("Under *Young)*, state officials may be sued in their official capacities for injunctive relief, although they may not be sued for money damages.").

Likewise, the Eleventh Amendment does not bar Plaintiff's damages claims against the individual Defendants in their personal capacities. *See MSA Realty Corp. v. State of Ill.,* 990 F.2d 288, 291 (7th Cir. 1993) at 291 ("the federal courts may exercise jurisdiction over suits alleging violations of federal constitutional or statutory law that are brought against state officials in their

personal capacities.); *see also Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991) ("Personal-capacity suits raise no eleventh amendment issues…"). *See also Mutter v. Rodriguez*, 700 F. App'x 528, 530 (7th Cir. 2017) (Eleventh Amendment "does not bar suits against state officials if they are sued in their official capacities for 'prospective equitable relief' to remedy 'ongoing violations of federal law,' or in their individual capacities for damages under 42 U.S.C. § 1983." (citation omitted)).  Thus, Defendants' Eleventh Amendment arguments must be rejected in full.

## IV.   THERE IS NO BASIS TO DISMISS PLAINTIFF'S STATE LAW CLAIMS WITH PREJUDICE

Defendants argue that Plaintiff's state law claims are barred because he has not presented them to the Wisconsin Board of Claims first. Moving Br. at 33. However, the statute cited by Defendants, Wis. Stat. § 16.007, has no time limit, and as such, Plaintiff can yet bring his state law claims upon completion of the claim presentation process in accordance with § 775.01. In fact, Plaintiff has already begun that process. *See* Declaration of Stuart Bernstein, dated June 7, 2021, enclosed herewith ("Bernstein Decl.") ¶ 5. Accordingly, Plaintiff respectfully submits that if this Court does find the state law claims to be unripe as a result of not completing the claim submission process set forth in Wis. Stat. § 16.007, the claims should be dismissed *without* prejudice and with leave to re-plead upon Plaintiff's compliance with the statute.

> Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182, (1962) (citation omitted); *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 522 (7th Cir. 2015).

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss the Complaint. Should this Court dismiss any of the claims in the Complaint, Plaintiff should be granted leave to amend.

Dated: June 7, 2021

<div style="margin-left:40%">

**Respectfully submitted,**

**Nesenoff & Miltenberg LLP**
***Attorneys for Plaintiff Quintez Cephus***

By: /s/Andrew T. Miltenberg, Esq.
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Adrienne Levy, Esq.
Kristen Mohr, Esq.
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
alevy@nmllplaw.com
kmohr@nmllplaw.com

**Gimbel, Reilly, Guerin & Brown, LLP**
***Attorneys for Plaintiff Quintez Cephus***
By: /s/Jason D. Luczak, Esq.
Jason D. Luczak, Esq.
330 E Kilbourn Ave
Suite 1170
Milwaukee, WI 53202
414-271-1440 (telephone)
414-271-7680 (fax)
jluczak@grgblaw.com

</div>