IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUINTEZ CEPHUS,

                          Plaintiff,                          OPINION AND ORDER

        v.                                                    21-cv-126-wmc

REBECCA BLANK, LAUREN HASSELBACHER
and BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

                          Defendants.

Plaintiff Quintez Cephus, a former student at the University of Wisconsin-Madison, sued the university (through its Board of Regents) and two university officials, claiming that they violated his rights by expelling him after an investigation into sexual assault allegations made against him by a fellow student. Defendants have filed a motion to dismiss all of Cephus's claims. (Dkt. #9.) In response, Cephus concedes that he failed to satisfy state statutory requirements for bringing his state-law claims, so those claims must be dismissed without prejudice.[1] The court will also dismiss Cephus's due process claims because he fails to allege that he was deprived of a liberty interest protected by the U.S. Constitution. However, the court will deny the motion to the extent it seeks to dismiss Cephus's claim under Title IX of the Education Amendments of 1972, because his allegations are sufficient to state a plausible sex-discrimination claim under Title IX.

---

[1] Specifically, Cephus did not present his breach of contract claim to the Wisconsin Board of Claims before filing this lawsuit as required by Wis. Stat. § 16.007, and he failed to file a notice of claim with the attorney general before raising his estoppel claims as required by Wis. Stat. § 893.82.

BACKGROUND[2]

**A. Sexual Assault Allegations**

In April 2018, plaintiff Quintez Cephus, a UW-Madison student and member of the UW football team, had a sexual encounter with two other UW students (Roe 1 and Roe 2). Cephus says that the encounter was consensual, but both Roe 1 and Roe 2 accused Cephus of sexually assaulting them while they were incapacitated by alcohol and unable to provide consent. A friend of Roe 1 reported the alleged sexual assault to the Madison Police Department, and Roe 1's father reported it to the University. Defendant Lauren Hasselbacher, the Title IX coordinator at UW-Madison, notified the UW Athletic Department of the allegations, and within three days of the sexual assault being reported, Cephus was suspended from the football team and subjected to no-contact orders prohibiting him from having contact with either Roe 1 or Roe 2.

Initially, both Roe 1 and 2 refused to speak with the university about the incident. However, about a month after the sexual encounter, Roe 1 submitted a two-page, written statement to the university alleging that Cephus had sexually assaulted her. As the Title IX coordinator, Hasselbacher showed Roe 1's statement to Roe 2 and asked her to confirm the accuracy of the statement. After Roe 2 agreed with Roe 1's statement, Hasselbacher

---

[2] The following facts are drawn from Cephus's complaint. (Dkt. #1). Because defendants have moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must recount the facts as Cephus describes them, drawing every reasonable inference in his favor. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017). In other words, the story that follows is decidedly one-sided, because the posture of the case requires it to be as a matter of law.

notified Cephus that he was being charged and investigated under the University's administrative code for sexually assaulting and harassing Roe 1 and Roe 2.

### B. UW-Madison's Alleged Anti-Male Bias

Cephus alleges that the University's sexual assault investigation was affected by its "anti-male bias," which began at least by 2011, when the U.S. Department of Education's Office of Civil Rights issued a "Dear Colleague" letter to colleges and universities nationwide, instructing them on how to comply with Title IX during investigation and resolution of sexual misconduct complaints.[3] Specifically, plaintiff alleges that letter encouraged a more rigorous approach to campus sexual misconduct claims by, among other things, defining "sexual harassment" broadly, and instructing that schools prioritize the speedy investigation and resolution of harassment claims, minimize the questioning and cross-examination of complainants to avoid re-traumatization, and adopt a lenient "more likely than not" burden of proof, as opposed to a "clear and convincing" standard for adjudicating sexual misconduct claims.  The Department further stated that a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct.  Although the Department of Education revoked the Dear Colleague letter in 2017, acknowledging that it had placed improper pressures on universities to adopt procedures that did not afford fairness for accused students, Cephus alleges that UW-Madison refused to change its policies after the Letter was revoked, and

---

[3] The Department's "Dear Colleague Letter" is available at https://www2.ed.gov/about/offices /list/ocr/letters/colleague-201104.pdf.

instead retained those it had adopted and enforced during the so-called "Dear Colleague" era.[4]

Cephus further alleges that UW-Madison adopted and enforced policies that were gender-biased against males in response to widespread student criticism and other negative publicity challenging the University's handling of sexual assault investigations and its failure to expel perpetrators of sexual assault.  At the time Cephus was accused of sexual assault, the Department of Education's Office of Civil Rights was investigating multiple complaints challenging the UW-Madison's handling of sexual assault investigations. Moreover, before the investigation involving Cephus, Chancellor Blank had endorsed a campaign called "Don't Be That Guy," which was launched initially by UW Police and allegedly suggested that men and masculinity were to blame for sexual assaults on campus. Cephus also points to other statements, training videos, programs and reports from Blank and other university officials that purportedly portrayed females as victims, males as predators, and sexual assault as "gender-based" violence.

