IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUINTEZ CEPHUS,

        Plaintiff,

        v.                            Case No. 21C0126

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

        Defendants.

## DECLARATION OF LAUREN HASSELBACHER

I, **LAUREN HASSELBACHER**, declare pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the following is true and correct:

1.    I make this declaration based on my personal knowledge and my review of records maintained by and kept in the course of regularly conducted activities of the University of Wisconsin-Madison (UW-Madison).

### Background

2.    I received my Bachelor of Arts from UW-Madison and my Juris Doctorate from the University of Colorado Boulder.

3.    Before joining UW-Madison in May 2017 as the Title IX Coordinator, I worked as a senior investigator at the University of Colorado Boulder. In that role, I investigated allegations of discrimination, harassment, and sexual misconduct on campus.

4.      As indicated above, I started my employment with UW-Madison in May 2017 as the Title IX Coordinator in the Office of Compliance. As Title IX Coordinator, I oversaw the sexual misconduct resource and response program (formerly called the Title IX program). In that role, I helped finalize a new campus-wide policy related to sexual harassment and sexual assault, I investigated and oversaw UW-Madison's responses to allegations of sexual harassment and sexual assault, I maintained data or information related to sexual harassment and sexual assault at UW-Madison, and I tracked training and trained UW-Madison staff and students on topics related to Title IX, sexual harassment, and sexual assault.

5.      I am currently employed as the Assistant Director of Civil Rights Compliance and Title IX Coordinator at UW-Madison. In this role, I continue to oversee the university's sexual misconduct resource and response program, as well as all civil rights investigations (including allegations of sexual harassment and sexual violence). I also supervise the university ADA Coordinator.

6.      I understand this Court allowed Plaintiff Quintez Cephus to proceed on a Title IX intentional sex discrimination claim against the Board of Regents of the University of Wisconsin System (Board) related to UW-Madison's investigation and adjudication of sexual assault allegations against him by two fellow students, Complainant 1 and Complainant 2, collectively referred to as the Complainants.

7.      The federal complaint in this lawsuit contains various pseudonyms for students who were involved in UW-Madison's investigation and adjudication of the sexual assault allegations against Cephus. For clarity, I will identify my

understanding of the identity of the individuals referred to by pseudonyms in Plaintiff's Complaint at Docket 1 in this case, and I will also list the pseudonyms used for the individual in the UWS 17 proceeding to the extent the pseudonym is different from the Complaint:

     a. Complainant 1 is ████████, also referred to as C1, Victim 1, and AB (in the criminal case).

     b. Complainant 2 is ████████, also referred to as C2, Victim 2, and XY (in the criminal case).

     c. Teammate 1 is █████████████, also referred to as Witness 6 or W6.

     d. Teammate 2 is ███████, also referred to as Respondent 2 and R2.

     e. Teammate 3 is ████████████, also referred to as Witness 5 or W5.

     f. Friend 1 is ███████, also referred to as Person 1 or P1.

     g. Friend 2 is ███████, also referred to as Witness 4 or W4.

8.    Cephus was referred to as Respondent 1 and R1 in the investigation and UWS 17 proceeding related to the Complainants' allegations.

9.    The Complainants' complaints to UW-Madison about Cephus were consolidated for the UWS 17 proceeding because they arose out of the same events.

10.    The Complainants also alleged that Teammate 2 took an intimate photograph of them. Teammate 2 was found not responsible for the allegations related to Complainant 2 by Office of Student Conduct and Community Standards

Investigating Officer, Assistant Dean Ervin "Kipp" Cox. Teammate 2 was found responsible for the allegations related to Complainant 1 by Cox.

**Title IX and UW-Madison's policies and procedures
related to sexual assault**

11.    Through my work at the University of Colorado Boulder and UW-Madison, I am familiar with Title IX. I understand Title IX protects people from discrimination based on sex in education programs or activities that receive federal financial assistance.

12.    One way UW-Madison implements Title IX on campus is through the enforcement of the UW-Madison Policy on Sexual Harassment and Sexual Violence. Attached and marked as **Exhibit 507** is a true and accurate copy of the UW-Madison Policy on Sexual Harassment and Sexual Violence in effect at the time of Complainant 2's allegations.

