Case: 3:21-cv-00856-wmc Document #: 54 Filed: 03/15/24 Page 1 of 160

REBECCA BLANK
March 25, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

JANE DOE,

Plaintiff,

vs. Case No. 3:20-CV-00856-WNC

THE UNIVERSITY OF WISCONSIN,
REBECCA BLANK, as an individual,

Defendants.

---

Deposition of REBECCA BLANK

Friday, March 25th, 2022

1:25 p.m.

at

BASCOM HALL, UNIVERSITY OF WISCONSIN-MADISON
500 LINCOLN DRIVE, MADISON, WISCONSIN 53706

Stenographically reported by:
Maria V. Camera, Court Reporter

U.S. Legal Support | www.uslegalsupport.com

Exhibit 548 - 001

Deposition of REBECCA BLANK, a witness in the above-entitled action, was taken at the instance of the Plaintiff, under and pursuant to the provisions of Chapter 804 of the Wisconsin Statutes, and pursuant to Notice, before me, MARIA V. CAMERA, Court Reporter, and Notary Public in and for the State of Wisconsin, at BASCOM HALL, UNIVERSITY OF WISCONSIN-MADISON, 500 LINCOLN DRIVE, MADISON, WISCONSIN 53706, on the 25th day of March, 2022, commencing at 1:25 p.m. and concluding at 9:35 p.m.

A P P E A R A N C E S

HUTCHINSON BLACK AND COOK LLC, by
Mr. John Clune
and Mr. Christopher W. Ford
921 Walnut Street, Suite 200
Boulder, Colorado 80302
appeared on behalf of the Plaintiff.

WISCONSIN DEPARTMENT OF JUSTICE, by
ASSISTANT ATTORNEY GENERAL
Ms. Rachel Bachhuber
Ms. Catherine R. Malchow
Mr. Jonathan Whitney
17 West Main Street
P.O. Box 7857
Madison, Wisconsin 53707-7857
appeared on behalf of the Defendants.

ALSO PRESENT:

Ms. Nancy Lynch
Ms. Rachel Jeris and
Mr. Dalton Clements, Videographer

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Mr. Clune | 6 |

E X H I B I T S

| NUMBER | | PAGE IDENTIFIED |
|---|---|---|
| Exh. 1 | Subpoena submitted to the University of Wisconsin in this case | 22 |
| Exh. 2 | Title IX Mandatory Reporting, Response Protocol and FPP Chapter 9 | 51 |
| Exh. 3 | Student-Athlete Discipline Policy | 89 |
| Exh. 4 | Report from Title IX investigation | 103 |
| Exh. 5 | Decision of Hearing Committee Regarding Nonacademic Misconduct by Quintez Cephus written on January 28, 2019 | 119 |
| Exh. 6 | Chancellor's Decision Regarding Quintez Cephus Petition for Restoration of Rights | 144 |
| Exh. 7 | Chancellor's Decision Appeal of a Non-Academic Misconduct Committee Decision Regarding Quintez Cephus | 128 |
| Exh. 8 | July 28, 2019 to August 3, 2019 Calendar | 143 |
| Exh. 9 | First 14 pages of written Petition for Readmission | 157 |
| Exh. 10 | Email from Raymond Taffora to Nancy Lynch | 166 |
| Exh. 11 | Closing--Factual Summary for the Jury | 167 |
| Exh. 12 | UW-Madison Policy on Sexual Harassment and Sexual Violence | 208 |
| Exh. 13 | Email from Matthew Mayrl to Rebecca Blank | 248 |
| Exh. 14 | Letter to Chancellor Blank written on behalf of the University of Wisconsin football program | 249 |
| Exh. 15 | Ms. Hasselbacher's handwritten notes | 250 |
| Exh. 16 | Article from madison.com about $25 million donation given by Ted Kellner | 270 |
| Exh. 17 | Documents that include a letter from Ted Kellner asking to have Mr. Cephus reinstated | 272 |

E X H I B I T S (Continued)

| NUMBER | | PAGE |
|---|---|---|
| Exh. 18 | UW-Madison 2019-2020 Budget Report | 275 |
| Exh. 19 | Article from madison.com dated September 24th, 2020 | 277 |
| Exh. 20 | Nonacademic Misconduct report | 280 |
| Exh. 21 | June, 2016 emails regarding harassment | |
| Exh. 22 | Incident Report Form | 286 |
| Exh. 23 | May 22, 2017 Letter to Quintez Cephus from Larry Davis | 292 |
| Exh. 24 | May 23, 2018 email from Tonya Schmidt to Argyle Wade | 294 |
| Exh. 25 | December 26, 2018 letter regarding academic misconduct | 297 |
| Exh. 26 | Document titled Academic Misconduct | 298 |
| Exh. 27 | August 16, 2019 email from Alex Nelson to Chancellor Blank | 301 |
| Exh. 28 | Email from Sue and Jim Patterson | 304 |
| Exh. 29 | Re: #LetQTPlay Update | 305 |
| Exh. 30 | FW: Expulsion of Quintez Cephus email | 306 |
| Exh. 31 | Email from John Lucas to Rebecca Blank | 307 |
| Exh. 32 | Coverage Update | 308 |
| Exh. 33 | Coverage Update | 309 |
| Exh. 34 | Draft Contact List | 310 |

(Original exhibits were attached to original transcript; copies to transcript copies.)

R E Q U E S T S

| ITEM REQUESTED | PAGE |
|---|---|
| Preserve text messages | 17 |

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We on are on the record at 1:25 p.m. on March 25th 2022. Audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video recorded proceedings of Rebecca Blank in the matter of Jane Doe versus the University of Wisconsin et al, filed in the United States District Court for the Western District of Wisconsin. The proceeding is being held at Bascom Hall, located at 500 Lincoln Drive in Madison Wisconsin.

My name is Dalton Clements, I'm the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive, Suite 900, in Houston, Texas 77060. I'm not related to any party in this action nor am I financially interested in the outcome.

The court reporter is Maria Camera, on behalf of U.S. Legal Support. Counsel, please state your appearances for the record after which the court reporter will swear in the witness.

MR. CLUNE: John Clune and Chris Ford on

behalf of the plaintiff.

MS. BACHHUBER: Rachel Bachhuber and Catie Malchow and Jon Whitney on behalf of the Board of Regents.

REBECCA BLANK, called as a witness herein by the Plaintiff, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CLUNE:

Q Chancellor, we just met offline a minute ago, and you introduced yourself as Becky. I'm not going to refer to you as Becky today because I want the transcript to look appropriate in front of a jury, but do you have a preference if I refer to you as Chancellor or Ms. Blank, or anything?

A Chancellor.

Q Okay.

A Chancellor Blank.

Q Chancellor Blank. All right. Chancellor Blank, have you been deposed before?

A I have.

Q How many times do you think you have been deposed?

A Once.

Q Okay. What kind of a case was that?

A It was the case involving the NCAA.

Q Okay. What was that regarding?

A It was regarding a lawsuit against the NCAA in California about student rights.

Q Okay. How long ago was that?

A Hmm -- six years. Five or six years.

Q Have you testified in court or in front of Congress before?

A I have testified in front of Congress a number of times.

Q Okay. That may be a little bit different, but in regards to the rules for today, just to go over some basics, you may recall from the last time you were deposed. First of all, we will take breaks roughly every hour or so. If we can go a little bit longer it will help us get out of here quicker, but if at any time you need a break, just let us know. You know, we'll need nature breaks at times that don't fit into the hour and whatever schedule. So just speak up and we will go ahead and take a break.

If I have a question that's on the table or a question or two left, that would make sense to let me finish those before we go to a break.

A Okay.

Q Okay. If you have any questions or if any of the

questions that I ask either sound confusing or it's not clear to understand what I'm asking you, would you let me know that? I probably just phrased the question poorly.

A I will ask.

Q Okay. And then as you may recall from that deposition, the one thing that's difficult for the court reporter is if we speak at the same time. So we'll both do it at some point and we'll get chastised, and that's okay. It's part of the reporter's job, but to the extent we can --

A Mm-hmm.

Q -- try to wait for each other to finish, that will be helpful to her.

Why don't we start a little bit with your background. Where are you from originally?

A I was born in Missouri.

Q And how long did you live there?

A Until I was five years old.

Q Okay. And why don't you tell me about your parents. What did they do when you were young?

A My mother was a homemaker. My dad worked for the extension service in a number of different states.

Q What does that mean, extension service?

A It is a group affiliated with the university that

takes the research of the university out into the state to various groups and communities.

Q Okay. Is that the University in Missouri?

A He was at that point. He subsequently moved to Michigan and then to Minnesota.

Q Okay. And how long were you in Mi- -- so you moved to Michigan when you were five?

A Mm-hmm.

Q And how long were you up there?

A We were in Michigan until I was in fifth grade. So five years.

Q Okay. And then was he with the University of Michigan, then?

A He was with, first, Northern Michigan University up in Marquette, and then with Michigan State.

Q Okay. And so in fifth grade you moved to --

A To Minnesota.

Q And is that where you ended up growing up?

A I spend the next more than ten years of my life in -- through college -- in Minnesota.

Q Okay. And that's helpful on my next question -- but maybe I'll ask about -- so your father was with the University of Minnesota --

A Yes, he was.

Q -- or with the extension service?

A Yes.
Q And so you went to college at the University of Minnesota?
A I did.
Q And what did you study?
A I studied economics.
Q Okay. And where did you go from there?
A I went out to an economic consulting firm in Chicago for three years and then went back for a PhD in economics at MIT.
Q Okay. And why don't -- instead of me asking you a litany of questions about your work history, maybe you can just summarize kind of what you did in your career leading up to coming to the University of Wisconsin.
A So after finishing my graduate work, I went to Princeton for a number of years and then was hired at Northwestern University. In between that, I spent a year as a senior staff economist on the Council of Economic Advisers under President George H.W. Bush.
Left Northwestern eight years after arriving and returned to DC to be a Member, which is the Senate-confirmed position at the Council of Economic Advisers under President Clinton.

Left that after two years -- it was a two-year gig -- to become the Dean at the Gerald R. Ford School of Public Policy at the University of Michigan.
When I left that job, very soon thereafter I took a job in the Obama administration and was subsequently an Undersecretary for Economic Affairs, the Deputy Secretary, and for quite a long period of time, the Acting Secretary of Commerce. And I left after the first term to take this job.
Q And how long were you the Acting Secretary?
A For almost a full year the second time and for a three-month period a year or two earlier than that.
Q Okay. And what prompted you to -- so did you leave the Department of Commerce to come to the University of Wisconsin?
A Yes, I did.
Q And what prompted that transition?
A I had actually stayed in that job -- those jobs -- partly because of some promotions, longer than I had expected and had been in the administration for four years and was ready to come back to a university. So I was looking for the next option.
Q Okay. And so what did you do when you were at Northwestern?

A I was a faculty member.
Q Okay. So you applied, and what was the process like for applying to the University of Wisconsin?
A Like most of these, there were a series -- there was a, you know, an interview by I don't know how many people at the O'Hare Hilton, followed by a campus visit in the next step.
Q Okay. Were you recruited for that position or did you reach out to them? How did that come about?
A I was told that I had been nominated, and I probably would have applied anyway, but it was a joint outreach.
Q You had applied previously to the same position?
A I had.
Q Okay. And what year was that?
A 2008.
Q Okay. And so was -- and Biddy Martin was the chancellor in between the two applications; is that right?
A Biddy was the chancellor for three years, and then she left, and there with an interim chancellor for the next two years.
Q Okay. Did you apply to any other universities or just Wisconsin?
A I applied -- you mean this last time around? I

applied to several places.
Q Okay. Where else did you apply? Just out of curiosity.
A Yeah. I probably shouldn't say. That's not public information.
Q That's fine. I don't need to know that.
So you've now applied and been hired to be a chancellor at Northwestern University?
A Mm-hmm. President, yes.
Q Oh, president.
A Same difference.
Q Is that the same position under a different title at Northwestern?
A It's essentially head of the university. It's a little different in that Northwestern is a private university and it's not part of a larger system as UW Madison is.
Q Okay. So at a private university you're more likely to find a title of Chancellor or President rather than Chancellor?
A Yes.
Q Okay. When you were applying to -- when were you applying to Northwestern? When did that process take place?
A August and September was the interview process.

Q Okay. And did you have to provide any information about this lawsuit in the interview process?
A No.
Q Okay. Weren't asked about it at all?
A No.
Q And so did you do anything to prepare for today's deposition?
A I looked over the documents that had been sent to me, the emails and things that I think went to you under Discovery. Looked over the petition and the appeal and my responses and talked with legal counsel about what to expect.
Q Okay. So you looked over their emails. Do you have a -- well, first of all, just generally speaking, do you have a sense of how much time you spent reviewing the various documents that you just disclosed?
A I probably spent several hours reading through everything. We spent several hours talking together. And then when this got delayed, I spent an hour or so last weekend looking through it all again.
Q Okay. So you initially prepared for this in January when we had it set?
A Yes.

Q When you say "several hours," how many would you estimate that is, roughly?
A Between two and three.
Q Okay. And so you looked over the various emails. You looked over, you said, the petition, the outgoing --
A My letters back.
Q Okay. Your letters back to whom?
A To Mr. Cephus.
Q Okay. And then the actual appeal -- when you say "the appeal," you're referencing the Chancellor's Letter of Appeal that --
A Yes. The first one. And then the petition that came later.
Q Okay. When this -- do you recall -- at some point I sent the university a Litigation Hold Letter. Do you recall being notified of that?
A I know at some point I was notified that I needed to be careful not to delete any emails or dispose of any documents that I had. I couldn't tell you anymore exactly when that was.
Q Okay. Does it sound familiar if it was shortly after the Petition for Restoration process?
A It probably would have been sometime that fall that -- yeah.

Q Okay. And what did you do to preserve information that you might have that would be relevant?
A I simply did not delete any of my relevant emails from that time period.
Q Okay.
A It's all in the emails. I didn't have any documents in my possession.
Q Do you text at all?
A Occasionally.
Q Do you text in a work capacity occasionally?
A Occasionally.
Q What did you do to preserve any text messages that you might have?
A I don't delete text messages, typically.
Q Okay. So you still have whatever text messages existed back at that time?
A If I have the same phone, I think I do. I changed phones but I think it was right before that time. I'd have to go back and double-check that.
Q Okay. And do you know if your texts back up to your computer?
A No, they don't.
Q Do you know if they backed up to a cloud?
A They're not backed up in any way as far as I know.
Q Okay. So to the extent that you may --

A I haven't looked for texts, so I honestly just don't know what I have there.
Q Okay.
A Yeah.
Q We're going to have to try to not talk over one another anymore, but --
A Okay.
Q You understandably know a question I'm about to ask which is understandable, but let's make that effort.
So to the extent that you have any text messages still in your possession, they would be on that device -- that's where they would be, right?
A Yes.
Q So just make sure that you preserve those at this time in case they contain things that need to be produced.
A I will do so.
Q Okay. And you just have the one cell phone?
A Yes.
Q And how about emails that you use for work? Is it all wisc.edu, do you know?
A I never use any email other than wisc.edu for work.
Q Okay. Could you give me kind of an overview of what your duties are as chancellor? We can start

broadly, and then I'll ask you some follow-up questions.

A Well, my primary duty is to create a vision for the university and about where we should be going and how we should get there, and then to make sure that that gets implemented.

Q And how do you do that?

A In a variety of ways. I have an executive team who does most of the work around here often.

Q Mm-hmm.

A But, you know, I work with each of them individually and as a group to set policy, to set direction, to talk to them about what they are doing in their units. I do a great deal of communication, both in small and large across campus, speaking at individual events, writing blogs and emails to everyone.

I do a great deal of communication outside the university to others about what the university is about and what we're doing and what we're trying to do.

Q I'm sure there is no such thing as an average week, so this is probably a poor question, but can you give me an idea of what type of things you would do in an average week?

A Internal meetings, particularly with my executive team. It wouldn't be unusual to have a briefing on one or two topics that are percolating in one form or another with a particular group of people. I would highly likely have some speaking engagements either on or off campus.

If I averaged it out, I'd probably be traveling on average one day a week to see alumni, to go to higher education events, to travel around the state, that type of thing.

I would almost surely spend a little of the time with the system in one form or another. The chancellors meet regularly with the president of the system. So those are the main activities for the week.

I probably have at least one event at my house, a reception or meeting or dinner with alumni.

Q Okay.

A Something like that.

Q And when -- you had mentioned travel with alumni and -- or travel to see alumni or have alumni at your house. What kind of alumni are you meeting with?

A I'm fortunate that many alumni come to campus here.

Many of them are major donors because of the excellent athletic activities we have that they want to come and see. But I regularly travel for events at major cities, elsewhere on campus, or for board meetings. There are several organizations that regularly hold board meetings that are affiliated with the university. And the board usually consists of -- other than me -- of alumni from the university.

Q Okay. You mentioned the excellent athletics. We're obviously talking about football in particular today. Is that one of the biggest, if not biggest, drivers of alumni support in terms of the athletic programs?

A Football is very important. It's certainly not the only driver. We have a very good basketball team. Our women's volleyball team won the national championship. There are, you know, a variety of ways in which people are pulled into athletics and support of athletics.

Q I am sorry about the Badgers getting run out. My Bulldogs got knocked out last night, so...

You said that football is important. In what ways is football important?

A It brings people to campus. It creates a sense of

cohesion and excitement on campus among the students. It provides a national platform for the university when we are doing well. You know, it's one way in which the university is visible on the national stage, certainly not the only way, but in the fall there are those who follow sports, and this is one way in which they hear about the university.

Q It seems to generate alumni donations as well?

A You know, it's interesting. There's a lot of research on what's the effect of that. My reading of the literature is that a program per se -- you know, there are certainly alums who support athletics -- they support other parts of the university as well -- but the effect of athletics on giving -- ramping it up or down is almost always -- occurs when you do something unexpected. If you're unexpectedly better, it generates for a year some additional donations. If your unexpectedly worse, it drops donations a little, but it's never more than a year's effect. It's not at all the main driver of donations.

Q Okay. At the University of Wisconsin, the football program is actually financially profitable, isn't it?

A It is a revenue generator.
Q Which is different than most schools. Is that your understanding?
A I don't think that's true. I think football is the main revenue generator in many schools, at least certainly at the major Division 1 schools.
Q I guess there's a difference between revenue generator and actually turning a profit. Are you familiar with whether or not other schools actually turn a profit on those programs?
A I believe that many of the major Division 1 schools that we would all name as good football schools do turn a profit on their football team.
MR. CLUNE: Okay. I'm going to hand the court reporter an exhibit.
(Exhibit No. 1 was marked for identification.)
BY MR. CLUNE:
Q So, Chancellor, if you turn to what I believe is the fourth page of that document, I'll represent to you, this is the subpoena that was issued to the university in this litigation --
A Mm-hmm.
Q -- to provide certain records. And, in fact, if you flip a couple of more pages -- two more pages down there's a page that has in bold "Document

Requests."
A Mm-hmm.
Q So do you see in Document Request Number 1 where it says "All documents, including emails, social messaging, text messages, phone messages, and other ESI," which I will tell you stands for Electronically Stored Information, "or documents in any form whatsoever between or among any official" -- I don't think you need to read the whole thing, but you see that paragraph?
A Yes, I do.
Q Were you asked to preserve your text messages?
A If I was, I do not recall it.
Q Okay. You can go ahead and put that one down or you are welcome to look at it.
A Like I say, I never delete text messages, so...
Q Okay. So you have no recollection of that request?
A What I don't have a recollection of is searching by text messages. But it's quite possible I handed someone else my phone to do that.
Q Okay. Do you recall doing that?
A I do not.
Q And you said you don't recall actually the request?
A No, I do not.
Q So what's your role as chancellor pertaining to

interacting with the Board of Regents?
A I report to the system, and the board is my governing board, and the board is run at the system level. I attend Board of Regent meetings. I meet regularly, one-on-one, with many of the regents over the year.
Q When you say "at the system level," you mean broader than just the University of Wisconsin-Madison?
A The system encompasses 13 four-year schools.
Q Okay. So it's the same board of regents for all of those?
A Yes, it is.
Q So the University of Wisconsin system?
A Yes.
Q Okay. And so what would your normal interaction be with the board?
A At the board meetings which occur, I think, 9 out of 12 months.
Q Okay. And then how about any other interactions with --
A Well, I talk.
Q -- the Board --
A I'm sorry. I talk one-on-one with a good number of Board of Regent members on a regular basis on

specific issues that are coming up.
Q Okay. Do you recall talking to any board members about Mr. Cephus' Petition for Restoration of Rights?
A I do not.
Q Okay. Do you think that -- go ahead. I'm sorry.
A Yeah, no. It would have been unusual for me to consult with the Board of Regents on a decision like this.
Q Okay. Do you recall having any Board of Regents reach out to you while that process was pending?
A I do not have any recollection of that.
Q Okay. Is it possible that that happened and you don't recall, or are you saying that you don't think that happened?
A I think I would remember if it happened.
Q Okay.
A I do believe that I did reach out to the president of the system by phone to tell him what we were doing and why.
Q Okay. Was it -- would it be uncommon for them to reach out to you to just ask what's going on?
A Depends on the issues.
Q How about this issue in particular?
A I don't recall anyone reaching out to me on this

Page 26

issue at any point along the way. As my emails indicate, I sent messages to them at one point to update them, but I don't remember any proactive outreach to me.

Q Okay. And do you have any role in the University of Wisconsin-Madison's budget process?

A I do.

Q What do you do?

A The Vice Chancellor for Finance and Administration reports to me. This is the person for whom -- the budget office sits inside his unit. I am part of a number of budget meetings with the various units around campus every spring, and the part of the final decision-making any budget allocations we might have to make that are new in the coming year.

Q So is that a significant part of your job is working with the budget?

A It's not a substantial time sink. It's an important part of my job, but it's not one that takes a great deal of my time.

Q Which department actually prepares a proposed budget?

A The Budget Office.

Q Okay. Well named.

A Yeah.

Page 27

Q Okay. So when they have their budget prepared, does it go to your office at that point, or what's the process?

A Well, they would work with the Vise Chancellor to Finance and Administration to put together some budget -- you know, based on requests, some ideas of how we might spend any additional budget money we might have. There's certainly been years while I have been here when we had no additional budget money, such as the pandemic year. Then we were discussing cuts, actually.

And, he, the provost, and I would typically be the three that would meet together to look through what's usually a prioritized set of things to fund and make a decision on how much money we're going to spend and on what issues.

Q Okay. So are there, like, a limited set of things that are more discretionary that you look at, or is everything discretionary and you have to make final decisions?

A No. Usually the assumption is that we will continue funding everything we've been funding in the past, and the decision is about any changes. So we're only looking at changes.

Q Okay. And then is your function -- is it kind of a

Page 28

-- I don't mean to call it a final review, but do you have to give your approval of the proposed budget before it goes to the board?

A Yes.

Q Okay. And the board, I assume, ultimately is the one that adopts --

A I actually do not think our budget goes to the board for approval. I believe that we make budget decisions and we report in, then, to the system on what we have done. But there's not a final review by the board.

Q Okay. So are you the final review? Or you and the provost?

A And the Vice Chancellor for Finance and Administration would be the final review in making decisions.

Q What is the provost's responsibility?

A He's in charge of the entire academic enterprise at the university.

Q Okay.

A The deans report to him.

Q Okay. So within the school, you're the, kind of, highest ranking employee at the school?

A That's correct.

Q And you're the -- at Northwestern, will you also be

Page 29

the highest ranking employee at Northwestern?

A Yes, I will.

Q You are not the highest paid employee at the University of Wisconsin, right?

A I am not.

Q Is that the football coach, Paul Chryst?

A I believe so.

Q Do you know how much he is making this year?

A I don't. I should because we did a new contract for him. It's somewhere north of $4 million, but I can't tell you exactly what it is. I'd have to look it up.

Q Would you be surprised if the was north of 5 million?

A With the new contract, I think it went there.

Q Okay. And then after Paul Chryst, who is the next highest paid employee?

A I'm not sure whether that was our athletic director or the basketball coach. I would have to go look that up. My guess is it's the basketball coach, and the athletic director is third.

Q Okay. And the athletic director currently is Chris McIntosh?

A Yes.

Q Do you know how much he makes?

Exhibit 548 - 008

A Chris McIntosh make a little bit under a million dollars.
Q And when Barry Alvarez was the athletic director, he was making north of $1 million?
A He was making north of $1 million.
Q Okay. Who is Jim Leonard?
A Jim Leonard is one of the assistant coaches in the football program.
Q Okay. He makes about a million dollars?
A I would have to look that up.
Q Does that sound about right?
A I know it's a high amount.
Q More than you make?
A Yes.
Q Okay. Same thing with Bobby Engram?
A Again, I'd have to look that up, but I would be surprised if he didn't make more than me.
Q Okay. And he's the offensive -- the new offensive coordinator employed?
A Yes.
Q Who makes the decisions about salaries for these athletic department and football officials?
A The athletic director negotiates the salaries when they hire them. They come back to me, and I, together with the athletic director, because of the

level of salaries in the contract, have to get the approval of the Board of Regents in order to make the offer.
Q Is there a certain threshold that has to go to the Board of Regents over a certain number, or...
A Well, these are contracts, which is a little different than salaries. Most of the employees don't have contracts, they just have -- and these contracts -- officially -- the rule is any contract that's over $1 million has to go to the Board of Regents for approval. But we will occasionally take contracts that are less than but which are of substantial interest to them.
Q Okay. Do you have an understanding of why these employees make so much money?
A It's the market. Their peers make this amount of money, and if you want to hire someone, you have to pay them in the market equivalent to their peers.
Q Do you have an impression as to why the market pays these types of employees so much money?
A My impression is that really top coaching talent for college sports is rare, and people who are actually able to do it very well at a high level therefore command very high salaries, not unlike in other professions.

Q And the university in revenue makes a lot more than those numbers we were just talking about on, let's say, the football program?
A Yes, if you add the media contracts in.
Q What are the big media contracts at the University of Wisconsin?
A We do not hold media contracts. They are all held by the Big Ten.
Q And does the Big Ten pay the schools uniformly, or does it depend on each individual institution?
A The Big Ten distributes its money equally to all schools regardless of how they perform over the year.
Q And do you have a sense of how much the university gets from the Big Ten from those media contracts from the football program?
A It's public information. I believe our media revenue over this past year was somewhere around $55 million.
Q You indicated that you have an executive team that does --
A Mm-hmm.
Q -- most of the work, which is probably not entirely true, but who is on your executive team?
A The provost, Vice Chancellor for Finance and

Administration, the Vice Chancellor for Student Affairs, the Vice Chancellor for Government Relations, the Vice Chancellor for Legal Affairs, our general counsel, my chief of staff and chief strategy officer. The Vice Chancellor for Research and Graduate Education. The head of the foundation is an ex officio member of that group. And our Chief Diversity Officer.
Q Okay. And you said the head of the foundation. That's the University of Wisconsin Foundation or UW foundation?
A It's -- The Wisconsin Foundation and Alumni Association is the official name.
Q Okay. And that's a nonprofit -- that's the official fundraising outfit for the university?
A That's right. And it's separate from the university. It's not an internal unit.
Q Okay. So the fundraising for the university and donations, that sort of thing, all go through the foundation?
A Yes, they do.
Q Who is on your staff?
A All of that group except for the head of the foundation reports to me. And then I have an assistant, and everyone else in my office reports

Page 34

to my chief of staff and not directly to me.
Q Okay. And who's your chief of staff?
A Matthew Mayrl.
Q Are they Mr. Mayrl's -- are they Mr. Maryl's employees, or I guess they're employees of the University?
A Employees at the university, yes.
Q Who are the people that report to Mr. Mayrl?
A All of the office staff in the Office of Chancellor.
Q And how many people do you have in that office?
A Seven.
Q Okay. Is that here in this building?
A It is. Right below us.
Q Okay. And what does Mr. Mayrl do for you?
A He manages the office. He helps coordinate activities across the vice chancellor units so when we have policy issues coming up that involve multiple units, he will often coordinate the conversation to make decisions.
So, for instance, in the pandemic, he was absolutely central in coordinating some of the decision-making and then implementation of public health provisions that the university had never done before, and he was a key player in all of

Page 35

that.
Q Okay. And we'll probably talk about this a little bit more later, but what was his role in regards to the Petition for Restoration of Rights that was filed by Mr. Cephus?
A Other than serving as a conduit of information between me and others and particularly organizing some of the conversations that were happening here, he doesn't have a decision-making role in it.
Q Okay. Did he have an authorship role or editing role, or that sort of thing, in the outcome letter?
A He would have seen the letter, and if he'd had edits, he certainly would have suggested some. Typically, it gets sent to me for edits.
Q Okay. Who drafts it?
A That letter would probably have been drafted by the Office of Legal Counsel.
Q So speaking of the Office of Legal Counsel, what are the ways that you normally interact with the Office of Legal Affairs?
A Well, I see the general counsel at executive team meetings once a week, I meet with the general counsel every other week and go through any issues that are in front of us, and then, you know, if issues arise that need my attention or that I need

Page 36

to talk about, I would talk on the phone. Most everything comes to me through the general counsel, who's the head of that office.
Q Is that Nancy Lynch now?
A Yes, it is.
Q Is that who you have your primary contact with?
A Yes, it is.
Q In this 2018-2019 period, does that mean that Rachel Flora would have been your primary contact?
A Yes.
Q And when it comes to things like -- well, scratch that. That's a bad question.
What is -- what would their role be in a Petition for Restoration of Rights like the one that we're talking about today?
A Their role being the General Counsel's office?
Q Yes.
A So I would consult closely with my lawyer on the arguments that are in this -- they would be inside a petition. They would certainly make suggestions and help put together the information that I would need to see to make a decision. And, you know, once we had come to a decision, they would almost surely draft that -- send me a draft of that decision for editing.

Page 37

Q Okay. And we'll move on from Office of Legal Affairs -- is that what -- is it Office of Legal Affairs or Legal Counsel?
A Yes, Legal Affairs.
Q Okay. General Counsel. I just want to make sure I --
A Office of Legal Affairs is one subset within the Office of the -- we've got the Vice Chancellor for Legal Affairs Office. The compliance function is another.
Q Okay.
A So there are two functions inside that office.
Q I understand. Thank you.
So what about your interactions with the football program? How frequently do you interact with people like, you know, the head coach or the athletic director on football-related issues?
A I actually misspoke earlier. The athletic director reports directly to me. He's another one of my direct reports, and I should have listed that.
The athletic director and I meet at least monthly to talk about any issues that are arising that we need to speak with, and, of course, occasionally outside of that as well. I probably meet with the football coach twice a year. I will

see him occasionally at other functions, to -- the sort of chat you do at those things -- and I go to games that are in town.
Q And how often do you think you see the head football coach at other functions?
A Oh, twice a year at the most.
Q Okay. You don't run into -- there's not on-campus things that you run into him?
A No. Not frequently.
Q Okay. And how about the athletic director?
A The athletic director I would see a bit more often because the athletic director will occasionally be at alumni events or there will be fundraising events that we are both at.
Q Okay. And what percentage do you think your job entails dealing with athletics at Wisconsin?
A 5 percent.
Q Okay. Do you ever interact with players on the football team?
A Almost never.
Q There are no functions that you go to where you meet players?
A I do meet players occasionally. There is, for instance, say, a scholarship lunch, which is into raising scholarship funding for athle- -- and

students will often speak at that. I certainly and exclusively sit next to players at that.
I meet regularly -- at least once a year, typically, have met with the -- I'm going to get the name wrong -- it's the student association group inside the Department of Athletics, which there's two students from every team on this, and the consulting group between the students and coaches and athletic directors, and I regularly meet with that group. And there will be football players on that.
Q Mm-hmm.
A In my first year, I went out and met with the team. I met with a number of teams that first year, but I have not repeated that.
Q Okay. I presume you had not met Mr. Cephus?
A I had not.
Q Or have not?
A I do not believe I have met Mr. Cephus at all.
Q Okay. You did mention that you go to home games. Do you go to all the home games?
A Yes. There's been one or two exceptions to that. That's mandatory attendance.
Q Do you ever go to away games?
A I have attended only one away game.

Q How about bowl games?
A I do go to football bowl games. Final bowl games, I should say. There have been nine since I have been here, and I believe that I have attended five.
Q Bowl games?
A Bowl games.
Q Where do you sit for a football game?
A There's a chancellor's box.
Q Okay.
A It has about 40 people in it.
Q So that's, like, a climate-controlled suite?
A Yes.
Q Okay. And who's invited to the chancellor's box?
A It varies from week to week. If there are alumni in town who are major donors, they would get invited. The Board of Regents has a standing invitation to this. So they are often -- they are members. We typically have additional seats and will invite a mix of other people. Occasionally there are faculty or staff who we want to thank for something that they have done. We occasionally invite groups of students to come. You know, it's a mix every week.
Q How many members of the Board do you think come on a weekly basis?

A Not a lot, actually. Probably somewhere between three to five, plus a spouse.
Q Okay. Are there any more regular faces out of the donor crowd that come?
A Many people who are regular have their own box rather than be in mine. So, yes, they will be at the game, but they wouldn't be in my box.
Q Okay. So my question is just a little bit different. Are there any, kind of, regular donors that do come to your box?
A It would be quite rare to have the same people in the box other than the regents and my senior staff. We do try to rotate it around so people get invited at least once over the year.
Q Okay. And who are the -- you mentioned some of the major donors that would come regularly. They have their own box. Tell me who are the people who come to mind when you think of those donors who have their own box?
A There are several people who share boxes together. Mike Shannon and George Hamel share a box with a third person. There is eight boxes held by someone who has now recently deceased, Wade Fetzer and his family. There are a number of companies that own boxes where the alumni -- people in that company

Exhibit 548 - 011

are alumni, and often the head of the company is. The athletic department has a box. They have two boxes, actually.

Q Do you see -- or, I shouldn't say "do you see." Do you know, does Ted Kellner come to the games regularly?

A Ted Kellner comes regularly to the games.

Q Where does he sit?

A Ted floats around. He spends a lot of time down on the field. That's usually where is he watching.

Q Okay. How does he get access to the field?

A He has access to the field as a long-time, very major donor and friend of the program.

Q He's close friends with Barry Alvarez, right?

A He indeed is.

Q Does he have a box in addition to spending his time down on the field?

A I'm not sure if Ted has a box or if Ted shares a box with someone. I see Ted in various different boxes. He rotates, as I say. He probably owns a box. Or he certainly has a share of one.

Q I noticed when I was looking up his name in the documents that were produced, and there were so many hits because every single signature block in an email from somebody in the Athletic Department

said Kellner Hall on it. I assume that's not coincidental?

A He was a major donor to the construction of that -- the renovations of Camp Randall.

Q And so and Kellner Hall -- was Kellner Hall added to Camp Randall, or was it just renamed?

A Kellner Hall was a completely renovated part of -- this was before my time, so I can't quite tell you what was there and what wasn't there. But it was an addition onto Camp Randall, which is where the Athletic Department's headquarters are.

Q His donation, did that contribute to constructing Kellner Hall, or was it already existing and his donation renovated it and got him naming rights?

A This was before I came, but I believe that he contributed to the construction --

Q Okay.

A -- which is how he got naming rights.

Q Okay. So all of the athletic -- is all of the Athletic Department housed in Kellner Hall?

A Not all of it. Some of them are over in the Kohl Center, but the athletic director and the football program are there.

Q Okay. Anybody else besides the Athletic Department and football program?

A No. There are other parts of the athletic program that are there. For instance, our tutoring program is there. All our academic support programs.

Q Okay. But football is the main sport that's housed in Kellner Hall?

A It's the main sport that uses Camp Randall on a regular basis, yeah.

Q Okay. But, I mean, their offices are in --

A Yes. Yes.

Q Okay. Just remind you to wait until I am done with the question.

A Yes.

Q What women's sports do you attend?

A I have attended a lot of volleyball this past year given we were national champions, and it's really fun to watch those games. I usually attend at least one women's hockey game a year, sometimes more. I usually attend at least one women's basketball game a year, sometimes more.

Probably not quite once a year, but I have gone to women's soccer. I have watched the crew team. I've watched the softball team.

Q Okay. Is there any sport in the Women's Athletic Department, or I should just say women's sport, that you attend with the same regularity as you

described in regards to the football team?

A There is not. But of course there is a limited number of home football games. There are typically seven. So you could attend all of the football games at home with far less attendance than -- you know, there is many, many more competitions, typically, in most other sports.

Q And so you try to attend 100 percent of the home football games?

A Yes, I do.

Q Why is it that you don't try to attend 100 percent of any of the women's sports?

A Well, I would say this of the other men's sports as well, right? There are many, many more sporting events, and I just can't go to all sporting events on campus. That's one answer. The football teams pull in a much larger attendance, including a larger attendance of alums who I want to speak with and talk to.

Q Okay. So do you -- other than attending in your -- in the box, do you have other responsibilities at a football game to go out and talk to other donors, or is it just the people that come to your box?

A So I typically have a tailgate before the game in my yard. And, again, the attendees at that will

rotate from week to week. We will invite different groups of people, walk over to the game, and then the box. And depending on who else is at that game, I may well walk to the other side of the stadium and visit people in some of the other boxes.

Q And so you are kind of expected to attend and to talk with these donors or other important individuals?

A I don't watch much football during the games. I tend to spend it talking to people.

Q Okay. Why is that beneficial to the school? Why is that something you're supposed to do?

A Well, this is a time when a lot of people come. It's not just the donors. It's -- the Board of Regents is in town. There are often legislatures who are at this -- you know, rather than me having to travel to go talk to them, they actually come here, and I would want to take advantage of that and interact with them and build relationships. Sometimes there's business to be transacted.

Q Like what?

A Well, with the Board of Regents, I regularly have a list of items I want to tell people about and ask them about.

Q Are there any tailgate parties that you have for any women's sports?

A The tailgates are not for specific -- for football -- no, I don't do tailgates for anything else. But the timing, of course, of football where you usually have it -- it's a Saturday. You do a tailgate prior to this. So many of the other sports have evening events. It doesn't bring the same number of people into town.

Q Okay. And I assume there are no women on the football team?

A There are no women on the football team.

Q And since you have been here, I assume there have been no women on the football team?

A There have never been women on the football team in Wisconsin.

Q Okay. How many years have they had their football team here? Do you know?

A That's a good question. Well over 100. Probably close to 120. I'm not quite sure.

Q I think that's pretty right. Aside from the case that we're talking about here today, what has been your historical interaction with the Title IX office?

A Probably the main interactions with it have been

when people are appealing disciplinary decisions to me.

Q How often do you think -- or, I mean, I don't know -- how many times do you think you have dealt with that situation prior to --

A With an appeal?

Q Yes.

A This is a guess, and I'd have to go back and look. My guess is that I do three or four appeals a year.

Q So it's a regular part of your job?

A Yes.

Q And when you do those appeals, what kind of interaction will you have with the Title IX office?

A I rarely have direct interaction with them. My interaction is typically with the person in legal affairs who is overseeing this. That's often the deputy general counsel. They will send me all of the documents. I often will talk with them about their reasoning on this case. They will draft a response to the appeal, which I typically read through and often edit after reading everything. Sometimes there are questions that arise and we go back and forth and talk about them. And I then complete the appeal.

But it's usually -- I have rarely been

involved with conversations with compliance in all of that. It's usually with my general counsel or the Deputy General Counsel.

Q Okay. So it wouldn't be with the Title IX office?

A No.

Q So you said you talk with the Deputy General Counsel about their reasoning. Are you saying that they come up with a draft outcome for you and then you talk to them about their reasoning? Am I reading that right?

A Yes. I mean, I get given a substantial amount of documents to read. But I, for instance, will rarely sit down and listen to the entire transcript of the hearing. Whereas I expect my general counsel or someone working for them to have listened to that entire transcript and to have read through absolutely everything.

I will not do all of that. I will read through all the main documents that are available. I will often skim through transcripts and things, but -- in part because they will have had far more extensive engagement in all of this, their opinion matters it me.

Q Okay. So they will propose -- it sounds like it's something similar to what happened here.

Case: 3:20-cv-00256-wmc Document #: 54 Filed: 03/15/24 Page 14 of 160

A Mm-hmm.
Q They will propose an outcome or maybe write up a draft, and then you will talk with them about it?
A They will inform me as to how they're reading this case, and I will then look through all of the information, make my decision about this, and engage them in a conversation if it's different than theirs.
Q Okay. So have you -- prior to this case, have you interacted with the Title IX Coordinator, Lauren Hasselbacher?
A I have met with her on several occasions when we have reviewed policies that were changing. For instance, when the federal government changed some of its regulations around Title IX. We met on several occasions to review what we were doing and how this was -- the system was changing policies to the entire system, and we talked about our opinions of that and how we were going to engage in that process.
The other way which I engaged with -- not with Lauren directly -- with titles. That they do regular online trainings that I do as well that come out of the Office of Compliance.
Q Okay. And how do those online trainings work? Is

it like a PowerPoint slide or...
A It's usually a little more than that. You know, it's a series of pages that you click through. There are often little videos in some of them. There are PowerPoints, there's a voiceover, a combination of videos and PowerPoints and little moving characters sometimes. Animation.
Q Okay. And does she construct those?
A I don't think she does personally but her office is responsible for making sure the right training is available.
Q Okay. Since you brought it up, let me show you.
MR. CLUNE: You can mark that as Exhibit 2.
(Exhibit No. 2 was marked for identification.)
BY MR. CLUNE:
Q You can take a look at that.
A Mm-hmm.
Q So this was something that the university provided to us in Discovery.
A Mm-hmm.
Q And you can see on the last page, this appears to be something that was drafted by Lauren Hasselbacher.
A Yes. Yes.

Q Are these the type of presentations that you would --
A Well, this --
Q -- see?
A What I have done as training goes well beyond this. It's an online training module that usually takes up to half an hour and goes through both definitions of sexual discrimination, sexual assault, dating violence, and then talks about all the appropriate responses to that. I'm a responsible reporter or mandatory reporter, responsible employee.
So, you know, it's all the things that you should do, and under what circumstance you need to report, and who you report to, as well as how you help an individual get assistance.
Q Okay.
A So it's an extensive -- it's much more extensive than this.
Q I'm sure your training is much more robust than this basic PowerPoint, but these are some of the types of slides that you might see as a part of one of these trainings?
A Yes.
Q Okay. The second page of this, which is marked as

BOR_18105.
A Mm-hmm.
Q This has Organizational Reference. Is this an accurate description of the Organizational Reference as it pertains to the Title IX hierarchy within the university?
A Yes. I can't testify to everyone who is exactly below Jaimee here, but, yes, this is the hierarchy.
Q Okay. The top three are --
A Yes.
Q -- certainly accurate?
A Yes.
Q And we know that Lauren --
A Yes. Yes.
Q Okay. So I'm going to have you flip to what is listed as BOR_18155, and on the right side it says "Title IX requires complainant notification and participation."
What is your understanding of the obligation to include complainant notification and participation, just generally within the Title IX process? We will talk about the petition in detail later, but...
A So I'm assuming that this is a reference to information on what is happening inside the Title

IX process. So, for instance, you -- one needs to deal -- to talk to the complainant to make sure to set a date for a hearing or to let them know that there's an investigation that is opening. You know, that's the type of notification that I assume that it's referring to.

Q Okay. And how about participation?

A The plaintiff is obviously highly involved in participating in the entire investigation and hearing process.

Q Okay. That was the only questions I had on that.

A Mm-hmm.

Q That's fine. So we talked about trainings a little bit. You do these online trainings?

A Mm-hmm.

Q Are there any other Title IX related trainings that you do?

A When I first came, I think it was probably before we had online trainings, I know I had an hour in my office with -- and I couldn't even tell you who it was anymore -- which was, you know, sexual assault training I think with all new employees. My guess is this is all online now. But since then everything that I have done has been online training of a mandatory sort. Happens either every

year or every other year.

Q Okay. What's your level of understanding regarding the process for -- the disciplinary process for sexual assault allegations?

A So, typically, there is an investigation that is launched, and upon the completion of that investigation and those findings, there is -- you know, if there are any findings from the investigation, it goes to a hearing with trained participants from among faculty staff. There's usually a student in that hearing as well, which involves both the participants if they choose to be there. A recommendation on discipline comes out of that and is communicated then to whoever is accused.

Q Okay. And a similar but slightly different question --

A Mm-hmm.

Q -- is, I think I'm just trying to get at in regards to your expertise on both the sexual assault policies and the even the university's -- the nonacademic disciplinary process -- are you -- that's a terrible question. I can tell already.

A Mm-hmm.

Q Give me just a second.

In regards to those two policies, sexual assault policy and nonacademic student discipline --

A Mm-hmm.

Q -- what's your level of familiarity with those processes versus how much you rely on General Counsel's office for their guidance?

A I certainly have been briefed and understand, I think, what the processes are. I am no way engaged in them. I do not -- I will typically be notified if there is a major allegation, you know, something that rises to the level or rape, for instance, that there has indeed been a complaint and that this is being investigated.

I do not get involved in any way with the investigatory or the hearing discipline process, in part because I am in the line of appeal. And should I get an appeal, I want to come to that without having been involved in the case earlier.

Q Okay. And you get notified if there is something like a rape? Or are you saying you get notified of all sexual assaults or rapes?

A No. I get notified if there is a complaint that is of a serious nature.

Q Okay.

A And, you know, in some sense it's up to the judgment of -- and oftentimes this will come from my student affairs officer because students will often seek help within that office.

Q Okay. Would you expect that you get notified of all sexual assaults that are reported and perceived as an actual complaint?

A I could not guarantee you that I get notified with all. There's different levels of sexual assault. I suspect there are some that do not -- that I do not get notified of. I would say I get notified of anything that strikes people as this is a really serious issue, and you, you know, you need to know that the complaint is out there.

Q And can you give me an example of what would not be a serious issue that would be a sexual assault? It's not a trick question. I'm --

A Hard to say that since I don't get notified of them, right? You know, I'm going to make this up, right?

I would imagine if a student said, you know, "I was at a bar, and I was groped," that that probably would not rise to the level of notifying me about that complaint.

Q Okay. But something of, like, sexual penetration

without consent, is that something that you would expect --
A Anything that involves rape, I would absolutely -- if it involves penetration, I would expect to be notified of.
Q And what do you do with that information? What's the purpose of notifying you of those cases?
A Just so that I'm aware that's out there. Many of these will hit the media, so that we often have to look at whether there's some communication strategies we need as to what we can say or won't say. And, you know, partly I want to know because I want to know the frequency of which these sorts of things are happening on campus, right?
Q So this -- you mentioned the media. That must be even more might heightened when it's of one of the more higher profile athletic teams?
A There is always additional media attention when it involves an athlete.
Q Okay. Significantly different if it's a football or basketball player; wouldn't you say?
A Probably. We certainly had cases that have gotten a great deal of attention that did not involve an athlete, let's put it that way. But, yeah.
Q Unfortunately, yeah.

A Yeah.
Q Okay. And so what do you -- what do you hope to strategize when -- and I'm still staying on this media --
A Mm-hmm.
Q -- aspect. What do you hope to strategize in regards to of a higher profile allegation of sexual assault?
A Not sure what you're asking in terms of strategize.
Q So I think you were -- tell me if I'm putting words in your mouth -- I think you were saying that if it's -- one of the reasons why it gets reported to you is if it's a case that might have media implications to it, that that's something that you need to know. Is there -- first of all, is that accurate?
A Mm-hmm. That is accurate.
Q Okay. And so the follow-up question is what do you do knowing that there is a higher profile sexual assault out there?
A Typically they would also notify the Communications Office. And if indeed we look like there was going to media attention to this, I would probably be informed by either the Head of Communications or Vice Chancellor for External Relations who the

Communications Office reports to as to what we were saying, what our prepared statement was, what we couldn't say. That type of thing.
Q Okay.
A I might want to know the timing of the investigation and the hearing to just to get a sense of what is going to break when.
Q And why do you say anything at all?
A Well, typically, we are often asked to make statements, right? If there is an allegation of a major sexual assault on campus. We say nothing about the individuals case; we are prohibited from doing that, but we typically will make a statement about our concern about these issues and a general statement about the process that we are following.
Q Okay. And what's the benefit to the school or student body by you making that kind of a statement?
A I think many people don't understand the process, don't know how these things are dealt with, and, you know, both internal and external to the campus. So that, you know, in part it's a reassurance that, yes, we are taking this seriously. And part it's education. This is what the university does in these cases.

Q Okay. Anything else that you try to include in a press statement or when there's just a matter pending other than what you stated?
A Those would the two main things that we would try to emphasize.
Q Okay. And does the fact that there are these higher profile cases are out there -- it's a poorly-phrased question -- but when you have one of these higher profile cases, are you in the loop more from either Title IX or OLA or Communications about the progress of that case?
A I try to get not involved with all or any of the substance of anything that is going on with the investigation or the hearing. As I say, that is both inappropriate and potentially, you know, will make it harder for me if there is an appeal that comes through.
I -- you know, it depends on if there's media interest, you do want to know what the timing is on -- you know, when is the investigation going to be done? When is this likely to go to a disciplinary decision? Because that's usually the sort of question you're getting.
Q So you are kept more in the loop, procedurally, when there is a higher profile case than --

REBECCA BLANK
March 25, 2022

Page 62

A Almost surely, yes.
Q Okay. When there's a case of lower media interest?
A Yes.
Q You find out --
A Yes. And some of it I'm always, of course, likely to be asked about when there is media interest, whether by someone on the governing board or whether by an external person who runs into me on the street at one of my community events, right? So I partly want to be able to make sure that I'm responding in the appropriate way and utterly consistent with the way in which the university is formally responding.
Q How do you deal with that? There must be people regularly asking you questions or just making comments about things that are in the media, these types of cases, and you can't really say anything. How do you deal with that when you're out at functions or whatever?
A It happens less often than you might expect, but my reaction is always to follow exactly the same template I just gave you. We cannot -- I cannot comment on any individual case and what's happening there. We take these cases seriously. Here's how we handle them.

Page 63

Q Okay. Have you had a higher profile student-on-student sexual assault case than this one?
A Yes.
Q Which one was that?
A It was one where someone was accused of raping a woman whom he held hostage in his apartment overnight. And after that complaint came out, several other women came forward and claimed that they had had somewhat similar experiences. So he was criminally charged with multiple rapes, and that got at least as much attention as the Cephus case.
Q And he was a student?
A He was a student.
Q Was that Mr. Cook?
A Yes.
Q Is Mr. Cephus's case the second highest?
A Probably, in my recollection.
Q Okay. Were they comparable, or are they the two that stand out as the highest profile ones you have dealt with?
A In terms of sexual assault, yes.
Q Okay. So in your role with these appeals, you have to be familiar with the school's procedures, right?

Page 64

A Yes.
Q Okay. And those procedures as it pertains to nonacademic misconduct, that's actually set by Wisconsin law, right? It's not something that the university just makes up?
A Well, it's set by federal regulation by Wisconsin law and by our own internal policies. All of those affect exactly how we handle the cases.
Q Okay. So it's not just off of UWS Chapter 17. It's the federal regulations?
A The federal guidelines out of Title IX are quite extensive. And, you know, as you may know, it actually went through changes since this case we are talking about took place. And it actually required changes in Wisconsin 17 because it was no longer consistent with the new regulations. So as I say, there are federal guidelines that are important to how we deal with this. Wisconsin 17 affects it, and then we have our own, you know, how do we specifically do this? How do you appoint people? How do you train people for the hearing? That type of thing.
Q And in -- so prior to these new regulations coming out --
A Mm-hmm.

Page 65

Q -- at the time period that this was ongoing, how did federal guidelines affect your handling of -- or the school's handling of Title IX?
A Well, probably the most important effect is that the federal guidelines tell us to use a preponderance of evidence, burden of proof, in looking at these cases. And that then shapes, in turn, what, sort of, instructions you give to people in the hearing in making disciplinary decisions.
Q Are there any particular guidances that you try to follow from the Department of Education during that timeframe? 2018-2019?
A Not me, personally, but I would expect my compliance office to follow the federal guidelines completely in terms of how they were behaving and the procedures they were following. And indeed, Wisconsin 17 is designed to be consistent with those federal guidelines.
Q So when you would do the these chancellor-level appeals that would come up three or four times a year, your remedy needed to comply --
A Yes.
Q When I say "need," I mean for you --
A Yes.

Q Need to comply with both Wisconsin law and the existing federal?
A Yes. Yes.
Q All right.
A And our own procedures. I mean, at the -- you know this as well, I'm sure -- there are three things that I look at in the appeals. The first is whether all appropriate procedures have been followed. The second is whether the conclusion follows the evidence. And the third is to make sure there is no violation of state or federal law.
Q Okay. And in your experience, have you seen conflicts between Wisconsin law and the federal guidelines?
A Only when the federal guidelines changed and the Board of Regents had to make changes, went through a process to make changes in Wisconsin 17.
Q Okay. And so we are talking about in the summer of 2020, when those --
A Yes. That was after all of this, yeah.
Q While this was going on, you didn't see any conflict between --
A No.
Q Let me just finish the quick question.
You didn't see conflict between the

federal guidances and Wisconsin law on nonacademic student discipline?
A No.
MR. CLUNE: This would be a good time for our first break. We can take five or so minutes.
MS. BACHHUBER: Sure.
THE VIDEOGRAPHER: This marks the end of Media Number 1. The time is 92:35 p.m.
(A recess was taken from 2:35 p.m. to 2:45 p.m.)
THE VIDEOGRAPHER: This marks the beginning of Media Number 1. The time is 2:45 p.m.
BY MR. CLUNE:
Q Just a couple of follow-up questions about what we talked about earlier. The other thing I'd say is I'm worried about what the transcript looks like. Because we had a number of times where we spoke at the same time --
A Mm-hmm.
Q -- so if you could try to listen until the end of my question before answering, that would be great.
Is anybody from -- are you taking anybody with you to Northwestern?
A My assistant is going with me.
Q Is that Mr. Mayrl?
A No. A woman named Diana Cline who keeps my

schedule.
Q So she's your --
A Yes.
Q Personal assistant is probably --
A Yes.
Q Okay. Is Mr. -- that wouldn't make any sense. Never mind.
The other thing I wanted to ask about is you had talked about how the normal process of how the Office for Legal Affairs does the main review of the documentation or the record. Is that what happened in the Mr. Cephus's case as well?
A Yes.
Q Okay. So they reviewed everything that was submitted in the petition, wrote it up, and then you reviewed the writeup?
A I looked at a number of the documents as well. Like I said, I don't just review the writeup. I do try to look at some of the evidence.
Q What things did you look at?
A I looked at a selective group of videos, and I believe that I read the transcript of a couple of the police reports.
Q Okay. So you said "a select group of videos." That means hat you were shown some of the videos

that were submitted?
A There were large numbers of videos as I understand it, and I looked at some that them that seemed more relevant.
Q Okay. And then you recall looking at a couple of police reports?
A Yes.
Q Anything else that you recall looking at?
A Other than going back to the original appeal as well as the petition, no.
Q Okay. So you looked at the petition that was submitted --
A Mm-hmm.
Q -- and then your prior appeal?
A Yes.
Q Okay.
A His appeal to me when the original discipline came down. Sorry. Yeah. And what I was interested in is what new information is there. And that particularly seemed to be the videos and the police reports.
Q Okay. So your written outcome of the original appeal from the hearing?
A Yes.
Q Right? And then the petition, right?

A Yes.
Q And then a couple of the police reports and some of the videos that were selected?
A Yes.
Q Who selected those videos for you?
A The General Counsel's Office.
Q Do you recall how many those were?
A I would guess I looked at five or six.
Q Okay. And these are five or six new videos that your understanding were not used in the actual Title IX hearing itself?
A Yes.
Q Okay. So if we can talk a little more about the chancellor appeal process. You said you do three or four a year. Has that been consistent throughout your nine years?
A Probably.
Q Okay.
A Yeah. Yes. This is appeals to disciplinary cases.
Q Okay. So, ballpark, that's either roughly 30 of those in your time here?
A Probably.
Q Okay. I won't hold you to that --
A Yeah.
Q -- but that's as fair number as we can come up with.

A Yes. I would guess a little lower than, but that's close.
Q How many of those would you estimate, or by percentage or numbers or whatever, were sexual assault cases?
A I would guess that the majority involved sexual assault or sexual harassment of some sort.
Q Okay. Did the prevalence of those appeals being sexual assault or harassment, have they increased over time? Like, if in 2013 maybe one of them was sexual assault, is there more in a given year now, or is it about the same?
A No. The only noticeable pattern is that during the pandemic there were very few.
Q Okay. During the pandemic, were there students on campus?
A Yes, there were.
Q The entire time?
A Well, not from March of 2020 until September of 2020.
Q Okay. So starting in September, you had people on campus?
A Yes.
Q Okay. Because, I assume, much less interaction between students during that time?

A Yes.
Q Okay. So going back to the run of the mill chancellor-level of appeal that you get, you talked about how you normally would start with legal affairs when they would submit information to you. Once you got that in your review, what's the process for you at that point?
A Well, I would read through all of the information that I had in front of me which would, you know, certainly involve the petition itself. It would also involve an investigative report. There would sometimes be even some parts of the transcripts of the trial that would be included. And I would usually talk with the general counsel's office if I had any questions or issues on this. And I would typically edit the document, talk with the counsel about the edits I was going to make, send it back, make sure that they were fine with my revised version and if they wanted to argue back in any way. And then we would send it out.
Q Okay. Anybody else on your staff or in your office that would be involved in that process?
A Typically, these would be sent to my chief of staff, who would in turn transmit them on to me.

So if he wished to, he could read through them. I don't know that he does that regularly. He probably has done that with some high profile cases just to make sure there's, you know, what's in here that's going to get picked up in the media.
Q Okay. So would he make, like, edits or suggestions to you based on things that seemed more media flag-worthy, for lack of a better term?
A I don't recall him ever making edits. You know, I am clearly the one who does the edits and makes the decision.
Q Okay. So he's not part of your team in deciding what to do? It's just you?
A No.
Q Just you?
A It's just me, yeah.
Q And you meet with, or discuss at least, with Legal Affairs?
A Yes. Me, in consultation with the General Counsel or the person in Legal Affairs who has put all this together.
Q And when you're discussing this with Legal Affairs, are you discussing the facts of the case?
A It depends on what the basis of the appeal is. Some appeals are based on procedures. Some appeals

are an appeal on facts. So it depends.
Q Okay. There's a few different options of why they can appeal to you, right?
A Yes.
Q And what are those options?
A One is either that the process was not followed, that we or the state or the federal government lays out. A second is that there -- the facts do not justify the finding. And the third is that in some way this decision violates state or federal law.
Q Okay. And in the time that you have been here, how many times do you think that, on appeal, you have reversed a finding of responsible on a sexual assault or harassment case?
A Almost never.
Q Can you think of one?
A I'd want to look back at the records. I know there were at least one case where I actually imposed a greater -- I don't know if this was sexual assault or nonacademic. I think it was a sexual assault -- I actually imposed a greater discipline than was recommended.
I could not think of a specific case where I actually, in the appeal, found any of -- either the findings didn't support it or that the

procedures were wrong.
Q Okay. And when you started that answer, you said "I don't recall if that was sexual assault or nonacademic." What's the difference between -- I assume you're referring to nonacademic student discipline?
A Yes.
Q What's the difference between -- what's the distinction that you were making between those two?
A Well, nonacademic student discipline could, for instance, involve cheating on tests. Or, I'm sorry, that's academic. Engaging in fights.
Q Okay. So it may follow the same process --
A Yes.
Q -- but you're just distinguishing between nonacademic that's not sexual in nature?
A That's right.
Q And for the Petition for Restoration, is -- first of all, how many of those have you done since you've --
A I actually asked that question. I could not have told you off the top of my head. I am told I have done eight.
Q Okay. And what is the -- is the process for dealing with a Petition for Restoration similar to

your process that you have for the chancellor-level appeal?
A So this is governed by Wisconsin Statute 17, and there is far less restriction in Wisconsin Statute 17 about the Petition for Restoration than there is about the appeal. For instance, there is not a list of here's what you must consider. It's clearly up to the decision maker to decide whether that petition would be granted.
Q Okay. And I'm just talking about, kind of, your process and how to deal with that. You had talked about -- this goes -- OLA, again, takes the lead on this, and then they do a writeup for you to review. Is that the same thing you do?
A It is the same process, yes.
Q Okay. Is there anything different -- and we will talk in a little more detail about what you just went into regarding what the actual bases are for a petition -- but is there anything else about your process that differs in the Petition for Restoration process versus the chancellor-level appeal?
A Well, I'm typically looking at whether there is any new evidence that was not there when the original discipline was imposed.

Q Okay.
A If there's something that I know that I didn't know that -- you know, in many cases there was not an appeal to the original discipline, that the first time I've seen this case is the petition. That would not be unusual.
Q Okay. And in those petitions that you have done -- the eight that you have done --
A Mm-hmm.
Q -- how many of them involve sexual harassment or abuse?
A Again, I asked this. I would not have been able to tell you off the top of my head. Two.
Q Okay. Two, including Mr. Cephus, or in addition to Mr. Cephus?
A I don't know the answer to that.
Q Okay.
A So it's either two to three is the answer.
Q Okay. And have you -- is the eight up to today's date, or is that up until --
A I think that was up until the Cephus case.
Q Okay. So you had done eight up until Mr. Cephus's case, and we are not sure if eight includes Mr. Cephus's case or not?
A That is correct.

Q Have you done some since Mr. Cephus's case?
A You know, we have been in a pandemic so much since then, and there has been almost nothing coming through. I don't recall it if I did, but it's possible there was one in there.
Q Okay. And on the other one or two cases that involved some type of sexual harassment, first of all, were they sexual assault allegations?
A I believe so.
Q Okay. So on those one or two others, did you reverse the finding of responsible in those cases?
A I did not.
Q Okay.
A I did not think there was new information.
Q Okay. And where is the -- where does the notion come from that a Petition for Restoration of Rights is to be based on whether or not there is new information?
A Well, as I say, Wisconsin Statute 17 is not -- it does not specify exactly on what basis one would make this decision. From my point of view, I would always support the original decision, which is presumably based on existing evidence. You know, a recent argument, unless I thought there was some reason to think that the information that the

hearing group had had was not complete. You know, otherwise I would see no reason to overturn the discipline. Many of these were cases, particularly with the nonacademic, asking to be -- they were suspended, and they wanted to come back to school sooner, right?
Q So in -- and maybe you just answered this.
A Mm-hmm.
Q But in all of these eight that you did, was your focus whether or not there was new information?
A Yes. The new information can come from two -- one is new information about the individual and whether they have gone through some sort of change because of training or treatment for alcohol abuse or whatever or new information that there's evidence that came forward that was not there when the original discipline was imposed.
Q Okay. So maybe they are still responsible for what they had done, but there was some arguable reason why they should be restored as a student at the university?
A Yes. That's right.
Q And out of those eight -- and forgive me if I asked this question already -- but out of those eight, were any of those students allowed back into the

university?
A I believe at least one or two of the nonacademic ones, I granted.
Q Okay. And when you say nonacademic, again, you're --
A I'm sorry. Non-sexual assault.
Q Okay. So by nonacademic -- and I understand what you're saying. I just want the record to be clear -- when you say nonacademic, you are not talking about sexual assault cases?
A That's correct.
Q So maybe there was a fight or some other bad behavior that wasn't sexual in nature?
A That's correct.
Q Okay. And in any of the eight -- I think I asked you this as it pertains to the sexual assault ones. But in any of the eight, did you ever decide that new facts warranted reversing the underlying finding?
A No, I did not.
Q Okay. You may not know the answer to this, but have you heard of -- prior to your time here -- have you heard of a sexual assault being -- having the finding reversed through a Petition for Restoration of Rights?

A No. But there was no reason why I would have known that since I was not in this type of position in any of my previous jobs.
Q All right. Nobody, since you have been here or during the Cephus case, has advised you, well, we have done this before back in 2011, or whatever?
A No.
Q So we talked a little bit about what the Title IX process looks like, although I didn't specifically ask you that question, so I'm going to do it just so I make sure I get as complete an answer as we can.
What is your understanding of the school's -- well, first of all, when I say the term "Title IX process," what does that mean to you? Or do you use that term?
A Yes. To me it means the process under which issues that fall under Title IX regulation are handled inside the school, and typically we're talking about complaints and charges.
Q Okay. And I know you are not the Title IX coordinator, but what is your understanding of how that process plays out? What are the steps in that process?
A So a student indicates that they have been the

Case: 3:20-cv-00856-wmc Document #: 294 Filed: 03/15/24 Page 22 of 160

victim of sexual assault. First thing we try to do is to get them whatever assistance they need, whether medical or mental health or whatever, right? Counseling. And they decide to bring charges.

There is always the question of are they only talking with us or are they also talking with the police. We have nothing to do with the police investigation, but those two often overlap. But if they are going to bring charges and request that we investigate this, we then assign an investigator to look into the charges to talk to as many people as who are around and involved with or identified, including both the accuser and the accused.

The investigator writes a report that in turn is submitted back to the Title IX office. And on the basis of that report, if there are any findings in investigation, they impanel a disciplinary hearing. And the disciplinary hearing in turn interviews people, including reading the investigator's report and makes a recommendation about discipline in this case. And, you know, it proceeds from there.

Q Okay. And from there, what is -- if somebody is found responsible, is the appeal to you the next

level of relief?

A Yes.

Q Okay. So they appeal to you -- we talked about that process. And then once your appeal is concluded, if you still find that the individual is responsible for the sexual harassment or assault, is there another level of appeal after that?

A Wisconsin 17 allows them to appeal to the Board of Regents.

Q Okay. And how does that work?

A Since I'm not directly involved in that, I assume they send a petition to the board. There's a subcommittee of the board that handles these, that reads the information. I believe they read their request to me and my response, as well as their subsequent requests to the board. And that subcommittee makes a recommendation to the board that decides in closed session on what their response will be.

Q Okay. And they don't talk to you during that process?

A I have no conversation with them. I often do not even know that an appeal has occurred.

Q Okay. And that's, I assume, partly by design?

A I assume so, yes.

Q And if at that point the Board of Regents decides -- that committee and the full board then decides that discipline is still merited after a finding of responsible, there is another level of relief, but it's outside the university, right?

A That completes the university process entirely.

Q Okay. Are you familiar with the process where somebody -- a student who has been disciplined can file an action with a local court to review the Board of Regents denial of their final --

A I am not familiar with that. If that has happened while I am here, I don't know it.

Q Okay. So from the university's -- go ahead.

A A person can always file a complaint with the Department of Education complaining we did not follow appropriate Title IX processes. That, I do know can happen. I am less familiar with their ability to go to a local court.

Q Okay. But the filing with the Department of Education, that doesn't affect anything about the school's disciplinary's outcome?

A We impose the disciplinary outcome immediately upon my decision to re-appeal.

Q Okay. So from the university's standpoint, things -- the process ends with the Board of

Regents' appeal?

A That is correct.

Q Okay. Is the Petition for Restoration of Rights part of the Title IX process?

A It is allowed under Wisconsin Statute 17. I do not know how that fits into -- I just don't know the federal regulations around this. It's certainly part of the Title IX process in the State of Wisconsin.

Q Okay. So let's shift to this case now after all this conversation.

A Mm-hmm.

Q When did you first hear about the allegations that were made by my client and the other student?

A I cannot give you a specific date. It would have been very soon after those allegations were made and it was clear that they were going to file a complaint and move forward with this.

Q Okay. So the actual assault is alleged to have occurred in April of 2018. So do you think you would have heard within a couple weeks of that?

A I would have heard within days, I would think.

Q Okay. And who would have told you?

A I would probably have heard either from my general counsel or from my Vice Chancellor for Student

Affairs. Typically, it would come from the general counsel, but occasionally the Student Affairs Office, which is often working with the complainants.

Q Okay. And you don't recall, as we sit here today, how you learned about it?

A The exact day, no, I can't recall which person told me.

Q Okay. Do you recall what -- generally what information you received?

A I know that I was told that there were two women involved in a case in a football player's -- and I don't know if Mr. Cephus was named or not -- apartment, and at least one of them was charging rape, and at that point it was unclear exactly what the full nature of the complaint was going to be.

Q Okay. And having that information, is there anything that you do in your responsibility as chancellor?

A There is not. I expect the process to move forward in a timely and effective way within the Office of Compliance.

Q Okay. Knowing that this was something that was high profile, would you have interacted with the Communications Office at all?

A I would guess that they would have been informed as well. And almost surely I would have had a conversation with them about the fact that this was one that was likely to hit the media and that we needed to have a prepared statement about -- I would also guess I would not have done this, but our Communications Office or the General Counsel's Office, probably the General Counsel's Office, would have talked with Athletics as well so they were both aware of the complaint, right? And that might kick in some procedures on their part as well as making sure that their communications people knew this because they would get advised, same as we would.

Q Okay. Are you aware of any procedures in Athletics that this might have affected at the stage where somebody was accused of something?

A Almost surely any coach would have wanted to talk to the involved player just because they want to know what's happening with their players and where things stand.

Q Is there any concern that the police haven't even completed an investigation; maybe that we shouldn't share that information around?

A The police investigation is completely separate

from anything that we do under Title IX. That's just -- in some ways that's irrelevant to our actions.

You know, once a student is accused, the Athletic Department needs to know this because depending on what happens and the nature of this, they may -- it raises the question not only about the discipline we are going to impose regarding whether this individual continues at the university or in what form, but it also raises questions about whether they continue as a student athlete, right?

And there are procedures inside the Athletics Department that would make decisions on suspension from their athletic -- I believe that the way the athletic student policy is written, once an allegation is made -- a serious allegation of sexual assault -- a student is suspended from participation in practice or in competition. They can continue to use the weight room, to be in the athletic facilities, but they are suspended from team activities as soon as a serious allegation occurs. I believe that to be true in the student athlete policy. And until that's decided, it remains the case.

Q Why don't we take a look at that policy.

A Yeah.

(Exhibit No. 3 was marked for identification.)

BY MR. CLUNE:

Q Chancellor Blank, you can take a couple minutes to take a look at that.

A Mm-hmm. I can now give you the appropriate -- proper answer to your question.

Q Okay. So let me just ask you a couple questions --

A Yeah.

Q -- and you will have the opportunity to revisit that one. So this is -- so -- and I will represent to you that this is a copy that we printed off online for no good reason. It doesn't have a Bates-stamp to it. So the purpose of the policy is to -- it says, "To impose mandatory suspensions for team activities when certain situations involving student athletes occur." That's what we were just talking about, right?

A Yes.

Q Okay. So in reviewing this policy, when does this policy apply?

A So I misstated before. It is not when a charge is made within our Title IX process. It's when a charge is made by the police -- when someone is charged with a crime within the criminal justice

Page 90

system. Within our process, suspension occurs when they are found guilty and either suspended or expelled.

Q Okay. So if somebody is found responsible for something that is eligible for suspension or expulsion, they are no longer eligible to participate in athletics, right?

A That is correct.

Q They still may be allowed to participate in the university as a student?

A Well, if they are suspended or expelled, they are not at the university at all.

Q Take a look at it. The way I'm reading this is if it's the type -- if you're found responsible for the type of crime where the sanction can be either suspension or expulsion, that's the type of finding that triggers the suspension.

A The way I read this -- and it's a little ambiguous -- is, if they are found responsible, which is to say a hearing has occurred, and they have been found guilty of whatever they are charged with, and the sanction that is imposed is either suspension or expulsion, then they are automatically out of athletics as well.

Q I see. So you can't play sports if you are

Page 91

suspended or expelled?

A That seems to be -- that would be my interpretation of this. And seems to make sense.

Q So just to rehear my question. So if you are suspended or expelled, based on this finding, you are not eligible to participate?

A Yes.

MS. BACHHUBER: I'm going to object on -- Exhibit 3 is undated and it's not Bates-stamped. It wasn't produced. I don't know when the effective date of the policy we are looking at is. I don't know if it's the one effective at the time.

MR. CLUNE: Okay.

BY MR. CLUNE:

Q Okay. That's the only question I had on that one.

A Mm-hmm. Okay.

Q So you -- we were -- before I went on this little sojourn, we were talking about when a high profile case like Mr. Cephus's, you would certainly have been in touch with someone in the Communications Office. I have an idea of what the Communications Office does, but can you tell me a little more about what their role is?

A Well, I probably would not have been the one in touch. I would guess that whoever notified me

Page 92

would also have notified the Communications Office if there was a set of charges against it or likely to go public, right? And the Communications Office needs to know that.

The Communications Office handles all internal and external communications at the university. If we get queries from the press on anything, they would be the ones who would issue a response. And this would have been a case that they almost surely would have been notified about expecting that there would be inquiries from the press at some point if and when it became pubic.

Q Okay. And who is the head of the Communications Office?

A A man named John Lucas.

Q Okay. And who else would you interact with out of that office?

A I would probably be interacting with the Vice Chancellor for External Relations. Is that the right title? Charlie Hoslet is the Vice Chancellor, inside of which John Lucas reports to him.

Q Okay. Is the Office of Communications underneath --

A Yes, Vice Chancellor for External Relations.

Page 93

Q Okay. And then who is Meredith McGlone?

A Meredith McGlone works for John Lucas. She is often our public spokesperson inside the Office of Communications.

Q Okay. And so what's their responsibility in -- let's just talk about Mr. Cephus's case. What would be their role early on when this matter is first reported?

A They would not do anything unless there were inquiries, public inquiries, about this. So if this did not become public and would only become public at that point if one of the -- some of the individuals involved talked about it publicly, you know, if that were to happen, it would potentially generate some media inquiry, and I would expect them to want to be prepared to respond so they could well draft a potential response to have it ready if needed.

Q Would you think that they would be in touch with the Athletic Department or somebody in the football program?

A They would probably coordinate with the Athletic Department's Communication Office to make sure that we were all saying the same thing if there was a public inquiry.

Exhibit 548 - 024

Q Who was in the Athletic Department's Communication Office? Do you know?
A I don't know the person who would have been there at that time.
Q So you have three different offices that are involved in communications?
A Mm-hmm.
Q In this kind of a scenario, would Charlie Hoslet be the lead or in charge of communications?
A Charlie would certainly be coordinating this. My guess is that much of the back and forth would go directly from our main communications office to Athletic Communications.
Q Okay. So you don't -- there's nothing for you to do when you received this information in April of 2018, but you just need to be in the loop?
A That's right.
Q Okay. And in May of 2018, the investigation from the university standpoint commenced -- because they believed they had enough information -- were you given that update the following month?
A I doubt if I was told the investigation commenced. I probably knew that we were opening an investigation, but I would have known that as soon as I knew there was a formal complaint.

Q Okay. There was a delay between the initial complaint and the time when the university felt like they had enough information to go forward. Were you aware of that?
A Not that I recall, but that's not unusual.
Q Okay. Sometimes survivors may report some but not all information, in other words?
A It's also true that survivors will waver as to whether they want to go forward with the complaint or not. So, you know, sometimes -- it's not unusual to have a lag until a formal investigation is opened.
Q Okay. So to the extent that you recall, throughout that summer, are you updated about anything that's going on with the police investigation? Maybe a better question is when do you recall next hearing about Mr. Cephus's allegations of sexual assault, I guess?
A At some point either in May or early that summer, the question clearly arose as to whether Mr. Cephus was going to be charged criminally by the district attorney, and, you know, we were obviously completely uninvolved in that process, but I do recall having one or two conversations probably at that point with my general counsel about what the

likelihood was of that happening, because that would kick this -- you know, like I say, it would obviously trigger this student athlete disciplinary process here. It would also create a much more public event.
Q Okay. And so, prior to any discussion regarding the criminal case --
A Mm-hmm.
Q -- do you recall learning that Mr. Cephus had been suspended from the football program?
A I do not recall when I was told that or when that happened.
Q Okay. Do you recall learning that at some point, that prior to the outcome of the disciplinary process, that Mr. Cephus had been suspended from the football team?
A I do know that when the district attorney charged him, that he was definitely suspended from the team at that point. And that would have been something I would have known then.
Q Okay. Pursuant that to policy that we just --
A Yes.
Q Pursuant to that policy that we just looked at?
A Yes.
Q Okay. So forgive me. I am going to repeat my

questions a few times just so we make sure we have a clear record.

Do you recall learning that Mr. Cephus was -- so I will give the chronology that I understand, and you tell me if this rings any bell for you.

Mr. Cephus was suspended over the summer prior to being charged, and then in a period of time not more than probably a few weeks he was then unsuspended. Does that sound familiar to you at all?
A I couldn't testify to that one way or the other.
Q Okay. So you recall learning that it seemed likely that he was going to be charged?
A What I recall was that it was very unclear and it took the DA a long time to make that decision, and we were waiting to know whether that would happen or not. What I don't recall was whether anything was public yet. Because one of the effects of that would have been that that would at that point made this whole case public, and I believe that that was one of the reasons why we were concerned about when that was going to happen.
Q And what's your role in dealing with the public nature of this? Why are you in the loop instead of

just the Communications Office?
A Because I am likely to be asked about this at various events. I need to know when a major event that could be in the news about the university is likely to break.
Q So they just read you in, it's not that they are asking for your input about, you know, media statements or anything like that?
A It wouldn't be unusual that they would show me the media statement just to say this is what we're doing. In this case, the type of media statement we are likely to release is very simple. It would be very similar to the media statement we'd released in other similar cases, and I don't think anyone would have -- you know, I wouldn't have expected that I would have edited anything or made any suggestions. They would have simply shown it to me, and I would have said, "looks like what we always say."
Q Okay. And we talked about that generally but, again, generally, what is it that the university would normally put out in this type of situation?
A It is relatively unusual, I will say, to have someone criminally charged. That does not happen frequently. Oftentimes the complainants either

don't want to go to the police or the police decide that they -- or the DA decides that they are not going to pursue the case.
So any statement we made would have been along the lines of what I mentioned before which is that we take these issues seriously. We can't talk about this particular case. Here's what we're doing on our campus. That would have been the generic first statement. But since this would then have involved a charge by the DA, we would go on to say -- to make it very clear that our process in Title IX's investigation are independent of the police investigation, and will proceed on its own regardless of what happens with the DA and with the police.
Q Okay.
A People don't understand that.
Q And so after those initial communications dealing with the media, you being kind of advised of what's going on, you don't have a role in this process during the Title IX proceedings?
A None at all. As I've said, I'm not involved in the investigation. I am not involved in any of the hearings.
Q Okay. Now, in this case, you got sued by

Mr. Cephus while the Title IX process was ongoing, right?
A That is correct.
Q Okay. He sued the university, but he also sued you personally or in your capacity. But you were named in the lawsuit?
A Mm-hmm. That's right.
Q What was Mr. Cephus alleging against you and the university?
A I don't think that I can even recall anymore. That suit was dropped quite quickly. So, you know, I would have to go back and look at it to know the details.
Q Do you recall anyone saying that the Title IX process should have been suspended while he was defending himself in court?
A Mr. Cephus all along has been concerned about the fact that we moved forward with our own Title IX process independent of the court investigation, and we have repeatedly cited all the legal reasons as to why we are independent from and forced to make timely decisions completely outside of anything that the courts are doing. The courts usually are not timely. Yeah.
Q That's true. And your understanding is that Title

IX actually has requirements that you respond promptly and equitably to reports?
A Yes. And I understand I'm not a lawyer, but I have been told, and I know I said this in my response to his petition -- or his appeal -- when he raised that issue that there were a number of court cases that affirmed that one needed to -- you know, it would have been untenable to have someone on campus charged with rape waiting for one or two years, which is often the time to get to a trial, and doing nothing about it on campus. You know, the court cases have affirmed that Title IX cases need to move promptly and should not wait upon trials or other criminal court action.
Q Survivors may drop out of school or take some other, sort of, mental health downturns as a result of waiting?
A Or everyone graduates and then the whole case goes away.
Q Right. So when you got sued, do you recall who else was sued besides yourself and the university?
A Well, it would have been the Board of Regents they would have named. You know, honestly, that lawsuit that came in and got dropped, I know it happened, but I couldn't tell you any details about it

Page 102

anymore.
Q Okay.
A Yeah.
Q What did you have to do to respond or deal with the fact that you got sued? Anything? Or...
A I didn't do anything about it.
Q Okay. Did OLA just tell you, "We got it"?
A Yes.
Q Okay. And they turned it over to these fine folks?
A Turned it over to the Department of Justice and defenses in these cases.
Q Okay. And so during that time period that we're talking about where Mr. Cephus gets charged and then you get sued, this is all during the football season. Is there media coverage that's going on of Mr. Cephus's case at that point, I assume?
A There is certainly coverage of the DA charge. You know, it goes quiet at that point because there is no new information coming out. And it's not probably -- I would guess -- again, I would have to go back and look at any records on this -- but I would guess that while it's probably mentioned, the case, there is no extensive coverage, again, until our case concludes and he is expelled from the university.

Page 103

Q Okay. And during that timeframe, until your case concludes, are you getting much pressure from anybody, or is it relatively quiet on that front?
A I am hearing almost nothing from anyone at that point.
MR. CLUNE: Okay. The court reporter is going to hand you what has been marked as Exhibit No. 4.
(Exhibit No. 4 was marked for identification.)
BY MR. CLUNE:
Q Go ahead and take a minute and take a look at it.
A Mm-hmm.
Q And what is that document?
A This is the investigative report from our Title IX investigation.
Q Okay. And you have seen this before, right?
A I have seen this before.
Q I assume you reviewed it, at the chancellor-level appeal, at least?
A Yes, I did.
Q Do you think you reviewed it at the Petition for Restoration or just at the chancellor-level appeal?
A I would guess that I had it in my possession, and I would look through it again at the petition-level review.

Page 104

Q Okay. And this one is signed by Ervin Cox. Who is Mr. Cox?
A He is one of our investigators, and I can't tell you much more about it than that.
Q Okay. He's not somebody that you know of?
A You know, I have met Mr. Cox very briefly. He works in the Student Affairs Office, what was then the Division of Student Life.
Q Okay. The date on this is October 30th, 2018.
A Mm-hmm.
Q And in this document, Mr. Cephus is found responsible for sexual assault in the second degree, sexual assault in the third degree as it pertains to the plaintiff in this case, and sexual harassment, right?
A That is correct.
Q And my understanding is Mr. Cephus is not suspended. The recommendation is expulsion, but he's not expelled as of the date of this outcome letter of October 30th, 2018, right?
A Following the investigative report, this would have to go to a hearing before discipline would be imposed.
Q Okay. So he stays a student with his full rights as a student after this, up until the hearing

Page 105

outcome?
A That is correct.
Q Okay. So in regards to these charges that he's found responsible for, first of all, there's a finding of responsibility for sexual assault in the second degree, and that is: "Sexual contact or sexual intercourse with a person who is under the influence of an intoxicant to a degree which renders that person incapable of giving consent. If the defendant has actual knowledge that the person is incapable of giving consent and the defendant has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent."
So that -- sexual assault in the second degree is having sex with somebody who is too intoxicated to give consent no matter what they say or do, right?
A And knowing that that person is intoxicated.
Q That's an excellent point. So you have to actually know that the person is at that level of intoxication?
A Yes.
Q And the next charge, sexual assault in the third degree, is just having sexual intercourse with a

person without their consent, right?
A Yes.
Q Okay. The next charge that I skipped over unintentionally is Violation of Criminal Law, which is, "Captures an intimate representation without the consent of the person depicted under circumstances in which he or she has a reasonable expectation of privacy if the person knows or has reason to know that the person who is depicted does not consent to the capture of the intimate representation."
So is it your understanding that he was charged with this because there was an allegation that he had elicited his teammate to come in and take photos of the two women who were in the room and at least one of them was in a state of undress?
A That is correct.
Q Okay. And he was found not responsible for violation of criminal law; is that correct?
A That is correct. Item Number 4, sexual harassment, is what they found him guilty of.
Q Okay. And sexual harassment is not defined in this letter because it's a -- I assume it's because it's a lengthy definition --
A Yes.

Q -- and probably has multiple --
A Yes.
Q -- subparts to it.
A Yes.
Q Okay. Why don't we turn to -- and just for clarity, this outcome is particular to both -- or particular to Complainant 2, who I will tell you is the plaintiff in this particular case. Do you see right above "Findings on the Allegations" on the first page?
A Yes.
Q So this is pertaining to Complainant 2 and not Complainant 1?
A Yes.
Q Okay. So if we turn to what is marked as Page 4 of 8, BOR_1336. So there's a section here that's called "Sexual Assault in the Third Degree." And Mr. Cox writes, "In evaluating when your conduct violated 17.09, sub 2, sexual assault, third degree, I examined available information to determine if it was more likely than not you engaged in sexual intercourse with Complainant 2 without her consent."
So he's, apparently, in agreement with what you just said, that this sexual assault in the

third degree is just whether or not you inflicted sexual intercourse on somebody without their consent, right?
A Yes.
Q Okay. And while we're here, this language was "more likely than not" -- and I know you are not a lawyer. I congratulate you for that -- but what is the difference, in your opinion, between the burden of proof, the preponderance of the evidence, that you referred to earlier and what is used in a criminal trial?
A So preponderance of the evidence suggests that there's a better than 50 percent chance that it happened. Clear and convincing evidence, or whatever the appropriate term is for typical trials is -- I don't think there is a bright line on that but a much higher standard that it is likely that this occurred.
Q Okay. If I said "beyond a reasonable doubt," would that sound right?
A Yes.
Q For criminal cases, it's beyond a reasonable doubt.
So if you go down a little further in that paragraph, he is found responsible for engaging in sexual intercourse with the plaintiff

in this case without her consent, right?
A That is correct.
Q Go ahead and turn the page where we have "The Analysis for a Violation of Criminal Law." And in that bottom paragraph, Mr. Cox indicates, "Based on the information available, it's not clear whether any photos of Complainant 2 captured an intimate representation as defined above."
So he goes on to find him not responsible for violation of criminal law for his role in the photographs. Is that your understanding?
A Yes.
Q If you turn the page to "Sexual Harassment," Mr. Cox -- I'm looking at the second paragraph under sexual harassment, and it's the last two sentences. The first one I'm looking at starts with, "By having engaging in sexual activity."
A I'm sorry, where are you? Oh, I see it. I've got it, yeah.
Q So it says, "By having engaging in sexual activity" -- and I presume that would just be a typo. It should be "by having engaged in sexual activity" -- "without Complainant 1's consent." I want you to take a look at that for a second. I'm guessing that that's a typo and he's referring to

Complainant 2. Would you take a look at that section and tell me if you agree that that's a typo?

A Let me read that section, if I can.

Q Yep.

A I agree that that looks to be a typo.

Q Is that how you would have interpreted it as you were reviewing this document?

A I would think so.

Q Okay. So he says, "By having engaging in sexual activity without the complainant's consent," I'm paraphrasing, "I believe your conduct would -- I believe your conduct as a fellow student created an intimidating, offensive, and hostile learning environment such that Complainant 2 would feel extremely uncomfortable sharing a campus with you. I believe that another reasonable person in Complainant 2's position would feel the same."

And you upheld the finding at the hearing which is based on this report. And I believe Mr. Cox testified at that hearing, didn't he?

A Yes, he did.

Q Did he testify consistent with what's written in this report?

A I would to go back and look at the record, but I

would assume so.

Q Okay. Do you recall anything that he testified to that was inconsistent with this report?

A Not that I recall.

Q Okay. So would you agree that based on what Mr. Cox had reviewed and the determination that he made, that that would create a hostile learning environment so that Complainant 2 would feel extremely uncomfortable sharing a campus with Mr. Cephus?

MS. BACHHUBER: Object to form. Go ahead and answer.

THE WITNESS: Yeah. I don't -- I am the not making the decisions on this. I mean, I certainly believe that Mr. Cox found that to be true, and that was his decision. You know, I would not want to judge.

BY MR. CLUNE:

Q So if you were reviewing this, and you were reviewing whether or not -- I mean, what -- I can phrase this a little bit differently.

Do you believe that if one student rapes another student and they both have to go to school together, do you think that creates a hostile learning environment for the victim in that case?

A That sets up the condition that she was raped, which was at issue in this case. So I wouldn't want my answer to that to influence any statements that I make in the future about -- yeah.

Q Understood. But if we're -- we can even use it as a hypothetical.

A Mm-hmm.

Q If we presume -- whether it's Mr. Cephus or anybody else -- a student rapes another student and they have to go to school -- the victim has to go to school with that individual, do you agree that that creates a hostile learning environment?

A That is one of the reasons we would expel someone who is found guilty of rape.

Q Okay. But the answer to my question --

A It's not the only reason, but it's one of the reasons, yes.

Q Just to be clear, the answer to my question, is generally speaking, you would think that if one student rapes another student, that would create a hostile learning environment if they had to go school together, for the victim?

MS. BACHHUBER: Object to foundation. Go ahead and answer.

THE WITNESS: Yes.

BY MR. CLUNE:

Q Okay. And do you think that it would be extremely -- in that scenario -- we can still keep it a hypothetical -- in that scenario would it make it extremely uncomfortable for that survivor to share a campus with the offender?

MS. BACHHUBER: Object to foundation. Go ahead and answer.

THE WITNESS: You know, I would say generally, yes, but with the caveat that we have a very large campus. If there was someone at the medical school and that there was someone over at the music school, there is no reason those two would ever interact in any way. They are more than a mile apart, and there's no classes that would come within that mile, period.

So, as always, circumstances do matter to a certain extent, but, you know, one of the reasons we expel students who are found guilty of rape is, A, you don't want them to do it again and you worry about that, and, B, you want them off campus. For those reasons.

BY MR. CLUNE:

Q Right. So -- but if you had two students who were both undergraduates and taking classes in --

A Yeah, I would agree.
Q -- similar undergraduate dorms, does that create a hostile environment for the survivor?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: Yes.
BY MR. CLUNE:
Q Okay. And in using this particular case of Mr. Cephus, if Mr. Cephus actually raped our client --
A Mm-hmm.
Q -- her having to go to school with him would create a hostile environment for her?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: Yes.
BY MR. CLUNE:
Q Okay. If you go down to the "Recommended Sanction," Mr. Cox, in the second sentence, starting with "Your conduct."
A Mm-hmm.
Q He says, "Your conduct had a profound impact on Complainant 2's academic environment, and I believe your continued presence on campus," meaning Mr. Cephus, "would have a significant negative impact on her educational experience."

In your reviews in your appeal in the Petition for Restoration of Rights, did you have any information that was inconsistent with the idea that Mr. Cephus's presence on campus would have a significant negative impact on her educational experience?
MS. BACHHUBER: Object to form. Go ahead and answer.
THE WITNESS: Yeah, I don't think this was an issue that I considered. The question was whether he should be expelled or not, and given the evidence we had available at that point suggested on a preponderance of evidence, that he had raped her, that would automatically lead to expulsion. You know, this wouldn't have been something I would have thought much about because the focus was on another issue.
BY MR. CLUNE:
Q Okay. And that's a fair point. And maybe my question, which is probably more specific, is just as it pertains to your review in the academic appeal, did you have any information that was inconsistent with the idea -- whether it was the basis of your finding or not, did you have any other information that was inconsistent with the

idea that Mr. Cephus's presence on campus had a significant negative impact on our client's educational experience?
MS. BACHHUBER: Object to form and foundation. Go ahead and answer.
THE WITNESS: I would say I didn't have any evidence one way or the other on that issue. That wasn't an issue that was part of my review particularly.
BY MR. CLUNE:
Q Okay.
A So the answer is, yes, but I didn't have any evidence to the opposite, either.
Q Okay. So I think you're saying the answer is no. My question is did you have any --
A Yes.
Q Let me just rephrase it.
Did you have any evidence that was inconsistent with Mr. Cox's finding on that point? And I think your answer is no; is that right?
A The answer is no, but I also had no evidence on the opposite of that either. I had no evidence.
Q Okay. Thank you. We can put that document aside.
A Mm-hmm.
Q Your understanding of how the process that leads to

this outcome works is that both sides have the opportunity to present whatever evidence they want or testify or -- I mean, I shouldn't say testify -- or interview with the Title IX office, right?
A That is correct. And at the hearing.
Q And then once they provided their evidence, Ms. Hasselbacher writes up a report, and then each side has the ability to respond to that evidence, right?
A That is correct.
Q And your understanding from your review is that happened in this case?
A Yes.
Q And Mr. Cox found him responsible for these allegations we talked about?
A Yes.
Q And that's a requirement for all sexual assault or sexual harassment disciplinary proceedings?
A Yes. There would have been an investigation, and it would have taken this form --
Q Okay.
A -- and gone back to the Title IX coordinator.
Q Okay.
MR. CLUNE: You know, maybe now would be a good time to take five minutes. We've been going

a little over an hour. Is that okay?

MS. BACHHUBER: It's good by me.

MR. CLUNE: Okay.

THE VIDEOGRAPHER: This marks the end of Media Number 2. The time is 3:48 p.m.

(A recess was taken from 3:48 p.m. to 4:02 p.m.)

THE VIDEOGRAPHER: This marks the beginning of Media Number 3. The time is 4:02 p.m.

BY MR. CLUNE:

Q So, Chancellor Blank, turning to your chancellor's-level appeal -- actually, I skipped a step.

Let's turn to the hearing process. You have no role in that process, right?

A None at all.

Q Okay. But the way this works is Dean Cox makes the original finding, and then if the accused individual that's been found responsible by Dean Cox contests the finding or the punishment, then it can be set for a hearing, right?

A That's correct.

THE VIDEOGRAPHER: Sir, your mic.

MR. CLUNE: Oh, I'm sorry. You need me to repeat that?

THE VIDEOGRAPHER: No, you're good.

BY MR. CLUNE:

Q And so that's the traditional -- that's probably the wrong word -- but that's a hearing process. People get to testify, cross-examination, that sort of thing?

A That's correct.

Q Okay.

A It's not cross-examination. It's direct cross-examination of the witnesses. It all goes through the hearing people.

Q So the other party who is not testifying gets to ask questions, and they get filtered through the actual panel; is that right?

A That's correct. Through, usually, the chair of the panel.

Q Do they report on all questions, or do they filter out? Do you know? Do they filter out some that are inappropriate or...

A I have never been to one of these hearings, so I can't tell you.

(Exhibit No. 5 was marked for identification.)

BY MR. CLUNE:

Q The court reporter is going to hand you what has been marked as Plaintiff's Exhibit 5. And go ahead and take a look at that.

A Mm-hmm.

Q What is 5?

A This is the decision report of the Hearing Committee.

Q Okay. And you have seen this one before as well, right?

A Yes.

Q And this one again pertains to both Complainant 1, who is not a party to this lawsuit --

A Mm-hmm.

Q -- and then Complainant 2, correct?

A Yes.

Q Okay. So there's not headings to it, but if you turn to Page 6 of 8, starting with just above, "sexual assault in the third degree," I believe this is the section that pertains to Complainant 2, who I can tell you is the plaintiff in this case.

So it says, "In respect to charge decisions involving Complainant 2, the committee unanimously found respondent responsible for violation of section 17.09, sexual assault in the third degree, and sexual harassment. In contrast, the committee unanimously found the respondent not responsible for 17.09, sexual assault in the second degree."

A Yes.

Q So as we discussed previously, that sexual assault in the second degree is the one involving being too intoxicated to consent to sexual activity and the accused individual knowing that the person was too intoxicated, correct?

A Yes.

Q So the remaining sexual assault charge is just the one that says that you had sexual intercourse with somebody without their consent?

A That's correct.

Q Okay. If you turn the page to 7 of 8, could you read that just to yourself, read that paragraph on sexual harassment?

A Yes. (Witness complies.)

Q What did you take that to mean? What did you take the hearing panel to have decided Mr. Cephus actually did regarding sexual harassment?

A From this paragraph, it's not entirely clear what they had in mind. It's clear the Complainant 2 talked about things that have happened in her academic schedule since she made these charges and her mental health, and therefore, as noted earlier, you know, her belief that there was a rape led to her feeling like she was in a hostile environment.

Q So why don't we go back to 4, which is a document that you have right in front of you there. That's Mr. Cox's -- Dean Cox's outcome. And you can turn to page 6 of 8. Why don't you take a minute and read those three paragraphs on sexual harassment.
A Mm-hmm. (Witness complies.)
Q So having read the outcome letter and hearing the panel's findings, what is your understanding of what Mr. Cephus was found responsible for as it pertains to sexual harassment?
A The way that I read this, Complainant 2 was simply uncomfortable on campus after this event.
Q After the event of being sexual assaulted?
A By having engaged in sexual activity without -- this says "Complainant 1," but we agreed it's Complainant 2's consent.
Q So it's tied to having the sexual intercourse without her consent?
A Yes.
Q So what you're saying is it's kind of the resulting hostile environment that Complainant 2 was left with after the sexual assault third degree?
MS. BACHHUBER: Object to form. Go ahead.

THE WITNESS: That is what I read them to be saying.
BY MR. CLUNE:
Q Okay. You can put 4 aside.
A Okay.
Q So even though the hearing outcome on Page 7 of 8 on sexual harassment is not particularly clear, you presume they can only find him responsible for things he was previously identified as responsible for by Dean Cox, right?
A Yes.
Q They can't make findings of him to be responsible for things that he wasn't found responsible for at the earlier stage?
A That is correct.
Q Okay. So if you go to Page 8 of 8 -- and this is, I think, tied to what you just testified to about the harassment. In that largest paragraph, it starts with, "In finding."
A Mm-hmm.
Q The last sentence there says, "The committee unanimously agreed that a hostile learning environment has been created for the complainants, and the complainants should not be further subjected to this hostile learning environment

during the duration of their education at University of Wisconsin." It says "UW-Madison."
A Yes.
Q From your perspective, why is that an important part of an outcome on a sexual assault case for the university?
A So I would probably argue that once you have someone who has been found guilty of rape, the primary reason you don't want them on campus is because this is not behavior that you want to see repeated in any way, right? To me, that's the first and most important issue. Clearly the committee felt that the hostile learning environment was also important. I admit, I would make that a far number two away from the threat that this individual potentially -- but I can understand what the committee is saying.
Q Okay. And is that just out of fear that the offending student may come after the complaining student, or is the hostility broader than that?
A I wouldn't think the -- usually to worry that the person is going to come after the student requires some degree of threat. And, in fact, people say explicitly there is no evidence that he intended to do anything, right? That's said in several places

here.
You know, so this is clearly the perception of the complainants that their environment in some way has been contaminated because of their experience.
Q And when you say contaminated --
A They are no longer comfortable.
Q Okay. And why is that? Well, your use of that term "no longer comfortable," what does that mean?
A Presumably, they found this quite a traumatic experience, and they don't want to be reminded of it.
Q I mean, do you -- well, that's probably a poor question, but what do you mean -- when you said they don't want to be reminded of that, what's the harm of that? I'll back up. You're talking about excluding a student from the university, right? Dismissing or suspending are whatever, the student. Are you doing that just to make the survivor more comfortable, or do you have a perception that there's an actual mental health impact that could affect somebody's education?
MS. BACHHUBER: Object to form and to foundation. Go ahead.
THE WITNESS: As I say, the main reason

you don't want this person on campus is because of the threat that they could do it again, right? And other people could be at risk. And it's a punishment for what they did. Those are the primary reasons.

It's clear the committee also believed that the complainants, as I say, had some degree of trauma coming out of this that left them feeling uncomfortable on campus and in their activities. And whether that takes the form of actual mental health issues or other forms of discomfort, there are many ways in which that could express itself.

BY MR. CLUNE:

Q Okay. And generally speaking, having worked on these types of cases --

A Mm-hmm.

Q -- what's the possible educational impact that the school is concerned with if they have to continue their school with their assailant?

MS. BACHHUBER: Object to foundation. Go ahead.

THE WITNESS: Like I say, whenever I have dealt with these cases, the focus is not because the person is being expelled for many reasons, right? Of which this is -- I have never spent a

lot of time worrying about this particular issue. But I do know, you know, if the question is in general, sexual assault often leads to depression. It also leads to difficulties in concentrating, all of which affects one's -- flashbacks, things that affect one's mental health and one's abilities to focus on coursework.

BY MR. CLUNE:

Q Okay. And is some of that -- some of that may be from the fact that you have been on the planet for a while, but is that also consistent with the training that you've talked about that you would get on sexual assault or Title IX?

A I know that the training indicates that there can be mental health effects of sexual assault. I don't know how much it went into detail.

Q Okay. Where do you get those ideas that you just testified to about how things like depression and being triggered can affect focus and concentration and whatnot?

A Through conversations with our mental healthcare providers, with my university health service, with our student affairs people when we talk about things like prevalence of sexual assault on campus and what its effects are.

Q Okay. You can go ahead and set that one aside.

(Exhibit No. 6 was marked for identification.)

BY MR. CLUNE:

Q The court reporter is going to hand you your appeal outcome in this case.

A Mm-hmm.

Q Why don't you take a look at it, and let me know if that looks like a reasonable copy of --

A Yes. This does indeed look like my response.

MS. BACHHUBER: Of what? What is this?

MR. CLUNE: What did I give you?

MS. BACHHUBER: You gave me the petition.

MR. CLUNE: Oh, I'm sorry. I handed her the right one.

MS. BACHHUBER: That's fine.

MR. CLUNE: I have got it. I just handed out the wrong one.

MS. BACHHUBER: Yes. Thanks.

THE WITNESS: This is the petition -- this is the response to the petition, not the response to the appeal.

MR. CLUNE: Oh, I did give you the wrong one. We will leave that as Exhibit 6 for the moment.

(Exhibit No. 7 was marked for identification.)

BY MR. CLUNE:

Q Does that look like an accurate copy of your decision on the chancellor-level appeal?

A Yes, it does.

Q Okay. So in this -- we talked about what your process is generally. In this particular case, do you recall what you actually reviewed?

A I am sure that I received the investigative report. I'm sure I received the copy of the petition. I do not believe that I actually looked at any videos in this case. And I'm uncertain about whether I had at least pieces of the transcript. I suspect not. I suspect that that was reported to me by the Legal Affairs Office as to what, you know, any issues in the transcript.

A number of these issues I felt were relatively straightforward. I had some questions about the little precedent of some of this stuff.

Q Okay. Was one of Mr. Cephus's arguments that the evidence didn't support the findings? You can take a minute to look through it.

A Yeah. I'd have to look a minute to see exactly how he stated that. It's not procedural errors. I think much of this is about procedure. I believe all of these are procedural.

Q So he doesn't even argue that the evidence against him doesn't support the finding?
A He does not.
Q That's probably why you didn't review some of the videos.
A Yes.
Q And so you uphold the Hearing Panel's determination that we just went over that he was found responsible for sexual assault in the third degree, and then the sexual harassment, right?
A That is correct.
Q If you look at page -- I have so many different numberings on here. Look at Number 16 in the bottom right-hand corner.
A Mm-hmm.
Q So this claim filed by Mr. Cephus is that, "The investigating officer, Dean Cox, violated the statute by considering and relying solely on the complainant's wishes in determining the date of my hearing."
Do you recall that argument?
A I do.
Q And if you turn to Page 10, you kind of outline the procedural history of getting this date set. Was your impression that the university had made

significant efforts to accommodate Mr. Cephus and his counsel's calendar?
A It was.
Q On Page 10 there, in the bottom portion of that first paragraph, it starts with -- well, actually you start in the middle, upper middle, of that section that first sentence starts with, "The investigating officer." So you say, "The investigating officer began attempting to schedule the hearing in November of 2018, and on November 9th offered the respondent's advisors specific hearing dates in December." Now, this hearing actually took place in January, didn't it?
A Yes, it did.
Q Okay. Was that predominantly to accommodate the request by Mr. Cephus and his counsel?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: I do not know what else went into that. Certainly this was one of the issues.
BY MR. CLUNE:
Q Okay. From your review that went into this outcome, was that a significant part of the denial of this argument on his behalf is that the

university made significant efforts to try to accommodate his schedule and his counsel's schedule?
A That is correct.
Q Okay. And this says, "On November 12th, respondent's advisors responded by email with a request that the hearings in question be adjourned until sometime after the new year. They further cited the scheduling conflicts and inadequate time to prepare before then for hearing day due to business travel in November, religious holiday in December, and a trial scheduled for four days in early January 2019." These are all requests that are being made by Mr. Cephus's counsel, right?
A Yes.
Q Okay. And, ultimately, the school ended up setting this for January of 2019?
A Yes.
Q Okay. Okay. That's all I have for that.
So let's talk about the petition. When did you first hear about the Petition for Restoration of Rights?
A Probably almost immediately after the court decision -- the jury decision was made.
Q Okay.

A We expected it at that point.
Q Okay. So I wanted to ask you that. Was there discussion that we may be getting a Petition for Restoration of Rights here?
A I think the expectation was that if the jury came out without a conviction, that we would almost surely see a conviction for restoration of rights.
Q To your knowledge, had you or anybody at the university heard from his counsel saying that that was likely the case?
A Not to my knowledge.
Q Okay. So this was just a strong suspicion within...
A We knew nothing about how the case was going to come out, but certainly, you know...
Q Go ahead.
A We certainly would have expected this if he was found not guilty.
Q Okay. Is this something that you had on your radar even before the trial started?
A No. I mean, what we were tracking was the timing of the trial. And, partly because there would be a whole bunch of additional publicity when that trial was finished one way or the other, and we probably held some conversations about what would be the

Case: 3:20-cv-00856-wmc Document #: 594 Filed: 03/15/24 Page 35 of 160

issues that would come forward depending upon how the trial came out.
Q Okay. But one of those was that you may get a petition from Mr. Cephus?
A Yes.
Q So I believe the verdict is on August 2nd. Does that sound --
A Sometime in early August. I'd have to look up the exact date.
Q Okay. And I believe that the petition is filed August 6th. Does that sound familiar?
A I believe that to be true, yes.
Q So on August 6th, the date the petition is filed, are you in town when the petition is filed?
A I'm leaving town on that day, and I'm flying.
Q Where are you going?
A I'm going with my husband to celebrate our 25th wedding anniversary, to Hawaii.
Q Wonderful. What island did you go to?
A Oahu and to Maui.
Q Oh, great. And how long were you and your husband on that trip to Hawaii?
A Ten days.
Q So you left the 6th and came back the 16th?
A The 16th.

Q So you were still in town when it came in, or were you already on the plane?
A I believe I was in town when the verdict came down. I was not in town by the time we received the Petition for Restoration.
Q Okay. So you fly -- did you go to Oahu first?
A Yes.
Q You fly to Oahu on the 6th, and given the time change, do you learn later that day in Hawaii about the petition being filed?
A I believe that I'm using -- as I remember using the WiFi on the plane, and I received an email that says, "We've just received this petition." And I remember, because I can't open it because the WiFi is so slow or some such thing.
Q Okay. So great way to ruin a trip to Hawaii.
A This was definitely going to take some time.
Q Yeah. Did you spend a lot of your time on vacation working on this or...
A I spent some substantial amount.
Q Okay. Is it something you had to deal with daily while you were --
A There were probably daily phone calls. I canceled one day entirely of all activities and let my husband and daughter go off on their own.

Q Okay.
A And spent the whole day on the phone.
Q Okay. So I assume you have a laptop with you -- oh, yeah, you must have because you were on the WiFi on the plane unless you were surfing your phone, which nobody does.
A No, I had a laptop with me.
Q And so what was your plan how you were going to deal with this significant issue with lots of documents and that sort of thing while you were in Hawaii? Once you got your feet on the ground and started to figure out what's my role going to be here.
A I can no longer testify definitely to this, but my assumption is they put all of this into a Box folder, and I accessed the Box folder. That would be the way that I would normally deal with this while I was out of town. I know that I obviously saw a number of documents. That would be the typical way to do it.
Q Okay. So you don't recall, but you think it's likely that you got a Box folder with everything in it?
A I don't know that everything was in it. As I think I testified earlier, I looked at some set of

videos. There was lots and lots of videos. I did not look at all of them. I looked at the information that my general counsel thought I needed to see to review in order to make a decision.
Q Okay. So we are referring to Mr. Taffora, right?
A Yes.
Q So Mr. Taffora decides -- so I presume what you're saying is -- your presumption is Mr. Taffora has reviewed everything at some point and then sends to you the things he thinks that you need to look at with your own eyes?
A Yes.
Q And do you recall when that happened?
A It was while I was in Maui, and I think that was the day that I pulled things down, was to read through all this, to look at this, to hold a series of phone calls.
Q Okay. And how many days did you spend in Oahu?
A In Oahu, we were there two and a half days.
Q Okay.
A Five days in Maui.
Q Waikiki or the North Shore?
A The North Shore.
Q Good for you. Okay.

Page 138

So at least two or three days after arriving in Oahu you get this Box, and you don't recall this, but you think that that makes the most sense of what happened?
A That's the way I would always look at this if I were out of town and not able to access the documents directly myself.
Q Okay. And do you have to log in to the Dropbox or do you have --
A You typically log in with the same log-in I would use for my computer.
Q Okay.
A For any access to UW materials.
Q So in that time -- let's use Oahu for the moment. But in that time before you received the documents, whether it's Oahu or Maui, who else did you talk with about this petition besides Mr. Taffora?
A I definitely talked with general counsel. I would have talked with the Vice Chancellor for University Relations -- not external affairs -- Charlie Hoslet, about the communication side of this. I'm sure that Matt Mayrl was in some of those conversations. It is possible that I also talked about my vice president for finance administration because he is my main contact into the Athletic

Page 139

Department and my designated representative on a number of things. I don't remember that he was in on the conversations, but it have would not been surprising that he had been.
Q Okay.
A I had a conversation with Lauren Hasselbacher -- I'm required to consult with her under statute -- after I looked through all of these documents.
Q And so is your general counsel giving you his opinion on what you should do with this petition?
A He did indeed give me his opinion. You know, I know that we talked through this. I think I typically like to look at the evidence before I go back and ask a lot of questions, right?
Q Mm-hmm.
A And have that follow-up conversation about what are you seeing and why are you seeing this.
Q I mean, if he has an opinion on it, it could shape what documents he's sending you, couldn't it?
A It could.
Q Okay. But you don't want to look at everything, you are comfortable with just what he selects for you?
A There were large numbers of videos, many of which had no relevance to what we were looking at and

Page 140

what we were thinking about.
Q Why is that?
A Because they didn't show any of the relevant times that you might want to see. You know, some of this was the question of -- the jury decision got our attention given how quickly it came down, right? It didn't decide anything, but it definitely gave us a sense that there was evidence there that we might not have seen that felt very decisive to the jury.

And so the question was what evidence were they looking at that had an impact on their decision that we should look at as well and that we might not have seen. As you know, we saw very little evidence coming forward in the hearing process because Mr. Cephus and his lawyers sent us very little.
Q Okay. So neither, obviously, you -- I shouldn't say obviously -- neither you nor anybody from your office sat through the trial, right?
A That is correct.
Q And nobody from OLA sat through the trial?
A I believe that to be correct.
Q Is there anybody that you spoke with, other than maybe Mr. Cephus's lawyers, that actually sat

Page 141

through the trial?
A I did not speak to Mr. Cephus's lawyers.
Q Okay. So there's nobody you spoke with --
A That's right.
Q -- that actually sat through the entirety of the trial?
A That's correct.
Q So you talked to your general counsel, who shares his thoughts with you, shares the contents of the Box, and then what's next for you in terms of processing this?
A I looked through this, and I think we convened a phone call almost surely with him and probably with Charlie Hoslet to talk to what it was that we were seeing that was new or different and was there any justification in the Petition for Restoration of Rights.
Q Okay. And why include Charlie Hoslet?
A Because he was going to be involved in communicating anything that we did publicly. And it became very quickly clear that the public communication would be important to us given how public a case this was and how much coverage it was getting.
Q Okay. So it's you and Mr. Taffora and Mr. Hoslet

all talking about -- I mean, what's the topic?
A I can no longer tell you exactly what conversation. I'm sure Ray Taffora, my general counsel, and I had a number of conversations. I suspect that Nancy Lynch, the deputy, was in a number of those as well, because she had been quite involved in reviewing all of this material.
I know that Charlie Hoslet joined us for some of those conversations. My guess is that Matt did as well. And exactly what was said in which conversation, I can't tell you.
Q But you were discussing what the outcome was going to be?
A What the evidence showed and then what that suggested for the outcome, what we were going to decide.
Q And was -- Mr. Hoslet is obviously with communications. He's not with OLA, but is he sharing his thoughts on what the outcome should be?
A He's primarily there to understand what we're doing and why we're doing it, so that as he's putting the communication strategy together, he knows what he could be saying.
Q So he's not weighing in on what the outcome should be?

A Not particularly.
Q At all?
A You know, he's in the conversation. He's part of my executive team. I would expect that -- you know, I would want to hear what he thought. I would give the conversations with my lawyers much greater credence.
Q Okay. So you have these conversations, and at what point do you feel like you decided what you were going to do?
A I don't think we decided until the Thursday, whatever Thursday -- that Thursday, because I know that they started drafting a response on Friday, and they would not have started that until after we made the decision. Is that the 15th, that Thursday?
Q I can show you on this calendar.
A Yeah. Give me the calendar, and I can tell you the dates.
MR. CLUNE: I'll just hand this to the court reporter first.
(Exhibit No. 8 was marked for identification.)
MS. BACHHUBER: Where are these from, the public records?
MR. CLUNE: Yeah.

THE WITNESS: I flied back on the 16th, and we made this decision on either the 14th or the 15th, Wednesday or Thursday. I probably could no longer tell you what day.
BY MR. CLUNE:
Q Okay.
A It was certainly not before Wednesday afternoon.
Q Okay. If I -- and I'm going to show you this in a few minutes -- but if I told you your conversation with -- according to Lauren's notes, your conversation with her was on the 14th --
A Yes. That would make sense because I would have talked to her, I think. Once I knew what I was going to do, I would want to talk to her and tell her what I was doing, get her input into that, and see what her objections, if any, were.
Q Okay. You had not spoken with her prior to --
A I did not.
Q Okay. Now, I'm going to have us look at 6. Let's look at 6. I think you have already looked that over.
Is that a copy of your Petition for Restoration of Rights outcome?
A Yes, it is.
Q Should call it "Chancellor's Decision" is the

actual title, right?
A Yes.
Q Okay. So in this opening background paragraph, you say that he's been expelled from the university. Says, "This section authorizes a student who's been expelled from university to petition the chancellor for the right to apply for readmission," right?
A That's correct.
Q Okay. And then, again, at the end of that, you are the one who's charged with making the readmission decision. Ultimately this is your call, right?
A Yes.
Q If you turn to Page 2. This details all of the things that were submitted in the petition and then goes on to identify things that the university independently sought. So let's walk through this for a minute.
So about halfway down that paragraph, do you see the sentence that starts with, "The petition consists of a written summary"?
A Yes.
Q Okay. So, "The petition consists of a written summary of select pieces of evidence at trial." From your recollection, what are you referring to there? Is that something summarized by

Case 3:23-cv-00128-wmc Document #: 29-4 Filed: 03/12/24 Page 38 of 160

Mr. Cephus's counsel?
A Yeah. The petition itself quotes some -- I don't know if it quotes. It actually refers to a number of different pieces of testimony and/or pieces of evidence that the jury heard. And this is what I'm referring to here. It's, you know, making their argument.
Q So this is something that they wrote up?
A Yes.
Q Do you have any idea of whether or not what they wrote up is accurate?
A No, and my decision was not based on what they wrote up.
Q Okay. Do you know whether or not these summaries -- well, I will put a pause on that for a second.
So you say that your decision was not based on their write up. Maybe the easier thing before we get into this is tell me what are the things that you based your outcome on?
A So the petition basically said to me that I needed to review the case and see what the evidence looked like and if there was any new evidence or mitigating circumstance that hadn't been there before, right? The jury trial clearly suggested, from what we knew of it, that there had been

evidence presented that we had not seen or had access to, so we were particularly interested in getting that.
The two pieces of evidence that were most important in my mind after I looked at this, were some of the police reports that had not been available to us, as well as some of these videos.
Q Okay. Thank you. We will talk about those in a few minutes. I want to go through what else was submitted. So there were written summaries of select pieces of evidence at trial. There were media accounts. So his lawyers attached articles from the media?
A I'm not sure they did, actually. Maybe they did. I don't remember that.
Q Okay. You didn't review everything, right? So there could have been things that were submitted that you never saw?
A I'm pretty sure that I simply read written petitions from the lawyers. If there were other things they sent, I didn't see those unless I was told they were relevant.
Q Okay. Next thing is credentials from certain expert witnesses. Do you know what that is?
A Yeah. They talked about I think a medical witness

in particular.
Q That said what?
A That said that the injuries of the complainant was consistent with -- did not necessarily have any evidence of sexual assault. It was consistent with normal sexual activity as well.
Q Did you give that any credence?
A I had them verify that what was in the petition was correct. You know, that that was what was testified to at the trial.
Q So your understanding is this expert testified at trial that the injuries were consistent with --
A Could be consistent with normal sexual activity.
Q Could be consistent.
A There was nothing there that suggested there had necessarily been sexual assault. That's my memory. I'm sure they used slightly different words.
Q Okay.
A But that is what I think that's a reference to.
Q Okay. Did that impact -- influence your decision in any way?
A I don't think it was the primary reason, but it was probably a secondary or tertiary reason -- tertiary issue.
Q Did you -- do you know how the DA's office

responded to that or if they had any experts themselves?
A I do not know that.
Q Was there anything done to try to verify whether or not that information was even accurate?
A Well, as I say, I did try to ask whether what they said in their petition was an accurate representation. And we had difficulty doing that, which is one reason why this was not an important issue to me in my decision. It's why I primarily focused on the videos and the police reports --
Q Okay. But it did --
A -- the complete information.
Q But it did have some impact? It just wasn't the primary reason why you --
A That's correct. It's not something I cite in this. Let me note that.
Q And you confirmed that that's what this expert testified to in trial but not whether or not his testimony was actually legitimate or accurate or scientific?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: I'm sorry, I'm not sure what the question was.

BY MR. CLUNE:
Q The question was you verified -- you were able to verify that this is what this individual said at trial, but you didn't verify the underlying testimony whether or not that testimony was actually accurate?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: That is correct.
BY MR. CLUNE:
Q Okay. How did you verify that that's what this person said at trial?
A I would have to talk to the lawyers to ask what they did. We were not able to get the trial transcript, which had not be completed. In fact, I'm not sure if there still is a complete trial transcript. I don't know that, but I know they had talked to some people that had been at the trial.
Q Do you know --
A This is just not a major issue in my decision. It's not even cited in the decision letter. It got my attention in the way that the jury -- and gave me a reason to want to look at this again.
Q But you review all this information. You're reviewing the body of evidence that's submitted.

A But --
Q And then reaching an out --
A The arguments by the petitioner are not the reason for me to make my decision, right? They simply make their argument, and I have to -- given that I have an argument in front of me -- relook at the evidence and decide, on my basis, whether there is any reason to reconsider the disciplinary action that was taken. I did not base my decision on the arguments the petitioner themselves made. Those are always a little suspect.
Q Did you ask for a copy of the transcript? Did you order a copy of the transcript from the trial?
A We tried to order a copy of the transcript of the trial, and it was not available.
Q What do you mean it was not available?
A They hadn't produced it yet.
Q But you could have ordered the transcript of the trial?
A There was no transcript that had yet been produced. And we were told it would be months and months before it would be available.
Q Okay.
A We were told that we would have to wait for a long time before we could get a transcript.

Q But you didn't order a transcript of the trial?
A I think they tried to and were told, you know, we should check back when they had it and that would be a long time from now. I don't even think that they actually placed an order. I don't know the answer to that.
Q But you didn't. You didn't say, "I don't care how long it's going to take, we need a trial transcript"?
A We talked about it. We said it's not tenable for us to wait, you know, for six-plus months, and I think it probably was going to be longer than that.
Q And who told you it was going to be six-plus months?
A Whoever it is in the DA's office that produces this from the court. I guess it's the court person who had told us that.
Q And you are getting this from --
A From my lawyers.
Q -- your general counsel?
A Yes. They tried to push, and they really got nowhere with trying to get a transcript of the trial, and we were told it was not going to be available anytime soon.
Q Okay. So the next item that we have on this list

is that there were select pages of a medical exam from one complainant. Do you recall which complainant that was?
A I do not. And as I said, the medical exams were not a major issue.
Q Next one is transcript of a video deposition for one witness. What did that witness --
A I don't know. I don't think I looked at that.
Q Okay. Brief excerpt of a portion of cross-examination of one complainant at trial. Did you look at that?
A I believe a good part of that was excerpted in the petition, and I certainly read that in the petition.
Q And what was that excerpt?
A I would have to go back and look at the petition again to be exactly sure which -- I know that they quoted at some length -- I don't know -- it's some length. They certainly quoted some excerpt from the trial that they had produced.
Q Okay. Well, we don't have to do that now. We will take a look at that.
A Yeah.
Q Then next is select text messages. What select text messages is that in reference to?

A They referenced a number of text messages that had gone back and forth between one of the complainants and Mr. Cephus and others following the events in his apartment as well as text messages prior to when they were meeting up, sort of setting up the meeting.
Q Sorry. Go ahead.
A Both text messages prior to their meeting that evening as well as after they left the apartment.
Q Okay. And those text messages were selected by Mr. Cephus?
A This is all part of the petition per se.
Q Okay. And were those -- we say the word "probative" in the law -- were those helpful to you in making your decision?
A They weren't the main reason I made the decision.
Q Okay. Did you do anything to try to -- do you recall when Mr. Cephus's attorneys were arguing as it pertained to those text messages?
A Well, they argued that they indicated that there was -- that the women were looking forward to this meeting that evening, that they actually helped set it up. And that after they left the apartment, there were messages going back and forth that did not suggest anything of substantial traumatic

nature had happened. There was an exchange of information about one woman had left her jewel back in his apartment and she wanted it.
Q And did you get --
A That was the argument by them, to be clear.
Q Did they provide for you what my client's explanation was for those text messages?
A That was not in the petitioner's case. One reason why I did not rely upon the petitioner's argument. You're asking me what arguments they made. I did not necessarily rely on those because they clearly were presented from one side and not both sides.
Q I appreciate that. I'm just mindful of the fact that you are very candidly answering in terms of what affected your decision-making. You're candidly answering that some of these things were not your primary reasons for reversing but they were things that you saw while you were making this decision, so you can't rule out that what you saw had an impact on you, right?
MS. BACHHUBER: Object to form. Go ahead.
THE WITNESS: Yeah. I mean, what I thought were the reasons to make my decision are listed in this document of my decision. And that

is not something that is listed in this document as one of the main reasons for my decision.
BY MR. CLUNE:
Q I totally appreciate that. My question is a little bit different instead. You reviewed a number of different things that were not the main reason for your decision, but you can't say that they didn't necessarily have some impact on your overall sense of whether or not this was the right thing to do or not.
MS. BACHHUBER: Object to form. Go ahead.
THE WITNESS: I can't answer whether there are implicit biases in what I did, of course. We're all human. But, you know, I was not explicitly thinking about those issues in making the decision.
BY MR. CLUNE:
Q I understand. Thank you.
A Yeah.
Q Those text messages that you just described, those were actually in the Title IX proceeding, weren't they?
MS. BACHHUBER: Object to foundation.
THE WITNESS: I'm not sure that

everything was in the Title IX proceeding. I'm just not sure of that. I would have to go back and check.
BY MR. CLUNE:
Q Okay.
A I believe that there were some texts at trial that had not been shown earlier.
Q Was it your understanding that the text messages that you are now being shown were not a part of the Title IX proceeding?
MS. BACHHUBER: Object to foundation.
THE WITNESS: I'm not sure that that was said one way or the other.
MR. CLUNE: Okay. I'm going to show you the petition.
(Exhibit No. 9 was marked for identification.)
MS. BACHHUBER: That's not the full petition.
MR. CLUNE: Sorry. I'll identify it more clearly on the record.
This is the written petition summary from defendant's counsel. Is that a fair description?
MS. BACHHUBER: No. The document that we provided to you was 242 pages. We did not separate out the argument portion. We provided to you

exactly how Mr. Cephus's counsel provided it to you.
BY MR. CLUNE:
Q Then, let me rephrase: This is the first 14 pages of the petition that's been provided to us by the university. So let me know when you're done.
A Yes, I'm ready.
Q Your counsel just made a good point that the entire production from the defense was 240-some pages. Did you review the 240-some pages, or did you review these first 14 pages that are signed by his counsel asking for you to reinstate him on page 14?
A I primarily reviewed these, and then I reviewed other things in addition to that some of which may have been in the remaining 240 pages.
Q Does this document that I've handed you, does this contain the portion of cross-examination that you referenced in your chancellor's decision in the Petition for Restoration of Rights?
A Yes. When I listed what was in the petition, that is -- at least a good amount of what's listed here, but there are other, as you say, other things too.
Q Okay. Where is the portion of cross-examination that you're referring to?
A I know that there were some quotes in here.

Q There were.
A So clearly they do not have a direct trial transcript evidence in here. They describe, you know, on Page 8, there's an extended description of testimony by Dr. -- I don't know how to say the last name -- Raichle.
Q Mm-hmm. And how about your outcome letter, the Chancellor's Decision, says, "A brief excerpt of a portion of cross-examination of one complainant at trial." Can you see if you can find what you're referencing in these pages or not?
A There were several places in here where they extensively quote from testimony that they seem to suggest happened at trial, such as the April 21st, 2018, on Page 5, the bottom paragraph there, this is a reference that there were -- and I assume that there were attached -- were some excerpts, but they were quoting extensively. Whether they are quoting correctly or not, I can't tell you.
Q Okay.
A Yeah.
Q They made allegations in this that the trial included indicia of racial bias. Do you recall that?
A Mm-hmm. I do recall that.

Q Was there any allegation that my client was -- her motivation for reporting this involved racial bias?
A I do not believe that the racial bias was aimed at your client.
Q Okay. Going back to your decision whenever you're ready.
A Okay.
Q So we talked about the select text messages, and the bottom of Page 2, the last thing that spills on to 3 is defense and prosecution investigator interviews with two witnesses. Are those things that affected your decision in this?
A I'm assuming that those were attached and not something that I saw. Like I say, I looked -- the next one, the police interviews, I did look at. Or the reports of the police interviews.
Q Okay. So you don't recall seeing defense and DA investigator interviews of two witnesses?
A I do not.
Q So next one you did recall, which is the transcript of police interview, of one complainant in the hospital.
A There were several police reports that were available at this point that we had not seen earlier.

Q What was it that was in those police reports that had an impact on your decision?
A There was very mixed evidence about how drunk the women were and whether they were able to make cognitive decisions or not. And, you know, much of it was around, you know, their observations of the complainants and what they saw.
Q So --
A It was mixed, you know.
Q So when you say "mixed," what do you mean?
A Some police reported greater observation of seemingly cognitive alcohol-related problems than others.
Q And what did you make of that?
A That it may have been harder to determine exactly how drunk they were depending upon what you were looking for. Different observers saw very different things about how alcoholically-impaired they were.
Q Anything else from the police interview of one complainant at the hospital?

MS. BACHHUBER: Object to foundation. She hasn't seen the document. Go ahead, if you can remember.

THE WITNESS: Yeah. I mean, I think the

Page 162

main issue is that very different viewpoints about exactly what -- you know, about the level of impairment. I must say the videos supplemented that.

BY MR. CLUNE:

Q Which complainant is this referencing?

A I don't know that without looking back at it.

Q Could it have been Complainant 1?

A I believe that there are police interviews of both of them, and, you know, it wasn't just this one police interview. We collected evidence beyond what they gave us, right? And were able to get them police interviews that we had not been able to get earlier.

Q Okay. And we will get to that.

MR. CLUNE: Why don't we break for five minutes. I see a number of things just in this paragraph just to get through.

MS. BACHHUBER: Are you going to take the full seven hours, John?

MR. CLUNE: I'd be happy to be done earlier, but...

MS. BACHHUBER: So, I'm just wondering if we should take time for dinner.

THE VIDEOGRAPHER: And this marks the end

Page 163

of Media Number 3. The time 5:05 p.m.

(A recess was taken from 5:05 p.m. to 5:40 p.m.)

THE VIDEOGRAPHER: This marks the beginning of Media Number 4. The time is 5:40 p.m.

BY MR. CLUNE:

Q So just taking off where we left off, the next item that was submitted to you was weather data. Do you recall looking at weather data or hearing about weather data being submitted?

A I did nothing with weather data.

Q Do you recall --

A I don't even know why it was there. We never discussed weather data.

Q Did you see it on the -- I don't even know --

A No.

Q And multiple prepared video clips. So what do you say -- when you say "prepared video clips," why do you use that word?

A I'm not sure.

Q Is it maybe because these were clips that were -- I don't want to say edited -- but were selected by Mr. Cephus's attorneys?

A Well, they were submitted with this petition, so obviously they were selected by them, yeah.

Q Okay. Do you know whether or not the video clips

Page 164

that they submitted was the entirety of the video evidence they had in their possession?

A I do not know that.

Q Okay. So they might have selected individual segments that was in the best interest of their client?

MS. BACHHUBER: Object to foundation. Go ahead and answer the question.

THE WITNESS: I wouldn't know.

BY MR. CLUNE:

Q That's a possibility because you don't know whether or not there was other footage?

A Not relative to -- like I said, I never saw the full 214 pages so I'm not sure what they submitted.

Q Okay. But in reference to the video clips --

A Mm-hmm.

Q -- those clips were just ones selected by Mr. Cephus's counsel?

A That were put in this part of this petition, yes.

Q Okay. And how many video clips do you think you reviewed?

MS. BACHHUBER: Object to form; asked and answered. Go ahead and answer it again.

THE WITNESS: I can no longer give you a definitive number. I would guess I looked at four,

Page 165

five, or six.

BY MR. CLUNE:

Q Okay. And these were selected by Ray Taffora for you to review?

A Yes, they were.

Q So the next thing you indicate in here is that at the university's request, petitioner's counsel provided lists of the witnesses who testified at the criminal trial and independently offered notes of closing arguments of the trial of the petitioner's counsel.

Let's start with the witness lists. Why did -- or did you ask for the witness lists?

A I did not. Our legal counsel's office did. They were trying to get a full sense of everything that happened at the trial and witnesses will give you a sense of what issues were raised or by whom.

Q How would they do that?

A Well, if you have a doctor, it suggests that there's medical evidence that's being presented, for instance.

Q Okay. Other than somebody who is an expert witness, how would the names of people who testified tell you anything about what they testified to?

A Well, it also tells you whether the sets of witnesses that we interviewed in our case were smaller or larger than the set of witnesses that were there at the trial and were there individuals who might have had information again that we did not have.
Q And did you decide that there were more witnesses that testified at trial?
A I no longer remember anything about the numbers of witnesses and what that looked like.
Q Okay. Was that something that was useful to you in making this determination?
A No.
Q Okay. That was Mr. Taffora's decision to make that request?
A Yes.
Q And then they independently offered notes of their closing argument. That means that you didn't ask for that, but they sent it to you; is that right?
A Yes.
Q Okay.
MR. CLUNE: We'll mark this as 10.
(Exhibit No. 10 was marked for identification.)
BY MR. CLUNE:
Q Chancellor Blank, take a look at that for a minute, and then let me know when you're done. I'm sorry, I'm going to give you 11, also.

(Exhibit No. 11 was marked for identification.)
BY MR. CLUNE:
Q So Exhibit 10 is a -- it starts off with an email from Ray Taffora to Nancy Lynch, and there is a box that has some privileged communications marked in that. But below that it shows an email from Steven Meyer to you, Mr. Taffora, Quintez Cephus, and Kathy Stilling.
Is it your understanding that Mr. Meyer and Ms. Stilling were the attorneys in the criminal case for Mr. Cephus?
A Yes, I understand that.
Q And were they attorneys in this Petition for Restoration for Mr. Cephus?
A Yes, they were.
Q So initially this email says, "Dear Chancellor Blank and Attorney Taffora. In light of our recent phone calls in anticipation of our meeting this afternoon, I'm attaching a copy of Attorney Stilling's closing argument that discusses the accusers."
So initially when Mr. Meyer refers to your "recent phone calls," how many calls do you think you had with Mr. Meyer or Ms. Stilling?

A I never talked to either of them.
Q So when he writes this, is it your presumption that he's referring to calls to Mr. Taffora?
A I assume so.
Q Okay. And it says, "In anticipation of our meeting this afternoon." Did you have a meeting, like a video meeting from Hawaii, with Mr. Meyer?
A I did not. As I said, I never talked to Mr. Meyer to my knowledge.
Q Okay. So, again, you are just presuming here, but I am asking you to do that. This must be something that just involved Mr. Taffora, not you?
MS. BACHHUBER: Object to foundation. Go ahead.
THE WITNESS: That's my assumption.
BY MR. CLUNE:
Q Okay. Do you recall talking to Mr. Taffora about his meeting with Mr. Meyer or Ms. Stilling?
A I do not.
Q Okay. So we can go to 11. 11 is the attachment to this email. Does that look like the closing argument that was submitted as part of the petition?
A I am assuming so. I believe that I did not read this. I did not see the point in reading -- as I say, I wanted to look at the evidence without necessarily listening to one side's final argument.

Q Do you know if this was included in the Box that would have been sent to you?
A I don't know that. I did receive the Box, and quite honestly, looking through this, I don't ever remember reading it.
Q Okay. So it does not look familiar to you?
A No.
Q Okay. Do you know, from Mr. Taffora, did he review everything?
A Yes. I believe he -- he would have reviewed everything that was relevant to him. He certainly would have looked at all the 214 pages and anything people sent.
Q Okay. The next thing on this list is, "Petitioner's counsel subsequently offered a letter they previously provided to the district attorney's office regarding petitioner's background as well as two affidavits from an expert witness who did not participate in the trial."
So let's start with the letter to the district attorney's office regarding the petitioner's background. Do you recall if you

Page 170

reviewed that?
A I do not remember reviewing that.
Q Do you know much about Mr. Cephus's background?
A I was told something of it.
Q What were you told?
A That he had a pretty rough childhood and ended up living with the family that was not his own that essentially adopted him and helped him get to college.
Q Were you told that by Mr. Taffora?
A I would assume I would have been told that by Mr. Taffora.
Q Okay. And was that during this petition process?
A No. That would have been earlier in the -- when the whole case first emerged.
Q Do you think Mr. Taffora would have summarized that letter from the DA's office to you?
A It all depends what was in it. If what was in it was basically facts about his background that we were all somewhat familiar with, I don't think there would have been a need to. I just don't know what was in it.
Q Did Mr. Taffora send you any kind of summary of his sense of the materials that had been submitted or what you should do?

Page 171

MS. BACHHUBER: I'm going to object based on privilege. That's work product.
And you're instructed not to answer.
BY MR. CLUNE:
Q So without going into the details of the communication, did he give you any sort of a summary of the evidence?
A We talked about the evidence extensively.
Q Just wondered if he sent you anything in writing.
A Not that I recall. This was done verbally.
Q And then two affidavits from an expert witness who did not participate in the trial.
Do you know who those experts were?
A I don't know what that is. If I knew it then, I no longer know it.
Q Okay. Did that have an impact on your decision?
A Not so far as I know. I don't know what those are.
Q Okay. Then you say that the petitioner, Mr. Cephus, and his counsel declined to provide other requested information for the review of the petition.
What else did you request of him that he did not provide?
A I don't know what other information at this point we would have requested. Again, it's been long

Page 172

enough that I simply can't produce that in a reliable way.
Q Did you make the request, or would Mr. Taffora have made the request?
A Mr. Taffora did all of the conversation back and forth with the lawyers.
Q Okay. You can't recall any other piece of information that you thought would be helpful to you that he may be in possession of?
A That would have been uniquely in their possession, no.
Q Okay. Why do you say "uniquely in their possession"? Couldn't you have asked them for things in his possession that might have been in somebody else's possession?
A Yes, we could have. But, for instance, if you want the police interviews, I know we got those -- the whole set of interviews -- directly from Madison PD rather than going -- you know, rather than going through the lawyers for one of the other parties.
Q Well, you could have just asked his lawyers to give you the police reports, right?
A Probably.
Q Okay. The next line is, "The University independently sought additional information that it

Page 173

understood was available at the trial or subject to release upon the trial's conclusion."
Do you know what that's in reference to?
A As I think we discussed earlier, the first thing we asked for was the transcript of the entire trial, and that was the -- it was difficult to get anything from the DA's office is my recollection. And so we went to Madison Police. We collected the videos from the ones they had here. I think they looked for other videos. Where they got them, I'm not sure. Maybe they got some of those from the DA's office.
Q Were there any particular witnesses that you feel like would have been useful to you to see their testimony?
A Not having seen any of the testimony, it's hard for me to say that.
Q So as you were addressing this, you weren't thinking it would be helpful for us to hear what [redacted] and the other complainant said at trial or any individualized interest about witnesses?
A You know, in general, it would have been useful to have the whole trial transcript both for the complainants as well as others, but we didn't.
Q Did you ask the court reporter why they were not --

they could have produced an individual witness's testimony in a shorter time frame than six months?
A You would have to ask Ray that.
Q Okay. Did Ray relay that statement to you from the court reporter about whether or not it would have been a shorter period of time for an individual witness?
A My recollection was that we were not able to get transcripts of anything from the trial.
Q Okay.
A Or at least at that point in time and for some period of time afterwards --
Q Okay.
A -- we were told this was not going to be quickly available.
Q Earlier you said six months. Do you recall that somebody said six months, or do you just recall that it was a long period of time?
A It was my recollection that it was going to be at least half a year. But I can't testify firmly to they said six months. It was definitely a long ways off. So long that it was not tenable to say we were simply going to wait on -- until this got produced to make a decision.
Q That would have been relayed to you through

Mr. Taffora?
A Yes.
Q He was -- I mean, were you talking to anybody else besides Mr. Taffora in regards to this process?
A I know that Nancy Lynch was on the phone, I suspect, on some of these conversations. As I said, Matt Mayrl, Charlie Hoslet were on some of these phone calls. But Ray was the main conduit of information -- or Nancy -- from what we had and what we couldn't get.
Q Okay. So down below the section that says "Decision analysis," in that second paragraph.
A Mm-hmm.
Q You said that, "Substantial amounts of information were not made to the university during the university's Title IX investigation and disciplinary proceedings, including information available to and under the petitioner's control."
What are you referring to there?
A Mr. Cephus and his lawyers largely refused to participate very much in this investigation. They did not provide us with any evidence on their side. I believe that Mr. Cephus did not even undergo extensive interrogation because they were worried this would contaminate their participation in the

trial -- a statement that we did not believe to be true, but we cannot compel someone to participate. So there was very little defense on his part, which of course was one reason we had limited evidence from that hearing.
Q So when you say "contaminate the trial," are you saying that you felt like Mr. Cephus was concerned about jeopardizing some of his defense in the criminal case?
A Yes.
Q So -- and is that because --
A That was what was stated to us. Let me be clear. That's not my conclusion. That's what was told to us.
Q Oh, and who told you that?
A His lawyers.
Q Mr. Meyer?
A I don't know which lawyer. And I was not the direct recipient of that conversation.
Q So your understanding from Mr. Taffora was that Ms. Meyer or Ms. Stilling or the both of them indicated they were not going to give you evidence because "we want to save it for trial"?
A Yes. And they were worried -- I don't know what all their concerns were, but they recommended he

not participate in our investigation and that they would not provide evidence on that, which is one reason there was new evidence available at the trial.
Q How does that sit with you as somebody determining whether or not to overturn the entire Title IX finding that this may have been evidence that they have had for quite some time?
A We were not happy that he refused to participate, and I believe that my earlier -- my response to his appeal indicates all of the court precedence that suggests that participation in a Title IX investigation does not -- that that evidence is not admissible into a trial and that this would not have been a problem, should not have been a problem. But, again, we can't compel someone's involvement in this. It is -- he is hardly the first person who has refused to participate for these reasons.
Q I don't need anybody's names --
A Yeah.
Q -- but have you had -- have you had other Petitions for Restoration where this same thing played out where the accused student withheld participation or evidence in the Title IX process but then submitted

it at the Petition for Restoration process?
A We have had so few Petitions for Restoration. Not that I recall.
Q Okay. So when you're referring to "this isn't the first time," you're just talking about somebody not fully participating in the Title IX process because they want to maintain some sort of element of surprise in the criminal trial?
A Yes. We have also had people refuse to participate just because they don't feel they should have been accused and aren't going to participate.
Q Okay. Do you know whether or not Mr. Cephus had these videos the whole time?
A I do not know that.
Q Okay. Mr. Brown testified this morning, the DA, that they would have been given all these videos right after the preliminary hearing, which was September 11, 2019. Are you aware of that?
MR. FORD: '18.
BY MR. CLUNE:
Q '18. I'm sorry.
A I did not know that.
Q Were you aware of that?
A I do not know that.
Q Does that have any concerns to you about the --

your Title IX process, that well after the Title IX process you can file this petition and withhold your evidence for as long as you want and live to fight another day?
MS. BACHHUBER: Object to form and foundation. Go ahead and answer.
THE WITNESS: I don't think any of us were happy at Mr. Cephus's refusal to participate fully in the investigation. As we told them, the results that are going to come out are not going -- you know, you are prejudicing the case against you by not participating in this fully. That was the choice that they made, and we made the decision based on the evidence we had, which was what we had to do at that point in time.
BY MR. CLUNE:
Q But you, personally, don't have a problem with them being able to then submit evidence that they've had during the entire Title IX process?
MS. BACHHUBER: Objection; form. Go ahead.
THE WITNESS: It is very rare -- you know, it is relatively rare that a criminal trial proceeding occurs in conjunction -- as I noted, very few of these cases go to the police or does

the DA accept them. So it's a relatively rare occurrence to have a trial as well as a Tile IX hearing together.
None of us, I would say, were happy at this. On the other hand, when we receive a petition, we then have to look at the full set of evidence that's available at that point in time. You know, I certainly could not say, well, because you didn't submit evidence then, I'm not going to read your evidence now. That would not be an appropriate procedure.
BY MR. CLUNE:
Q Why?
A Because I do think I need to make a decision based on the evidence I have available, and that type of tit for tat is not the right way to bring judgment on these cases.
Q Is there something in Wisconsin 17 that precludes you from doing that?
A There is nothing that precludes me, but I would have that would have -- that would have not made me believe that I was making the right decision and doing the right thing. Mr. Cephus was acting on the advice of his lawyers. I might have thought that advice was ill-founded, but he was acting on

the advice of his lawyers, and I was not going to hold him -- therefore hold him -- in some way punish him at a later stage because of that.
Q Do you know, is there anything in your Title IX materials online that tells survivors that their Title IX finding could be thrown out on a Petition for Restoration of Rights?
A It's clear that there is a Petition for Restoration of Rights that is available to the person who is found -- who is convicted -- who is found guilty, right. Or who is disciplined.
Q And you think that is communicated here on the Title IX information provided to students?
A I just don't know. I would have to go look. It's relatively rare, as noted. If someone has a lawyer, I would assume that they would have read Wisconsin Statute 17 and noticed.
Q Well, the Wisconsin Statute 17 doesn't even say that you would potentially throw out the finding of the sexual assault, does it?
A It let's you fully analyze the petition, and the petition clearly is going to set -- to either reduce a sentence or to set aside a finding. I don't know why else you would be petitioning for appeal.

Q Well, you may be petitioning for appeal to get back into school. It doesn't mean that the entire Title IX process that a survivor has gone through can be thrown out?

MS. BACHHUBER: Objection; form. Go ahead.

THE WITNESS: I can't imagine that we would readmit someone to school if we thought that the evidence continued to be persuasive that they had raped someone on campus. This was a question of either the evidence had -- there was additional evidence or the decision was going to stay as it was.

BY MR. CLUNE:

Q Did you advise the plaintiff in this case -- either yourself or somebody else at your instruction -- that this Petition for Restoration was pending?

A I know that Wisconsin Statute 17 requires that we contact the complainant if we are taking action on the appeal. I do not know if they were notified ahead of time. I just -- if I knew that then, I no longer recall it.

Q Do you recall -- did you send the plaintiff in this case a copy of the Petition for Restoration?

A I believe we did not. But, again, I was not the

one responsible for that type of communication.

Q Did you ask -- did you or anybody at your direction ask my client whether or not she wanted to have any response to the information that was now being provided to you?

A That is not part of the process that we're required under Statute 17.

Q And that's slightly different than my question. I'm just asking you, did you offer her the opportunity to respond to any of the information that Mr. Cephus was providing?

A If we did, I do not know it. I never saw any results from that.

Q You didn't authorize it?

A I did not authorize it, no.

Q You didn't ask Mr. Taffora to contact either my client or her attorney and say, "Hey, we should really get her take on this" or words to that effect?

A I did not.

Q Why not?

A We looked at the evidence that we could find available from this trial that we had not seen before, and the question is did that provide a change in our opinion on preponderance of evidence

in this case. And that was the question in front of us.

I'm not sure that asking someone's opinion -- just as I wasn't very interested in reading the closing arguments, nor did I base my opinion on Mr. Cephus's petition, so the closing arguments of the other attorneys would not have been useful either. We were looking at what outside evidence there was, impartial videos and police reports, which were not filtered through either side.

Q How do you know that either my client or her attorney at the time couldn't have provided you with evidence that contradicted some of the things that Mr. Cephus had submitted?

A I would assume they would have presented that at trial.

Q Well, how would they know if they hadn't even seen the evidence being submitted to you?

MS. BACHHUBER: Object to foundation. Go ahead.

THE WITNESS: That was why we were looking at as much evidence as we could from the trial. I mean, we did not want to base this just on a letter from Mr. Cephus and his attorneys.

BY MR. CLUNE:

Q Well, having been shut down by the DA's office, it seems like all the more you would want to find out if there's any evidence that either my client or her attorney had that could have been useful to you?

MS. BACHHUBER: Object to form. Go ahead.

THE WITNESS: This is not a rehearing and a retrial, right? This is a question of was there additional evidence that's become available we did not have at the original hearing that would change one's impression about this case and where it stands in terms of preponderance of evidence, right?

And as I say, we looked at things that were impartial, were not being filtered in one way or another. Hearing the arguments from the other side I don't think would have been any more useful than saying I based my decision on the petition and the words here.

BY MR. CLUNE:

Q But everything was filtered. I mean, the videos were selected by the defense attorney. Where they stopped, where they started, were selected by he

defense attorney. The text messages you got are selected by the defense attorney.

A I don't think so. I think on a number of the videos we received, we went back to the police, and we did get videos from the police that had been available at the trial. That's my belief. That we did not just use the ones that came to us with this 214 pages or whatever it is.

Q Do you know whether or not my client or her attorney might have had evidence that could have helped your decision?

A I don't know that.

Q So why wouldn't you ask?

A It was not part of the process that we needed to engage in. You know, we were told to review the petition and to look at what we thought about it. That is what Statute 17 tells us to do.

Q But you're trying to decide whether or not there is sufficient evidence to uphold this expulsion or not so you're trying to figure out what actually happened in this case, right?

A We are trying to figure out whether there is additional evidence that -- you know, one can never figure out definitively what actually happened or what didn't. One can simply ask is the evidence

that is available to me provide a preponderance of evidence that leads you one way or the other.

Q How do you know that the evidence is even accurate? I mean, say, for example, we take one of these video clips, one of these four, five, or six that you reviewed and Mr. Meyer selected 17 seconds of which where client or the other complainant looks like they're walking normally down a hallway and what you didn't get is two seconds later one of them falls down and takes the lot of them out.

A So, again, I would have to go back and double-check. I do believe that we got some of these video clips from other places rather than just those that were provided to us here.

Q Okay. But my question is a little different. I mean, you don't know that there could have been other evidence that could have been compelling against Mr. Cephus.

A It's possible. It obviously did not persuade the jury in the trial.

Q But that's proof beyond a reasonable doubt, and you're dealing with just preponderance, right?

A Yes.

Q How much did that jury verdict sway you?

A It got our attention. The verdict in part, but the

speed of the verdict was particularly quite striking. And that more than anything else I think persuaded all of us that we needed to look at this petition very seriously and look at this additional evidence.

Q Even though nobody sat through the trial itself?

MS. BACHHUBER: Objection; asked and answered. Go ahead and answer again.

THE WITNESS: That's correct.

BY MR. CLUNE:

Q So you chose not to reach out to my client and see if she had any sort of response to the information that was being provided. That wasn't required of you under Wisconsin 17?

A It is true that both in the original petition way back when after the first case, we looked at the petition and did not reach out to the complainant about a response. And when we received an appeal, we treated that in the same way, which seemed like the right way to treat it. This was a second petition, now in appeal, and we dealt with it the same way we dealt with the original petition.

Q But in the appeal there's not additional new evidence being submitted, right?

A No. You're reviewing the evidence that is there.

And in a good number of petitions, that's what you're doing as well.

Q But in this petition, there is actual new evidence?

A That's true.

Q Okay. So it was a decision -- it wasn't required that you had to exclude her from the process or not notify her and give her the opportunity to respond?

MS. BACHHUBER: Objection; foundation and form. That misstates what you're talking about, but go ahead and answer.

THE WITNESS: There was not only no requirement we should do that, but, for all of us, it seemed the right way to treat this was the same way we treated other appeals, and we did treat it in exactly the same way.

BY MR. CLUNE:

Q Other appeals or other petitions?

A Other petitions and other appeals. We have in no case that I know about gone back and asked for additional evidence from the complainants on these before making a decision.

Q Okay. So on appeals we've already established there isn't new evidence being submitted, so there's nothing to actually respond to evidentiary-wise, right?

MS. BACHHUBER: Objection; asked and answered. Go ahead.

THE WITNESS: Yes.

BY MR. CLUNE:

Q So in regards to the way you have done it with other petitions, you've had the same process were other individuals -- accused individuals, whether expelled or suspended -- offered new evidence, and you didn't give the complainant the opportunity to respond?

A That's correct. I mean, for instance, as I mentioned, there are cases where we had someone who was engaged in alcohol-fueled fighting who presented substantial evidence that they had gone through a great deal of anti-alcohol, Alcoholic's Anonymous, a bunch of other training that had outside testimony they had not had a drink in two years. And we took -- that was new evidence, and we took that in. And, you know, I know in one case we certainly adjusted the discipline.

Q Have you ever allowed that on a sexual assault case? On a petition for rehearing on a sexual assault case?

MS. BACHHUBER: Object to form.

THE WITNESS: I believe that the two

sexual assault petitions that we had received, which I think were outside of this one, we rejected.

BY MR. CLUNE:

Q Okay.

A It's not a big body of evidence.

Q So just so I understand, so this report comes in in April of 2018, right?

A "This report"? I don't know what you're referring to.

Q The report of sexual assault. It comes to the university --

A The original report. The original claim, yeah.

Q Comes in April of 2018, correct?

A Yes.

Q And at the outcome of the -- of your decision, which we have here -- could we -- let's look at the date of that.

MS. BACHHUBER: March 13th, 2019. Or -- the appeal or the petition?

MR. CLUNE: The appeal.

MS. BACHHUBER: March 13th.

THE WITNESS: March 13th, 2019.

BY MR. CLUNE:

Q Okay. And then there's a further appeal to the

board, right? The Board of Regents by Mr. Cephus?

A Mm-hmm.

Q So it is roughly a year for that Title IX to process; is that right?

A That was what it took, yes.

Q So there's a year of this Title IX process, and then a few months later somebody is allowed -- Mr. Cephus is allowed to submit this 240 pages and however many video clips of new evidence. My client's not allowed to see it. She is not allowed to respond to it. And you think that's a fair outcome?

MS. BACHHUBER: Object; form. Go ahead.

THE WITNESS: Your client would have seen all of this. It would have been at the trial.

BY MR. CLUNE:

Q Why do you think she saw it at trial?

A Well, presumably everything that they gave us came from the trial and would have been presented there, and you and others would have been present there. There would have been no evidence that would not have been seen by you or -- you know, this is not a secret proceeding. This is sending us things from the trial.

Q Why do you think I was at trial?

A I don't know if you were there. Someone was there on her lawyer's part.

Q Why do you think my client was at the trial?

A I do not know. She had a lawyer there who would clearly have seen all of this evidence and been representing her.

Q So you knew that she had a lawyer there the whole time. Did you talk to the lawyer to see if any of this evidence that they were submitting was complete or accurate or...

A That is why we were talking to the police and we were talking to the DA, to make sure that we had as much of a record as we could, rather than taking the evidence that they submitted.

Q So you didn't ask her lawyer if this information was either accurate or complete?

A I can't testify to that. You would have to ask Mr. Taffora that question.

Q Okay. But you certainly didn't do it?

A I did not do that.

Q And you don't recall Mr. Taffora ever telling you that he did it?

A I do not recall that.

Q Every other stage of the Title IX process where evidence is submitted, you would agree with me that

Page 194

the other side has the right to review it and respond to it?

MS. BACHHUBER: Object to form. Go ahead and answer.

THE WITNESS: They did not respond to the petition. You know, there was a number of claims in that petition that were not part of the hearing about how the process was misdone, right? And we dealt with that as a petition without going back to the complainant.

BY MR. CLUNE:

Q But my question was a little different. I was asking, in the Title IX process, at every stage where any of the parties have the ability to submit information, there's a requirement that the other side learn of that information and have the ability to respond to it, right?

A In all of the hearings we held, yes.

Q Okay. Except for this petition process that we've talked about?

MS. BACHHUBER: Object to form. Go ahead.

THE WITNESS: At that point, there had been a trial that had aired all of this. None of it was secret information.

Page 195

BY MR. CLUNE:

Q That's not what I'm asking. I'm asking you, except for the Petition for Restoration of Rights that you have talked about, every other process requires that the other side give notice of the evidence that's being submitted and have the ability to respond to it?

MS. BACHHUBER: Object to form and to foundation. Go ahead.

THE WITNESS: No. That's not true. There' no ability to respond to -- I need to get the words right -- the petition that was put in, which made a whole series of arguments that the complainant may have had a response to, but we did not go and ask.

BY MR. CLUNE:

Q I think I may not be speaking clearly, so I'm going to try to rephrase that. I'm saying except for the petition.

A Okay.

Q Except for the petition, at every other stage in the Title IX proceeding, if evidence is being submitted, you are required under Wisconsin 17 to give the other side notice of that evidence and the ability to respond to it?

Page 196

MS. BACHHUBER: Object to form. Go ahead.

THE WITNESS: I have difficulty with that question because by accepting the petition, putting it aside, the appeal is most like the petition. And so the comparison should be to the petition, not to the rest of the trial, of the hearing and the investigation.

BY MR. CLUNE:

Q What comparison?

A I mean, you were right in your statement, but the fact that you are excepting the petition from that means that you are excepting the one thing that is most like the decision we were making on the appeal.

Q Okay. I have a better way to do this. So in the investigation process --

A Yeah.

Q -- the actual investigation by Lauren Hasselbacher and the findings by Mr. Cox.

A They put that forward, and everyone responds.

Q Okay. So the parties get to submit information and evidence?

A Mm-hmm.

Q They can make arguments but -- if they want to

Page 197

submit evidence, they can do that. And then in that process, the other side has the ability to see the evidence that's being submitted by the other party and respond to it, right?

A That's correct.

Q Okay. And then Mr. Cox makes his finding. And then if it's contested, as it was in Mr. Cephus's case...

A Can I actually correct that? It is not clear to me, in the process of the investigation, that both sides see everything that's being presented. I think they don't see it until they see the final report by Mr. Cox.

Q Okay. So you think they don't see that --

A Yeah.

Q -- while it's going on?

A It's not until you see the final report that you find the evidence -- that you have everything that both sides are saying.

Q There is -- Ms. Hasselbacher actually creates a draft report of the investigation, doesn't she, before Mr. Cox makes his findings?

A Mm-hmm.

Q And that draft report actually gets submitted to the parties for them to review?

A That is correct.
Q So they get -- so what I will call the final investigative report is a draft investigative report from Lauren Hasselbacher. That's what is being shared with the parties, right?
MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: Yes.
BY MR. CLUNE:
Q You are aware of that?
A Yes.
Q Okay. And then the parties have the ability to respond to that draft investigative report before it goes to Mr. Cox?
MS. BACHHUBER: Object to form and foundation. Go ahead.
THE WITNESS: I believe that to be true.
BY MR. CLUNE:
Q Okay. And then Mr. Cox makes his findings?
A He prepares the final report.
Q Okay. His outcome and the findings, right?
A Yes.
Q And then the matter gets set for a hearing in January of 2019, right?
A Yes.

Q And at that hearing, both parties get to hear the evidence that's being submitted by the other parties -- we say both, there's actually three -- but the two complainants and Mr. Cephus get to hear what's being submitted, and they're allowed to respond to the evidence that's being submitted at that hearing, right?
A They are all part of the process, right.
Q Is there any other process that I missed until we get to the petition where evidence gets submitted?
A Not that I knew of.
Q Okay. So we talked, generally, about the fact that the things that were most compelling to you were the police reports and then some of the videos that you viewed.
A Mm-hmm.
Q You said that there were "mixed reports" of the intoxication level of the complainants, right?
A That's correct.
Q Was it both of them, or one more than the other? Do you recall?
A My recollection is different comments were made about each, but they were mixed about each.
Q Do you recall that one of the two women was reported to be so intoxicated she was just blacked

out -- passed out?
A My recollection was -- and it's my recollection -- she was not actually passed out. She was blacked out in the sense she did not remember anything. And that was at least the claim that she made for quite a while afterwards.
Q Okay. This was the same individual that her friend, the other complainant, had said that she saw her eyes rolled back in her head. Is that the same person? Do you know?
A As I said, there was mixed evidence from what I saw about exactly how drunk she appeared. I understand that there were people who testified that she was very drunk.
Q The more important point that I'm asking about is there was one that was reportedly more intoxicated than the other?
A That was certainly discussed, yes.
Q Okay. And I can represent to you, the person who was generally regarded as being more intoxicated was the plaintiff in this case.
A Mm-hmm.
Q So what do you recall about the reports -- the descriptions in the police reports -- that was new information for you?

A So there were police reports that we did not get at the time, and some of those reports suggested that they did not see a lot of physical evidence of intoxication. Again, that's my recollection of that. I remember there was a case where the testimony at the hearing had been that someone had gone back to the room and vomited, and the police report said there was no -- they did not see or smell any evidence of that it.
So there were a number of police reports that suggested that, at least by their observation, the individuals that they interviewed were not completely unable to -- to take action, to act normally.
Q And whose police reports were these? Was this UWPD?
A This was, I think, Madison Police.
Q Okay. But you don't recall with more specificity than you just described?
A I would have to go back and review the documents.
Q Okay. What about the videos? What did you see on the videos that was significant to you?
A Groups of people laughing. Seemingly, you know, not staggering in any way. At one point I know one of the complainants picks -- halfway carries Danny

Page 202

Davis on her back. You know, there's a series of a couple of videos as they are leaving the bar where people do not look completely drunk.

And then there's a series of videos after they leave Mr. Cephus's apartment, depending on who you're seeing and when, where they're entering the dorms and again, going upstairs, functioning seemingly quite normally.

Q What's your impression on how well you can judge intoxication by looking at security camera footage?

A So the issue is not how well I can judge intoxication or even how intoxicated a person is. The issue is whether someone else was interacting with them, found them to be so intoxicated as to not be able to give consent, that this was -- to think this was not a consensual encounter. And, you know, that's a visual perception.

Q Was that the focus of your review in this petition?

A The issue here of -- revolves a great deal around the question of consent. And, you know, it's clear that Mr. Cephus believed he had consent. The complainants argued that they were so drunk he did not. And therefore the observations that both are made in the video and that are made by the police officers very soon therefore strike me as quite

Page 203

relevant to the question of would Mr. Cephus have believed he had consent from the basis of their behavior.

Q Okay. And was -- how much of your decision on this petition focused on that issue about whether Mr. Cephus believed he had consent?

A So it's not whether he believed. It's whether there is evidence that would be consistent with his claim, that, you know, he might have thought there was consent.

Q That's a better way --

A You can only observe the evidence that you have, right?

Q That's a better way to phrase it.

A Yes.

Q So how much of your determination in reversing this finding was based on that focus?

A A substantial amount. I thought there was much more question about that issue after looking at this than there had been based on the information we had at the hearing.

Q Okay. But that was sexual assault in the second degree, wasn't it, whether or not he believed he had their consent?

A I would have to go back and look at the second and

Page 204

third degree again. I'm sorry.

Q We can look at it.

A Let me make sure I am answering that correctly. This is the Cox memo?

MS. BACHHUBER: Yes.

THE WITNESS: This is it.

Sexual assault -- well, third degree is sexual intercourse without the consent. Second degree is sexual intercourse under the influence of alcohol, right.

BY MR. CLUNE:

Q So this issue that you were just saying was a significant part of your determination, that charge has already been dismissed by the hearing?

MS. BACHHUBER: Objection; form; foundation.

THE WITNESS: I don't think so. I mean, the question is about consent. And there are a lot of reasons around consent. And some of them -- much of it relates to the behavior of the person you are interacting with and then going to have sex with.

BY MR. CLUNE:

Q But this question of whether or not Mr. Cephus knew that she was too intoxicated to consent, that

Page 205

wasn't even before you in the Petition of Restoration of Rights because that had already been dismissed at the hearing panel.

A What was before me was the question of whether he had reason to believe that she was consenting or not. And there were a lot of reasons why one could do that. Certainly intoxication is one of them. The intoxication per see was dismissed, but the issue of consent was not. And that doesn't mean that alcohol is completely out of it.

Q Where in sexual assault in the third degree does it require that he have reason to believe that she couldn't consent?

A The issue is whether there was consent on the part of the other party.

Q Isn't the distinction between sexual assault second degree and sexual assault third degree whether or not he knew that she was too intoxicated to consent?

MS. BACHHUBER: I am going to object to foundation and to form. Go ahead and answer.

THE WITNESS: Third degree just says you don't have consent. The second degree says you don't have consent by reason of alcohol, right? I can't go back and judge again, without looking at

Page 206

it, about the reasons for dismissal of one versus the other. But it was clear alcohol was playing a major role in this case throughout the investigation as well as throughout the trial from what I know about it.

And, you know, to the extent that you judge consent on the basis of people's behavior, are they willingly going with you? Are they flirting with you? Are they clearly able to make a decision for themselves about whether this is wise or not? That's the issue on the table.

And, again, based on some of the third-party observation, either by video or by the police reports, it seemed that there was much more mixed evidence about whether one, in observing these women, would think that they had given consent or not that had seemed clear in the initial investigation.

BY MR. CLUNE:

Q But the issue of whether or not Mr. Cephus believed he had consent or whether he believed she was so intoxicated that she couldn't consent, his belief doesn't apply to sexual assault, third degree. It only applies to sexual assault, second degree.

If you want to look at the definitions

Page 207

again, you're welcome to.

MS. BACHHUBER: Objection; form; foundation. Go ahead and answer.

THE WITNESS: Yeah. I don't agree with that. I mean, the question is did he have reason to believe he had consent, right? That might be based on a number of factors of which alcohol is only one. And the dismissal decision was not solely an alcohol-based charge. But, again, you know, it is one of the factors that was there throughout all of the testimony on the part of both sides and together with other forms of behavior, you know, was this person rational? Were they giving coherent answers? Were they walking in a straight line? You know, all of those relate to the question of did he believe he had consent.

BY MR. CLUNE:

Q Is that Mr. Cox's report in front of you?

A I had it here a minute ago. It's Exhibit 4.

Q Could you read the definition of sexual assault in the third degree out loud?

A "Whoever has sexual intercourse with a person without the consent of that person."

Q Doesn't say anything about whether or not somebody believed he had consent of that person, does it?

Page 208

A That's an important part of the concept, right? You know, consent is a dual action. I mean, you know, if someone comes up to me and I say absolutely nothing, they have much more reason to believe that they have consent than if I actually say, "no, stop," right? So the perception of the person has to be important in this.

BY MR. CLUNE:

Q I'm just asking you, it doesn't say anything in that definition about --

A At least, I would have to read the whole statute. You know, it does not say it in what's quoted here.

Q Okay.

(Exhibit No. 12 was marked for identification.)

BY MR. CLUNE:

Q So what I've handed you is obviously titled UW-Madison Policy on Sexual Harassment and Sexual Violence, effective January of 2018.

A Yes.

Q If you flip to what is marked as 13141.

MS. BACHHUBER: What page are you on? Oh, 13141.

BY MR. CLUNE:

Q Page 14 of 20. Yeah, it's probably easier. Okay. That's where it lists out what the prohibited

Page 209

conduct is under the policy on sexual harassment and sexual violence, right?

A Yes.

Q So sexual assault, there's first degree, there's second degree sexual assault, and if you look at subpart D of second degree sexual assault, it says that there's this language, "If the respondent had actual knowledge that the person is incapable of giving consent," right?

A That's right.

Q Okay. So flip to the next page, which is third degree sexual assault. Doesn't say anything about if the respondent had actual knowledge that the person is incapable of giving consent?

A No. This is presumably a summary of the state law. It does not say it here, no, in our summary.

Q Do you think the state law says something different?

A I have no reason to believe that it does.

Q Okay. So where that is required, it's written right into second degree sexual assault?

A Mm-hmm.

Q And it's not in third degree sexual assault?

MS. BACHHUBER: Objection. Form, foundation. Go ahead.

THE WITNESS: So the issue is what outside evidence do you have to believe that Mr. Cephus thought he had consent or not, right? And it's not enough for a complainant to say, no, he didn't have consent. We have to have some evidence of that. And that is where much of this additional evidence is important.

It's not an open-and-shut case because the defendant says, "No, I didn't give consent." There has to be, in any judgment, some evidence that would support that, right? And that's what we are trying to evaluate. Is there evidence that would support the belief that the complainant did not give consent.

Q That's not the plaintiff's responsibility to establish that she did not give consent, is it, in the university's process?

A It's the complainant's responsibility that she indicated she was not consenting in some way. If it's just a "he said/she said" case, that's not a case that we can adjudicate. There has to be other evidence beyond that, beyond what the two parties in the room are saying. There have to be other witnesses. There has to be video evidence. There has to be police and medical evidence. Because you

cannot judge a "he said/she said" situation in and of itself with a preponderance of evidence.

Q So is it the complainant's responsibility to establish that she didn't give consent, or is it the defendant's -- or the respondent's responsibility to establish that he did have consent?

MS. BACHHUBER: Objection; foundation and form. Go ahead.

THE WITNESS: I think both sides should be working on that, right? If you are going to try to persuade whoever is listening to the case.

MR. CLUNE: Why don't we break for five minutes. If I organize my thoughts, we'll be more efficient.

MS. BACHHUBER: Okay.

THE VIDEOGRAPHER: This marks the end of Media Number 4. The time is 6:42 p.m.

(A recess was taken from 6:42 p.m. to 6:53 p.m.)

THE VIDEOGRAPHER: This marks the beginning of Media Number 5. The time is 6:53 p.m.

BY MR. CLUNE:

Q So, Chancellor Blank, you at some point review the videos either during the petition process or during the appeal process, the videos of -- that were in

the possession of the university during the Title IX process?

A I did not view those videos at the petition point. The lawyers did review them and told me what they saw from them.

Q Okay. What did they tell you they saw from those videos that were in the possession of the university during the Title IX trial?

A I think they did not believe they had a major -- they were not a major part of the decision, which is one of the reasons I was not given them to review.

Q Do you recall if those videos that were in the possession of the Title IX's office during those hearings, do you recall being informed whether those made my client look like she was intoxicated?

A I can no longer tell you what videos were available at that point in the process versus later. I'd have to know what was on that list.

Q Mr. Taffora would be probably a better person for that question?

A Yes.

Q Why don't you pick up number 5, Exhibit 5.

A I have them all out of order now. Oh, here it is.

Q So if you turn to Page 7 of 8.

A Okay. I have to find the page numbers. Yes.

Q This is the finding of the hearing panel. The hearing panel finds -- if you look at the top, top line, it says, "Furthermore, the credible information provided evidence that Complainant 2 also verbalized nonconsent. While Complainant 2 had minimal recollection of the evening, statements Complainant 2 described in the investigative report and in the hearing testimony were consistent.

The investigative report" -- Page 4 of the hearing packet -- "collected a statement from Witness 1, who knows Complainant 2 well, knowing that Complainant 2 was very drunk that evening, and Witness 1 observed Complainant 2 as being intoxicated. Additionally, Complainant 1's testimony of the evening shared that Complainant 2 appeared limp with eyes rolled backwards when observed in respondent's bedroom," Page 32 of the hearing packet.

"Committee believes Complainant 2 was intoxicated to a point where she was unable to provide consent. Complainant 1 also provided testimony that Complainant 2 had said, 'No, I'm too tired' while the respondent was engaging in sexual activity with her, further supporting lack of

consent."

So here's my question is, what is it that you saw in the videos that in any way undid the findings of your own hearing panel that said that Complainant 2 verbalized nonconsent?

MS. BACHHUBER: Objection. Foundation and form. Go ahead.

THE WITNESS: So I just have a question. Before, I thought we were discussing the fact that lack of consent due to overconsumption of alcohol had been dismissed. And now you are talking about evidence here that is all about, presumably, alcohol consumption. Are we going back to the discussion of alcohol is a reason for nonconsent?

BY MR. CLUNE:

Q It's just a brand-new question. Pivoting to this question, which is, what about the videos that you watched in any way undid the finding for you that Complainant 2 verbalized nonconsent?

A So I'm back to the issue that this statement is all about the she said side of "he said/she said." It's the two complainants, right, without any other corroboration of what was true and what wasn't true.

So the question is what evidence do we

have that would support that -- that Complainant 2 would have been completely passed out and unable to even give consent. Certainly the videos did not suggest that was true. The interviews with the police that took place very soon thereafter did not suggest that was true.

Q This is not a "he said/she said." This is a finding that your hearing panel made on credible information provided that evidence that Complainant 2 verbalized nonconsent. That's a finding that the hearing panel made, right?

A That is what is presented, yes.

Q So my question is what is it about your impressions of whatever you saw on the videos that you watched changed your impression of whether or not Complainant 2 verbalized nonconsent?

MS. BACHHUBER: Objection. Asked and answered. Go ahead and answer again.

THE WITNESS: I mean, this is a discussion among -- by the two complainants and without response from Mr. Cephus. And when you look at some of the other evidence, it strongly suggests that Mr. Cephus had reason to believe that he was engaging in a consensual -- again, from external evidence, it appears that it is at least

reasonable to think he might have had that impression.

BY MR. CLUNE:

Q And what I'm asking you is what did you see in those videos that made you question whether or not this finding that the hearing panel came up with, which is that the Complainant 2 verbalized nonconsent? What was in the video that you saw that told you she didn't verbalize consent?

MS. BACHHUBER: Objection; asked and answered. Go ahead.

THE WITNESS: So Comment Number 1, again, is at the hearing, there was virtually no response back from Mr. Cephus. For better or worse, I wish it hadn't happened that way. We had a poor set of responses at the end of the trial.

Issue Number 2 is these -- whether this was the hearing or not, if I'm looking at all the full evidence later on, the question is then does Mr. Cephus have reason to believe he might have had consent. And a number of other observations at and near that time make it at least consistent that he might have believed that.

BY MR. CLUNE:

Q Do you agree with me that if Complainant 2

verbalized that she did not consent, that that would be a sexual assault?

MS. BACHHUBER: Object to foundation. Go ahead.

THE WITNESS: Again, the fact that someone says "I objected," by itself does not give you enough evidence to find one way or another. You have to have some external evidence on this. That's just true in any trial. You know, you can say, "I didn't commit the murder." But unless there is evidence one way or another, that itself is not a definitive statement.

BY MR. CLUNE:

Q So if the hearing panel finds that she said no to Mr. Cephus, that's not enough for to you determine it was a sexual assault?

A I would want to see evidence that suggests she -- this was reported in a particular way, that there was medical evidence that there's, you know -- that she had her eyes rolled back and she was unconscious, that she was behaving in such a way immediately before and after that would be consistent with that observation by the other complainant.

That is what trials are all about is

trying to say is there other evidence beyond the statements of, you know, the immediate accuser and defendant.

Q I think you are answering a slightly different question than the one that I'm asking.

A Mm-hmm.

Q What I'm asking you is if your own hearing panel found that our client said "no" during the sexual encounter, that's not enough for you to conclude that a sexual assault occurred?

A No. The --

Q It's not a difficult question.

A The answer is there was more evidence available at a later stage, and at this stage there was virtually no response at all by Mr. Cephus one way or the other. We had other evidence, I presume, presented by his team, but which we acquired independently in many cases, that suggested that this particular testimony may not have been fully accurate from if you're looking at what did he observe and experience.

Q So her saying "no" is not enough?

MS. BACHHUBER: Object to foundation. Go ahead and answer.

THE WITNESS: The testimony that I said

no to something by itself should not persuade a jury or a hearing or anyone else unless there is some evidence to suggest indeed I did say no and the person who I was saying no to heard that, saw that. There has to be some outside evidence here. It cannot just be my statement or his statement.

BY MR. CLUNE:

Q He never gave a statement to the university, did he?

A He did not give a statement, which is one reason why when additional evidence came up, we had to look at it.

Q It's not "he said/she said." He didn't say anything, right?

A Mm-hmm. Which -- and you asked me why am I willing to go beyond what was found at the hearing. It is precisely because of that. He did not say anything. That made all of us very unhappy and a little queazy. But at the end of the day we had other evidence, then, when we were given the appeal.

Q So how do you contradict your own hearing panel's finding that she said no when you don't have a statement from him?

MS. BACHHUBER: Object to foundation and

form. It's a very confusing question. Go ahead.

THE WITNESS: You want to restate it?

MR. CLUNE: Could I ask the reporter to read it back.

(Requested portion was read.)

THE WITNESS: I did not have a statement from him at the hearing. We had other evidence at a later stage that we looked at.

BY MR. CLUNE:

Q But nothing from him saying that wasn't true?

MS. BACHHUBER: Objection. Vague. When are you talking about her correcting? It's vague as to time. Go ahead.

THE WITNESS: So I do think Mr. Cephus, multiple times at a later stage, certainly at the trial, said that he felt he had consent. That was the heart of his defense. So he clearly at a later stage said he did not see the lack of consent.

Like I say, the issue is what -- the hearing itself did not have all the evidence present that we had at a later stage. And so the fact that the question is what is the predominance of evidence in my mind shifted from what was available at that hearing to what was available at a later stage. And that is what led me to overturn

the sexual assault.

BY MR. CLUNE:

Q Did you ever read anywhere in any of the materials that you reviewed that contradicted this statement that the hearing panel found that she said no?

A What I saw was a variety of pieces of evidence suggested that Mr. Cephus had some reason to believe -- and, again, simply someone saying "I didn't want this, and I said no" without other evidence, is not by itself enough on which you can make a judgment.

Q And I appreciate your point on that. I understand your point on that. I'll put it that way. But what I'm asking you is did you have any evidence that suggested that this statement that your hearing panel found that she said no, did you have any evidence that suggested that that actually didn't happen?

A There was no additional evidence about what did or did not happen in that room among just the three of them that provided further illumination; let's put it that way. The evidence was about things that happened outside that room.

Q Okay. Was there anything else in the police report or the videos that was illuminating to you besides

REBECCA BLANK
March 25, 2022

Page 222

things having to do with their level of intoxication, or I should say my client's level of intoxication?
A Yeah. I think there was also some evidence of some of the communications back and forth between the complainants and Mr. Cephus and his friends that also suggested that they were not immediately feeling in peril.
Q What do you mean by that?
A You know, there was evidence in terms of questions that were asked, texts that were sent, things that suggested that the women were not deeply afraid of this man who they were claiming had recently raped them.
Q So you are saying afterwards?
A Afterwards.
Q What specifically are you referring to?
A The exchange around the jewel is certainly a piece of it. You know, the question of what texts they sent and what they said in those texts, those -- again there's -- it didn't immediately look like these were people that had gone through a very traumatic event and did not want anything to do with these two men again.
Q You testified earlier that you believe that my

Page 223

client was black-out drunk, that she didn't recall, but not necessarily passed-out drunk. Do you remember that?
MS. BACHHUBER: Objection; misstates her testimony. Go ahead.
THE WITNESS: Yeah, I don't think I testified to that.
BY MR. CLUNE:
Q Okay. You understand that my client didn't recall any portion of the evening that involved the -- I shouldn't say that. That's not accurate.
A I know that your client has indicated she has very little memory of a lot of this. That is one of the reasons why you have to go on the basis of how she presented to other people.
Q Did you have reason to doubt that she didn't have memory?
A I can't judge that one way or the other.
Q Okay. I'm just asking, did you have any reason to --
A I just can't judge it. I don't know that I have any evidence one way or the other on that.
Q So if she didn't recall anything about the sexual assault --
A Mm-hmm.

Page 224

Q -- you would agree that the "jewel" comment is not very --
A Well, she didn't recall --
Q Hold on. Let me finish.
You would agree with me that if she didn't recall anything --
A Mm-hmm.
Q -- like that jewel comment --
A Mm-hmm.
Q -- and not saying anything about being sexually assaulted, or whatever, like, that's not that helpful?
A That's true that she didn't recall anything. She also has no viable testimony about whether she consented or not.
Q Okay. That's not the question that I'm asking you, though.
A No, but I'm saying relative to what we were just discussing.
Q And I appreciate that. It's hard to answer these questions without trying to explain the context of it.
A Yeah. Yeah.
Q But it would be helpful if you just answer the questions that I'm asking you.

Page 225

A If you're telling me if she had no memory of the sexual assault, she could then interact with these folks, you know, without any hesitation, I assume that's true, but that then calls into question anything about -- that she might have testified about what happened in the bedroom.
Q What was it about the jewel text that you thought was helpful?
A I don't know if it was helpful.
Q Helpful to you, I should say. When I'm talking about helpful, I'm talking about helpful to you in turn in making this decision.
A You know, it suggested someone who was happy to interact further with the individual, right, with Mr. Cephus, and, you know, maintain a relationship.
Q Other than that jewel text, which was also considered by the Title IX panel, right?
A Mm-hmm.
Q They had that information?
A They had that, yes.
Q Other than that the jewel text, was there anything in either the police reports or the videos that we haven't talked about yet that was helpful to you in your decision-making except for how it helps you decide the level of intoxication? That's a

poorly-phrased question. Let me rephrase that.

Other than issues regarding intoxication of the complainants, what was in the police reports or the videos that we haven't discussed yet that was helpful to you in making this determination to overturn the finding?

MS. BACHHUBER: Object to foundation. Go ahead.

THE WITNESS: So as I said, and as I indicate in this report, right, the main issue in my mind was the question of how did they present to Mr. Cephus from looking at how they presented themselves an hour or two later to the police or however long that was, and how they looked inside the videos both before and after the event. To me, that was the most definitive evidence here.

There was some evidence consistent with that. There was some evidence inconsistent with that. This evidence does not clearly go all one way or the other. The question is, is there a preponderance of evidence that goes one way.

BY MR. CLUNE:

Q Okay. Again, my question is a little different.

A Yeah.

Q What I'm asking you is, aside from any issues about

intoxication or how they appeared to Mr. Cephus, what in the police reports or the video helped you on the issue of consent?

MS. BACHHUBER: Object to foundation and to form. Go ahead.

THE WITNESS: So, you know, the other piece -- and I say this in here clearly -- the police report provided indications that the evidence we had at the hearing was quite incomplete, not just on Mr. Cephus's part but on the complainant's part as well. You know, so it added to the sense of I'm not sure what happened here. Certainly what we heard at that hearing was a very partial story and not just because Mr. Cephus wasn't testifying.

BY MR. CLUNE:

Q So what I'm asking you is what piece of new evidence -- let me ask an easier question.

A Mm-hmm.

Q We've talked about alcohol, right?

A Mm-hmm.

Q We've talked about how the complainants may have appeared to Mr. Cephus?

A Mm-hmm.

Q We've talked about the jewel text?

A Mm-hmm.

Q What else have we not talked about yet that was in those police reports or videos that helped you make a determination on consent?

MS. BACHHUBER: Objection to foundation. Go ahead.

THE WITNESS: I will go back to my same answer. And as I pointed out here in my report, they also indicated how incomplete the complainant's reports were that we had at the hearing, that there was other information in the police reports that came out presumably at the trial that was certainly available. And that -- you asked me why was I willing to overturn the findings of that investigation or that disciplinary hearing. It was very clear that there was additional information. And the police reports added to that sense.

BY MR. CLUNE:

Q Okay. So the question is what is the additional information?

MS. BACHHUBER: Object to foundation. You are not showing her the information. Go ahead and answer.

THE WITNESS: Yeah. I mean, the very

fact that they did not give us the full story that they gave the police very soon thereafter is symbolic of the fact that the hearing itself was not complete and therefore makes it easier to say let me -- that that is an important piece of why I made the decision to overturn the results of the hearing as well as the other things that you mentioned.

BY MR. CLUNE:

Q But you didn't just say there's additional information, so that works in Mr. Cephus's favor. There must have been specific things that --

A Well, this is additional information that works in the disfavor of the complainants in that they were not telling a full story even though they told their story to the police. The police had information that they were not telling us about.

Q Right. So going back to the question of what is the information?

MS. BACHHUBER: Object to foundation.

BY MR. CLUNE:

Q Maybe I will ask a better question. What is the additional information that they provided to the police that they didn't provide to the Title IX?

A I would have to go back and look at those police

reports and compare them to our -- I mean, I just can't testify at that level of detail right now.
Q Okay. Did anybody besides Mr. Taffora, to your knowledge, help with the vetting of the new information that was being provided by Mr. Cephus?
A I know that his assistants did. I know his assistant general counsel was quite involved with this. I assume there might have been others as well in the Office of Legal Affairs.
Q Is that Ms. Jeris?
A I think that's Ms. Lynch.
Q Oh, Ms. Lynch was at the time, of course.
A Mm-hmm. Yes.
Q So you understood Ms. Lynch was involved in whatever vetting was done?
A Yes.
Q Anybody else that you were aware of?
A I think the two -- there could well have been other lawyers in the office involved as well, but I don't know who that was or if that was true.
Q Okay. When you say there was additional information that was in the police reports, did you have the impression, from the complainants -- did you have the impression that the complainants had withheld information from the university, or did

you just have the impression that there was additional information in the police reports?
A The impression I got was that they did not give as full information in our investigation and that the police had additional information that they could have told us about and they did not. Not the police. The complainants could have told us about and didn't.
Q But you don't recall today what that is?
A I would have to go back and look at that.
Q Okay. You don't think it's possible that the police just did a -- I mean, they are police. They might do a better job interviewing people than --
A That's possible. But usually if you just went through one interview and you're doing another interview and you're in the midst of a hearing, you would -- that information would be front of mind.
Q You think so?
A You know, you're the lawyer. I'll ask you that.
Q Well, I may be a lawyer, but I'm not a rape victim, though, so I don't know.
A Yeah. Yeah.
Q You decided, in your petition, that the matter was now incapable of resolution; is that right?
A The sentence that I wrote is, "The level of

ambiguity created by these conflicting accounts is, practically speaking, incapable of resolution."
Q Okay. So we talked about preponderance earlier. It's whatever is just over 50 percent?
A Mm-hmm.
Q So if you're just over 50 percent, then you find the respondent responsible, right?
A Yes.
Q If you are just under 50 percent, you find the respondent not responsible?
A Yes.
Q And you're saying it was somewhere between just over and just under 50 percent?
A I was saying I could not tell where the preponderance of the evidence fell and I thought we could no longer make a finding.
Q Isn't that what your job is?
A Well, my job is to decide where the preponderance of evidence falls. And the evidence was mixed enough after we had looked at all the additional evidence that you simply could not say that the majority of the evidence suggested that the complainants were accurate in this case.
Q And you were well aware that in making that finding, that Mr. Cephus would be found not

responsible?
A Yes. That was the whole question here, was was he responsible or not.
Q Okay. Had you ever made such a finding before?
MS. BACHHUBER: Object to form. Go ahead.
THE WITNESS: In a sexual assault case, no.
BY MR. CLUNE:
Q Okay. In a nonsexual assault case, you did?
A I guess I've -- shortened sentences -- I don't believe I've overturned them.
Q But what I'm asking you is have you ever made the finding that something was incapable of resolution?
A Not in any petition or appeal that I have received.
Q In anything?
A There are certain things that I will tell you I think I cannot tell you what the answer is. Incapable, at least what I know, of making a decision as to where the truth lies.
Q Making a decision on a disciplinary matter through either a petition or appeal --
A Yeah.
Q -- you had never made -- this is first of its kind for you?

A Yes. That's true.
Q Have you ever heard of, since you have been here, the Title IX office making a finding that it's incapable of resolution?
A Well, incapable of resolution, I'm not clear what that means. It means that we're finding -- the respondent is not guilty. We don't have enough evidence to -- and certainly there have been investigations that have resulted in a finding that we did not have enough evidence to move forward. That same thing.
Q But you are not finding here that the preponderance of the evidence shows that he didn't do it, are you?
A I'm not making a judgment one way or the other about what actually happened in that bedroom either on the part of the complainants or the respondent. I'm saying from the evidence that is available there's not a preponderance of evidence that suggests that the complainants' story are more likely to be true than the defendant's story.
Q But if you had decided that the evidence made it more likely that Mr. Cephus was not responsible for a sexual assault, you would have made that finding, wouldn't you?

MS. BACHHUBER: Objection; form; foundation.
THE WITNESS: I didn't quite get that question.
BY MR. CLUNE:
Q That's okay. If you believed that the evidence showed that Mr. Cephus, by a preponderance of the evidence, did not commit a sexual assault, you would have made that finding and found him not responsible, wouldn't you?
MS. BACHHUBER: Objection; form; foundation. Go ahead and answer.
THE WITNESS: I think that is exactly what this finding is. There is not a preponderance of evidence that Mr. Cephus committed these rapes; therefore, I have to find him -- you know, I have to dismiss that charge. I mean, the dismissal of the charge is essentially a statement that there is not a preponderance of the evidence in favor of the complaint, and that means, by definition, there is not a finding.
BY MR. CLUNE:
Q So did you believe that the preponderance of the evidence showed that Mr. Cephus didn't commit this assault?

A From the way that this is said, and I think it's accurate, I would say that there is a 50 percent or better chance that Mr. Cephus did not commit an assault, to use the definition of a preponderance of the evidence. That doesn't mean he didn't -- you know, it's not over 50 percent.
Q What's not over 50 percent?
A The likelihood that he committed an assault.
Q Okay. But you are not specifically finding that it's under 50 percent either?
A It's not over 50 percent. That's all I'm saying. That's what a preponderance of evidence finding is about.
Q Why didn't you just find him not responsible? Why say it's incapable of resolution?
A I did find him not responsible. That is essentially what this does. It dismisses the charge.
Q Why not use the phrasing "I find Mr. Cephus nonresponsible after reviewing the additional information"? Why say "It's incapable of resolution"?
MS. BACHHUBER: Objection; form; argumentative. Go ahead and answer.
THE WITNESS: Let me read the sentence.

"As a result, the evidence falls short of a preponderance of evidence standard required to find the petitioner responsible for sexual assault." That is the same as saying I find the petitioner not responsible for sexual assault based on the preponderance of evidence standard. Those two are identical statements.
BY MR. CLUNE:
Q So -- but when you say "incapable of resolution," I mean, doesn't that sound to you like you're saying I can't say one way or the other?
A It might be that that was not phrased in the right way. I think the second sentence is quite clear, that I cannot find the petitioner responsible for sexual assault. That's the same as saying I find him not responsible for sexual assault. Those statements are the same.
Q Who came up was that phrasing, "incapable of resolution"?
A Probably my lawyers. You can blame them. They drafted this.
Q On Page 5 -- on the top of Page 5 of your petition in that first paragraph, the first full sentence is, "It is particularly disappointing that certain individuals with relevant information testified at

trial but refused to participate in the university's process even when they were not subject to any criminal prosecution."
Who are you referring to there?
A Mr. Cephus. And that whole paragraph is a statement about how I can overturn this when we had an evidentiary hearing that reached the opposite conclusion. That is what that whole paragraph is about, and you're reading the final sentence of that paragraph.
Q Okay. Thank you. In the next paragraph, in the, I believe, third sentence starts with, "My decision."
A Mm-hmm.
Q "My decision in no way suggests that the complainants in this matter were not telling the truth as they perceived it."
Why do you mean by that?
A No decision of this sort is a decision about what actually happened inside that bedroom. This is the decision about what is the evidence that we can observe and where does it lie and relative to a preponderance of evidence standard.
Q I think the quote, though, is that your decision in no way suggests that the complainants were not telling the truth --

A As they perceived it.
Q So what was your -- what are you saying there about the complainants and their truthfulness?
A I am saying I think it's quite clear that they may well have perceived this to be a rape situation, but the evidence that I have available to me does not allow me to make that finding because there is not a predominance of evidence for that.
Q Okay. Did you ever have evidence that either of the complainants lied to the Title IX office?
A I do not have evidence of them lying. Like I say, I think there was some incompleteness in the information they provided. I take your point that maybe because we didn't ask the right questions, but so be it.
Q You have evidence that Mr. Cephus lied, though, right?
A Not in the hearing process.
Q Well, he lied to the police, right? You make that finding in your petition.
A He -- I don't know about whether he lied to the police or not. What he did was in his statement of the appeal, he lied to us by saying he had never had any disciplinary action against him.
Q Okay.

A That was a statement to us, not to the police.
Q So he lied to you in that appeal process.
A Yeah.
Q If you look to the bottom of Page 6.
A Mm-hmm.
Q You started that, "I'm also troubled by the fact that Petitioner lied to the police as part of the investigation of the incident associated with this petition" and you say, "and misrepresented his university disciplinary history."
A Yeah. I'm assuming that that's a reference to that statement of not being in any sort of disciplinary trouble. But, you know, both causes of the "and."
Q The first one is, "The petitioner lied to the police as part of the investigation." I'm assuming you're referring to when he lied to the police about the photographing; is that right?
A I can no longer tell you what that clause is referring to.
Q But you agree with me it says he lied to the police. That's different than misrepresenting his university disciplinary history?
A I'm assuming so.
Q So he refused to testify, lied to the police in your finding, and lied to the university.

A I do not take refusing to testify in the same category as the other two.
Q But all three of those statements are accurate?
A He -- those statements are accurate.
Q Okay. So he refused to interview with the University of Wisconsin, but he did give an interview to the police?
MS. BACHHUBER: Object to form. Go ahead and answer.
THE WITNESS: I assume that he cooperated with police pretty quickly. As I say, his lawyers told him not to cooperate with us, and I was not happy about that, but I'm certainly not going to blame him individually for that.
BY MR. CLUNE:
Q So -- and all of these that you're making, this is information that's referred to you from Mr. Taffora, right? This isn't stuff you had firsthand knowledge of?
A Well, I had firsthand -- you know, "firsthand" -- I certainly knew during the hearing I was told that Mr. Cephus was refusing to participate, and we were trying to persuade him and his lawyers that he should and that he was not at risk for, in fact, participating. And that obviously failed.

Page 242

Q And you saw the police reports where he did willingly interview with police?
A Yes. Not surprisingly his lawyers did direct him to talk to the police.
Q Where do you get the impression that his lawyers directed him to talk to the police?
A Well, the fact that they were telling him not to talk to us, he was presumably following their advice. If they told him not to talk to the police, I -- you know, he was clearly in their hands in terms of how he was handling this case.
Q Do you recall that his actual interview with the police was the day after the assault?
A Yeah. I could not tell you what date, when that was.
Q Do you know if he had attorneys at that point?
A I do not know that.
Q Okay. So this process, the Title IX, we established took about a year.
A Mm-hmm.
Q Why couldn't you wait for the transcripts from the trial?
MS. BACHHUBER: Objection; asked and answered. Go ahead.
THE WITNESS: Because it was not tenable

Page 243

for us to wait for multiple months before we made a decision on this appeal.
BY MR. CLUNE:
Q Why?
MS. BACHHUBER: Objection; asked and answered. Go ahead.
THE WITNESS: We had to make a timely decision on this.
BY MR. CLUNE:
Q How do you define "timely"?
A Within a reasonable period of time after the appeal is filed.
Q I mean, the complaint was filed, and it took a year to resolve. Why is waiting several months for the transcripts not reasonable?
MS. BACHHUBER: Objection; asked and answered and argumentative. Go ahead.
THE WITNESS: I'll give the same answer. We had to do a timely response as we are required to do, I think, in almost all of these types of cases. And he was appealing for readmission to the university. The university was going to start very soon. If he was going to be readmitted, we were going to make a decision inside a month, which is not an unreasonable period of time to make that

Page 244

decision.
BY MR. CLUNE:
Q Why couldn't you have made the decision later in the semester?
A It was not clear to us when those trial transcripts were going to come through. The DA basically -- again, you should ask Mr. Taffora about this, but my impression is the DA told us not to expect them anytime soon. Wait a year after a petition like this was filed to respond to it? I can't do that.
Q I'm not sure how we got to a year, but if this decision could have been made later in the semester, wouldn't you have rather had complete information than do it quickly to get it in before the school semester starts?
A I don't think that was tenable both on the basis of what he wanted, which was readmission to the university. It wasn't tenable given the publicity this trial was getting. We clearly had to make a decision on this case and to make it in a timely manner rather than putting his life on hold for another number of months to a year or however long it was going to take.
Q What would have happened if you had waited for the transcript?

Page 245

MS. BACHHUBER: Object to foundation. Go ahead and answer.
THE WITNESS: You know, I don't think that would have been a viable choice for us. We both -- you know, we have said all along in all of our Title IX issues that we have to respond timely, right? You can't just let something wait. I mean, sometimes things get delayed often because the accusers are delaying things. But you are either going to let him back into school or you are not.
He had already been found not guilty on the basis of the jury trial. For us to say we were going to wait six more months or longer in order to collect further information and evidence, I just don't think that would have been the appropriate response to, you know, someone who is asking to be readmitted to school and asking us to make a decision around what the evidence showed, particularly given that he had just been through a trial that managed to conclude relatively quickly.
BY MR. CLUNE:
Q Do you recall when Mr. Cephus's attorney did a press release saying they have already decided they are not going to let him back in or something to that effect?

A I know they did a press release. They were clearly trying to play a political game on this, which I was annoyed at.
Q And your recall is it was something to that effect?
A I don't know remember what they said, but they were clearly trying to put pressure on the university to decide, and we said were going to review the evidence, and we would decide when we had reviewed the evidence available to us.
Q Also, at this time Mr. Cephus was again threatening to refile his lawsuit against the university, wasn't he?
A As far as I can see, everyone is filing lawsuits around this case. You know, you can't be governed by that. Yes. I do believe they made that threat in this press conference.
Q Okay. Did you hear from Mr. Taffora that they were also threatening to sue the university?
A Yes.
Q Were you hearing from anybody else regarding your decision during this time period from -- I think your outcome came out August 19th. So from the time it was filed, August 6th, until August 19th, were you hearing from anybody else within the university about what you should or shouldn't do?

A We heard from very few people inside the university.
Q Did you hear from anybody?
A We heard from a lot of people outside the university with strong opinions.
Q We will talk about that in a few minutes. But did you hear from anybody within the university?
A I might have gotten -- I should specify that many of the responses both inside -- outside and inside ones -- came into my public box, and I did not read my public box. Explicitly, I tell my people if there is something that -- if there is something that comes from someone I need to know or that has real information I need, they should send it to me, but otherwise the Communications Office reads and monitors and responds to that email.
So I know quite a few emails came into that box, and I did not -- in fact, the first time I saw them was when the lawyers here gave me a copy of all the emails that had come forward -- I found them interesting to read -- that came forward in discovery. I'm trying to remember whether any of those were from the university or not. I think there might have been one or two staff members.
Q And does the Communications Office give you any sort of summary of what's coming into your box or a heads-up of noteworthy messages?

A You know, I'm sure I probably asked them what we are hearing, and they said you are getting a number from various people who you don't know. I tend not to really care about people who are not stakeholders and have strong opinions about things they don't know a lot about. Yeah. I get email on a lot of subjects of this sort, and I ignore it. I don't read it most of the time. It doesn't come to me.
Q During this process, did you hear from the football team?
A I received an email from Paul Chryst, which was my only communication with him over this time, in which he informed me that some of the students would like to send me -- his team would like to send me a letter and would I be willing to receive that. And I wrote back and said of course he should send that along.
Q Okay. Next exhibit.
(Exhibit No. 13 was marked for identification.)
BY MR. CLUNE:
Q So this is, as you can see, an email from Mr. Mayrl to you on the 11th, which is forwarding an email from Mr. McIntosh to Mr. Mayrl.

A Should I have something on the second page here? This is just blank.
Q No. They go together, and we kind of left it off. So this says to -- this is forwarded from Mr. Mayrl. But it says, "Matt, heads up on the attached letter. But since you and I spoke this morning, this new draft was shared with me. It's now in the hands of Justin. It will probably be representative of what we'll send to Chancellor Blank later today."
Why are you getting copies of drafts of the letter that's going to be sent to you? Do you know?
A I'm sure he's just sending it to me so I have an idea of what I am going to receive from the students.
Q Okay. So kind of a --
A This is obviously the letter I'm going to read and want to respond to.
Q Giving you a heads-up?
A Yeah.
Q Okay.
(Exhibit No. 14 was marked for identification.)

Case: 3:20-cv-01085-wmc Document #: 524 Filed: 03/15/24 Page 64 of 160

REBECCA BLANK
March 25, 2022

Page 250

BY MR. CLUNE:
Q Take a minute to look at that, and let me know if it looks familiar.
A Mm-hmm. This is the letter I received from the football team.
Q Okay. What is your understanding of -- do you have an understanding -- there are a lot of signatures on there. Do you have an understanding of what percentage of the football team signed this letter?
A I do not know the percentage, but given the number of people, my guess is it's close to 100 percent.
Q Okay. And that's a --
A Mm-hmm.
Q That's fine. We can go ahead and set that one aside.
A Yeah.
Q So you mentioned you consulted with Ms. Hasselbacher from the Title IX office?
A Mm-hmm.
Q I want to show you her notes from that phone call.
(Exhibit No. 15 was marked for identification.)
BY MR. CLUNE:
Q Have you ever seen her notes before?
A I have never seen her notes before, no.
Q Okay. So you can see, as we were talking about,

Page 251

she at least has this dated August 14th, 2019.
A Yes.
Q And I am going to do my best to read her handwriting. And you can tell me if you think I'm misreading any of this.
MS. BACHHUBER: And I'm going to object to foundation because she's never seen this before.
MR. CLUNE: I didn't ask her any questions.
MS. BACHHUBER: I know, but you are going to read it to her and ask her if you're reading it right. She has never seen it before. She doesn't know what Lauren's handwriting looks like. So, I mean, go ahead, but I object to foundation for all of this.
MR. CLUNE: Okay.
BY MR. CLUNE:
Q So do you recall the conversation that you had with Lauren --
A Yes, I do.
Q -- in detail? Okay.
A Well, let's just say I called her about the time that I thought I had -- I had come to a decision, and I wanted to consult with her about that and hear what her response was.

Page 252

Q Okay. So according to her this is the actual conversation. Starts off with "Appreciated work done on the case." Is that something that you said?
A Absolutely.
Q Okay. And you said "Both sides might sue."
A Turns out -- to depression.
Q You did say that. And it says, "Decide what's right." I'm presuming she's saying that you told her, like, you just really needed to decide what's right?
A Yes.
Q Okay. And you mention -- according to her, you mentioned fast, and I'm guessing it's unequivocal jury decision, that you can't ignore that?
A That's the way I would read it.
Q Do you recall saying something like that?
A That would not be unusual if I said that. I was certainly feeling that at that time.
Q Okay. And then "collecting info. Videos are important." That's consistent with what we were talking about today?
A Mm-hmm.
Q "Doesn't feel like she can parse"? What --
A I can't read that either. I guess that says "parse

Page 253

difference," but I can't tell.
Q "Parse difference -- challenge anyone to distinguish." I don't need to ask you a question about that.
A Yeah. That's a sentence that was in here.
Q So she puts in her notes, "Set aside sexual assault."
A Mm-hmm.
Q That's consistent with what you've testified today. "Lift the expulsion," which is what you did. "Retain form of the sexual harassment charge. Not frivolous." Do you recall saying something about something being not frivolous?
A I don't recall using that specific language, but I certainly did -- was not going to set aside the charge of taking pictures of women without their consent that he and his friend both admitted to. You know, that was a self-admitted issue.
Q And then, according to her notes, you say something along the lines of "would allow him to decide to play here or elsewhere." Do you recall that part of the conversation?
A Well, you know, one of the questions that people immediately ask is what does this mean for his athletic ability. And I don't know if she asked me

Exhibit 548 - 064

the question. Probably so. But we were discussing the various aspects of the case.

And I said, as I said in my decision here, it was not up to me to decide whether he could play. That was an NCAA decision, and he had to petition to be readmitted following this whole process that he had been through. But if he was allowed to play, it was up to -- you know, I thought that there was some high chance -- it wouldn't be surprising if he would decide he wasn't staying at UW.

Q Okay.

A That's the statement that if he's readmitted to play, you know, that's the decision he's going to have to make.

Q You said you do recall this conversation in some detail?

A Mm-hmm.

Q Does that refresh your memory about discussing that with Lauren?

A You know, it would not surprise me at all that I discussed it with her. I can't say that I remember those specific words.

Q Okay. Do you recall discussing that topic with her?

A It would have been surprising if I didn't.

Q Okay. Are you saying you don't recall?

A I don't specifically recall that.

Q Okay.

A It was part of almost every conversation I had.

Q Okay. So the next line is, "You don't take things lightly -- overturning the process," and then, "don't see much other choice." Is that how you read that?

A That is what it could say. I'm not entirely sure of that first word. Yeah.

Q Okay.

A And I have no idea what those next three things say.

Q Okay. I don't need to ask you anything more about that. Thank you.

A Mm-hmm.

Q So you found Mr. Cephus responsible for something having to do with the photographing. Can you explain that a little bit about what your sexual harassment was based on?

A Well, my understanding was they photographed one woman who was semi-nude and another woman who was clearly in bed with the covers sort of partly over her head, neither which clearly knew this was going

to happen. And he and his friend admitted to doing this. So it was not an issue of finding -- they admitted that they had done it, and that was clearly a sexual harassment charge.

Q Okay. That is actually though not the sexual harassment charge that he had previously been found responsible for?

A It was the picture that we were talking about here, I am pretty sure. Let me look at that in my decision letter. "The petitioner's instigation of photographing the women in his bedroom, including one in a state of undress, without their consent, represents behavior that violates the nonacademic misconduct code prohibiting sexual harassment as defined in board of regent policies."

Q That's what you found him responsible for, right?

A Yes.

Q But that's not what he was found responsible for by the hearing panel?

MS. BACHHUBER: Object to foundation and form.

THE WITNESS: I would need to look at what you're referring to.

BY MR. CLUNE:

Q I believe it's 5. Should be Page 7 of 8.

A One should be readmitting him to school. I did notice that I put a new contact order in here, but the sexual harassment issue, he admitted to taking the picture that meets the definition of sexual harassment, and we basically gave him time served, if you will, having been expelled from the university for several months on that charge.

Q So -- but the sexual harassment that he was found responsible, both in Mr. Cox's outcome and at the hearing, was not linked to the photographing, was it?

MS. BACHHUBER: Objection. Misstates the hearing decision. But go ahead and answer.

BY MR. CLUNE:

Q Do you want to look at Mr. Cox's findings?

A Is that different -- yeah, I do. What number is that?

Q That could be -- I didn't mark it.

A Maybe I will find it here. Maybe Number 4.

Q If you look on 6 of 8.

A I'm a little puzzled about how you can find someone guilty of sexual harassment for something that might happen in the future, but...

Q What do you mean by that?

A I agree with you. It's talking about the

possibility of a hostile environment that would be on campus, you know, moving forward.
Q Okay.
A But, yes, I see that much of this talks about the environment as opposed to the picture.
Q Okay. And actually, if you look at Mr. Cox's report on Page 5 of 8, Mr. Cephus is actually found not responsible for the photographing under violations of criminal law.
A Yeah. I think that's one of the things that changes because he subsequently admits to being involved with it. That's one of the things that changes after this.
Q What do you mean he subsequently admits to being involved in it?
A Well, I think that he -- I'd have to go back and look at the record of this. I believe that he directed his friend to come in and take the picture. And I would have to take a look at this to be sure about it, but clearly he admitted to being involved in the picture.
Q Okay. But, nonetheless, you found him responsible for a sexual harassment charge that he hadn't actually been charged with?
MS. BACHHUBER: Objection; form. Go ahead and answer.

THE WITNESS: He had clearly been under discussion about the picture. And there was clearly subsequent evidence that he was involved in the picture. And therefore we found him guilty of being involved with the picture, which was sexual harassment.
BY MR. CLUNE:
Q Even though he had been cleared of that at the hearing?
MS. BACHHUBER: Objection; asked and answered. Go ahead.
THE WITNESS: There's further evidence of that that he subsequently admitted to being involved.
BY MR. CLUNE:
Q When was that evidence admitted?
A I believe that was part of the police report. I would have to go back and double-check that.
Q When was that? During the Petition for Restoration?
MS. BACHHUBER: Objection; asked and answered.
THE WITNESS: No. I believe this was something that happened outside of that, and I

honestly would have on go back and look up, but I do know that there was evidence that he actually admitted to this --
Q Okay.
A -- and exactly when that happened, I am not sure at this point.
BY MR. CLUNE:
Q Okay.
A It says here, "Following the petitioner's original denial to police, petitioner eventually admitted in a police interview and at trial that he took steps to document his sexual interaction with the complainants, including eliciting the assistance of a friend to photograph the women in a vulnerable state and without their consent."
Q Okay. So in the Petition for Restoration, you not only can overturn previous findings of responsibility, you can add new findings of responsibility?
MS. BACHHUBER: Object to form; argumentative. Go ahead and answer.
THE WITNESS: I clearly did so, and it was acceptable.
BY MR. CLUNE:
Q So on page -- I'm sorry. I'm back on your decision

on the restoration of rights.
A Yes.
Q On Page 6. So at the top you talk about taking a photo in this situation as described, "Even if the photo was deleted, it was an invasion of privacy and is hostile, intimidating, offensive. This type of behavior can have continuing effects on the educational environment for the impacted complainants."
Why did you want to include that in the letter, or was that Mr. Taffora's decision?
A I'm assuming it is a statement that sexual harassment -- it's what we were discussing earlier or in an earlier point of discussion, that sexual harassment does have ongoing effects for people that makes them feel more vulnerable. And I think we're simply making that statement that this is a serious offense that can have ongoing impact on the individual who's affected.
Q Okay. And one of the two individuals actually left the University of Wisconsin, right?
A One student did. I believe they transferred elsewhere.
Q So you decided that the outcome was basically time served, and what you mean by that, I assume, is

Page 262

that there's no additional punishment other than --
A Yes.
Q -- the fact that he been not able to participate as a student for --
A He had been expelled whenever the last decision was dated in March.
Q Okay. So from March until May or June here?
A This is August. This is August, 2019.
Q I'm sorry. That was a bad question. The end of the semester, is that June?
A He was not able to complete any of his winter semester -- spring semester work. He lost the entire semester.
Q Okay. And I'm just trying to get an idea of how long that was. So March 13th is when your decision is final. That's March through when -- when does the semester end?
A Middle of May.
Q So March 13th -- so effectively he was suspended for two months, and you decided that was time served?
A The impact of that is that he lost the entire semester. Any of the work done earlier in the semester he got no credit for.
Q Okay. So he missed a semester?

Page 263

A Yes.
Q So you decided that was a sufficient punishment?
A Yes.
Q Did you consider any education around sexual harassment or that sort of thing for him, or a class?
A We did not do that.
Q You have a class, right, for sexual harassment? Students that are found responsible for sexual harassment?
A We have various training things that we occasionally will put people through.
Q And why didn't you have him do that?
A I could no longer answer that question right now. I don't recall.
Q Okay. What you did put in place was a no-contact provision, right?
A Right.
Q Did you consider anything stronger than a no-contact provision, like not allowing him on campus but for classes and football activities or anything like that?
A No.
Q I mean, if he had actually raped somebody or raped two somebodies --

Page 264

A But -- what -- of course, this decision --
Q Can I finish my question, and I will give you all the time you want to explain.
If he actually -- and this is hypothetical, because you found that the preponderance wasn't carried. But if he did do that, because we don't know, like you talked about. Like, none of us were there. We don't know what actually happened. But if he did that. If he's willing to do that, complying with something like a no-contact order might not make somebody like our client feel particularly safe. Do you think so?
MS. BACHHUBER: Object to form. Go ahead and answer.
THE WITNESS: So I'm not going to answer that in a hypothetical. He was found, through this, to no longer have a preponderance of evidence suggesting that he had committed rape. He also was exonerated in a jury trial, and that did not give me the ability to treat him differently than I would treat anyone under this circumstance which was -- we've had people where there were complaints made even though the complaint was found to be not substantiated, we initiated no-contact orders. So that was consistent with how we would have treated

Page 265

other individuals in this situation.
BY MR. CLUNE:
Q So if a school finds somebody responsible for sexual assault and believes that it did occur, you would never just impose a no-contact order as the remedy to -- for the punishment for the student, right?
MS. BACHHUBER: Object to foundation. Go ahead.
THE WITNESS: We would expel them.
BY MR. CLUNE:
A No contact would not be a sufficient punishment?
MS. BACHHUBER: Object to foundation. Go ahead.
THE WITNESS: The punishment for rape is expulsion.
BY MR. CLUNE:
Q Mr. Cox and the hearing board had that language in there that was indicating that just having him on campus would be enough to create a hostile educational environment. Do you recall that, or should we take a look at that?
A I do recall it.
Q Okay. So if this was a sexual assault, just having him on campus would create a hostile educational

environment?
MS. BACHHUBER: Object to foundation. Go ahead.
THE WITNESS: The claim that was made was that -- both found him -- thought that he should be charged with sexual assault and said that he should not stay on campus as a result of that. That's the way I read that.
I don't disagree with that. Again, the punishment for sexual assault is typically expulsion.
BY MR. CLUNE:
Q Yeah, but you don't disagree with my question, do you?
A That this is what Mr. Cox recommended?
Q That they found -- do you agree with their finding that this is a sexual assault? Just having him on campus creates a hostile educational environment?
MS. BACHHUBER: Object to foundation.
THE WITNESS: I don't know that I -- whether it creates a hostile educational environment or not, the issue is you don't want someone on campus who had been found guilty of rape for all sorts of reasons of which that is only one.

BY MR. CLUNE:
Q I'm just asking if you agree with their conclusions.
A Someone who is found guilty of rape should not be on campus. It's a hostile environment not just for the individuals who might have been the victims but for anyone else who might come across this person.
MR. CLUNE: Why don't we take a short break.
THE VIDEOGRAPHER: This marks the end of Media Number 5. The time is 8:01 p.m.
(A recess was taken from 8:01 p.m. to 8:14 p.m.)
THE VIDEOGRAPHER: This marks the beginning of Media Number 6. The time is 8:14 p.m.
BY MR. CLUNE:
Q Chancellor Blank, in our lawsuit we allege that during this petition process that you had heard from a significant donor trying to implore you to readmit Mr. Cephus. And in the university's answer, which I guess was your answer as well because at the time you were a party to the case, both you and the university acknowledge that you had heard from a significant donor. Who was that?
MS. BACHHUBER: I'm going to object. She was not part of the case. She was dismissed on the

motion to dismiss. She did not answer the complaint.
MR. CLUNE: Oh, you're right.
MS. BACHHUBER: Thank you.
BY MR. CLUNE:
Q So you weren't. But my reciting that there was an answer from the university saying that you did hear from a significant donor encouraging you to readmit Mr. Cephus. Does that sound familiar to you?
A I am assuming you are talking about Ted Kellner.
Q That's what I'm assuming, but I don't know. That's why I wanted to ask you. Is that right?
A Yes.
Q And I know Mr. Kellner wrote you a letter. Did you speak to him as well?
A I believe I called him on the phone because I owed him a response given his affiliation with the university.
Q Okay. When you said you owed him a response, a response to what?
A A response to his letter. To tell him that I -- basically what we were saying to everyone else. We were going to make a decision on this based on the evidence. He had a personal relationship with Mr. Cephus. Mr. Cephus had worked for him. So he

felt particularly involved in this case. I responded to him the same way I responded to everyone else, that I appreciated his commentary, and we would look at the evidence and make a decision.
Q And what is your understanding of how Mr. Cephus worked for Mr. Kellner?
A He was an intern in Mr. Kellner firm for a summer.
Q Okay. And what does Mr. Kellner do?
A He does investments, investment management.
Q So he had a job while he was at the University of Wisconsin or prior to coming to the University of Wisconsin?
A I think it was while he was here during one of the summers between -- before practice started in August.
Q Okay. While we are talking about Mr. Kellner, Mr. Kellner is what I refer to in the lawsuit as a "significant donor." Is that a fair estimation?
A That's a fair estimation.
Q And what's your understanding of what his history is with donating to the university?
A He and his wife together have donated to a substantial number of places around the university, from the business school to the School of Education

to the Athletics Department.
Q Do you have any sense of how much he's donated in the time that you have been here?
A I would have to look that up.
Q Okay.
(Exhibit No. 16 was marked for identification.)
BY MR. CLUNE:
Q So what you have just been handed is an article from madison.com that talks about a $25 million donation given by Ted Kellner. You're familiar with that donation in particular, aren't you?
A I am. This is part of our alumni fundraising campaign that's just closed.
Q Okay. That's not the only sizeable gift that Mr. Kellner has given?
A It is not.
Q Okay. That's different from the gift that he gave to get Kellner Hall?
A That was a number of years ago when they were building it.
Q Okay. So those were different. And he's done other gifts as well?
A That's correct.
Q Are there any other large gifts that come to mind?
A The Kellner Hall donation, I believe he was a major

donor to the -- 20, 25 years ago, to the business school when they were in the process of trying to raise a substantial endowment.
Q And do you recall how much that donation was for?
A I think every one of the partners in that put in close to $10 million.
Q Okay. Would you consider him to be one of the largest private donors of the university?
A He is among that. He's certainly not amongst our largest, but he's certainly in the group of large donors.
Q Would you say he's top five private donors?
A He's certainly top ten. I don't know if he's top five.
Q Okay. And he's particularly -- even in this photograph, he's on the football field. What's his affiliation with the athletic department?
MS. BACHHUBER: Objection; asked and answered. Go ahead.
THE WITNESS: He's been a major donor to the football -- to the athletic program, not football specifically. And he very much enjoys Badger athletics.
BY MR. CLUNE:
Q Okay. This $25 million donation on homecoming

weekend, this article is dated October 22nd, 2017. Is that around the time that he made the pledge?
A Yes.
Q And do you have an understanding of how that $25 million, how he pays that out? Is it over time or is it all at once at the start? Do you know?
A I believe he is paying it out over time, and I do not know what the time frame is.
Q Okay. So since he is paying that over time, does -- I mean, legal- -- I shouldn't say "legally." Does he have the ability to not continue to live up to the pledge if he wants to?
A Of course he does. I mean, he would violate the gift agreement, but we do have people who occasionally do that.
(Exhibit No. 17 was marked for identification.)
BY MR. CLUNE:
Q So, Chancellor Blank, what I have just handed you is a collection of documents that were produced to us from the university. The first one, which is Page 1 of 6 and 2 of 6, appears to be the letter from Ted Kellner; is that right?
A That's correct.
Q And then the second one is a letter to Ted from Phil Gross. Do you know what this letter is?

A Yes.
Q What is it?
A It's basically a letter back to Ted saying that he agrees with the opinions expressed to me.
Q Did Ted forward you several letters?
A I know that I had seen these other letters. Whether they were forwarded by Ted or whether these folks sent them to me directly as a cc when they sent their reply, I just don't remember that anymore.
Q Okay. And Mr. Phil Gross, is he a donor?
A He is.
Q Is he a significant donor?
A He's a significant donor.
Q Next one, John Oros. Is he a donor?
A He is.
Q Is he a significant donor?
A Not quite on the level of Phil Gross and Ted Kellner.
Q Seven-figure donor?
A Yes.
Q Next one looks like it's signed by Paul Leff.
A Mm-hmm.
Q Is he a donor?
A Yes, he is.

Page 274

Q Is he a significant donor?
A He is.
Q And then, lastly, Louis Holland. Same question. Is he a donor?
A He is.
Q Would you consider him to be a significant donor?
A He has been a major donor. He gives a lot of time and energy to the university.
Q Does he give a lot of money to the university?
A He isn't quite at the same level of wealth as the others.
Q Okay. But does he --
A He definitely is a donor to the university.
Q Is he a seven-figure donor?
A Yes, he is.
Q Okay. So collectively between these individuals that are in these letters, have they given over, what, $100 million to the school?
A I would have to go add that up. It would not surprise me that they would be in about that magnitude.
Q So in Mr. Kellner's letter, on the bottom of Mr. Kellner's letter, Page 2 of 6, he -- so this is dated August 8th, right?
A Yes.

Page 275

Q Okay. So he says, "Becky, I urge you to act on this quickly. Time is of the essence if Quintez is to be readmitted to the University of Wisconsin. He's innocent. He's a great young man. He deserves to be a student at the University of Wisconsin in whatever capacity he desires." And Mr. Kellner says, "I urge you to fast-track and readmit him to our university in the next two weeks," right?
A He does.
Q And that's actually exactly what happened?
A He was readmitted about two weeks later.
(Exhibit No. 18 was marked for identification.)
BY MR. CLUNE:
Q So I assume that document looks familiar to you?
A I am very familiar with this document.
Q Probably in both final and draft form, I would imagine?
A Yes.
Q Want I wanted to ask you about is if you turn to Page 3 of this document. This is like a pie chart of where the money comes from, right?
A Yes, it is.
Q And this -- on the first bulleted paragraph, it says, "The largest portion of the university's

Page 276

budget, approximately 906 million or 29 percent, is from the federal government," right?
A Yes.
Q Is it your understanding that in exchange for the significant financial assistance the federal government provides to the university, that the university is required to comply with all civil rights statutes, federal civil rights statutes?
A I don't think any of that is a quid pro quo. Whether we received money from them or not in grants, we would have to comply with all the federal statutes.
Q But when you actually -- and this may be not something that you deal with, but when you actually get federal grant money, isn't it true that you actually have to agree that you're going to comply with --
A There are all sorts of regulations around federal grant money from every agency that we have to comply with all those rules.
Q Are you aware that one of them is that you have to comply with civil rights statutes?
A I could not have told you that, but I'm not surprised.
Q Okay.

Page 277

A But we would have to comply with civil rights statutes whether we've got grant money or not, so...
Q We talked earlier about how you could file a complaint to the Department of Education and the Office of Civil Rights?
A Yes.
Q Is it your understanding that if the Department of Education was so inclined, they could actually deprive the school of their federal financial assistance for violations of Title IX?
A They could.
Q Okay.
(Exhibit No. 19 was marked for identification.)
BY MR. CLUNE:
Q I have handed you an article also from madison.com that's dated September 24th of 2020. Do you know the person in this picture?
A I have met him, yes.
Q According to the article, in that first paragraph next to his photo, it says that he's the Associate Athletic Director and Chief Financial Officer, Adam Barnes; is that correct?
A Yes. That's correct.
Q They indicate in this article -- and I want to ask

Exhibit 548 - 070

you if this -- what you think of this in terms of accuracy. It says, "The Badgers are facing a revenue drop between 60 and $70 million in the '20 and '21 fiscal year racked by COVID-19 pandemic." And they talk about how, "The department had previously cautioned that the revenue shortfall of 100 million or more was possible this year without a football season."

Is $100 million, is that the revenue that's brought in from the football program?

A No. We bring in less than that, but this is an estimate of what could happen across the entire year. And the football season is a piece of it.

Q Okay. So that's --

A This is because of the pandemic, right? We are not sure what sports are going to be played. We were sure -- pretty sure at this point we were not going to have anyone in our seats, so our ticket revenue would have gone away. And even with the shortened season, we only got part of the -- at this point we thought we were only going to get part of the TB revenue.

Q Okay. And this article -- which doesn't have to be accurate -- but this article says, "The department had previously cautioned that a revenue shortfall

of 100 million or more was possible this year without a football season." So you're saying the 100 million represents more things than just the football --

A That's correct.

Q What's your understanding of what the revenue is that the football program brings in annually?

A I would have to look at that. I am not able to separate out the media revenue because that covers a lot of other sports. Football is some of it but not all -- football might be the majority, but it's not the vast majority. I would guess football is somewhere around 60 to 70 million.

Q Okay. In your outcome letter for the Petition of Restoration of Rights, you note that this is not Mr. Cephus's first time getting in trouble at the university; is that right?

A That's correct.

Q You go ahead and list out the number of things that he has been reported for, and I'm going to go through those with you. Initially -- would you like to open your -- go ahead if you want to find the one.

MS. BACHHUBER: It's 6.

THE WITNESS: Thank you.

No, 6 is the appeal.

MS. BACHHUBER: I have 6.

THE WITNESS: I have 7. Sorry. I am looking at 7. I think I got it.

BY MR. CLUNE:

Q So what is the first thing that you note on his prior disciplinary history?

A Something called harassment and disruption.

Q So on these instances, did you look into his prior history, or did somebody just summarize it for you?

A Someone summarized it for me.

Q Did anybody tell you what the harassment was?

A I am sure that they described each of these incidents.

Q Did they describe to you that there were two reports of sexual harassment the first week that he was on campus?

A They did describe that. They said it to me, and I believe the record shows that they were nothing that rose to the level of these later charges.

Q Right.

(Exhibit No. 20 was marked for identification.)

BY MR. CLUNE:

Q So this is the report on the sexual harassment. What's the SOAR program?

A The SOAR program is the orientation program for incoming freshmen.

Q Okay. And so the record describes what the behavior is, which I agree with you is nothing like what has been alleged here. In the -- if you scroll down on Page 21273. Can you read that section just to yourself where it says, "Basis for Closure," by Mr. Blum.

A Yes.

Q What is the university's policy on what you do when there is a report of sexual harassment?

A So this was -- he made one of the student leaders in the orientation program feel uncomfortable. She reported that. And he was called in to talk to the Title IX coordinator, then Dave Blum, who basically explained to him what sexual harassment was and why this made the individual uncomfortable and suggested he needed to pay attention to that and change his behavior. So that was the appropriate response to this type of a behavior to an incoming freshman.

Q Aren't all reports of sexual harassment supposed to be investigated and findings made?

A Only if you bring charges. This person did not bring charges. All this person did was simply go

Page 282

to the supervisor and say, you know, this guy made me uncomfortable. That's very different from saying, I'm bringing a formal investigation.
Q So Mr. Blum gave him, what, a warning?
A Talked to him. Yeah, basically talked to him about what sexual harassment is; why this was considered unwelcome.
Q Did Mr. Cephus take responsibility for his behavior?
A There is no record of that, and I do not know what Mr. Cephus's response was.
Q Okay.
A I mean, it says here he listened respectfully and attentively and understood why they wanted to meet.
Q So if you go to Page 21259.
A 21259. We do not have a 59.
MR. CLUNE: We're in the 21270s. You don't have a 59.
THE WITNESS: No.
MR. CLUNE: I'm sorry.
(Exhibit No. 21 was marked for identification.)
BY MR. CLUNE:
Q So can you see 21259 now?
A Yes.
Q In the middle of that paragraph there's an email

Page 283

from Chris, whose name I won't try to pronounce, to Tonya Schmidt, saying, "Did you get my email about the comments from," and somebody's redacted. "She was the other staff member that had concerns from last week. I don't think she wants to do anything with it because she feels the football players might find out it was her but wanted to pass them along officially."
What is the university supposed to do, or what do you want to see your employees do when you find out that somebody may not want to report a matter because they are afraid about what might happen if the football players find out?
MS. BACHHUBER: Object to foundation. Go ahead.
THE WITNESS: Let me first say that I can't imagine anyone who will issue on a formal report and go through an investigation on a situation of this nature, which was someone who basically, you know, came on a little too strong for a few minutes. This was not an extended interaction, from what I can see of the record.
I would certainly -- you know, she did exactly what she should have done under those circumstances. She told her supervisor, and it got

Page 284

passed on, and they dealt with it as an educational opportunity for an incoming freshman.
BY MR. CLUNE:
Q So this says she was the other staff member, so how do you know that she is --
A I don't know what that's referring to.
Q Well, you understand there were two different reports of harassment in his first week?
A I haven't seen that.
Q You see it says she was the other staff member, right?
MS. BACHHUBER: Object to foundation.
THE WITNESS: I can't tell what that's a reference to. It's not clear it's a reference to Cephus. It could well be a reference to another staff member that had an experience elsewhere. I just don't know. It's not something that I'm familiar with.
BY MR. CLUNE:
Q So if you look on that same page that we were just talking about.
A Mm-hmm.
Q At the top of that Tonya Schmidt writes back to Chris, "Thanks, Chris. I did get the notes from whoever's experience. Dave from Title IX will

Page 285

follow up with both of them but will not go forward if either are not uncomfortable doing so."
Does that give you the impression that there are two women?
MS. BACHHUBER: Object to foundation and form; calls for speculation.
THE WITNESS: Yeah, there's just not enough information here for me to tell what happened beyond the one person who is doing the complaining that we read about.
BY MR. CLUNE:
Q All right. That doesn't suggest to you that there are two reports?
MS. BACHHUBER: Object to foundation and form. It calls for speculation. Go ahead.
THE WITNESS: Yeah, they could be referring to both the woman and to Mr. Cephus.
BY MR. CLUNE:
Q Are they saying that the woman and Mr. Cephus, if either are not comfortable going forward?
MS. BACHHUBER: Objection; calls for speculation. Go ahead and answer.
THE WITNESS: -- means about what we're doing going forward. I really just can't tell from this. Without another report, I -- and there

Case: 23-2056 Document: 54 Filed: 03/15/2024 Pages: 160

doesn't seem to be another one.

BY MR. CLUNE:

Q Okay. What's the next thing that you have listed on your list of --

A Disorderly conduct.

Q And what is that one?

A What is that?

Q Yeah.

A September 20, 2016.

Q Do you recall what that one is?

A I would have to be reminded what exactly happened.

(Exhibit No. 22 was marked for identification.)

BY MR. CLUNE:

Q Do you recall being briefed on this incident?

A You mean at the time of the appeal?

Q Yes.

A I do not think that we went through each of these in great detail. I was told there were a series of more minor disciplinary actions that were taken. I've since seen this more recently.

Q In this one, Mr. Cephus is accused of shoplifting from a deli and then threatening a university employee with physical harm. Is that a more minor incident?

MS. BACHHUBER: Object to foundation and

to form. Go ahead and answer.

THE WITNESS: I would not call this shoplifting in quite that way, which usually indicates surreptitious effects to try to steal.

BY MR. CLUNE:

Q Is it stealing?

A He was definitely stealing, but he was not trying to be surreptitious about it. He's clearly engaged in some back-and-forth with a friend of his as to what they're doing with these Doritos, and they get into an argument about it, and he sort of walks off without paying. Now, that's stealing. Someone needs to pay. And he does.

Q So --

A But you know, it does not show him in a good light.

Q This says, "In the hallway that leads to the Smith's lobby, somebody tapped Cephus on the shoulder since Cephus had headphones in and said Cephus still hadn't paid for the Doritos. At this point, Cephus responded by saying, "Don't fucking touch me," says the person's name. "The person responded saying Cephus just needed to pay for the Doritos, to which Cephus responded again, under his voice, about physically retaliating against the individual."

Is threatening to physically retaliate against a university employee a significant matter to you?

MS. BACHHUBER: Object to form. Go ahead and answer.

THE WITNESS: Yeah, it's not clear to me whether it was an employee or whether it was someone else who tapped him on the shoulder. But in any case, it's not good behavior. He did go back and pay for the Doritos. That's good. But, you know, this is not the way he should be behaving, and he got censured for it, right?

BY MR. CLUNE:

Q I think my question is -- and first of all, if you look up higher in that paragraph, it refers to the Newell's. Newell's is the deli, isn't it?

A Right. Right.

Q Okay. So it says that, "Cephus responded again under his voice about physically retaliating against the individual."

A Yes. He should not have done that.

Q Is that a serious thing to you as somebody reviewing this?

MS. BACHHUBER: Object to form and foundation. Go ahead.

THE WITNESS: You know, I can't judge, without knowing more about the incident, exactly how serious this was. Certainly, if he took a swing at someone, that would with be very serious. He was mouthing off. He should not have mouthed off in that way. That's inappropriate, and I assume he got a warning from this. I'm not seeing here what the effect was.

BY MR. CLUNE:

Q You didn't -- you weren't interested in asking for more information about this?

A I was more interested in the question about what we knew or didn't know about the trial and the case at hand. In some ways, previous disciplinary actions were not entirely relevant to the question of was there enough evidence or not enough evidence to move forward with continuing the expulsion. That was the question at hand.

Q But you were about to find him responsible for two accounts of sexual harassment, right?

A I think there was one count of sexual harassment.

Q You didn't find him responsible for two counts, one for each complainant?

MS. BACHHUBER: Object to foundation.

THE WITNESS: I don't know that that's

Page 290

two counts. He was found guilty of sexual harassment. I don't know how that plays out. I found him guilty of sexual harassment for being involved with taking the two photos. You know, maybe this might be a legal parsing, but, yeah.

BY MR. CLUNE:

Q Well, but you found him responsible for sexually harassing both female students?

A Yes, both.

Q Both students?

A Yes. Both. There were two photos, and both students had pictures taken. And that was not appropriate. And he was found guilty of sexual harassment for that in my letter.

Q So you were about to find him responsible for sexual harassment. Isn't his prior disciplinary history relevant to determining what punishment he gets for the sexual harassment?

A So having already been expelled, which is a higher punishment than we would typically give out for sexual harassment, I'm not sure that it would have been highly relevant as to whether he had -- whether he paid for bag of Doritos two years earlier.

I don't want to dismiss this as an

Page 291

unimportant thing, but I don't know how highly relevant it was. What this was relevant to was not my findings. What this was relevant to was his statement in his appeal to me saying he had never been in trouble with the university. And what I wanted to do was lay down a marker to say we had noticed that that was a lie. We knew he had been in trouble.

And I think I say quite clearly that if you are in trouble again, there's going to be -- any further determinations of responsibility for any form of misconduct while a student here is likely to result in serious disciplinary action.

Q Okay. In this report that you have in front of you, which allegation is more troubling to you? That he didn't pay for a bag of Doritos or that he raised again under his voice about physically retaliating against the individual?

MS. BACHHUBER: Object to foundation. Go ahead.

THE WITNESS: You know, I find both of them troubling. They're both bad behavior and they're linked together, right.

BY MR. CLUNE:

Q So not paying for Doritos is just as serious to you

Page 292

as threatening physical retaliation?

MS. BACHHUBER: Object to foundation.

THE WITNESS: You know, it depends on the context, and I don't know enough about the setting. I find -- both of them deserved a censure.

BY MR. CLUNE:

Q Do you recall being briefed on an incident regarding Mr. Cephus shoving a parking staffer at the university?

MS. BACHHUBER: Object to form. Go ahead and answer.

THE WITNESS: I believe that when we finally revenued the tape on that, I had been told that he did not actually shove him. There is not video evidence of that.

BY MR. CLUNE:

Q I'm just asking if you recall being --

A I realize that that was one of the issues in which he was considered in violation of university rules.

Q Okay.

(Exhibit No. 23 was marked for identification.)

BY MR. CLUNE:

Q Does that seem to be the incident that you were just referring to?

A Yes, it is.

Page 293

Q So this indicates that according to reports, it alleged that he pushed a transportation services employee while they were attempting to tow his moped for unpaid tickets.

A Yes.

Q Where did you get the information that he didn't actually push the employee?

A I think I was told they reviewed the videotape and that he actually did not appear to push them in the tape.

Q Who allegedly reviewed this tape?

A I do not know who reviewed the tape. I was told this through the office of legal counsel when we were looking at these cases.

Q Did Mr. Taffora indicate that he reviewed the tape?

A No. This would be much more recently in the last few months as we were preparing for the deposition and I was looking -- I had not seen these reports before, and I was looking -- you know, I say I was briefed on them and I hadn't read them. So I cannot tell you exactly who viewed the tape and when.

Q How certain are you that somebody told you that they reviewed the tape that was --

A I'm reasonably certain someone told me that.

Whether it's accurate or not, I cannot testify to.

(Exhibit No. 24 was marked for identification.)

BY MR. CLUNE:

Q So what you have just been handed is an email from Tonya Schmidt to Argyle Wade. Do you have any understanding of why Tonya Schmidt would be looking into this in May of 2018, or is that -- that's probably -- never mind. I will withdraw that.

So this email from Tonya says Larry updated the case after I asked him. And his note reads, "I talked with a student on the phone about the situation. He thought the mail worker made a bigger deal about it. He acknowledged that he was angry. I talked with the worker about it, and he was fine with me warning the student that he needs to be more respectful in the future, which I did." LJD, I assume, is Larry's initials. Do you know who Larry is?

A I do not know who Larry is.

Q "I will remind Larry that he needs to follow the process and send a finding letter."

So at the top of this email, the subject line is 2016 289501, which suggests that the actual incident was from 2016. Is that your understanding of how the numbering system works?

A Well, this is presumably Larry Davis. And the findings in the letter you sent me last time is the finding letter on this. It was May 3rd, 2017, seems to be the date of the incident.

Q Okay. So do you have any reason -- any explanation why Tonya Schmidt is looking at this right after the Title IX investigation starts into Mr. Cephus?

A I assume that she was involved in looking at the video. I do not know why she was specifically involved.

Q Okay.

A And I don't know what role Larry Davis seems to be in Residence Hall.

Q There is no reference to anybody reviewing the tape, is there?

A No, there is not.

Q And Tonya says that -- or, this is Larry's note. Larry says that he talked to the worker about it, and he was fine with just giving a warning to Mr. Cephus, right?

A Yes.

Q Okay. What's Larry's job?

A I only know what is on here, which it says Associate Director of Residence Life and Conduct.

Q Okay. What was Mr. Cephus's penalty for the -- or

punishment for the Doritos and threatening behavior incident?

A I believe it was a written reprimand, which also told him that his housing contract would be in jeopardy if repeated because it was in a housing dining hall.

Q Okay. So on the harassment, he got a talking-to.

A Mm-hmm.

Q On the whatever we want to call the deli --

A Disorderly conduct.

Q The disorderly conduct he got a reprimand. Is there anything he has to do as a reprimand other than stay out of trouble?

A Stay out of trouble.

Q Okay. And then on the allegation of shoving a parking staffer who was towing his moped, he got a warning?

A Yes.

Q Do you think that -- have you ever seen that student athletes like football players getting special breaks by the university in terms of discipline?

A I would very much hope that they do not. I have not seen that they have gotten extra breaks on this.

Q Have you heard that that happens at --

A I have never been told that there's a problem with that.

Q Okay. Do you think that that happens?

A I think that what you see here is probably what almost any student engaged in this -- they are far enough apart that you would see approximately the same thing happening. You have a conversation on one case. You have a written reprimand on the other. In this third case, you've got a warning given. If repeated, that would have an implication.

Q So with those three incidents that we talked about and then the sexual harassment that he was found responsible for, that's four separate instances of disciplinary history of varying findings, right?

A And varying levels of seriousness.

Q Do you recall another incident of academic misconduct from Mr. Cephus?

A I'm looking at it -- I have it right here.

Q Do you recall being briefed on what that is?

A I would have to look at the -- I believe he cheated on an exam.

Q Okay.

(Exhibit No. 25 was marked for identification.)

BY MR. CLUNE:
Q So this letter that I gave you dated December 26, 2018, this is the academic incident that we're talking about?
A Yes.
Q It's reported that he used his phone to gather information for an exam?
A Yes.
Q This actually is in the fall of 2018. So this is while he is being criminally prosecuted for the two counts of rape, right?
A Yes, it is.
Q So does that document tell you the outcome of the --
A This document gives him two options. One is to go to the Badgers training program, since this is his first incident of academic misconduct, or to go to a misconduct hearing.
(Exhibit No. 26 was marked for identification.)
BY MR. CLUNE:
Q Does this document also indicate at the top "Academic Misconduct," right?
A Mm-hmm.
Q So if you turn to the second page of that document, 21292, this says, "Following up to our conversation

today, I'm writing to inform you the sanction I'm imposing on your second exam.
So on the day of the exam, a student emailed me with concerns about a student looking at class material on their phone towards the end of the exam period when the reporting student was leaving. The student positively identified where you were sitting and a physical description of you."
It says, "In order to follow up on this, Dr. Christine Whelan and I reviewed your exam and found definitions of terms that were identical to the ones that were available on the class slides in the review sheet that the class created on December 3rd."
So this basically indicates that he was given a zero on the section, which ended up meaning he failed the exam, right?
A Yes.
Q So also in the end of that paragraph says, "I am copying" -- it says, "while we will not pursue full academic disciplinary measures, I am copying the Office of Student Conduct and Community Standards and the Dean of Students Office to officially report this as a warning. As I appreciate all that

you have been going through recently and hope you will continue to show your true character rather than this lapse of judgment."
So he gets a warning for this academic misconduct?
A So let me be clear that the letter you gave me is Exhibit 25. Actually it follows this email. It's dated several days later. So as a result of the warning, you get the formal letter from the Office of Student Conduct. That says, "This is your first offense. You have two choices." And you can decide whether you want to remediate or go to a hearing. So it does sound like we definitely followed up on the student conduct side of this.
Q Okay. But is it accurate that he received a warning?
A He received what would be the typical response for someone for the first case of student misconduct, which is either you go to a misconduct hearing which could result in some sort of disciplinary action, or you take remediation by participating in Badger AIM.
He got that letter, it looks like, four days after he received this email. I don't know whether I'd call that a warning or not. It's the

standard response for a misconduct charge.
Q Do you know anything about whether he did the AIM program?
A I do not know that. The fact that he almost -- surely he did not have a misconduct hearing because that would have been in his record, so I assume that means he did the Badger AIM program.
Q If he had not responded to that letter, would he still have been eligible to do the AIM program?
MS. BACHHUBER: Object to foundation.
THE WITNESS: I'm not sure what you mean by not respond to the letter. If he didn't respond to the letter, he wouldn't have had a misconduct hearing scheduled.
BY MR. CLUNE:
Q So you don't get to blow off the AIM program and then still just get away with a warning?
A That is correct.
Q Okay.
(Exhibit No. 27 was marked for identification.)
BY MR. CLUNE:
Q This is an email from Alex Nelson to you. Is this what you would describe as your Box email address, or is this your actual email address?
MS. BACHHUBER: Object to form. Go

ahead.

THE WITNESS: That would not come to me. I'm not quite sure where that goes. I assume that would go to my public email that's somehow redirected. That's not an email address I know.

BY MR. CLUNE:

Q Oh. What's your public email?

A I thought it was -- it had public, not edu, does it not? Maybe this is it.

Q Okay.

A I never send anything to my public email. If this is where the other emails went, then, yes, this is my public email.

Q Okay.

A Is that --

MS. BACHHUBER: I'm looking.

BY MR. CLUNE:

Q Do you know who Alex Nelson is?

A No. I do not know Alex Nelson. He describes himself here, but I do not know him.

Q He or she says that they serves as violence prevention specialist.

A Yeah.

Q So if you turn to the second page in that large block paragraph at the top, following along the

right, you see where it says "R. Kelly"?

A On the right -- point to me where -- oh, I see. Bill Crosby and --

Q Yeah. Just a couple lines below that, there's a sentence that says, "If you were." "If you were to Google Quintez Cephus, you could exhaust yourself with the sheer number of identical comments regarding this specific case, many of which used violent and threatening language directed at the survivors themselves."

I presume that would be concerning to you?

A I was concerned at some of the social media around this, as I am concerned at the social media around virtually any event that takes place on campus these days.

Q Did you have concerns about our clients' safety being back on campus in Madison?

A I know that our Office of Student Affairs was in touch with them and tried to provide them the support that was needed. If they felt unsafe, we would have taken some steps around that. I just don't know -- you know, I was not involved in any direct information about exactly what went on in those conversations with them.

(Exhibit No. 28 was marked for identification.)

BY MR. CLUNE:

Q So this is an email that is from you. You are forwarding this on to Mr. Taffora, right?

A Yes.

Q And this is something that you received and Alisa Robertson, is that how --

A Alisa Robertson, yes.

Q Is she with the foundation?

A She's with the foundation, as is Mike Knetter.

Q And this R. Blank, that's your actual --

A That's my personal email, yes.

Q Do you know who Sue and Jim Patterson are?

A I do.

Q Are they -- are either of them alumni?

A Sue is an alum.

Q Are they donors?

A Yes, they are.

Q Are they significant donors?

A They are major donors.

Q What's the difference between major donors?

A They are seven-figure donors. But, again, not quite at the level of Ted Kellner or some others.

Q Is Jim Patterson, is that the author Jim Patterson?

A Yes, it is.

Q Did he go to the university or just his wife?

A Just his wife.

(Exhibit No. 29 was marked for identification.)

BY MR. CLUNE:

Q So, Chancellor, I will represent to you that these are some of the documents provided to you by the university in discovery. You are not an email recipient on this list, but I wanted to know if you were aware that this kind of collection of media coverage was going on at the university and if you were briefed on that?

A I know that there was a lot of media coverage of the outcome of the trial. I can't tell you about anything specific. I tend not to watch TV. I tend to read the newspapers. So I probably did not see any of the TV coverage.

Q But this -- this is the day after the petition is filed, right?

A Yes.

Q Who is Nate Moll?

A Nate Moll is a member of our communications team.

Q Okay. So was somebody keeping you in the loop on what the media coverage was or no?

A When I was talking regularly with people, they were telling me what was happening in terms of media

Case 3:20-cv-00856-wmc Document #: 594 Filed: 03/15/24 Page 78 of 160

attention as well as emails coming in, the general summaries of what was -- where things were.

Q This indicates that media outlets were picking up on today's statement made by Coach Chryst. Do you know what that's in reference to?

A I would have to double-check to be reminded of that. I am reading down here below. It appears to be a reference to a statement he made that he would be open to Quintez Cephus coming back to the team if reinstated. I'm assuming that's the reference, but I don't know that without reading this.

Q Okay.

(Exhibit No. 30 was marked for identification.)

BY MR. CLUNE:

Q And this is an email the day of the filing, maybe before or after the filing. I don't know. But, again, you are not on this in terms of an email recipient.

My question for you is, first of all, this Twitter account @BeckyBlank, is that your Twitter account?

A That is my Twitter account. I do not actually write those tweets. I just handle -- and Nate Moll is the person that handles my social media accounts.

Q And on Page 2 is this graphic that's apparently posted with this hashtag "letqtplay." Have you seen that before?

A Not to my knowledge. I might have seen it. I don't remember it.

Q Okay.

(Exhibit No. 31 was marked for identification.)

BY MR. CLUNE:

Q So, Chancellor, this email is addressed to you from John Lucas. And you said he is the head of communications?

A Yes, he is.

Q Okay. So he sends out this summary of today's coverage below, right?

A Yes.

Q Okay. The date of this is Monday, August the 19th?

A Yes.

Q Okay. And if you look down to social media, it says, in that second paragraph, "Conversation is trending positive as the overwhelming majority of the users are reacting warmly to the announcement with many calling it the right decision."

Was that your impression of how the community responded to your decision?

A It depends which part of the community we are

talking about. Certainly the people who had emailed me earlier telling me to reinstate Quintez Cephus were very happy with this. I do think there was more people on that side than on the other side. This decision was not based on numbers of people or social medial or letters from folks I don't know.

Q You aren't going to make any friends regardless of -- you might have made some friends, but you also were going -- you're not going to make everybody happy, I should say.

A No matter what I did in this case, I knew that I was going to get criticized, and that's why you just have to do what you think is the right thing.

MR. CLUNE: Just a couple more of these.

(Exhibit No. 32 was marked for identification.)

BY MR. CLUNE:

Q Exhibit 32, and this is Bates stamped BOR_12709. This is another coverage update, but you don't seem to be included on this one.

A This is actually earlier. This is a whole week earlier than the other one.

Q It is.

A Yeah.

Q This coverage update you don't seem to be copied

on. Do you know why you weren't copied on it?

A Probably because I was on vacation and they were trying not to bother me. They were beeping me by phone. They called once -- when they needed me.

Q Okay.

A That would be my guess. I would normally be copied on something like this.

Q Okay. So this addresses that Mr. Cephus and his lawyers held a press conference with several dozen teammates in the background. Do you recall hearing about that?

A I definitely heard about that.

Q What did you hear?

A I heard that they were holding this press conference, and it was not going to be to our benefit, that they were going to try to put pressure on us to make the decision in a particular way.

Q Is this the press conference saying that the school wasn't going to help him?

A I do not know anymore what was actually said at that press conference. You had said that, but I don't know that.

MR. CLUNE: Okay. Last one.

(Exhibit No. 33 was marked for identification.)

Page 310

BY MR. CLUNE:
Q This one is dated August 7th. And, again, you are not copied on this. So what is Cap Times?
A The Cap Times is the weekly newspaper here that's local.
Q It says it's a letter from the editor from someone named David Peterson. I assume you don't know who that is?
A I do not know who that is.
Q Okay.
(Exhibit No. 34 was marked for identification.)
BY MR. CLUNE:
Q So, Chancellor, I don't know what this is, but I am going to ask you. It's obviously an email from your chief of staff to you on August the 15th. It says, "Please see attached. First cut of contact list. I can add numbers tomorrow after your feedback."
Do you know what this document is?
A I assume this is the list of people that I need to communicate my decision to, some before I send the letter, most after I send the letter.
Q Okay. Do you know who created this?
A Probably my chief of staff in consultation with the Communications Office.

Page 311

Q Okay. And so if we could just go through them. We've got the provost.
Who is Laurent?
A He's the Vice Chancellor for Finance and Administration.
Q Part of your executive team?
A Mm-hmm.
Q And who is Lori R. and Christina O.?
A Lori Reesor is the Vice Chancellor of Student Affairs, and Christina O. is the Dean of Students.
Q And Patrick?
A Would be our Chief Diversity Officer, Patrick Sims.
Q Is it Barry Alvarez?
A Yes.
Q And is Mac --
A Chris McIntosh, who's his Associate AD at that point.
Q Okay. So why does it say "pre-sending letter"? What does that mean?
A That we would want to let these people know that the letter of a decision was going out and what the decision was prior to sending that letter because these folks could be asked to comment on it, you know, would want to know in advance.
Q And "send letter." What's this list?

Page 312

A That would be those, after the letter is sent out, that we would want to let know that we had made a decision and what it is.
Q Okay. And who is Pete Miller?
A He's the head of the Athletic Board, which is the faculty staff board that oversees athletics.
Q How about Knetter/Alisa?
A The people who work for the foundation.
Q Okay. Ray C.?
A Is the president of the system.
Q Drew P.?
A He's the President of the Board of Regents.
Q Gary Bennett?
A Gary Bennett, I think at that point, was the communications person in the system.
Q Ruben Anthony?
A Ruben Anthony is the head of the Urban League here and probably a strong supporter of Quintez Cephus.
Q What is this note here, "You gotta help to support us"? Do you know what that's for?
A That we would have wanted Ruben Anthony almost surely to talk to others within the African American community about what we had done and why we did it.
Q Okay. So that's a note to ask him or to tell him you gotta support us on this?
A Yes. Yes.
Q You were concerned about some of the publicity around the racial --
A Yes.
Q -- issues. Floyd Rose?
A Head of 100 Black Men in Madison.
Q All Comm Advisory, is that communications?
A It's the Community Advisory Council, which is a group of community leaders who I meet with about every quarter.
Q Okay. And who are these legislators?
A Taylor and Stubs are both local legislators. Steinecke, I think, might have been the majority leader at that point -- I'm not sure -- in the assembly.
Q And then the governor's office. Why do you need to call the governor's office?
A Because the governor's office always needs to know when you're making news.
Q Is that right?
A Yes. The joys of a public university.
Q Who was the governor at the time?
A '19. Was Evers in yet, or was it Walker? I guess Evers was in by then.

Page 313

Q Okay. And then Justin Doherty?
A Justin Doherty is in athletic communications.
Q And "Donors," I assume Ted is Ted Kellner?
A Yes.
Q Okay. And then the other people are --
A Are all the people who handed me letters from.
Q Okay. Just let me get my questions in.
So the other people are -- we have the other folks whose letters we went through and then the email from Sue and Jim Patterson?
A Yes. These are all people I had heard from and needed to respond back to.
Q Okay. And then Number 20, "Possibly," you have Chancellor's Advisory Council Members?
A Mm-hmm.
Q How about "Key Emailers," what's that category?
A I'm not sure who those are.
Q Okay.
A I assume those are people who emailed me and who we felt we needed to respond back to.
Q Okay. And then "Other Issues," it says down below "Student support plan for" -- is that somebody having to do with this case?
A I don't know that since it's listed as another issue. I just no longer remember what that is,

whether that's this case or something else.
Q Okay. That's fine.
So I may be out of questions, but if we could just take a short break, and I'll double-check and then we'll see.
MS. BACHHUBER: I'd rather not take a break.
THE WITNESS: If you need a few minutes, I'd just as soon give you time to check.
MR. CLUNE: We need five minutes.
MS. BACHHUBER: We will just wait here on the record for you to finish.
MR. FORD: I need to go to the restroom.
MS. BACHHUBER: Go ahead. And when the 23 or so minutes is up, I mean, we're done.
MR. CLUNE: That's fine.
MS. BACHHUBER: We are on the record. You can't relax.
MR. CLUNE: I'm going to wait for Mr. Ford, but we just have a couple more. Can I see that last stack of exhibits?
BY MR. CLUNE:
Q So, Chancellor Blank, when we were going through all of the exhibits that we went through in the last 45 minutes, I kind of rifled through them

without probably stating what they were, so I am just going to go in order starting at number 20 -- and have you look at it -- actually we'll start at 21 -- and have you identify what the exhibit is. So this is 21.
MS. BACHHUBER: Object. She doesn't have foundation to authenticate that. She's not copied on that email.
MR. CLUNE: Not asking her to authenticate it. I'm just asking her to describe what the exhibit is that she's looking at.
THE WITNESS: It is an email about presumably Quintez Cephus's misbehavior with regard to a store student leader.
BY MR. CLUNE:
Q Okay. And this is 22. What is that document?
A This is documentation of the complaint about his misbehavior at Newell's Deli.
Q Okay. And this is 23. I believe it's the report about the parking staffer; is that right?
A That's correct.
Q Okay.
A It's the letter to Quintez about that.
Q Okay. This is 24. And that's that email from Tonya Schmidt that forwards on Larry Davis's note?

A Yes. That relates to the parking incident.
Q Okay. And this is 25, which is the letter advising him of the options given the academic misconduct?
A Yes, that's correct.
Q Okay. And this is 26, which looks like the internal reporting on the academic misconduct?
A Documents the letter from his instructor to Cephus that preceded this letter from Larry. I think this is Larry Davis.
Q Okay. And this is 27. And this is that email that you received from a person you didn't know. His or her name is Alex Nelson.
A Yes.
Q And we pointed out the Googling and the violent acts that people have stated, right?
A Yes.
MS. BACHHUBER: And I am too late to object, so go ahead.
BY MR. CLUNE:
Q So this is 28, which is the email from Sue and Jim Patterson, right?
A Yes.
MS. BACHHUBER: Yeah, I am going to object to her ability -- to her foundation to that one.

BY MR. CLUNE:

Q This is 29. It's an email that you weren't copied on. But from the appearance of it, it's an email from Nate Moll to some other people, including your chief of staff, right?

A Yes.

Q And the subject of that one is #letqtplay update, right?

A Yes.

Q I should say it's R-E, regarding, #letqtplay update, right?

A Yes.

Q And then --

MS. BACHHUBER: I will object to foundation.

BY MR. CLUNE:

Q So this one, this is Number 30. This is another email. This is from Meredith McGlone. It's an email entitled "Expulsion of Quintez Cephus."

A Yes.

Q And the date is August 6th?

A Yes.

Q And this one is Number 31. It's an email called coverage summary. It's addressed to you and dated August 19th, right?

A That's correct.

Q And then 32 -- go ahead.

MS. BACHHUBER: Object to foundation.

BY MR. CLUNE:

Q This 32 is an email from Meredith McGlone to some of the same people on the email chain. You are not copied on this, but from reviewing what I handed you, it's an email with a title "Coverage Update" dated August 12th; is that right?

A That's what it appears to be, yeah.

MS. BACHHUBER: Object to foundation.

BY MR. CLUNE:

Q So 33 is a similar email also entitled "Coverage Update." And from what it appears to be, it's an email to the same parties dated August 7th.

A That's what it appears to be.

Q Okay. And the last one is it number 34. And this is the draft contact list that we just went through identifying who all the individuals were; is that right?

A That's correct.

MR. CLUNE: Thank you, Chancellor. That's all I have.

THE WITNESS: Thank you.

MS. BACHHUBER: I have no questions.

MR. FORD: Thank you for your time.

THE WITNESS: Enjoy your weekend in Madison.

MR. CLUNE: Thank you.

THE VIDEOGRAPHER: This marks the end of the deposition. The time is 9:35 p.m.

(Concluded at 9:35 p.m.)

(Original exhibits were attached to original transcript; copies to transcript copies.)

STATE OF WISCONSIN )
) SS
MILWAUKEE COUNTY )

I, MARIA V. CAMERA, Court Reporter, and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition was recorded by me and reduced to writing under my personal direction.

I further certify that said deposition was taken before me at BASCOM HALL, UNIVERSITY OF WISCONSIN-MADISON, 500 LINCOLN DRIVE, MADISON, WISCONSIN 53706, on the 25th day of March, 2022, commencing at 1:25 p.m. and concluding at 9:35 p.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office at Milwaukee, Wisconsin, on this 30th day of March, 2022.

Maria Vittoria Camera

MARIA VITTORIA CAMERA Notary Public State of Wisconsin

MARIA V. CAMERA - Notary Public
In and for the State of Wisconsin
My commission expires January 25, 2023.

Exhibits

**EX 0001 Rebecca Blank 032522**
22:16

**EX 0002 Rebecca Blank 032522**
51:14,15

**EX 0003 Rebecca Blank 032522**
89:2 91:9

**EX 0004 Rebecca Blank 032522**
103:7,8,9 207:19

**EX 0005 Rebecca Blank 032522**
119:21,24 212:23

**EX 0006 Rebecca Blank 032522**
128:2,23

**EX 0007 Rebecca Blank 032522**
128:25

**EX 0008 Rebecca Blank 032522**
143:22

**EX 0009 Rebecca Blank 032522**
157:16

**EX 0010 Rebecca Blank 032522**
166:23 167:5

**EX 0011 Rebecca Blank 032522**
167:3

**EX 0012 Rebecca Blank 032522**
208:14

**EX 0013 Rebecca Blank 032522**
248:22

**EX 0014 Rebecca Blank 032522**
249:24

**EX 0015 Rebecca Blank 032522**
250:21

**EX 0016 Rebecca Blank 032522**
270:6

**EX 0017 Rebecca Blank 032522**
272:16

**EX 0018 Rebecca Blank 032522**
275:13

**EX 0019 Rebecca Blank 032522**
277:14

**EX 0020 Rebecca Blank 032522**
280:22

**EX 0021 Rebecca Blank 032522**
282:21

**EX 0023 Rebecca Blank 032522**
292:21

**EX 0024 Rebecca Blank 032522**
294:2

**EX 0025 Rebecca Blank 032522**
297:25 300:7

**EX 0026 Rebecca Blank 032522**
298:19

**EX 0027 Rebecca Blank 032522**
301:20

**EX 0028 Rebecca Blank 032522**
304:1

**EX 0029 Rebecca Blank 032522**
305:3

**EX 0030 Rebecca Blank 032522**
306:13

**EX 0031 Rebecca Blank 032522**
307:7

**EX 0032 Rebecca Blank 032522**
308:16,18

**EX 0033 Rebecca Blank 032522**
309:25

**EX 0034 Rebecca Blank 032522**
310:11

#

**#letqtplay**
318:7,10

$

**$1**
30:4,5 31:10

**$10**
271:6

**$100**
274:18 278:9

**$25**
270:9 271:25 272:5

**$4**
29:10

**$55**
32:19

**$70**
278:3

1

**1**
22:6,11,16 23:3 67:8,11 107:13 120:8 122:15 213:12,14,22 216:12 272:21

**1's**
109:23 213:15

**10**
130:23 131:4 166:22,23 167:5

**100**
45:8,11 47:19 250:11 278:7 279:1,3 313:7

**11**
167:2,3 168:21 178:18

**11th**
248:25

**12**
24:19 208:14

**120**
47:20

**12th**
132:5 319:9

**13**
24:10 248:22

**13141**

208:20,22

**13th**
191:19,22,23 262:15,19

**14**
158:4,11,12 208:24 249:24

**14th**
144:2,11 251:1

**15**
250:21

**15th**
143:15 144:3 310:15

**16**
130:13 270:6

**16825**
5:17

**16th**
134:24,25 144:1

**17**
64:9,15,18 65:18 66:17 76:3,5 78:19 83:8 85:5 180:18 181:17, 18 182:18 183:7 186:17 187:6 188:14 195:23 272:16

**17.09**
107:19 120:21, 24

**18**
178:19,21 275:13

**19**
277:14 313:24

**19th**
246:22,23 307:16 318:25

**1:25**
5:3

**2**

**2**
51:14,15 107:7,12,19,22 109:7 110:1,15 111:8 118:5 120:11,16,19 121:20 122:11, 21 145:13 160:9 213:5,6, 8,12,13,14,16, 20,23 214:5,19 215:1,10,16 216:7,17,25 272:21 274:23 307:1

**2's**
110:18 114:22 122:16

**20**
208:24 271:1 278:3 280:22 286:9 314:13 316:2

**2008**
12:16

**2011**
81:6

**2013**
71:11

**2016**
286:9 294:23, 24

**2017**
272:1 295:3

**2018**
85:20 94:16,18 104:9,20 131:10 159:15 191:8,14 208:18 294:7 298:3,9

**2018-2019**
36:8 65:13

**2019**
132:13,17 178:18 191:19, 23 198:24 251:1 262:8

**2020**
66:19 71:20,21 277:17

**2022**
5:3

**21**
278:4 282:21 316:4,5

**21259**
282:15,16,23

**21270s**
282:17

**21273**
281:6

**21292**
298:25

**214**
164:14 169:15 186:8

**21st**
159:14

**22**
286:12 316:16

**22nd**
272:1

**23**
292:21 315:15 316:19

**24**
294:2 316:24

**240**
158:15 192:8

**240-some**
158:9,10

**242**
157:24

**24th**
277:17

**25**
271:1 297:25 300:7 317:2

**25th**
5:3 134:17

**26**
298:2,19 317:5

**27**
301:20 317:10

**28**
304:1 317:20

**289501**
294:23

**29**
276:1 305:3 318:2

**2:35**
67:9

**2:45**
67:9,11

**2nd**
134:6

**3**

**3**

89:2 91:9 118:8 160:10 163:1 275:21

**30**
70:20 306:13 318:17

**30th**
104:9,20

**31**
307:7 318:23

**32**
213:18 308:16, 18 319:2,5

**33**
309:25 319:13

**34**
310:11 319:17

**3:48**
118:5,6

**3rd**
295:3 299:15

**4**

**4**
103:8,9 106:20 107:15 122:1 123:4 163:4 207:19 211:18 213:10 257:19

**40**
40:10

**45**
315:25

**4:02**
118:6,8

**5**

**5**
29:14 38:17 119:21,24 120:2 159:15 211:21 212:23 237:22 256:25 258:7 267:11

**50**
108:13 232:4, 6,9,13 236:2, 6,7,10,11

**500**
5:13

**59**
282:16,18

**5:05**
163:1,2

**5:40**
163:2,4

**6**

**6**
120:14 122:4 128:2,23 144:19,20 240:4 257:20 261:3 267:14 272:21 274:23 279:24 280:1,2

**60**
278:3 279:13

**6:42**
211:18,19

**6:53**
211:19,21

**6th**
134:11,13,24 135:8 246:23 318:21

**7**

**7**
121:12 123:6 128:25 212:25 256:25 280:3,4

**70**
279:13

**77060**
5:18

**7th**
310:2 319:15

**8**

**8**
107:16 120:14 121:12 122:4 123:6,16 143:22 159:4 212:25 256:25 257:20 258:7

**8:01**
267:11,12

**8:14**
267:12,14

**8th**
274:24

**9**

**9**
24:18 157:16

**900**
5:17

**906**
276:1

**92:35**
67:8

**9:35**
320:6,7

**9th**
131:11

**@**

**@beckyblank**
306:20

**A**

**abilities**
127:6

**ability**
84:18 117:8 194:14,16 195:6,11,25 197:2 198:12 253:25 264:20 272:11 317:24

**able**
31:23 62:10 77:12 138:6 150:2,14 161:4 162:12,13 174:8 179:18 202:15 206:9 262:3,11 279:8

**above**
107:9 109:8 120:14

**absolutely**
34:22 49:17 58:3 208:4 252:5

**abuse**
77:11 79:14

**academic**
28:18 44:3 75:12 114:22 115:21 121:22

297:18 298:3,
17,22 299:22
300:4 317:3,6

**accept**
180:1

**acceptable**
260:23

**accepting**
196:4

**access**
42:11,12
138:6,13 147:2

**accessed**
136:16

**accommodate**
131:1,15 132:2

**account**
306:20,21,22

**accounts**
147:12 232:1
289:20 306:25

**accuracy**
278:2

**accurate**
53:4,11 59:16,
17 129:2
146:11 149:5,
7,20 150:6
187:3 193:10,
16 218:20
223:11 232:23
236:2 241:3,4
278:24 294:1
300:15

**accused**
55:15 63:6
82:14 87:17
88:4 118:17
121:5 177:24
178:11 190:7
286:21

**accuser**
82:14 218:2

**accusers**
167:23 245:9

**acknowledge**
267:22

**acknowledged**
294:13

**acquired**
218:17

**across**
18:15 34:17
267:7 278:12

**act**
201:13 275:1

**acting**
11:9,11
180:23,25

**action**
5:19 84:9
101:14 151:8
182:19 201:13
208:2 239:24
291:13 300:21

**actions**
88:3 286:19
289:14

**activities**
19:14 20:2
34:17 88:21
89:16 126:9
135:24 263:21

**activity**
109:17,20,22
110:11 121:4
122:14 148:6,
13 213:25

**acts**
317:15

**actual**
15:10 57:7
70:10 76:18
85:19 105:10
119:13 125:21
126:10 145:1
189:3 196:19
209:8,13
242:12 252:1
294:23 301:24
304:11

**AD**
311:16

**Adam**
277:22

**add**
32:4 260:18
274:19 310:17

**added**
43:5 227:12
228:18

**addition**
42:16 43:10
77:14 158:14

**additional**
21:19 27:7,9
40:18 58:18
133:23 172:25
182:11 185:11
186:23 188:4,
23 189:20
210:7 219:11
221:19 228:17,
20 229:10,13,
23 230:21
231:2,5 232:20
236:20 262:1

**Additionally**
213:15

**address**
301:23,24
302:5

**addressed**
307:9 318:24

**addresses**
309:8

**addressing**
173:18

**adjourned**
132:7

**adjudicate**
210:21

**adjusted**
190:20

**administration**
11:6,21 26:9
27:5 28:15
33:1 138:24
311:5

**admissible**
177:14

**admit**
124:14

**admits**
258:11,14

**admitted**
253:17 256:1,3
257:3 258:20
259:14,17
260:3,10

**adopted**
170:8

**adopts**
28:6

**advance**
311:24

**advantage**
46:19

**advice**
180:24,25
181:1 242:9

**advise**
182:15

**advised**
81:5 87:13 99:19

**Advisers**
10:20,25

**advising**
317:2

**advisors**
131:11 132:6

**Advisory**
313:8,9 314:14

**affairs**
11:8 33:2,3 35:20 37:2,3, 4,7,9 48:16 57:3 68:10 72:6 73:18,20, 22 86:1,2 104:7 127:23 129:14 138:20 230:9 303:19 311:10

**affect**
64:8 65:2 84:20 125:22 127:6,19

**affected**
87:16 155:15 160:12 261:19

**affects**
64:19 127:5

**affidavits**
169:21 171:11

**affiliated**
8:25 20:7

**affiliation**
268:17 271:17

**affirmed**
101:7,12

**afraid**
222:12 283:12

**African**
312:22

**afternoon**
144:7 167:21 168:7

**afterwards**
174:12 200:6 222:15,16

**agency**
276:19

**ago**
6:10 7:4 207:19 270:19 271:1

**agree**
5:5 110:2,6 111:5 112:11 114:1 193:25 207:4 216:25 224:1,5 240:20 257:25 266:16 267:2 276:16 281:4

**agreed**
122:15 123:22

**agreement**
107:24 272:14

**agrees**
273:4

**ahead**
7:19 23:14 25:6 84:13 103:11 109:3 111:11 112:24 113:8 114:5,14 115:7 116:5 119:24 122:24 125:24 126:21 128:1 131:18 133:16 149:23 150:8 154:7 155:22 156:12 161:23 164:8, 23 168:15 179:6,21 182:6,21 184:21 185:8 188:8 189:10 190:2 192:13 194:3,22 195:9 196:2 198:7,16 205:21 207:3 209:25 211:9 214:7 215:18 216:11 217:4 218:24 220:1, 13 223:5 226:8 227:5 228:6,23 233:6 235:12 236:24 241:8 242:24 243:6, 17 245:2 250:14 251:14 257:13 259:1, 12 260:21 264:13 265:9, 14 266:3 271:19 279:19, 22 283:15 285:15,22 287:1 288:4,25 291:20 292:10 302:1 315:14 317:18 319:2

**AIM**
300:22 301:2, 7,9,16

**aimed**
160:3

**aired**
194:24

**alcohol**
79:14 204:10 205:10,24 206:2 207:7 214:10,13,14 227:20

**alcohol-based**
207:9

**alcohol-fueled**
190:13

**alcohol-related**
161:12

**Alcoholic's**
190:15

**alcoholically-impaired**
161:18

**Alex**
301:22 302:18, 19 317:12

**Alisa**
304:6,8

**allegation**
56:11 59:7 60:10 88:16,21 106:13 160:1 291:15 296:15

**allegations**
55:4 78:8 85:13,16 95:17 107:9 117:15 159:22

**allege**
267:16

**alleged**
85:19 281:5 293:2

**allegedly**
293:11

**alleging**
100:8

**allow**
239:7 253:20

**allowed**
79:25 85:5 90:9 190:21 192:7,8,10 199:5 254:8

**allowing**
263:20

**allows**
83:8

**alum**
304:16

**alumni**
19:8,18,21,22, 23,25 20:8,13 21:9 33:12 38:13 40:14 41:25 42:1 270:12 304:15

**alums**
21:13 45:18

**Alvarez**
30:3 42:14 311:13

**ambiguity**
232:1

**ambiguous**
90:19

**American**
312:23

**amount**
30:12 31:16 49:11 135:20 158:21 203:18

**amounts**
175:14

**analysis**
109:4 175:12

**analyze**
181:21

**and/or**
146:4

**angry**
294:14

**Animation**
51:7

**anniversary**
134:18

**announcement**
307:21

**annoyed**
246:3

**annually**
279:7

**Anonymous**
190:16

**answer**
45:16 75:2 77:16,18 80:21 81:11 89:7 111:12 112:3, 15,18,24 113:8 114:5,14 115:8 116:5,12,14, 20,21 131:18 149:23 150:8 152:6 156:13 164:8,23 171:3 179:6 188:8 189:10 194:4 198:7 205:21 207:3 215:18 218:13,24 224:20,24 228:8,24 233:18 235:12 236:24 241:9 243:18 245:2 257:13 259:1 260:21 263:14 264:14,15 267:20 268:1,7 285:22 287:1 288:5 292:11

**answered**
79:7 164:23 188:8 190:2 215:18 216:11 242:24 243:6, 17 259:12,23 271:19

**answering**
67:20 155:14, 16 204:3 218:4

**answers**
207:14

**Anthony**
312:16,17,21

**anti-alcohol**
190:15

**anticipation**
167:20 168:6

**anybody**
43:24 67:21 72:22 103:3 112:8 133:8 140:19,24 175:3 183:2 230:3,17 246:20,24 247:3,7 280:12 295:14

**anybody's**
177:20

**anymore**
15:21 17:6 54:21 100:10 102:1 273:10 309:21

**anyone**
25:25 98:15 100:14 103:4 219:2 253:2 264:21 267:7 278:18 283:17

**anytime**
152:24 244:9

**apart**
113:15 297:7

**apartment**
63:7 86:14 154:4,9,23 155:3 202:5

**apparently**
107:24 307:1

**appeal**
14:11 15:10, 11,12 48:6,20, 24 56:17,18 61:16 69:9,14, 17,23 70:14 72:4 73:24 74:1,3,12,24 76:2,6,22 77:4 82:25 83:3,4, 7,8,23 85:1 101:5 103:19, 22 115:1,22 118:11 128:4, 21 129:3 177:11 181:25 182:1,20 188:18,21,23 191:20,21,25 196:5,15 211:25 219:21 233:15,22 239:23 240:2 243:2,11 280:1 286:15 291:4

**appealing**
48:1 243:21

**appeals**
48:9,12 63:24 65:21 66:7 70:19 71:9 73:25 189:14, 17,18,22 62:11 66:8 84:16 89:6 108:15 180:11 245:15 281:19 290:13

**appearance**
318:3

**appearances**
5:23

**appeared**
200:12 213:17 227:1,23

**appears**
51:22 215:25 272:21 306:7 319:10,14,16

**applications**
12:18

**applied**
12:2,11,13,25 13:1,7

**applies**
206:24

**apply**
12:23 13:2 89:21 145:7 206:23

**applying**
12:3 13:22,23

**appoint**
64:20

**appreciate**
155:13 156:4 221:12 224:20 299:25

**appreciated**
252:2 269:3

**appropriate**
6:13 52:10

**approval**
28:2,8 31:2,11

**approximately**
276:1 297:7

**April**
85:20 94:15 159:14 191:8, 14

**arguable**
79:19

**argue**
72:20 124:7 130:1

**argued**
154:20 202:22

**arguing**
154:18

**argument**
78:24 130:21 131:25 146:7 151:5,6 155:5, 9 157:25 166:18 167:22 168:23 169:3 287:11

**argumentative**
236:24 243:17 260:21

**arguments**
36:19 129:19 151:3,10 155:10 165:10 184:5,7 185:18 195:13 196:25

**Argyle**
294:5

**arise**
35:25 48:22

**arising**
37:22

**arose**
95:20

**around**
12:25 18:9 19:9 26:13 32:18 41:13 42:9 50:15 82:13 85:7 87:24 161:6 202:19 204:19 222:18 245:18 246:14 263:4 269:24 272:2 276:18 279:13 303:13,14,22 313:4

**arriving**
10:23 138:2

**article**
270:8 272:1 277:16,20,25 278:23,24

**articles**
147:12

**asked**
14:4 23:12 60:9 62:6 75:21 77:12 79:23 80:15 98:2 164:22 172:13,21 173:5 188:7 189:19 190:1 215:17 216:10 219:15 222:11 228:14 242:23 243:5,16 248:3 253:25 259:11, 22 271:18 294:10 311:23

**asking**
8:2 10:11 59:9 62:15 79:4 98:7 155:10 158:12 168:12 183:9 184:3 194:13 195:2 200:15 208:9 216:4 218:5,7 221:14 223:19 224:16,25 226:25 227:17 233:13 245:16, 17 267:2 289:10 292:17 316:9,10

**aspect**
59:6

**aspects**
254:2

**assailant**
126:19

**assault**
52:9 54:21 55:4,20 56:2 57:9,16 59:8, 20 60:11 63:2, 23 71:6,8,10, 12 74:14,19,20 75:3 78:8 80:6,10,16,23 82:1 83:6 85:19 88:17 95:17 104:12, 13 105:5,15,24 107:17,19,25 117:17 120:15, 21,24 121:2,8 122:22 124:5 127:3,13,15,24 130:9 148:5,16

181:20 190:21,
23 191:1,11
203:22 204:7
205:11,16,17
206:23,24
207:20 209:4,
5,6,12,21,23
217:2,16
218:10 221:1
223:24 225:2
233:7,10
234:24 235:8,
25 236:4,8
237:3,5,15,16
242:13 253:7
265:4,24
266:6,10,17

**assaulted**
122:13 224:11

**assaults**
56:22 57:6

**assembly**
313:16

**assign**
82:11

**assistance**
52:16 82:2
260:13 276:5
277:11

**assistant**
30:7 33:25
67:23 68:4
230:7

**assistants**
230:6

**Associate**
277:21 295:24
311:16

**associated**
240:8

**association**

33:13 39:5

**assume**
28:5 43:1
47:10,13 54:5
71:25 75:5
83:11,24,25
102:16 103:18
106:23 111:1
136:3 159:16
168:5 170:11
181:16 184:16
225:3 230:8
241:10 261:25
275:15 289:7
294:17 295:8
301:6 302:3
310:7,20
314:3,19

**assuming**
53:24 160:13
168:25 240:11,
15,23 261:12
268:10,11
306:10

**assumption**
27:21 136:15
168:16

**athle-**
38:25

**athlete**
58:19,24
88:11,23 96:3

**athletes**
89:17 296:20

**athletic**
20:2,14 29:18,
21,22 30:3,22,
23,25 37:17,
18,21 38:10,
11,12 39:9
42:2,25 43:11,
19,20,22,24

44:1,23 58:17
88:5,14,15,20
93:20,22 94:1,
13 138:25
253:25 271:17,
21 277:22
312:5 314:2

**athletics**
20:10,19,20
21:14,15 38:16
39:6 87:9,15
88:13 90:7,24
270:1 271:23
312:6

**attached**
147:12 159:17
160:13 249:7
310:16 320:8

**attaching**
167:21

**attachment**
168:21

**attempting**
131:9 293:3

**attend**
24:4 44:13,16,
18,25 45:4,8,
11 46:7

**attendance**
39:23 45:5,17,
18

**attended**
39:25 40:4
44:14

**attendees**
45:25

**attending**
45:20

**attention**
35:25 58:18,23
59:23 63:12

140:6 150:22
187:25 281:18
306:1

**attentively**
282:14

**attorney**
95:22 96:17
167:19,21
183:17 184:13
185:5,24
186:1,2,10
245:22

**attorney's**
169:19,24

**attorneys**
154:18 163:22
167:12,15
184:7,25
242:16

**Audio**
5:3

**August**
13:25 134:6,8,
11,13 246:22,
23 251:1 262:8
269:16 274:24
307:16 310:2,
15 318:21,25
319:9,15

**authenticate**
316:7,10

**author**
304:24

**authorize**
183:14,15

**authorizes**
145:5

**authorship**
35:10

**automatically**

90:24 115:14

**available**
49:19 51:11 107:20 109:6 115:12 147:7 151:15,16,22 152:24 160:24 173:1 174:15 175:18 177:3 180:7,15 181:9 183:23 185:11 186:6 187:1 212:17 218:13 220:24 228:13 234:18 239:6 246:9 299:13

**average**
18:22,25 19:8

**averaged**
19:7

**aware**
58:8 87:10,15 95:4 178:18,23 198:10 230:17 232:24 276:21 305:9

**B**

**Bachhuber**
6:2 67:6 91:8 111:11 112:23 113:7 114:4,13 115:7 116:4 118:2 122:23 125:23 126:20 128:10,12,15, 18 131:17 143:23 149:22 150:7 155:21 156:11,24 157:11,17,23 161:22 162:19, 23 164:7,22 168:14 171:1 179:5,20 182:5 184:20 185:7 188:7 189:8 190:1,24 191:19,22 192:13 194:3, 21 195:8 196:1 198:6,15 204:5,15 205:20 207:2 208:21 209:24 211:8,16 214:6 215:17 216:10 217:3 218:23 219:25 220:11 223:4 226:7 227:4 228:5,22 229:20 233:5 235:1,11 236:23 241:8 242:23 243:5, 16 245:1 251:6,10 256:20 257:12 258:25 259:11, 22 260:20 264:13 265:8, 13 266:2,19 267:24 268:4 271:18 279:24 280:2 283:14 284:12 285:5, 14,21 286:25 288:4,24 289:24 291:19 292:2,10 301:10,25 302:16 315:6, 11,14,17 316:6 317:17,23 318:14 319:3, 11,25

**back**
10:9 11:22 15:7,8 16:16, 19,20 30:24 48:8,23 69:9 72:3,18,20 74:17 79:5,25 81:6 82:16 94:11 100:12 102:21 110:25 117:22 122:1 125:16 134:24 139:14 144:1 152:3 153:16 154:2,24 155:2 157:2 160:5 162:7 172:5 182:1 186:4 187:11 188:16 189:19 194:9 200:9 201:7,20 202:1 203:25 205:25 214:13, 20 216:14 217:20 220:4 222:5 228:7 229:18,25 231:10 245:10, 24 248:19 258:16 259:19 260:1,25 273:3 284:23 288:10 303:18 306:9 314:12,20

**back-and-forth**
287:9

**backed**
16:23,24

**background**
8:16 145:3 169:20,25 170:3,19 309:10

**backwards**
213:17

**bad**
36:12 80:12 262:9 291:22

**Badger**
271:23 300:22 301:7

**Badgers**
20:21 278:2 298:16

**bag**
290:23 291:16

**ballpark**
70:20

**bar**
57:22 202:2

**Barnes**
277:23

**Barry**
30:3 42:14 311:13

**Bascom**
5:12

**base**
151:9 184:5,24

**based**
27:6 73:7,25 78:17,23 91:5 109:5 110:20 111:5 146:12, 17,19 171:1 179:14 180:14 185:20 203:17, 20 206:12 207:7 237:5 255:21 268:23 308:5

**bases**
76:18

**basic**
52:21

**basically**
146:20 170:19 244:6 257:5 261:24 268:22 273:3 281:15 282:5 283:20 299:16

**basics**
7:12

**basis**
24:25 40:25 44:7 73:24 78:20 82:17 115:24 151:7 203:2 206:7 223:14 244:16 245:12 281:7

**basketball**
20:16 29:19,20 44:19 58:21

**Bates**
308:18

**Bates-stamp**
89:14

**Bates-stamped**
91:9

**Becky**
6:11,12 275:1

**bed**
255:24

**bedroom**
213:18 225:6 234:16 238:19 256:11

**beeping**
309:3

**began**
131:9

**beginning**
67:11 118:8 163:4 211:21 267:14

**behalf**
5:16,22 6:1,3 131:25

**behaving**
65:16 217:21 288:12

**behavior**
80:13 124:10 203:3 204:20 206:7 207:12 256:13 261:7 281:4,19,20 282:9 288:9 291:22 296:1

**belief**
121:24 186:6 206:22 210:13

**believe**
22:11,18 25:18 28:8 29:7 32:17 39:19 40:4 43:15 68:22 78:9 80:2 83:14 88:14,22 97:21 110:12,13,17, 20 111:15,22 114:22 120:15 129:10,24 134:6,10,12 135:3,11 140:23 153:12 157:6 160:3 162:9 168:25 169:13 175:23 176:1 177:10 180:22 182:25 187:12 190:25 198:17 205:5, 12 207:6,16 208:5 209:19 210:2 212:9 215:23 216:20 221:8 222:25 233:12 235:23 238:12 246:15 256:25 258:17 259:18,24 261:22 268:16 270:25 272:7 280:19 292:12 296:3 297:22 316:19

**believed**
94:20 126:6 202:21 203:2, 6,7,23 206:20, 21 207:25 216:23 235:6

**believes**
213:20 265:4

**bell**
97:5

**below**
34:14 53:8 167:8 175:11 303:4 306:7 307:14 314:21

**beneficial**
46:12

**benefit**
60:16 309:16

**Bennett**
312:13,14

**besides**
43:24 101:21 138:17 175:4 221:25 230:3

**best**
164:5 251:3

**better**
21:18 73:8 95:16 108:13 196:16 203:11, 14 212:20 216:14 229:22 231:13 236:3

**bias**
159:23 160:2,3

**biases**
156:14

**Biddy**
12:17,20

**big**
32:5,8,9,11,15 191:6

**bigger**
294:13

**biggest**
20:12,13

**Bill**
303:3

**bit**
7:10,15 8:15 30:1 35:3 38:11 41:8 54:14 81:8 111:21 156:5 255:20

**Black**
313:7

**black-out**
223:1

**blacked**
199:25 200:3

**blame**
237:20 241:14

**blank**
5:9 6:5,15,18, 19 89:4 118:10

166:25 167:19 211:23 249:3, 11 267:16 272:18 304:11 315:23

**block**
42:24 302:25

**blogs**
18:17

**blow**
301:16

**Blum**
281:8,15 282:4

**board**
6:4 20:5,6,7 24:1,2,3,4,11, 17,18,23,25 25:2,8,10 28:3,5,8,11 31:2,5,10 40:16,24 46:15,23 62:7 66:16 83:8,12, 13,16,17 84:1, 2,10,25 101:22 192:1 256:15 265:18 312:5, 6,12

**Bobby**
30:15

**body**
60:17 150:25 191:6

**bold**
22:25

**BOR_12709**
308:18

**BOR_1336**
107:16

**BOR_18105**
53:1

**BOR_18155**
53:16

**born**
8:17

**bother**
309:3

**bottom**
109:5 130:14 131:4 159:15 160:9 240:4 274:22

**bowl**
40:1,2,5,6

**box**
40:8,13 41:5, 7,10,12,17,19, 21 42:2,16,18, 19,21 45:21,23 46:3 136:15, 16,22 138:2 141:10 167:6 169:4,6 247:10,11,18 248:1 301:23

**boxes**
41:20,22,25 42:3,20 46:6

**brand-new**
214:16

**break**
7:16,20,23 60:7 67:5 98:5 162:16 211:13 267:9 315:4,7

**breaks**
7:13,17 296:21,24

**brief**
153:9 159:8

**briefed**
56:8 286:14

292:7 293:20 297:21 305:11

**briefing**
19:2

**briefly**
104:6

**bright**
108:16

**bring**
47:8 82:4,10 180:16 278:11 281:24,25

**bringing**
282:3

**brings**
20:25 279:7

**broader**
24:8 124:20

**broadly**
18:1

**brought**
51:12 278:10

**Brown**
178:15

**budget**
26:6,11,12,17, 22,23 27:1,6, 7,9 28:3,7,8 276:1

**budget allocations**
26:14

**build**
46:20

**building**
34:13 270:20

**Bulldogs**
20:22

**bulleted**
275:24

**bunch**
133:23 190:16

**burden**
65:6 108:8

**Bush**
10:21

**business**
46:21 132:11 269:25 271:1

**C**

**calendar**
131:2 143:17, 18

**California**
7:3

**call**
28:1 141:13 144:25 145:11 198:2 250:20 287:2 296:9 300:25 313:18

**called**
6:5 107:17 251:22 268:16 280:8 281:14 309:4 318:23

**calling**
307:22

**calls**
135:23 137:18 167:20,25 168:4 175:8 225:4 285:6, 15,21

**camera**
5:21 202:10

**Camp**
43:4,6,10 44:6

**campaign**
270:13

**campus**
12:7 18:16 19:6,25 20:4, 25 21:1 26:13 45:16 58:14 60:11,21 71:17,23 99:8 101:8,11 110:16 111:9 113:6,11,21 114:23 115:4 116:1 122:12 124:9 126:1,9 127:24 182:10 258:2 263:21 265:20,25 266:7,18,23 267:5 280:17 303:15,18

**canceled**
135:23

**candidly**
155:14,16

**Cap**
310:3,4

**capacity**
16:10 100:5 275:6

**capture**
106:10

**captured**
109:7

**Captures**
106:5

**care**
152:7 248:6

**career**
10:14

**careful**
15:19

**carried**
264:6

**carries**
201:25

**case**
6:24,25 17:16 47:21 48:19 50:5,9 56:19 59:13 60:12 61:11,25 62:2, 23 63:2,13,18 64:13 68:12 73:23 74:14, 18,23 77:5,21, 23,24 78:1 81:5 82:22 85:10 86:12 88:24 91:19 92:9 93:6 96:7 97:21 98:11 99:3,7,25 101:18 102:16, 23,24 103:1 104:14 107:8 109:1 111:25 112:2 114:8 117:12 120:17 124:5 128:5 129:6,11 133:10,14 141:23 146:21 155:8 166:2 167:13 170:15 176:9 179:11 182:15,24 184:1 185:13 186:21 188:16 189:19 190:19, 22,23 197:8 200:21 201:5 206:3 210:8, 20,21 211:12 232:23 233:7, 10 242:11 244:20 246:14 252:3 254:2 267:21,25 269:1 288:9 289:13 294:10 297:9,10 300:18 303:8 308:12 314:23 315:1

**cases**
58:7,22 60:25 61:7,9 62:17, 24 64:8 65:7 70:19 71:6 73:3 77:3 78:6,11 79:3 80:10 98:14 101:6,12 102:11 108:22 126:15,23 179:25 180:17 190:12 218:18 243:21 293:14

**category**
241:2 314:16

**Catie**
6:3

**cautioned**
278:6,25

**caveat**
113:10

**cc**
273:8

**celebrate**
134:17

**cell**
17:19

**censure**
292:5

**censured**
288:12

**Center**
43:22

**central**
34:22

**Cephus**
15:9 35:5 39:16,19 63:12 77:14,15,21 81:5 86:13 95:20 96:9,15 97:3,7 100:1, 8,17 102:13 104:11,17 111:10 112:8 114:9,24 121:17 122:9 130:16 131:1, 16 134:4 140:16 154:3, 11 167:9,13,16 171:19 175:20, 23 176:7 178:12 180:23 183:11 184:15, 25 187:18 192:1,8 199:4 202:21 203:1,6 204:24 206:20 210:3 215:21, 23 216:14,20 217:15 218:15 220:14 221:7 222:6 225:15 226:12 227:1, 15,23 230:5 232:25 234:23 235:7,15,24 236:3,19 238:5 239:16 241:22 246:10 255:18

258:7 267:19 268:9,25 269:6 282:8 284:15 285:17,19 286:21 287:17, 18,19,20,22,23 288:18 292:8 295:7,20 297:19 303:6 306:9 308:3 309:8 312:18 317:7 318:19

**Cephus'**
25:3

**Cephus's**
63:18 68:12 77:22,24 78:1 91:19 93:6 95:17 102:16 115:4 116:1 129:19 132:14 140:25 141:2 146:1 154:18 158:1 163:22 164:18 170:3 179:8 184:6 197:7 202:5 227:10 229:11 245:22 279:16 282:11 295:25 316:13

**certain**
22:23 31:4,5 89:16 113:18 147:23 233:17 237:24 293:23, 25

**certainly**
20:15 21:5,13 22:6 27:8 35:13 36:20 39:1 42:21 53:11 56:8 58:22 72:11 85:7 91:19 94:10 102:17 111:15 131:20 133:15,17 144:7 153:13, 19 169:14 180:8 190:20 193:19 200:18 205:7 215:3 220:15 222:18 227:13 228:13 234:8 241:13, 21 252:19 253:15 271:9, 10,13 283:23 289:3 308:1

**chain**
319:6

**chair**
119:14

**challenge**
253:2

**champions**
44:15

**championship**
20:18

**chance**
108:13 236:3 254:9

**chancellor**
6:10,15,16,18, 19 12:18,20,21 13:8,19,20 17:25 22:18 23:25 26:9 27:4 28:14 32:25 33:1,2, 3,5 34:10,17 37:8 59:25 70:14 85:25 86:19 89:4 92:19,21,25 118:10 138:19 145:6 166:25 167:18 211:23 249:10 267:16 272:18 305:5 307:9 310:13 311:4,9 315:23 319:22

**chancellor's**
15:11 40:8,13 144:25 158:18 159:8 314:14

**chancellor's-level**
118:11

**chancellor-level**
65:20 72:4 76:1,21 103:18,22 129:3

**chancellors**
19:13

**change**
79:13 135:9 183:25 185:12 281:19

**changed**
16:17 50:14 66:15 215:15

**changes**
27:23,24 64:13,15 66:16,17 258:11,13

**changing**
50:13,17

**Chapter**
64:9

**character**
300:2

**characters**
51:7

**charge**
28:18 89:22,24 94:9 99:10 102:17 105:24 106:3 120:18 121:8 204:13 207:9 235:17, 18 236:18 253:11,16 256:4,6 257:7 258:23 301:1

**charged**
63:11 89:25 90:21 95:21 96:17 97:8,14 98:24 101:9 102:13 106:13 145:10 258:24 266:6

**charges**
81:20 82:5,10, 12 92:2 105:3 121:22 280:20 281:24,25

**charging**
86:14

**Charlie**
92:20 94:8,10 138:20 141:14, 18 142:8 175:7

**chart**
275:21

**Chase**
5:17

**chastised**
8:10

**chat**
38:2

**cheated**

297:22

**cheating**
75:11

**check**
152:3 157:3 315:9

**Chicago**
10:9

**chief**
33:4,8 34:1,2 72:24 277:22 310:15,24 311:12 318:5

**childhood**
170:6

**choice**
179:13 245:4 255:8

**choices**
300:11

**choose**
55:12

**chose**
188:11

**Chris**
5:25 29:22 30:1 283:1 284:24 311:16

**Christina**
311:8,10

**Christine**
299:11

**chronology**
97:4

**Chryst**
29:6,16 248:14 306:4

**circumstance**
52:14 146:23

264:21

**circumstances**
106:7 113:17 283:25

**cite**
149:16

**cited**
100:20 132:9 150:21

**cities**
20:4

**civil**
276:7,8,22 277:1,6

**claim**
130:16 191:13 200:5 203:9 266:4

**claimed**
63:9

**claiming**
222:13

**claims**
194:6

**clarity**
107:6

**class**
263:6,8 299:5, 13,14

**classes**
113:15,25 263:21

**clause**
240:18

**clear**
8:2 80:9 85:17 97:2 99:11 108:14 109:6 112:18 121:19, 20 123:7 126:6

141:21 155:5 176:12 181:8 197:9 202:20 206:2,17 228:16 234:5 237:13 239:4 244:5 284:14 288:6 300:6

**cleared**
259:9

**clearly**
73:10 76:8 95:20 124:12 125:2 146:24 155:11 157:20 159:2 181:22 193:5 195:17 206:9 220:17 226:19 227:7 242:10 244:19 246:1,6 255:24,25 256:4 258:20 259:2,4 260:22 287:8 291:9

**Clements**
5:15

**click**
51:3

**client**
85:14 114:9 160:1,4 164:6 183:3,17 184:12 185:4 186:9 187:7 188:11 192:14 193:3 212:16 218:8 223:1,9, 12 264:12

**client's**
116:2 155:6 192:10 222:2

**clients'**
303:17

**climate-controlled**
40:11

**Cline**
67:25

**Clinton**
10:25

**clips**
163:16,17,20, 25 164:15,17, 20 187:5,13 192:9

**close**
42:14 47:20 71:3 250:11 271:6

**closed**
83:18 270:13

**closely**
36:18

**closing**
165:10 166:18 167:22 168:22 184:5,6

**Closure**
281:8

**cloud**
16:23

**Clune**
5:25 6:9 22:14,17 51:13,16 67:4, 12 89:3 91:13, 14 103:6,10 111:18 113:1, 23 114:7,16 115:18 116:10 117:24 118:3, 9,23 119:1,22

123:3 126:13 127:8 128:3, 11,13,16,22 129:1 131:22 143:20,25 144:5 150:1,10 156:3,18 157:4,14,19 158:3 162:5, 16,21 163:5 164:10 165:2 166:22,24 167:4 168:17 171:4 178:20 179:16 180:12 182:14 185:1, 22 188:10 189:16 190:4 191:4,21,24 192:16 194:11 195:1,16 196:9 198:9,18 204:11,23 206:19 207:17 208:8,15,23 211:13,22 214:15 216:3, 24 217:13 219:7 220:3,9 221:2 223:8 226:22 227:16 228:19 229:9, 21 233:9 235:5,22 237:8 241:15 243:3,9 244:2 245:21 248:23 250:1, 22 251:8,16,17 256:24 257:14 259:8,16 260:7,24 265:2,11,17 266:12 267:1, 8,15 268:3,5 270:7 271:24 272:17 275:14 277:15 280:5, 23 282:17,20, 22 284:3,19 285:11,18 286:2,13 287:5 288:13 289:9 290:6 291:24 292:6,16,22 294:3 298:1,20 301:15,21 302:6,17 304:2 305:4 306:14 307:8 308:15, 17 309:24 310:1,12 315:10,16,19, 22 316:9,15 317:19 318:1, 16 319:4,12,22 320:4

**coach**
29:6,19,20 37:16,25 38:5 87:18 306:4

**coaches**
30:7 39:9

**coaching**
31:21

**code**
256:14

**cognitive**
161:5,12

**coherent**
207:14

**cohesion**
21:1

**coincidental**
43:2

**collect**
245:14

**collected**
162:11 173:8 213:11

**collecting**
252:20

**collection**
272:19 305:9

**collectively**
274:16

**college**
9:20 10:2 31:22 170:9

**combination**
51:6

**come**
11:15,22 12:9 19:25 20:3 30:24 36:23 40:22,24 41:4, 10,16,17 42:5 45:23 46:14,18 49:8 50:24 56:18 57:2 65:21 70:25 78:16 79:5,11 86:1 106:14 113:16 124:19, 22 133:15 134:1 179:10 244:6 247:20 248:10 251:23 258:18 267:7 270:24 302:2

**comes**
36:2,11 42:7 55:13 61:17 191:7,11,14 208:3 247:13 275:22

**comfortable**
125:7,9,20 139:22 285:20

**Comm**
313:8

**command**
31:24

**commenced**
94:19,22

**comment**
62:23 216:12 224:1,8 311:23

**commentary**
269:3

**comments**
62:16 199:22 283:3 303:7

**Commerce**
11:9,15

**commit**
217:10 235:8, 24 236:3

**committed**
235:15 236:8 264:18

**committee**
84:2 120:4,19, 23 123:21 124:13,17 126:6 213:20

**communicate**
310:21

**communicated**
55:14 181:12

**communicating**
141:20

**communication**
18:15,18 58:10 93:23 94:1 138:21 141:22 142:22 171:6 183:1 248:15

**communications**
59:21,24 60:1 61:10 86:25 87:7,12 91:20, 21 92:1,3,5,6, 13,23 93:4 94:6,9,12,13 98:1 99:18 142:18 167:7 222:5 247:15, 25 305:21 307:11 310:25 312:15 313:8 314:2

**communities**
9:2

**community**
62:9 299:23 307:24,25 312:23 313:9, 10

**companies**
41:24

**company**
41:25 42:1

**comparable**
63:20

**compare**
230:1

**comparison**
196:6,10

**compel**
176:2 177:16

**compelling**
187:17 199:13

**competition**
88:18

**competitions**
45:6

**complainant**
53:17,20 54:2 107:7,12,13,22 109:7,23 110:1,15,18 111:8 114:22 120:8,11,16,19 121:20 122:11, 15,16,21 148:3 153:2,3,10 159:9 160:21 161:21 162:6,8 173:20 182:19 187:7 188:17 190:9 194:10 195:14 200:8 210:4,13 213:5,6,8,12, 13,14,15,16, 20,22,23 214:5,19 215:1,9,16 216:7,25 217:24 289:23

**complainant's**
110:11 130:19 210:18 211:3 227:11 228:10

**complainants**
86:4 98:25 123:23,24 125:3 126:7 154:2 161:7 173:24 189:20 199:4,18 201:25 202:22 214:22 215:20 222:6 226:3 227:22 229:14 230:23,24 231:7 232:23 234:17 238:15, 24 239:3,10 260:13 261:9

**complainants'**
234:20

**complaining**
84:15 124:19 285:10

**complaint**
56:13,23 57:7, 14,24 63:8 84:14 85:18 86:16 87:10 94:25 95:2,9 235:20 243:13 264:23 268:2 277:5 316:17

**complaints**
81:20 264:22

**complete**
48:24 79:1 81:11 149:13 150:16 193:10, 16 229:4 244:13 262:11

**completed**
87:23 150:15

**completely**
43:7 65:16 87:25 95:23 100:22 201:13 202:3 205:10 215:2

**completes**
84:6

**completion**
55:6

**compliance**
37:9 49:1 50:24 65:15 86:22

**complies**
121:15 122:6

**comply**
65:22 66:1 276:7,11,16, 20,22 277:1

**complying**
264:10

**computer**
16:21 138:11

**concentrating**
127:4

**concentration**
127:19

**concept**
208:1

**concern**
60:14 87:22

**concerned**
97:22 100:17 126:18 176:7 303:13,14 313:3

**concerns**
176:25 178:25 283:4 299:4 303:17

**conclude**
218:9 245:20

**concluded**
83:5 320:7

**concludes**
102:24 103:2

**conclusion**
66:9 173:2 176:13 238:8

**conclusions**
267:3

**condition**
112:1

**conduct**
107:18 110:12, 13 114:19,21

209:1 286:5 295:24 296:10, 11 299:23 300:10,14

**conduit**
35:6 175:8

**conference**
246:16 309:9, 15,19,22

**confirmed**
149:18

**conflict**
66:22,25

**conflicting**
232:1

**conflicts**
66:13 132:9

**confusing**
8:1 220:1

**congratulate**
108:7

**Congress**
7:6,8

**conjunction**
179:24

**consensual**
202:16 215:24

**consent**
58:1 105:9,11, 14,17 106:1,6, 10 107:23 108:3 109:1,23 110:11 121:4, 10 122:16,18 202:15,20,21 203:2,6,10,24 204:8,18,19,25 205:9,13,14, 19,23,24 206:7,17,21,22 207:6,16,23,25 208:2,5 209:9, 14 210:3,5,9, 14,16 211:4,7 213:22 214:1, 10 215:3 216:9,21 217:1 220:16,18 227:3 228:4 253:17 256:12 260:15

**consented**
224:15

**consenting**
205:5 210:19

**consider**
76:7 263:4,19 271:7 274:6

**considered**
115:10 225:17 282:6 292:19

**considering**
130:18

**consistent**
62:12 64:16 65:18 70:15 110:23 127:11 148:4,5,12,13, 14 203:8 213:9 216:22 217:23 226:17 252:21 253:9 264:25

**consists**
20:8 145:20,22

**construct**
51:8

**constructing**
43:12

**construction**
43:3,16

**consult**
25:8 36:18 139:7 251:24

**consultation**
73:19 310:24

**consulted**
250:17

**consulting**
10:8 39:8

**consumption**
214:13

**contact**
36:6,9 105:6, 12 138:25 182:19 183:16 257:2 265:12 310:16 319:18

**contaminate**
175:25 176:6

**contaminated**
125:4,6

**contents**
141:9

**contested**
197:7

**contests**
118:19

**context**
224:21 292:4

**continue**
5:4 27:22 88:11,19 126:18 272:12 300:2

**continued**
114:23 182:9

**continues**
88:9

**continuing**
261:7 289:17

**contract**
29:9,15 31:1,9 296:4

**contracts**
31:6,8,9,12 32:4,5,7,15

**contradict**
219:22

**contradicted**
184:14 221:4

**contrast**
120:22

**contribute**
43:12

**contributed**
43:16

**control**
175:18

**convened**
141:12

**conversation**
34:20 50:7 83:22 85:11 87:3 139:6,16 142:2,11 143:3 144:9,11 172:5 176:19 251:18 252:2 253:22 254:16 255:5 297:8 298:25 307:19

**conversations**
5:7 35:8 49:1 95:24 127:21 133:25 138:23 139:3 142:4,9 143:6,8 175:6 303:25

**convicted**

181:10

**conviction**
133:6,7

**convincing**
108:14

**Cook**
63:16

**cooperate**
241:12

**cooperated**
241:10

**coordinate**
34:16,19 93:22

**coordinating**
34:22 94:10

**coordinator**
30:19 50:10 81:22 117:22 281:15

**copied**
308:25 309:1,6 310:3 316:7 318:2 319:7

**copies**
249:12 320:8

**copy**
89:12 128:8 129:2,9 144:22 151:12,13,14 167:21 182:24 247:19

**copying**
299:21,22

**corner**
130:14

**correct**
28:24 77:25 80:11,14 85:2 90:8 100:3 104:16 105:2 106:17,19,20 109:2 117:5,10 118:21 119:6, 14 120:11 121:6,11 123:15 130:11 132:4 140:21, 23 141:7 145:8 148:9 149:16 150:9 188:9 190:11 191:14 197:5,9 198:1 199:19 270:23 272:23 277:23, 24 279:5,18 301:18 316:21 317:4 319:1,21

**correcting**
220:12

**correctly**
159:19 204:3

**corroboration**
214:23

**Council**
10:20,24 313:9 314:14

**counsel**
5:22 14:12 33:4 35:17,18, 21,23 36:2 37:3,5 48:17 49:2,3,7,15 72:17 73:19 85:25 86:2 95:25 131:16 132:14 133:9 137:3 138:18 139:9 141:8 142:3 146:1 152:20 157:22 158:1,8,12 164:18 165:7, 11 169:18 171:19 230:7 293:13

**counsel's**
36:16 56:7 70:6 72:15 87:7,8 131:2 132:2 165:14

**Counseling**
82:4

**count**
289:21

**counts**
289:22 290:1 298:11

**couple**
22:24 67:13 68:22 69:5 70:2 85:21 89:4,8 202:2 303:4 308:15 315:20

**course**
37:23 45:2 47:5 62:5 156:14 176:4 230:12 248:19 264:1 272:13

**coursework**
127:7

**court**
5:11,21,24 7:6 8:8 22:15 84:9,18 100:16,19 101:6,12,14 103:6 119:23 128:4 132:23 143:21 152:16 173:25 174:5 177:11

**courts**
100:23

**coverage**
102:15,17,23 141:23 305:10, 12,16,23 307:14 308:19, 25 318:24 319:8,13

**covers**
255:24 279:9

**COVID-19**
278:4

**Cox**
104:1,2,6 107:18 109:5, 14 110:21 111:6,15 114:18 117:14 118:16,19 123:10 130:17 196:20 197:6, 13,22 198:14, 19 204:4 265:18 266:15

**Cox's**
116:19 122:3 207:18 257:9, 15 258:6

**create**
18:3 96:4 111:7 112:20 114:2,11 265:20,25

**created**
110:13 123:23 232:1 299:14 310:23

**creates**
20:25 111:24 112:12 197:20 266:18,21

**credence**
143:7 148:7

**credentials**
147:23

**credible**
213:4 215:8

**credit**
262:24

**crew**
44:22

**crime**
89:25 90:15

**criminal**
89:25 96:7 101:14 106:4, 19 108:11,22 109:4,10 165:9 167:12 176:9 178:8 179:23 238:3 258:9

**criminally**
63:11 95:21 98:24 298:10

**criticized**
308:13

**Crosby**
303:3

**cross-examination**
119:4,8,9 153:10 158:17, 23 159:9

**crowd**
41:4

**curiosity**
13:3

**cut**
310:16

**cuts**
27:11

**D**

**DA**
97:16 99:2,10, 14 102:17 160:17 178:15 180:1 193:12 244:6,8

**DA's**
148:25 152:15 170:17 173:7, 12 185:2

**dad**
8:22

**daily**
135:21,23

**Dalton**
5:15

**Danny**
201:25

**data**
163:7,8,9,10, 13

**date**
54:3 77:20 85:15 91:11 104:9,19 130:19,24 134:9,13 191:18 242:14 295:4 307:16 318:21

**dated**
251:1 262:6 272:1 274:24 277:17 298:2 300:8 310:2 318:24 319:9, 15

**dates**
131:12 143:19

**dating**
52:9

**daughter**
135:25

**Dave**
281:15 284:25

**David**
310:7

**Davis**
202:1 295:1,12 317:9

**Davis's**
316:25

**day**
19:8 86:7 132:10 134:15 135:9,24 136:2 137:16 144:4 179:4 219:19 242:13 299:3 305:17 306:15

**days**
85:22 132:12 134:23 137:19, 20,22 138:1 300:8,24 303:16

**DC**
10:23

**deal**
18:14,18 26:20 54:2 58:23 62:14,18 64:18 76:11 102:4 135:21 136:9, 17 190:15 202:19 276:14 294:13

**dealing**
38:16 75:25 97:24 99:18

187:22

**dealt**
48:4 60:20 63:22 126:23 188:21,22 194:9 284:1

**Dean**
11:2 118:16,18 122:3 123:10 130:17 299:24 311:10

**deans**
28:21

**Dear**
167:18

**deceased**
41:23

**December**
131:12 132:12 298:2 299:15

**decide**
76:8 80:17 82:4 99:1 140:7 142:16 151:7 166:7 186:18 225:25 232:18 246:7,8 252:8,10 253:20 254:4, 10 300:12

**decided**
88:23 121:17 143:9,11 231:23 234:22 245:23 261:24 262:20 263:2

**decides**
83:18 84:2,3 99:2 137:8

**deciding**
73:12

**decision**
25:8 27:15,23 36:22,23,25 50:6 61:22 73:11 74:10 76:8 78:21,22 84:23 97:16 111:16 120:3 129:3 132:24 137:5 140:5,13 143:15 144:2, 25 145:11 146:12,16 148:20 149:10 150:20,21 151:4,9 154:15,16 155:19,24,25 156:2,7,17 158:18 159:8 160:5,12 161:2 166:14 171:16 174:24 175:12 179:13 180:14, 22 182:12 185:20 186:11 189:5,21 191:16 196:14 203:4 206:10 207:8 212:10 225:12 229:6 233:20,21 238:12,14,18, 20,23 243:2,8, 24 244:1,3,12, 20 245:18 246:21 251:23 252:15 254:3, 5,14 256:10 257:13 260:25 261:11 262:5, 15 264:1 268:23 269:5 307:22,24 308:5 309:17 310:21 311:21, 22 312:3

**decision-making**
26:14 34:23 35:9 155:15 225:24

**decisions**
27:20 28:9,16 30:21 34:20 48:1 65:10 88:13 100:22 111:14 120:19 161:5

**decisive**
140:9

**declined**
171:19

**deeply**
222:12

**defendant**
105:10,12 210:9 218:3

**defendant's**
157:22 211:5 234:21

**defending**
100:16

**defense**
158:9 160:10, 17 176:3,8 185:24 186:1,2 220:17

**defenses**
102:11

**define**
243:10

**defined**
106:22 109:8 256:15

**definitely**
96:18 135:17 136:14 138:18 140:7 174:21 274:13 287:7 300:13 309:12

**definition**
106:24 207:20 208:10 235:20 236:4 257:4

**definitions**
52:8 206:25 299:12

**definitive**
164:25 217:12 226:16

**definitively**
186:24

**degree**
104:13 105:6, 8,16,25 107:17,20 108:1 120:15, 22,25 121:3 122:22 124:23 126:7 130:9 203:23 204:1, 7,9 205:11,17, 22,23 206:23, 24 207:21 209:4,5,6,12, 21,23

**delay**
95:1

**delayed**
14:20 245:8

**delaying**
245:9

**delete**
15:19 16:3,14 23:16

**deleted**
261:5

**deli**
286:22 288:16 296:9 316:18

**denial**
84:10 131:24 260:10

**department**
11:15 26:21 30:22 39:6 42:2,25 43:20, 24 44:24 65:12 84:15,19 88:5, 13 93:20 102:10 139:1 270:1 271:17 277:5,8 278:5, 24

**Department's**
43:11 93:23 94:1

**depend**
32:10

**depending**
46:3 88:6 134:1 161:16 202:5

**depends**
25:23 61:18 73:24 74:1 170:18 292:3 307:25

**depicted**
106:6,9

**deposed**
6:20,22 7:13

**deposition**
8:7 14:7 153:6 293:17 320:6

**depression**
127:3,18 252:7

**deprive**
277:10

**deputy**
11:8 48:17 49:3,6 142:5

**describe**
159:3 280:15, 18 301:23 316:10

**described**
45:1 156:21 201:19 213:8 261:4 280:13

**describes**
281:3 302:19

**description**
53:4 157:22 159:4 299:8

**descriptions**
200:24

**deserved**
292:5

**deserves**
275:5

**design**
83:24

**designated**
139:1

**designed**
65:18

**desires**
275:6

**detail**
53:22 76:17 127:16 230:2 251:21 254:17 286:18

**details**
100:13 101:25 145:13 171:5

**determination**
111:6 130:7 166:12 203:16 204:13 226:5 228:4

**determinations**
291:11

**determine**
107:21 161:15 217:15

**determining**
130:19 177:5 290:17

**device**
17:13

**Diana**
67:25

**difference**
13:11 22:7 75:4,8 108:8 253:1,2 304:21

**different**
7:10 8:23 13:12,15 22:2 31:7 41:9 42:19 46:1 50:7 55:16 57:9 58:20 74:2 76:16 94:5 130:12 141:15 146:4 148:17 156:5,6 161:17,18 162:1 183:8 187:15 194:12 199:22 209:18 218:4 226:23 240:21 257:16 270:17,21 282:2 284:7

**differently**
111:21 264:20

**differs**
76:20

**difficult**
8:7 173:6 218:12

**difficulties**
127:4

**difficulty**
149:8 196:3

**dining**
296:6

**dinner**
19:17 162:24

**direct**
37:20 48:14 119:8 159:2 176:19 242:3 303:24

**directed**
242:6 258:18 303:9

**direction**
18:13 183:2

**directly**
34:1 37:19 50:22 83:11 94:12 138:7 172:18 273:8

**director**
29:18,21,22 30:3,23,25 37:17,18,21 38:10,11,12 43:22 277:22 295:24

**directors**
39:9

**disagree**
266:9,13

**disappointing**
237:24

**disciplinary**
48:1 55:3,22 61:22 65:9 70:19 82:19 84:22 96:3,14 117:18 151:8 175:17 228:15 233:21 239:24 240:10,12,22 280:7 286:19 289:14 290:16 291:13 297:16 299:22 300:20

**disciplinary's**
84:21

**discipline**
55:13 56:3,16 67:2 69:17 74:21 75:6,10 76:25 77:4 79:3,17 82:22 84:3 88:8 104:22 190:20 296:22

**disciplined**
84:8 181:11

**disclosed**
14:17

**discomfort**
126:11

**discovery**
14:10 51:20 247:22 305:7

**discretionary**
27:18,19

**discrimination**
52:8

**discuss**
73:17

**discussed**
121:2 163:13 173:4 200:18 226:4 254:22

**discusses**
167:22

**discussing**
27:11 73:22,23 142:12 214:9 224:19 254:1, 19,24 261:13

**discussion**
96:6 133:3 214:14 215:20 259:3 261:14

**disfavor**
229:14

**dismiss**
235:17 268:1 290:25

**dismissal**
206:1 207:8 235:17

**dismissed**
204:14 205:3,8 214:11 267:25

**dismisses**
236:17

**Dismissing**
125:18

**disorderly**
286:5 296:10, 11

**dispose**
15:19

**disruption**
280:8

**distinction**
75:9 205:16

**distinguish**
253:3

**distinguishing**
75:15

**distributes**
32:11

**district**
5:11 95:21 96:17 169:19, 24

**Diversity**
33:8 311:12

**Division**
22:6,11 104:8

**doctor**
165:19

**document**
22:19,25 23:3 72:17 103:13 104:11 110:8 116:23 122:1 155:25 156:1 157:23 158:16 161:23 260:12 275:15,16,21 298:13,15,21, 24 310:19 316:16

**documentation**
68:11 316:17

**documents**
14:8,16 15:20 16:7 23:4,7 42:23 48:18 49:12,19 68:17 136:10,19 138:7,15 139:8,19 201:20 272:19

305:6 317:7

**Doe**
5:9

**Doherty**
314:1,2

**doing**
18:14,20 21:3 23:21 25:20 50:16 60:13 98:11 99:8 100:23 101:11 125:19 142:20, 21 144:15 149:8 180:19, 23 189:2 231:15 256:1 285:2,9,24 287:10

**dollars**
30:2,9

**donated**
269:23 270:2

**donating**
269:22

**donation**
43:12,14 270:10,11,25 271:4,25

**donations**
21:9,19,20,22 33:19

**donor**
41:4 42:13 43:3 267:18,23 268:8 269:19 271:1,20 273:11,13,14, 15,17,20,24 274:1,4,6,7, 13,14

**donors**
20:1 40:15 41:9,16,18 45:22 46:8,15 271:8,11,12 304:17,19,20, 21,22 314:3

**Doritos**
287:10,19,23 288:10 290:23 291:16,25 296:1

**dorms**
114:2 202:7

**double-check**
16:19 187:12 259:19 306:6 315:5

**doubt**
94:22 108:19, 22 187:21 223:16

**downturns**
101:16

**dozen**
309:9

**draft**
36:24 48:19 49:8 50:3 93:17 197:21, 24 198:3,13 249:8 275:17 319:18

**drafted**
35:16 51:23 237:21

**drafting**
143:13

**drafts**
35:15 249:12

**Drew**
312:11

**drink**
190:17

**Drive**
5:13,17

**driver**
20:16 21:22

**drivers**
20:13

**drop**
101:15 278:3

**Dropbox**
138:8

**dropped**
100:11 101:24

**drops**
21:20

**drunk**
161:3,16 200:12,14 202:3,22 213:13 223:1,2

**dual**
208:2

**due**
132:10 214:10

**duly**
6:6

**duration**
124:1

**duties**
17:25

**duty**
18:3

**E**

**earlier**
11:13 37:18 56:19 67:14 108:10 121:23 123:14 136:25 157:7 160:25 162:14,22 170:14 173:4 174:16 177:10 222:25 232:3 261:13,14 262:23 277:4 290:24 308:2, 21,22

**early**
93:7 95:19 132:13 134:8

**easier**
146:17 208:24 227:18 229:4

**economic**
10:8,20,25 11:7

**economics**
10:6,10

**economist**
10:19

**edit**
48:21 72:17

**edited**
98:16 163:21

**editing**
35:10 36:25

**editor**
310:6

**edits**
35:13,14 72:18 73:6,9,10

**education**
19:9 33:6 60:24 65:12 84:15,20 124:1 125:22 263:4 269:25 277:5,9

**educational**
114:25 115:5 116:3 126:17 261:8 265:21, 25 266:18,21 284:1

**effect**
21:11,15,21 65:4 183:19 245:25 246:4 289:8

**effective**
86:21 91:11,12 208:18

**effectively**
262:19

**effects**
97:19 127:15, 25 261:7,15 287:4

**efficient**
211:15

**effort**
17:10

**efforts**
131:1 132:1

**eight**
10:22 41:22 75:23 77:8,19, 22,23 79:9,23, 24 80:15,17

**either**
8:1 19:6 54:25 59:24 61:10 70:20 74:6,25 77:18 85:24 90:2,15,22 95:19 98:25 116:13,22 144:2 168:2 181:22 182:11, 15 183:16 184:8,11,12 185:4 193:16 206:13 211:24 225:22 233:22 234:16 236:10 239:9 245:9 252:25 285:2, 20 300:19 304:15

**Electronically**
23:7

**element**
178:7

**elicited**
106:14

**eliciting**
260:13

**eligible**
90:5,6 91:6 301:9

**else's**
172:15

**email**
17:23 42:25 132:6 135:12 167:5,8,18 168:22 247:16 248:8,14,24,25 282:25 283:2 294:4,9,22 300:7,24 301:22,23,24 302:4,5,7,11, 13 304:3,12 305:7 306:15, 17 307:9 310:14 314:10 316:8,12,24 317:10,20 318:2,3,18,19, 23 319:5,6,8, 13,15

**emailed**
299:4 308:2 314:19

**Emailers**
314:16

**emails**
14:9,13 15:4, 19 16:3,6 17:21 18:17 23:4 26:1 247:17,20 302:12 306:1

**emerged**
170:15

**emphasize**
61:5

**employed**
30:19

**employee**
28:23 29:1,3, 17 52:12 286:23 288:2,7 293:3,7

**employees**
31:7,15,20 34:5,7 54:22 283:10

**encompasses**
24:10

**encounter**
202:16 218:9

**encouraging**
268:8

**end**
67:7,19 118:4 145:9 162:25 211:17 216:16 219:19 262:9, 17 267:10 299:5,20 320:5

**ended**
9:18 132:16 170:6 299:17

**endowment**
271:3

**ends**
84:25

**energy**
274:8

**engage**
50:7,19 186:15

**engaged**
50:21 56:9 107:22 109:22 122:14 190:13 287:8 297:6

**engagement**
49:22

**engagements**
19:5

**engaging**
75:12 108:25 109:17,20 110:10 213:24 215:24

**Engram**
30:15

**Enjoy**
320:2

**enjoys**
271:22

**entails**
38:16

**entering**
202:6

**enterprise**
28:18

**entire**
28:18 49:13,16 50:18 54:9 71:19 158:8 173:5 177:6 179:19 182:2 262:13,22 278:12

**entirely**
32:23 84:6 121:19 135:24 255:10 289:15

**entirety**
141:5 164:1

**entitled**
318:19 319:13

**environment**
110:15 111:8, 25 112:12,21 114:3,12,22 121:25 122:21 123:23,25 124:14 125:4 258:1,5 261:8 265:21 266:1, 18,22 267:5

**equally**
32:11

**equitably**
101:2

**equivalent**
31:18

**errors**
129:23

**Ervin**
104:1

**ESI**
23:6

**essence**
275:2

**essentially**
13:14 170:8 235:18 236:17

**establish**
210:16 211:4,6

**established**
189:22 242:19

**estimate**
15:2 71:4 278:12

**estimation**
269:19,20

**et al**
5:10

**evaluate**
210:12

**evaluating**
107:18

**evening**
47:8 154:9,22 213:7,13,16 223:10

**event**
19:16 96:5 98:3 122:12,13 222:23 226:15 303:15

**events**
18:16 19:9 20:4 38:13,14 45:15 47:8 62:9 98:3 154:3

**eventually**
260:10

**Evers**
313:24,25

**everybody**
308:11

**everyone**
18:17 33:25 53:7 101:18

196:21 246:13
268:22 269:3

**evidence**
65:6 66:10
68:19 76:24
78:23 79:15
108:9,12,14
115:12,13
116:7,13,18,
21,22 117:2,6,
8 124:24
129:20 130:1
139:13 140:8,
11,15 142:14
145:23 146:5,
21,22 147:1,4,
11 148:5
150:25 151:7
159:3 161:3
162:11 164:2
165:20 169:2
171:7,8 175:22
176:4,22
177:2,3,7,13,
25 179:3,14,18
180:7,9,10,15
182:9,11,12
183:22,25
184:9,14,19,23
185:4,11,14
186:10,19,23,
25 187:2,3,17
188:5,24,25
189:3,20,23
190:8,14,18
191:6 192:9,21
193:5,9,14,25
195:5,22,24
196:23 197:1,
3,18 199:2,6,
10 200:11
201:3,9 203:8,
12 206:15
210:2,6,7,10,
12,22,24,25

211:2 213:5
214:12,25
215:9,22,25
216:19 217:7,
8,11,17,19
218:1,13,16
219:3,5,11,20
220:7,20,23
221:6,10,14,
17,19,22
222:4,10
223:22 226:16,
17,18,19,21
227:9,18
232:15,19,21,
22 234:8,10,
13,18,19,22
235:6,8,15,19,
24 236:5,12
237:1,2,6
238:20,22
239:6,8,9,11,
16 245:14,18
246:8,9 259:4,
13,17 260:2
264:17 268:24
269:4 289:16
292:15

**evidentiary**
238:7

**evidentiary-wise**
189:25

**ex**
33:7

**exact**
86:7 134:9

**exactly**
15:21 29:11
53:7 62:21
64:8 78:20
86:15 129:22
142:2,10
153:17 158:1

161:15 162:2
189:15 200:12
235:13 260:5
275:11 283:24
286:11 289:2
293:21 303:24

**exam**
153:1 297:23
298:7 299:2,3,
6,11,18

**EXAMINATION**
6:8

**examined**
6:7 107:20

**exams**
153:4

**excellent**
20:2,10 105:20

**excepting**
196:12,13

**exceptions**
39:22

**excerpt**
153:9,15,19
159:8

**excerpted**
153:12

**excerpts**
159:17

**exchange**
155:1 222:18
276:4

**excitement**
21:1

**exclude**
189:6

**excluding**
125:17

**exclusively**

39:2

**executive**
18:8 19:1
32:20,24 35:21
143:4 311:6

**exhaust**
303:6

**exhibit**
22:15,16
51:14,15 89:2
91:9 103:7,9
119:21,24
128:2,23,25
143:22 157:16
166:23 167:3,5
207:19 208:14
212:23 248:21,
22 249:24
250:21 270:6
272:16 275:13
277:14 280:22
282:21 286:12
292:21 294:2
297:25 298:19
300:7 301:20
304:1 305:3
306:13 307:7
308:16,18
309:25 310:11
316:4,11

**exhibits**
315:21,24
320:8

**existed**
16:16

**existing**
43:13 66:2
78:23

**exonerated**
264:19

**expect**
14:12 49:14

57:5 58:2,4 62:20 65:14 86:20 93:15 143:4 244:8

**expectation**
106:8 133:5

**expected**
11:21 46:7 98:16 133:1,17

**expecting**
92:11

**expel**
112:13 113:19 265:10

**expelled**
90:3,11 91:1,5 102:24 104:19 115:11 126:24 145:4,6 190:8 257:6 262:5 290:19

**experience**
66:12 114:25 115:6 116:3 125:5,11 218:21 284:16, 25

**experiences**
63:10

**expert**
147:24 148:11 149:18 165:22 169:21 171:11

**expertise**
55:20

**experts**
149:1 171:13

**explain**
224:21 255:20 264:3

**explained**
281:16

**explanation**
155:7 295:5

**explicitly**
124:24 156:16 247:11

**express**
126:12

**expressed**
273:4

**expulsion**
90:6,16,23 104:18 115:14 186:19 253:10 265:16 266:11 289:17 318:19

**extended**
159:4 283:21

**extension**
8:23,24 9:25

**extensive**
49:22 52:18 64:12 102:23 175:24

**extensively**
159:13,18 171:8

**extent**
8:11 16:25 17:11 95:13 113:18 206:6

**external**
59:25 60:21 62:8 92:6,19, 25 138:20 215:25 217:8

**extra**
296:24

**extremely**
110:16 111:9 113:3,5

**eyes**
137:12 200:9 213:17 217:20

**F**

**faces**
41:3

**facilities**
88:20

**facing**
278:2

**fact**
22:23 61:6 87:3 100:18 102:5 124:23 127:10 150:15 155:13 196:12 199:12 214:9 217:5 220:22 229:1,3 240:6 241:24 242:7 247:18 262:3 301:4

**factors**
207:7,10

**facts**
73:23 74:1,8 80:18 170:19

**faculty**
12:1 40:20 55:10 312:6

**failed**
241:25 299:18

**fair**
70:25 115:19 157:22 192:11 269:19,20

**fall**
15:24 21:6 81:18 298:9

**falls**
187:10 232:19 237:1

**familiar**
15:22 22:9 63:25 84:7,11, 17 97:10 134:11 169:9 170:20 250:3 268:9 270:10 275:15,16 284:18

**familiarity**
56:5

**family**
41:24 170:7

**far**
16:24 45:5 49:21 76:4 124:15 171:17 246:13 297:6

**fast**
252:14

**fast-track**
275:7

**father**
9:22

**favor**
229:11 235:19

**fear**
124:18

**federal**
50:14 64:6,10, 11,17 65:2,5, 15,19 66:2,11, 13,15 67:1 74:7,10 85:7 276:2,5,8,12,

15,18 277:10

**feedback**
310:18

**feel**
110:15,18 111:8 143:9 173:13 178:10 252:24 261:16 264:12 281:13

**feeling**
121:25 126:8 222:8 252:19

**feels**
283:6

**feet**
136:11

**fell**
232:15

**fellow**
110:13

**felt**
95:2 124:13 129:16 140:9 176:7 220:16 269:1 303:21 314:20

**female**
290:8

**Fetzer**
41:23

**field**
42:10,11,12,17 271:16

**fifth**
9:10,16

**fight**
80:12 179:4

**fighting**
190:13

**fights**
75:12

**figure**
136:12 186:20, 22,24

**file**
84:9,14 85:17 179:2 277:4

**filed**
5:10 35:5 130:16 134:10, 13,14 135:10 243:12,13 244:10 246:23 305:18

**filing**
84:19 246:13 306:15,16

**filter**
119:16,17

**filtered**
119:12 184:10 185:17,23

**final**
26:14 27:19 28:1,10,12,15 40:2 84:10 169:3 197:12, 17 198:2,20 238:9 262:16 275:17

**finally**
292:13

**finance**
26:9 27:5 28:14 32:25 138:24 311:4

**financial**
276:5 277:10, 22

**financially**
5:19 21:24

**find**
13:19 62:4 83:5 109:9 123:8 159:10 183:22 185:3 197:18 213:1 217:7 232:6,9 235:16 236:14, 16,19 237:2,4, 14,15 257:19, 21 279:22 283:7,11,13 289:19,22 290:15 291:21 292:5

**finding**
74:9,13 78:11 80:19,24 84:4 90:16 91:5 105:5 110:19 115:24 116:19 118:17,19 123:19 130:2 177:7 181:6, 19,23 197:6 203:17 213:2 214:18 215:8, 10 216:6 219:23 226:6 232:16,25 233:4,14 234:3,6,9,12, 24 235:9,14,21 236:9,12 239:7,20 240:25 256:2 266:16 294:21 295:3

**findings**
55:7,8 74:25 82:18 107:9 122:8 123:12 129:20 196:20 197:22 198:19, 21 214:4 228:15 257:15 260:17,18 281:23 291:3 295:2 297:16

**finds**
213:3 217:14 265:3

**fine**
13:6 54:13 72:19 102:9 128:15 250:14 294:15 295:19 315:2,16

**finish**
7:23 8:13 66:24 224:4 264:2 315:12

**finished**
133:24

**finishing**
10:16

**firm**
10:8 269:8

**firmly**
174:20

**first**
6:6 7:13 9:14 11:10 14:14 15:13 39:13,14 54:18 59:15 66:7 67:5 75:18 77:4 78:7 81:14 82:1 85:13 93:8 99:9 105:4 107:10 109:16 124:12 131:5,7 132:21 135:6 143:21

158:4,11
170:15 173:4
177:18 178:5
188:16 209:4
233:24 237:23
240:14 247:18
255:11 272:20
275:24 277:20
279:16 280:6,
16 283:16
284:8 288:14
298:17 300:10,
18 306:19
310:16

**firsthand**
241:19,20

**fiscal**
278:4

**fit**
7:18

**fits**
85:6

**five**
7:5 8:19 9:7,
11 40:4 41:2
67:5 70:8,9
117:25 137:22
162:16 165:1
187:5 211:13
271:12,14
315:10

**flag-worthy**
73:8

**flashbacks**
127:5

**flied**
144:1

**flip**
22:24 53:15
208:20 209:11

**flirting**

206:9

**floats**
42:9

**Flora**
36:9

**Floyd**
313:6

**fly**
135:6,8

**flying**
134:15

**focus**
79:10 115:16
126:23 127:7,
19 202:18
203:17

**focused**
149:11 203:5

**folder**
136:16,22

**folks**
102:9 225:3
273:8 308:6
311:23 314:9

**follow**
21:6 62:21
65:12,15 75:13
84:16 285:1
294:20 299:10

**follow-up**
18:1 59:18
67:13 139:16

**followed**
12:6 66:9 74:6
300:14

**following**
60:15 65:17
94:21 104:21
154:3 242:8
254:6 260:9

298:25 302:25

**follows**
6:7 66:10
300:7

**footage**
164:12 202:10

**football**
20:11,15,23,24
21:23 22:4,12,
13 29:6 30:8,
22 32:3,16
37:15,25 38:5,
19 39:10 40:2,
7 43:22,25
44:4 45:1,3,4,
9,16,22 46:10
47:3,5,11,12,
14,15,17 58:20
86:12 93:20
96:10,16
102:14 248:12
250:5,9 263:21
271:16,21,22
278:8,10,13
279:2,4,7,10,
11,12 283:6,13
296:20

**football-related**
37:17

**forced**
100:21

**Ford**
5:25 11:3
178:19 315:13,
20 320:1

**forgive**
79:23 96:25

**form**
19:3,12 23:8
88:10 111:11
115:7 116:4
117:20 122:23

125:23 126:10
155:21 156:11
164:22 179:5,
20 182:5 185:7
189:9 190:24
192:13 194:3,
21 195:8 196:1
198:15 204:15
205:21 207:2
209:24 211:9
214:7 220:1
227:5 233:5
235:1,11
236:23 241:8
253:11 256:21
258:25 260:20
264:13 275:17
285:6,15 287:1
288:4,24
291:12 292:10
301:25

**formal**
94:25 95:11
282:3 283:17
300:9

**formally**
62:13

**forms**
126:11 207:12

**forth**
48:23 94:11
154:2,24 172:6
222:5

**fortunate**
19:25

**forward**
63:9 79:16
85:18 86:20
95:3,9 100:18
134:1 140:15
154:21 196:21
234:10 247:20,
21 258:2 273:5

285:1,20,24 289:17

**forwarded**
249:5 273:7

**forwarding**
248:25 304:4

**forwards**
316:25

**found**
74:24 82:25 90:2,4,14,19, 21 104:11 105:4 106:18, 21 108:24 111:15 112:14 113:19 117:14 118:18 120:20, 23 122:9 123:13 124:8 125:10 130:8 133:18 181:10 202:14 218:8 219:16 221:5, 16 232:25 235:9 245:11 247:20 255:18 256:6,16,18 257:8 258:7,22 259:5 263:9 264:5,16,23 266:5,16,23 267:4 290:1,3, 7,13 297:14 299:12

**foundation**
33:6,9,10,11, 12,20,24 112:23 113:7 114:4,13 116:5 125:24 126:20 131:17 149:22 150:7 156:24 157:11 161:22 164:7 168:14 179:6 184:20 189:8 195:9 198:6,16 204:16 205:21 207:3 209:25 211:8 214:6 217:3 218:23 219:25 226:7 227:4 228:5,22 229:20 235:2, 12 245:1 251:7,14 256:20 265:8, 13 266:2,19 283:14 284:12 285:5,14 286:25 288:25 289:24 291:19 292:2 301:10 304:9,10 312:8 316:7 317:24 318:15 319:3, 11

**four**
11:22 48:9 65:21 70:15 132:12 164:25 187:5 297:15 300:23

**four-year**
24:10

**fourth**
22:19

**frame**
174:2 272:8

**frequency**
58:13

**frequently**
37:15 38:9 98:25

**freshman**
281:21 284:2

**freshmen**
281:2

**Friday**
143:13

**friend**
42:13 200:8 253:17 256:1 258:18 260:14 287:9

**friends**
42:14 222:6 308:8,9

**frivolous**
253:12,13

**front**
6:13 7:6,8 35:24 72:10 103:3 122:2 151:6 184:1 207:18 231:17 291:14

**fucking**
287:20

**full**
11:12 84:2 86:16 104:24 157:17 162:20 164:14 165:15 180:6 216:19 229:1,15 231:4 237:23 299:21

**fully**
178:6 179:9,12 181:21 218:19

**fun**
44:16

**function**
27:25 37:9

**functioning**
202:7

**functions**
37:12 38:1,5, 21 62:19

**fund**
27:15

**funding**
27:22 38:25

**fundraising**
33:15,18 38:13 270:12

**future**
112:4 257:23 294:16

**G**

**game**
39:25 40:7 41:7 44:17,19 45:22,24 46:2, 4 246:2

**games**
38:3 39:20,21, 24 40:1,2,5,6 42:5,7 44:16 45:3,5,9 46:10

**Gary**
312:13,14

**gather**
298:6

**gave**
62:22 128:12 140:7 150:22 162:12 192:18 219:8 229:2 247:19 257:5 270:17 282:4 298:2 300:6

**general**
33:4 35:21,22

36:2,16 37:5 48:17 49:2,3, 6,14 56:6 60:14 70:6 72:15 73:19 85:24 86:1 87:7,8 95:25 127:3 137:3 138:18 139:9 141:8 142:3 152:20 173:22 230:7 306:1

**generally**
14:14 53:21 86:9 98:20,21 112:19 113:10 126:14 129:6 199:12 200:20

**generate**
21:9 93:15

**generates**
21:18

**generator**
22:1,5,8

**generic**
99:9

**George**
10:20 41:21

**Gerald**
11:2

**getting**
20:21 61:23 103:2 130:24 133:3 141:24 147:3 152:18 244:19 248:4 249:12 279:16 296:20

**gift**
270:14,17 272:14

**gifts**
270:22,24

**gig**
11:2

**give**
17:24 18:24 28:2 55:25 57:15 65:8 85:15 89:6 97:4 105:17 128:11,22 139:11 143:6, 18 148:7 164:24 165:16 167:2 171:6 172:21 176:22 189:7 190:9 195:5,24 202:15 210:9, 14,16 211:4 215:3 217:6 219:10 229:1 231:3 241:6 243:18 247:25 264:2,19 274:9 285:3 290:20 315:9

**given**
44:15 49:11 71:12 94:21 115:11 135:8 140:6 141:22 151:5 178:16 206:16 212:11 219:20 244:18 245:19 250:10 268:17 270:10, 15 274:17 297:11 299:17 317:3

**giving**
21:16 105:9, 11,14 139:9 207:14 209:9, 14 249:21 295:19

**goes**
28:3,7 52:5,7 55:9 76:12 101:18 102:18 109:9 119:9 145:15 198:14 226:21 302:3

**going**
6:11 17:5 18:4 22:14 25:22 27:16 39:4 50:19 53:15 57:19 59:22 60:7 61:13,20 66:21 67:23 69:9 72:3,18 73:5 81:10 82:10 85:17 86:16 88:8 91:8 95:15,21 96:25 97:14,23 99:3,20 102:15 103:7 117:25 119:23 124:22 128:4 133:14 134:16,17 135:17 136:8, 12 141:19 142:12,15 143:10 144:8, 14,19 152:8, 12,13,23 154:24 157:14 160:5 162:19 167:2 171:1,5 172:19 174:14, 19,23 176:22 178:11 179:10 180:9 181:1,22 182:12 194:9 195:17 197:16 202:7 204:21 205:20 206:8 211:11 214:13 229:18 241:13 243:22,23,24 244:6,23 245:10,13,24 246:7 249:13, 16,19 251:3,6, 10 253:15 254:14 255:25 264:15 267:24 268:23 276:16 278:16,17,21 279:20 285:20, 24 291:10 300:1 305:10 308:8,10,13 309:15,16,20 310:14 311:21 315:19,23 316:2 317:23

**good**
20:16 22:12 24:24 47:19 67:4 89:13 117:25 118:2, 25 137:25 153:12 158:8, 21 189:1 287:15 288:9, 10

**Google**
303:6

**Googling**
317:14

**gotta**
312:19 313:1

**governed**
76:3 246:14

**governing**
24:3 62:7

**government**

33:2 50:14 74:7 276:2,6

**governor**
313:23

**governor's**
313:17,18,19

**grade**
9:10,16

**graduate**
10:16 33:6

**graduates**
101:18

**grant**
276:15,19 277:2

**granted**
76:9 80:3

**grants**
276:11

**graphic**
307:1

**great**
18:14,18 26:20 58:23 67:20 134:21 135:16 190:15 202:19 275:4 286:18

**greater**
74:19,21 143:7 161:11

**groped**
57:22

**Gross**
272:25 273:11, 18

**ground**
136:11

**group**
8:25 18:12 19:4 33:7,23 39:6,8,10 68:21,24 79:1 271:10 313:10

**groups**
9:2 40:22 46:2 201:23

**growing**
9:18

**guarantee**
57:8

**guess**
22:7 29:20 34:5 48:8,9 54:22 70:8 71:2,7 87:1,6 91:25 94:11 95:18 102:20, 22 103:23 142:9 152:16 164:25 233:11 250:11 252:25 267:20 279:12 309:6 313:24

**guessing**
109:24 252:14

**guidance**
56:7

**guidances**
65:11 67:1

**guidelines**
64:11,17 65:2, 5,15,19 66:14, 15

**guilty**
90:2,21 106:21 112:14 113:19 124:8 133:18 181:10 234:7 245:11 257:22 259:5 266:23 267:4 290:1,3, 13

**guy**
282:1

**H**

**H.W.**
10:21

**half**
52:7 137:20 174:20

**halfway**
145:18 201:25

**hall**
5:13 43:1,5,7, 13,20 44:5 270:18,25 295:13 296:6

**hallway**
187:8 287:16

**Hamel**
41:21

**hand**
22:14 103:7 119:23 128:4 143:20 180:5 289:14,18

**handed**
23:19 128:13, 16 158:16 208:16 270:8 272:18 277:16 294:4 314:6 319:7

**handle**
62:25 64:8 306:23

**handled**
81:18

**handles**
83:13 92:5 306:24

**handling**
65:2,3 242:11

**hands**
242:11 249:9

**handwriting**
251:4,13

**happen**
84:17 93:14 97:17,23 98:24 221:18,20 256:1 257:23 278:12 283:13

**happened**
25:13,15,16 49:25 68:12 84:11 96:12 101:24 108:14 117:12 121:21 137:14 138:4 155:1 159:14 165:16 186:21, 24 216:15 221:23 225:6 227:12 234:16 238:19 244:24 259:25 260:5 264:9 275:11 285:9 286:11

**happening**
35:8 53:25 58:14 62:23 87:20 96:1 297:8 305:25

**happy**
162:21 177:9 179:8 180:4 225:13 241:13 308:3,11

**harassing**
290:8

**harassment**
71:8,10 74:14 77:10 78:7 83:6 104:15 106:20,22 109:13,15 117:18 120:22 121:14,18 122:5,10 123:7,18 130:10 208:17 209:1 253:11 255:21 256:4, 6,14 257:3,5, 8,22 258:23 259:7 261:13, 15 263:5,8,10 280:8,12,16,24 281:11,16,22 282:6 284:8 289:20,21 290:2,3,14,16, 18,21 296:7 297:14

**hard**
57:18 173:16 224:20

**harder**
61:16 161:15

**harm**
125:16 286:23

**hashtag**
307:2

**Hasselbacher**
50:11 51:24 117:7 139:6 196:19 197:20 198:4 250:18

**hat**
68:25

**Hawaii**
134:18,22
135:9,16 136:11 168:8

**head**
13:14 33:6,9, 23 36:3 37:16 38:4 42:1 59:24 75:22 77:13 92:13 200:9 255:25 307:10 312:5, 17 313:7

**headings**
120:13

**headphones**
287:18

**headquarters**
43:11

**heads**
249:6

**heads-up**
248:2 249:21

**health**
34:24 82:3 101:16 121:23 125:21 126:11 127:6,15,22

**healthcare**
127:21

**hear**
21:7 85:13 132:21 143:5 173:19 199:1,4 246:17 247:3,7 248:12 251:25 268:7 309:13

**heard**
80:22,23 85:21,22,24 133:9 146:5 219:4 227:13 234:2 247:1,4 267:17,23 297:1 309:12, 14 314:11

**hearing**
49:14 54:3,10 55:9,11 56:16 60:6 61:14 64:21 65:9 69:23 70:11 79:1 82:19 90:20 95:16 103:4 104:22, 25 110:19,21 117:5 118:13, 20 119:3,10 120:3 121:17 122:7 123:6 130:7,20 131:10,12,13 132:10 140:15 163:8 176:5 178:17 180:3 185:12,18 194:7 196:7 198:23 199:1,7 201:6 203:21 204:14 205:3 213:2,3,9,11, 19 214:4 215:8,11 216:6,13,18 217:14 218:7 219:2,16,22 220:7,20,24 221:5,16 227:9,13 228:11,16 229:3,7 231:16 238:7 239:18 241:21 246:20, 24 248:4 256:19 257:10, 13 259:10 265:18 298:18 300:13,19 301:5,14 309:10

**hearings**
99:24 119:19 132:7 194:18 212:15

**heart**
220:17

**heightened**
58:16

**held**
5:12 32:7 41:22 63:7 133:25 194:18 309:9

**help**
7:15 36:21 52:16 57:4 230:4 309:20 312:19

**helped**
154:22 170:8 186:11 227:2 228:3

**helpful**
8:14 9:21 154:14 172:8 173:19 224:12, 24 225:8,9,10, 11,23 226:5

**helps**
34:16 225:24

**hesitation**
225:3

**Hey**
183:17

**hierarchy**
53:5,8

**high**
30:12 31:23,24

73:3 86:24 91:18 254:9

**higher**
19:9 58:17 59:7,19 61:7, 9,25 63:1 108:17 288:15 290:19

**highest**
28:23 29:1,3, 17 63:18,21

**highly**
19:5 54:8 290:22 291:1

**Hilton**
12:6

**hire**
30:24 31:17

**hired**
10:17 13:7

**historical**
47:23

**history**
10:12 130:24 240:10,22 269:21 280:7, 10 290:17 297:16

**hit**
58:9 87:4

**hits**
42:24

**Hmm**
7:5

**hockey**
44:17

**hold**
15:16 20:6 32:7 70:23 137:17 181:2 224:4 244:21

**holding**
309:14

**holiday**
132:11

**Holland**
274:3

**home**
39:20,21 45:3, 5,8

**homecoming**
271:25

**homemaker**
8:22

**honestly**
17:1 101:23 169:7 260:1

**hope**
59:2,6 296:23 300:1

**Hoslet**
92:20 94:8 138:21 141:14, 18,25 142:8,17 175:7

**hospital**
160:22 161:21

**hostage**
63:7

**hostile**
110:14 111:7, 24 112:12,21 114:3,12 121:25 122:21 123:22,25 124:13 258:1 261:6 265:20, 25 266:18,21 267:5

**hostility**
124:20

**hour**
7:14,18 14:21 52:7 54:19 118:1 226:13

**hours**
14:18,19 15:1 162:20

**house**
19:17,23

**housed**
43:20 44:4

**housing**
296:4,5

**Houston**
5:18

**human**
156:15

**husband**
134:17,21 135:25

**hypothetical**
112:6 113:4 264:5,16

**I**

**idea**
18:24 91:21 115:3,23 116:1 146:10 249:16 255:13 262:14

**ideas**
27:6 127:17

**identical**
237:7 299:12 303:7

**identification**
22:16 51:15 89:2 103:9 119:21 128:2, 25 143:22 157:16 166:23 167:3 208:14 248:22 249:24 250:21 270:6 272:16 275:13 277:14 280:22 282:21 286:12 292:21 294:2 297:25 298:19 301:20 304:1 305:3 306:13 307:7 308:16 309:25 310:11

**identified**
82:13 123:9 299:7

**identify**
145:15 157:19 316:4

**identifying**
319:19

**ignore**
248:9 252:15

**ill-founded**
180:25

**illuminating**
221:25

**illumination**
221:21

**imagine**
57:21 182:7 275:18 283:17

**immediate**
218:2

**immediately**
84:22 132:23 217:22 222:7, 21 253:24

**impact**
114:21,25 115:5 116:2 125:21 126:17 140:12 148:20 149:14 155:20 156:8 161:2 171:16 261:18 262:22

**impacted**
261:8

**impairment**
162:3

**impanel**
82:18

**impartial**
184:9 185:17

**implementation**
34:23

**implemented**
18:6

**implication**
297:12

**implications**
59:14

**implicit**
156:14

**implore**
267:18

**important**
20:15,23,24 26:19 46:8 64:18 65:4 124:4,12,14 141:22 147:5 149:9 200:15 208:1,7 210:7 229:5 252:21

**impose**
84:22 88:8 89:15 265:5

**imposed**
74:18,21 76:25 79:17 90:22 104:23

**imposing**
299:2

**impression**
31:19,21 130:25 185:13 202:9 215:15 216:2 230:23, 24 231:1,3 242:5 244:8 285:3 307:23

**impressions**
215:13

**inadequate**
132:9

**inappropriate**
61:15 119:18 289:6

**incapable**
105:9,11,14 209:8,14 231:24 232:2 233:14,19 234:4,5 236:15,21 237:9,18

**incident**
240:8 286:14, 24 289:2 292:7,23 294:24 295:4 296:2 297:18 298:3,17 317:1

**incidents**
280:14 297:13

**inclined**
277:9

**include**
53:20 61:1 141:18 261:10

**included**
72:14 159:23 169:4 308:20

**includes**
77:23

**including**
23:4 45:17 77:14 82:14,20 175:17 256:11 260:13 318:4

**incoming**
281:2,20 284:2

**incomplete**
227:10 228:9

**incompleteness**
239:12

**inconsistent**
111:3 115:3, 23,25 116:19 226:18

**increased**
71:10

**indeed**
42:15 56:13 59:22 65:17 128:9 139:11 219:3

**independent**
99:12 100:19, 21

**independently**
145:16 165:9 166:17 172:25 218:18

**indicate**
26:2 165:6 226:10 277:25 293:15 298:21

**indicated**
32:20 154:20 176:22 210:19 223:12 228:9

**indicates**
81:25 109:5 127:14 177:11 287:4 293:1 299:16 306:3

**indicating**
265:19

**indications**
227:8

**indicia**
159:23

**individual**
18:16 32:10 52:16 62:23 79:12 83:5 88:9 112:11 118:18 121:5 124:16 150:3 164:4 174:1,6 200:7 225:14 261:19 281:17 287:25 288:20 291:18

**individualized**
173:21

**individually**
18:12 241:14

**individuals**
46:9 60:12 93:13 166:4 190:7 201:12 237:25 261:20 265:1 267:6 274:16 319:19

**inflicted**
108:1

**influence** 105:8 112:3 148:20 204:9

**info** 252:20

**inform** 50:4 299:1

**information** 13:5 14:1 16:1 23:7 32:17 35:6 36:21 50:6 53:25 58:6 69:19 72:6,9 78:14, 18,25 79:10, 11,12,15 83:14 86:10,17 87:24 94:15,20 95:3, 7 102:19 107:20 109:6 115:3,22,25 137:3 149:5,13 150:24 155:2 166:5 171:20, 24 172:8,25 175:9,14,17 181:13 183:4, 10 188:12 193:15 194:15, 16,25 196:22 200:25 203:20 213:5 215:9 225:19 228:11, 17,21,23 229:11,13,17, 19,23 230:5, 22,25 231:2,4, 5,17 236:21 237:25 239:13 241:17 244:14 245:14 247:14 285:8 289:11 293:6 298:7 303:24

**informed** 59:24 87:1 212:15 248:16

**initial** 95:1 99:18 206:17

**initially** 14:23 167:18, 24 279:21

**initials** 294:17

**initiated** 264:24

**injuries** 148:3,12

**innocent** 275:4

**input** 98:7 144:15

**inquiries** 92:11 93:10

**inquiry** 93:15,25

**inside** 26:11 36:19 37:12 39:6 53:25 81:19 88:12 92:21 93:3 226:14 238:19 243:24 247:1,9

**instance** 34:21 38:24 44:2 49:12 50:14 54:1 56:12 75:11 76:6 165:21 172:16 190:11

**instances** 280:9 297:15

**instigation** 256:10

**institution** 32:10

**instructed** 171:3

**instruction** 182:16

**instructions** 65:8

**instructor** 317:7

**intended** 124:24

**interact** 35:19 37:15 38:18 46:20 92:16 113:14 225:2,14

**interacted** 50:10 86:24

**interacting** 24:1 92:18 202:13 204:21

**interaction** 24:16 47:23 48:13,14,15 71:25 260:12 283:22

**interactions** 24:20 37:14 47:25

**intercourse** 105:7,13,25 107:22 108:2, 25 121:9 122:17 204:8,9 207:22

**interest** 31:13 61:19 62:2,6 164:5 173:21

**interested** 5:19 69:18 147:2 184:4 289:10,12

**interesting** 21:10 247:21

**interim** 12:21

**intern** 269:8

**internal** 19:1 33:17 60:21 64:7 92:6 317:6

**interpretation** 91:2

**interpreted** 110:7

**interrogation** 175:24

**interview** 12:5 13:25 14:2 117:4 160:21 161:20 162:11 231:15, 16 241:5,7 242:2,12 260:11

**interviewed** 166:2 201:12

**interviewing** 231:13

**interviews** 82:20 160:11, 15,16,18 162:9,13 172:17,18 215:4

**intimate**
106:5,10 109:7

**intimidating**
110:14 261:6

**intoxicant**
105:8

**intoxicated**
105:17,19 121:4,6 199:25 200:16,20 202:12,14 204:25 205:18 206:22 212:16 213:15,21

**intoxication**
105:22 199:18 201:4 202:10, 12 205:7,8 222:2,3 225:25 226:2 227:1

**introduced**
6:11

**invasion**
261:5

**investigate**
82:11

**investigated**
56:14 281:23

**investigating**
130:17 131:8,9

**investigation**
54:4,9 55:5,7, 9 60:6 61:14, 20 82:9,18 87:23,25 94:18,22,24 95:11,15 99:12,13,23 100:19 103:15 117:19 175:16, 21 177:1,13 179:9 196:8, 17,19 197:10, 21 206:4,18 228:15 231:4 240:8,15 282:3 283:18 295:7

**investigations**
234:9

**investigative**
72:12 103:14 104:21 129:8 198:3,13 213:8,10

**investigator**
82:11,15 160:10,18

**investigator's**
82:21

**investigators**
104:3

**investigatory**
56:16

**investment**
269:10

**investments**
269:10

**invitation**
40:17

**invite**
40:19,22 46:1

**invited**
40:13,16 41:13

**involve**
34:18 58:23 72:11,12 75:11 77:10

**involved**
49:1 54:8 56:15,19 61:12 71:7 72:23 78:7 82:13 83:11 86:12 87:19 93:13 94:6 99:10,22, 23 141:19 142:6 160:2 168:13 223:10 230:7,14,19 258:12,15,21 259:4,6,15 269:1 290:4 295:8,10 303:23

**involvement**
177:17

**involves**
55:12 58:3,4, 19

**involving**
6:25 89:16 120:19 121:3

**irrelevant**
88:2

[redacted]
173:20

**island**
134:19

**issue**
25:24 26:1 57:13,16 92:8 101:6 112:2 115:10,17 116:7,8 124:12 127:1 136:9 148:24 149:10 150:20 153:5 162:1 202:11, 13,19 203:5,19 204:12 205:9, 14 206:11,20 210:1 214:20 216:17 220:19 226:10 227:3 253:18 256:2 257:3 266:22 283:17 314:25

**issued**
22:20

**issues**
25:1,23 27:16 34:18 35:23,25 37:17,22 60:14 72:16 81:17 99:6 126:11 129:14,16 131:21 134:1 156:16 165:17 226:2,25 245:6 292:18 313:6 314:21

**item**
106:20 152:25 163:6

**items**
46:24

**IX**
47:23 48:13 49:4 50:10,15 53:5,17,21 54:1,16 61:10 64:11 65:3 70:11 81:8,15, 18,21 82:16 84:16 85:4,8 88:1 89:23 99:21 100:1, 14,18 101:1,12 103:14 117:4, 22 127:13 156:22 157:1, 10 175:16 177:6,12,25 178:6 179:1,19 180:2 181:4,6, 13 182:3

192:3,6 193:24 194:13 195:22 212:2,8 225:17 229:24 234:3 239:10 242:18 245:6 250:18 277:11 281:15 284:25 295:7

**IX's**
99:12 212:14

**J**

**Jaimee**
53:8

**Jane**
5:9

**January**
14:24 131:13 132:13,17 198:24 208:18

**jeopardizing**
176:8

**jeopardy**
296:5

**Jeris**
230:10

**jewel**
155:2 222:18 224:1,8 225:7, 16,21 227:25

**Jim**
30:6,7 304:13, 24 314:10 317:20

**job**
8:11 11:5,6, 10,19 26:16,19 38:15 48:10 231:13 232:17, 18 269:11

295:22

**jobs**
11:19 81:3

**John**
5:25 92:15,21 93:2 162:20 273:15 307:10

**joined**
142:8

**joint**
12:12

**Jon**
6:3

**joys**
313:22

**judge**
111:17 202:9, 11 205:25 206:7 211:1 223:18,21 289:1

**judgment**
57:2 180:16 210:10 221:11 234:15 300:3

**June**
262:7,10

**jury**
6:13 132:24 133:5 140:5,10 146:5,24 150:22 187:20, 24 219:2 245:12 252:15 264:19

**justice**
89:25 102:10

**justification**
141:16

**justify**
74:9

**Justin**
249:9 314:1,2

**K**

**Kathy**
167:10

**keep**
113:3

**keeping**
305:22

**Kellner**
42:5,7 43:1,5, 7,13,20 44:5 268:10,14 269:7,8,9,17, 18 270:10,15, 18,25 272:22 273:19 275:7 304:23 314:3

**Kellner's**
274:22,23

**Kelly**
303:1

**kept**
61:24

**key**
34:25 314:16

**kick**
87:11 96:2

**kind**
6:24 10:13 17:24 19:23 27:25 28:22 41:9 46:7 48:12 60:17 76:10 94:8 99:19 122:20 130:23 170:23

233:24 249:4, 18 305:9 315:25

**Knetter**
304:10

**Knetter/alisa**
312:7

**knew**
87:13 94:23,25 133:14 144:13 146:25 171:14 182:21 193:7 199:11 204:24 205:18 241:21 255:25 289:13 291:7 308:12

**knocked**
20:22

**know**
7:17 8:3 12:5 13:6 15:18 16:20,23,24 17:2,8,22 18:11 20:18 21:3,10,13 27:6 29:8,25 30:12 35:24 36:22 37:16 40:22 42:5 45:6 46:17 47:18 48:4 51:2 52:13 53:13 54:3,5, 19,21 55:8 56:11 57:1,13, 14,19,22 58:12,13 59:15 60:5,20,21,22 61:15,18,19,20 64:12,19 66:5 72:10 73:2,4,9 74:17,19 77:2, 3,16 78:2,23

79:1 80:21 81:21 82:22 83:23 84:12,17 85:6 86:11,13 87:20 88:4,5 91:10,12 92:4 93:14 94:2,3 95:10,22 96:2, 17 97:17 98:3, 7,15 100:11,12 101:4,7,11,23, 24 102:18 104:5,6 105:21 106:9 108:6 111:16 113:9, 18 115:15 117:24 119:17 121:24 125:2 127:2,14,16 128:7 129:14 131:19 133:15 136:18,24 139:11,12 140:4,14 142:8 143:3,5,12 146:3,6,14 147:24 148:9, 25 149:3 150:17,19 152:2,5,11 153:8,17,18 156:15 158:6, 25 159:4,5 161:5,6,9 162:2,7,10 163:12,14,25 164:3,9,11 167:1 169:4,6, 11 170:3,21 171:13,14,15, 17,24 172:17, 19 173:3,22 175:5 176:18, 24 178:12,14, 22,24 179:11, 23 180:8 181:4,14,24 182:18,20 183:12 184:12, 18 186:9,12, 15,23 187:3,16 189:19 190:19 191:9 192:22 193:1,4 194:6 200:10 201:23, 24 202:1,17,20 203:9 206:5,6 207:10,13,15 208:2,3,12 212:19 217:9, 19 218:2 222:10,19 223:12,21 225:3,9,13,15 227:6,11 230:6,20 231:19,21 233:19 235:16 236:6 239:21 240:13 241:20 242:10,16,17 245:3,5,16 246:1,5,14 247:13,17 248:3,5,8 249:14 250:2, 10 251:10,13 253:18,23,25 254:8,14,21 258:2 260:2 264:7,8 266:20 268:11,14 271:13 272:6, 8,25 273:6 277:17 282:1, 10 283:20,23 284:5,6,17 287:15 288:11 289:1,13,25 290:2,4 291:1, 21 292:3,4 293:12,19 294:17,19 295:9,12,23 300:24 301:2,4 302:5,18,19,20 303:19,23 304:13 305:8, 12 306:5,11,16 308:7 309:1, 21,23 310:7,9, 13,19,23 311:20,24 312:2,20 313:19 314:24 317:11

**knowing**
59:19 86:23 105:19 121:5 213:12 289:2

**knowledge**
105:10 133:8, 11 168:10 209:8,13 230:4 241:19 307:4

**known**
81:1 94:24 96:20

**Kohl**
43:21

**L**

**lack**
73:8 213:25 214:10 220:18

**lag**
95:11

**language**
108:5 209:7 253:14 265:18 303:9

**lapse**
300:3

**laptop**
136:3,7

**large**
18:15 69:2 113:11 139:24 270:24 271:10 302:24

**largely**
175:20

**larger**
13:16 45:17,18 166:3

**largest**
123:18 271:8, 10 275:25

**Larry**
294:9,18,19,20 295:1,12,18 316:25 317:8,9

**Larry's**
294:17 295:17, 22

**lastly**
274:3

**late**
317:17

**laughing**
201:23

**launched**
55:6

**Lauren**
50:10,22 51:23 53:13 139:6 196:19 198:4 251:19 254:20

**Lauren's**
144:10 251:13

**Laurent**
311:3

**law**
64:4,7 66:1, 11,13 67:1 74:10 106:4,19 109:4,10 154:14 209:15, 17 258:9

**lawsuit**
7:2 14:2 100:6 101:23 120:9 246:11 267:16 269:18

**lawsuits**
246:13

**lawyer**
36:18 101:3 108:7 176:18 181:16 193:4, 7,8,15 231:19, 20

**lawyer's**
193:2

**lawyers**
140:16,25 141:2 143:6 147:12,20 150:13 152:19 172:6,20,21 175:20 176:16 180:24 181:1 212:4 230:19 237:20 241:11, 23 242:3,5 247:19 309:9

**lay**
291:6

**lays**
74:7

**lead**
76:12 94:9 115:14

**leader**
313:15 316:14

**leaders**
281:12 313:10

**leading**
10:14

**leads**
116:25 127:3,4 187:2 287:16

**League**
312:17

**learn**
135:9 194:16

**learned**
86:6

**learning**
96:9,13 97:3, 13 110:14 111:7,25 112:12,21 123:22,25 124:13

**leave**
11:14 128:23 202:5

**leaving**
134:15 202:2 299:7

**led**
121:24 220:25

**Leff**
273:22

**left**
7:22 10:22 11:1,5,10 12:21 122:21 126:8 134:24 154:9,23 155:2 163:6 249:4 261:20

**legal**
5:16,22 14:11 33:3 35:17,18, 20 37:1,2,3,4, 7,9 48:15 68:10 72:5 73:17,20,22 100:20 129:13 165:14 230:9 290:5 293:13

**legal-**
272:10

**legally**
272:11

**legislators**
313:12,13

**legislatures**
46:16

**legitimate**
149:20

**length**
153:18,19

**lengthy**
106:24

**Leonard**
30:6,7

**letqtplay**
307:2

**letter**
15:12,16 35:11,12,16 104:20 106:23 122:7 150:21 159:7 169:18, 23 170:17 184:25 248:18 249:7,13,19 250:4,9 256:10 261:11 268:14, 21 272:21,24, 25 273:3 274:22,23 279:14 290:14 294:21 295:2,3 298:2 300:6,9, 23 301:8,12,13 310:6,22 311:18,21,22, 25 312:1 316:23 317:2, 7,8

**letters**
15:7,8 273:5,6 274:17 308:6 314:6,9

**level**
24:4,7 31:1,23 55:2 56:5,12 57:23 83:1,7 84:4 105:21 162:2 199:18 222:1,2 225:25 230:2 231:25 273:18 274:10 280:20 304:23

**levels**
57:9 297:17

**lie**
238:21 291:7

**lied**
239:10,16,19, 21,23 240:2,7, 14,16,20,24,25

**lies**
233:20

**life**
9:19 104:8 244:21 295:24

**Lift**
253:10

**light**
167:19 287:15

**lightly**
255:7

**likelihood**
96:1 236:8

**limited**
27:17 45:2 176:4

**limp**
213:17

**Lincoln**
5:13

**line**
56:17 108:16 172:24 207:15 213:4 255:6 294:23

**lines**
99:5 253:20 303:4

**linked**
257:10 291:23

**list**
46:24 76:7 152:25 169:17 212:19 279:19 286:4 305:8 310:17,20 311:25 319:18

**listed**
37:20 53:16 155:25 156:1 158:20,21 286:3 314:24

**listen**
49:13 67:19

**listened**
49:16 282:13

**listening**
169:3 211:12

**lists**
165:8,12,13 208:25

**litany**
10:12

**literature**
21:12

**litigation**
15:16 22:21

**little**
7:10,14 8:15 13:15 19:11 21:20 30:1 31:6 35:2 41:8 51:2,4,6 54:13 70:13 71:2 76:17 81:8 90:18 91:17,22 108:23 111:21 118:1 129:18 140:15,17 151:11 156:4 176:3 187:15 194:12 219:19 223:13 226:23 255:20 257:21 283:20

**live**
8:18 179:3 272:12

**living**
170:7

**LJD**
294:17

**lobby**
287:17

**local**
84:9,18 310:5 313:13

**located**
5:13,17

**log**
138:8,10

**log-in**
138:10

**long**
7:4 8:18 9:6,9 11:8,11 97:16 134:21 151:24 152:4,8 171:25 174:18,21,22 179:3 226:14 244:22 262:15

**long-time**
42:12

**longer**
7:15 11:20 64:16 90:6 125:7,9 136:14 142:2 144:4 152:12 164:24 166:9 171:15 182:22 212:17 232:16 240:18 245:13 263:14 264:17 314:25

**look**
6:13 23:15 27:14,18 29:12,19 30:10,16 48:8 50:5 51:17 58:10 59:22 66:7 68:19,20 74:17 82:12 88:25 89:5 90:13 100:12 102:21 103:11, 24 109:24 110:1,25 119:25 128:7,9 129:2,21,22 130:12,13 134:8 137:2, 11,17 138:5 139:13,21 140:13 144:19, 20 150:23 153:11,16,22 160:15 166:25 168:22 169:2,9 180:6 181:14 186:16 188:3,4 191:17 202:3 203:25 204:2 206:25 209:5 212:16 213:3 215:22 219:12 222:21 229:25 231:10 240:4 250:2 256:9,22 257:15,20 258:6,17,19 260:1 265:22 269:4 270:4 279:8 280:9 284:20 288:15 297:22 307:18 316:3

**looked**
14:8,10,13 15:4,5 17:1 68:17,21 69:3, 11 70:8 96:23 129:10 136:25 137:2 139:8 141:12 144:20 146:21 147:5 153:8 160:14 164:25 166:10 169:15 173:10 183:22 185:16 188:16 220:8 226:14 232:20

**looking**
11:23 14:21 27:24 42:22 65:7 69:5,8

76:23 91:11 109:14,16 139:25 140:12 154:21 161:17 162:7 163:8 169:7 184:8,23 202:10 203:19 205:25 216:18 218:20 226:12 280:4 293:14, 18,19 294:6 295:6,8 297:20 299:4 302:16 316:11

**looks**
67:15 81:9 98:18 110:6 128:8 187:7 250:3 251:13 273:22 275:15 300:23 317:5

**loop**
61:9,24 94:16 97:25 305:22

**Lori**
311:8,9

**lost**
262:12,22

**lot**
21:10 32:1 41:1 42:9 44:14 46:14 127:1 135:18 139:14 187:10 201:3 204:18 205:6 223:13 247:4 248:8,9 250:7 274:7,9 279:10 305:12

**lots**
136:9 137:1

**loud**
207:21

**Louis**
274:3

**lower**
62:2 71:2

**Lucas**
92:15,21 93:2 307:10

**lunch**
38:24

**lying**
239:11

**Lynch**
36:4 142:5 167:6 175:5 230:11,12,14

**M**

**Mac**
311:15

**made**
85:14,16 88:16 89:23,24 97:20 98:16 99:4 111:7 121:22 130:25 132:1, 14,24 143:15 144:2 151:10 154:16 155:10 158:8 159:22 172:4 175:15 179:13 180:21 195:13 199:22 200:5 202:24 212:16 215:8, 11 216:5 219:18 229:6 233:4,13,24 234:22,24 235:9 243:1 244:3,12 246:15 264:23 266:4 272:2 281:12,17,23 282:1 294:12 306:4,8 308:9 312:2

**Madison**
5:13 13:17 172:18 173:8 201:17 303:18 313:7 320:3

**madison.com**
270:9 277:16

**magnitude**
274:21

**mail**
294:12

**main**
19:14 21:22 22:5 44:4,6 47:25 49:19 61:4 68:10 94:12 125:25 138:25 154:16 156:2,6 162:1 175:8 226:10

**maintain**
178:7 225:15

**major**
20:1,4 22:6,11 40:15 41:16 42:13 43:3 56:11 60:11 98:3 150:20 153:5 206:3 212:9,10 270:25 271:20 274:7 304:20, 21

**majority**
71:7 232:22 279:11,12 307:20 313:14

**make**
7:22 17:9,15 18:5 26:15 27:15,19 28:8 30:1,13,17 31:2,15,16 34:20 36:20,22 37:5 50:6 54:2 57:19 60:9,13 61:16 62:10 66:10,16,17 68:6 72:18,19 73:4,6 78:21 81:11 88:13 91:3 93:23 97:1,16 99:11 100:21 112:4 113:4 123:12 124:15 125:19 137:4 144:12 151:4,5 155:24 161:4,14 166:14 172:3 174:24 180:14 193:12 196:25 204:3 206:9 216:22 221:11 228:3 232:16 239:7,19 243:7,24,25 244:19,20 245:17 254:15 264:11 268:23 269:4 308:8,10 309:17

**maker**
76:8

**makes**
29:25 30:9,21 32:1 64:5 73:10 82:21 83:17 118:16 138:3 197:6,22

198:19 229:4
261:16

**making**
28:15 29:8
30:4,5 51:10
60:17 62:15
65:9 73:9 75:9
87:12 111:14
145:10 146:6
154:15 155:18
156:16 166:12
180:22 189:21
196:14 225:12
226:5 232:24
233:19,21
234:3,15
241:16 261:17
313:20

**Malchow**
6:3

**man**
92:15 222:13
275:4

**managed**
245:20

**management**
269:10

**manages**
34:16

**mandatory**
39:23 52:11
54:25 89:15

**manner**
244:21

**March**
5:3 71:20
191:19,22,23
262:6,7,15,16,
19

**Maria**
5:21

**mark**
51:13 166:22
257:18

**marked**
22:16 51:15
52:25 89:2
103:7,9 107:15
119:21,24
128:2,25
143:22 157:16
166:23 167:3,7
208:14,20
248:22 249:24
250:21 270:6
272:16 275:13
277:14 280:22
282:21 286:12
292:21 294:2
297:25 298:19
301:20 304:1
305:3 306:13
307:7 308:16
309:25 310:11

**marker**
291:6

**market**
31:16,18,19

**marks**
67:7,10 118:4,
7 162:25 163:3
211:17,20
267:10,13
320:5

**Marquette**
9:15

**Martin**
12:17

**Maryl's**
34:4

**material**
142:7 299:5

**materials**
138:13 170:24
181:5 221:3

**Matt**
138:22 142:9
175:7 249:6

**matter**
5:9 61:2 93:7
105:17 113:17
198:23 231:23
233:21 238:15
283:12 288:2
308:12

**matters**
49:23

**Matthew**
34:3

**Maui**
134:20 137:15,
22 138:16

**Mayrl**
34:3,8,15
67:24 138:22
175:7 248:24
249:1,6

**Mayrl's**
34:4

**Mcglone**
93:1,2 318:18
319:5

**Mcintosh**
29:23 30:1
249:1 311:16

**mean**
8:24 12:25
24:7 28:1 36:8
44:8 48:3
49:11 65:24
66:5 81:15
111:14,20
117:3 121:16

125:9,13,14
133:21 139:18
142:1 151:16
155:23 161:10,
25 175:3 182:2
184:24 185:23
187:4,16
190:11 196:11
204:17 205:9
207:5 208:2
215:19 222:9
228:25 230:1
231:12 235:17
236:5 237:10
238:17 243:13
245:7 251:14
253:24 257:24
258:14 261:25
263:24 272:10,
13 282:13
286:15 301:11
311:19 315:15

**meaning**
114:23 299:17

**means**
68:25 81:17
166:18 196:13
234:6 235:20
285:23 301:7

**measures**
299:22

**media**
32:4,5,7,15,17
58:9,15,18
59:4,13,23
61:19 62:2,6,
16 67:8,11
73:5,7 87:4
93:15 98:7,10,
11,13 99:19
102:15 118:5,8
147:12,13
163:1,4
211:18,21

267:11,14 279:9 303:13, 14 305:9,12, 23,25 306:3,24 307:18

**medial**
308:6

**medical**
82:3 113:12 147:25 153:1,4 165:20 210:25 217:19

**meet**
19:13 24:4 27:13 35:22 37:21,25 38:22,23 39:3, 10 73:17 282:14 313:10

**meeting**
19:17,23 154:5,6,8,22 167:20 168:6, 7,8,19

**meetings**
19:1 20:5,6 24:4,18 26:12 35:22

**meets**
257:4

**member**
10:23 12:1 33:7 283:4 284:4,10,16 305:21

**members**
24:25 25:2 40:18,24 247:24 314:14

**memo**
204:4

**memory**
148:16 223:13, 17 225:1 254:19

**men**
222:24 313:7

**men's**
45:13

**mental**
82:3 101:16 121:23 125:21 126:10 127:6, 15,21

**mention**
39:20 252:13

**mentioned**
19:21 20:10 41:15 58:15 99:5 102:22 190:12 229:8 250:17 252:14

**Meredith**
93:1,2 318:18 319:5

**merited**
84:3

**messages**
16:12,14,15 17:12 23:5,12, 16,19 26:2 153:24,25 154:1,4,8,10, 19,24 155:7 156:21 157:8 160:8 186:1 248:2

**messaging**
23:5

**met**
6:10 39:4,13, 14,16,19

50:12,15 104:6 277:19

**Meyer**
167:9,11,24 168:1,8,9,19 176:17,21 187:6

**Mi-**
9:6

**mic**
118:22

**Michigan**
9:5,7,10,13, 14,15 11:4

**microphones**
5:6

**middle**
131:6 262:18 282:25

**midst**
231:16

**Mike**
41:21 304:10

**mile**
113:15,16

**mill**
72:3

**Miller**
312:4

**million**
29:10,14 30:1, 4,5,9 31:10 32:19 270:9 271:6,25 272:5 274:18 276:1 278:3,7,9 279:1,3,13

**mind**
41:18 68:7 121:20 147:5

220:23 226:11 231:17 270:24 294:8

**mindful**
155:13

**mine**
41:6

**minimal**
213:7

**Minnesota**
9:5,17,20,23 10:3

**minor**
286:19,23

**minute**
6:10 103:11 122:4 129:21, 22 145:17 166:25 207:19 250:2

**minutes**
67:5 89:4 117:25 144:9 147:9 162:17 211:14 247:6 283:21 315:8, 10,15,25

**misbehavior**
316:13,18

**misconduct**
64:3 256:14 291:12 297:19 298:17,18,22 300:5,18,19 301:1,5,13 317:3,6

**misdone**
194:8

**misreading**
251:5

**misrepresented**
240:9

**misrepresenting**
240:21

**missed**
199:9 262:25

**Missouri**
8:17 9:3

**misspoke**
37:18

**misstated**
89:22

**misstates**
189:9 223:4 257:12

**MIT**
10:10

**mitigating**
146:23

**mix**
40:19,23

**mixed**
161:3,9,10 199:17,23 200:11 206:15 232:19

**Mm-hmm**
8:12 9:8 13:9 18:10 22:22 23:2 32:22 39:12 50:1 51:18,21 53:2 54:12,15 55:18,24 56:4 59:5,17 64:25 67:18 69:13 77:9 79:8 85:12 89:6 91:16 94:7 96:8 100:7 103:12 104:10 112:7 114:10, 20 116:24 120:1,10 122:6 123:20 126:16 128:6 130:15 139:15 159:7, 25 164:16 175:13 192:2 196:24 197:23 199:16 200:22 209:22 218:6 219:15 223:25 224:7,9 225:18 227:19,21,24 228:1 230:13 232:5 238:13 240:5 242:20 250:4,13,19 252:23 253:8 254:18 255:17 273:23 284:22 296:8 298:23 311:7 314:15

**module**
52:6

**Moll**
305:20,21 306:23 318:4

**moment**
128:24 138:14

**Monday**
307:16

**money**
27:7,10,16 31:15,17,20 32:11 274:9 275:22 276:10, 15,19 277:2

**monitors**
247:16

**month**
94:21 243:24

**monthly**
37:22

**months**
24:19 151:21 152:11,14 174:2,16,17,21 192:7 243:1,14 244:22 245:13 257:7 262:20 293:17

**moped**
293:4 296:16

**morning**
178:15 249:8

**mother**
8:22

**motion**
268:1

**motivation**
160:2

**mouth**
59:11

**mouthed**
289:5

**mouthing**
289:5

**move**
37:1 85:18 86:20 101:13 234:10 289:17

**moved**
9:4,6,16 100:18

**moving**
51:7 258:2

**multiple**
34:19 63:11 107:1 163:16 220:15 243:1

**murder**
217:10

**music**
113:13

**N**

**name**
5:15 22:12 33:13 39:5 42:22 159:6 283:1 287:21 317:12

**named**
26:24 67:25 86:13 92:15 100:5 101:23 310:7

**names**
165:23 177:20

**naming**
43:14,18

**Nancy**
36:4 142:4 167:6 175:5,9

**Nate**
305:20,21 306:23 318:4

**national**
20:17 21:2,5 44:15

**nature**
7:17 56:24 75:16 80:13 86:16 88:6 97:25 155:1 283:19

**NCAA**
254:5

**NCWA**
6:25 7:2

**necessarily**
148:4,16 155:11 156:8 169:3 223:2

**need**
7:16,17 13:6 17:16 23:9 35:25 36:22 37:23 52:14 57:13 58:11 59:15 65:24 66:1 82:2 94:16 98:3 101:12 118:23 137:11 152:8 170:21 177:20 180:14 195:11 247:13,14 253:3 255:15 256:22 310:20 313:17 315:8, 10,13

**needed**
15:18 65:22 87:5 93:18 101:7 137:4 146:20 186:14 188:3 252:10 281:18 287:22 303:21 309:4 314:12,20

**needs**
54:1 88:5 92:4 287:13 294:15, 20 313:19

**negative**
114:24 115:5 116:2

**negotiates**
30:23

**Nelson**
301:22 302:18, 19 317:12

**never**
17:23 21:21 23:16 34:24 38:20 47:15 68:7 74:15 119:19 126:25 147:18 163:12 164:13 168:2,9 183:12 186:23 219:8 233:24 239:23 250:24 251:7,12 265:5 291:4 294:8 297:2 302:11

**Newell's**
288:16 316:18

**news**
98:4 313:20

**newspaper**
310:4

**newspapers**
305:15

**night**
20:22

**nine**
40:3 70:16

**no-contact**
263:16,20 264:11,24 265:5

**nominated**
12:10

**Non-sexual**
80:6

**nonacademic**
55:22 56:2 64:3 67:1 74:20 75:4,5, 10,16 79:4 80:2,4,7,9 256:13

**nonconsent**
213:6 214:5, 14,19 215:10, 16 216:8

**nonetheless**
258:22

**nonprofit**
33:14

**nonresponsible**
236:20

**nonsexual**
233:10

**normal**
24:16 68:9 148:6,13

**north**
5:17 29:10,13 30:4,5 137:23, 24

**Northern**
9:14

**Northwestern**
10:18,22 11:25 13:8,13,15,23 28:25 29:1 67:22

**note**
5:6 149:17 279:15 280:6 294:10 295:17 312:19,25 316:25

**noted**
121:23 179:24 181:15

**notes**
144:10 165:9 166:17 250:20, 23,24 253:6,19 284:24

**noteworthy**
248:2

**notice**
195:5,24 257:2

**noticeable**
71:14

**noticed**
42:22 181:17 291:7

**notification**
53:17,20 54:5

**notified**
15:17,18 56:10,20,21,23 57:5,8,11,18 58:5 91:25 92:1,10 182:20

**notify**
59:21 189:7

**notifying**
57:23 58:7

**notion**
78:15

**November**
131:10,11 132:5,11

**number**
7:8 8:23 10:17 23:3 24:24 26:12 31:5 39:14 41:24 45:3 47:9 67:8,11,16 68:17 70:25 101:6 106:20 118:5,8 124:15 129:16 130:13 136:19 139:2 142:4,5 146:3 154:1 156:5 162:17 163:1,4

164:25 186:3 189:1 194:6 201:10 207:7 211:18,21 212:23 216:12, 17,21 244:22 248:4 250:10 257:16,19 267:11,14 269:24 270:19 279:19 303:7 314:13 316:2 318:17,23 319:17

**numbering**
294:25

**numberings**
130:13

**numbers**
32:2 69:2 71:5 139:24 166:9 213:1 308:5 310:17

O

**O'HARE**
12:6

**Oahu**
134:20 135:6,8 137:19,20 138:2,14,16

**Obama**
11:6

**object**
91:8 111:11 112:23 113:7 114:4,13 115:7 116:4 122:23 125:23 126:20 131:17 149:22 150:7 155:21 156:11,24 157:11 161:22 164:7,22 168:14 171:1 179:5 184:20 185:7 190:24 192:13 194:3, 21 195:8 196:1 198:6,15 205:20 217:3 218:23 219:25 226:7 227:4 228:22 229:20 233:5 241:8 245:1 251:6,14 256:20 260:20 264:13 265:8, 13 266:2,19 267:24 283:14 284:12 285:5, 14 286:25 288:4,24 289:24 291:19 292:2,10 301:10,25 316:6 317:18, 24 318:14 319:3,11

**objected**
217:6

**Objection**
179:20 182:5 188:7 189:8 190:1 204:15 207:2 209:24 211:8 214:6 215:17 216:10 220:11 223:4 228:5 235:1,11 236:23 242:23 243:5,16 257:12 258:25 259:11,22 271:18 285:21

**objections**
144:16

**obligation**
53:20

**observation**
161:11 201:11 206:13 217:23

**observations**
161:6 202:23 216:21

**observe**
203:12 218:21 238:21

**observed**
213:14,18

**observers**
161:17

**observing**
206:15

**obviously**
20:11 54:8 95:22 96:3 136:18 140:18, 19 142:17 163:24 187:19 208:16 241:25 249:19 310:14

**occasionally**
16:9,10,11 31:11 37:24 38:1,12,23 40:19,21 86:2 263:12 272:15

**occasions**
50:12,16

**occur**
24:18 89:17 265:4

**occurred**
83:23 85:20 90:20 108:18 218:10

**occurrence**
180:2

**occurs**
21:17 88:22 90:1 179:24

**October**
104:9,20 272:1

**offender**
113:6

**offending**
124:19

**offense**
261:18 300:11

**offensive**
30:18 110:14 261:6

**offer**
31:3 183:9

**offered**
131:11 165:9 166:17 169:18 190:8

**office**
26:11,23 27:2 33:25 34:9,11, 16 35:17,18,20 36:3,16 37:1, 2,7,8,9,12 47:24 48:13 49:4 50:24 51:9 54:20 56:7 57:4 59:22 60:1 65:15 68:10 70:6 72:15,22 82:16 86:3,21, 25 87:7,8 91:21,22 92:1, 3,5,14,17,23

93:3,23 94:2, 12 98:1 104:7 117:4 129:14 140:20 148:25 152:15 165:14 169:20,24 170:17 173:7, 12 185:2 212:14 230:9, 19 234:3 239:10 247:15, 25 250:18 277:6 293:13 299:23,24 300:9 303:19 310:25 313:17, 18,19

**officer**
33:5,8 57:3 130:17 131:8,9 277:22 311:12

**officers**
202:25

**offices**
44:8 94:5

**official**
23:8 33:13,15

**officially**
31:9 283:8 299:24

**officials**
30:22

**officio**
33:7

**offline**
6:10

**oftentimes**
57:2 98:25

**okay**
6:17,24 7:1,4, 10,24,25 8:6, 10,20 9:3,6, 12,16,21 10:7, 11 11:14,24 12:2,8,15,17, 23 13:2,18,22 14:1,4,13,23 15:4,8,10,15, 22 16:1,5,15, 20,25 17:3,7, 19,24 19:19 20:10 21:23 22:14 23:14, 17,21 24:11, 16,20 25:2,6, 10,13,17,21 26:5,24 27:1, 17,25 28:5,12, 20,22 29:16,22 30:6,9,15,18 31:14 33:9,14, 18 34:2,13,15 35:2,10,15 37:1,5,11 38:7,10,15,18 39:16,20 40:9, 13 41:3,8,15 42:11 43:17, 19,24 44:4,8, 10,23 45:20 46:12 47:10,17 49:4,24 50:9, 25 51:8,12 52:17,25 53:9, 15 54:7,11 55:2,16 56:20, 25 57:5,25 58:20 59:2,18 60:4,16 61:1,6 62:2 63:1,20, 24 64:2,9 66:12,18 68:6, 14,24 69:5,11, 16,22 70:9,13, 18,20,23 71:9, 16,22,25 72:3, 22 73:6,12 74:2,11 75:2, 13,24 76:10,16 77:1,7,14,17, 19,22 78:6,10, 13,15 79:18 80:4,7,15,21 81:21 82:24 83:3,10,20,24 84:7,13,19,24 85:3,10,19,23 86:5,9,17,23 87:15 89:8,20 90:4 91:13,15, 16 92:13,16,23 93:1,5 94:14, 18 95:1,6,13 96:6,13,21,25 97:13 98:20 99:16,25 100:4 102:2,7,9,12 103:1,6,16 104:1,5,9,24 105:3 106:3, 18,22 107:5,15 108:5,19 110:10 111:2,5 112:15 113:2 114:8,17 115:19 116:11, 14,23 117:21, 23 118:1,3,16 119:7 120:5,13 121:12 123:4, 5,16 124:18 125:8 126:14 127:9,17 128:1 129:5,19 131:15,23 132:5,16,19,25 133:2,12,19 134:3,10 135:6,16,21 136:1,3,21 137:6,19,21,25 138:8,12 139:5,21 140:18 141:3, 18,25 143:8 144:6,8,17,19 145:3,9,22 146:14 147:8, 16,23 148:18, 20 149:12 150:11 151:23 152:25 153:9, 21 154:10,13, 17 157:5,14 158:23 159:20 160:5,7,17 162:15 163:25 164:4,15,20 165:3,22 166:11,14,21 168:6,11,18,21 169:9,11,17 170:13 171:16, 18 172:7,12,24 174:4,10,13 175:11 178:4, 12,15 187:15 189:5,22 191:5,25 193:19 194:19 195:20 196:16, 22 197:6,14 198:12,19,21 199:12 200:7, 19 201:18,21 203:4,22 208:13,24 209:11,20 211:16 212:6 213:1 221:24 223:9,19 224:16 226:23 228:20 230:3, 21 231:11 232:3 233:4,10 235:6 236:9

238:11 239:9, 25 241:5 242:18 246:17 248:21 249:18, 23 250:6,12,25 251:16,21 252:1,6,13,20 254:12,24 255:2,4,6,12, 15 256:5 258:3,6,22 260:4,8,16 261:20 262:7, 14,25 263:16 265:24 268:19 269:9,17 270:5,14,17,21 271:7,15,25 272:9 273:11 274:12,16 275:1 276:25 277:13 278:14, 23 279:14 281:3 282:12 286:3 288:18 291:14 292:20 295:5,11,22,25 296:7,15 297:4,24 300:15 301:19 302:10,14 305:22 306:12 307:6,13,16,18 309:5,8,24 310:10,23 311:1,18 312:4,9,25 313:12 314:1, 5,7,13,18,21 315:2 316:16, 19,22,24 317:2,5,10 319:17

**OLA**
61:10 76:12 102:7 140:22 142:18

**on-campus**
38:7

**once**
6:23 35:22 36:23 39:3 41:14 44:20 72:7 83:4 88:4,16 117:6 124:7 136:11 144:13 272:6 309:4

**one**
8:7 15:13 17:5,19 19:3, 8,12,16 20:12 21:4,7 23:14 26:2,19 28:6 30:7 36:14 37:7,19 39:22, 25 42:21 44:17,18 45:16 52:22 54:1 58:16 59:12 61:8 62:9 63:3,5,6 71:11 73:10 74:6,16, 18 78:5,6,10, 20 79:11 80:2 86:14 87:4 89:11 91:12, 15,24 93:12 95:24 97:12, 19,22 101:7,9 104:1,3 106:16 109:16 111:22 112:13,16,19 113:18 116:7 119:19 120:5,8 121:3,9 128:1, 14,17,23 129:19 131:20 133:24 134:3 135:24 145:10 149:9 153:2,6, 7,10 154:2 155:2,8,12 156:2 157:13 159:9 160:15, 20,21 161:20 162:10 169:3 172:20 176:4 177:2 183:1 185:17 186:23, 25 187:2,4,5,9 190:19 191:2 196:13 199:20, 24 200:16 201:24 205:6,7 206:1,15 207:8,10 212:11 217:7, 11 218:5,15 219:10 223:13, 18,22 226:19, 21 231:15 234:15 237:11 240:14 247:24 250:14 253:23 255:22 256:12 257:1 258:10, 12 261:20,22 266:24 269:14 271:5,7 272:20,24 273:15,22 276:21 279:23 281:12 285:9 286:1,6,10,21 289:21,22 292:18 297:9 298:15 308:20, 22 309:24 310:2 317:25 318:7,17,23 319:17

**one's**
127:5,6 185:13

**one-on-one**
24:5,24

**ones**
63:21 80:3,16 92:8 164:17 173:9 186:7 247:10 299:13

**ongoing**
65:1 100:1 261:15,18

**online**
50:23,25 52:6 54:14,19,23,24 89:13 181:5

**open**
135:14 279:22 306:9

**open-and-shut**
210:8

**opened**
95:12

**opening**
54:4 94:23 145:3

**opinion**
49:22 108:8 139:10,11,18 183:25 184:4,6

**opinions**
50:18 247:5 248:7 273:4

**opportunity**
89:10 117:2 183:10 189:7 190:9 284:2

**opposed**
258:5

**opposite**
116:13,22 238:7

**option**
11:23

**options**
74:2,5 298:15 317:3

**order**
31:2 137:4 151:13,14 152:1,5 212:24 245:13 257:2 264:11 265:5 299:10 316:2

**ordered**
151:18

**orders**
264:24

**Organizational**
53:3,4

**organizations**
20:5

**organize**
211:14

**organizing**
35:7

**orientation**
281:1,13

**original**
69:9,17,22 76:24 77:4 78:22 79:17 118:17 185:12 188:15,22 191:13 260:9 320:8

**originally**
8:16

**Oros**
273:15

**outcome**
5:20 35:11 49:8 50:2 69:22 84:21,22 96:14 104:19 105:1 107:6 117:1 122:3,7 123:6 124:5 128:5 131:24 142:12,15,19, 24 144:23 146:19 159:7 191:16 192:12 198:21 246:22 257:9 261:24 279:14 298:13 305:13

**outfit**
33:15

**outgoing**
15:6

**outlets**
306:3

**outline**
130:23

**outreach**
12:12 26:4

**outside**
18:19 37:24 84:5 100:22 184:9 190:17 191:2 210:2 219:5 221:23 247:4,9 259:25

**overconsumption**
214:10

**overlap**
82:9

**overnight**
63:8

**overseeing**
48:16

**oversees**
312:6

**overturn**
79:2 177:6 220:25 226:6 228:14 229:6 238:6 260:17

**overturned**
233:12

**overturning**
255:7

**overview**
17:24

**overwhelming**
307:20

**owed**
268:16,19

**owns**
42:20

**P**

**p.m.**
5:3 67:8,9,11 118:5,6,8 163:1,2,4 211:18,19,21 267:11,12,14 320:6,7

**packet**
213:11,19

**page**
22:19,25 51:22 52:25 107:10, 15 109:3,13 120:14 121:12 122:4 123:6,16 130:12,23 131:4 145:13 158:12 159:4, 15 160:9 208:21,24 209:11 212:25 213:1,10,18 237:22 240:4 249:2 256:25 258:7 260:25 261:3 272:21 274:23 275:21 281:6 282:15 284:20 298:24 302:24 307:1

**pages**
22:24 51:3 153:1 157:24 158:4,9,10,11, 15 159:11 164:14 169:15 186:8 192:8

**paid**
29:3,17 287:19 290:23

**pandemic**
27:10 34:21 71:15,16 78:2 278:4,15

**panel**
119:13,15 121:17 205:3 213:2,3 214:4 215:8,11 216:6 217:14 218:7 221:5,16 225:17 256:19

**panel's**
122:8 130:7 219:22

**paragraph**
23:10 108:24 109:5,14 121:13,19 123:18 131:5 145:3,18 159:15 162:18

175:12 237:23 238:5,8,10,11 275:24 277:20 282:25 288:15 299:20 302:25 307:19

**paragraphs**
122:5

**paraphrasing**
110:12

**parents**
8:21

**parking**
292:8 296:16 316:20 317:1

**parse**
252:24,25 253:2

**parsing**
290:5

**part**
8:10 13:16 26:11,13,16,19 43:7 48:10 49:21 52:22 56:17 60:22,23 73:12 85:4,8 87:11 116:8 124:5 131:24 143:3 153:12 154:12 157:9 164:19 168:23 176:3 183:6 186:14 187:25 193:2 194:7 199:8 204:13 205:14 207:11 208:1 212:10 227:10,11 234:17 240:7, 15 253:21 255:5 259:18

267:25 270:12 278:20,21 307:25 311:6

**partial**
227:14

**participants**
55:10,12

**participate**
90:7,9 91:6 169:22 171:12 175:21 176:2 177:1,9,18 178:9,11 179:8 238:1 241:22 262:3

**participating**
54:9 178:6 179:12 241:25 300:21

**participation**
53:18,21 54:7 88:18 175:25 177:12,24

**particular**
19:4 20:12 25:24 65:11 99:7 107:6,7,8 114:8 127:1 129:6 148:1 173:13 217:18 218:19 270:11 309:17

**parties**
5:5 47:1 172:20 194:14 196:22 197:25 198:5,12 199:1,3 210:22 319:15

**partly**
11:20 58:12 62:10 83:24

133:22 255:24

**partners**
271:5

**parts**
21:14 44:1 72:13

**party**
5:18 119:11 120:9 197:4 205:15 267:21

**pass**
283:7

**passed**
200:1,3 215:2 284:1

**passed-out**
223:2

**past**
27:23 32:18 44:14

**Patrick**
311:11,12

**pattern**
71:14

**Patterson**
304:13,24 314:10 317:21

**Paul**
29:6,16 248:14 273:22

**pause**
146:15

**pay**
31:18 32:9 281:18 287:13, 22 288:10 291:16

**paying**
272:7,9 287:12 291:25

**pays**
31:19 272:5

**PD**
172:18

**peers**
31:16,18

**penalty**
295:25

**pending**
25:11 61:3 182:17

**penetration**
57:25 58:4

**people**
12:6 19:4 20:19,25 31:22 34:8,11 37:16 40:10,19 41:5, 11,13,17,20,25 45:23 46:2,5, 11,14,24 47:9 48:1 57:12 60:19 62:14 64:21 65:9 71:22 82:12,20 87:12 99:17 119:4,10 124:23 126:3 127:23 150:18 165:23 169:16 178:9 200:13 201:23 202:3 222:22 223:15 231:13 247:1, 4,11 248:5,6 250:11 253:23 261:15 263:12 264:22 272:14 305:24 308:1, 4,6 310:20 311:20 312:8 314:5,6,8,11, 19 317:15

318:4 319:6

**people's**
206:7

**perceived**
57:6 238:16
239:1,5

**percent**
38:17 45:8,11
108:13 232:4,
6,9,13 236:2,
6,7,10,11
250:11 276:1

**percentage**
38:15 71:5
250:9,10

**perception**
125:3,20
202:17 208:6

**percolating**
19:3

**perform**
32:12

**peril**
222:8

**period**
11:9,13 16:4
36:8 65:1 97:8
102:12 113:16
174:6,12,18
243:11,25
246:21 299:6

**person**
26:10 41:22
48:15 62:8
73:20 84:14
86:7 94:3
105:7,9,11,13,
19,21 106:1,6,
8,9 110:17
121:5 124:22
126:1,24

150:12 152:16
177:18 181:9
200:10,19
202:12 204:20
207:13,22,23,
25 208:7
209:8,14
212:20 219:4
267:7 277:18
281:24,25
285:9 287:21
306:24 312:15
317:11

**person's**
287:21

**personal**
68:4 268:24
304:12

**personally**
51:9 65:14
100:5 179:17

**perspective**
124:4

**persuade**
187:19 211:12
219:1 241:23

**persuaded**
188:3

**persuasive**
182:9

**pertained**
154:19

**pertaining**
23:25 107:12

**pertains**
53:5 64:2
80:16 104:14
115:21 120:8,
16 122:10

**Pete**
312:4

**Peterson**
310:7

**petition**
14:10 15:5,13,
23 25:3 35:4
36:14,20 53:22
68:15 69:10,
11,25 72:11
75:18,25 76:5,
9,19,20 77:5
78:16 80:24
83:12 85:3
101:5 103:21
115:2 128:12,
19,20 129:9
132:20,21
133:3 134:4,
10,13,14
135:5,10,13
138:17 139:10
141:16 144:22
145:6,14,20,22
146:2,20 148:8
149:7 153:13,
14,16 154:12
157:15,18,21
158:5,19,20
163:23 164:19
167:15 168:24
170:13 171:21
178:1 179:2
180:6 181:6,8,
21,22 182:17,
24 184:6
185:20 186:16
188:4,15,17,
21,22 189:3
190:22 191:20
194:6,7,9,19
195:3,12,19,21
196:4,5,6,12
199:10 202:18
203:5 205:1
211:24 212:3
231:23 233:15,

22 237:22
239:20 240:9
244:9 254:6
259:20 260:16
267:17 279:14
305:17

**petition-level**
103:24

**petitioner**
151:3,10
171:18 237:3,
4,14 240:7,14
260:10

**petitioner's**
155:8,9 165:7,
11 169:18,20,
25 175:18
256:10 260:9

**petitioning**
181:24 182:1

**petitions**
77:7 147:20
177:22 178:2
189:1,17,18
190:6 191:1

**Phd**
10:10

**Phil**
272:25 273:11,
18

**phone**
16:17 17:19
23:5,20 25:19
36:1 135:23
136:2,6 137:18
141:13 167:20,
25 175:5,8
250:20 268:16
294:11 298:6
299:5 309:4

**phones**
16:18

**photo**
261:4,5 277:21

**photograph**
260:14 271:16

**photographed**
255:22

**photographing**
240:17 255:19 256:11 257:10 258:8

**photographs**
109:11

**photos**
106:15 109:7 290:4,11

**phrase**
111:21 203:14

**phrased**
8:3 237:12

**phrasing**
236:19 237:18

**physical**
201:3 286:23 292:1 299:8

**physically**
287:24 288:1, 19 291:17

**pick**
5:6 212:23

**picked**
73:5

**picking**
306:3

**picks**
201:25

**picture**
256:8 257:4 258:5,19,21 259:3,5,6 277:18

**pictures**
253:16 290:12

**pie**
275:21

**piece**
172:7 222:18 227:7,17 229:5 278:13

**pieces**
129:12 145:23 146:4 147:4,11 221:6

**Pivoting**
214:16

**place**
5:4 13:24 64:14 131:13 215:5 263:16 303:15

**places**
13:1 124:25 159:12 187:13 269:24

**plaintiff**
6:1,6 54:8 104:14 107:8 108:25 120:17 182:15,23 200:21

**plaintiff's**
119:24 210:15

**plan**
136:8 314:22

**plane**
135:2,12 136:5

**planet**
127:10

**platform**
21:2

**play**
90:25 246:2 253:21 254:5, 8,14

**played**
177:23 278:16

**player**
34:25 58:21 87:19

**player's**
86:12

**players**
38:18,22,23 39:2,11 87:20 283:6,13 296:20

**playing**
206:2

**plays**
81:23 290:2

**please**
5:5,22 310:16

**pledge**
272:2,12

**point**
8:9 9:4 15:15, 18 26:1,2 27:2 72:8 78:21 84:1 86:15 92:12 93:12 95:19,25 96:13,19 97:20 102:16,18 103:5 105:20 115:12,19 116:19 133:1 137:10 143:9 158:8 160:24 169:1 171:24 174:11 179:15 180:7 194:23 200:15 201:24 211:23 212:3, 18 213:21 221:12,13 239:13 242:16 260:6 261:14 278:17,20 287:20 303:2 311:17 312:14 313:15

**pointed**
228:8 317:14

**police**
68:23 69:6,20 70:2 82:8 87:22,25 89:24 95:15 99:1,13, 15 147:6 149:11 160:15, 16,21,23 161:1,11,20 162:9,11,13 172:17,22 173:8 179:25 184:10 186:4,5 193:11 199:14 200:24 201:1, 7,10,15,17 202:24 206:14 210:25 215:5 221:24 225:22 226:3,13 227:2,8 228:3, 12,17 229:2, 16,24,25 230:22 231:2, 5,7,12 239:19, 22 240:1,7,15, 16,21,24 241:7,11 242:1,2,4,6, 10,13 259:18 260:10,11

**policies**
50:13,17 55:21

56:1 64:7 256:15

**policy**
11:3 18:12 34:18 56:2 88:15,23,25 89:14,20,21 91:11 96:21,23 208:17 209:1 281:10

**political**
246:2

**poor**
18:23 125:13 216:15

**poorly**
8:4

**poorly-phrased**
61:8 226:1

**portion**
131:4 153:9 157:25 158:17, 23 159:9 220:5 223:10 275:25

**position**
10:24 12:8,13 13:12 81:2 110:18

**positive**
307:20

**positively**
299:7

**possession**
16:7 17:12 103:23 164:2 172:9,10,13, 14,15 212:1,7, 14

**possibility**
164:11 258:1

**possible**
23:19 25:13 78:5 126:17 138:23 187:19 231:11,14 278:7 279:1

**Possibly**
314:13

**posted**
307:2

**potential**
93:17

**potentially**
61:15 93:14 124:16 181:19

**Powerpoint**
51:1 52:21

**Powerpoints**
51:5,6

**practically**
232:2

**practice**
88:18 269:15

**pre-sending**
311:18

**preceded**
317:8

**precedence**
177:11

**precedent**
129:18

**precisely**
219:17

**precludes**
180:18,20

**predominance**
220:22 239:8

**predominantly**
131:15

**preference**
6:14

**prejudicing**
179:11

**preliminary**
178:17

**prepare**
14:6 132:10

**prepared**
14:23 27:1 60:2 87:5 93:16 163:16, 17

**prepares**
26:21 198:20

**preparing**
293:17

**preponderance**
65:6 108:9,12 115:13 183:25 185:14 187:1, 22 211:2 226:21 232:3, 15,18 234:12, 19 235:7,14, 19,23 236:4,12 237:2,6 238:22 264:6,17

**presence**
114:23 115:4 116:1

**present**
117:2 192:20 220:21 226:11

**presentations**
52:1

**presented**
147:1 155:12 165:20 184:16 190:14 192:19 197:11 215:12 218:17 223:15 226:12

**preserve**
16:1,12 17:15 23:12

**president**
10:20,25 13:9, 10,19 19:13 25:18 138:24 312:10,12

**press**
61:2 92:7,12 245:23 246:1, 16 309:9,14, 19,22

**pressure**
103:2 246:6 309:17

**presumably**
78:23 125:10 192:18 209:15 214:12 228:12 242:8 295:1 316:13

**presume**
39:16 109:21 112:8 123:8 137:8 218:16 303:11

**presuming**
168:11 252:9

**presumption**
137:9 168:3

**pretty**
47:21 147:19 170:6 241:11 256:9 278:17

**prevalence**
71:9 127:24

**prevention**
302:22

**previous** 81:3 260:17 289:14

**previously** 12:13 121:2 123:9 169:19 256:6 278:6,25

**primarily** 142:20 149:10 158:13

**primary** 18:3 36:6,9 124:9 126:5 148:22 149:15 155:17

**Princeton** 10:17

**printed** 89:12

**prior** 47:7 48:5 50:9 64:23 69:14 80:22 96:6,14 97:8 144:17 154:4,8 269:12 280:7,9 290:16 311:22

**prioritized** 27:14

**privacy** 106:8 261:5

**private** 5:7 13:15,18 271:8,12

**privilege** 171:2

**privileged** 167:7

**pro** 276:9

**proactive** 26:3

**probably** 8:3 12:11 13:4 14:18 15:24 18:23 19:7,16 32:23 35:2,16 37:24 41:1 42:20 44:20 47:19,25 54:18 57:23 58:22 59:23 63:19 65:4 68:4 70:17,22 73:3 85:24 87:8 91:24 92:18 93:22 94:23 95:24 97:9 102:20,22 107:1 115:20 119:2 124:7 125:13 130:4 132:23 133:24 135:23 141:13 144:3 148:23 152:12 172:23 208:24 212:20 237:20 248:3 249:9 254:1 275:17 294:8 297:5 305:15 309:2 310:24 312:18 316:1

**probative** 154:14

**problem** 177:15,16 179:17 297:2

**problems** 161:12

**procedural** 129:23,25 130:24

**procedurally** 61:24

**procedure** 129:24 180:11

**procedures** 63:25 64:2 65:17 66:5,8 73:25 75:1 87:11,15 88:12

**proceed** 99:13

**proceeding** 5:12 156:22 157:1,10 179:24 192:23 195:22

**proceedings** 5:1,8 99:21 117:18 175:17

**proceeds** 82:23

**process** 12:2 13:23,25 14:2 15:23 25:11 26:6 27:3 50:20 53:22 54:1,10 55:3,22 56:16 60:15,19 66:17 68:9 70:14 72:8,23 74:6 75:13,24 76:1, 11,15,20,21 81:9,15,17,23, 24 83:4,21 84:6,7,25 85:4,8 86:20 89:23 90:1 95:23 96:4,15 99:11,20 100:1,15,19 116:25 118:13, 14 119:3 129:6 140:16 170:13 175:4 177:25 178:1,6 179:1, 2,19 182:3 183:6 186:14 189:6 190:6 192:4,6 193:24 194:8,13,19 195:4 196:17 197:2,10 199:8,9 210:17 211:24,25 212:2,18 238:2 239:18 240:2 242:18 248:12 254:7 255:7 267:17 271:2 294:21

**processes** 56:6,9 84:16

**processing** 141:11

**produce** 172:1

**produced** 17:17 42:23 91:10 151:17, 20 153:20 174:1,24 272:19

**produces** 152:15

**product** 171:2

**production** 158:9

**professions** 31:25

**profile** 58:17 59:7,19 61:7,9,25

63:1,21 73:3 86:24 91:18

**profit**
22:8,10,13

**profitable**
21:24

**profound**
114:21

**program**
21:12,24 30:8 32:3,16 37:15 42:13 43:23,25 44:1,2 93:21 96:10 271:21 278:10 279:7 280:25 281:1, 13 298:16 301:3,7,9,16

**programs**
20:14 22:10 44:3

**progress**
61:11

**prohibited**
60:12 208:25

**prohibiting**
256:14

**promotions**
11:20

**prompted**
11:14,18

**promptly**
101:2,13

**pronounce**
283:1

**proof**
65:6 108:9 187:21

**proper**
89:7

**propose**
49:24 50:2

**proposed**
26:21 28:2

**prosecuted**
298:10

**prosecution**
160:10 238:3

**provide**
14:1 22:23 155:6 171:19, 23 175:22 177:2 183:24 187:1 213:22 229:24 303:20

**provided**
51:19 117:6 157:24,25 158:1,5 165:8 169:19 181:13 183:5 184:13 187:14 188:13 213:5,22 215:9 221:21 227:8 229:23 230:5 239:13 305:6

**providers**
127:22

**provides**
21:2 276:6

**providing**
183:11

**provision**
263:17,20

**provisions**
34:24

**provost**
27:12 28:13 32:25 311:2

**provost's**
28:17

**pubic**
92:12

**public**
11:3 13:4 32:17 34:23 92:3 93:3,10, 11,12,25 96:5 97:19,21,24 141:21,23 143:24 247:10, 11 302:4,7,8, 11,13 313:22

**publicity**
133:23 244:18 313:3

**publicly**
93:13 141:20

**pull**
45:17

**pulled**
20:19 137:16

**punish**
181:3

**punishment**
118:19 126:4 262:1 263:2 265:6,12,15 266:10 290:17, 20 296:1

**purpose**
58:7 89:14 105:12

**Pursuant**
96:21,23

**pursue**
99:3 299:21

**push**
152:21 293:7,9

**pushed**
293:2

**put**
23:14 27:5 36:21 58:24 73:20 98:22 116:23 123:4 136:15 146:15 164:19 195:12 196:21 221:13, 21 246:6 257:2 263:12,16 271:5 309:16

**puts**
253:6

**putting**
59:10 142:21 196:4 244:21

**puzzled**
257:21

**Q**

**quarter**
313:11

**queazy**
219:19

**queries**
92:7

**question**
7:21,22 8:4 9:21 17:8 18:23 36:12 41:8 44:11 47:19 55:17,23 57:17 59:18 61:8,23 66:24 67:20 75:21 79:24 81:10 82:6 88:7 89:7 91:4,15 95:16, 20 112:15,18

115:10,20 116:15 125:14 127:2 132:7 140:5,11 149:25 150:2 156:4 164:8 182:10 183:8, 24 184:1 185:10 187:15 193:18 194:12 196:4 202:20 203:1,19 204:18,24 205:4 207:5,16 212:21 214:2, 8,16,17,25 215:13 216:5, 19 218:5,12 220:1,22 222:19 224:16 225:4 226:1, 11,20,23 227:18 228:20 229:18,22 233:2 235:4 253:3 254:1 262:9 263:14 264:2 266:13 274:3 288:14 289:12,15,18 306:19

**questions**
7:25 8:1 10:12 18:2 48:22 54:11 62:15 67:13 72:16 88:10 89:8 97:1 119:12,16 129:17 139:14 222:10 224:21, 25 239:14 251:9 253:23 314:7 315:3 319:25

**quick**
66:24

**quicker**
7:15

**quickly**
100:11 140:6 141:21 174:14 241:11 244:14 245:20 275:2

**quid**
276:9

**quiet**
102:18 103:3

**Quintez**
167:9 275:2 303:6 306:9 308:2 312:18 316:13,23 318:19

**quite**
11:8 23:19 41:11 43:8 44:20 47:20 64:11 100:11 125:10 142:6 169:7 177:8 188:1 200:6 202:8,25 227:9 230:7 235:3 237:13 239:4 247:17 273:18 274:10 287:3 291:9 302:3 304:23

**quo**
276:9

**quote**
159:13 238:23

**quoted**
153:18,19 208:12

**quotes**
146:2,3 158:25

**quoting**
159:18

**R**

**R-E**
318:10

**Rachel**
6:2 36:9

**racial**
159:23 160:2,3 313:4

**racked**
278:4

**radar**
133:19

**Raichle**
159:6

**raise**
271:3

**raised**
101:5 165:17 291:17

**raises**
88:7,10

**raising**
38:25

**ramping**
21:16

**Randall**
43:4,6,10 44:6

**ranking**
28:23 29:1

**rape**
56:12,21 58:3 86:15 101:9 112:14 113:19 121:24 124:8 231:20 239:5 264:18 265:15 266:23 267:4 298:11

**raped**
112:1 114:9 115:13 182:10 222:13 263:24

**rapes**
56:22 63:11 111:22 112:9, 20 235:15

**raping**
63:6

**rare**
31:22 41:11 179:22,23 180:1 181:15

**rarely**
48:14,25 49:13

**rational**
207:13

**Ray**
142:3 165:3 167:6 174:3,4 175:8 312:9

**re-appeal**
84:23

**reach**
12:9 25:11,18, 22 188:11,17

**reached**
238:7

**reaching**
25:25 151:2

**reacting**
307:21

**reaction**
62:21

**read**
23:9 48:20 49:12,16,18 68:22 72:9 73:1 83:14 90:18 98:6 110:4 121:13 122:5,7,11 123:1 137:16 147:19 153:13 168:25 180:10 181:16 207:20 208:11 220:4,5 221:3 236:25 247:10,21 248:10 249:19 251:3,11 252:16,25 255:9 266:8 281:6 285:10 293:20 305:15

**reading**
14:18 21:11 48:21 49:10 50:4 82:20 90:13 169:1,8 184:5 238:9 251:11 306:7, 11

**readmission**
145:7,10 243:21 244:17

**readmit**
182:8 267:19 268:8 275:8

**readmitted**
243:23 245:17 254:6,13 275:3,12

**readmitting**
257:1

**reads**
83:14 247:15 294:11

**ready**
11:22 93:18 158:7 160:6

**real**
247:14

**realize**
292:18

**reason**
78:25 79:2,19 81:1 89:13 106:9 112:16 113:13 124:9 125:25 148:22, 23 149:9,15 150:23 151:3,8 154:16 155:8 156:6 176:4 177:3 205:5, 12,24 207:5 208:4 209:19 214:14 215:23 216:20 219:10 221:7 223:16, 19 295:5

**reasonable**
106:7 108:19, 22 110:17 128:8 187:21 216:1 243:11, 15

**reasoning**
48:19 49:7,9

**reasons**
59:12 97:22 100:20 112:13, 17 113:18,22 126:5,24 155:17,24 156:2 177:19 204:19 205:6 206:1 212:11 223:14 266:24

**reassurance**
60:22

**Rebecca**
5:9 6:5

**recall**
7:12 8:6 15:15,17 23:13,21,23 25:2,10,14,25 69:5,8 70:7 73:9 75:3 78:4 86:5,7,9 95:5, 13,16,24 96:9, 11,13 97:3,13, 15,18 100:10, 14 101:20 111:2,4 129:7 130:21 136:21 137:14 138:3 153:2 154:18 159:23,25 160:17,20 163:8,11 168:18 169:25 171:10 172:7 174:16,17 178:3 182:22, 23 193:21,23 199:21,24 200:23 201:18 212:13,15 223:1,9,23 224:3,6,13 231:9 242:12 245:22 246:4 251:18 252:17 253:12,14,21 254:16,24 255:2,3 263:15 265:21,23 271:4 286:10, 14 292:7,17 297:18,21 309:10

**receive**
169:6 180:5 248:18 249:16

**received**
86:10 94:15 129:8,9 135:4, 12,13 138:15 186:4 188:18 191:1 233:15 248:14 250:4 276:10 300:15, 17,24 304:6 317:11

**recent**
78:24 167:19, 25

**recently**
41:23 222:13 286:20 293:16 300:1

**reception**
19:17

**recess**
67:9 118:6 163:2 211:19 267:12

**recipient**
176:19 305:8 306:18

**reciting**
268:6

**recollection**
23:17,18 25:12 63:19 145:24 173:7 174:8,19 199:22 200:2 201:4 213:7

**recommendation**
55:13 82:21 83:17 104:18

**recommended** 74:22 114:17 176:25 266:15

**reconsider** 151:8

**record** 5:3,5,23 68:11 80:8 97:2 110:25 157:20 193:13 258:17 280:19 281:3 282:10 283:22 301:6 315:12, 17

**recorded** 5:8

**recording** 5:4

**records** 22:23 74:17 102:21 143:24

**recruited** 12:8

**redacted** 283:3

**redirected** 302:5

**reduce** 181:23

**Reesor** 311:9

**refer** 6:12,14 269:18

**reference** 53:3,5,24 148:19 153:25 159:16 164:15 173:3 240:11 284:14,15 295:14 306:5, 8,10

**referenced** 154:1 158:18

**referencing** 15:11 159:11 162:6

**referred** 108:10 241:17

**referring** 54:6 75:5 109:25 137:6 145:24 146:6 158:24 168:4 175:19 178:4 191:9 222:17 238:4 240:16, 19 256:23 284:6 285:17 292:24

**refers** 146:3 167:24 288:15

**refile** 246:11

**refresh** 254:19

**refusal** 179:8

**refuse** 178:9

**refused** 175:20 177:9, 18 238:1 240:24 241:5

**refusing** 241:1,22

**regard** 316:13

**regarded** 200:20

**regarding** 7:1,2 55:2 76:18 88:8 96:6 121:18 169:20,24 226:2 246:20 292:8 303:8 318:10

**regent** 24:4,25 256:15

**regents** 6:4 24:1,5,11 25:8,10 31:2, 5,11 40:16 41:12 46:16,23 66:16 83:9 84:1,10 101:22 192:1 312:12

**Regents'** 85:1

**regular** 24:25 41:3,5,9 44:7 48:10 50:23

**regularity** 44:25

**regularly** 19:13 20:3,6 24:5 39:3,9 41:16 42:6,7 46:23 62:15 73:2 305:24

**regulation** 64:6 81:18

**regulations** 50:15 64:10, 16,23 85:7 276:18

**rehear** 91:4

**rehearing** 185:9 190:22

**reinstate** 158:12 308:2

**reinstated** 306:10

**rejected** 191:3

**relate** 207:15

**related** 5:18 54:16

**relates** 204:20 317:1

**Relations** 33:3 59:25 92:19,25 138:20

**relationship** 225:15 268:24

**relationships** 46:20

**relative** 164:13 224:18 238:21

**relax** 315:18

**relay** 174:4

**relayed** 174:25

**release** 98:12 173:2 245:23 246:1

**released** 98:14

**relevance** 139:25

**relevant**

16:2,3 69:4
140:3 147:22
169:14 203:1
237:25 289:15
290:17,22
291:2,3

**reliable**
172:2

**relief**
83:1 84:5

**religious**
132:11

**relook**
151:6

**rely**
56:6 155:9,11

**relying**
130:18

**remaining**
121:8 158:15

**remains**
88:24

**remediate**
300:12

**remediation**
300:21

**remedy**
65:22 265:6

**remember**
25:16 26:3
135:11,14
139:2 147:15
161:24 166:9
169:8 170:2
200:4 201:5
223:3 246:5
247:22 254:22
273:9 307:5
314:25

**remind**
44:10 294:20

**reminded**
125:11,15
286:11 306:6

**renamed**
43:6

**renders**
105:9

**renovated**
43:7,14

**renovations**
43:4

**repeat**
96:25 118:24

**repeated**
39:15 124:11
296:5 297:11

**repeatedly**
100:20

**rephrase**
116:17 158:4
195:18 226:1

**reply**
273:9

**report**
24:2 28:9,21
34:8 52:15
72:12 82:15,
17,21 95:6
103:14 104:21
110:20,24
111:3 117:7
119:16 120:3
129:8 191:7,9,
11,13 197:13,
17,21,24
198:3,4,13,20
201:8 207:18
213:8,10
221:24 226:10

227:8 228:8
258:7 259:18
280:24 281:11
283:11,18
285:25 291:14
299:25 316:19

**reported**
57:6 59:12
93:8 129:13
161:11 199:25
217:18 279:20
281:14 298:6

**reportedly**
200:16

**reporter**
5:21,24 8:8
22:15 52:11
103:6 119:23
128:4 143:21
173:25 174:5
220:3

**reporter's**
8:11

**reporting**
160:2 299:6
317:6

**reports**
26:10 33:24,25
37:19,20 60:1
68:23 69:6,21
70:2 92:21
101:2 147:6
149:11 160:16,
23 161:1
172:22 184:10
199:14,17
200:23,24
201:1,2,10,15
206:14 225:22
226:3 227:2
228:3,10,12,17
230:1,22 231:2
242:1 280:16

281:22 284:8
285:13 293:1,
18

**represent**
22:19 89:11
200:19 305:5

**representation**
106:5,11 109:8
149:8

**representative**
139:1 249:10

**representing**
193:6

**represents**
256:13 279:3

**reprimand**
296:3,11,12
297:9

**request**
23:3,17,23
82:10 83:15
131:16 132:7
165:7 166:15
171:22 172:3,4

**requested**
171:20,25
220:5

**requests**
23:1 27:6
83:16 132:13

**require**
205:12

**required**
64:15 139:7
183:6 188:13
189:5 195:23
209:20 237:2
243:19 276:7

**requirement**
117:17 189:12

194:15

**requirements**
101:1

**requires**
53:17 124:22
182:18 195:4

**research**
9:1 21:11 33:5

**Residence**
295:13,24

**resolution**
231:24 232:2
233:14 234:4,5
236:15,22
237:9,19

**resolve**
243:14

**respect**
120:18

**respectful**
294:16

**respectfully**
282:13

**respond**
93:16 101:1
102:4 117:8
183:10 189:7,
24 190:10
192:11 194:2,
5,17 195:7,11,
25 197:4
198:13 199:6
244:10 245:6
249:20 301:12
314:12,20

**responded**
132:6 149:1
269:2 287:20,
22,23 288:18
301:8 307:24

**respondent**
120:20,23
209:7,13
213:24 232:7,
10 234:7,17

**respondent's**
131:11 132:6
211:5 213:18

**responding**
62:11,13

**responds**
196:21 247:16

**response**
48:20 83:15,19
92:9 93:17
101:4 128:9,
20,21 143:13
177:10 183:4
188:12,18
195:14 215:21
216:13 218:15
243:19 245:16
251:25 268:17,
19,20,21
281:20 282:11
300:17 301:1

**responses**
14:11 52:10
216:16 247:9

**responsibilities**
45:21

**responsibility**
28:17 86:18
93:5 105:5
210:15,18
211:3,6
260:18,19
282:8 291:11

**responsible**
51:10 52:11,12
74:13 78:11
79:18 82:25

83:6 84:4
90:4,14,19
104:12 105:4
106:18 108:24
109:9 117:14
118:18 120:20,
24 122:9
123:8,9,12,13
130:9 183:1
232:7,10
233:1,3 234:23
235:10 236:14,
16 237:3,5,14,
16 255:18
256:7,16,18
257:9 258:8,22
263:9 265:3
289:19,22
290:7,15
297:15

**rest**
196:7

**restate**
220:2

**restoration**
15:23 25:3
35:4 36:14
75:18,25 76:5,
21 78:16 80:25
85:3 103:22
115:2 132:22
133:4,7 135:5
141:16 144:23
158:19 167:16
177:23 178:1,2
181:7,8
182:17,24
195:3 205:2
259:21 260:16
261:1 279:15

**restored**
79:20

**restriction**

76:4

**restroom**
315:13

**result**
101:16 237:1
266:7 291:13
300:8,20

**resulted**
234:9

**resulting**
122:20

**results**
179:10 183:13
229:6

**Retain**
253:11

**retaliate**
288:1

**retaliating**
287:24 288:19
291:18

**retaliation**
292:1

**retrial**
185:10

**returned**
10:23

**revenue**
22:1,5,7 32:1,
18 278:3,6,9,
18,22,25
279:6,9

**revenued**
292:13

**reverse**
78:11

**reversed**
74:13 80:24

**reversing**
80:18 155:17 203:16

**review**
28:1,10,12,15 50:16 68:10,18 72:7 76:13 84:9 103:25 115:21 116:8 117:11 130:4 131:23 137:4 146:21 147:16 150:24 158:10, 11 165:4 169:11 171:20 186:15 194:1 197:25 201:20 202:18 211:23 212:4,12 246:7 299:14

**reviewed**
50:13 68:14,16 103:18,21 111:6 129:7 137:10 156:5 158:13 164:21 169:13 170:1 187:6 221:4 246:8 293:8, 11,12,15,24 299:11

**reviewing**
14:16 89:20 110:8 111:19, 20 142:7 150:25 170:2 188:25 236:20 288:23 295:14 319:7

**reviews**
115:1

**revised**
72:19

**revisit**
89:10

**revolves**
202:19

**rifled**
315:25

**right**
6:19 12:19 16:18 17:13 29:4 30:11 33:16 34:14 42:14 45:14 47:21 49:10 51:10 53:16 57:19,20 58:14 60:10 62:9 63:25 64:4 66:4 69:25 74:3 75:17 79:6,22 81:4 82:4 84:5 87:10 88:11 89:18 90:7 92:3,20 94:17 100:2,7 101:20 103:16 104:15, 20 105:18 106:1 107:9 108:3,20 109:1 113:24 116:20 117:4,9 118:14,20 119:13 120:6 122:2 123:10 124:11,25 125:17 126:2, 25 128:14 130:10 132:14 137:6 139:14 140:6,20 141:4 145:1,7,11 146:24 147:16 151:4 155:20 156:9 162:12 166:19 172:22 178:17 180:16, 22,23 181:11 185:10,15 186:21 187:22 188:20,24 189:13,25 191:8 192:1,4 194:1,8,17 195:12 196:11 197:4 198:5, 21,24 199:7,8, 18 203:13 204:10 205:24 207:6 208:1,6 209:2,9,10,21 210:3,11 211:11 214:22 215:11 219:14 225:14,17 226:10 227:20 229:18 230:2 231:24 232:7 237:12 239:14, 17,19 240:17 241:18 245:7 251:12 252:9, 11 256:16 261:21 263:8, 14,17,18 265:7 268:3,12 272:22 274:24 275:9,22 276:2 278:15 279:17 280:21 284:11 285:12 288:12, 17 289:20 291:23 295:6, 20 297:16,20 298:11,22 299:18 303:1,2 304:4 305:18 307:14,22 308:14 313:21 316:20 317:15, 21 318:5,8,11, 25 319:9,20

**right-hand**
130:14

**rights**
7:3 25:4 35:4 36:14 43:14,18 78:16 80:25 85:3 104:24 115:2 132:22 133:4,7 141:17 144:23 158:19 181:7,9 195:3 205:2 261:1 276:8,22 277:1,6 279:15

**rings**
97:5

**rise**
57:23

**rises**
56:12

**risk**
126:3 241:24

**Robertson**
304:7,8

**robust**
52:20

**role**
23:25 26:5 35:3,9,10,11 36:13,16 63:24 91:23 93:7 97:24 99:20 109:10 118:14 136:12 206:3 295:12

**rolled**
200:9 213:17 217:20

**room**
88:19 106:15 201:7 210:23 221:20,23

**rose**
280:20 313:6

**rotate**
41:13 46:1

**rotates**
42:20

**rough**
170:6

**roughly**
7:14 15:2 70:20 192:3

**Ruben**
312:16,17,21

**ruin**
135:16

**rule**
31:9 155:19

**rules**
7:11 276:20 292:19

**run**
20:21 24:3 38:7,8 72:3

**runs**
62:8

S

**safe**
264:12

**safety**
303:17

**said/she**
210:20 211:1 214:21 215:7 219:13

**salaries**
30:21,23 31:1,7,24

**sanction**
90:15,22 114:18 299:1

**sat**
140:20,22,25 141:5 188:6

**Saturday**
47:6

**save**
176:23

**saying**
25:14 49:7 56:21 59:11 60:2 80:8 93:24 100:14 116:14 122:20 123:2 124:17 133:9 137:9 142:23 176:7 185:20 195:18 197:19 204:12 210:23 218:22 219:4 220:10 221:8 222:15 224:10,18 232:12,14 234:18 236:11 237:4,10,15 239:2,4,23 245:23 252:9,17 253:12 255:2 268:7,22 273:3 279:2 282:3 283:2 285:19 287:20,22 291:4 309:19

**says**
23:4 53:16 89:15 109:20 110:10 114:21 120:18 121:9 122:15 123:21 124:2 132:5 135:13 145:5 159:8 167:18 168:6 175:11 205:22,23 209:6,17 210:9 213:4 217:6 240:20 249:5,6 252:8,25 260:9 275:1,7,25 277:21 278:2,24 281:7 282:13 284:4,10 287:16,21 288:18 294:9 295:17,18,23 298:25 299:10,20,21 300:10 302:21 303:1,5 307:19 310:6,16 314:21

**scenario**
94:8 113:3,4

**schedule**
7:18 68:1 121:22 131:9 132:2,3

**scheduled**
132:12 301:14

**scheduling**
132:9

**Schmidt**
283:2 284:23 294:5,6 295:6 316:25

**scholarship**
38:24,25

**school**
11:3 28:22,23 46:12 60:16 79:5 81:19 101:15 111:23 112:10,11,22 113:12,13 114:11 126:18,19 132:16 182:2,8 244:15 245:10,17 257:1 265:3 269:25 271:2 274:18 277:10 309:19

**school's**
63:25 65:3 81:14 84:21

**schools**
22:2,5,6,9,11,12 24:10 32:9,12

**scientific**
149:21

**scratch**
36:11

**scroll**
281:6

**searching**
23:18

**season**
102:15 278:8,13,20 279:2

**seats**
40:18 278:18

**second**
11:12 52:25 55:25 63:18 66:9 74:8 104:12 105:6,15 109:14,24 114:18 120:24 121:3 146:15 175:12 188:20

203:22,25
204:8 205:16,
23 206:24
209:5,6,21
237:13 249:2
272:24 298:24
299:2 302:24
307:19

**secondary**
148:23

**seconds**
187:6,9

**secret**
192:23 194:25

**Secretary**
11:8,9,11

**section**
107:16 110:2,4
120:16,21
131:7 145:5
175:11 281:7
299:17

**security**
202:10

**see**
19:8,22 20:3
23:3,10 35:21
36:22 38:1,4,
11 42:4,19
51:22 52:4,22
66:21,25 79:2
90:25 107:8
109:18 124:10
129:22 133:7
137:4 140:4
144:16 145:19
146:21 147:21
159:10 162:17
163:14 169:1
173:14 188:11
192:10 193:8
197:2,11,12,

14,17 201:3,8,
21 205:8 216:4
217:17 220:18
246:13 248:24
250:25 255:8
258:4 282:23
283:10,22
284:10 297:5,7
303:1,2 305:15
310:16 315:5,
21

**seeing**
139:17 141:15
160:17 202:6
289:7

**seek**
57:4

**seemingly**
161:12 201:23
202:8

**segments**
164:5

**select**
68:24 145:23
147:11 153:1,
24 160:8

**selected**
70:3,5 154:10
163:21,24
164:4,17 165:3
185:24,25
186:2 187:6

**selective**
68:21

**selects**
139:22

**self-admitted**
253:18

**semester**
244:4,13,15
262:10,12,13,

17,23,24,25

**semi-nude**
255:23

**Senate-confirmed**
10:24

**send**
36:24 48:17
72:18,21 83:12
170:23 182:23
247:14 248:17,
18,20 249:10
294:21 302:11
310:21,22
311:25

**sending**
139:19 192:23
249:15 311:22

**sends**
137:10 307:13

**senior**
10:19 41:12

**sense**
7:22 14:15
20:25 32:14
57:1 60:7 68:6
91:3 138:4
140:8 144:12
156:8 165:15,
17 170:24
200:4 227:12
228:18 270:2

**sensitive**
5:6

**sentence**
114:18 123:21
131:7 145:19
181:23 231:25
236:25 237:13,
23 238:9,12
253:5 303:5

**sentences**

109:16 233:11

**separate**
33:16 87:25
157:24 279:9
297:15

**September**
13:25 71:20,22
178:18 277:17
286:9

**series**
12:4 51:3
137:17 195:13
202:1,4 286:18

**serious**
56:24 57:13,16
88:16,21
261:18 288:22
289:3,4
291:13,25

**seriously**
60:23 62:24
99:6 188:4

**seriousness**
297:17

**served**
257:5 261:25
262:21

**serves**
302:21

**service**
8:23,24 9:25
127:22

**services**
293:2

**serving**
35:6

**session**
83:18

**set**
14:24 18:12

27:14,17 54:3 64:3,6 92:2 118:20 128:1 130:24 136:25 154:22 166:3 172:18 180:6 181:22,23 198:23 216:15 250:14 253:6, 15

**sets**
112:1 166:1

**setting**
132:16 154:5 292:4

**seven**
34:12 45:4 162:20

**seven-figure**
273:20 274:14 304:22

**several**
13:1 14:18,19 15:1 20:5 41:20 50:12,16 63:9 124:25 159:12 160:23 243:14 257:7 273:5 300:8 309:9

**sex**
105:16 204:21

**sexual**
52:8 54:21 55:4,20 56:1, 22 57:6,9,16, 25 59:7,19 60:11 63:2,23 71:5,7,8,10,12 74:13,19,20 75:3,16 77:10 78:7,8 80:10, 13,16,23 82:1 83:6 88:17 95:17 104:12, 13,14 105:5,6, 7,12,13,15,24, 25 106:20,22 107:17,19,22, 25 108:2,25 109:13,15,17, 20,22 110:10 117:17,18 120:15,21,22, 24 121:2,4,8, 9,14,18 122:5, 10,13,14,17,22 123:7 124:5 127:3,13,15,24 130:9,10 148:5,6,13,16 181:20 190:21, 22 191:1,11 203:22 204:7, 8,9 205:11,16, 17 206:23,24 207:20,22 208:17 209:1, 2,4,5,6,12,21, 23 213:24 217:2,16 218:8,10 221:1 223:23 225:2 233:7 234:24 235:8 237:3,5, 15,16 253:6,11 255:20 256:4, 5,14 257:3,4, 8,22 258:23 259:6 260:12 261:12,14 263:4,8,9 265:4,24 266:6,10,17 280:16,24 281:11,16,22 282:6 289:20, 21 290:1,3,13, 16,18,21 297:14

**sexually**
224:10 290:7

**Shannon**
41:21

**shape**
139:18

**shapes**
65:7

**share**
41:20,21 42:21 87:24 113:6

**shared**
198:5 213:16 249:8

**shares**
42:18 141:8,9

**sharing**
110:16 111:9 142:19

**sheer**
303:7

**sheet**
299:14

**shift**
85:10

**shifted**
220:23

**shoplifting**
286:21 287:3

**Shore**
137:23,24

**short**
237:1 267:8 315:4

**shortened**
233:11 278:19

**shorter**
174:2,6

**shortfall**
278:6,25

**shortly**
15:22

**shoulder**
287:18 288:8

**shove**
292:14

**shoving**
292:8 296:15

**show**
51:12 98:9 140:3 143:17 144:8 157:14 250:20 287:15 300:2

**showed**
142:14 235:7, 24 245:18

**showing**
228:23

**shown**
68:25 98:17 157:7,9

**shows**
167:8 234:13 280:19

**shut**
185:2

**side**
46:4 53:16 117:8 138:21 155:12 175:22 184:11 185:19 194:1,16 195:5,24 197:2 214:21 300:14 308:4,5

**side's**
169:3

**sides**
117:1 155:12 197:11,19 207:12 211:10 252:6

**signature**
42:24

**signatures**
250:7

**signed**
104:1 158:11 250:9 273:22

**significant**
26:16 114:24 115:5 116:2 131:1,24 132:1 136:9 201:22 204:13 267:18, 23 268:8 269:19 273:13, 14,17 274:1,6 276:5 288:2 304:19

**Significantly**
58:20

**similar**
49:25 55:16 63:10 75:25 98:13,14 114:2 319:13

**simple**
98:12

**simply**
16:3 98:17 122:11 147:19 151:4 172:1 174:23 186:25 221:8 232:21 261:17 281:25

**Sims**
311:12

**single**
42:24

**sink**
26:18

**Sir**
118:22

**sit**
39:2 40:7 42:8 49:13 86:5 177:5

**sits**
26:11

**sitting**
299:8

**situation**
48:5 98:22 211:1 239:5 261:4 265:1 283:19 294:12

**situations**
89:16

**six-plus**
152:11,13

**sizeable**
270:14

**skim**
49:20

**skipped**
106:3 118:11

**slide**
51:1

**slides**
52:22 299:13

**slightly**
55:16 148:17 183:8 218:4

**slow**
135:15

**small**
18:15

**smaller**
166:3

**smell**
201:9

**Smith's**
287:17

**SOAR**
280:25 281:1

**soccer**
44:21

**social**
23:4 303:13,14 306:24 307:18 308:6

**softball**
44:22

**sojourn**
91:18

**solely**
130:18 207:9

**somebodies**
263:25

**somebody's**
125:22 283:3

**someone's**
177:16 184:3

**sooner**
79:6

**sort**
33:19 35:11 38:2 54:25 61:23 65:8 71:8 79:13 101:16 119:4 136:10 154:5 171:6 178:7 188:12 238:18 240:12 248:1,9 255:24 263:5 287:11 300:20

**sorts**
58:13 266:24 276:18

**sought**
145:16 172:25

**sound**
8:1 15:22 30:11 97:10 108:20 134:7, 11 237:10 268:9 300:13

**sounds**
49:24

**speak**
7:19 8:8 37:23 39:1 45:18 141:2 268:15

**speaking**
14:15 18:16 19:5 35:18 112:19 126:14 195:17 232:2

**special**
296:21

**specialist**
302:22

**specific**
25:1 47:3 74:23 85:15 115:20 131:12 229:12 253:14 254:23 303:8 305:14

**specifically**
64:20 81:9 222:17 236:9

255:3 271:22
295:9

**specificity**
201:18

**specify**
78:20 247:8

**speculation**
285:6,15,22

**speed**
188:1

**spend**
9:19 19:11
27:7,16 46:11
135:18 137:19

**spending**
42:16

**spends**
42:9

**spent**
10:19 14:16,
18,19,20
126:25 135:20
136:2

**spills**
160:9

**spoke**
67:16 140:24
141:3 249:7

**spoken**
144:17

**spokesperson**
93:3

**sport**
44:4,6,23,24

**sporting**
45:14,15

**sports**
21:6 31:22
44:13 45:7,12,

13 47:2,8
90:25 278:16
279:10

**spouse**
41:2

**spring**
26:13 262:12

**stack**
315:21

**stadium**
46:5

**staff**
10:19 33:4,22
34:1,2,9 40:20
41:12 55:10
72:22,25
247:24 283:4
284:4,10,16
310:15,24
312:6 318:5

**staffer**
292:8 296:16
316:20

**stage**
21:5 87:16
123:14 181:3
193:24 194:13
195:21 218:14
220:8,15,18,
21,25

**staggering**
201:24

**stakeholders**
248:7

**stamped**
308:18

**stand**
63:21 87:21

**standard**
108:17 237:2,6

238:22 301:1

**Standards**
299:23

**standing**
40:16

**standpoint**
84:24 94:19

**stands**
23:6 185:14

**start**
8:15 17:25
72:5 131:6
165:12 169:23
243:22 272:6
316:3

**started**
75:2 133:20
136:12 143:13,
14 185:25
240:6 269:15

**starting**
71:22 114:19
120:14 316:2

**starts**
109:16 123:19
131:5,7 145:19
167:5 238:12
244:15 252:2
295:7

**state**
5:23 9:2,15
19:10 66:11
74:7,10 85:8
106:16 209:15,
17 256:12
260:15

**stated**
61:3 129:23
176:12 317:15

**statement**
60:2,13,15,18

61:2 87:5
98:10,11,13
99:4,9 174:4
176:1 196:11
213:11 214:20
217:12 219:6,
8,10,24 220:6
221:4,15
235:18 238:6
239:22 240:1,
12 254:13
261:12,17
291:4 306:4,8

**statements**
60:10 98:8
112:3 213:7
218:2 237:7,17
241:3,4

**states**
5:11 8:23

**stating**
316:1

**statute**
76:3,4 78:19
85:5 130:18
139:7 181:17,
18 182:18
183:7 186:17
208:11

**statutes**
276:8,12,22
277:2

**stay**
182:12 266:7
296:13,14

**stayed**
11:19

**staying**
59:3 254:11

**stays**
104:24

**steal**
287:4

**stealing**
287:6,7,12

**Steinecke**
313:14

**step**
12:7 118:12

**steps**
81:23 260:11 303:22

**Steven**
167:8

**Stilling**
167:10,12 168:1,19 176:21

**Stilling's**
167:22

**stop**
208:6

**stopped**
185:25

**store**
316:14

**Stored**
23:7

**story**
227:14 229:1, 15,16 234:20, 21

**straight**
207:15

**straightforward**
129:17

**strategies**
58:11

**strategize**
59:3,6,9

**strategy**
33:5 142:22

**street**
62:9

**strike**
202:25

**strikes**
57:12

**striking**
188:2

**strong**
133:12 247:5 248:7 283:20 312:18

**stronger**
263:19

**strongly**
215:22

**Stubs**
313:13

**student**
7:3 33:1 39:5 55:11 56:2 57:3,21 60:17 63:14,15 67:2 75:5,10 79:20 81:25 84:8 85:14,25 86:2 88:4,11,15,17, 22 89:17 90:10 96:3 104:7,8, 24,25 110:13 111:22,23 112:9,20 124:19,20,22 125:17,18 127:23 145:5 177:24 261:22 262:4 265:6 275:5 281:12 291:12 294:11, 15 296:20 297:6 299:3,4, 6,7,23 300:10, 14,18 303:19 311:9 314:22 316:14

**student-on-student**
63:2

**students**
21:2 39:1,7,8 40:22 57:3 71:16 72:1 79:25 113:19, 24 181:13 248:16 249:17 263:9 290:8, 10,12 299:24 311:10

**studied**
10:6

**study**
10:5

**stuff**
129:18 241:18

**sub**
107:19

**subcommittee**
83:13,17

**subject**
173:1 238:3 294:22 318:7

**subjected**
123:25

**subjects**
248:9

**submit**
72:6 179:18 180:9 192:8 194:14 196:22 197:1

**submitted**
68:15 69:1,12 82:16 145:14 147:10,17 150:25 163:7, 9,23 164:1,14 168:23 170:24 177:25 184:15, 19 188:24 189:23 193:14, 25 195:6,23 197:3,24 199:2,5,6,10

**submitting**
193:9

**subpart**
209:6

**subparts**
107:3

**subpoena**
22:20

**subsequent**
83:16 259:4

**subsequently**
9:4 11:7 169:18 258:11, 14 259:14

**subset**
37:7

**substance**
61:13

**substantial**
26:18 31:13 49:11 135:20 154:25 175:14 190:14 203:18 269:24 271:3

**substantiated**
264:24

**sue**
246:18 252:6

304:13,16 314:10 317:20

**sued**
99:25 100:4 101:20,21 102:5,14

**sufficient**
186:19 263:2 265:12

**suggest**
154:25 159:14 215:4,6 219:3 285:12

**suggested**
35:13 115:12 142:15 146:24 148:15 201:2, 11 218:18 221:7,15,17 222:7,12 225:13 232:22 281:18

**suggesting**
264:18

**suggestions**
36:20 73:6 98:17

**suggests**
108:12 165:19 177:12 215:23 217:17 234:20 238:14,24 294:23

**suit**
100:11

**suite**
5:17 40:11

**summaries**
146:14 147:10 306:2

**summarize**
10:13 280:10

**summarized**
145:25 170:16 280:11

**summary**
145:20,23 157:21 170:23 171:7 209:15, 16 248:1 307:13 318:24

**summer**
66:18 95:14,19 97:7 269:8

**summers**
269:15

**supervisor**
282:1 283:25

**supplemented**
162:3

**support**
5:16,22 20:13, 20 21:13,14 44:3 74:25 78:22 129:20 130:2 210:11, 13 215:1 303:21 312:19 313:1 314:22

**supporter**
312:18

**supporting**
213:25

**supposed**
46:13 281:22 283:9

**sure**
17:15 18:5,22 29:18 37:5 42:18 47:20 51:10 52:20 54:2 59:9 62:10 66:6,11 67:6 72:19 73:4 77:23 81:11 87:12 93:23 97:1 129:8,9 138:22 142:3 147:14, 19 148:17 149:24 150:16 153:17 156:25 157:2,12 163:19 164:14 173:11 184:3 193:12 204:3 227:12 244:11 248:3 249:15 255:10 256:9 258:20 260:5 278:16,17 280:13 290:21 301:11 302:3 313:15 314:17

**surely**
19:11 36:24 62:1 87:2,18 92:10 133:7 141:13 301:5 312:22

**surfing**
136:5

**surprise**
178:8 254:21 274:20

**surprised**
29:13 30:17 276:24

**surprising**
139:4 254:10 255:1

**surprisingly**
242:3

**surreptitious**
287:4,8

**survivor**
113:5 114:3 125:19 182:3

**survivors**
95:6,8 101:15 181:5 303:10

**suspect**
57:10 129:12, 13 142:4 151:11 175:6

**suspended**
79:5 88:17,20 90:2,11 91:1,5 96:10,15,18 97:7 100:15 104:18 190:8 262:19

**suspending**
125:18

**suspension**
88:14 90:1,5, 16,17,23

**suspensions**
89:15

**suspicion**
133:12

**sway**
187:24

**swear**
5:24

**swing**
289:4

**sworn**
6:7

**symbolic**
229:3

**system**
13:16 19:12,14

24:2,3,7,10,14 25:19 28:9 50:17,18 90:1 294:25 312:10, 15

T

**table**
7:21 206:11

**Taffora**
137:6,8,9 138:17 141:25 142:3 165:3 167:6,9,19 168:4,13,18 169:11 170:10, 12,16,23 172:3,5 175:1, 4 176:20 183:16 193:18, 21 212:20 230:3 241:18 244:7 246:17 293:15 304:4

**Taffora's**
166:14 261:11

**tailgate**
45:24 47:1,7

**tailgates**
47:3,4

**take**
5:4 7:13,19 11:10 13:24 31:12 46:19 51:17 62:24 67:5 88:25 89:4,5 90:13 99:6 101:15 103:11 106:15 109:24 110:1 117:25 119:25 121:16 122:4 128:7 129:20 135:17 152:8 153:22 162:19, 24 166:25 183:18 187:4 201:13 239:13 241:1 244:23 250:2 255:6 258:18,19 265:22 267:8 282:8 300:21 315:4,6

**taken**
67:9 117:20 118:6 151:9 163:2 211:19 267:12 286:19 290:12 303:22

**takes**
9:1 26:20 52:6 76:12 126:10 187:10 303:15

**taking**
60:23 67:21 113:25 163:6 182:19 193:13 253:16 257:3 261:3 290:4

**talent**
31:21

**talk**
17:5 18:13 24:22,24 35:2 36:1 37:22 45:19,22 46:8, 18 48:18,23 49:6,9 50:3 53:22 54:2 70:13 72:15,17 76:17 82:12 83:20 87:18 93:6 99:6 127:23 132:20 138:16 141:14 144:14 147:8 150:13 193:8 242:4,6,8,9 247:6 261:3 278:5 281:14 312:22

**talked**
14:11 50:18 54:13 67:14 68:9 72:4 76:11 81:8 83:3 87:9 93:13 98:20 117:15 121:21 127:12 129:5 138:18,19,23 139:12 141:8 144:13 147:25 150:18 152:10 160:8 168:2,9 171:8 194:20 195:4 199:12 225:23 227:20, 22,25 228:2 232:3 264:7 277:4 282:5 294:11,14 295:18 297:13

**talking**
14:19 20:11 25:2 32:2 36:15 46:11 47:22 64:14 66:18 76:10 80:10 81:19 82:7 89:18 91:18 102:13 125:16 142:1 168:18 175:3 178:5 189:9 193:11,12 214:11 220:12 225:10,11 250:25 252:22 256:8 257:25 268:10 269:17 284:21 298:4 305:24 308:1

**talking-to**
296:7

**talks**
52:9 258:4 270:9

**tape**
292:13 293:10, 11,12,15,21,24 295:15

**tapped**
287:17 288:8

**tat**
180:16

**Taylor**
313:13

**TB**
278:21

**team**
18:8 19:2 20:16,17 22:13 32:20,24 35:21 38:19 39:7,13 44:22 45:1 47:11,12,14, 15,18 73:12 88:21 89:16 96:16,18 143:4 218:17 248:13, 17 250:5,9 305:21 306:9 311:6

**teammate**
106:14

**teammates**
309:10

**teams**
39:14 45:16 58:17

**Ted**
42:5,7,9,18,19 268:10 270:10 272:22,24 273:3,5,7,18 304:23 314:3

**tell**
8:20 15:20 23:6 25:19 29:11 41:17 43:8 46:24 54:20 55:23 59:10 65:5 77:13 91:22 97:5 101:25 102:7 104:3 107:7 110:2 119:20 120:17 142:2,11 143:18 144:4, 14 146:18 159:19 165:24 212:6,17 232:14 233:17, 18 240:18 242:14 247:11 251:4 253:1 268:21 280:12 284:13 285:8, 24 293:21 298:13 305:13 312:25

**telling**
193:21 225:1 229:15,17 238:15,25 242:7 305:25 308:2

**tells**
166:1 181:5 186:17

**template**
62:22

**ten**
9:19 32:8,9, 11,15 134:23 271:13

**tenable**
152:10 174:22 242:25 244:16, 18

**tend**
46:11 248:5 305:14

**term**
11:10 73:8 81:14,16 108:15 125:9

**terms**
20:13 59:9 63:23 65:16 141:10 155:14 185:14 222:10 242:11 278:1 296:21 299:12 305:25 306:17

**terrible**
55:23

**tertiary**
148:23

**testified**
6:7 7:6,8 110:21 111:2 123:17 127:18 136:25 148:10, 11 149:19 165:8,24,25 166:8 178:15 200:13 222:25 223:7 225:5 237:25 253:9

**testify**
53:7 97:12 110:23 117:3 119:4 136:14 174:20 193:17 230:2 240:24 241:1 294:1

**testifying**
119:11 227:15

**testimony**
146:4 149:20 150:5 159:5,13 173:15,16 174:2 190:17 201:6 207:11 213:9,16,23 218:19,25 223:5 224:14

**tests**
75:11

**Texas**
5:18

**text**
16:8,10,12,14, 15 17:11 23:5, 12,16,19 153:24,25 154:1,4,8,10, 19 155:7 156:21 157:8 160:8 186:1 225:7,16,21 227:25

**texts**
16:20 17:1 157:6 222:11, 19,20

**thank**
37:13 40:20 116:23 147:8 156:19 238:11 255:16 268:4 279:25 319:22, 24 320:1,4

**Thanks**
128:18 284:24

**There'**
195:11

**thing**
8:7 18:22 19:10 23:9 30:15 33:19 35:11 60:3 64:22 67:14 68:8 76:14 82:1 93:24 119:5 135:15 136:10 146:17 147:23 156:9 160:9 165:6 169:17 173:4 177:23 180:23 196:13 234:11 263:5 280:6 286:3 288:22 291:1 297:8 308:14

**things**
14:9 17:16 18:24 27:15,17 36:11 38:2,8 49:20 52:13 58:14 60:20 61:4 62:16 66:6 68:20 73:7 84:25 87:21 121:21 123:9,13 127:5,18,24 137:11,16 139:2 145:14, 15 146:19 147:17,21 155:16,18 156:6 158:14, 22 160:11 161:18 162:17 172:14 184:14

185:16 192:23
199:13 221:22
222:1,11
229:7,12
233:17 245:8,9
248:7 255:6,13
258:10,12
263:11 279:3,
19 306:2

**think**
6:22 14:9
16:17,18 22:4
23:9 24:18
25:6,15,16
28:7 29:15
38:4,15 40:24
41:18 47:21
48:3,4 51:9
54:18,22 55:19
56:9 59:10,11
60:19 74:12,
16,20,23 77:21
78:14,25 80:15
85:20,22 93:19
98:14 100:10
103:21 108:16
110:9 111:24
112:19 113:2
115:9 116:14,
20 123:17
124:21 129:24
133:5 136:21,
24 137:15
138:3 139:12
141:12 143:11
144:13,20
147:25 148:19,
22 152:2,4,12
153:8 161:25
164:20 168:1
170:16,20
173:4,9 179:7
180:14 181:12
185:19 186:3
188:2 191:2

192:11,17,25
193:3 195:17
197:12,14
201:17 202:16
204:17 206:16
209:17 211:10
212:9 216:1
218:4 220:14
222:4 223:6
230:11,18
231:11,18
233:18 235:13
236:1 237:13
238:23 239:4,
12 243:20
244:16 245:3,
15 246:21
247:23 251:4
258:10,16
261:16 264:12
269:14 271:5
276:9 278:1
280:4 283:5
286:17 288:14
289:21 291:9
293:8 296:19
297:4,5 308:3,
14 312:14
313:14 317:8

**thinking**
140:1 156:16
173:19

**thinks**
137:11

**third**
29:21 41:22
66:10 74:9
104:13 105:24
107:17,19
108:1 120:15,
22 122:22
130:9 204:1,7
205:11,17,22
206:23 207:21

209:11,23
238:12 297:10

**third-party**
206:13

**thought**
78:24 115:16
137:3 143:5
155:24 172:8
180:24 182:8
186:16 203:9,
18 210:3 214:9
225:7 232:15
251:23 254:9
266:5 278:21
294:12 302:8

**thoughts**
141:9 142:19
211:14

**threat**
124:15,23
126:2 246:15

**threatening**
246:10,18
286:22 288:1
292:1 296:1
303:9

**three**
10:9 12:20
15:3 27:13
41:2 48:9 53:9
65:21 66:6
70:14 77:18
94:5 122:5
138:1 199:3
221:20 241:3
255:13 297:13

**three-month**
11:13

**threshold**
31:4

**throw**
181:19

**thrown**
181:6 182:4

**Thursday**
143:11,12,16
144:3

**ticket**
278:18

**tickets**
293:4

**tied**
122:17 123:17

**Tile**
180:2

**time**
7:12,16 8:8
11:9,12 12:25
14:15 16:4,16,
18 17:16 19:12
26:18,20 42:9,
16 43:8 46:14
65:1 67:4,8,
11,17 70:21
71:11,19 72:1
74:11 77:5
80:22 91:12
94:4 95:2
97:9,16 101:10
102:12 117:25
118:5,8 127:1
132:9 135:4,8,
17,18 138:14,
15 151:25
152:4 162:24
163:1,4 174:2,
6,11,12,18
177:8 178:5,13
179:15 180:7
182:21 184:13
193:8 201:2
211:18,21
216:22 220:13
230:12 243:11,
25 246:10,21,

23 247:18 248:10,15 251:22 252:19 257:5 261:24 262:20 264:3 267:11,14,21 270:3 272:2,5, 7,8,9 274:7 275:2 279:16 286:15 295:2 313:23 315:9 320:1,6

**timeframe**
65:13 103:1

**timely**
86:21 100:22, 24 243:7,10,19 244:20 245:6

**times**
6:22 7:9,17 48:4 65:21 67:16 74:12 97:1 140:3 220:15 310:3,4

**timing**
47:5 60:5 61:19 133:21

**tired'**
213:24

**tit**
180:16

**title**
13:12,19 47:23 48:13 49:4 50:10,15 53:5, 17,21,25 54:16 61:10 64:11 65:3 70:11 81:8,15,18,21 82:16 84:16 85:4,8 88:1 89:23 92:20 99:12,21 100:1,14,18,25 101:12 103:14 117:4,22 127:13 145:1 156:22 157:1, 10 175:16 177:6,12,25 178:6 179:1,19 181:4,6,13 182:2 192:3,6 193:24 194:13 195:22 212:1, 8,14 225:17 229:24 234:3 239:10 242:18 245:6 250:18 277:11 281:15 284:25 295:7 319:8

**titled**
208:16

**titles**
50:22

**today**
6:12 7:11 20:12 36:15 47:22 86:5 231:9 249:11 252:22 253:9 299:1

**today's**
14:6 77:19 306:4 307:13

**told**
12:10 75:22 85:23 86:7,11 94:22 96:11 101:4 144:9 147:22 151:21, 24 152:2,13, 17,23 170:4,5, 10,11 174:14 176:13,15 179:9 186:15 212:4 216:9 229:15 231:6,7 241:12,21 242:9 244:8 252:9 276:23 283:25 286:18 292:13 293:8, 12,23,25 296:4 297:2

**tomorrow**
310:17

**Tonya**
283:2 284:23 294:5,6,9 295:6,17 316:25

**top**
31:21 53:9 75:22 77:13 213:3 237:22 261:3 271:12, 13 284:23 294:22 298:21 302:25

**topic**
142:1 254:24

**topics**
19:3

**totally**
156:4

**touch**
91:20,25 93:19 287:21 303:20

**tow**
293:3

**towing**
296:16

**town**
38:3 40:15 46:16 47:9 134:14,15 135:1,3,4 136:18 138:6

**tracking**
133:21

**traditional**
119:2

**train**
64:21

**trained**
55:9

**training**
51:10 52:5,6, 20 54:22,25 79:14 127:12, 14 190:16 263:11 298:16

**trainings**
50:23,25 52:23 54:13,14,16,19

**transacted**
46:21

**transcript**
5:1 6:13 49:13,16 67:15 68:22 129:12, 15 150:15,17 151:12,13,14, 18,20,25 152:1,9,22 153:6 159:3 160:20 173:5, 23 244:25 320:8

**transcripts**
49:20 72:13 174:9 242:21 243:15 244:5

**transferred**
261:22

**transition**
11:18

**transmit**
72:25

**transportation**
293:2

**trauma**
126:8

**traumatic**
125:10 154:25 222:23

**travel**
19:9,21,22 20:3 46:18 132:11

**traveling**
19:8

**treat**
188:20 189:13, 14 264:20,21

**treated**
188:19 189:14 264:25

**treatment**
79:14

**trending**
307:20

**trial**
72:14 101:10 108:11 132:12 133:20,22,23 134:2 140:20, 22 141:1,6 145:23 146:24 147:11 148:10, 12 149:19 150:4,12,14, 16,18 151:13, 15,19 152:1,8, 23 153:10,20 157:6 159:2, 10,14,22 165:9,10,16 166:4,8 169:22 171:12 173:1, 5,20,23 174:9 176:1,6,23 177:4,14 178:8 179:23 180:2 183:23 184:17, 24 186:6 187:20 188:6 192:15,17,19, 24,25 193:3 194:24 196:7 206:4 212:8 216:16 217:9 220:16 228:13 238:1 242:22 244:5,19 245:12,20 260:11 264:19 289:13 305:13

**trial's**
173:2

**trials**
101:13 108:15 217:25

**trick**
57:17

**trigger**
96:3

**triggered**
127:19

**triggers**
90:17

**trip**
134:22 135:16

**trouble**
240:13 279:16 291:5,8,10 296:13,14

**troubled**
240:6

**troubling**
291:15,22

**true**
22:4 32:24 88:22 95:8 100:25 111:16 134:12 176:2 188:15 189:4 195:10 198:17 214:23,24 215:4,6 217:9 220:10 224:13 225:4 230:20 234:1,21 276:15 300:2

**truth**
233:20 238:16, 25

**truthfulness**
239:3

**try**
8:13 17:5 41:13 45:8,11 61:1,4,12 65:11 67:19 68:19 82:1 132:1 149:4,6 154:17 195:18 211:11 283:1 287:4 309:16

**trying**
18:21 55:19 152:22 165:15 186:18,20,22 210:12 218:1 224:21 241:23 246:2,6 247:22 262:14 267:18 271:2 287:7 309:3

**turn**
22:10,13,18 65:8 72:25 82:16,20 107:5,15 109:3,13 118:13 120:14 121:12 122:3 130:23 145:13 212:25 225:12 275:20 298:24 302:24

**turned**
102:9,10

**turning**
22:8 118:10

**Turns**
252:7

**tutoring**
44:2

**TV**
305:14,16

**tweets**
306:23

**twice**
37:25 38:6

**Twitter**
306:20,21,22

**two**
7:22 11:1,13 12:18,22 15:3 19:3 22:24 37:12 39:7,22 42:2 56:1 61:4 63:20 75:9 77:13,14,18 78:6,10 79:11 80:2 82:9 86:11 95:24 101:9 106:15 109:15 113:13, 24 124:15

137:20 138:1 147:4 160:11, 18 169:21 171:11 187:9 190:17,25 199:4,24 210:22 214:22 215:20 222:24 226:13 230:18 237:6 241:2 247:24 261:20 262:20 263:25 275:8,12 280:15 284:7 285:4,13 289:19,22 290:1,4,11,23 298:10,15 300:11

**two-year** 11:2

**type** 18:24 19:10 52:1 54:5 60:3 64:22 78:7 81:2 90:14,15, 16 98:11,22 180:15 183:1 261:6 281:20

**types** 31:20 52:22 62:17 126:15 243:20

**typical** 108:15 136:20 300:17

**typically** 16:14 27:13 35:14 39:4 40:18 45:3,7, 24 48:15,20 55:5 56:10 59:21 60:9,13 72:17,24 76:23 81:19 86:1 138:10 139:13 266:10 290:20

**typo** 109:21,25 110:3,6

**U**

**U.S.** 5:16,22

**ultimately** 28:5 132:16 145:11

**unable** 201:13 213:21 215:2

**unanimously** 120:20,23 123:22

**uncertain** 129:11

**unclear** 86:15 97:15

**uncomfortable** 110:16 111:9 113:5 122:12 126:9 281:13, 17 282:2 285:2

**uncommon** 25:21

**unconscious** 217:21

**undated** 91:9

**undergo** 175:23

**undergraduate** 114:2

**undergraduates** 113:25

**underlying** 80:18 150:4

**underneath** 92:24

**Undersecretary** 11:7

**understand** 8:2 37:13 56:8 60:19 69:2 80:7 97:5 99:17 101:3 124:17 142:20 156:19 167:14 191:7 200:12 221:12 223:9 284:7

**understandable** 17:9

**understandably** 17:8

**understanding** 22:3 31:14 53:19 55:2 70:10 81:13,22 100:25 104:17 106:12 109:11 116:25 117:11 122:8 148:11 157:8 167:11 176:20 250:6, 7,8 255:22 269:6,21 272:4 276:4 277:8 279:6 294:6,24

**understood** 112:5 173:1 230:14 282:14

**undid** 214:3,18

**undress** 106:16 256:12

**unequivocal** 252:14

**unexpected** 21:17

**unexpectedly** 21:18,20

**unhappy** 219:18

**uniformly** 32:9

**unimportant** 291:1

**unintentionally** 106:4

**uninvolved** 95:23

**uniquely** 172:10,12

**unit** 26:11 33:17

**United** 5:10

**units** 18:14 26:12 34:17,19

**universities** 12:23

**university** 5:10 8:25 9:1, 3,12,14,23 10:2,14,18 11:3,16,23 12:3 13:8,14, 16,18 15:16 18:4,19,20 20:7,9 21:3,4, 8,15,23 22:21 24:8,14 26:5

28:19 29:4 32:1,5,14 33:10,15,17,18 34:6,7,24 51:19 53:6 60:24 62:12 64:5 79:21 80:1 84:5,6 88:9 90:10,12 92:7 94:19 95:2 98:4,21 100:4,9 101:21 102:25 124:2,6 125:17 127:22 130:25 132:1 133:9 138:19 145:4,6,15 158:6 172:24 175:15 191:12 212:1,8 219:8 230:25 240:10, 22,25 241:6 243:22 244:18 246:6,11,18,25 247:2,5,7,23 257:7 261:21 267:22 268:7, 18 269:11,12, 22,24 271:8 272:20 274:8, 9,13 275:3,5,8 276:6,7 279:17 283:9 286:22 288:2 291:5 292:9,19 296:21 305:1, 7,10 313:22

**university's**
55:21 84:13,24 165:7 175:16 210:17 238:2 267:19 275:25 281:10

**unlike**
31:24

**unpaid**
293:4

**unreasonable**
243:25

**unsafe**
303:21

**unsuspended**
97:10

**untenable**
101:8

**unusual**
19:2 25:7 77:6 95:5,11 98:9, 23 252:18

**unwelcome**
282:7

**update**
26:3 94:21 308:19,25 318:7,11 319:8,14

**updated**
95:14 294:10

**upheld**
110:19

**uphold**
130:7 186:19

**upper**
131:6

**upstairs**
202:7

**Urban**
312:17

**urge**
275:1,7

**users**
307:21

**utterly**
62:11

**UW**
13:17 33:10 138:13 254:11

**UW-MADISON**
124:2 208:17

**UWPD**
201:16

**UWS**
64:9

**V**

**vacation**
135:18 309:2

**vague**
220:11,12

**varies**
40:14

**variety**
18:8 20:18 221:6

**various**
9:2 14:16 15:4 26:12 42:19 98:3 248:5 254:2 263:11

**varying**
297:16,17

**vast**
279:12

**verbalize**
216:9

**verbalized**
213:6 214:5,19 215:10,16 216:7 217:1

**verbally**
171:10

**verdict**
134:6 135:3 187:24,25 188:1

**verified**
150:2

**verify**
148:8 149:4 150:3,4,11

**version**
72:20

**versus**
5:9 56:6 76:21 206:1 212:18

**vetting**
230:4,15

**viable**
224:14 245:4

**vice**
26:9 28:14 32:25 33:1,2, 3,5 34:17 37:8 59:25 85:25 92:18,20,25 138:19,24 311:4,9

**victim**
82:1 111:25 112:10,22 231:20

**victims**
267:6

**video**
5:4,8 153:6 163:16,17,25 164:1,15,20 168:8 187:5,13 192:9 202:24 206:13 210:24 216:8 227:2 292:15 295:9

**videographer**
5:2,16 67:7,10 118:4,7,22,25 162:25 163:3 211:17,20 267:10,13 320:5

**videos**
51:4,6 68:21, 24,25 69:2,20 70:3,5,9 129:10 130:5 137:1 139:24 147:7 149:11 162:3 173:9,10 178:13,16 184:9 185:23 186:4,5 199:14 201:21,22 202:2,4 211:24,25 212:3,7,13,17 214:3,17 215:3,14 216:5 221:25 225:22 226:4,15 228:3 252:20

**videotape**
293:8

**view**
78:21 212:3

**viewed**
199:15 293:21

**viewpoints**
162:1

**violate**
272:13

**violated**
107:19 130:17

**violates**
74:10 256:13

**violation**
66:11 106:4,19 109:4,10 120:21 292:19

**violations**
258:9 277:11

**violence**
52:9 208:18 209:2 302:21

**violent**
303:9 317:14

**virtually**
216:13 218:15 303:15

**Vise**
27:4

**visible**
21:4

**vision**
18:3

**visit**
12:7 46:5

**visual**
202:17

**voice**
287:24 288:19 291:17

**voiceover**
51:5

**volleyball**
20:17 44:14

**vomited**
201:7

**vulnerable**
260:14 261:16

W

**Wade**
41:23 294:5

**Waikiki**
137:23

**wait**
8:13 44:10 101:13 151:24 152:11 174:23 242:21 243:1 244:9 245:7,13 315:11,19

**waited**
244:24

**waiting**
97:17 101:9,17 243:14

**walk**
46:2,4 145:16

**Walker**
313:24

**walking**
187:8 207:14

**walks**
287:11

**want**
6:12 20:3 31:17 37:5 40:20 45:18 46:19,24 56:18 58:12,13 60:5 61:19 62:10 74:17 80:8 87:19 93:16 95:9 99:1 109:23 111:17 112:3 113:20, 21 117:2 124:9,10 125:11,15 126:1 139:21 140:4 143:5 144:14 147:9 150:23 163:21 172:16 176:23 178:7 179:3 184:24 185:3 196:25 206:25 217:17 220:2 221:9 222:23 249:20 250:20 257:15 261:10 264:3 266:22 275:20 277:25 279:22 283:10, 11 290:25 296:9 300:12 311:20,24 312:2

**wanted**
68:8 72:20 79:5 87:18 133:2 155:3 169:2 183:3 244:17 251:24 268:12 275:20 282:14 283:7 291:6 305:8 312:21

**warmly**
307:21

**warning**
282:4 289:7 294:15 295:19 296:17 297:10 299:25 300:4, 9,16,25 301:17

**warranted**
80:18

**watch**
44:16 46:10 305:14

**watched**
44:21,22 214:18 215:14

**watching**

42:10

**waver**
95:8

**way**
16:24 21:4,5,7
26:1 50:21
56:9,15 58:24
62:11,12 72:21
74:10 86:21
88:15 90:13,18
97:12 113:14
116:7 118:16
122:11 124:11
125:4 133:24
135:16 136:17,
20 138:5
148:21 150:22
157:13 172:2
180:16 181:2
185:17 187:2
188:15,19,20,
22 189:13,14,
15 190:5
196:16 201:24
203:11,14
210:19 214:3,
18 216:15
217:7,11,18,21
218:15 221:13,
22 223:18,22
226:20,21
234:15 236:1
237:11,13
238:14,24
252:16 266:8
269:2 287:3
288:11 289:6
309:18

**ways**
18:8 20:19,24
35:19 88:2
126:12 174:22
289:14

**wealth**
274:10

**weather**
163:7,8,9,10,
13

**wedding**
134:18

**Wednesday**
144:3,7

**week**
18:22,25 19:8,
15 35:22,23
40:14,23 46:1
280:16 283:5
284:8 308:21

**weekend**
14:21 272:1
320:2

**weekly**
40:25 310:4

**weeks**
85:21 97:9
275:9,12

**weighing**
142:24

**weight**
88:19

**went**
10:2,8,9,16
14:9 29:15
39:13 64:13
66:16 76:18
91:17 127:16
130:8 131:20,
23 173:8 186:4
231:14 286:17
302:12 303:24
314:9 315:24
319:18

**Western**
5:11

**whatnot**
127:20

**whatsoever**
23:8

**Whelan**
299:11

**whispering**
5:7

**Whitney**
6:3

**whoever's**
284:25

**wife**
269:23 305:1,2

**Wifi**
135:12,14
136:5

**willingly**
206:8 242:2

**winter**
262:11

**wisc.edu**
17:22,23

**Wisconsin**
5:10,12,14
10:15 11:16
12:3,24 21:23
24:14 29:4
32:6 33:10,12
38:16 47:16
64:4,6,15,18
65:18 66:1,13,
17 67:1 76:3,4
78:19 83:8
85:5,9 124:2
180:18 181:17,
18 182:18
188:14 195:23
241:6 261:21
269:12,13
275:3,6

**Wisconsin-madison**
24:9

**Wisconsin-madison's**
26:6

**wise**
206:10

**wished**
73:1

**wishes**
130:19

**withdraw**
294:8

**withheld**
177:24 230:25

**withhold**
179:2

**witness**
5:24 6:5
111:13 112:25
113:9 114:6,15
115:9 116:6
121:15 122:6
123:1 125:25
126:22 128:19
131:19 144:1
147:25 149:24
150:9 153:7
155:23 156:13,
25 157:12
161:25 164:9,
24 165:12,13,
23 168:16
169:21 171:11
174:7 179:7,22
182:7 184:22
185:9 188:9
189:11 190:3,
25 191:23
192:14 194:5,
23 195:10

196:3 198:8,17 204:6,17 205:22 207:4 210:1 211:10 213:12,14 214:8 215:19 216:12 217:5 218:25 220:2, 6,14 223:6 226:9 227:6 228:7,25 233:7 235:3,13 236:25 241:10 242:25 243:7, 18 245:3 256:22 259:2, 13,24 260:22 264:15 265:10, 15 266:4,20 271:20 279:25 280:3 282:19 283:16 284:13 285:7,16,23 287:2 288:6 289:1,25 291:21 292:3, 12 301:11 302:2 315:8 316:12 319:24 320:2

**witness's**
174:1

**witnesses**
119:9 147:24 160:11,18 165:8,16 166:2,3,7,10 173:13,21 210:24

**woman**
63:7 67:25 155:2 255:23 285:17,19

**women**
47:10,12,14,15 63:9 86:11 106:15 154:21 161:4 199:24 206:16 222:12 253:16 256:11 260:14 285:4

**women's**
20:17 44:13, 17,18,21,23,24 45:12 47:2

**won**
20:17

**wondered**
171:9

**Wonderful**
134:19

**wondering**
162:23

**word**
119:3 154:13 163:18 255:11

**words**
59:10 95:7 148:17 183:18 185:21 195:12 254:23

**work**
10:12,16 16:10 17:21,23 18:9, 11 27:4 32:23 50:25 83:10 171:2 252:2 262:12,23 312:8

**worked**
8:22 126:14 268:25 269:7

**worker**
294:12,14

295:18

**working**
26:17 49:15 86:3 135:19 211:11

**works**
93:2 104:7 117:1 118:16 229:11,13 294:25

**worried**
67:15 175:24 176:24

**worry**
113:20 124:21

**worrying**
127:1

**worse**
21:20 216:14

**write**
50:2 146:17 306:23

**writes**
82:15 107:18 117:7 168:3 284:23

**writeup**
68:16,18 76:13

**writing**
18:16 171:9 299:1

**written**
69:22 88:15 110:23 145:20, 22 147:10,19 157:21 209:20 296:3 297:9

**wrong**
39:5 75:1 119:3 128:17, 22

**wrote**
68:15 146:8, 11,13 231:25 248:19 268:14

**Y**

**yard**
45:25

**yeah**
13:4 15:25 17:4 25:7 26:25 44:7 58:24,25 59:1 66:20 69:18 70:19,24 73:16 89:1,9 100:24 102:3 109:19 111:13 112:4 114:1 115:9 129:22 135:18 136:4 143:18, 25 146:2 147:25 153:23 155:23 156:20 159:21 161:25 163:24 177:21 191:13 196:18 197:15 207:4 208:24 222:4 223:6 224:23 226:24 228:25 231:22 233:23 240:3,11 242:14 248:8 249:22 250:16 253:5 255:11 257:16 258:10 266:13 282:5 285:7,16 286:8 288:6 290:5 302:23 303:4 308:24 317:23

319:10

**year**
10:19 11:12,13 12:15 21:19 24:6 26:15 27:10 29:8 32:13,18 37:25 38:6 39:3,13, 14 41:14 44:14,17,19,20 48:9 55:1 65:22 70:15 71:12 132:8 174:20 192:3,6 242:19 243:13 244:9,11,22 278:4,7,13 279:1

**year's**
21:21

**years**
7:5 8:19 9:11, 19 10:9,17,22 11:1,22 12:20, 22 27:8 47:17 70:16 101:9 190:18 270:19 271:1 290:23

**young**
8:21 275:4

Z

**zero**
299:17