IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

QUINTEZ CEPHUS,

      Plaintiff,

   -vs-                    Case No. 21-C-0126

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

      Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOCONFERENCE DEPOSITION OF QUINTEZ R. CEPHUS

Thursday, February 29, 2024

9:02 a.m.

Reported by:  SANDRA L. McDONALD

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

```
 1        VIDEOCONFERENCE DEPOSITION of QUINTEZ R. CEPHUS,
 2   a witness of lawful age, taken on behalf of the
 3   defendant in the above-entitled cause, under the
 4   Federal Rules of Civil Procedure, pursuant to
 5   notice, before SANDRA L. McDONALD, a Notary Public
 6   in and for the State of Wisconsin, from various
 7   remote locations, on the 29th day of February, 2024,
 8   commencing at 9:02 a.m.
 9
              * * * * *
10
11        A P P E A R A N C E S
12   KRISTEN MOHR and ANDREW MILTENBERG,
        NESENOFF & MILTENBERG, LLP
13      363 Seventh Avenue, 5th Floor
        New York, New York  10001
14      kmohr@nmllplaw.com
        amiltenberg@nmllplaw.com
15      appearing by videoconference on behalf of
        the plaintiff;
16   SARAH A. HUCK, RACHEL L. BACHHUBER and
        JONATHON M. DAVIES,
17      Assistant Attorneys General
        WISCONSIN DEPARTMENT OF JUSTICE
18      17 West Main Street
        Madison, Wisconsin  53703
19      hucksa@doj.state.wi.us
        bachhuberrl@doj.state.wi.us
20      daviesjm@doj.state.wi.us
        appearing by videoconference on behalf of
21      the defendant.
22
              * * * * *
23
24
25
```

```
 1             QUINTEZ R. CEPHUS,
 2        having been first duly sworn on oath,
 3        was examined and testified as follows:
 4
 5             EXAMINATION
 6   BY MS. HUCK:
 7   Q   Mr. Cephus, because this deposition is proceeding on
 8       Zoom, there can sometimes be technical issues, so if
 9       at any point during today's proceedings you have any
10       difficulty hearing me or seeing any documents or
11       anything like that, just please let me know right
12       away, and we'll address and deal with any kind of
13       technical or audio problems, okay?
14   A   Okay.
15   Q   And also because the deposition is being transcribed,
16       all of your answers need to be spoken out loud,
17       because the court reporter can't reflect in the
18       transcript very readily a head shake yes or no, so
19       I'll need you to answer all the questions out loud.
20       Do you understand that?
21   A   Yes.
22   Q   Okay.  If I ask you a question that is unclear for
23       some reason or that you do not understand, please let
24       me know that at the time I ask the question so that I
25       can rephrase it and we have a shared understanding of
```

```
 1              * * * * *
 2           I N D E X
 3   Examination By:                        Page:
 4   Attorney Huck                             4
 5   Attorney Mohr                            --
 6
 7              * * * * *
 8         E X H I B I T S
 9   Exhibit Nos.:                      Identified:

10   1 - Plaintiff's Response to Defendants' First
         Set of Discovery Requests              7
11   2 - Plaintiff's Supplemental Response to
         Defendants' First Set of Discovery Requests   12
12
13   3 - Complaint and Jury Demand            24

14   4 - 05/01/18 letter to Quintez Cephus from
         Lauren Hasselbacher                   26
15   5 - Packet of emails and other correspondence
         between May 2018 and September 2018   29
16
17   6 - 10/07/18 email to Lauren Hasselbacher from
         Quintez Cephus                        44
18   7 - Declaration of Quintez Cephus         48
19   8 - Rule 26(a)(1) Initial Disclosures     81
20
21              * * * * *
22
23
24        (Original transcript filed with the DOJ)
25
```

```
 1       the question before you begin your answer, because if
 2       you do answer my question, I'll understand that you
 3       had properly heard and understood it, okay,
 4       understood?
 5   A   Yes.
 6   Q   Okay.  We will be taking breaks through the
 7       deposition from time to time.  If at any time you
 8       feel that you need a break, please let me know.  The
 9       one asterisk to use is if I have asked you a
10       question, I will ask that you answer that question
11       pending before a break is taken.  So if you need a
12       break, that's fine, you can let me know, but not when
13       there's a question that still needs to be answered,
14       understood?
15   A   Yes.
16   Q   Okay.  Where are you currently located right now for
17       this deposition?  Where are you?
18   A   In Arizona.
19   Q   Okay.  And is anybody else in the room with you?
20   A   No.
21   Q   Okay.  Do you have any documents with you or in front
22       of you at this time?
23   A   No.
24   Q   What, if anything, Mr. Cephus, did you do to prepare
25       for this deposition today?
```

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

| | | |
|---|---|---|
| 1 | A | Talked to my attorneys. |
| 2 | Q | And who are the attorneys with whom you spoke?  I'm |
| 3 | | not asking what you talked about, just who the |
| 4 | | attorneys were. |
| 5 | A | Kristen, Andrew Miltenberg and Stuart. |
| 6 | Q | And what day did you meet with them -- or talk with |
| 7 | | them?  I apologize. |
| 8 | A | I first spoke with them about my deposition weeks |
| 9 | | ago. |
| 10 | Q | Have you spoken to them on more than one occasion? |
| 11 | A | No. |
| 12 | Q | And how long was your conversation with your |
| 13 | | attorneys relating to preparation for your |
| 14 | | deposition? |
| 15 | A | I don't recall. |
| 16 | Q | Do you recall whether it was shorter than one hour? |
| 17 | A | I don't recall. |
| 18 | Q | So sitting here today, you have no recollection of |
| 19 | | how long of a time you spent with your attorneys to |
| 20 | | prepare for this deposition? |
| 21 | A | I don't. |
| 22 | Q | Okay.  Did you review any documents to prepare for |
| 23 | | your deposition? |
| 24 | A | No. |
| 25 | Q | Did you review any transcripts of depositions? |

| | | |
|---|---|---|
| 1 | | I'll represent that it's the complete copy that was |
| 2 | | received from your attorneys.  And if at any point |
| 3 | | you need us to slow down or want to look at anything |
| 4 | | in particular, but we will be turning to Page 32 of |
| 5 | | that document and looking at Interrogatory No. 17. |
| 6 | | Okay.  Do you recognize Plaintiff's Response |
| 7 | | to Defendants' First Set of Discovery Requests, |
| 8 | | Mr. Cephus? |
| 9 | A | Sorry.  What was that question? |
| 10 | Q | Yeah, I can ask it a different way.  Have you seen |
| 11 | | the document that is Exhibit 1, Plaintiff's Response |
| 12 | | to Defendants' First Set of Discovery Requests, |
| 13 | | before today? |
| 14 | A | Yes. |
| 15 | Q | Okay.  And if you see on the bottom of Page 32 a |
| 16 | | paragraph numbered 17, which is in the |
| 17 | | interrogatories section, do you see that?  Is it big |
| 18 | | enough for you to read, Mr. Cephus? |
| 19 | A | Yes. |
| 20 | Q | Okay.  Do you see Interrogatory No. 17 on your |
| 21 | | screen? |
| 22 | A | Yes, it's big enough for me to read, and I see it. |
| 23 | Q | Okay.  And you've seen this interrogatory before |
| 24 | | today? |
| 25 | A | Yes.  I'm trying to read it. |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you review any transcripts of courtroom |
| 3 | | testimony? |
| 4 | A | No. |
| 5 | Q | Other than your attorneys, have you spoken with |
| 6 | | anyone else about the deposition taking place today? |
| 7 | A | No. |
| 8 | Q | So I'm going to be, with the assistance of Attorney |
| 9 | | Bachhuber, placing an exhibit up onto your Zoom |
| 10 | | screen.  Because we will be in control of the sizing |
| 11 | | of that and sort of scrolling down, you should let us |
| 12 | | know, Mr. Cephus, if you need us to enlarge it in any |
| 13 | | way or scroll to a different page or anything else. |
| 14 | | So just let us know if there's any difficulty seeing |
| 15 | | anything on the screen. |
| 16 | | So the first document we're going to put up and |
| 17 | | mark as Exhibit 1 will be Plaintiff's Response to |
| 18 | | Defendants' First Discovery Requests. |
| 19 | | (Exhibit 1 is shared on the video screen) |
| 20 | Q | And has that shown up on your screen, Mr. Cephus? |
| 21 | A | Yes. |
| 22 | Q | This is a document that is your/plaintiff's responses |
| 23 | | to discovery requests served by the defendant in this |
| 24 | | case, and we can sort of slowly scroll through the |
| 25 | | long document to show you that that is what it is. |

| | | |
|---|---|---|
| 1 | Q | Okay.  Just let me know when you've had an |
| 2 | | opportunity to finish reading Interrogatory No. 17. |
| 3 | | (Witness examines document) |
| 4 | A | Okay. |
| 5 | Q | And on the next page, if we scroll down one page, |
| 6 | | we'll see the response to Interrogatory 17.  And you |
| 7 | | can let me know once you've had a chance to review |
| 8 | | that, Mr. Cephus. |
| 9 | | (Witness examines document) |
| 10 | A | Yes. |
| 11 | Q | Okay.  And so this interrogatory had asked you to |
| 12 | | identify each internet-based social networking site |
| 13 | | you've used since January 1, 2018 to the present. |
| 14 | | And in your response you identified an Instagram |
| 15 | | account, a Twitter account and a Snapchat, correct? |
| 16 | A | I'm sorry.  Can you ask your question again? |
| 17 | Q | Yep.  You see that in terms of the social media that |
| 18 | | you have identified that you have been active on that |
| 19 | | there was an Instagram account, a Twitter and a |
| 20 | | Snapchat, correct? |
| 21 | A | Yes. |
| 22 | Q | And is that a complete list of all the social media |
| 23 | | sites that you have been active on since January 1, |
| 24 | | 2018 to the present? |
| 25 | A | Yes. |

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

| | | |
|---|---|---|
| 1 | Q | And there are no others? |
| 2 | A | Not that I can think of right now. |
| 3 | Q | Okay.  And if we look then at Interrogatory No. 18, |
| 4 | | it asks you to identify each text messaging or |
| 5 | | instant messaging service.  And you can read |
| 6 | | Interrogatory 18 quietly to yourself, Mr. Cephus, and |
| 7 | | let me know when you've had an opportunity to finish |
| 8 | | reading that interrogatory. |
| 9 | | (Witness examines document) |
| 10 | A | Yes. |
| 11 | Q | Okay.  And in your response immediately below that |
| 12 | | you indicate that you did communicate via iMessage on |
| 13 | | your cell phone, correct? |
| 14 | A | I'm not sure what you're asking me. |
| 15 | Q | In the response to Interrogatory 18, you've |
| 16 | | identified that you used your cell phone to |
| 17 | | communicate or text via iMessage using your cell |
| 18 | | phone, correct? |
| 19 | A | I always text using my iPhone. |
| 20 | Q | Okay.  And since January 1, 2018, have you had more |
| 21 | | than one -- have you had any different iPhone |
| 22 | | accounts in that time period? |
| 23 | A | I've had different phones after 2018. |
| 24 | Q | And do you recall how many different phones you've |
| 25 | | had since 2018? |

| | | |
|---|---|---|
| 1 | | phone as it relates to iMessaging or texting? |
| 2 | A | No. |
| 3 | Q | Okay.  We can take that exhibit down.  And we'll be |
| 4 | | putting up and marking as Exhibit 2 Plaintiff's |
| 5 | | Supplemental Response to Defendants' First Set of |
| 6 | | Discovery Requests. |
| 7 | | (Exhibit 2 is shared on the video screen) |
| 8 | Q | And so Exhibit 2 is Plaintiff's Supplemental Response |
| 9 | | to Defendants' First Set of Discovery Requests. |
| 10 | | Again we'll scroll through this fairly quickly and to |
| 11 | | the signature page, which is dated, once we get |
| 12 | | there, as you'll see, February 16, 2024. |
| 13 | | I know we went through this fairly quickly, but |
| 14 | | my question to you, Mr. Cephus, is -- and we can do |
| 15 | | it more slowly if you'd like -- if you had seen this |
| 16 | | document before today? |
| 17 | A | I didn't even get a chance to look at it. |
| 18 | Q | Okay.  So I'm going to go up to the top and let you |
| 19 | | look. |
| 20 | | (Witness examines document) |
| 21 | A | Yes. |
| 22 | Q | Okay.  You provided information -- I'm sorry.  If |
| 23 | | we go to Page 8 of the document and look at |
| 24 | | Request No. 10, which you see on your screen -- and |
| 25 | | you can look at it yourself, but this request had |

| | | |
|---|---|---|
| 1 | A | I don't. |
| 2 | Q | Okay.  Do you recall what you did with phones that |
| 3 | | you no longer have in that period since 2018? |
| 4 | A | No. |
| 5 | Q | Do you have any system for backing up your phone at |
| 6 | | any time since 2018? |
| 7 | A | What are you asking me? |
| 8 | Q | I'm asking if you use any system to back up the data |
| 9 | | or information that will be on the cell phone that |
| 10 | | you've used at any time since April 2018. |
| 11 | A | I don't -- I don't know. |
| 12 | Q | Okay.  Do you have any kind of -- do you know if you |
| 13 | | have any kind of iCloud account or any other system |
| 14 | | that might provide a backup for any of the phones |
| 15 | | that you've used since 2018? |
| 16 | A | I think iPhones back up themselves.  I don't know. |
| 17 | Q | But no other service that you like purchased in terms |
| 18 | | of iCloud storage or otherwise made use of or that |
| 19 | | you yourself downloaded or backed up your phones |
| 20 | | separate from whatever the phone might do |
| 21 | | automatically that you can recall? |
| 22 | A | I'm not sure what you're asking me. |
| 23 | Q | Okay.  Since 2018 did you take any steps yourself |
| 24 | | beyond what the phone might do automatically to back |
| 25 | | up the information that would be contained on your |

| | | |
|---|---|---|
| 1 | | asked that you produce all emails, text messages, |
| 2 | | instant and direct message correspondence or other |
| 3 | | communications during the period April 20, 2018 to |
| 4 | | May 1, 2020 between you, the plaintiff, and any |
| 5 | | football coaches, journalists, scouts, recruiters, |
| 6 | | agents or public or media relations consultants that |
| 7 | | mention or relate to the allegations of sexual |
| 8 | | assault committed or allegedly committed by you, the |
| 9 | | plaintiff, to the allegations in this lawsuit or to |
| 10 | | your injuries or damages.  Do you see where I just |
| 11 | | read that aloud on your screen? |
| 12 | A | Yes. |
| 13 | Q | Okay.  And in the response immediately below it, it |
| 14 | | says that, "Plaintiff is not in possession of any |
| 15 | | responsive documents."  Do you see that? |
| 16 | A | Yes. |
| 17 | Q | Okay.  Did you perform a search for any such |
| 18 | | communications as was requested in Request for |
| 19 | | Production No. 10? |
| 20 | A | Yes. |
| 21 | Q | And what steps did you take to search for any |
| 22 | | communications? |
| 23 | A | I searched for the stuff that was asked of me. |
| 24 | Q | Okay.  And as it relates specifically to this |
| 25 | | request, which is asking for communications as I just |