Finally, Cephus alleges that defendant Hasselbacher, who was hired as UW's Title IX coordinator in 2017 and was responsible for investigating the allegations against Cephus, was personally biased against him in particular and against men generally, because she had an extensive history as an advocate for women who had experienced domestic and sexual violence.

---

[4] In particular, the UW apparently continues to apply a "preponderance of the evidence" standard to all cases involving sexual misconduct, Wis. Admin. Code UWS § 17.153, though it applies a "clear and convincing evidence" standard to all other cases of nonacademic misconduct in which the student faces suspension or expulsion. Wis. Admin. Code UWS § 17.12(4)(f).

### C.  Title IX Investigation

On May 31, 2018, after notifying Cephus of the charges against him, Hasselbacher requested that he contact her to schedule a meeting, during which he could respond to the allegations against him.  Cephus's attorney emailed Hasselbacher that same day to schedule the requested meeting.  Hasselbacher responded a few days later, stating that she would be willing to meet with Cephus and his counsel to discuss the investigation process, but that they could wait until her investigation had progressed further, when she would likely have more questions for him.  Cephus's counsel wrote back that law enforcement had obtained critical and exculpatory evidence that refuted the allegations of Roe 1 and 2, including toxicology reports, security camera footage, a forensic examination of Cephus's phone and the results of a search of Cephus's apartment.

Hasselbacher responded approximately two weeks later, indicating that at any time, Cephus could provide information, evidence and witness names, and could participate in an interview, but that it was her "intention to alert you when I am nearing the conclusion of the investigation and provide an opportunity to meet with me at that time."  Cephus's counsel emailed back that "despite the pending criminal investigation, it is still our (Quintez and myself) intention to cooperate and participate in your investigation."  He also reiterated that there was critical evidence in the possession of the police department that Hasselbacher had not obtained.

More than a month later, Hasselbacher contacted Cephus's counsel again, asking whether Cephus wanted to provide evidence or participate in an interview.  A few days later, Cephus and his counsel met with Hasselbacher to discuss the University's

investigation and interview process, as well as accommodations that Cephus may need due to learning disabilities.  An interview with Cephus was then scheduled for August 27, 2018.  Before that interview occurred, however, the Dane County District Attorney's Office notified Cephus that it would be filing criminal charges against him.  The next day, Cephus issued a public statement that he was being forced to take a leave of absence from the football team while the charges were being pursued.

Cephus's counsel also notified Hasselbacher that answering questions as part of the University proceedings would violate Cephus's Fifth Amendment rights to remain silent in the criminal proceedings.  Accordingly, counsel requested that the university proceedings be stayed until the criminal matter was resolved, as the evidence obtained and presented during the criminal matter would be critical to the Title IX proceedings as well.  However, UW's Vice Chancellor for Legal Affairs Raymond Taffora denied that request, stating that the letter from Cephus's counsel constituted "a refusal to participate in the University's Title IX investigation while the criminal process is ongoing."  At the same time, attorney Taffora acknowledged that the District Attorney's Office had refused to provide relevant evidence to the University until after the resolution of the criminal proceedings.  Nonetheless, Taffora wrote that the University's investigation was "expected to move more swiftly than criminal proceedings," so the University would make its decision based on the information available at that time.

On August 31, 2018, the day after Taffora's letter, Hasselbacher issued her investigative report.  The report included statements from six witnesses, in addition to Roe 1 and Roe 2, none of which Cephus had seen or responded to before the issuance of the

report.  However, Cephus did submit a brief response to Hasselbacher's report, challenging the failure to include exculpatory evidence, stating that he was unable to speak freely, and requesting that the University stay its investigation pending the conclusion of criminal proceedings.  He also stated that the report did not address all relevant evidence, including the missing toxicology reports and text messages.  Hasselbacher then amended her report twice, but declined to stay administrative proceedings and issued her final investigative report on October 9, 2018, which attached the Dane County criminal complaint to her final report.  She also notified Cephus that the report would be forwarded to the University's Assistant Dean of Students Ervin Cox for final decision-making.  Because Hasselbacher had attached the criminal complaint against him, Cephus requested that she also attach the motion to dismiss the criminal complaint, along with accompanying documents that he had filed in the criminal proceeding, but Hasselbacher declined to do so.