13.    Among other things, the UW-Madison Policy on Sexual Harassment and Sexual Violence establishes the disciplinary procedures used to investigate claims of sexual harassment and sexual assault. Relevant here, the Policy explains that when the respondent is a student, UW-Madison uses the investigatory and disciplinary procedures outlined in the Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726). (Ex. 507, at 4–5.)

14.    Wisconsin Administrative Code ch. UWS 17 ("UWS 17") is titled "Student Nonacademic Disciplinary Procedures." UWS 17 outlines the investigatory and disciplinary procedures UW-Madison follows before imposing any sanction on a student. Attached and marked as **Exhibit 508** is a true and accurate copy of

4

Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726) applicable at the time of the investigation. (Ex. 508.)

15.    UWS 17 provided for my involvement (as Title IX Coordinator) in allegations concerning sexual harassment or sexual assault. Wis. Admin. Code. UWS § 17.05. (Ex. 508, at 2.)

16.    A student could report sexual assault to several authorities, including my office (Office of Compliance/Title IX) or the Dean of Students Office. If the student's allegation might constitute criminal conduct that violates the Wisconsin statutes, the student also has the option of reporting the sexual assault to law enforcement agencies, including the University of Wisconsin-Madison Police Department (UWPD) or the Madison Police Department (MPD). (Ex. 507, at 3–4.)

17.    I became involved in sexual harassment or sexual assault allegations when they were reported to me or reported to another office and then communicated to me. Whether reported directly to me or from another source, I would typically reach out to the complainant to introduce myself, offer referrals to confidential resources, academic accommodations, protective measures, and response options.

18.    Any next steps in the Title IX process depended on the circumstances, including whether the complainant wanted to proceed with an investigation and the information available at the time. Generally, though, the process outlined in UWS 17 is followed whenever a formal investigation is initiated.

### The complainants' sexual assault allegations

19.    Complainant 1 and Complainant 2 alleged Cephus sexually assaulted them on April 21, 2018. Complainant 1's father reported the sexual assault to the

Dean of Students Office on April 23, 2018. Complainant 2's father also reported the sexual assault to the Dean of Students Office on April 24, 2018.

20.     A true and correct copy of emails and correspondence that I exchanged with Cephus and/or his attorneys are attached and marked as **Exhibit 509.**

21.     As the Title IX Coordinator at UW-Madison, I have access to UW-Madison's Maxient database, which contains electronically stored records of student complaints of sexual assault reported before 2019.

22.     Attached and marked **Exhibit 511** is true and correct copy of Complainant 1's Maxient file for Case 20172677, which was the number assigned to Complainant 1's report that she was sexually assaulted by Cephus.

23.     Attached and marked **Exhibit 510** is a true and correct copy of Complainant 2's Maxient file for Case 20172697, which was the case number assigned to Complainant 2's report that she was sexually assaulted by Cephus**.**

24.     I also recorded case notes related to the Complainants' allegations against Cephus and Teammate 2. I entered information about contacts I had with the parties and their representatives, as well as potential witnesses. I would record the information in my case notes during or shortly after the contact occurred. A true and correct copy of my case notes is attached and marked **Exhibit 512**.

25.     On April 25, 2018, I emailed Complainant 2 to introduce myself, explain my position as Title IX Coordinator, offer to speak with Complainant 2 about academic accommodations, reporting options, and protective measures, and provide her with information on support services. I also told Complainant 2 I had insufficient

information to initiate an investigation at that time and offered to discuss how UW-Madison could investigate and proceed on her allegations.

26.    I told Complainant 2 I had insufficient information to initiate an investigation at that time because at that point in time, the university had only received very short, general reports. Before we begin an investigation, we would usually require more details, including dates and circumstances and the nature of the alleged assault.

27.    Also on April 25, 2018, Complainant 1's father came to my office to meet with me about Complainant 1's allegations against Cephus and Teammate 2. Complainant 1's father and I generally discussed the process and options for initiating a formal investigation. (See Ex. 512, at 1.)

28.    On April 27, I learned Cephus had been suspended from the UW-Madison football team effective April 26, 2018. On April 30, I confirmed with Associate Athletics Director Chris McIntosh that Cephus had been suspended based on the fact the Athletics Department had been notified by the Madison Police Department that Cephus was the subject of a criminal investigation.

29.    The Athletics Department made the decision to suspend Cephus based on information independently provided to it by the Madison Police Department that Cephus was the subject of a criminal investigation.