1    read, where specifically did you look in terms of
2    trying to identify such emails, text messages,
3    instant/direct messages or other communications
4    during that time period?
5   A   For emails, I searched my email. For texts, I
6    searched my phone. For direct messages, I searched
7    Instagram.
8   Q   Okay. And what email account did you search?
9   A   My email.
10   Q   And what email address was that that you were
11    searching?
12   A   My ███████████████
13   Q   Okay. Do you have any other email accounts other
14    than your Gmail account?
15   A   I used my Gmail account, because that's the only
16    email I use.
17   Q   Okay.
18   A   That's my personal email.
19   Q   Okay. And then was that the Gmail account that you
20    had in the time period between April 20, 2018 and
21    May 1, 2020?
22   A   Yes.
23   Q   Okay. And did you search for -- how did you conduct
24    that search? Did you run, for example, search terms?
25    Did you look at every email that was in your Inbox,

1    in your Deleted box, in your Sent? How did you run
2    the search for emails?
3   A   I searched -- I searched my -- I searched -- so I
4    know -- can you ask me that question again?
5   Q   Yeah. So I'm trying to understand. I'll ask it a
6    different way of how it is -- you said that you
7    searched your email account, and then we established
8    that you have a Gmail account. So my question to you
9    is how did you go about doing a search for documents
10    that may or may not be responsive to this request in
11    your email, whether you used search terms, whether
12    you looked at or did something else. How did you go
13    about searching for documents?
14   A   So what is this request asking me for, if you don't
15    mind me asking?
16   Q   Yep. So in Request No. 10 the request looked for or
17    was requesting all emails, text messages,
18    instant/direct message correspondence or other
19    communications for the time period April 20, 2018 to
20    May 1, 2020 between you and then a group of people,
21    football coaches, journalists, scouts, recruiters,
22    agents, public or media relations consultants, that
23    relate or mention in any way the allegations of the
24    sexual assault that was allegedly committed by you or
25    the allegations that you're making in this lawsuit or

1    any injuries or damages you claim. So that's the
2    request.
3   A   I didn't -- I didn't email anybody about any of this.
4   Q   Okay. And did you ever text any of those, any people
5    during that time period?
6   A   No.
7   Q   Or use instant or direct message correspondence?
8   A   No.
9   Q   So did you search for any such documents, or is it
10    that you believe that you never emailed, texted or
11    DM'd anybody, so you don't need to conduct a search?
12   A   No.
13   Q   Sorry, my question probably isn't clear. Is it the
14    case that you determined that there would be no such
15    emails or text messages or DMs and so that you didn't
16    do a search at all for these, for communications
17    requested in Request No. 10?
18   A   Yeah, I know for a fact I didn't email a coach, a
19    journalist, a scout, a recruiter or agent. Like I
20    had no reason to email anybody about any of this.
21   Q   Okay. And then the same for texting or any kind of
22    instant or direct messages, correct?
23   A   Right.
24   Q   Okay. And then if we go down, I'm going to have
25    similar questions relating to some other categories

1    on the next page. In Request No. 12, which asked
2    that you produce all emails, text messages, instant
3    or direct message correspondence or other
4    communications between you and Ms. Dickey and
5    Mr. Dickey that mention or relate to the
6    investigations of sexual assault or sexual harassment
7    allegedly committed by you, the allegations of your
8    lawsuit or your injuries and damages, do you see that
9    request at the top of that page?
10   A   Yes.
11   Q   Okay. And do you see the response immediately below
12    that, that you're not in possession of any responsive
13    documents?
14   A   Yes.
15   Q   Would you have emailed, texted or IM'd or DM'd
16    Laura Beth Dickey or Jamie Dickey at any time
17    regarding any of the subject matters there, the
18    allegations of sexual assault or the allegations in
19    your lawsuit or your injuries and damages at any
20    time?
21   A   No.
22   Q   So you never communicated with them by email, text
23    messages or IM/DM about the allegations in your
24    lawsuit, the allegations of sexual assault or any of
25    your injuries and damages?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  A   No.
2  Q   And for that reason, did you choose not to perform a
3      search for any such documents that may be responsive,
4      you didn't go looking for them because it was your
5      belief that they did not exist?
6  A   You asked for the information, and it says the
7      plaintiff is not in possession of it.
8  Q   Right, and so my question is did you do any kind of
9      search for such documents yourself?
10 A   Yes.
11 Q   Okay.  And what search did you do for emails to
12     Laura Beth Dickey or Jamie Dickey regarding the
13     topics in Request No. 12?
14 A   I've never emailed Laura Beth.  I have only emailed
15     Coach Jamie Dickey.  I never emailed him about this.
16 Q   You never emailed him about the allegations of sexual
17     assault or harassment allegedly committed by you or
18     the allegations in your lawsuit against the Board of
19     Regents or any of your injuries or damages?
20 A   No.
21 Q   Okay.  And what about text messages, did you ever
22     text Laura Beth Dickey about any of those subject
23     matters?
24 A   No.
25 Q   Okay.  And what about Jamie Dickey, did you ever text

1      to search?
2  A   I don't recall how far it goes back.
3  Q   When you conducted the search for text messages, you
4      didn't look to see how far back they went?
5  A   I don't recall how far back my text messages went.
6  Q   Do you delete any of your text messages from
7      Mr. Dickey as you receive them?
8  A   No.
9  Q   We're going to look at Request for Production of
10     Documents No. 16, which is on the next page.  So this
11     one is a little bit different than the other requests
12     we were just talking about that asked for
13     communications with specific people.  This request
14     for production asked for any emails, text messages,
15     direct messages or other communications between you
16     and any person other than your attorneys that mention
17     or relate to the allegations of sexual assault, the
18     allegations in your lawsuit or your injuries or
19     damages in the lawsuit.  Do you see that request?
20 A   I'm sorry.  Which request are you talking about?
21 Q   Request No. 16.  And if you want to take a look at
22     that, just go ahead, and let me know when you've had
23     a chance to review it.
24         (Witness examines document)
25 A   Yes.

1      him about anything that mentioned or related to the
2      allegations of sexual assault or the allegations in
3      your lawsuit or your injuries and damages in this
4      lawsuit?
5  A   No.
6  Q   Did you attempt to perform any kind of search for any
7      text messages?
8  A   Yes.
9  Q   And how -- related to this in terms of text messages
10     with Jamie Dickey, you searched for those text
11     messages?
12 A   Yes.
13 Q   And how did you search for text messages with
14     Mr. Dickey?
15 A   Go through my text messages and look through them.
16 Q   Okay.  And are those only ones that exist on the
17     phone that you currently have in your possession?
18 A   I'm sorry.  What was your question?
19 Q   Was that searching only text messages that are
20     available to you on the iPhone that you currently
21     have in your possession?
22 A   I'm not sure what you're asking me.
23 Q   Okay.  How far back do your text messages with
24     Jamie Dickey go in terms of the timing?  Do they
25     go back to April 2018 that were available to you

1  Q   And did you perform a search for these communications
2      requested in Request No. 16?
3  A   You're requesting --
4  Q   I'm asking did you perform a search for the
5      communications that were requested in Request No. 16?
6  A   Yes.
7  Q   And what steps did you take to search for
8      communications requested in Request No. 16?  What did
9      you do to perform that search?
10 A   I went through emails, text messages.
11 Q   In terms of the text messages, how did you perform
12     that search?  Did you use like the search feature,
13     the kind of microscope or whatever to try to search
14     for particular terms?  Did you review all the text
15     messages that you have?  How did you search your text
16     messages?
17 A   Which question do you want me to answer first?
18 Q   How did you go about searching your text messages
19     for text messages that would be responsive to
20     Request No. 16?
21 A   I went through my text messages.
22 Q   And by the answer that you went through your text
23     messages, is it that you read every text message
24     available to you to determine if it would be
25     responsive to this request?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  A  I don't recall if I went through every one.  I just
2     went through my text messages.
3  Q  And I guess I'm just trying to understand.  When you
4     said you went through your text messages, did you
5     look at particular individuals that you might have
6     texted?  Did you search for terms?  Like how did you
7     go about going through your text messages?
8  A  I searched terms, and I went back and just went
9     through text messages.
10 Q  And what search terms did you use?
11 A  Terms from your request.
12 Q  And when you say terms from my request, what terms in
13    particular did you use when you performed the search
14    of your texts?
15 A  Lawsuit, sexual harassment, sexual assault.
16 Q  Any other search terms that you used, Mr. Cephus?
17 A  No.
18 Q  And do you know how far back in time your available
19    text messages exist that you were able to search in
20    terms of looking for documents responsive to
21    Request No. 16?
22 A  I don't recall.
23 Q  Do you recall if at any time you had texted any
24    individuals regarding the allegations of sexual
25    assault or harassment allegedly committed by you or

1  A  the allegations in your lawsuit or your injuries and
2     damages, that you ever texted with anybody about that
3     since 2018?
4  A  I'm sorry.  Could you repeat that question again?
5  Q  Yep, I'll say it a little bit differently.  I'm
6     looking to see whether or not any of these documents
7     might have existed at one time, even if you were not
8     able to locate them in your search for responsive
9     documents.  So my question is do you believe that at
10    any time you would have texted anyone other than your
11    attorneys about the subject matters of the
12    allegations of the alleged sexual assault, the
13    lawsuit or the allegations in this lawsuit or your
14    injuries and damages, that you would have sent a text
15    to anybody about those subject matters at any time.
16 A  No.
17 Q  Mr. Cephus, did you take any steps yourself to
18    attempt to preserve any electronic information such
19    as emails or text messages or instant or direct
20    messages that relate to the allegations of the events
21    of April 22, 2018 or the allegations in your lawsuit?
22    Did you take any steps to preserve that information?
23 A  Preserve it for what?  What are you --
24 Q  So that it would be available to you now in this
25    lawsuit.  Did you take any steps so that any texts

1     that might have existed, for example, on May 1, 2018
2     is still available today?  Did you take any steps to
3     preserve information?
4  A  No, no.
5  Q  We can take that exhibit down.  I'm going to put up
6     on the screen another exhibit.  We'll mark this as
7     Exhibit 3, and it is a Complaint filed on your behalf
8     on October 9, 2018.  And so just wait a second.  You
9     can let me know when you see that on your screen,
10    Mr. Cephus.
11       (Exhibit 3 is shared on the video screen)
12 A  Yes.
13 Q  Okay.  Do you recognize -- so this is a federal
14    Complaint that was filed on your behalf.  You can see
15    from the document header at the top that it was filed
16    on October 9, 2018.  It's a lawsuit against the Board
17    of Regents of the University of Wisconsin-Madison and
18    others.  Are you familiar with this lawsuit that was
19    filed on your behalf?
20 A  Yes.
21 Q  Okay.  And then other than information that may have
22    been communicated to you by your attorneys, what is
23    your understanding of how this lawsuit that you filed
24    was terminated?  How did it end?  I'm sorry.  What
25    is your understanding of how this lawsuit was

1     terminated?
2  A  I'm not sure what you're asking me.
3  Q  Do you recall that this lawsuit was voluntarily
4     dismissed by you after it was filed?
5  A  I don't recall.
6  Q  So other than information that may have been
7     communicated to you by your attorneys, do you have
8     any knowledge or information or reason as to why or
9     how this lawsuit was dismissed -- I'm sorry, as to
10    why this lawsuit was dismissed?
11 A  I don't recall.
12       MS. HUCK:  All right.  We can take
13    that exhibit down.  Ms. Mohr, I have a question
14    for you because it relates to attorney-client
15    privilege.  I'm going to be asking some
16    questions regarding the Title IX investigation.
17    I guess my question that I'll direct to you is
18    if you will be or Mr. Cephus will be asserting
19    attorney-client privilege as to communications
20    between Mr. Cephus and his attorney Steve Meyer
21    and Attorney Stilling relating to the time
22    period during 2018 and 2019.
23       MS. MOHR:  Yes.
24       MS. HUCK:  Okay.  And then will you
25    be asserting attorney-client privilege as to