On October 30, 2018, Assistant Dean Cox issued a decision, finding it more likely than not that Cephus sexually assaulted and harassed Roe 1 and Roe 2.  He noted in his report that Cephus had not provided any alternative version of the events during the Title IX investigation, besides a statement that the sexual encounter was consensual.  Accordingly, Cox proposed that Cephus be expelled, and he empaneled a hearing committee to consider his findings.  Cephus's attorneys requested that the hearing be delayed until the beginning of spring semester, on a date when his chosen advisor could be available.  In response, Cox reported that Roe 1 and Roe 2 requested that the hearing *not*

be delayed until the spring semester, and he refused to reschedule the hearing for a date when Cephus's advisor was available.

### D. Cephus's Expulsion

The formal expulsion hearing was held by the University's appointed committee on January 15, 2019.  Cephus's Title IX counsel was unavailable, so he was represented by one of his criminal defense attorneys, who acknowledged her lack of familiarity with Title IX proceedings.  Cephus was also not permitted to have his religious support person accompany him at the hearing, despite being told earlier by Hasselbacher that he would be permitted to do so because of his learning disabilities.  During the hearing, Dean Cox referred repeatedly to the criminal court complaint, which Hasselbacher had included in her final investigative report; in response, Cephus's counsel argued that the evidence being presented was incomplete.

Roe 1 and Roe 2 appeared at the hearing by video.  Although Cephus's attorney was not allowed to cross-examine them, she was able to provide a list of questions in writing to the committee's chairperson before the hearing.  But the chairperson apparently altered Cephus's questions when addressing Roe 1 and Roe 2.  For example, Cephus's counsel proposed asking Roe 1 whether she had a blood alcohol test done after the incident, but the chairperson modified the question into: "Okay. I know your—your recollection of the hospital is—is fuzzy.  Do you recall interacting with any nurses or receiving medication or anything to that effect?"  Cephus also alleges that the questions posed by the chairperson reflected a preconceived notion of Cephus's guilt, and the chairperson encouraged Roe 1 and Roe 2 to respond in a way that would support finding Cephus responsible.  For

8

example, the chairperson prefaced questions for Roe 2 with: "What I'm getting at and, again, not, not trying to rush you or anything to that effect, is, you know, the elements of second-degree sexual assault require a respondent or person who's accused to have actual knowledge that the victim was unable to consent."

Following the hearing, the committee found Cephus responsible for sexual assault and sexual harassment, and he was expelled from the University.  Cephus appealed the committee's decision to then-Chancellor Rebecca Blank and the Board of Regents, identifying what he believed were several, procedural errors, but both upheld the hearing committee's findings and Cephus's expulsion.

### E.  Criminal Acquittal and Subsequent Events

Meanwhile, the criminal proceeding against Cephus continued.  Ultimately, a week-long jury trial commenced on July 29, 2019, at which Cephus testified and presented exculpatory evidence, including photographs, video footage, text messages, toxicology reports and expert testimony.  On August 2, the jury deliberated for 30 minutes before finding Cephus not guilty on all charges.

Following his acquittal, Cephus petitioned for readmittance to the University, citing the exculpatory evidence that was obtained during the criminal investigation and presented at the trial.  On August 21, Chancellor Blank reversed the Title IX finding of sexual assault, downgrading the committee's earlier finding to sexual harassment alone, reinstating Cephus to the University, and explaining in a public statement that the University had received "substantial amounts of information" not provided previously.  Cephus also was reinstated to the UW football team in time for its fall season.

Following the 2019–2020 football season, Cephus entered the National Football League draft.  NFL scouts expressed skepticism about Cephus due to the allegations against him, related media coverage, and his having missed an entire season.  Cephus ultimately was selected in the 5th round of the draft, which he alleges caused his salary to be drastically less than what it would have been had he been drafted in an earlier round.

OPINION

Cephus contends that: (1) defendants Rebecca Blank and Lauren Hasselbacher violated his right to due process by using an unfair process to investigate and expel him; and (2) UW-Madison violated his rights under Title IX by discriminating against him based on his gender.  Defendants have moved to dismiss the claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12(b)(6), the court may dismiss a claim if the allegations in the complaint are insufficient to state a claim, *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009), or the alleged facts show that plaintiff has pleaded himself out of court, *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).  The court will first consider whether Cephus has stated a due process claim, then consider his Title IX claim, understanding that at this stage, the court's task is *not* to determine whether the allegations are true or supported by evidence, but to determine whether Cephus is entitled to relief if everything that he says is true and all reasonable inferences are resolved in his favor.  *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

### A. Due Process

Cephus contends that defendants expelled him under a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause.  To state a claim for violation of his due process rights, Cephus must allege facts showing that: (1) he was deprived of a liberty or property interest protected by the Constitution; and (2) the procedures applied failed to satisfy the minimum constitutional requirements of fairness. *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019); U.S. Const. amend. IV, § 1.