30.    Complainant 1 asked for a no contact directive between herself and Cephus and Teammate 2.

31.    On April 30, 2018, I issued a no contact directive between Complainant 1 and Cephus and between Complainant 1 and Teammate 2.

32.    On April 30, 2018, Complainant 2 asked for a no contact directive between herself and Cephus and Teammate 2.

33.    On May 1, 2018, I issued a no contact directive between Complainant 2 and Cephus and between Complainant 2 and Teammate 2.

34.    On May 3, I spoke with Jaime Sathasivam, Director of Client Programming at the Rape Crisis Center (RCC), by phone. I recorded a note about our phone call in Complainant 2's Maxient file. (Ex. 511, at 3.)

35.    During the May 3 call, RCC Director Sathasivam relayed that Complainant 2's family was overwhelmed with communication and wanted all communication to run through her. I again reiterated there was insufficient information to proceed with an investigation and that we could either meet and speak with the Complainants or wait for the Madison Police Department Report. (Ex. 511, at 3.)

36.    For the several weeks in May, I had insufficient information to proceed with an investigation.

37.    On May 18, 2018, I received an update from Sathasivam. Sathasivam said the Madison Police Department referred two charges, one for each complainant, to the District Attorney's Office yesterday, which would have been May 17.

38.    In response, I reiterated my understanding that Complainant 2 and her family were waiting for the Madison Police Department report to become available

before initiating a response with UW-Madison. I also asked whether Complainant 2 was comfortable with me acknowledging her involvement in any communications I had with Complainant 1.

39.    Complainant 1 was represented by Attorneys Lester Pines and Jordan Loeb of Pines Bach LLP as of May 18, 2018.

40.    On May 18, 2018, I received an email from Attorney Jordan Loeb. Attorney Loeb indicated that Complainant 1 was ready to move forward with the student disciplinary process.

41.    On May 24, 2018, I received a written statement from Complainant 1 about the sexual assault allegations April 21. A true and correct copy of this written statement and an email explaining the statement is just two pages of written text (the document contains 4 blank pages and 2 pages of text) is attached and marked as **Exhibit 513**. (Ex. 513.)

42.    After receiving permission from Complainant 1, I shared Complainant 1's written statement with Complainant 2's support person (Sathasivam) and asked for Complainant 2's preference on how to proceed with her own potential claims. I explained that at some point I would either need the Madison Police Department report or additional information from Complainant 2.

43.    I shared Complainant 1's statement with Complainant 2 because Complainant 1's statement indicated that Complainant 2 may also have been sexually assaulted. By this point, Sathasivam had communicated to me that Complainant 2 did not have any recollection of what occurred that night, but

Complainant 2 believed she was sexually assaulted. Sharing Complainant 1's statement seemed to be the only way to generally understand if Complainant 2's allegations involved the same underlying incident and conduct as Complainant 1 and to establish the allegations for the Notice of Charge.

44.    On May 29, 2018, I emailed Sathasivam a summary and list of charges for Complainant 2's review. I asked her to confirm with Complainant 2 that the summary and list of charges were accurate and if Complainant 2 had any edits or additions.

45.    Sathasivam responded that she had spoken to Complainant 2 and relayed the following: Complainant 2 had reviewed Complainant 1's written statement and was unsure what more she could add, given her limited memory. Complainant 2 said what she read was accurate and offered to speak with me and answer questions.

46.    I responded to Sathasivam and Complainant 2. I explained that I had enough information to initiate an investigation and would be sending out the Notices of Charge that day (May 29). I thanked Complainant 2 for agreeing to speak with me and suggested we wait to speak until I could review the Madison Police Department report and/or speak with witnesses.

47.    Later that day (May 29), I issued Notices of Charge to Cephus and Teammate 2, and I emailed a copy of the notices to Complainant 1 and her attorneys and Complainant 2 and her support person.

48.    I issued Amended Notices of Charge to Cephus and Teammate 2 on May 31, 2018, after learning the initial notice inadvertently provided the wrong date for the alleged assault. I emailed copies of the Amended Notices of Charge to Sathasivam and Complainant 2 on May 31, as well as Complainant 1 and her attorneys.

49.    I true and correct copy of the Amended Notices of Charge to Cephus dated May 31, 2018, is attached and marked **Exhibit 514**.

50.    On May 31, 2018, Attorney Stephen Meyer sent me an email introducing himself as the attorney for Quintez Cephus. (Ex. 509, at 1.)