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

| | | |
|---|---|---|
| 1 | | communications between Mr. Cephus and attorneys |
| 2 | | at your firm relating to that same time period |
| 3 | | between 2018 and 2019? |
| 4 | | MS. MOHR:  Yes. |
| 5 | | MS. HUCK:  Okay.  So any questions |
| 6 | | I might ask of Mr. Cephus, you would object |
| 7 | | and instruct him not to respond; is that |
| 8 | | correct? |
| 9 | | MS. MOHR:  Correct. |
| 10 | Q | Okay.  Mr. Cephus, my question for you is having |
| 11 | | heard that, will you be accepting the instruction |
| 12 | | from your counsel not to answer any questions |
| 13 | | regarding communications you've had with your |
| 14 | | attorneys, Attorneys Meyer and Stillilng, on the |
| 15 | | basis of attorney-client privilege? |
| 16 | A | Yes. |
| 17 | Q | Okay.  And will you also be accepting her instruction |
| 18 | | that you will not answer any questions regarding your |
| 19 | | communications with attorneys at her firm? |
| 20 | A | Yes. |
| 21 | Q | I'm going to put up another document, and this one |
| 22 | | will be marked as Exhibit 4.  It is a May 1, 2018 |
| 23 | | letter from the Office of Compliance at the |
| 24 | | University of Wisconsin-Madison.  Just let me know |
| 25 | | when you're able to see that. |

| | | |
|---|---|---|
| 1 | A | I don't recall when I hired an attorney. |
| 2 | Q | Okay.  If we look at the second page of the document, |
| 3 | | I'm going to direct your attention to the section |
| 4 | | under the heading Support and Assistance, which you |
| 5 | | can read for yourself, and let me know when you've |
| 6 | | had an opportunity.  But in it, the letter, |
| 7 | | Ms. Hasselbacher stated that, "We understand that it |
| 8 | | can be concerning to receive this notice," and |
| 9 | | provided that, "The University has a variety of |
| 10 | | resources available to you including Dean of Students |
| 11 | | Office, University Health Services."  Do you see |
| 12 | | that? |
| 13 | A | Yes. |
| 14 | Q | And after receiving the May 1, 2018 letter, did you |
| 15 | | contact the Dean of Students Office? |
| 16 | A | No. |
| 17 | Q | Did you contact or reach out to University Health |
| 18 | | Services at that time? |
| 19 | A | I don't recall.  I remember the University Health |
| 20 | | Services, but I don't recall if I reached out to them |
| 21 | | at this time or not. |
| 22 | Q | Okay.  You understood that Ms. Hasselbacher was |
| 23 | | providing you with resources that could be available |
| 24 | | for your use as it relates to the No Contact |
| 25 | | instruction, order or directive in the May 1, 2018 |

| | | |
|---|---|---|
| 1 | | (Exhibit 4 is shared on the video screen) |
| 2 | A | Yes. |
| 3 | Q | This is a two-page document.  Have you seen this |
| 4 | | document before? |
| 5 | A | Yes. |
| 6 | Q | Okay.  And what is it? |
| 7 | A | It's telling me not to -- it's like a No Contact |
| 8 | | document. |
| 9 | Q | Okay.  And you recall receiving this on or around |
| 10 | | May 1, 2018, correct? |
| 11 | A | Yes. |
| 12 | Q | Okay.  And did you have an understanding at the time |
| 13 | | you received this letter regarding No Contact as to |
| 14 | | an understanding that it related to the events of the |
| 15 | | night of April 22, 2018? |
| 16 | A | Yes. |
| 17 | Q | And at the time you received this you were aware that |
| 18 | | a criminal investigation and proceeding had begun |
| 19 | | involving you regarding the events of the night of |
| 20 | | April 22, 2018? |
| 21 | A | I don't remember when the criminal investigation |
| 22 | | started.  I can't remember that right now. |
| 23 | Q | Had you returned -- had you retained an attorney by |
| 24 | | the time you had received this letter on |
| 25 | | approximately May 1, 2018? |

| | | |
|---|---|---|
| 1 | | letter? |
| 2 | A | Yes. |
| 3 | Q | Okay.  And below that Ms. Hasselbacher wrote, |
| 4 | | "If you have questions or concerns about this |
| 5 | | directive or would otherwise like to speak with me," |
| 6 | | meaning Ms. Hasselbacher, that you can contact her |
| 7 | | at, and then she provided her email address and her |
| 8 | | telephone number.  Do you see that? |
| 9 | A | Yes. |
| 10 | Q | Okay.  So you understood that you were able to reach |
| 11 | | out to Ms. Hasselbacher if you chose to do so at that |
| 12 | | time after receiving the May 1, 2018 letter, correct? |
| 13 | A | Yes. |
| 14 | Q | We can put that -- or close that document.  The next |
| 15 | | exhibit that we're going to mark is, I believe, |
| 16 | | Exhibit 5.  And I will -- while that is coming up on |
| 17 | | the Zoom, I will represent to you and counsel that |
| 18 | | this is an exhibit that counsel for Defendant |
| 19 | | assembled that consists of certain emails and other |
| 20 | | correspondence between May 2018 and September 2018, |
| 21 | | so it's different documents. |
| 22 | | (Exhibit 5 is shared on the video screen) |
| 23 | Q | The Bates ranges, for the record, of the documents |
| 24 | | included in this group exhibit are all beginning with |
| 25 | | the prefix BOR, and the Bates ranges of the documents |

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1      included all starting with that prefix BOR are
2      006813, 003023-3025, 004789-4793, 004621-4623,
3      006814 to 6815, 005133-5135, 002088-2091,
4      005092-5096, 009960-9961 and 005189 to 005191.
5          So that was primarily for the record so that we
6      can kind of go back through that.  I know that I
7      listed those off quickly.  Mr. Cephus, I'm not going
8      to be asking you about any specific -- about the
9      Bates information itself.
10         But if we go to Page 5 of the PDF itself, can
11     you see that document on your screen?  That's an
12     email that's sort of in the middle of the page
13     that's dated -- it's to you and Attorney Meyer from
14     Ms. Hasselbacher dated June 19, 2018.  Can you sort
15     of see that it's being sort of highlighted a little
16     bit with the cursor?  Do you see that on your
17     screen?
18   A  Yes.
19   Q  Okay.  You can take a moment to read that, but my
20     first question for you, once you've had an
21     opportunity to review that, is if you admit that
22     you received the email at that time from
23     Ms. Hasselbacher.
24              (Witness examines document)
25   A  Yes.

1   Q  And when you say, "We told them," what do you mean?
2   A  My attorneys.  My attorneys asked them to proceed at
3      a later time.
4   Q  Okay.
5   A  And they proceeded to move forward.
6   Q  I apologize if I spoke over you a little bit there.
7      Did you finish your answer, Mr. Cephus?
8   A  My attorneys asked them to move forward at a later
9      time, and they proceeded to move forward.
10  Q  At this time when you received this email on
11     June 19th, you agree that Ms. Hasselbacher was
12     telling you that it was your choice whether or not to
13     participate in an interview, correct?
14  A  I'm sorry.  Can you ask me that again?
15  Q  Sure.  When you received this email on June 19, 2018,
16     she was telling you that it was your choice whether
17     or not to participate in an interview, correct?
18  A  No, it sounds like she was just telling me to provide
19     her with information at any time and that that was
20     okay.
21  Q  So you see in the paragraph that begins, "Also, I
22     want to clarify that," Mr. Cephus, you, "Can provide
23     information relevant to the investigation at any
24     time, which would (sic.) include participating in an
25     interview"?  Did I read that correctly?

1   Q  Okay.  And you understood that Ms. Hasselbacher was
2      telling you that you could provide information
3      relevant to the investigation at any time, correct?
4   A  She is telling me I could provide her information,
5      but at this time I have a criminal case over my head,
6      so I don't know how much information I could provide
7      her.
8   Q  Because you would make a choice not to provide that
9      information to Ms. Hasselbacher because of the
10     criminal investigation?
11  A  No, I just said I'm just not sure how much
12     information I could provide her at this time.
13  Q  And why would that be?
14  A  Because of the criminal matter.
15  Q  But do you agree that Ms. Hasselbacher was telling
16     you that she was available for you to provide
17     information relevant to the investigation at any time
18     if you chose to do so?
19  A  Yes.
20  Q  Okay.  And was it your understanding that you did not
21     need to wait for a later time, if you chose to
22     participate in an interview with Ms. Hasselbacher,
23     you could do it at any time, correct?
24  A  We told them that we could provide it at a later
25     time, and they proceeded to go forward with it.

1   A  "Which could include," yes.
2   Q  So Ms. Hasselbacher -- you agree that
3      Ms. Hasselbacher said that you could participate in
4      an interview at any time, correct?
5   A  I'm confused at what you're asking me.
6   Q  My question is Ms. Hasselbacher in this email said to
7      you that you could participate in an interview,
8      correct?
9   A  Yes.
10  Q  Okay.  And Ms. Hasselbacher in this email also told
11     you that you could provide information relevant to
12     the investigation at any time, correct?
13  A  Yes.
14  Q  And Ms. Hasselbacher in this email said that you
15     could provide information relevant to the
16     investigation at any time, which could include
17     participating in an interview, correct?
18  A  Yes.
19  Q  Okay.  And Ms. Hasselbacher in this email also told
20     you that you could provide names of witnesses,
21     correct?
22  A  Yes.
23  Q  Or other documentation, including text messages,
24     photos, et cetera that you believe may be relevant,
25     correct?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1   A    Yes.
2   Q    Okay.  Continuing in that paragraph, do you see that
3        Ms. Hasselbacher also wrote in her email that she
4        intended to alert you, "When I am nearing the
5        conclusion of the investigation and provide an
6        opportunity to meet with me at that time"?  Do you
7        see that?
8   A    Yes.
9             MS. HUCK:  Okay.  So you understood
10            that you -- never mind, strike that.  We've been
11            going one hour, so I'd just like to take a
12            five-minute break, if that's okay with
13            everybody.  So we can turn off cameras and mute
14            ourselves and come back at 10:07 a.m., which is
15            Central Time.  I don't know what that does for
16            everybody else.  Okay?  Thanks.
17                 (A recess is taken)
18                 (10:01 a.m. to 10:08 p.m.)
19            (Exhibit 5 is shared on the video screen)
20                 EXAMINATION (RESUMED)
21  BY MS. HUCK:
22  Q    With the same exhibit that we were just looking at,
23        we're going to move to Page 15 of that same, again,
24        batched exhibit.  The Bates number on this, the
25        bottom of this page, is BOR_006814.  And do you see

1        that document, Mr. Cephus?
2   A    I cannot.  I don't know what I did with my -- I only
3        can see all of your faces or our screens.  I can't
4        see --
5             MS. HUCK:  Why don't we go off the
6            record for one minute while you work with your
7            settings.
8                 (Discussion off the record)
9             MS. HUCK:  Okay.  So let's go back on
10            the record.
11  Q    Mr. Cephus, can you see the exhibit that's up on your
12        screen?
13  A    Yes.
14  Q    Okay.  And is it large enough for you to read?
15  A    Yes.
16  Q    Okay.  And you can see that this at the top of the
17        document is an email from Attorney Stephen Meyer to
18        Ms. Hasselbacher, and you see that you were cc'd on
19        this email, correct?
20  A    Correct.
21  Q    Okay.  And in it Mr. Meyer is saying, "Thank you for
22        following up on our discussion."  If we scroll down a
23        little bit in the document, you'll see the email from
24        Lauren Hasselbacher dated August 9, 2018.  Do you see
25        that, Mr. Cephus?

1   A    Yes.
2   Q    Okay.  And Ms. Hasselbacher wrote, "Hello Stephen
3        and," Mr. Cephus, "Thank you for meeting with us
4        yesterday."  Do you see that?
5   A    Yes.
6   Q    And you were a recipient of this email from
7        Ms. Hasselbacher as well, do you recall?
8   A    Yes.
9   Q    Okay.  Do you recall an August 8, 2018 meeting that
10       you attended with Ms. Hasselbacher and Mr. Meyer?
11  A    Yes.
12  Q    And was anybody else there at that meeting?
13  A    I don't recall.
14  Q    What do you recall being said during the meeting?
15  A    I don't recall anything.  I don't recall.  I don't
16       recall anything from a meeting that happened in 2018,
17       August 9th.
18  Q    You recall being at the meeting itself on August 8th?
19  A    Yes.
20  Q    And you recall -- do you recall that Attorney Meyer
21       was with you?
22  A    Yes.
23  Q    Do you recall that Ms. Hasselbacher was there?
24  A    Yes.
25  Q    But you don't recall if anybody else was there; is

1        that correct?
2   A    I think we were -- no, I don't recall who else was
3        there, if anybody.
4   Q    Okay.  Do you recall if you said anything during the
5        meeting?
6   A    I don't recall.
7   Q    Do you recall anything that anyone said during that
8        meeting?
9   A    I don't recall.
10  Q    Did you bring any documents with you to that meeting?
11  A    I don't recall.
12  Q    Do you recall going through any documents at that
13       meeting?
14  A    I don't.
15  Q    Do you recall how long the meeting lasted?
16  A    I don't.
17  Q    Is there anything from this meeting other than the
18       fact that it occurred and the individuals in
19       attendance that you've already testified to as you
20       sit here today?
21  A    Correct.
22  Q    Are there any documents that would exist that might
23       refresh your recollection as to the August 8, 2018
24       meeting that you can think of?
25  A    I'm not sure what you're asking.