With respect to the first element, Cephus contends that the University deprived him of a liberty interest by damaging his reputation and interfering with his ability to pursue a career in the NFL.  As Cephus acknowledges, his due process claim is based on a "stigma plus" theory.  To state a due process claim under that theory, Cephus must allege facts showing that: (1) a state actor inflicted reputational damage; (2) which was accompanied by an alteration in his legal status; and (3) he was deprived of a right he previously held.  *Purdue Univ.*, 928 F.3d at 661.  Certainly, Cephus has adequately pleaded that the UW-Madison inflicted reputational damage after finding him guilty of sexual assault and harassment, and that his expulsion from the university changed his legal status. *See id.* (one-year suspension from university was a change in legal status).  However, his allegations do not show that he was deprived of the right he previously held.

The Fourteenth Amendment protects a person's right or liberty to pursue a trade, profession, or other calling of choice.  *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984).  However, that liberty interest is impinged only when someone's "good name, reputation, honor or integrity [are] called into question in a

manner that makes it *virtually impossible* for [the person] to find new employment in his chosen field." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (emphasis added). Cephus concedes that he *was* able to pursue a career in the NFL, albeit at substantially less money because the university had unfairly tarnished his reputation.   However, Cephus cites no legal authority for the proposition that he had a liberty interest in a *better or more lucrative* position in the NFL.   Instead, the Seventh Circuit has "consistently drawn a distinction . . . between occupational liberty and the right to a specific job." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992).   "It is the liberty to pursue a calling or occupation, and *not the right to a specific job*, that is secured by the Fourteenth Amendment." *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (emphasis added); *see also Wroblewski*, 965 F.2d at 455 ("being a police officer is an occupation; being a police lieutenant is not") (citation omitted); *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985) ("ranks within an occupation—head nurse versus rank-and-file nurse, for example—are not 'occupations' themselves; and while preventing someone from advancing in his occupation can be a cruel deprivation, it would stretch the idea of liberty of occupation awfully far, it seems to us, to treat a bar to promotion as a deprivation of that liberty").

Because Cephus ultimately was able to pursue a career in the NFL, he has failed to allege that he was denied a liberty interest protected by due process.  To the extent, Cephus was also prevented from pursuing his undergraduate degree, and as a result, some other

profession later in life, this, too, remains something open to him.  Thus, his claim of denial of due process will be dismissed.[5]

### B. Title IX Claim

Cephus also asserts a claim against the University under Title IX, which provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (explaining that Title IX is enforceable through an implied private right of action).  Defendants concede that UW-Madison receives federal funding and that Cephus was "excluded from participation in [or] denied the benefits of . . . [an] education program" when he was expelled.  20 U.S.C. § 1681(a).  As a result, the sole question for the court at the motion to dismiss stage is whether Cephus's alleged facts, if true, raise a plausible inference that the university discriminated against him "on the basis of [his] sex."  In this instance, the court concludes that several of Cephus's allegations, when accepted together, are sufficient to state a claim to relief that is reasonably inferable (i.e., plausible) on its face.

First, Cephus points to a variety of evidence that he says provides background for his claim of discrimination under Title IX.  For example, he points to the 2011 "Dear Colleague" letter from the Department of Education's Office of Civil Rights that at least

---

[5] For this reason, the court need not consider defendants' alternative arguments for dismissal of his due process claim based on sovereign immunity, qualified immunity, lack of personal involvement, or the provision of adequate process.

by his reading arguably gave the UW a financial and public motive to pursue sexual assault investigations aggressively **and** to impose severe punishments against men.  Relatedly, Cephus points to the multiple Office of Civil Rights investigations that were underway at UW-Madison at the time, in which female students alleged that the University had failed to adequately respond to their allegations of sexual misconduct against male students, as well as media reports about sexual assault and inadequate investigations at UW.  In light of this, Cephus argues that given his status as a well-known, male football player, the UW-Madison made him a ready scapegoat in an effort to demonstrate its commitment to pursuing allegations of sexual assault against men aggressively.