## The investigation and hearing

51.    Between May 30 and October 9, 2018,[1] I investigated the Complainants' allegations. Broadly speaking, during this time, I collected the relevant, available documentation, I interviewed witnesses, and I attempted to interview Cephus and Teammate 2.

52.    More specifically, during this timeframe, I interviewed several witnesses, identified as Witness 1, Witness 2, Witness 3, and Witness 4. I documented my interviews with these witnesses. Attached and marked as **Exhibit 515** are true and accurate copies of my interviews with Witness 1, Witness 2, Witness 3, and Witness 4. (Ex. 515.)

---

[1] The Final Investigative Report, which is discussed more below, says the Office of Compliance collected relevant documentation and interviewed four witnesses between May 31, 2018, and August 29, 2018. Because I received more information between the Initial Investigative Report and the Final Investigative Report, I have expanded the dates here.

53.    Witness 4 also provided a written statement. Attached and marked as **Exhibit 516** is a true and accurate copy of Witness 4's written statement.

54.    On June 6, 2018, Attorney Richard Coad contacted me to notify me that he represented Teammate 2 in the investigation being conducted by my office.

55.    On June 6, 2018, Cephus's attorney, Stephen Meyer, emailed me a letter urging me to obtain and review some specific information in the hands of law enforcement. (Ex. 509, at 2-4.)

56.    I responded to Meyer's letter via email on June 19, 2018, and clarified that Cephus could provide information relevant to the investigation at any time, which included participating in an interview. I also said Cephus could provide names of witnesses or other documentation (text messages, photos, etc.) that he believed might be relevant. I stated that my intention was to alert Cephus and his attorney when I am nearing the conclusion of the investigation and provide an opportunity to meet with me at that time. (Ex. 509, at 5.)

57.    Generally, unless a respondent wants to meet sooner, it is the practice of the Office of Compliance to wait until we are near the end of an investigation to interview the respondent because we will have collected the available information for the interview. This allows us to give the respondent an opportunity to answer questions about all the available evidence and information we have collected.

58.    Cephus's attorney responded to my email on June 21, 2018, and attached two letters. (Ex. 509, at 5-11.)

59.    On June 28, 2018, Cephus's attorney sent me another letter and included a screenshot of a text message exchange between Cephus and Complainant 2 from April 22, 2018. (Ex. 509, at 12-14.)

60.    A private investigator working with Cephus's legal team interviewed two additional witnesses, Witness 5 (Teammate 3) and Witness 6 (Teammate 1), and provided me with written summaries of the interviews. Witnesses 5 and 6 declined to be interviewed by me. Attached and marked as **Exhibit 517** are true and accurate copies of the written summaries I received for Witness 5 and Witness 6. (Ex. 517.)

61.    In addition, I tried to contact another individual, identified as Person 1 and P1 (Friend 1), but she refused to participate in the process. Attached and marked as **Exhibit 518** is a true and accurate copy of my documentation about P1's refusal to participate in the process. (Ex. 518.)

62.    I also offered to interview Cephus and Teammate 2, but both declined to participate in an interview. A true and correct copy of a chronology I created of offers and/or requests to interview Cephus during the course of the Office of Compliance Title IX investigation initiated on May 29, 2018, is attached and marked **Exhibit 519**.

63.    I created the chronology of offers and/or requests to interview Cephus in response to a letter Cephus's attorney, Andrew Miltenberg, sent to me on August 23, 2019, in which he accused me of waiting four months to request an interview with Cephus, and another email from Attorney Miltenberg on August 26, 2018. A true and

correct copy of the August 23 letter and the August 26 email are attached and marked **Exhibit 520.**

64.     Between May 30 and October 9, 2018, I collected the following relevant, available documentation: surveillance footage from Cephus's apartment of Complainant 2 leaving and Cephus, Teammate 2, Complainant 1, and P1 leaving, surveillance footage from the complainants' residence halls, text messages between the complainants, text messages between Complainant 2 and Cephus, text messages between Complainant 1 and Witness 6, text messages between Complainant 2 and Witness 3, Instagram photograph and message from Cephus to Complainant 2, photographs of Complainant 2 and Cephus, snapchat messages from Complainant 1, Complainant 2's uber receipt, the UW-Madison Police Department report,[2] the Dane County Circuit Court criminal complaint, and records from Complainant 1's SANE examination (forensic nurse examination report).

65.     I knew about but was unable to collect the following documentation: the Madison Police Department report(s), surveillance footage of the parties arriving at Cephus's apartment, surveillance footage from the UU bar, surveillance footage from city cameras, and records from Complainant 2's SANE forensic nurse examination. I was also unable to obtain interviews with Cephus, Teammate 2, and P1.

---

[2] Because the criminal investigation was ongoing at this point, the UW-Madison Police Department did not provide a copy of the report. Instead, it allowed an Office of Compliance staff member to review the report and take notes.

66.    I tried to collect records from Complainant 2's forensic nurse examination on June 19 and July 26, 2018. I included the link Complainant 2 could use to request the examination report in my email from June 19.

67.    Complainant 2 never provided me with any records from her SANE forensic nurse examination.

68.    I could not collect any reports from the Madison Police Department because they refused to disclose them due to the ongoing nature of their criminal investigation.

69.    On July 26, 2018, I emailed Sathasivam and asked if Complainant 2 would be willing to provide additional information, including an in-person interview and any other documentation like text messages or communications with Cephus, Teammate 2, or the witnesses. Sathasivam said she would check with Complainant 2.

70.    On August 1, 2018, I met with Cephus's lawyer, Stephen Meyer. Meyer brought a PowerPoint presentation of surveillance footage of the parties leaving Cephus's apartment on April 22, 2018. A true and correct copy of the file memo I drafted about the surveillance footage review and the meeting on August 1 is attached and marked **Exhibit 521.**

71.    Cephus's suspension from the UW-Madison football team was lifted on August 1, 2018. The Athletics Department has a separate Student-Athlete Discipline Policy that applies to student athletes. The Athletics Department is the responsible office for enforcing the Student-Athlete Discipline Policy. I did not participate in the

decision-making related to Cephus's suspension from the football team, nor did I participate in the decision-making related to lifting Cephus's suspension from the football team.

72.     On August 8, 2018, Jennifer Horace and I met with Attorney Meyer and Cephus to discuss the investigative process. During this meeting, we tentatively scheduled an interview with Cephus for August 23, 2018.

73.     Title IX/EO Complaint Investigator Jennifer Horace and I met with Complainant 2 on August 9, 2018. Attached and marked as **Exhibit 522** is a true and accurate copy of my documentation from the August 9 interview of Complainant 2.

74.     On August 10, 2018, Attorney Meyer emailed me that he would have some follow up inquiry which would be sent via a second email. In this email, Attorney Meyer notified me that Attorney Stilling and Attorney Miltenberg also represented Cephus and that I might be receiving communications from them during Attorney Meyer's absence next week. (Ex. 509, at 15.)

75.     On August 16, 2018, I received an email from Attorney Andrew Miltenberg, one of Cephus's lawyers. Due to a scheduling conflict, Attorney Miltenberg asked to reschedule Cephus's interview to Monday, August 27 or Tuesday, August 28. I had a phone call with Attorney Miltenberg that same day and granted his request to move Cephus's interview to Monday, August 27, 2018. (Ex. 509, at 17.)

76.     I also emailed Attorney Miltenberg, Attorney Stilling, and Attorney Meyer on August 16 to confirm our meeting for Monday, August 27, 2018 at 1:00 p.m. I explained that if there was any other information Cephus would like us to consider

as part of our investigation, to please provide it by Monday August 20. (Ex. 509, at 20.)

77.    On August 20, 2018, I learned that the Dane County District Attorney's Office had issued criminal charges against Cephus. Attached and marked as **Exhibit 523** is true and correct copy of the email I received notifying me of the charges, as well as the email attachment, which was a copy of the criminal complaint with two charges against Cephus.

78.    Also on August 20, 2018, I learned that Cephus announced a decision to take a leave of absence from the football team due to imminent criminal charges. I also learned on August 20, that the Athletics Department decided to suspend Cephus from the football team pursuant to the Student Athlete Discipline Policy.

79.    On August 20, I asked the Dean of Students Office if someone would check whether any classes overlapped for the Complainants, Cephus, and Teammate 2. I indicated it wasn't an issue for the women to have the same classes as each other, or for the men, but the men should not have any class overlap with the women.

80.    On August 22, I was notified that Complainant 2 had retained an attorney, Amy Bogost. I received permission from Complainant 2 to speak with Attorney Bogost about the investigation.

81.    On August 22, 2018, I emailed Cephus's legal team due to the changed circumstances since we last connected (the criminal charges). In my email I asked the lawyers to let me know if Cephus no longer planned to participate in an interview, but reiterated Cephus was still welcome to do an interview if he chose to. I also

provided some information about some confidential services available for support on campus for Cephus. (Ex. 509, at 20.)

82.    On August 23, 2018, Attorney Miltenberg emailed me a letter demanding that I delay issuing the investigative report now that Cephus had been charged criminally. Attorney Miltenberg asserted that "significant, critical evidence will now become available in the next two (2) months." Attorney Miltenberg requested that the interview with Cephus "be conducted on a date to be agreed upon." (Ex. 520, at 1-2.)

83.    However, it was my understanding that Cephus and his lawyers had agreed to the August 27 interview date based on Attorney Miltenberg's August 16 email to me asking to reschedule Cephus's interview for August 27. (Ex. 520, at 17.)

84.    On August 24, I emailed Attorney Miltenberg to confirm that Cephus intended to participate in the interview scheduled for August 27. (Ex. 520, at 4.)

85.    On August 26, Miltenberg emailed me to state that Cephus would not attend the interview that had been scheduled for August 27. (Ex. 520, at 3.)

86.    On August 30, 2018, I was copied on an email to Cephus's attorneys attaching a letter from Vice Chancellor for Legal Affairs Raymond Taffora to Cephus's attorneys, as well as a chronology I prepared of my offers and/or requests to interview Cephus during the course of the Title IX investigation initiated on May 29. A true and correct copy of the email, Taffora's letter, and my chronology is attached and marked **Exhibit 530.**

87.     In Taffora's letter to Cephus's attorneys, Taffora explained that the District Attorney's Office will not provide the university access to any additional information until the conclusion of the criminal proceedings, and the university could not delay resolution of this matter until the conclusion of criminal proceedings given current Title IX guidance. Taffora explained that "promptness" is required by the Department of Education's 2017 Q&A on Campus Sexual Misconduct, and the Department's 2001 Revised Sexual Harassment Guidance specifies that university's Title IX obligation to investigate sexual harassment and sexual assault is independent of any law enforcement proceedings. (Ex. 530 at 4 & n.1.)

88.     On August 31, 2018, by separate email to each party, I sent my Initial Investigative Report to the attorneys for the Complainants and Respondents (Cephus and Teammate 2). I told the parties that if they had clarifications, additions, or any other thoughts they wished to share with me to please submit them in writing no later than 8:00 am on Monday, September 10, 2018. (*See e.g.,* Ex. 532, at 1-2.)

89.     Attached and marked **Exhibit 532** is true and correct copy of my emails to Cephus and his attorneys with the instructions regarding the initial investigative report (August 31, 2018), the amended investigative report (September 21, 2018), and the second amended investigative report (October 2, 2018).

90.     On September 6, 2018, Cephus emailed me and asked for a one week extension to provide clarifications, additions, or any other thoughts on the Initial Investigative Report. Specifically, Cephus requested an extension until 5pm on Monday, September 17, 2018. (Ex. 509, at 27.)

91.    On September 10, Attorney Bogost emailed saying she had no changes to the Initial Investigative Report. She also challenged Cephus's and Teammate 2's right to respond to the report, given their lack of participation in the investigation to that point. Attached and marked as **Exhibit 525**, is a true and correct copy of this email exchange with Bogost, including Bogost's September 10, 2018 email to me.

92.    On September 11, Teammate 2's attorney provided additional information and a letter in response to the Initial Investigative Report. Attached and marked **Exhibit 526**, is a true and correct copy of Coad's September 11, 2018 email to me, the attached letter, and the written statement from Teammate 2.

93.    On September 12, Attorney Bogost asked to speak about her concerns related to Cephus's and Teammate 2's right to respond to the Initial Investigative Report. (Ex. 525, at 1.)

94.    On September 12, I also sent Attorney Bogost a copy of the written statement Teammate 2 provided in response to the Initial Investigative Report.  (Ex. 525, at 1; Ex. 526, at 6.)

95.    On September 12, I sent Cephus and his attorneys a copy of the written statement Teammate 2 provided in response to the Initial Investigative Report. (Ex. 509, at 26.)

96.    On September 13, Cephus sent me his response to the Initial Investigative Report by email. Cephus attached his letter responding to the report (the letter was dated September 14), his criminal motion to dismiss, an attorney

affidavit, and an exhibit. A true and correct copy of Cephus's response email and the attached documents is attached and marked **Exhibit 527**.

97.    On September 17, Complainant 1's attorney, Lester Pines, sent me a letter objecting to the inclusion of Respondent/Teammate 2's statement in the investigative report. A true and correct copy of this letter is attached and marked **Exhibit 528.**

98.    On September 20, Cephus's attorney provided me with a copy of the PowerPoint presentation with video from Cephus's apartment building of the parties leaving the apartment. (Ex. 509, at 24-27, 29.)

99.    On September 21, I was copied on a letter from Senior University Counsel Rachel Jeris to Complainant 1's attorney in response to the September 17 letter objecting to the inclusion of Teammate 2's statement. A true and correct copy of Jeris's September 21, 2018, letter to Complaint 1's attorney is attached and marked **Exhibit 529**.

100.    In the letter, Jeris explained to Complainant 1's attorney that the university does not have legal authority to compel parties and witnesses to participate in an interview, nor can it condition their right to offer information during the investigation or to participate in other phases of the non-academic misconduct process upon their willingness to participate in an interview. Jeris explained that the university also cannot draw a negative inference from a respondent's unwillingness to be interviewed. Jeris explained that the university gathers as much information as it can and makes decisions based upon what it has obtained. (Ex. 529, at 1.)

101.    Also on September 21, I was copied on a letter from Rachel Jeris to Cephus's attorneys in response to Cephus's September 13 submission to me regarding the Initial Investigative Report. A true and correct copy of Jeris's September 21, 2018, letter to Cephus's attorneys is attached and marked **Exhibit 531**.

102.    In the letter, Jeris explained to Cephus's attorneys that Cephus's denial of the allegations underlying the pending non-academic misconduct charges and his assertion that his sexual encounter with Complainants was consensual will be included in the final investigative report. Jeris explained that UW-Madison cannot compel Cephus to say more and will make a determination about the pending non-academic charges based upon the information gathered during the investigation. (Ex. 531, at 1.)

103.    In the letter to Cephus's attorneys, Jeris explained that UW-Madison has an independent legal obligation to move forward with its Title IX investigation and student non-academic misconduct process even though concurrent law enforcement proceedings are occurring. Jeris explained that Cephus was provided opportunities to give a verbal or written statement as well as to submit documents, video, and any other information he wished to share. Jeris explained that Cephus's decision to remain largely silent during the investigation is a voluntary choice. (Ex. 531, at 1-2.)

104.    Because the parties provided additional substantive information in response to the Initial Investigative Report, on September 21, I issued an Amended Initial Investigative Report and emailed the Complainants and Respondents a copy

of the Amended Initial Investigative Report. I gave the parties a new deadline of September 26, 2018, to provide clarification, additions, or other thoughts they wished to share. (Ex. 532, at 1.)

105.    On September 26, Complainant 2's attorney, Amy Bogost, emailed an objection to "the amended reports that are based on material submitted by Respondents." Broadly speaking, Attorney Bogost claimed it was unfair for Cephus and Teammate 2 to be able to review and comment on the report, complained about the length of the investigation, and urged me to finish the investigation as "promptly and reasonably possible." Attached and marked **Exhibit 533** is true and correct copy of Bogost's email and letter dated September 26, 2018.

106.    Attorney Bogost also again complained about Cephus's and Teammate 2's presence on campus. She opined that since the alleged assault there had been "an ongoing hostile environment" for Complainant 2 and claimed Complainant 2 "suffered every day that she is on campus with the knowledge Respondents are on campus." (Ex. 533, at 3.)

107.    Neither Cephus nor Teammate 2 were removed from campus during the Office of Compliance/Title IX investigation into the Complainant's allegations.

108.    Also on September 26, Teammate 2's attorney provided an additional factual statement from Teammate 2. Attached and marked **Exhibit 534** is true and correct copy of the September 26, 2018, email from Attorney Coad attaching Teammate 2's second written statement.

109.    In addition, Complainant 1 submitted a redacted copy of her forensic nurse examination.

110.    On October 2, I emailed the parties the Second Amended Initial Investigative Report. I gave the parties until 9:00am on Monday, October 8, 2018, to submit clarifications, additions, or any other thoughts they wished to share. (*See e.g.,* Ex. 532, at 1.)

111.    On October 7, Cephus emailed me a written statement in response to the Second Amended Initial Investigative Report. Attached and marked **Exhibit 535** is a true and correct copy of Cephus's October 7, 2018 email and attached statement (statement is dated October 6, 2018).

112.    In his October 6 statement, Cephus incorporated by reference his prior letter dated September 14 (emailed to me on September 13), which Senior University Legal Counsel Rachel Jeris responded to on September 21. (Ex. 535, at 2; Ex. 527, at 5-7; Ex. 531.)

113.    Attorney Bogost responded on October 8, again objecting to Cephus's and Teammate 2's participation in the investigative reports. Attorney Bogost reiterated many of the same complaints in her September 26 letter. A true and correct copy of Bogost's October 8, 2018, email to me and my response is attached and marked **Exhibit 536**. (Ex. 536, at 2.)

114.    On October 9, 2018, I provided the Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS). Attached and

marked **Exhibit 537** is a true and accurate copy of the Final Investigative Report submitted October 9.

115.    The same day, October 9, I notified all parties that the Final Investigative Report was sent to the OSCCS. Attached and marked **Exhibit 538** is a true and correct copy of my email to Cephus and his attorneys on October 9, 2018.

116.    Throughout this process, I served as a neutral investigator. Based on my training, I did not make assessments based on any person's overall credibility when drafting the final investigative report. I presented the information I collected to the OSCCS without opinion. OSCCS made the findings and recommended the sanctions.

117.    In addition to serving as a neutral investigator, I also served in my role as Title IX Coordinator, so I was also ensuring the proper process was followed.

118.    Also on October 9, 2018, I received notice that Cephus had sued me in federal court, along with the Board of Regents, Cathy Trueba, and Chancellor Emeritus Blank. In the lawsuit, Cephus sought a stay of all University disciplinary proceedings against him pending the resolution of the related criminal matter. A true and correct copy of Cephus's federal complaint is attached and marked **Exhibit 539**

119.    Assistant Dean/Director, Division of Student Life Ervin (Kipp) Cox was assigned as the investigating officer for decision making purposes.

120.    I understand Dean Cox issued Finding Letters on October 30, 2018. I was not involved in drafting those letters or in the findings he reached in those letters.

121.    I participated as a witness in the Nonacademic Misconduct Hearing held on January 15, 2019.

122.    I understand the Nonacademic Misconduct Hearing Committee issued its written decision on January 29, 2019.

123.    I was not involved in drafting the Nonacademic Misconduct Hearing Committee's decision or in the findings it reached in the decision.

### The appeal and petition for restoration of rights

124.    I understand Cephus appealed the Nonacademic Misconduct Hearing Committee's decision to then-Chancellor Rebecca Blank, who I will refer to as Chancellor Blank.

125.    I further understand Chancellor Blank issued a decision affirming Cephus's appeal.

126.    I was not involved in drafting Chancellor Blank's decision on Cephus's appeal or in the conclusions she reached in the decision.

127.    I understand Cephus appealed Chancellor Blank's decision to the Board on March 13, 2019. Cephus's attorneys copied me on the email providing notice of the appeal.

128.    I further understand the Board issued a decision denying Cephus's request for review.

129.    I was not involved in drafting the Board of Regents' decision on Cephus's appeal or in the conclusions the Board reached in the decision.

130.    I understand a jury acquitted Cephus on August 2, 2019.

131.    I further understand Cephus submitted a petition for restoration of rights on August 6, 2019. Director of Office of Compliance Jaimee Gilford forwarded a copy of the petition to me that same day.

132.    I spoke with Chancellor Blank by phone about Cephus's petition on August 14, 2019. Attached and marked **Exhibit 524** is a true and correct copy of my handwritten notes from the call on August 14, 2019.

133.    Chancellor Blank informed me that she appreciated the work I had done on the case, and told me that "both sides might sue." Chancellor Blank discussed that they had been collecting information, the videos were important to her review, and she could not ignore the quick jury verdict.

134.    Chancellor Blank issued her decision on Cephus's petition for restoration of rights on August 19.

135.    Chancellor Blank died on February 17, 2023.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE STATEMENTS IN THIS DECLARATION ARE TRUE, CORRECT, AND BASED ON MY PERSONAL KNOWLEDGE**.

Executed: March 15, 2024

s/ Lauren Hasselbacher
Lauren Hasselbacher