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

| | |
|---|---|
| 1  Q  If there are any documents that might exist that | 1  Q  Do you recall whether an interview had been scheduled |
| 2     might refresh your recollection as to what occurred | 2     but you don't recall the date it had been scheduled? |
| 3     during the meeting on August 8, 2018. | 3  A  Yes, it was probably scheduled if we're asking to do |
| 4  A  I'm not sure. | 4     it on another day. |
| 5  Q  You can't think of any such documents, anything that | 5  Q  Okay.  So as of August 16, 2018, it was your |
| 6     might help you remember what happened? | 6     intention, your understanding that you would be |
| 7  A  I can't think of any documents.  I don't know.  I | 7     participating in an interview with the Title IX |
| 8     can't think of any documents from that meeting. | 8     investigators at the University of Wisconsin-Madison? |
| 9  Q  Going back up to the top of that same page of the | 9  A  Yes. |
| 10    PDF, in the August 10 email from Attorney Stephen | 10  Q  And it was your attorney, Attorney Miltenberg, who |
| 11    Meyer, do you see that in the -- in his email in the | 11     was asking to schedule that to a different date, |
| 12    third line Mr. Meyer wrote, "At this time it is Q's | 12     correct? |
| 13    intention to participate."  Do you see that sentence? | 13  A  Yes. |
| 14  A  Yes. | 14  Q  Looking at Page 20 of this exhibit, which has a Bates |
| 15  Q  What was your understanding of what was meant in | 15     label 002088 with a BOR prefix, do you see this is -- |
| 16    terms of your intention to participate? | 16     at the top of this document, Mr. Cephus, it's an |
| 17  A  I don't recall what that meant. | 17     email from Ms. Hasselbacher? |
| 18  Q  As of the date August 10, 2018, was it your intention | 18  A  Yes. |
| 19    to participate in an interview with the University of | 19  Q  And you were a recipient of this email, correct? |
| 20    Wisconsin-Madison regarding their Title IX | 20  A  Yes. |
| 21    investigation? | 21  Q  It was dated August 22, 2018, correct? |
| 22  A  I'm sorry.  Can you say that one more time? | 22  A  Yes. |
| 23  Q  Uh-huh.  At the time of this email, August 10, 2018, | 23  Q  And in this email you agree that Ms. Hasselbacher was |
| 24    was it your intention to participate in an interview | 24     telling you that it was your choice to participate in |
| 25    with the investigators involved in the Title IX | 25     an interview with her office, correct? |

| | |
|---|---|
| 1     investigation at the University of Wisconsin-Madison? | 1  A  Yes. |
| 2  A  I don't recall what this means.  It just says, | 2  Q  And you agree that Ms. Hasselbacher is also providing |
| 3     "At this time it is Q's intention to participate." | 3     you with information on confidential services that |
| 4     I don't know what -- I'm not sure what, participate | 4     could be used to support -- to provide support to |
| 5     in what.  I'm not sure what this means. | 5     you, correct? |
| 6  Q  If we go down to Page 17 still within this exhibit, | 6  A  Yes. |
| 7     the document Bates labeled BOR_005133, this is an | 7  Q  We're going to go to Page 27 and put that up on the |
| 8     August 16, 2018 email from Andrew Miltenberg to | 8     screen, still in the same exhibit, and the Bates |
| 9     Ms. Hasselbacher.  Do you see that? | 9     number on that is BOR_005095.  Mr. Cephus, do you |
| 10  A  Yes. | 10     recognize the email that is from you to |
| 11  Q  And you were cc'd on this email? | 11     Ms. Hasselbacher that is dated September 6, 2018? |
| 12  A  Yes. | 12  A  Yes. |
| 13  Q  And so you received it at that time, correct? | 13  Q  This is an email that you sent to her regarding an |
| 14  A  Yes. | 14     August 31, 2018 email in which Ms. Hasselbacher had |
| 15  Q  And Mr. Miltenberg was your attorney that you had | 15     provided you with a copy of her initial Investigative |
| 16    retained at that time, correct? | 16     Report, correct? |
| 17  A  Well, yes. | 17  A  Yes. |
| 18  Q  And do you see that Attorney Miltenberg is asking to | 18  Q  So you had received from Ms. Hasselbacher a copy of |
| 19    reschedule an interview of you to Monday, August 27th | 19     her initial Investigative Report as of this date? |
| 20    or Tuesday, August 28th? | 20  A  I'm not sure.  I'm not sure about that. |
| 21  A  Yes. | 21  Q  In your email, you see that you are stating to |
| 22  Q  Do you recall that an interview had been previously | 22     Ms. Hasselbacher that your email is in response to an |
| 23    scheduled, had been scheduled in August 2018? | 23     email from her -- |
| 24  A  I don't recall when it was scheduled, when the | 24  A  Right. |
| 25    interview was scheduled. | 25  Q  -- in which she had provided to you a copy of her |

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1      Investigative Report, correct?
2   A  Right.
3   Q  Okay.  So you had received that from Ms. Hasselbacher
4      at the time you wrote this, correct?
5   A  Right.
6   Q  And in this document you are asking Ms. Hasselbacher
7      for additional time to provide information to her; is
8      that right?
9   A  Right.
10  Q  Okay.  And Ms. Hasselbacher -- did Ms. Hasselbacher
11     agree to your request for additional time to provide
12     your information, clarifications, additions or other
13     thoughts on the Investigative Report?
14  A  I don't recall.
15  Q  Okay.  If we just scroll up a little bit, I might be
16     able to refresh your recollection here.  On Page 26
17     of the PDF, at the bottom of the page do you see
18     an email from Ms. Hasselbacher to you dated
19     September 7th?  Mr. Cephus, do you see that?
20  A  Yes.
21  Q  Okay.  And in it -- it's kind of a little bit awkward
22     because it carries over on kind of two pages on the
23     screen, but I'll give you a chance to read that to
24     yourself, and when you finish reading it, you can let
25     me know.

1              (Witness examines document)
2   A  Yes.
3   Q  And does reading that refresh your recollection that
4      Ms. Hasselbacher agreed to give you an extension of
5      time to provide information to her regarding a
6      response to the initial Investigative Report?
7   A  Could you scroll back down to my email?
8              (Witness examines document)
9   A  She didn't give us the extension that we asked for.
10  Q  So you're saying that you had asked for until
11     September -- 5 p.m. on Monday, September 17, 2018?
12  A  Yes.
13  Q  And she only gave you an extension until 8 a.m. on
14     Friday, September 14, 2018, correct?
15  A  Right.
16  Q  So she provided an extension to respond, but it
17     wasn't as long of an extension as you had requested;
18     is that what your testimony is?
19             (Witness examines document)
20  A  My testimony is that we received the report on a
21     holiday and her deadline fell in the middle of the
22     Jewish New Year, so we asked her for an extension
23     that fit, that worked for us, and she didn't give us
24     that.
25  Q  She gave you an extension, but not as long as the one

1      you were requesting; is that a fair statement of what
2      you're saying, your testimony?
3   A  Yes.
4   Q  Okay.  We can take down that exhibit.  And I'm
5      marking Exhibit 6, I believe, which is a document
6      dated October 6, 2018 that will pop up on your screen
7      in a second.  And it's Bates labeled BOR_008826.
8              (Exhibit 6 is shared on the video screen)
9   Q  It is a two-page document.  If we look at the top of
10     Page 1, it will show the email header.  And this is,
11     Mr. Cephus, an email from you to Ms. Hasselbacher
12     dated October 7, 2018, correct?
13  A  Yes.
14  Q  And if we scroll to the second page, do you recognize
15     what this is?
16             (Witness examines document)
17  A  Yes.
18  Q  And what is it?
19  A  It's me explaining to her, Lauren Hasselbacher, that
20     I can't provide more information to her because I'm
21     currently facing a criminal case that could put me in
22     prison for 40 years, so I can't give her information
23     or I can't provide any information to her at this
24     time.
25  Q  Did you write this response yourself?

1   A  Yes.
2   Q  And if you look at the first sentence of -- I'm
3      sorry.  Did you -- when you say -- well, I should
4      have asked a better question.  Is it that you typed
5      the response yourself, or did you also write the
6      content of the response yourself?
7   A  Which question do you want me to answer first?
8   Q  Sure.  Did you write the content of this response
9      yourself?
10  A  Yes, I wrote this email to Lauren Hasselbacher.
11  Q  Okay.  And in the first sentence you write, "I write
12     in response to the Second Amended Initial
13     Investigative Report issued on October 2, 2018,"
14     and then the sentence goes on.  Do you see that,
15     Mr. Cephus?
16  A  Yes.
17  Q  So you had received also -- the Second Amended
18     Initial Investigative Report had been provided to
19     you, correct?
20  A  Yes.
21  Q  And you had an opportunity, if you had chosen to, to
22     provide information to Ms. Hasselbacher as it related
23     to the Title IX investigation, correct?
24  A  No, it's not.  I couldn't provide her information
25     because I was -- like I said, I was like facing

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1    criminal charges, so it was impossible for me to
2    provide her with information.
3  Q  When you say impossible, was there any order in the
4    criminal proceeding that prevented you from providing
5    information to Ms. Hasselbacher?
6  A  I mean, why would I provide her with information
7    when I'm facing 40 years in prison through the
8    State of Wisconsin?  Like why would I go speaking to
9    Lauren Hasselbacher --
10  Q  In terms of --
11  A  -- like give information to her.
12  Q  Oh, sorry.  Please finish your answer.  I apologize.
13  A  Why would I go giving information to
14    Lauren Hasselbacher when I'm facing 40 years in
15    prison or proceeding with an investigation through
16    Title IX when I'm facing 40 years in prison?
17  Q  So that was a choice that was being made by you,
18    Mr. Cephus, to not participate in the Title IX
19    investigation?
20  A  No, it's not a choice.  It's me saying that I
21    don't -- I wasn't given the right to -- I wasn't
22    given -- I wasn't given an opportunity to share
23    information, what she's asking me.
24  Q  And for any reason other than the fact that your
25    criminal proceeding -- that criminal proceedings were

1    ongoing that prevented you from providing information
2    to Ms. Hasselbacher?
3  A  Yes, and we asked her to also hold off on it as well,
4    so it wasn't like I wasn't trying to give her the
5    information.  It wasn't the time for it.
6  Q  And was there any order in your criminal proceeding
7    that prevented you, an order from the Court of any
8    kind that prevented you from providing information to
9    Ms. Hasselbacher?
10  A  I don't recall.
11  Q  We can take down that exhibit.  Mr. Cephus, other
12    than the August 8, 2018 meeting that we previously
13    discussed, at any time before January 15, 2019, which
14    is the date of the investigative hearing, do you
15    recall having any meetings or conversations with
16    anyone from the University of Wisconsin-Madison
17    relating to the investigation by the Title IX Office
18    into the allegations of April 22, 2018?
19  A  Could you ask that question again?
20  Q  Yep.  So we talked about one meeting already,
21    August 8, 2019, that you had with Ms. Hasselbacher,
22    correct?
23  A  Yes.
24  Q  Okay.  So other than that August 8, 2019 meeting, do
25    you recall having any meetings or conversations with

1    anyone from the University of Wisconsin-Madison
2    relating to the investigation by the Title IX Office
3    into the allegations of April 22, 2018 before the
4    hearing of January 15, 2019?
5  A  Yes.
6  Q  Okay.  And what meeting is that?  What meetings do
7    you recall?
8  A  Therapy sessions.
9  Q  Okay.  So other than your -- so during this time you
10    attended therapy?
11  A  Yes.
12  Q  Okay.  Outside of your therapy sessions, any other
13    meetings that you recall having with anybody from the
14    University of Wisconsin-Madison relating to the
15    Title IX investigation before January 15, 2019?
16  A  I don't recall.  I don't recall.
17  Q  Do you keep any kind of calendar -- did you keep any
18    kind of calendar, Mr. Cephus, in the fall of 2018?
19  A  No.
20  Q  So not an Outlook calendar of any kind that you kept?
21  A  No.
22  Q  I'm going to put up our next exhibit, Exhibit 7,
23    which is a declaration signed by you under penalty of
24    perjury dated June 4, 2021.
25       (Exhibit 7 is shared on the video screen)

1  Q  Do you see that document on your screen, Mr. Cephus?
2  A  Yes.
3  Q  Do you recognize what that is?
4  A  No, not really.
5  Q  We can scroll through it and down to the end, and
6    you'll see that it was signed by you on June 4, 2021
7    under penalty of perjury.  And if we look at the
8    header on the document, it was filed in this lawsuit
9    on June 7, 2021.
10  A  Yes.
11  Q  Okay.  Do you recall signing -- reviewing and signing
12    this declaration, Mr. Cephus?
13  A  Yes.
14  Q  Looking at Paragraph 10 of your declaration, in your
15    declaration you wrote in Paragraph 10, "On August 22,
16    2018, Andrew Miltenberg of Nesenoff & Miltenberg, LLP
17    sent a letter to Defendant Hasselbacher stating that
18    I," meaning you, Mr. Cephus, "Would be constrained
19    from participating in the Title IX proceedings given
20    the concurrent criminal prosecution that was
21    underway.  Miltenberg also requested that
22    Hasselbacher stay the Title IX proceedings until the
23    close of the criminal matter as critical evidence
24    would become available over the next few months."
25    Do you see that?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1   A   Yes.
2   Q   In your declaration that you signed, what is the
3       critical evidence to become available that you are
4       referring to in Paragraph 10 of your declaration?
5   A   I mean, it was tons of evidence, like all the
6       evidence in court that came out in court that helped
7       me be acquitted.
8   Q   In this paragraph you're referring to a request made
9       in August 22, 2018 regarding the critical evidence
10      that would become available over the next few months.
11      Do you have any knowledge specifically about what the
12      critical evidence is that you're referring to in your
13      declaration?
14          (Witness examines document)
15  A   I don't recall.
16  Q   Do you know if --
17  A   It's been several years.
18  Q   Oh, sorry, okay.  Sorry, I apologize for
19      interrupting.  It's a Zoom thing.  Did you finish
20      your answer?
21  A   It's been several years.  I don't recall.
22  Q   Do you know if any of the critical evidence you're
23      referring to in Paragraph 10 in your declaration was
24      already in the possession of your -- any of your
25      attorneys at that time?

1   A   Ask that one more time, please.
2   Q   Do you know if any of the critical evidence that
3       you're referring to in Paragraph 10 was already in
4       the possession of any of your attorneys at that time?
5   A   I don't recall.
6   Q   Do you know if any of the critical evidence came into
7       the possession of any of your attorneys at any time
8       before January 15, 2019?
9   A   I don't recall.
10  Q   Would you have known at the time?
11  A   I mean, yes.  My life was on the line.  I would have
12      known everything at the time.  I would have known if
13      we had evidence.  If I'm facing 40 years in prison, I
14      know everything, every piece of evidence that we
15      would have, but right now five, six years later, I
16      don't recall.
17  Q   Did you, in completing your declaration in June of
18      2021 to file in this case, review any documents in
19      order to prepare your declaration that was filed in
20      this case?
21  A   No.
22  Q   Looking at Paragraph 14 of this declaration, can you
23      read that paragraph to yourself, Mr. Cephus, and let
24      me know when you've had an opportunity to read it?
25          (Witness examines document)

1   A   Yes.
2   Q   My question is do you know when you or your attorneys
3       received what you state in Paragraph 14 is the most
4       critical, exculpatory evidence from the District
5       Attorney's Office?
6   A   I don't remember.  I don't recall.
7   Q   Is there any document that you could look at that
8       would refresh your recollection?
9   A   I don't -- I don't know.  I'm not sure.
10  Q   Did you review any documents when you submitted this
11      declaration in 2021 when you were preparing
12      Paragraph 14?
13  A   No.
14  Q   We can take down that exhibit.  And I'm going to ask
15      some questions now, Mr. Cephus, about the January 15,
16      2019 hearing, okay?
17  A   Okay.
18  Q   Okay, first things first.  Do you recall a hearing
19      that was held as part of the Title IX proceedings
20      that took place on January 15, 2019?
21  A   Yes.
22  Q   Okay.  Did you attend?
23  A   Yes.
24  Q   And were you there in person or by other means?
25  A   In person.

1   Q   Did anybody else attend with you on your behalf?
2   A   Kathy Stilling.
3   Q   Any other person?
4   A   No.
5   Q   Was there an advisor other than Attorney Stilling
6       that you wanted to have present with you at the
7       January 15, 2019 hearing?
8   A   Yes.
9   Q   And who was or were -- who was that person or
10      persons?
11  A   The attorneys that were handling my Title IX case,
12      Andrew Miltenberg, Stuart and Kristen -- well, not at
13      the time Kristen, but Andrew and Stuart.
14  Q   Okay.  And what is your understanding as to why they
15      were not in attendance at the January 15, 2019
16      hearing?
17  A   I don't recall.
18  Q   Do you recall the University -- did the University
19      tell them that they could not attend the January 15,
20      2019 hearing?
21  A   I don't recall what the University told them.
22  Q   Was there any other person that you wanted in
23      attendance with you at the January 15, 2019 hearing?
24  A   Not that I can think of, probably just my attorneys.
25  Q   And by attorneys, you mean Attorneys Miltenberg and

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1    Bernstein because Attorney Stilling was with you,
2    correct?
3  A  Right.
4  Q  And you did not testify at the hearing, correct?
5  A  Correct.
6  Q  Why not?
7  A  Because at the time I was in the middle of a criminal
8    investigation, so I couldn't. Anything I said could
9    be used against me. I just couldn't. I couldn't at
10   that time properly give -- did Kristen -- I'm sorry,
11   but somebody --
12            MS. BACHHUBER: Sorry. This is
13        Rachel Bachhuber. I did note that your attorney
14        has dropped off of the Zoom, so we should stop
15        until she returns. I'll send her an email right
16        now.
17            (Discussion off the record)
18        (Reporter reads back Page 53, Line 22
19            through Page 54, Line 10)
20  Q  Mr. Cephus, any additional answer or part to your
21     answer as to why you did not testify yourself at the
22     January 15th hearing?
23  A  Yeah, along with what I was saying or already had
24     said, but I just couldn't properly participate
25     because of the criminal matter.

1  Q  Other than your personal testimony, were there any
2     limitations on your ability to provide documentary
3     evidence or other evidence to the Title IX
4     investigatory committee to your knowledge?
5  A  Can you ask that again, please?
6  Q  Sure. Let me ask it in a different way. So I
7     understand from your previous testimony that you did
8     not provide -- you did not testify yourself, you did
9     not provide personal testimony at the January 15,
10    2019 hearing because of the criminal proceedings.
11    And my question is was there any limitation on your
12    ability to provide documentary evidence at the
13    January 15, 2019 hearing?
14  A  Yes, from my understanding, there were limitations on
15    documents I could provide. I mean, we didn't even
16    get all the court documents in at the criminal trial
17    until right before trial, so it was all types of
18    evidence missing at the time of January. Like it
19    was -- there were all types of documents in evidence
20    that I couldn't provide because documents and
21    evidence were still being put into the criminal
22    investigation all the way leading up to trial later
23    that year.
24  Q  I'm going to sort of unpack that to be sure I'm
25    understanding. Is it -- is it your testimony that

1    there was, as of January 15, 2019, evidence that you
2    or your lawyers had not yet received? That would be
3    as of that time in January 15, 2019. Is that
4    correct?
5  A  Could you say that one more time.
6  Q  Yeah. Is it your testimony that there was evidence
7     as of January 15, 2019 that you or your attorneys had
8     still not received as of that time? Is that correct?
9  A  Correct.
10  Q  Okay. As to evidence, documentary evidence that you
11    or your attorneys had already received as of
12    January 15, 2019, was there any limitation on your
13    ability to provide that to the Title IX
14    investigators?
15  A  Yes, there were limitations on everything I could do
16    leading up to that because of the criminal
17    investigation pending.
18  Q  Okay. And what were those limitations as it relates
19    to being able to provide documents to the Title IX
20    investigation as of January 15, 2019?
21  A  Well, I think the simple fact that there was still
22    evidence and documents still being presented in the
23    criminal case, and later that year it just -- it was
24    no way I could have -- it was obviously limitations
25    on what I could give in January if in July when we

1    went to court on trial there were still stuff being
2    done as far as documents. There was obviously
3    limitations on documents I could provide in January.
4  Q  So I totally get and understand your testimony that
5    there was information and evidence that you did not
6    receive that was not in your or your attorneys'
7    possession until sometime after January 15, 2019, and
8    so I understand your statement that you could not
9    provide something that you did not have or you did
10   not receive until later, got that. My question is as
11   to documents or evidence that were in your possession
12   or your attorneys' possession as of or before
13   January 15, 2019, were there any limitations on your
14   or your attorneys' ability to provide that to the
15   Title IX investigation investigators at the
16   January 15, 2019 hearing?
17  A  I don't recall if there were limitations, no.
18  Q  Sorry. Is that the end of your answer, Mr. Cephus --
19  A  I don't recall.
20  Q  -- that you don't recall?
21  A  Yes.
22  Q  And after the January 15, 2019 hearing do you recall
23    having any meetings or conversations with anyone from
24    the University of Wisconsin-Madison relating to the
25    Title IX investigation into the allegations regarding

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

```
 1        April 22, 2018?
 2   A    No.
 3   Q    Okay, all right.  I'm going to have some questions
 4        now about sort of your current information and
 5        employment, things like that.  Mr. Cephus, are you
 6        currently employed?
 7   A    No.
 8   Q    Do you have any kind of like business interests that
 9        you are involved with currently?
10   A    No.
11   Q    Do you -- are you receiving any kind of income or
12        revenue from any sources currently?
13   A    No.
14   Q    What is the last employment that you held?
15   A    Playing football in the National Football League.
16   Q    And this was with the Detroit Lions, Mr. Cephus,
17        correct?
18   A    Yes.
19   Q    Okay.  And you were released from your contract with
20        the Lions, correct?
21   A    Yes.
22   Q    That occurred in April of 2023, correct?
23   A    Yes.
24   Q    And what are the reasons that the Lions released you
25        from your contract?
```

```
 1   Q    And what steps have you taken, if any, in regard to
 2        being reinstated by the National Football League?
 3             MS. MOHR:  I'm going to object to
 4             this.
 5   Q    Her objection is noted for the record, Mr. Cephus.
 6        You're still allowed to answer.
 7   A    I don't have an answer.  I'm not going to answer.
 8             MS. HUCK:  Ms. Mohr, are you
 9             instructing your client not to answer a question
10             on a basis that's not related to privilege?
11             MS. MOHR:  This is an ongoing process,
12             so I do not think he should answer.
13             MS. HUCK:  So are you giving your
14             client an instruction that he is not to answer
15             my question about what, if any, steps he is
16             taking to pursue reinstatement with the National
17             Football League?
18             MS. MOHR:  Quintez, you can answer,
19             but my objection is noted.
20   A    What's your question?
21   Q    Yeah, what, if any, steps are you taking to pursue
22        reinstatement from the National Football League?
23   A    I guess I'm just not sure why I have to tell you
24        about the steps I'm talking.  My -- my plan is to be
25        reinstated.  I'm going to take the steps to be
```

```
 1        reinstated.  That's pretty much what I have.
 2   Q    Is there --
 3   A    My agent is working on getting reinstated.  He's
 4        going to help me with that process.
 5   Q    And what is your agent's name?
 6   A    Patrick Dye.
 7   Q    Can you please spell the last name?
 8   A    D-y-e.
 9   Q    Do you have any businesses or partnerships in which
10        you hold an ownership interest currently?
11   A    Not that I can think of right now.
12   Q    At any time since January 1, 2020, have you held an
13        ownership interest in any businesses or partnerships?
14   A    Yes.
15   Q    And what were those?
16   A    An organization that provides for kids growing up how
17        I did, less fortunate kids.  I talked about trucks
18        and creating a truck business, trucking business.
19        Things like that have been plans that I've had since
20        2020, January.
21   Q    Let me ask it this way.  Since January 1, 2020, have
22        you received any income or earnings that would not be
23        reported on your tax returns?
24   A    No.  All of my income should be on my tax returns.
25   Q    Okay.
```

```
 1   A    I had -- I had a disciplinary issue with them.
 2   Q    And what was the disciplinary issue with them that
 3        you had?
 4   A    Gambling.
 5   Q    Are you currently looking for any employment?
 6   A    No.
 7   Q    Are you currently involved in any pursuit related to
 8        business, a business venture or other ways to make
 9        money?
10   A    I hope to in the future.
11   Q    And what is it that you intend to pursue?
12   A    I guess I'm just not sure why this is relevant to
13        you, to know my future plans and goals.
14   Q    You're making a claim for damages in this case,
15        Mr. Cephus, so I'm entitled to ask questions
16        regarding the damages you're seeking, including ways
17        you may be seeking to mitigate them.  So my question
18        is do you have an intention to pursue employment at
19        this time?
20   A    Yes.
21   Q    And what is that intention?
22   A    Play football.
23   Q    Are you seeking to be reinstated by the National
24        Football League?
25   A    Yes.
```

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  A   I'm --
2  Q   Oh, sorry.  Please finish.
3  A   I'm not sure totally if everything that I have gained
4      has been reported on my taxes.  I'm not sure about
5      that.
6  Q   And when you say everything that you've gained, what
7      do you have in mind?
8  A   Like money I've made.
9  Q   Through what sources?
10 A   Any source, like any.  I'm telling you that any
11     income that I've had over the last four or five
12     years, I don't know if it all has been reported on
13     my taxes.
14 Q   Are you aware of any gifting that may have -- that
15     you have received that is not reported on your tax
16     returns?
17 A   I'm not sure.  I don't recall.
18 Q   You worked with an accountant to prepare your tax
19     returns since January 2020, it looked like to me; is
20     that correct?
21 A   Yes.
22 Q   We're going to pull up again Exhibit 2, which is
23     Plaintiff's Supplemental Response to Defendants'
24     First Set of Discovery, which was previously marked
25     as an exhibit.

1      (Exhibit 2 is shared on the video screen)
2  Q   Do you see that, Mr. Cephus?
3  A   Yes.
4  Q   Okay.  And beginning on Page 3 of the document,
5      there's a section for Interrogatories.  If we go to
6      Page 5, you'll see Request No. 19 at the bottom of
7      the page.  Can you see that?
8  A   Yes.
9  Q   Okay.  And this interrogatory requested a computation
10     of each category of damages that you are claiming you
11     sustained because of Defendant's actions in this
12     case.  Do you see that?
13 A   Yes.
14 Q   Okay.  And the response begins at the bottom of that
15     page and carries over onto the next page.  And I will
16     give you an opportunity to review that, and once
17     you've had an opportunity to review that, please let
18     me know.
19     (Witness examines document)
20 A   Yes.
21 Q   So you were picked in the NFL 2020 Draft in the fifth
22     round; is that correct?
23 A   Yes.
24 Q   In the response to the interrogatory by you, it
25     states that a 2020 fifth round draft pick has an

1      average contract of four years with an approximate
2      salary of $899,292 salary per year, including
3      $304,292 guaranteed and a signing bonus of $304,292.
4      My question is were those the dollar terms of your
5      contract with the Detroit Lions?
6  A   Yes.
7  Q   Did you have an agent who represented you in
8      negotiations for that contract?
9  A   Nobody negotiates a rookie deal.
10 Q   Okay.  In year one with the Lions, what is the salary
11     amount that you received from them?
12 A   Somewhere over a million dollars.
13 Q   What documents would I look at to determine the
14     amount of salary that you received in year one of
15     your contract with the Lions?
16 A   This one.
17 Q   This one being?  What are you referring to?
18 A   This one that we're looking at right now.  It says
19     that the signing bonus was $300,000, over $300,000,
20     and the average income, average income on the salary
21     was $800,000, so that's somewhere over a million
22     dollars.
23 Q   Is that information reflected in any other documents
24     that you're aware that I could look at other than
25     this response to this interrogatory?

1  A   I mean, you could look at a 2020 fifth round draft
2      pick.  We also gave you guys tax returns.
3  Q   Okay.
4  A   The numbers don't change.
5  Q   And so on your tax returns would be all salary that
6      you received from the Detroit Lions; is that correct?
7  A   I'm not sure.
8  Q   Okay.  So that's what I'm trying to figure out too,
9      Mr. Cephus.  Where do I look to find out the amount
10     of money that you actually received in year one from
11     the Detroit Lions?  I'm just looking for where I
12     might find it.
13 A   It's on Google.  Like you can Google, "Quintez Cephus
14     contracts," and it will tell you that.  It will tell
15     you that I made 300-something thousand dollars when I
16     signed the paper, and it will tell you that I made
17     around $800,000 for my rookie year, so it's there.
18 Q   And in year two with the Lions, what salary did you
19     receive from them?
20 A   Somewhere around $800,000 or $900,000, somewhere
21     around that number.
22 Q   And what document would I look at to determine the
23     salary income that you received from the Detroit
24     Lions in year two of your contract?
25 A   I mean, like you can go on Google and type in anybody

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1    that played in the NFL's contract, and it will tell
2    you every dollar they made.  Like you can go type in,
3    "Quintez Cephus contract," on Google, and it tell you
4    how much money I made.
5  Q  And is that your same answer for year three, look at
6    Google?
7  A  Or my tax returns, or we provided you with the
8    information.  I'm pretty sure we gave you all the
9    information about how much money I made each year.
10 Q  Okay.  Did you receive any income from sources other
11   than the Lions, such as advertising, being a social
12   influencer, promotions, anything like that?
13 A  Yes.
14 Q  And what was the source of that income?  Let me ask
15   you a different way.  So you received income from
16   sources relating to other than your salary from the
17   Lions.  What income -- what sources provided you
18   income other than the Lions in the years 2020 to
19   2023?
20 A  Signings, like autograph signings.  Marketing, like
21   branding deals, things like that, like endorsements,
22   things outside of football based off of your name.
23 Q  Was there anybody that -- any companies or
24   organizations specifically that you had branding
25   deals with in the years 2020 to 2023?

1  A  It was very limited.  It was limited, but there were
2    some.  There were some, but it was limited.  I don't
3    really remember.  I can't recall when or who it was
4    specifically, but I know I made money outside of my
5    contract.
6  Q  And do you have an understanding about whether or not
7    that income or revenue would be reported on the tax
8    returns if I look at those to determine how much it
9    was?
10 A  I'm not sure if that information is on there or not.
11 Q  Okay.  In the response to this interrogatory it also
12   has a response related to a second round draft pick
13   and states that a 2020 second round draft pick salary
14   is approximately -- I'm sorry.  I need to read that
15   again.  "A 2020 second round draft pick has an
16   average contract of four years at approximately
17   $1,506,294 salary per year."  Do you see that?
18 A  Yes.
19 Q  And what is the factual basis for that statement in
20   your response to Interrogatory No. 19?
21 A  This stuff is all set.  It's all prorated pretty
22   much.  Like a first -- like first-rounders make
23   X amount of dollars.  If you go number one pick, if
24   you go second round, number 35th pick, it's all --
25   it's all slated, and you're going to make whatever

1    that amount is.
2  Q  Okay.  And then does what pick you are within each
3    round also affect the salary you would receive?
4  A  Yes, your pick affects -- if you go earlier, you're
5    going to make more money.  If you go later, you're
6    going to make less money.
7  Q  In the response to Interrogatory No. 19, the last
8    sentence, it says, "In addition, Plaintiff has
9    incurred legal expenses of $321,065.79 to date."
10   Do you see that?
11 A  Yes.
12 Q  To whom have those legal expenses been paid, what law
13   firm?
14 A  To between Miltenberg, between my lawyers that I've
15   had to pay for this matter.
16 Q  So you include --
17 A  I don't know how  --
18 Q  Sorry, go ahead.
19 A  The lawyers that I've had to pay to help me with this
20   Title IX lawsuit, this Title IX investigation.
21 Q  Does that amount include any fees relating to
22   attorney representation of you in the criminal
23   matter?
24 A  No, it's just N&M, which is Miltenberg's law firm.
25   It's just their fees.

1  Q  Okay.  I have some questions about the requests,
2    Interrogatory Request No. 20 and the response.  If
3    you look a little bit further down on that same page,
4    you'll see Request No. 20.  It asked for you to
5    identify all facts and/or evidence in support of your
6    contention that NFL scouts expressed skepticism about
7    you, and there's a reference then to a paragraph
8    number in the Complaint that you filed in this
9    lawsuit.  Can you see that?
10 A  Yes.
11 Q  Okay.  My question is did any NFL scouts express
12   skepticism about you?
13 A  Because of this Title IX matter?
14 Q  The question or interrogatory is in reference to an
15   allegation complaint in the paragraph filed on your
16   behalf that NFL scouts expressed skepticism about
17   you.  I can pull up that Complaint if you'd like to
18   see it.
19 A  Yes.
20 Q  Okay.
21 A  You don't have to pull it up, but yes, there was
22   skepticism.
23 Q  Oh, I see, okay.  And who were the NFL scouts who
24   expressed skepticism about you?
25 A  So when you're going to the NFL Combine when you're

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  a draft prospect, you go to this NFL Combine over
2  like three or four days where you work out and you
3  interview with like -- it's like you're doing
4  interviews for a day or for two days straight from
5  the time you wake up to the time you go to sleep.
6  And I probably met with every NFL team, so I mean, I
7  had interviews all day.
8      Every interview that I had, they would last
9  20 minutes and for 15 minutes I was talking to them
10 about this Title IX investigation.  So there was
11 obvious skepticism about these allegations that's
12 been placed on me or me being expelled from school.
13 You know, I mean, every single person that I talked
14 to, it was I spent five minutes talking about
15 football and I spent 15 minutes talking about what
16 happened with this allegation through the school.
17 It was a character flaw against me.
18 Q  Do you recall if you were asked specific questions
19    about the Title IX investigation, or were you asked
20    specific questions about the criminal proceeding?
21 A  No, it was about the University of Wisconsin.  It was
22    about being expelled from school.  It was about -- I
23    was acquitted at trial for the criminal case.  I
24    still had to deal with the school.  It was still an
25    ongoing school process that wasn't settled.  It's

1  Q  So that outcome of the Title IX investigation had
2     been completed by the time you were at the NFL
3     Combine in March 2020, correct?
4  A  I mean, it's still not completed.  I've still -- like
5     I'm still today four years later like on a Zoom call
6     about Title IX.  It's still not completed.
7  Q  I understand that we're having your deposition
8     because you have sued the Board of Regents in this
9     lawsuit.  My question to you is that when you were at
10    the NFL Combine you had been -- at that time had
11    already been readmitted to the University of
12    Wisconsin-Madison, correct?
13 A  Right.
14 Q  And you had played in the fall football season in
15    2019, correct?
16 A  Right.
17 Q  So the NFL scouts with whom you were meeting in the
18    2020 Combine knew that information, correct?
19 A  I don't know.  I don't know what they knew.
20 Q  Do you recall informing any of the NFL scouts at the
21    2020 Combine that you had been -- that you had been
22    readmitted to the University of Wisconsin-Madison?
23    Did you provide that information to them?
24 A  No.
25 Q  Why did you not tell the NFL scouts that the

1  still not settled, and I've been in the league for
2  three or four years now.
3  Q  When was the NFL Combine that you're referring to?
4     When did that take place?
5  A  It's happening this week, so four years ago maybe,
6     February of 2020.
7  Q  Okay.  So by the time you were participating in the
8     NFL Combine in February of 2020, your criminal trial
9     was over and you had been acquitted, correct?
10 A  Correct.
11 Q  And you had filed your petition for restoration to
12    the University of Wisconsin-Madison, and that had
13    been granted, correct?
14 A  What does that mean?  I filed a restoration to the
15    University of Madison and it had been granted, what
16    does that mean?
17 Q  Okay.  Do you recall that you asked to be readmitted
18    to the University of Wisconsin-Madison?
19 A  Right.
20 Q  And it was granted, you were admitted to the
21    University of Wisconsin-Madison, correct --
22 A  Right.
23 Q  -- in the fall of 2019, and you played your fall
24    season in 2019, correct?
25 A  Right.

1  University of Wisconsin had essentially modified and
2  changed the Title IX investigation, that you were
3  readmitted?  Why did you not share that information
4  with them?
5  A  At that time I had already been found responsible,
6     and even though it was overturned, I still -- it
7     still was a finding.  The school had still found
8     me -- it still was a finding that I had did something
9     wrong based off the school's finding, so I had to
10    answer questions around the school's findings.
11       They let me back in.  I was reinstated.  I
12    played.  That's all a fact.  But there was still a
13    finding.  I still got kicked out of school.  I still
14    was found responsible for something I didn't do.  I
15    still had to answer questions months and years later
16    about the findings that the school found me
17    responsible for that I didn't do.
18 Q  Was one of the findings that the school found you
19    responsible for related to the taking of a photograph
20    of Complainants 1 and 2 on April 22, 2018?
21 A  You said what?
22 Q  Is one of the findings that the University of
23    Wisconsin found you responsible for related to the
24    taking of a photograph of either or both of the
25    complainants on the night of April 22, 2018?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1   A   I didn't -- I didn't take a picture of them.
2   Q   Did you request that another person take a photograph
3       of them on April 22, 2018?
4   A   You asked me if I was responsible for a picture.  I
5       didn't take a picture.
6   Q   And the next question is did you request that another
7       person take a photograph of the complainants on the
8       night of April 22, 2018?
9   A   I don't recall the specifics of that night, but I
10      know I didn't take a picture of anybody.
11  Q   Do you recall any specific comment that any
12      particular NFL scout made to you relating to the
13      University of Wisconsin Title IX investigation and
14      findings during the NFL 2020 combine?
15  A   At this time I can't recall specifics about
16      conversations I had, but like I said, at the NFL
17      Combine I spent two days explaining how I was found
18      guilty by the University of Wisconsin for something I
19      didn't do.
20  Q   Did any of the NFL scouts, to your recollection,
21      express any doubt to you about your having missed an
22      entire season?
23  A   Yes, they questioned what I did over that time, where
24      I spent it.  Yes, they had concerns about me missing
25      a year of school and football.

1       injuries.  At the Combine they have their team
2       doctors there.  Every team has their team doctors
3       there.  They evaluate your body.  They know
4       everything that's wrong with you.  They know if
5       you're healthy.  The scouts aren't asking those
6       questions.
7   Q   In your response to Interrogatory No. 19 regarding
8       your damages, you're making a comparison between a
9       second round pick and a fifth round pick.  What is
10      your basis for asserting that you would have been a
11      second round draft pick but for the Title IX
12      investigation by the University of Wisconsin-Madison?
13  A   They have -- they have draft grades, and there's
14      been -- there was enough questions asked about my
15      character and this Title IX stuff.  There were
16      concerns about this Title IX stuff the whole way,
17      and that was a determining factor or one of the
18      determining factors.  That was a determining factor
19      on are you going to take this guy, are you going to
20      take a guy that has been expelled from school, that
21      has been accused of whatever, like taking a picture
22      or whatever else that was the school's case, or
23      choose another guy that didn't have these concerns or
24      questions about his character?
25          This case has put a lot of questioning on my

1   Q   Do you remember specifically which scouts raised
2       those concerns to you?
3   A   I mean, most of them did.  They're all there to
4       figure out -- I mean, that's what I do for a living,
5       play football.  I wasn't playing it for a year
6       because I was expelled from school.  They all wanted
7       to know what -- they all had concerns and wanted to
8       know what I did over the year that I wasn't.
9   Q   So each and every scout had those concerns?
10  A   Yes.  I mean, if you're paying somebody millions of
11      dollars to come to your organization, you're going to
12      want to know about a year of them missing, you're
13      going to have concerns.  I would have concerns about
14      them missing a year of football.
15  Q   Did any of the NFL scouts at the 2020 NFL Combine
16      raise any concerns about seasons you missed due to
17      your injuries in college?
18  A   No.
19  Q   You received no questions from any NFL scout about
20      any of the seasons you missed playing because of your
21      injuries; is that correct?
22  A   They have a day where you visit with doctors at the
23      NFL Combine.  No NFL scout -- from their knowledge,
24      I played that last season, I looked healthy, I was
25      healthy the whole year.  You meet with doctors about

1       character, whether it's with the league,
2       endorsements, brands, companies, whatever.  Like if
3       you Google my name, you're going to see Title IX,
4       University of Wisconsin, expelled.  You're going to
5       see all of that.  That plays a part in somebody
6       drafting you, where you're valued or not.
7           Like I was one of the best receivers in the
8       Big 10.  There is plenty of good receivers in the
9       Big 10.  I outplayed them.  I went to the Big 10
10      Championship.  We were the number one team -- the
11      number four team in the nation.
12          You receive -- that's what you -- you make more
13      money for things like that.  You're drafted higher
14      for things like that.  You're -- if you don't have
15      those blemishes on your name, these people not
16      raising questions about your character, you get
17      drafted higher.
18  Q   So I'm going to ask some questions about that answer.
19      You mentioned that they have draft grades.  Who's
20      they?
21  A   Scouts.
22  Q   At any time were you given by scouts draft grades of
23      yourself?
24  A   I don't recall, but I remember -- I remember being
25      told that I was supposed to go in the second or third

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  round, and that was my draft projection, second to
2  third.  And if it -- if it wasn't, if it wasn't, I
3  would have stayed in college for another year.  I
4  decided to come out because I was told I would be a
5  second round pick.  If I wasn't told that, I would
6  have stayed in college for my last season.
7  Q  Who told you that you were going to be a second or
8     third round pick?
9  A  So it was so long ago, I don't know exactly who told
10    me what, but my draft projection was second round,
11    and that's the reason I came out of school a year
12    early.
13 Q  So sitting here today, you can't recall any
14    particular person who told you that you were going to
15    go on the second or third round; is that correct?
16 A  Right.
17 Q  But it's your recollection that your draft projection
18    was second or third round; is that correct?
19 A  Right.
20 Q  And when you say your draft projection, I'm just not
21    familiar enough with NFL procedures.  Like what is
22    that?  Is that a formal rating?  Is that something
23    that's made public, or is it just something that was
24    shared with you by someone whom you don't recall at
25    this point?  Like what is the draft projection that

1  was my -- the reasoning for me leaving school a year
2  early.
3  Q  And when you say, "We talked to," who besides
4     yourself were part of those discussions?
5  A  I worked with Ted Gilmore and I hired an agent,
6     Pat Dye, Patrick Dye, and that's what we -- that's
7     why we made the decision to leave school, based off
8     the gathered information around the league from
9     scouts that I was going to be a second round guy and
10    that it was my best decision to leave school.
11 Q  At any time after that NFL 2020 Draft has anybody
12    expressed to you that but for the Title IX
13    investigation by the University of Wisconsin-Madison
14    that a particular team would have picked you in the
15    second round of the draft?
16 A  I don't recall.
17 Q  Do you believe sitting here today that if someone had
18    told you specifically but for the Title IX
19    investigation by the University of Wisconsin-Madison
20    that you would have been picked by a team in the
21    second round that you would recall that?
22 A  Say that again.
23 Q  If somebody had told you after the 2020 Draft that
24    but for the Title IX investigation by the University
25    of Wisconsin-Madison that you would have been picked

1  you're referring to?
2  A  Scouts, scouts provide that information.  Scouts
3     provide that information to the coaches.  That's what
4     I mean.  My coach got a -- my coach, Ted Gilmore, he
5     was my receivers coach at Wisconsin.  I worked with
6     him to make that decision, if I was going to come
7     out.  I didn't work with him, but I got information
8     from him.  I remember conversations that I had that
9     gave me -- that I came up with the decision that I
10    was going to leave school and enter the draft.
11 Q  So you made that determination that you were going to
12    enter the draft, and you believed that you were going
13    to go in the second or third round, correct, that was
14    your belief?
15 A  That's right.
16 Q  Correct?
17 A  Yes.
18 Q  Okay.  Is there any written documentation reflecting
19    that you were projected to go in the second or third
20    round of the 2020 NFL Draft?
21 A  Not that I can -- not that I recall.  I can't -- we
22    talked to scouts.  We got information from scouts to
23    come up with that decision that I was going to leave
24    school, and to my knowledge, it was that I was
25    projected to be a second round guy.  That's -- that

1  by a team in the second round of the draft that you
2  would recall such a conversation?
3  A  I'm not sure.
4         MS. HUCK:  Let's take a 10-minute --
5     well, we'll say 12-minute break and come back at
6     the hour.  I think I have about 15 minutes of
7     questions just to get through, but I do need
8     just a short break for comfort.  So we'll get
9     back on at noon my time.  I don't know what that
10    does.  And like I said, I think everybody can
11    anticipate about 15 minutes after that to the
12    end, okay?
13         (A recess is taken)
14         (11:48 a.m. to 12:01 p.m.)
15         EXAMINATION (RESUMED)
16 BY MS. HUCK:
17 Q  Okay.  I'm going to put up another exhibit, this is
18    Exhibit No. 8.  It is Plaintiff's Rule 26 Initial
19    Disclosures from this case.
20         (Exhibit 8 is shared on the video screen)
21 Q  Can you see that document that's up on the screen,
22    Mr. Cephus?
23 A  Yes.
24 Q  Is this a document you've seen before?  You didn't
25    sign it, but I'm asking have you seen it before?

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1  A   Yes.
2  Q   Okay. Towards the end there's a section that sets
3      out damages that you're claiming in this lawsuit.
4      Do you see the section Roman Numeral III,
5      Rule 26(a)(1)(A)(iii) Damages on your screen,
6      Mr. Cephus?
7  A   Yes.
8  Q   Okay. And in that section Plaintiff has set out the
9      damages, the category of damages that you are
10     claiming in this lawsuit, so I'm going to go through
11     those to ask you questions about them. So in your
12     response you are asserting damages in an amount to be
13     determined at trial for damages to your physical
14     well-being. What are the damages to your physical
15     well-being that you are asserting occurred and are
16     seeking as damages in this lawsuit?
17  A   Physical well-being, meaning like days where I
18     physically didn't feel comfortable. Walking around
19     campus, people were looking at me, not feeling
20     comfortable going to class, dropping out of courses
21     just because I wasn't able to just go. I wasn't
22     feeling up for going to class because I just -- I
23     felt down.
24         I had to get my friend to come live with me in
25     Wisconsin because I wasn't feeling comfortable being

1     claiming is damage to your physical well-being. So
2     my question is what is the damage to your physical
3     well-being that occurred because of the actions of
4     Defendant in this case?
5  A   That was my answer for that part of the question.
6  Q   Okay. And did you receive treatment from a medical
7     provider for damage to your physical well-being?
8  A   Yes, I received -- I received therapy.
9  Q   Okay. What are the names of the therapists from whom
10     you received treatment?
11  A   Cassie, Dr. Cassie, I think. I don't remember. It
12     was whoever the football team's therapists were over
13     that time period between 2018 and 2020. It was a
14     couple different ones. I met with one back home as
15     well when I was sent home back to Georgia. I met
16     with a therapist there in Macon, Georgia.
17  Q   What is the name of your therapist in Macon, Georgia
18     that you met with?
19  A   I can't remember. I've -- I'm drawing a blank on his
20     name.
21  Q   Do you recall when you saw this therapist?
22  A   Yes, it was whenever I was expelled from school and
23     sent back to Macon. It was just -- I'm drawing a
24     blank on the name. If it comes to my head --
25  Q   Okay. If it pops into your mind, you can let me

1     there after I was back, allowed back on campus. I
2     mean, that's pretty much -- that's what I mean by
3     physical damage, yes, going to the stadium for a
4     game, and a lady telling me, "Shame on you." She got
5     fired for that.
6         I mean, I don't know. Those are all physical.
7     That's all physically damaging in my opinion. It's
8     not making me feel like I'm safe in a space where I
9     should be.
10  Q   Have you received treatment from any medical provider
11     for the harm to your physical well-being that you're
12     claiming as damages in this lawsuit?
13  A   Yes, I received therapy from a few different people
14     based on this matter.
15  Q   And I'll ask you questions about therapy later, but
16     in terms of your physical well-being, did you see any
17     medical providers?
18  A   I guess maybe I'm not sure. I don't know if I'm even
19     answering the question, honestly. Like maybe I'm --
20     are you telling me that I'm answering emotional, the
21     emotional aspect of your question? Or I'm not sure
22     if I'm answering your question right.
23  Q   Okay. So there's -- I'm just trying to ask questions
24     about the damages that you're claiming in this
25     lawsuit, and one of the types of damages you are

1     know, but otherwise we'll just keep going. Did you
2     see this therapist in Georgia after you returned to
3     school in the fall of 2019?
4  A   Between -- between the two therapists that was at
5     Wisconsin over the time of 2018 to 2020 and the
6     therapist in Macon, Georgia that I met with, those
7     were the three that I met with. I don't know when
8     like specifically. I'm sure they have it on record,
9     but I don't know like after -- I don't know the
10     specific dates.
11  Q   And since 2020 have you seen any therapists related
12     to any claim for damages that you're making in this
13     lawsuit?
14  A   Yes, I've received therapy for this lawsuit, this,
15     the damages that was done to me during this time, so
16     after.
17  Q   And what is the name of that or those therapists?
18  A   The same ones that I've already said, the therapist
19     in Macon or the two therapists that were provided
20     by -- at the football facility.
21  Q   And by at the football facility, you mean the
22     UW football facility?
23  A   Yes.
24  Q   Okay. Since you have no longer been a student
25     since -- once you stopped being a student at the

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

```
1      University of Wisconsin-Madison, did you receive any
2      therapy after that from anyone at or affiliated with
3      the University of Wisconsin-Madison?
4   A  I didn't receive any.  I haven't received therapy
5      from anybody at the University of Wisconsin since
6      I've been a student there.
7   Q  Okay.  And do you recall the last time that you
8      received therapy from the therapist that you saw in
9      Macon, Georgia?
10  A  I don't recall, but I'm still actively receiving
11     therapy like today as well.
12  Q  And who is the therapist that you are currently
13     seeing?
14  A  His name is Galen Cole, Galen Cole.
15  Q  And do you know the location of his practice?  Like
16     where is he located?
17  A  Atlanta, Georgia.
18  Q  Any other therapists that you've seen besides the
19     ones we've talked about?
20  A  I have a mindfulness coach.  She works as a -- I
21     mean, it's a part of therapy, but her name is
22     Ashley Baer, B-a-e-r.  I've also worked with her on
23     the traumas that I've experienced in my lifetime and
24     how those things have affected me or can affect me.
25     I'm practicing with her.  Mindfulness helps me with
```

```
1      myself that grew up in poverty that fought hard to
2      make something out of nothing, and I'll forever have
3      a scratch on my back that, you know, I was expelled
4      from school, facing sexual assault allegations, that
5      I got kicked out of school for it.  Brands have
6      turned their back on me because of those allegations.
7      That is damaging my reputation.
8   Q  Do you contend that it was -- that any staffperson
9      from the University of Wisconsin-Madison publicized
10     the fact that there was a Title IX investigation
11     going on in which you were involved?
12  A  I mean, it was -- it was clear I was -- I was -- like
13     I said, at the time I was part of a team that was
14     nationally ranked.  I was facing this Title IX
15     investigation.  I knew you guys -- that if they were
16     going to kick me out of school, I had to step away
17     from the team.
18        It's not my fault that I'm on a
19     nationally-ranked football team, a high power five
20     school where the news, the media, people -- I'm
21     starting.  I'm the number one wide receiver on the
22     football team.  It changed our season when I was
23     missing.  We were no longer who we were before I
24     left.  That was going to be in the media.  It was no
25     way around it.
```

```
1      handling the traumas that I've experienced, like the
2      one that we're talking about today, this Title IX
3      case.
4   Q  Are there other traumas that get discussed during
5      your therapy other than the Title IX case?
6   A  Yes.
7   Q  In the response in the Rule 26(a)(1) documents it
8      also lists that you're seeking damages to reputation.
9      What is the basis for your assertion that you're
10     seeking damages relating to reputation?
11  A  So a lot of times like -- so I'm an athlete, I'm on
12     TV a lot of the time, and you can Google my name and
13     you're not going to miss the being expelled from
14     school, being charged or whatever, facing like the
15     things that the school -- like facing sexual assault.
16     The sexual assault allegations, they aren't --
17     they're never going to go away.
18        When all of this stuff happened, it was on like
19     CNN, it was on all the media news outlets, it was on
20     Twitter, it was on the news in Macon, from Macon,
21     Georgia to Wisconsin to national news.  It was all
22     over the news, all over every media platform.  That
23     is my reputation.
24        I do receive money for my using my image and my
25     likeness.  I am an example for a lot of kids like
```

```
1         Like I had no choice.  I mean, it was no choice.
2      Like it's a media-driven business.  I had to step
3      away from my team to let them focus and enjoy what
4      they had going on, to try not to be a distraction for
5      my team.  So I chose to step away from the team to
6      try to avoid some of the turmoil or chaos that would
7      come from the University finding me guilty for
8      something that I had no real fair chance to fight
9      for.
10  Q  And so my question is like do you contend that it
11     was a staffperson with the University of
12     Wisconsin-Madison who made public the information
13     that you were involved in a Title IX investigation at
14     the University of Wisconsin-Madison?
15  A  I mean, it was going to be public.  Like it's --
16     there's no -- I can't help who I am.  I can't help
17     the gifts that God gave me.  I can't help that
18     whatever I do or have done has gone on the national
19     news.  I can't help that.
20        Like they expelled me from school, so it was
21     going to be on the news.  Like I'm a kid from Macon,
22     Georgia, from nowhere, that is thousands of miles
23     away from home that is here to help this
24     nationally-ranked team do well, this school,
25     represent this school, this team.
```

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

```
 1         I was kicked off the team.  Like I don't --
 2   like they knew what was going to happen behind that.
 3   I don't -- I don't know.  It's just natural life for
 4   me.  It's going to be in the news.  Like I don't
 5   know.  I don't know.
 6  Q  Do you have any knowledge personally of a person or a
 7   staffperson or anybody affiliated with the University
 8   of Wisconsin-Madison who made it public that you were
 9   involved in a Title IX investigation at the
10   University of Wisconsin-Madison?
11  A  Yes, they made it public.  Like I was found guilty for
12   something.  Like I was found guilty and expelled from
13   school.  It was public.
14  Q  And why do you say that was public?
15  A  Because I represent their football team and I was
16   missing from it.  It was --
17  Q  In response to the -- oh, I'm sorry.  Did you finish
18   your answer?
19  A  You can go ahead.
20  Q  Okay.  In response to the initial disclosures on your
21   damages, it says that you are seeking damages or that
22   you sustained damages including past and future
23   economic losses.  Do you see that?
24         MS. HUCK:  We lost him.  It's always
25   the case when you're so close to finishing, just
```

```
 1   University of Wisconsin that I committed a crime or
 2   whatever.  I will forever have
 3   that against my name.
 4         I will -- there's people 50, 60 years old that
 5   makes money from the NFL and from being who they are
 6   and playing football and being able to build their
 7   name and their brand.  I will forever -- like it's
 8   already happened where I don't -- I have been limited
 9   to the brands that are willing to accept me because
10   of you Google my name and I was founded guilty for
11   this University of Wisconsin whatever.
12         Like I will forever be fighting against that.  I
13   will be forever trying to build my name.  I will
14   forever have to accept whatever comes with it,
15   whoever wants to touch me.  Some people will.  Some
16   people won't.  Some people have wanted to touch me
17   and give me endorsements or like branding
18   opportunities.  Some haven't.  And I will forever
19   live the rest of my life having to deal with that
20   people may not want to touch me because I was founded
21   guilty at the University of Wisconsin for committing
22   sexual whatever the charges were that got me expelled
23   from school.
24         And then when this stuff happens, the media, the
25   news blows up, oh, he was expelled from school, he
```

```
 1         can't quite get across the line.  We'll just
 2         give him a minute to get back on.
 3            MS. MOHR:  He said his computer just
 4         died.  He'll be right back.
 5            MS. HUCK:  Okay.
 6         (Mr. Cephus rejoins the videoconference)
 7  A  Sorry.
 8  Q  No problem.  So in the 26(a)(1) disclosures seeking
 9   damages, you are seeking damages for past and future
10   economic losses.  Do you see that in the third line
11   of the document?
12  A  Yes.
13  Q  Okay.  Is there any difference from this claim for
14   past and future economic losses that are different
15   than the response to interrogatories that we talked
16   about before relating to the salary amounts relative
17   to a second round pick or a fifth round draft pick?
18  A  Yes.  I will forever have an opportunity to make
19   money off of my name because I was blessed enough to
20   be able to play in the National Football League.  I
21   won't be able to change that I was expelled from
22   school and I was -- I still have this sexual assault
23   thing with the school where they found me guilty.
24   Outside of the criminal case where I was innocent and
25   proven innocent, I still was found guilty from the
```

```
 1   was this, he was that, but when he's let back in,
 2   nobody talks about it.  It's just the way the world
 3   works.  Nobody speaks on when somebody does good,
 4   somebody is doing this, but when I was supposed to be
 5   a rapist or I was supposed to be this sexual
 6   assaulter or female abuser, then the whole media,
 7   then everybody's talking about it, my name is getting
 8   drug through the mud.  But when the school allows me
 9   back in, nobody talks about it, the media.  It blows
10   over, everybody gets a breeze.
11         But I'm the only one that has to face what's
12   going to happen with my name, who's going to look at
13   me different.  I'm the only one that's going to be
14   faced with that for the rest of my life.
15  Q  Is there a dollar amount that you put on your future
16   economic losses that you're claiming in this lawsuit?
17  A  I mean, there is no amount that I can put on that
18   right now.
19  Q  And is there any effect on your claim for future
20   economic losses relating to the disciplinary issue
21   that arose with the Detroit Lions releasing you?
22  A  Excuse me?
23  Q  Is there any effect from your position on your claim
24   for future economic losses because the Detroit Lions
25   released you from your contract for the disciplinary
```

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1    issue relating to gambling?
2  A  No.  This has nothing to do with that.  This was a
3     few months ago when this incident happened.  This,
4     all of this stuff was way before that.  It has
5     nothing to do with what is going on in my life today
6     and me dealing with the gambling policy that I broke.
7  Q  Okay.  And you seek damages relating to loss of
8     educational opportunities.  What is the basis for the
9     claim for damages relating to the loss of educational
10    opportunities?
11  A  Can you ask me that again?  Oh, educational.
12  Q  Sure.
13  A  I'm sorry.  So, yeah, so when was I expelled from
14    school?  It was the -- so I just took classes at the
15    University of Wisconsin this past fall, trying to
16    catch up on my school.
17        I was in the middle of completing, I was almost
18    complete, I was about to complete 12 to 14 hours of
19    school when I was expelled from school.  I had -- it
20    was -- I had two or three weeks left of school, I
21    think, when I was expelled.  That is educational
22    loss.
23        I haven't completed my degree to date.
24    That's -- I mean, I just trashed a semester of my
25    life and hard work that I put in to get a degree.

1     was -- there was no reason for rushing to find me
2     guilty, just as the -- I was just -- I don't know.
3         I just feel like as a male, I was a black male
4     in a predominantly white town, and I was just rushed,
5     like they rushed to find me guilty.  I was just a
6     football player, a kid thousands of miles away from
7     home.  There was really no due process.  I asked for
8     time.  It was no reason to just rush to a conclusion.
9         Nobody had all the evidence.  I was facing a
10    criminal matter.  So I just felt like they rushed to
11    blame me for doing something wrong when they didn't
12    have all the evidence.  They were aware that even the
13    criminal case wasn't over.  It was still evidence
14    that needed to be found for the State district
15    attorney to come up with a finding, and even when
16    they did, I was still innocent.
17        So I felt like as a male, a male student,
18    somebody that was blamed for something that he didn't
19    do, I felt like the school rushed to find me
20    guilty.
21  Q  Anything else?
22  A  No.
23  Q  Did any members of the disciplinary tribunal make any
24    statement to you that you contend discriminated
25    against you on the basis of your gender?

1     All of that was for nothing.
2  Q  And that refers specifically to what time period,
3     Mr. Cephus, just to make sure I'm following you?
4  A  When I was expelled from school.
5  Q  So was that March 2019 until you were reinstated in
6     the fall of 2019?
7  A  Yes.
8  Q  Are there any other claims for damages that you're
9     seeking from the defendants in this lawsuit?
10  A  At this time I don't.  I don't have an answer to that
11    question at --
12  Q  So -- oh, sorry.  Go ahead.
13  A  At this time, no.
14  Q  In this lawsuit you contend that the Board of Regents
15    intentionally discriminated against you on the basis
16    of your gender.  What is the factual basis for your
17    contention that Defendant intentionally discriminated
18    against you on the basis of your gender?
19  A  Sorry.  I'm trying to refresh my memory.
20  Q  Is there any document that you're trying to look at
21    right now, Mr. Cephus, to refresh your recollection?
22  A  No, I don't have any documents.
23  Q  Okay.  It's just hard to tell on Zoom, okay.
24  A  I think as a male, as a male, I was rushed.  I feel
25    like the school rushed to find me guilty.  There

1  A  Can you ask that again?
2  Q  Sure.  Did any member of the disciplinary tribunal at
3     the University of Wisconsin-Madison relating to the
4     Title IX investigation make any statement --
5  A  I'm sorry.  My -- I'm sorry.  I don't mean to cut you
6     off, but it kind of cut off the beginning of your
7     question.
8  Q  Okay.  Is it okay now?  Can you hear me okay now?
9     Can other people hear me?
10        MR. DAVIES:  Yeah, I can hear you
11    fine.
12  A  I can hear now.
13  Q  Okay.  Mr. Cephus, did any members of the
14    disciplinary tribunal at the University of
15    Wisconsin-Madison as part of the Title IX proceedings
16    make any statement that you contend discriminated
17    against you on the basis of your gender?
18  A  Yes.  I felt like -- I felt like the whole process,
19    it was just a sped-up process to blame me for doing
20    something wrong.  That's what I felt like the school
21    did, they rushed to find a finding.  We asked for
22    time.
23        It's just I felt like in the world it is with
24    this Title IX stuff, the woman -- especially with
25    these sexual assault things, the woman is always

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

1    protected, nothing happens to them.  Nothing has
2    happened to them.  I went to court.  I still deal
3    with this stuff today.  I meet new people.  People
4    hear about what happened.  You know, the male, it's
5    always the male.  The male has to -- I mean, I'll
6    always have to live with this.
7         Like nothing happens with -- nothing will
8    ever -- those girls don't have to answer questions.
9    Their name is not in the media.  Nobody knows their
10   name.  They're all -- they're protected.  They were
11   protected by the school, don't contact them, no
12   contact from me.  Like, no, it's just -- it was all
13   protected.  The school, they protected the women.
14   They always do.
15  Q   So I appreciate that answer, which all relates to
16   process.  My question is whether any member of the
17   disciplinary tribunal at the University of
18   Wisconsin-Madison involved in the Title IX
19   proceedings made any statement, written or oral, that
20   you contend discriminated against you on the basis of
21   your gender?
22  A   Yeah, the written findings, all of that.  The
23   findings were -- all that is a part of how I feel
24   gender affected it.
25  Q   So you're saying those are the statements made.  Any

1    other statements that you contend?
2   A   At this time, no.
3   Q   How about any of the investigators involved in the
4    Title IX investigation, did any of them make any
5    statement that you contend discriminated against you
6    on the basis of your gender?
7   A   At this time I can't remember any statements.  I
8    don't recall any statements at this time that
9    happened four or five years ago, not really reading
10   any documents or refreshing my memory on it.
11  Q   Well, you understand that your deposition was noticed
12   for today, so you could have prepared for it and
13   reviewed any documents had you chosen to do so,
14   correct?
15  A   Do you have any more questions?
16  Q   Yep.  My question was just that you could have chosen
17   to review documents to prepare for this deposition
18   had you chosen to do so, correct?
19  A   Sure.
20  Q   Did any of the decision-makers involved in the
21   Title IX proceedings at the University of
22   Wisconsin-Madison make any statement that you
23   contend discriminated against you on the basis of
24   your gender outside of your previous response
25   regarding the written findings that were made in the

1    Title IX proceeding?
2   A   I'm not sure if I understand your question.
3   Q   Sure.  What about my question do you not -- is
4    causing you trouble?
5   A   Can you repeat it?
6   Q   Sure.  Did any decision-maker in the Title IX
7    investigation make any statement that you contend
8    discriminated against you on the basis of your gender
9    other than what is contained in the written findings
10   that you already mentioned previously?
11  A   At this time I don't recall.
12  Q   Did anyone involved in the Title IX proceedings in
13   any way ever say anything to you that your guilt or
14   your finding of responsibility was presumed prior to
15   issuing the final decision?
16  A   At this time I don't recall.
17  Q   Did anyone from the university programs or staff say
18   anything to you as they were investigating in the
19   Title IX proceedings that they equated victims with
20   women?
21  A   I'm not sure if this lady that worked at the football
22   stadium that allows us to walk in for games is a part
23   of the school's programs or payroll or whatever, but
24   in my opinion, somebody telling me that I should be
25   ashamed of myself or, "Shame on you," that sounds to

1    me that somebody feels like I'm wrong for
2    something.
3   Q   Okay.  And when did that occur?
4   A   After, sometime after, after the allegations or the
5    findings, sometime after -- through sometime within
6    this process of me hearing about what was going on
7    and finding me guilty.
8   Q   So was it during the period of time you were not
9    playing football in the fall of 2018 and 2019, or was
10   it after you had returned to the team in the fall of
11   2019?
12  A   No, it was after.  It was before I returned, but I
13   mean, the lady was fired.  It has to be like
14   documented.  The lady was fired for it.  Like the
15   football program fired her for her comments to me, so
16   it has to be.
17  Q   Did Ms. Hasselbacher every say anything to you that
18   she was equating victims with being a woman during
19   the course of the Title IX investigation?
20  A   Did Ms. Hasselbacher do what?
21  Q   Ever say anything to you or make a statement that she
22   was equating being a victim with being a woman in the
23   course of the Title IX investigation?
24  A   At this time I don't recall.
25  Q   Did Ms. Hasselbacher ever make a statement to you

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

```
 1        that she was equating being a perpetrator with being
 2        a man during the Title IX investigation?
 3   A    At this time I don't recall.
 4   Q    At any time during the January 15, 2019 hearing did
 5        anyone from the University say anything that they
 6        were equating victims with being a woman during the
 7        course of that hearing in the Title IX proceeding?
 8   A    I don't recall.
 9   Q    Did anyone during the January 15, 2019 hearing say
10        anything that they were equating being a perpetrator
11        of a sexual assault with being a man?
12   A    At this time I don't recall.
13   Q    Okay.  During this deposition have you received any
14        messages from anyone during the course of this
15        deposition?
16   A    No.
17                MS. HUCK:  Okay, all right.  I don't
18        have any more questions.
19                (Adjourned at 12:46 p.m.)
20
21
22
23
24
25
```

```
 1   STATE OF WISCONSIN    )
                           )
 2   COUNTY OF DANE        )
 3
 4             I, SANDRA L. McDONALD, Shorthand Reporter
 5        and Notary Public in and for the State of Wisconsin,
 6        do hereby certify that the foregoing is a true
 7        record of the videoconference deposition of
 8        QUINTEZ R. CEPHUS, who was first duly sworn by me;
 9        having been taken on the 29th day of February, 2024,
10        from various remote locations, in my presence, and
11        reduced to writing in accordance with my stenographic
12        notes made at said time and place.
13             I further certify that I am not a relative
14        or employee or attorney or counsel for any of the
15        parties, or a relative or employee of such attorney
16        or counsel, or financially interested in said action.
17             In witness whereof, I have hereunto set my
18        hand and affixed my seal of office this 7th day of
19        March, 2024.
20
21                              Sandra L. McDonald
22        [seal: SANDRA L MCDONALD    Notary Public, State of Wisconsin
         Notary Public              My Commission Expires 10/18/26
         State of Wisconsin]
23
24
25
```



QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024

QUINTEZ CEPHUS vs BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN SYSTEM
CEPHUS, QUINTEZ on 02/29/2024