Defendants respond reasonably enough that although Cephus's allegations show that the University took seriously its responsibility to protect students, support victims and pursue perpetrators of sexual assault, the evidence does *not* show sex discrimination against men.  This is a fair point:  prevention and support programs for victims of sexual violence are not inherently gender biased.  However, Cephus also alleges that at least some University programs and staff equated "victims" with "women" and "perpetrators" with "men."  He further points to the "Don't Be That Guy" campaign, reports and training programs allegedly depicting males as the sole perpetrators of sexual assault, and educational programs that blamed men and masculinity for sexual assault.  Ultimately, statistics may well bear out the reasonableness of the University's focus, but that will have to await actual evidence.

Regardless, several courts -- most importantly, controlling precedent from the Court of Appeals for the Seventh Circuit -- have recognized that the "Dear Colleague" letter,

14

Office of Civil Rights' investigations, and related background events are relevant in evaluating the plausibility of a Title IX sex discrimination claim. *See Doe v. Columbia Coll.*, 933 F.3d 849, 855 (7th Cir. 2019) (considering campus events "aimed at raising awareness of sexual assault issues"); *Purdue*, 928 F.3d at 668–69 (recognizing Dear Colleague letter and recent OCR investigations of school as relevant to assessing school's motive to discriminate against males accused of sexual assault); *see also Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) (finding Dear Colleague letter and related events relevant to Title IX claim); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (explaining that the pressure of OCR investigation and the resulting negative publicity "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim"); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016) ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.").

That said, Cephus cannot rely on such generalized information alone; instead, he must combine it with facts creating an inference that *in his specific case*, the institution treated him differently because of his sex. *Columbia Coll.*, 933 F.3d at 855. Cephus alleges that the one-sidedness of the University's Title IX investigation shows that it treated him differently because of his sex, specifically alleging the following facts as supporting an inference of gender-bias:

- Hasselbacher conducted the investigation in a way designed to bolster the female students' claims, including by showing Roe 2 the statement by Roe 1

and asking her to confirm it, rather that interviewing Roe 2 and assessing the consistency of their stories at the outset.

- Hasselbacher failed to obtain Cephus's version of events early in her investigation, and instead waited to schedule Cephus for an interview until she had spoken with all other witnesses, at which point, he was hamstrung by the parallel criminal proceeding.

- Hasselbacher failed to investigate obvious, missing evidence that could have undermined the Roes' version of events, including missing text messages, toxicology reports, surveillance video, and contradictions in testimony.

- Relatedly, Hasselbacher and other University officials refused to stay the hearing despite knowing that the District Attorney's Office and Madison Police Department possessed relevant and exculpatory evidence that had not been provided to the University.

- The University refused to reschedule the disciplinary hearing for a time when Cephus's chosen advisor would be available, and instead, scheduled the hearing to decide his punishment based on the preferences of the Roes.

- The University refused to permit Cephus's support person to be present during the hearing, while permitting the Roes' advisors of their choosing.

- The University refused to permit Cephus's attorney to cross-examine Roe 1 and Roe 2 at the hearing, and instead, rephrased his written questions in ways that changed their meaning and benefited the Roes' ability to respond.

- The University drew an adverse conclusion against Cephus for not testifying, providing an interview, or testifying at the hearing, while not drawing adverse conclusions against the Roes for failing to hand over relevant evidence.

- The University reached an erroneous conclusion unsupported by evidence.

Whether they hold up to closer examination or not, the court concludes that these allegations are sufficient to state a Title IX sex discrimination case on their face. Ultimately, Cephus may not be able to submit evidence that supports all of these allegations, and he may not be able to convince a reasonable finder of fact to infer sex discrimination from his evidence. Taken together, however, Cephus's allegations of

16

external pressure on the University and an internal practice of blaming men for sexual violence, along with his allegations regarding his particular disciplinary proceedings (particularly, the University's refusal to wait for exculpatory evidence it knew existed and the decision to move forward with a one-sided record), give rise to a plausible inference of discriminatory intent.  At his stage of the lawsuit, nothing more is required to defeat the University's motion to dismiss Cephus's Title IX claim.

## ORDER

IT IS ORDERED that:

1. The motion to dismiss filed by defendants Board of Regents of the University of Wisconsin System, Rebecca Blank and Lauren Hasselbacher (dkt. #9) is GRANTED IN PART with respect to plaintiff's due process claims against Blank and Hasselacher, which are DISMISSED WITH PREJUDICE, and state-law claims, which are DISMISSED WITHOUT PREJUDICE, and DENIED IN PART in all other respects as to plaintiff's Title IX claim.

2. The clerk of court is directed to convert the status conference set for January 3, 2023, to a scheduling conference before the magistrate judge.

Entered this 14th day of December 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge