IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUINTEZ CEPHUS,

      Plaintiff,

    v.                            Case No. 21C0126

BOARD OF REGENTS

      Defendant.

## DEFENDANT'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 4

STATEMENT OF FACTS ................................................................................ 4

    A.    The University of Wisconsin-Madison ............................................ 4

    B.    UW-Madison's Policy on Sexual Harassment and Sexual Violence. ......................................................................................... 5

    C.    The Complainants' allegations against Cephus. ......................... 5

    D.    The Investigation ............................................................................ 6

    E.    The Disciplinary Hearings and Appeals .................................... 18

    F.    The Criminal Trial ........................................................................ 25

    G.    The Petition for Restoration of Rights ....................................... 25

    H.    Prior Litigation and Procedural History .................................... 27

    I.    Cephus's Contentions ................................................................... 28

SUMMARY JUDGMENT STANDARD ........................................................ 29

ARGUMENT ................................................................................................... 30

    I.    Title IX requires Cephus to produce evidence showing the University treated him differently because of his sex in his specific case. ................................................................................... 31

    II.    Cephus can show no evidence of sex discrimination. ............................ 32

        A.    Cephus concedes he has no evidence that he was treated differently from female students in the same situation. ........... 32

        B.    Proceeding with the Title IX investigation and reaching a decision based on the evidence available to the University has no nexus to gender and does not establish gender discrimination. .......................................................................... 34

            1.    There is no legal support for the position that a university discriminates on the basis of sex when it proceeds with nonacademic misconduct charges alongside a pending criminal prosecution. ...................... 35

            2.    The University's policy on sexual harassment and sexual violence and the Board's rules governing nonacademic misconduct implement the University's duty under federal law and are not evidence of gender discrimination. .................................. 37

3.    Cephus's choices about what evidence to provide to the University is not evidence of gender discrimination. .................................................. 39

C.    Cephus's allegations of flaws in the disciplinary process lack evidentiary support, have no nexus to gender, and do not establish gender discrimination. .......................................... 44

1.    No reasonable juror could infer gender discrimination based on the alleged flaws Cephus identifies. ........................................................................ 45

2.    The University did not conduct the investigation in a way designed to favor the Complainants during the investigation. ............................................................ 46

3.    Trauma-informed investigation is sex-neutral. ............... 51

D.    External pressure and general campus climate do not show sex bias in Cephus's specific case. ................................. 51

CONCLUSION ............................................................................................ 57

## INTRODUCTION

The University of Wisconsin-Madison investigated student Quintez Cephus after two accusations of sexual misconduct were brought against him by different complainants. Following the investigation and based on the available evidence, a hearing committee found him responsible for sexual misconduct and Cephus was expelled as a sanction, effective March 2019. The Board of Regents affirmed the decision. In August 2019, Cephus filed a petition for restoration, which the Chancellor granted based on evidence presented at his criminal trial that had not previously been made available to the University. Cephus was readmitted to the University for the 2019 fall semester. Cephus sues the University alleging discrimination on the basis of sex under Title IX, 20 U.S.C. § 1681(a)

## STATEMENT OF FACTS

### A.    The University of Wisconsin-Madison

The Board of Regents of the University of Wisconsin System (the Board) is the defendant. The University of Wisconsin—Madison (UW-Madison or University) is part of the UW System, which is governed by the UW System Board of Regents. (DPFOF ¶ 2.) At the time relevant to this case, UW-Madison served 46,000 students, from all 50 states and 134 countries, with 22,000 faculty and staff, and had a mission of education, research and outreach. (DPFOF ¶ 3.) At all times relevant to this case, Rebecca "Becky" Blank was the Chancellor, or chief executive, of the University. (DPFOF ¶ 6.) Chancellor Blank died on February 17, 2023.[1] (DPFOF ¶ 283.)

---

[1] Because Chancellor Blank is unavailable as a witness under Rule 804(a)(1)(4) of the Federal Rules of Evidence, the Defendant offers Chancellor Blank's former testimony given

### B.     UW-Madison's Policy on Sexual Harassment and Sexual Violence.

As a recipient of federal funding, one way UW-Madison implements Title IX on campus is through the enforcement of the UW-Madison Policy on Sexual Harassment and Sexual Violence (January 2018). (DPFOF ¶ 25.) Among other things, the Policy establishes the disciplinary procedures used to investigate claims of sexual harassment and sexual assault. (DPFOF ¶ 26.) Relevant here, the Policy dictates that when the respondent is a student, UW-Madison uses the investigatory and disciplinary procedures outlined in the Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726) ("UWS 17").[2] (DPFOF ¶ 26.) UWS 17 is titled "Student Nonacademic Disciplinary Procedures," and outlines the investigatory and disciplinary procedures UW-Madison follows before imposing any sanction on a student. UWS 17 provides for the Title IX Coordinator's involvement in allegations concerning sexual harassment or sexual assault. (DPFOF ¶ 27.) At UW-Madison, Lauren Hasselbacher is the Title IX Coordinator. (DPFOF ¶ 10.)

### C.     The Complainants' allegations against Cephus.

Cephus was a student at the University during the 2017-18 academic year and played football for the University football team. (DPFOF ¶ 41.) On April 21-22, 2018, Cephus had a sexual encounter with two female students at an off-campus apartment. (DPFOF ¶¶ 32-33, 60.) One of Cephus's teammates, Teammate 2, was at

---

at her lawful deposition, declaration, and exhibits in *Jane Doe v. Board of Regents*, W.D. Case No. 20-cv-856-wmc, pursuant to Rules 804(b) and 807 of the Federal Rules of Evidence. (Bachhuber Decl. ¶¶ 60-61.)

[2] All reference to the Wisconsin Administrative Code are to the 2016 version unless otherwise noted.

the apartment during the encounter. (DPFOF ¶ 22.) Following the encounter, the two women, referred to as Complainant 1 and Complainant 2, reported that Cephus had raped and sexually harassed them and that Teammate 2 participated in the harassment. (DPFOF ¶¶ 32-33, 60) Specifically, they reported that Cephus digitally penetrated them; that Cephus engaged in penis-to-vagina intercourse with them; and that Cephus and Teammate 2 took nude pictures of them—all without their consent. (DPFOF ¶¶ 60-61.)

### D.   The Investigation

On April 23, 2018, Complainant 1's father reported to the University that Complainant 1 was sexually assaulted. (DPFOF ¶ 32.) Complainant 2's father reported the incident to the University on April 24. (DPFOF ¶ 33.) On April 25, Complainant 1's father met with Title IX Coordinator Lauren Hasselbacher in her office about Complainant 1's allegations against Cephus and Teammate 2. Complainant 1's father and Hasselbacher discussed the process and options for initiating a formal investigation. (DPFOF ¶ 40.) Also on April 25, Hasselbacher contacted Complainant 2 by email and informed her that the University did not have sufficient information to initiate a Title IX investigation. (DPFOF ¶¶ 37-39.) A few days later, Hasselbacher issued no contact directives to Cephus and Teammate 2 at the Complainants' request. (DPFOF ¶¶ 43-46.)

While the University waited for information, the Madison Police Department (MPD) conducted its own investigation into the alleged sexual assaults. Following its investigation, MPD referred two charges against Cephus, one for each complainant,

to the Dane County District Attorney's Office on May 17, 2018. The University learned of the referral the next day, May 18. (DPFOF ¶¶ 48-49.)

Following the referral for prosecution, the University obtained more information about the allegations of sexual assault. On May 24, 2018, Complainant 1 submitted a written statement summarizing the sexual encounter. (DPFOF ¶ 51.) After receiving permission from Complainant 1, Hasselbacher shared Complainant 1's written statement with Complainant 2's support person, Jaime Sathasivam, and asked for Complainant 2's preference on how to proceed with her own potential allegations. Hasselbacher explained that at some point she would either need the Madison Police Department report or additional information from Complainant 2. (DPFOF ¶ 52.) Sathasivam responded that she had spoken to Complainant 2 and relayed the following: Complainant 2 had reviewed Complainant 1's written statement and was unsure what more she could add, given her limited memory. Complainant 2 said what she read was accurate and offered to speak with Hasselbacher and answer questions. (DPFOF ¶ 56.)

Hasselbacher shared Complainant 1's statement with Complainant 2 because Complainant 1's statement indicated that Complainant 2 may also have been sexually assaulted. By this point, Sathasivam had communicated to Hasselbacher that Complainant 2 did not have any recollection of what occurred that night, but Complainant 2 believed she was sexually assaulted. (DPFOF ¶ 53.) To Hasselbacher, sharing Complainant 1's statement seemed to be the only way to understand if Complainant 2's allegations involved the same underlying incident and conduct as

Complainant 1 and to establish the allegations for the Notice of Charge. (DPFOF ¶ 54.)

Based on the information provided by Complainant 1 and confirmed by Complainant 2, Hasselbacher determined that the University had sufficient information to initiate an investigation. (DPFOF ¶ 57.)

The University's investigation commenced with a Notice of Charge sent to Cephus and his counsel on May 29, 2018—over one month after the University first learned of the incident. (DPFOF ¶¶ 32, 57-58.) The University sent an Amended Notice of Charge (ANOC) on May 31, which became the operative document in the investigation and disciplinary proceedings. (DPFOF ¶ 59.) The ANOC notified Cephus that the University was investigating him for nonacademic misconduct under Chapter UWS 17 of the Wisconsin Administrative Code. Specifically, the ANOC notified Cephus that the University was investigating the "possible violations" of Second Degree Sexual Assault (UWS § 17.09(2)), Third Degree Sexual Assault (UWS § 17.09(2)), Violation of Criminal Law (UWS § 17.09(12)), and Sexual Harassment of both Complainant 1 and Complainant 2 (UWS § 17.09(19)). (DPFOF ¶¶ 60-61.) Hasselbacher sent copies of the ANOC to Cephus and the Complainants on the same day. (DPFOF ¶ 59.)

All three parties had attorneys representing them during UW-Madison's investigation into the sexual assault and harassment allegations against Cephus.[3] Complainant 1 was represented by Lester Pines of Pines Bach LLP. (DPFOF ¶ 65.)

_____

[3] Although not a party to the charges against Cephus, Teammate 2 was represented during the investigation process by Attorney Richard Coad. (DPFOF ¶ 67.)

Complainant 2 was represented by Attorney Amy Bogost. (DPFOF ¶ 68.) Cephus was represented by several attorneys, including Stephen Meyer, Kathleen Stilling, Andrew Miltenberg, and Stuart Bernstein. (DPFOF ¶ 66.)

The University spent the next four months investigating the charges in the ANOC. During that time, Hasselbacher collected extensive documentation and evidence: she obtained surveillance footage of Complainant 2 leaving and Complainant 1, Teammate 2, and Cephus leaving the apartment, surveillance footage from the Complainants' residence halls, text messages between the Complainants, text messages between Complainant 2 and Cephus, text messages between Complainant 1 and Witness 6, text messages between Complainant 1 and Witness 3, Instagram photograph and message from Cephus to Complainant 2, photographs of Complainant 2 and Cephus, snapchat messages from Complainant 1, Complainant 2's uber receipt, notes from a review of the UW-Madison Police Department report, the Dane County Circuit Court criminal complaint, and records from Complainant 1's SANE examination (forensic nurse examination report). (DPFOF ¶ 84.)

The University offered Cephus many opportunities to present his side of the story during the investigation. From the outset, the ANOC itself invited Cephus to contact Hasselbacher and to "provide a written statement about or response to the alleged misconduct, or additional materials you deem relevant for the Office of Compliance to consider during its investigation." (DPFOF ¶ 62.) Hasselbacher followed up the ANOC with at least four emails to Cephus's counsel in May, June, and July 2018 inviting Cephus to submit evidence or make a statement. (DPFOF ¶¶

64, 72, 75-77, 90.) Hasselbacher repeated the invitation in person on August 1. (DPFOF ¶ 91.)

On June 6, 2018, Cephus's counsel emailed Hasselbacher to inform her of potentially exculpatory evidence in the possession of the District Attorney and the Madison Police Department. (DPFOF ¶ 75.) Hasselbacher responded on June 19, 2018, and stated that she requested the relevant Madison Police Report and should obtain it once it was cleared for release. (DPFOF ¶ 75.) However, the Madison Police Department refused to disclose any reports due to the ongoing nature of their investigation. (DPFOF ¶ 88.)

On June 28, Cephus's attorney sent Hasselbacher another letter and included a screenshot of a text message exchange between Cephus and Complainant 2 from April 22, 2018. (DPFOF ¶ 80.) A private investigator working with Cephus's legal team interviewed two additional witnesses, Witness 5 and Witness 6, and provided Hasselbacher with written summaries of the interviews. Witnesses 5 and 6 declined to be interviewed by Hasselbacher. (DPFOF ¶ 81.)

On July 26, Hasselbacher emailed Attorney Meyer and Cephus. This email stated, "As of now, my office does not have access to the Madison Police Department report related to this investigation. While I understand that could change at any time, we should likely proceed with the investigation assuming that may not occur so we collect all possible information that may be relevant. Please let me know if Quintez would like to provide any additional information via an interview, written statement (or answers to questions via email) or other evidence that may be relevant (text

messages, photos, etc.). If there are any specific witnesses you would like me to contact, please let me know that as well." (DPFOF ¶ 90.)

On August 1, Hasselbacher met with Attorney Meyer. Meyer brought a PowerPoint presentation of surveillance footage of the parties leaving Cephus's apartment on April 22, 2018. Hasselbacher drafted a file memo about her review of the surveillance footage and meeting on August 1. (DPFOF ¶ 91.)

On August 8, 2018, Hasselbacher and Title IX/EO Complaint Investigator Jennifer Horace met with Attorney Meyer and Cephus to discuss the investigative process. During this meeting, they tentatively scheduled an interview with Cephus for August 23, 2018. (DPFOF ¶ 95.)

On August 9, Hasselbacher and Horace met with Complainant 2 for her interview about the allegations. (DPFOF ¶ 96.)

On August 10, Attorney Meyer emailed Hasselbacher that he would have some follow up inquiry which would be sent via a second email. Attorney Meyer notified Hasselbacher that Attorney Stilling and Attorney Miltenberg also represented Cephus and that Hasselbacher might receive communications from them during Attorney Meyer's absence the next week. (DPFOF ¶ 97.) On August 16, Hasselbacher received an email from Attorney Miltenberg. Due to a scheduling conflict, Attorney Miltenberg asked to reschedule Cephus's interview to Monday, August 27 or Tuesday, August 28. Hasselbacher had a phone call with Attorney Miltenberg that same day and granted his request to move Cephus's interview to Monday, August 27. (DPFOF ¶ 98.) Hasselbacher also emailed Attorney Miltenberg, Attorney Stilling, and

Attorney Meyer on August 16 to confirm their meeting for Monday, August 27 at 1:00 p.m. Hasselbacher requested that if there was any other information Cephus would like her to consider as part of the investigation, he provide it by August 20. (DPFOF ¶ 99.)

On August 20, the Dane County District Attorney's Office issued criminal charges against Cephus. Cephus was criminally charged with two felonies. (DPFOF ¶¶ 100-101.) Also on August 20, Cephus announced to the media his decision to take a leave of absence from the football team due to imminent criminal charges. (DPFOF ¶ 103.)

Following the criminal charges, on August 22, Hasselbacher emailed Cephus's legal team due to the changed circumstances (the criminal charges). Hasselbacher asked the lawyers to let her know if Cephus no longer planned to participate in an interview but reiterated that Cephus was still welcome to do an interview if he chose. Hasselbacher also provided information for on-campus support services available to Cephus. (DPFOF ¶ 105.)

On August 23, Attorney Miltenberg emailed Hasselbacher a letter demanding that Hasselbacher delay issuing the investigative report now that Cephus had been charged criminally. Attorney Miltenberg asserted that "significant, critical evidence will now become available in the next two (2) months." Attorney Miltenberg did not identify or describe what this evidence was. Miltenberg asked for the interview with Cephus "to be conducted on a date to be agreed upon," even though the date had already been agreed upon to be August 27. (DPFOF ¶ 106.) Hasselbacher responded

on August 24 to confirm that Cephus intended to participate in the interview scheduled for August 27. On August 26, Attorney Miltenberg responded to Hasselbacher to state that Cephus would not attend the interview scheduled for August 27. (DPFOF ¶¶ 108-110.)

On August 30, Vice Chancellor for Legal Affairs Raymond Taffora responded to Cephus's attorneys' letters dated August 10, August 23, and August 26. (DPFOF ¶ 111.) Taffora explained that the District Attorney's Office would not provide the university access to any additional information until the conclusion of the criminal proceedings, and the university could not delay resolution of this matter until the conclusion of criminal proceedings given current Title IX guidance. (DPFOF ¶ 112.) Taffora explained that "promptness" is required by the Department of Education's 2017 Q&A on Campus Sexual Misconduct, and that the Department of Education's 2001 Revised Sexual Harassment Guidance specifies that a university's Title IX obligation to investigate sexual harassment and sexual assault is independent of any law enforcement proceedings. (DPFOF ¶ 113.)

On August 31, Hasselbacher provided a draft of the Initial Investigative Report to the attorneys for the complainants and the respondents. She asked that any information or comments be provided by September 10. (DPFOF ¶ 114.) Cephus requested an extension of time to September 17 to respond. Hasselbacher granted an extension of time but instead of the requested extension to September 17, she granted an extension to September 14. (DPFOF ¶ 115.)

On September 10, Attorney Bogost emailed Hasselbacher on behalf of Complainant 2. Attorney Bogost said that she had no changes to the Initial Investigative Report. She also challenged Cephus's and Teammate 2's right to respond to the report, given their lack of participation in the investigation to that point. (DPFOF ¶ 116.)

On September 11, Teammate 2's attorney provided additional information and a letter in response to the Initial Investigative Report. (DPFOF ¶ 117.) On September 12, Hasselbacher sent the Complainants and Cephus a copy of the written statement Teammate 2 provided in response to the Initial Investigative Report. (DPFOF ¶¶ 118, 120, 122.) That same day, Attorney Bogost asked to speak with Hasselbacher about her concerns related to Cephus's and Teammate 2's right to respond to the Initial Investigative Report. (DPFOF ¶ 119.)

On September 13, Cephus submitted a response to the Initial Investigative Report. Cephus attached his letter responding to the report (the letter was dated September 14), his criminal motion to dismiss, an attorney affidavit, and an exhibit. (DPFOF ¶ 121.)

On September 17, Complainant 1's attorney, Lester Pines, sent Hasselbacher a letter objecting to the inclusion of Respondent/Teammate 2's statement in the investigative report. (DPFOF ¶ 122.)

On September 20, Cephus's attorney provided Hasselbacher with a copy of the PowerPoint presentation with video from Cephus's apartment building. The video showed the parties leaving the apartment. (DPFOF ¶ 123.) Also on September 20, the

Dane County District Attorney's office provided Attorney Meyer discovery in the criminal case. The discovery comprised over two hundred pages of documents and 9 CD/DVDs. The District Attorney's office also told Attorney Meyer that videos, audio and photographs could be made available for viewing. (DPFOF ¶ 124.)

On September 21, Senior University Legal Counsel Rachel Jeris sent a letter to Cephus's attorneys addressing Cephus's September 13 submission in response to the Initial Investigative Report. (DPFOF ¶ 125.) Jeris explained to Cephus's attorneys that Cephus's denial of the allegations underlying the pending non-academic misconduct charges and his assertion that his sexual encounter with Complainants was consensual would be included in Hasselbacher's final investigative report. (DPFOF ¶ 126.) In the letter to Cephus's attorneys, Jeris explained that UW-Madison could not compel Cephus to say more and would make a determination about the pending non-academic charges based upon the information Hasselbacher gathered during her investigation. (DPFOF ¶ 127.) Jeris further explained in her letter to Cephus's attorneys that, as Taffora noted in his August 30 letter, UW-Madison had an independent legal obligation to move forward with its Title IX investigation and student non-academic misconduct process even though concurrent law enforcement proceedings were occurring. (DPFOF ¶ 128.) Jeris explained that Cephus was provided opportunities to give a verbal or written statement as well as to submit documents, video, and any other information he wished to share. Jeris noted that Cephus's decision to remain largely silent during the investigation was a voluntary choice. (DPFOF ¶ 129.)

Jeris also sent a letter to Complainant 1's attorneys on September 21 responding to a September 17 letter objecting to the inclusion of Respondent/Teammate 2's statement in the investigative report. (DPFOF ¶ 130.) In the letter, Jeris explained to Complainant 1's attorney that the University did not have legal authority to compel parties and witnesses to participate in an interview, nor could it condition their right to offer information during the investigation or to participate in other phases of the non-academic misconduct process upon their willingness to participate in an interview. Jeris explained that the University also could not draw a negative inference from a respondent's unwillingness to be interviewed. Jeris explained that the University gathers as much information as it can and makes decisions based upon what it has obtained. (DPFOF ¶ 131.)

On September 21, Hasselbacher emailed the parties a copy of the Amended Initial Investigative Report. (DPFOF ¶ 132.)

On September 26, Attorney Bogost emailed an objection to "the amended reports that are based on material submitted by Respondents." Broadly speaking, Attorney Bogost claimed it was unfair for Cephus and Teammate 2 to be able to review and comment on the report. (DPFOF ¶ 133.) Despite the complaints by Attorney Bogost, Hasselbacher continued to share her Investigative Report with the Respondents and their attorneys, and to incorporate their responses into her Investigative Report. (DPFOF ¶ 134.) Attorney Bogost also again complained about Cephus's and Teammate 2's presence on campus. She opined that since the alleged assault there had been "an ongoing hostile environment" for Complainant 2 and

claimed Complainant 2 "suffered every day that she is on campus with the knowledge Respondents are on campus." (DPFOF ¶ 135.) Neither Cephus nor Teammate 2 were removed from campus at that time. (DPFOF ¶ 136.)

On September 26, Teammate 2's attorney provided an additional factual statement from Teammate 2. (DPFOF ¶ 137.) In addition, Complainant 1 submitted a redacted copy of her forensic nurse examination. (DPFOF ¶ 138.)

On October 2, Hasselbacher emailed the parties the Second Amended Initial Investigative Report. Hasselbacher gave the parties until 9:00am on Monday, October 8, to submit clarifications, additions, or any other thoughts they wished to share. (DPFOF ¶ 139.)

On October 7, Cephus submitted a written statement (dated October 6) to Hasselbacher in response to the Second Amended Initial Investigative Report in which he incorporated his September 14 letter responding to the August 31 Initial Investigative Report and asked that the investigation be held in abeyance. (DPFOF ¶ 140.) At his deposition, Cephus could not recall any order in the criminal proceeding that prevented him from providing information to Hasselbacher. (DPFOF ¶ 141.)

Attorney Bogost responded on October 8, again objecting to Cephus's and Teammate 2's participation in the investigative reports. Attorney Bogost reiterated many of the same complaints in her September 26 letter. (DPFOF ¶ 142.)

On October 9, Hasselbacher provided the Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS). (DPFOF ¶ 143.) On October 9, Hasselbacher notified all parties that the Final Investigative Report was

sent to the OSCCS. (DPFOF ¶ 144.) Throughout this process, Hasselbacher served as a neutral investigator. Based on her training, Hasselbacher did not make assessments based on any person's overall credibility when drafting the Final Investigative Report. Hasselbacher presented the information she collected to the OSCCS without opinion. (DPFOF ¶ 145.) OSCCS made the findings and recommended the sanctions. (DPFOF ¶ 145.) In addition to serving as a neutral investigator, Hasselbacher served in her role as Title IX Coordinator, so she was also ensuring the proper process was followed. (DPFOF ¶ 146.)

Also on October 9, Hasselbacher received notice that Cephus had sued her in federal court, along with the Board of Regents, Director of the Office of Compliance Cathy Trueba, and Chancellor Blank. (DPFOF ¶ 147.) The lawsuit sought to enjoin the University nonacademic misconduct process pursuant to allegations of race discrimination under Title VI, among other claims. No injunction was issued. Cephus voluntarily dismissed the case in March 2019, having sought several extensions and never responding to the motion to dismiss and response to the motion for preliminary injunction filed by defendant. *Cephus v. Board of Regents of Univ. of Wis. Sys, et al.*, Case No. 18-cv-832-wmc, dockets 25-29, 30, 32, 33, 36, 37 (W.D. Wis. Oct. 31, 2018 – March 14, 2019). (DPFOF ¶ 148.)

### E.   The Disciplinary Hearings and Appeals

The University assigned Assistant Dean Ervin (Kipp) Cox to make a disciplinary decision on the Final Investigative Report. Cox issued Finding Letters on October 30, 2018. (DPFOF (DPFOF ¶¶ 149-150.) As to Complainant 1, Cox found

Cephus not responsible for violating 17.09(2) Sexual Assault Second Degree, responsible for violating 17.09(2) Sexual Assault Third Degree, not responsible for violating 17.09(12) Violation of Criminal Law, and responsible for violating 17.09(19) Sexual Harassment. (DPFOF ¶¶ 152-153.) As to Complainant 2, Cox found Cephus responsible for violating 17.09(2) Sexual Assault Second Degree, responsible for violating 17.09(2) Sexual Assault Third Degree, not responsible for violating 17.09(12) Violation of Criminal law, and responsible for violating 17.09(19) Sexual Harassment. (DPFOF ¶¶ 154-155.) Both Finding Letters reviewed all the available evidence. (DPFOF ¶¶ 150-151.) Based on the Findings, Cox recommended a sanction of expulsion. (DPFOF ¶ 156.)

The Wisconsin Administrative Code generally required that a nonacademic misconduct hearing take place after a finding of responsibility with a recommended sanction of expulsion. Wis. Admin. Code UWS § 17.11(4)(c) & § 17.12(2). Accordingly, Cox emailed Cephus's counsel on October 31, 2018—the day after the Findings Letters—to schedule the disciplinary hearing. (DPFOF ¶ 160.) In Cox's October 31 email, Cox explained that the hearings were supposed to be scheduled within 15 days of the letters finding Cephus responsible for nonacademic misconduct and the hearings were to be held within 45 days of the letters, i.e. by December 14. (DPFOF ¶ 161.) Cox stated that the 15 day/45 day deadlines could possibly be extended with the agreement of all parties. (DPFOF ¶ 162.)

Over the next several weeks, Cox contacted Cephus's attorneys on multiple occasions in an attempt to schedule the hearings and make accommodations that

19

would fit with the schedule limitations asserted by Attorneys Bernstein and Miltenberg. (DPFOF ¶ 163.) Cox emailed Cephus's counsel on November 8 and again on November 9, to try to schedule the Nonacademic Misconduct Hearing. At that time, Cox was looking at dates for scheduling a hearing in early December 2018. (DPFOF ¶ 164.) On November 12, Bernstein requested that the hearing(s) be adjourned until sometime after the New Year. (DPFOF ¶ 165.) Because Cephus's counsel had requested that no hearings be held in 2018, on November 14, Cox worked to accommodate this and proposed several dates in January 2019 for the Nonacademic Misconduct Hearing during the weeks of January 14 and January 21, including specifically, January 15, 2019. Cox asked them to hold the dates on their calendar. (DPFOF ¶ 166.) In the November 14 email, Cox also explained that Cephus, just as with the Complainants, would be permitted to have one advisor accompanying him in the hearing room during the Nonacademic Misconduct Hearing. (DPFOF ¶ 167.)

On November 15, Bernstein acknowledged Cox's email, stating that he would review the dates with Cephus and provide Cox with their "preferred dates." (DPFOF ¶ 168.) On November 26, Cox emailed Cephus's attorneys to confirm their availability and Cephus's availability on January 14, 15, 16, and 18. (DPFOF ¶ 169.) Cox received no response to his November 26 email. (DPFOF ¶ 170.)

Cox emailed Cephus's attorneys on December 5 to inform them that the Nonacademic Misconduct Hearing had been scheduled for January 14 and 18, 2019 as, at that time, it was the intention to hold separate hearings relating to

Complainant 1 and Complainant 2. Cox had been able to arrange a committee for the hearings, and the dates also occurred the week before the spring term classes began so none of the students involved would need to miss any class time. (DPFOF ¶ 171.) In response to Cox's December 5 email, Bernstein informed Cox that he and Miltenberg had a conflict for January 11, 12, 14 and 24 because they would be in California attending a hearing in another matter. (DPFOF ¶ 172.) On December 5, Cox informed Bernstein that the hearing for Complainant 1 could be moved to January 15 (and possibly January 16) to accommodate their conflict on January 14. (DPFOF ¶ 173.)

On December 11, Cox emailed Bernstein and Miltenberg that the hearings would be scheduled for January 15 and January 18. Cox also provided additional information regarding the hearing process in his January 15 email, as well as in an email Cox sent on December 18. (DPFOF ¶ 174.) On December 21, Bernstein informed Cox that because of Cephus's pending criminal matter, they requested the January 15 and January 18 hearing dates be adjourned and rescheduled for some unknown date in the future at a mutually convenient time for Cephus's attorneys and the University. (DPFOF ¶ 175.)

On December 27, Rachel Jeris, Senior University Legal Counsel for the University of Wisconsin-Madison sent a letter to respond to Attorney Bernstein's request to postpone the non-academic misconduct hearings for Cephus. The letter explained that the request for postponement was being denied. (DPFOF ¶ 176.) Jeris also explained that Cephus was entitled to be accompanied by one advisor at the

nonacademic misconduct hearings, and the chosen advisor must make themselves reasonably available and respond to attempts to schedule hearings. (DPFOF ¶ 177.)

On January 4, 2019, Cephus's attorneys sent Cox a letter from Attorney Bernstein and a written submission from Cephus that Cephus requested the hearing committee to consider. (DPFOF ¶ 178.) In the January 4 letter from Attorney Bernstein, Cephus objected to the use of two separate Hearing Committees. The University agreed to consolidate the Complainants' allegations into a single hearing. (DPFOF ¶ 179.) Cox included Cephus's January 4, 2019 written submission, as well as Cephus's motion to dismiss in his criminal case, the affidavit of Attorney Steven Meyer, and the exhibit in the hearing packet provided to the Hearing Committee and the parties in advance of the hearing. (DPFOF ¶ 180.) On January 9, Senior University Legal Counsel Rachel Jeris responded to Attorney Bernstein's letter and addressed the issues raised by Bernstein. (DPFOF ¶ 181.)

On January 10, Cox sent Cephus and Attorney Bernstein the hearing packet. (DPFOF ¶ 182.) On January 11, Cephus's attorneys informed Cox that Attorney Kathy Stilling would appear with Cephus at the January 15, 2019 hearing. Cox provided Stilling with the hearing packet. (DPFOF ¶ 183.)

Prior to the January 15, 2019 hearing, Cephus's attorneys received discovery from the District Attorney's Office in the criminal case on September 20, September 28, October 11, October 12, October 23, November 14, November 27, December 4, December 5, 2018 and January 7 and January 9, 2019. (DPFOF ¶ 184.)

After September 20, 2018, Cephus's attorneys chose not to provide any additional documentation to the University officials involved in the nonacademic misconduct process at or before the January 15, 2019 hearing, aside from Cephus's statements dated September 25 and October 6, 2018, and the written submission dated January 4, 2019. (DPFOF ¶ 185.)

The disciplinary hearing took place on January 15, 2019. (DPFOF ¶ 186.) The disciplinary hearing included testimony from Complainant 1, Complainant 2, Cox, Hasselbacher, and a detective from the University police department. (DPFOF ¶¶ 193, 199, 200.) Cephus's attorney cross-examined Complainant 1 and Complainant 2 via questions asked through the Hearing Committee. (DPFOF ¶ 189.) Cephus chose not to testify at the hearing. (DPFOF ¶¶ 195-196.)

The Hearing Committee issued its written decision on January 29, 2019. (DPFOF ¶ 204.) The 8-page decision reviewed the evidence submitted during the hearing. It also emphasized that "the Committee did not draw any adverse inference from [Cephus's] limited ability to participate in the hearing." (DPFOF ¶ 203.) Based on the evidence submitted, the Committee found Cephus responsible for third degree sexual assault and sexual harassment of Complainant 1. (DPFOF ¶ 205.) The Committee also found Cephus responsible for third degree sexual assault and sexual harassment of Complainant 2. (DPFOF ¶ 207.) The Committee unanimously found Cephus not responsible for second degree sexual assault of Complainant 2. (DPFOF ¶ 206.) In a two(yea)-to-one(nay) vote, the Hearing Committee recommended to uphold the sanction of expulsion. (DPFOF ¶ 208.)

On February 12, 2019, Cephus submitted his appeal of the findings of responsibility issued by the Nonacademic Misconduct Hearing Committee to the Office of the Chancellor. (DPFOF ¶ 219.) On February 13, Office of the Chancellor, Chief of Staff Matt Mayrl emailed Cephus and his legal team to confirm the Chancellor's Office had received his February 12, 2019, appeal of the Hearing Committee's decision. (DPFOF ¶ 220.) In response to Mayrl's email, Attorney Miltenberg emailed Mayrl, "Matthew, the lack of judgment on the part of UW is absolutely stunning. UW has made, so many significant missteps that it is truly mystifying. Keep this email handy, I will remind you of it in the near future." (DPFOF ¶ 221.) In his appeal, Cephus argued the process was unfair, arbitrary and subject to bias such that he was unable to adequately present a defense to the allegations of nonacademic misconduct without prejudicing his concurrent criminal case. (DPFOF ¶ 222.) Chancellor Blank issued her decision on March 13, 2019, and affirmed the Committee's decision and recommended sanction of University Disciplinary Expulsion. (DPFOF ¶ 223.)

The Chancellor's decision was the final institutional decision in the matter, and Cephus's expulsion from the University was effective as of the date of the decision. But the exclusion from campus provisions would not be enforced until March 16. (DPFOF ¶ 228.) The Chancellor's decision also included information for both the Complainants and Respondent about seeking further review of the March 13 decision by the Board of Regents. (DPFOF ¶ 229.) On March 13, 2019, Mayrl emailed Cephus

a copy of the Chancellor's decision regarding his appeal and copied Cephus's attorneys. (DPFOF ¶ 230.)

Cephus submitted a formal request for review to the Board of Regents on March 13, 2019. (DPFOF ¶ 232.) The Board of Regents denied the request for review on June 7. (DPFOF ¶ 241.)

### F.    The Criminal Trial

Cephus's five-day criminal trial eventually took place from July 29 to August 2, 2019. The jury found Cephus not guilty of Second Degree Sexual Assault and Third Degree Sexual Assault.

### G.    The Petition for Restoration of Rights

On August 6, 2019, Cephus submitted a written petition for restoration of rights pursuant to Wis. Admin. Code § UWS 17.18. (DPFOF ¶ 253.) The written petition was 242 pages, including exhibits. (DPFOF ¶ 253.) The petition also included a jump drive, which contained approximately 70 video clips. (DPFOF ¶ 253.) Cephus's counsel stated that the "jump drive contains all of the video which was played at trial. These video excerpts (found on the jump drive under Cephus Exhibits-Prepared Clips) were admitted at trial as Exhibit 1." (DPFOF ¶ 254.) The Chancellor received the petition while vacationing with her family in Hawaii; nevertheless, the Chancellor spent a substantial amount of her vacation evaluating Cephus's petition in order to make a decision before the start of the academic year. (DPFOF ¶¶ 244-245, 257-258.)

On August 14, Chancellor Blank had a call with Hasselbacher to consult with the Title IX Coordinator, pursuant to UWS 17.18. (DPFOF ¶ 260.) Chancellor Blank told Hasselbacher that she appreciated the work Hasselbacher had done on the case and that "both sides might sue." (DPFOF ¶ 262.) Chancellor Blank discussed that they had been collecting information, the videos were important to her review, and she could not ignore the quick jury verdict. (DPFOF ¶ 262.)

To make her decision, Chancellor Blank looked at the newly available evidence to answer the question presented of whether there was a preponderance of evidence to support the finding that Cephus committed third degree sexual assault of the Complainants. (DPFOF ¶ 265.)

On August 19, 2019, the Chancellor issued her decision on Cephus's petition for restoration of rights. (DPFOF ¶ 266.) The decision granted his petition and readmitted him to the University. (DPFOF ¶ 266.) In her decision, the Chancellor noted that "[s]ubstantial amounts of information were not made available to the University during the University's Title IX investigation and disciplinary proceedings, including information available to and under the Petitioner's control." (DPFOF ¶ 267.) As the Chancellor's written decision explains, the following materials were available to her for review: (1) the University's investigatory and hearing record, (2) the materials Cephus submitted with his petition and the materials his attorneys submitted thereafter, and (3) available Madison Police Department reports independently obtained by UW-Madison's Office of Legal Affairs. (DPFOF ¶ 267.) Chancellor Blank noted that the newly supplied information, in particular the

Madison Police Department reports and certain video clips presented at the criminal trial, impacted the prior third-degree sexual assault finding. (DPFOF ¶ 269.)

Chancellor Blank was persuaded by the totality of the police reports, statements, and videos that she reviewed, including the fact that the University now had in its possession the statements of all major witnesses to the April 21-22, 2018 incident, such as P1, Teammate 2, and Cephus himself. (DPFOF ¶ 270.) Chancellor Blank determined that based upon her review of the totality of the evidence, there was no longer a preponderance of the evidence that Cephus had committed third degree sexual assault. (DPFOF ¶ 272.) The Chancellor also found that a preponderance of the evidence continued to support the finding that Cephus had sexually harassed the Complainants by enlisting Teammate 2 to photograph the Complainants without their consent. (DPFOF ¶ 273.) The Chancellor determined that Cephus's suspension between her decision on March 13 and the reinstatement on August 19 had sufficiently punished the sexual harassment. (DPFOF ¶ 274.) Accordingly, Cephus was reinstated effective the day of the Chancellor's decision—in time for the start of the academic school year. (DPFOF ¶ 276.)

## H.    Prior Litigation and Procedural History

As the Chancellor had predicted, no one was happy with the outcome of the University disciplinary process. Complainant 2 sued the University in this Court in September 2020. (DPFOF ¶ 278.) Complainant 2 alleged that the University had violated Title IX by discriminating against her because of her sex. The Court granted

summary judgment to the University and dismissed that case on July 19, 2022. *Doe v. Board of Regents*, 615 F.Supp.3d 877 (W.D. Wis. 2022).

The present case, which Cephus filed in February 2021, represents the third discrimination lawsuit arising out of the incident. Cephus now alleges that the University discriminated against him because of his sex. (Dkt. 1.)

## I.   Cephus's Contentions

Cephus's factual basis for his claims for gender discrimination in this case is as follows:

> I think as a male, as a male, I was rushed · I feel like the school rushed to find me guilty. There was -- there was no reason for rushing to find me guilty, just as the -- I was just -- I don't know.
>
> I just feel like as a male, I was a black male in a predominantly white town, and I was just rushed, like they rushed to find me guilty. I was just a football player, a kid thousands of miles away from home. There was really no due process. I asked for time. It was no reason to just rush to a conclusion.
>
> Nobody had all the evidence. I was facing a criminal matter. So I just felt like they rushed to blame me for doing something wrong when they didn't have all the evidence. They were aware that even the criminal case wasn't over. It was still evidence that needed to be found for the State district attorney to come up with a finding, and even when they did, I was still innocent.
>
> So I felt like as a male, a male student, somebody that was blamed for something that he didn't do, I felt like the school rushed to find me guilty.

(DPFOF ¶ 284.)

There is nothing—other than the testimony set forth above—that Cephus identified at his deposition as the factual basis for his contention that the University discriminated against him based on his gender. (DPFOF ¶ 285.) Cephus cannot identify any statement by Hasselbacher that equated being a victim with being a

woman during the Title IX investigation. (DPFOF ¶ 286.) Cephus cannot identify any statement by Hasselbacher that equated being a perpetrator with being a man during the Title IX investigation. (DPFOF ¶ 287.) Cephus cannot identify any statement by any member of the disciplinary tribunal at the University that Cephus contends discriminated against him on the basis of his gender other than unspecified statements contained in the written findings. (DPFOF ¶ 288.) Cephus cannot identify any statement by any of the investigators involved in the Title IX investigation that he contends discriminated against him on the basis of his gender. (DPFOF ¶ 289.) Cephus cannot identify any statement by any of decision-maker involved in the Title IX investigation that he contends discriminated against him on the basis of his gender. (DPFOF ¶ 290.) Cephus cannot identify anyone who was involved in the Title IX proceedings saying anything to him indicating that his guilt or his finding of responsibility was presumed prior to the issuance of the final decision. (DPFOF ¶ 291.) Cephus cannot identify any statement by anyone from the University during the January 15, 2019 hearing that equated being a victim with being a woman. (DPFOF ¶ 292.) Cephus cannot identify any statement by anyone from the University during the January 15, 2019 hearing that equated being a perpetrator with being a man. (DPFOF ¶ 293.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact where the evidence would not

allow a reasonable jury to find for the nonmoving party. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). At the summary judgment stage, the nonmovant is entitled to the benefit of reasonable inferences supported by admissible evidence, but "not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotation marks omitted). Indeed, "summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Id*. A court should therefore enter summary judgment against a nonmovant "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

To survive summary judgment, Cephus must point to facts that show the University's decisions about the sexual misconduct complaints filed against Cephus were motivated by gender bias in Cephus's specific case. *See Johnson v. Marian University*, 829 F. App'x 731, 732-33 (7th Cir. 2020) (unpublished).

Here, Cephus can show no evidence of sex discrimination. Cephus admits that he has no evidence that he was treated differently from female students. The evidence shows that the University's actions were sex-neutral. Federal law requires universities to follow their procedures, weigh evidence gathered, and render decisions. The pendency of parallel criminal proceedings does not change a

university's responsibilities. When a university adjudicates sexual misconduct claims in a reasoned way, based on evidence available to the university at the time it made its decision, the Seventh Circuit has explained that gender-bias challenges under Title IX cannot second-guess how university personnel weighed the evidence. *See Doe v. University of Southern Indiana*, 43 F.4th 784, 799-800 (7th Cir. 2022). Because Cephus can show no evidence of sex discrimination in his specific case, the Court should grant summary judgment to the University.

I. **Title IX requires Cephus to produce evidence showing the University treated him differently because of his sex in his specific case.**

Cephus alleges that the University violated Title IX by discriminating against him on the basis of sex. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The Supreme Court has interpreted Title IX to provide individual plaintiffs with an implied private right of action to pursue claims of gender discrimination in federal court and has recognized a number of claims that constitute discrimination." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019).

The Seventh Circuit recognizes two broad categories of claims under Title IX: "indirect" discrimination, in which a student alleges harassment by another student; and "direct" discrimination, in which the plaintiff alleges that "the school itself discriminated against a person on the basis of their sex." *Jauquet v. Green Bay Area*

*Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021). An allegation that an institution's response to sexual misconduct was motivated by sex bias falls in the category of direct discrimination. *Id.* A direct Title IX discrimination claim requires a plaintiff to prove "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Id.* at 810 (quoted source omitted).

This case implicates only the third element. The Seventh Circuit test is simple: "whether [the university] discriminated against [the student] 'on the basis of his sex.'" *Johnson*, 829 F. App'x at 732. To satisfy this test, a plaintiff "cannot rely on [] generalized allegations" about campus climate or external pressures on a university. *Columbia Coll.*, 933 F.3d at 855. Rather, a plaintiff must show "facts particular to his case" indicating sex discrimination. *Id.* That is, to survive summary judgment, a plaintiff must put forward "facts creating an inference that, in *his specific case*, the institution treated him differently because of his sex." *Johnson*, 829 F. App'x at 732 (emphasis in original).

## II.  Cephus can show no evidence of sex discrimination.

### A.  Cephus concedes he has no evidence that he was treated differently from female students in the same situation.

A male plaintiff alleging sex discrimination in disciplinary proceedings must generally show that he was treated differently from female students in the same situation. *Columbia Coll.*, 933 F.3d at 854. For example, in *Columbia College*, the male plaintiff alleged that the institution "restrict[ed] his access to documents

relevant to the investigation." *Id*. The Seventh Circuit held that the allegation did not support an inference of sex discrimination because the plaintiff had not alleged "that females accused of sexual assault were allowed to review materials or that only female victims were allowed to view them." *Id*. Likewise, in *Doe v. Loyola University-Chicago*, the male plaintiff alleged various procedural defects in the disciplinary proceedings. And again, the court held that the plaintiff's "gripes with [the institution's] proceedings in his case are 'divorced from gender' and do not allege that a woman accused of sexual assault would have been treated any differently than he was." No. 20 CV 7293, 2021 WL 2550063, at *9 (N.D. Ill. June 22, 2021). To take just one more example, in *O'Shea v. Augustana College*, a female plaintiff alleged that the institution's investigation and hearing on her accusation of sexual misconduct contained various procedural defects. 593 F. Supp. 3d 838, 846 (C.D. Ill. 2022). The court dismissed her direct discrimination claim because she did not "identify instances in which she or other women were treated differently than men during the investigation." *Id*. at 848.

The rule emerging from these cases is that Cephus must "identify instances" during the disciplinary proceedings in which he was treated differently from female students. *See id*. Cephus admits he has no evidence to show.

The University asked Cephus in discovery to identify all evidence showing that he was treated differently from other students. Cephus identified none. The precise exchange was as follows:

> 12. Identify all facts and/or evidence in support of your contention that you were treated differently during the University's disciplinary process

33

against you than other students were treated during the University's disciplinary proceedings against them.

**RESPONSE**: Plaintiff will require further discovery to fully answer this request.

(Bachhuber Decl. Ex. 597, Interrog. No. 12, dated Dec. 22, 2023.)

Because Cephus has failed to show that he was treated any differently from similarly-situated females, he cannot show that he suffered discrimination because of his sex. *See Columbia Coll.*, 933 F.3d at 854.

> **B.    Proceeding with the Title IX investigation and reaching a decision based on the evidence available to the University has no nexus to gender and does not establish gender discrimination.**

Cephus contends that the University discriminated against him based on his gender because (1) the University declined to stay the disciplinary proceedings until after his criminal case and (2) the University was unable to obtain exculpatory evidence prior to the misconduct hearing. Cephus contends the University refused to stay the disciplinary proceedings until after his criminal trial despite knowing that the District Attorney's office and the Madison Police Department possessed relevant and exculpatory evidence that had not been given to the University. In short, his position is that that the University was obligated to stay all disciplinary proceedings because he was simultaneously facing criminal prosecution and evidence from his criminal trial would be relevant and exculpatory. There is no support for Cephus's position in the law or the facts.

1.   **There is no legal support for the position that a university discriminates on the basis of sex when it proceeds with nonacademic misconduct charges alongside a pending criminal prosecution.**

Cephus contends there was a "rush" to find him guilty even though he was facing a criminal trial, implying that continuing with the proceedings forced him to either give up his Fifth Amendment right against self-incrimination or face disciplinary sanctions in the University proceeding. (DPFOF ¶ 284.) Cephus claims that this dilemma necessarily overrules the University's duty under federal and state law and is evidence of gender discrimination. Cephus is wrong on both counts.

There is no evidence that the University's obligation to press forward in spite of Cephus's request for adjournment of the nonacademic misconduct proceeding (and his asserted Fifth Amendment rights) was in any way related to his sex. A criminal defendant can be a man or a woman. Cephus has not identified any circumstances in which the University agreed to adjourn a misconduct hearing where a woman was a respondent merely because the woman requested adjournment based on potential or pending criminal charges. (DPFOF ¶ 203.)

Every court that has addressed the theory—that parallel criminal prosecution and Fifth Amendment concerns require adjournment of university proceedings— disagrees with it. *See, e.g., Hart v. Ferris State Coll.,* 557 F. Supp. 1379, 1384 (W.D. Mich. 1983) ("A number of courts have faced this precise issue of whether postponement of a college disciplinary hearing until resolution of related criminal charges is constitutionally required; all have rejected plaintiff's argument.")

(collecting cases).[4] In *Hart*, the court found that under the university's disciplinary hearing procedure the student could elect to remain silent at the hearing and that no inference pointing to guilty could be drawn. Accordingly, the court held that the testimony would be voluntary and the Fifth Amendment did not apply. *Id.* at 1385. The same is true here. Assistant Dean Cox's finding letters specifically noted that he did not draw any adverse inference from Cephus's limited participation in the investigation. (DPFOF ¶ 151.) The Hearing Committee's decision likewise noted that "in deliberating and arriving at its findings and conclusions, the Committee did not draw any adverse inference from the Respondent [Cephus]'s limited ability to participate in the hearing." (DPFOF ¶ 203.)

Further, Cephus was allowed to (and did) submit written statements and other evidence of his choosing. (DPFOF ¶¶ 80-81, 121, 123, 140.) He was represented by an attorney throughout the process. (DPFOF ¶ 66.) The University did not make a negative inference against Cephus based on his limited participation in the investigation. And regardless, none of this is evidence of gender bias.

---

[4] It is worth noting the logic of this result. Under Cephus's theory, a university could not hold a hearing on sexual misconduct until after any criminal proceedings finished. Accusations of sexual misconduct will often result in criminal charges, almost by definition. Because criminal proceedings can take a very long time (Cephus's took over a year), there is a high likelihood that the interested students will graduate before the criminal case finishes. This, of course, would obviate the need for discipline entirely, and would defeat the purpose of having sexual misconduct rules in the first place. *See e.g., Nzuve v. Castleton State College*, 335 A.2d 321 (Vt. 1975).

Also of note is the fact that Cephus ended up waiving his Fifth Amendment rights by testifying at his criminal trial. He can offer no explanation as to why he needed to guard so jealously a right he ultimately waived. Perhaps sensing this weakness, Cephus declines to answer whether he testified at his trial or not. (Bachhuber Decl. Ex. 597, RTA 65.)

> **2.     The University's  policy on sexual harassment and sexual violence and the Board's rules governing nonacademic misconduct implement the University's duty under federal law and are not evidence of gender discrimination.**

The University's obligation to resolve complaints of sexual violence promptly and equitably arises under the University's gender neutral policy on sexual harassment and sexual violence and UWS 17, which implement the mandate of Title IX and the Clery Act.

The Clery Act, as amended by the Violence Against Women Act, required that the University promulgate a policy stating that "[p]rocedures for institutional disciplinary action in cases of … sexual assault … shall … provide a *prompt*, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) (emphasis added). The United States Department of Education (Department of Education) regulations required that the University's policy provide that the disciplinary proceedings "will [i]nclude a prompt, fair, and impartial process from the initial investigation to the final result." 34 C.F.R. § 668.46(k)(2)(i) (eff. July 1, 2015).

The Department of Education, Office for Civil Rights (OCR) also issued relevant guidance and identified elements it would evaluate to determine whether a university's grievance procedures were prompt and equitable. These elements included whether the procedures provide for "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process." Revised Sexual Harassment Guidance, U.S. Dept. of Educ., 20 (Jan. 2001). This same OCR guidance provided that "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment

occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively." Revised Sexual Harassment Guidance, U.S. Dept. of Educ., 21 (Jan. 2001). The Department of Education's Q&A on Campus Sexual Misconduct likewise required universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct." Q&A on Campus Sexual Misconduct, U.S. Dept. of Educ., 3 (Sept. 2017).

In keeping with the federal promptness requirements, the Wisconsin Administrative Code set designated timeframes by which certain steps in the disciplinary proceedings had to be completed. Relevant here, it required the University to schedule the misconduct hearing "within 15 days" of a written report finding the student responsible for nonacademic misconduct and recommending a sanction of expulsion. Wis. Admin. Code §§ UWS 17.11(4)(c)(2) & 17.12(2). It further required that "[t]he hearing shall be conducted within 45 days of the … written report, unless a different time period is mutually agreed upon by the respondent and investigating officer, or is ordered or permitted by the hearing examiner or committee." *Id*. Finally, it required that a student submit an appeal to the Chancellor within 14 days of the hearing decision and that the Chancellor decide the appeal within 30 days of that submission. Wis. Admin. Code § UWS 17.13(2).

The University's written policy complied with these federal and state laws. Specifically, the guiding policy stated,

**Prompt and Equitable Resolution**

The offices and University officials responding to a report of sexual harassment or sexual violence pursuant to this policy will endeavor to resolve the matter in a prompt and equitable manner in accordance with

the applicable procedures, taking into consideration the nature and complexity of the report and procedural due process requirements. The complainant and the respondent will be advised of any delays that occur during the process.

UW-Madison Policy on Sexual Harassment and Sexual Violence, IX.D. (Jan. 2018). Additionally, given the federal and state promptness requirements, the University's practice was to "not consent to delaying non-academic misconduct hearings beyond that forty-five (45) day timeframe specified in UWS 17.12(2) without the agreement of the complainant(s)." (DPFOF ¶ 161; Ex. 542, at 2.)

The University could not stay the disciplinary proceedings until after Cephus's criminal trial without falling afoul of these federal, state, and policy authorities. The University's policy and UWS 17 implemented the federal mandate in gender neutral terms, referring to complainants, respondents, and students. An institution's adherence to the letter of state and federal law does not constitute discrimination on the basis of gender.[5] The University thus acted appropriately when it declined to stay the disciplinary proceedings.

> **3.   Cephus's choices about what evidence to provide to the University is not evidence of gender discrimination.**

Cephus complains that Hasselbacher did not obtain evidence from the District Attorney's Office or the Madison Police Department that Cephus contends was exculpatory and should not have proceeded knowing there may be additional

---

[5] *Cf. Williams v. Gen. Foods Corp.*, 492 F.2d 399, 404 (7th Cir. 1974) (under the anti-discrimination provision of Title VII "employers are exempted from liability under state laws which require the doing of acts which constitute unlawful employment practices").

information. (Ex. 597, Interrog. No. 2.) But Cephus's claim is belied by the factual record, which shows that Hasselbacher tried to obtain the evidence but was unable to obtain it from the District Attorney, the Madison Police Department, and from Cephus. Throughout the process, the University was transparent to the parties about its inability to obtain additional information from the Madison Police Department and the District Attorney's Office. (DPFOF ¶¶ 75, 85, 88, 90, 102, 112.)

The Madison Police Department refused to disclose any reports to Hasselbacher due to the ongoing nature of their criminal investigation. (DPFOF ¶ 88.) On July 26, 2018, Hasselbacher told Cephus and his lawyers that she did not have access to the Madison Police Department Report and asked if Cephus would provide any additional information via an interview, written statement, or other evidence. This prompted Cephus's lawyer to allow Hasselbacher to view the PowerPoint with surveillance footage and take notes for inclusion in the investigative report. (DPFOF ¶¶ 90-91.)

A month later, on August 30, 2018, Vice Chancellor Raymond Taffora emailed a letter to Cephus's lawyers and explained the legitimate nondiscriminatory reason for the University's inability to obtain additional evidence from the District Attorney's Office, as well as the University's duty to move forward with resolution of the nonacademic misconduct charges against Cephus: "the District Attorney's Office will not provide the University access to any additional information until the conclusion of the criminal proceedings, and the University cannot not delay resolution of this matter until the conclusion of criminal proceedings given current Title IX

guidance." (DPFOF ¶ 112.) This is corroborated by Assistant District Attorney Andrea Raymond's email to Taffora on August 20, 2018, in which she noted: "At this time we will not be releasing anything beyond the criminal complaint." (DPFOF ¶ 102.)

Cephus, however, was entitled to receive all evidentiary materials from the District Attorney, including in particular exculpatory evidence. Wis. Stat. § 971.23; *Brady v. Maryland*, 373 U.S. 83 (1963). Cephus could have made this information available had he chosen to do so. And there is no requirement under *Brady* that the University obtain any potentially exculpatory evidence before the disciplinary proceeding may commence. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 662 (S.D. Ohio 2016) (declining to extend *Brady* to university disciplinary proceedings and rejecting plaintiff's argument that the university had key evidence it did not disclose which limited the effectiveness of plaintiff's cross examination of a victim in a university Title IX proceeding); *Tanyi v. Appalachian State Univ.*, No. 5:14–CV–170RLV, 2015 WL 4478853, at *5 (W.D.N.C. July 22, 2015). Cephus had access to the exculpatory evidence, and Cephus alone controlled the evidence he provided to the University.

A plaintiff cannot manufacture a cause of action through his own conduct. *See generally Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005). So, in a Title IX discrimination claim, a plaintiff cannot rely on gaps in the evidence that he "invited." *S. Indiana*, 43 F.4th at 792. But that is exactly what Cephus does here.

Hasselbacher and other University officials made multiple efforts to obtain evidence from Cephus. From the outset, the Amended Notice of Charge itself stated,

> I [Hasselbacher] would like to schedule a meeting with you to discuss the information referenced above and to give you an opportunity to respond to the allegations. Please contact me by telephone [] or by email [] no later than Friday, June 1, 2018 in order to schedule a meeting with me. You may also provide a written statement about or response to the alleged misconduct, or additional materials you deem relevant for the Office of Compliance to consider during its investigation. If you provide a written statement, response, or additional materials, they will become part of the official record.

(DPFOF ¶ 62.)

Simultaneously, Hasselbacher emailed Cephus's counsel on May 31, 2018, reiterating that she was "happy to meet with you at any point to discuss the investigation process and answer any questions you may have." (DPFOF ¶ 64.) The email stated, "I am also able to conduct an interview or receive any information you would like to provide." (*Id.*)

Hasselbacher continued to offer chances for Cephus to submit evidence. She emailed his counsel again at least three times between June 4 and July 26, 2018, to invite Cephus to "provide any additional information via an interview, written statement … or other evidence" or to identify witnesses. Hasselbacher repeated the invitation to participate in an interview at an August 1 meeting with Cephus's counsel. (DPFOF ¶¶ 64, 72, 75-77, 90.)

After the criminal case was filed, Hasselbacher sent yet another email to Cephus's counsel inviting Cephus to participate in an interview. Additionally, Vice Chancellor Raymond Taffora emailed Cephus's counsel on August 30 stating, "If either you or Mr. Cephus has access to additional information, including but not

limited to, police reports, videos, text messages, or any other information that could be relevant to the non-academic misconduct charges, please provide it to Ms. Hasselbacher immediately and she will evaluate it as part of the University's Title IX investigation." (DPFOF ¶¶ 111-113; Ex. 530.)

Cephus has avoided revealing when he took possession of the exculpatory evidence he was entitled to receive in his criminal proceeding. (Bachhuber Decl. ¶¶ 53-54, Ex. 597 & Ex. 598 at Interrog. No. 10.) In response to the Board's interrogatory asking for all facts, information or evidence withheld from the University during the disciplinary process, Cephus states only that he was "unable to provide his personal testimony during the University's Title IX investigation, as there was a criminal proceeding simultaneously pending." Cephus asserts that he "was unable to disclose some evidence which was obtained during the course of the criminal investigation" and "unable to…provide supplemental documentation to the University until after the criminal hearing concluded on August 2, 2019." (Bachhuber Decl. ¶¶ 53-54, Ex. 597 & Ex. 598 at Interrog. No. 10.) But Cephus provides no specific facts as to why this was so. And Cephus cannot identify any order in his criminal proceeding that would have prevented him from providing information to the University. (Cephus Dep. Tr. 47:6-10.)

Public records show that on September 20, 2018, the District Attorney produced discovery to Cephus's lawyer consisting of "over two hundred pages of documents, 9 CD/DVDs" and also stated that videos, audio and photographs could be made available for viewing. (DPFOF ¶ 124.) Prior to the January 15, 2019 hearing,

43

Cephus's attorneys received discovery from the District Attorney's Office on September 20, September 28, October 11, October 12, October 23, November 14, November 27, December 4, December 5, 2018 and January 7 and January 9, 2019. (DPFOF ¶ 184.) Yet, after September 20, 2018, Cephus's attorneys chose not to provide any additional documentation to the University officials involved in the nonacademic misconduct process at or before the January 15, 2019 hearing, aside from Cephus's statements dated September 25 and October 6, 2018, and the written submission dated January 4, 2019. (DPFOF ¶ 185.) Cephus thus had almost three months to submit the evidence for consideration at the misconduct hearing on January 15, 2019. He chose not to do so.

This sequence of events demonstrates that Cephus is responsible for not including the exculpatory evidence at the misconduct hearing. This alone defeats any allegation of sex discrimination. *See S. Indiana*, 43 F.4th 784, 792 (errors that plaintiff "invited" did not evince sex discrimination).

### C.   Cephus's allegations of flaws in the disciplinary process lack evidentiary support, have no nexus to gender, and do not establish gender discrimination.

Cephus contends that internal and external pressure on UW-Madison and alleged flaws in the disciplinary process show the University discriminated against him because of his sex. (Ex. 597 at Interrog. No. 13.) But Cephus's allegations lack evidentiary support, have no nexus to gender, and do not establish gender discrimination.

### 1. No reasonable juror could infer gender discrimination based on the alleged flaws Cephus identifies.

Courts have defined the types of evidence that defeat a sex discrimination claim predicated on flaws in disciplinary proceedings. An institution can show that the plaintiff "was provided with the opportunity to review the investigative materials; was given multiple opportunities to submit evidence; … and submitted questions to be asked of [the complainant] on cross-examination." *Columbia College*, 933 F.3d at 856. Such a showing would disprove a plaintiff's contention that procedural defects were so serious as to allow an inference of discrimination. *Id.*; *Loyola Univ.*, 2021 WL 2550063, at *8.

Here, the undisputed evidence establishes that the alleged flaws Cephus identifies were not so serious as to allow an inference of discrimination. In particular, Cephus received all copies of the investigative materials at the same time as the Complainants. He received multiple opportunities to submit evidence, including in the notices of charges, throughout the investigation, and at the hearing. He was provided with the investigative reports completed by Hasselbacher and permitted to submit information in response. Cephus submitted questions on cross-examination.[6] (DPFOF ¶¶ 189-190.) Throughout, Cephus was represented by counsel. In short, Cephus "was provided with the opportunity to review the investigative materials; was

---

[6] Cephus alleges that the University "materially changed the questions" to favor the Complainants. (Dkt. 1, ¶ 282r.) However, Cephus did not identify any differences in the questions proposed by his counsel and the question that was actually asked of the witness at the hearing. Cephus has no personal knowledge and subsequently refused to respond to the interrogatory based on an assertion of attorney-client privilege and work product doctrine. (Bachhuber Decl., Ex. 597 and Ex. 598 at Interrog. No. 14.)

given multiple opportunities to submit evidence; … and submitted questions to be asked of [the complainants] on cross-examination." *Columbia Coll.*, 933 F.3d at 856. The Court must therefore conclude that the flaws he does allege—even if they were true—do not permit an inference of sex discrimination. *See id.*

> **2.    The University did not conduct the investigation in a way designed to favor the Complainants during the investigation.**

Cephus contends that he can show gender discrimination because the University favored Complainants because they were women and disfavored him because he is a man. In support of his contention of the alleged favoritism for the Complainants during the investigation, Cephus contends:

i. The investigators credited inconsistent statements of the female Complainants over consistent statements of Plaintiff and other male witnesses;

ii. Hasselbacher failed to obtain Cephus's version of events early in the investigation, waiting four months to even request an interview with Plaintiff until all other witnesses had been interviewed and Cephus had been criminally charged;

iii. the University "went against University policy and complied with the Complainants' wishes in scheduling a hearing date, thereby denying Plaintiff the opportunity to have his advisor of choice present";

iv. "[d]efendant[] included the skewed criminal complaint but not Plaintiff's motion to dismiss…";

(Bachhuber Decl. Ex. 597, Interrog. No. 13; Dkt. 1, ¶¶ 282-283.) These allegations are directly contradicted by the factual record.

First, Cephus does not identify which "inconsistent statements of the female Complainants" the investigators credited over the "consistent statements of Plaintiff and other male witnesses." Nor does Cephus identify the "investigators." To the

extent Cephus is referring to Hasselbacher, Hasselbacher served as a neutral investigator. Based on her training, Hasselbacher did not make assessments based on any person's overall credibility when drafting the final investigative report. She presented the information she collected to the OSCCS without opinion. The OSCCS made the findings and recommended the sanctions. To the extent Cephus is referring to Assistant Dean Kipp Cox, Cox specifically noted that he reviewed the information available about Cephus's description of the April 21-22, 2018, which included statements attributed to Cephus by the Madison Police indicating that he had sex with both complainants and that it was consensual and Cephus's written statements submitted during the investigation stating the encounter was consensual. None of this is evidence of sex discrimination.

To the extent Cephus argues the University showed Complainant 1's statement to Complainant 2 instead of asking Complainant 2 for her own statement to commence the Title IX investigation, this is also not evidence of sex discrimination. Hasselbacher shared Complainant 1's statement with Complainant 2 because Complainant 1's statement indicated that Complainant 2 may also have been sexually assaulted. By this point, Sathasivam had communicated to Hasselbacher that Complainant 2 did not have any recollection of what occurred that night, but Complainant 2 believed she was sexually assaulted. To Hasselbacher, sharing Complainant 1's statement seemed to be the only way to understand if Complainant 2's allegations involved the same underlying incident and conduct as Complainant 1. The information contained in the statements was used to initiate the official

investigation and issue the notice of charge. (DPFOF ¶¶ 52-54.) Further, Teammate 2, who may be considered a favorable witness for Cephus, made his statement on September 12, 2018. (DPFOF ¶ 117.) All parties received copies of that statement on the same day. (DPFOF ¶¶ 119-120.) And Cephus was allowed to review a copy of Teammate 2's statement before making his own statements later on September 13, September 25, and October 6. (DPFOF ¶¶ 117, 120, 121, 140, 185.) Thus, this cannot be evidence of gender discrimination.

Second, there is no evidence that Hasselbacher intentionally delayed obtaining Cephus's version of events or waited four months to request an interview with Cephus. The facts show that immediately upon issuing the May 31, 2018 notices of charge to Cephus, which started the investigation, Hasselbacher invited Cephus to provide information or to participate in an interview. (DPFOF ¶¶ 59-64.) Throughout the process, Cephus could have made himself available for an interview, as Hasselbacher made clear to him. In August 2018, when Cephus sought to schedule the interview, his attorney postponed the interview based on his own schedule and then cancelled it. (DPFOF ¶¶ 98-99, 106, 108-110.) Moreover, Complainant 1 was interviewed July 27 and Complainant 2 did not take part in an interview until August, which was the same month Cephus initially indicated he was willing to give an interview before he backed out. (DPFOF ¶¶ 95-96, 98; Ex. 537, at 5 n.10.) Cephus, Complainant 1, and Complainant 2 received the same opportunity to participate in an interview. That Cephus declined the opportunity while the others did not does not show sex discrimination.

Third, the University did not intentionally schedule the hearing date so that Cephus's preferred advisor could not attend based on the preferences of the Complainants. The facts show that the University (through Assistant Dean Cox) attempted to schedule the hearing for a date that would work for all the parties, witnesses, hearing officials and staff involved. Cox provided the relevant timelines for scheduling under Wis. Admin. Code § UWS 17.12. (DPFOF ¶¶ 160-163.) The University accommodated Cephus's attorneys requests on scheduling at multiple turns and scheduled the hearing for a date that they had not indicated any scheduling conflict during the weeks of emails on the subject matter. Cephus's attorneys then requested that the hearing be adjourned until after the criminal matter. Ultimately, Cephus was accompanied at the hearing by his attorney, Kathleen Stilling. (DPFOF ¶¶ 163-183.)

Fourth, the University did include the motion to dismiss in the hearing record. Specifically, it added the motion to dismiss to the hearing packet that was sent to the parties and the hearing committee on January 10, 2019, for consideration at the hearing on January 15. (DPFOF ¶¶ 178, 180, 182-183.)

Cephus sprinkles in some more allegations that he says show the University favored the Complainants. (Bachhuber Decl. Ex. 597, Interrog. No. 13.) These additional assertions do not merit individual arguments because they are conclusory, vague, and of marginal relevance. (*See, e.g.,* Bachhuber Decl. Ex. 597, Interrog. No. 13 ("Statements from the head of UW violence prevention program, Sam Johnson, explicitly voicing gender bias and the idea that males are the problem.").) Cephus can

provide no evidence in their support or tie them to his specific case. These additional assertions do not show particularized evidence of sex discrimination.

Before concluding, three more facts of record further evidence that the University did not favor the Complainants. First, the University found Cephus not responsible for Second Degree Sexual Assault, which tends to disprove that the University discriminated against Cephus specifically. *See Doe v. Williams Coll.*, No. 3:20-CV-30024-KAR, 2022 WL 4099273, at *19 (D. Mass. Sept. 7, 2022) ("the hearing panel's finding that [plaintiff] was not responsible for" one of two encounters with complainant "belies his claims of bias"). Second, the University granted Cephus's petition for readmission, which begs the question of why it would favor the Complainants at the misconduct hearing, but not on the subsequent petition. And third, Complainant 2 felt that the University discriminated *in favor* of Cephus because of his sex. At minimum, these undisputed facts bolster the conclusion that Cephus cannot show sex discrimination. *See Doe v. Cummins,* 662 F. App'x 437, 454 (6th Cir. 2016) (unpublished) (finding the plaintiff's claim of bias against male respondents unpersuasive where plaintiff was found "not responsible" as to the complainant's allegations).

As explained above, none of the alleged flaws in the process are evidence of sex discrimination. Rather, the University had legitimate non-discriminatory reasons for its actions during the disciplinary proceedings.

### 3.   Trauma-informed investigation is sex-neutral.

Cephus contends that the process was biased against him because "upon information and belief" Hasselbacher received trauma-informed training that caused her to overlook exculpatory evidence and inconsistencies in the complainants. (Bachhuber Decl. Ex. 597, Interrog. No. 13.) Cephus's contention does not withstand scrutiny for at least two reasons.

First, "information and belief" is insufficient at the "put up or shut up" moment of summary judgment. At summary judgment, Cephus must come forward with actual evidence. He has, essentially, conceded in his response to discovery requests that he has none.

Second, Cephus's emphasis on a trauma-informed investigation is misguided because both men and women can be victims of sexual assault. Thus, a trauma-informed investigation, which Cephus himself alleges is focused on "victims of sexual assault," is sex-neutral. (Ex. 597, Interrog. No. 13.) Even if Cephus had evidence, at most it would imply that the University displayed pro-victim bias. But as the Seventh Circuit has explained, "pro-victim bias" does not indicate sex discrimination because "both women and men can be victims of sexual assault." *See Johnson*, 829 F. App'x at 733.

### D.   External pressure and general campus climate do not show sex bias in Cephus's specific case.

Cephus also alleges external pressure on the University and the general campus climate show he was discriminated against on the basis of gender. (Ex. 597 at Rog 13 a-e) He alleges that the University faced pressure from the Department of

51

Education, the media, and its own students to protect female victims of sexual assault; he also alleges that this pressure resulted in campus awareness projects that depicted men as perpetrators of sexual assault, and women as victims.

Only one Seventh Circuit case has considered a Title IX respondent case at summary judgment: *Johnson v. Marian University*, 829 F. App'x 731 (7th Cir. Nov. 20, 2020). The *Johnson* court applied the fundamental principles of *Purdue* and *Columbia College* to the "put up or shut up" stage of litigation that is summary judgment. In *Johnson*, the Sevent Circuit specifically analyzed whether there was evidence of gender bias in the plaintiff's particular case. *Id.* at 733. The *Johnson* court reiterated that background evidence (external pressure, etc.) can be relevant to this analysis but is insufficient on its own to create a genuine issue of fact without "facts creating an inference that, in [the plaintiffs] specific case, the institution treated him differently because of his sex." *Id.* at 732 *(quoting Columbia Coll.*, 933 F.3d at 855).

In *Johnson,* the plaintiff contended he was entitled to a trial based on evidence that the dean who received the complainant's (identified as Roe) report in that case had stated that the events complainant described during her initial interview amounted to violations of university policy based on her report alone. Plaintiff argued that the dean "jumped to conclusions and determined Johnson's guilt based on Roe's first impression and report alone." *Id.* at 733. Even accepting that as an accurate interpretation of the interview, as required by the summary judgment standard, the Seventh Circuit concluded that the dean's "statements reveal no sex-based bias." *Id.* The Seventh Circuit explained that nothing suggested that the dean "believed Roe's

account simply because she was a female; his comments were 'divorced from gender.'" *Id.* (*citing Columbia Coll.*, 933 F.3d at 856). "At most, they demonstrate a pro-victim bias, but both women and men can be victims of sexual assault." *Id.* at 733. The Court found that the dean's statements demonstrated at most a pro-victim bias, not sex-based bias. *Id.*

Cephus also alleged external pressure and the general campus climate about a perceived anti-male bias is evidence of gender discrimination, pointing towards such things as the rescinded Department of Education's 2011 "Dear Colleague" letter, and media reports about sexual assault and inadequate investigations at the University.  In response to discovery requests specifically asking Cephus to identify facts in support of his contention that any Office of Civil Rights investigation, alleged media attention or campus training caused the University to discriminate against Cephus in his specific case, Cephus provided no facts, but only the conclusory statements such as that they caused the University to take a hard-lined or "aggressive stance against males accused of sexual assault...." (Bachhuber Decl. ¶ 53, Ex. 597, Interrog. No. 6-9.) But Cephus "cannot rely on [] generalized allegations" about campus climate or external pressures on a university. *Columbia Coll.*, 933 F.3d at 855. "Public pressure is not enough on its own to support a claim of discrimination." *S. Indiana*, 43 F.4th at 792. Rather, a plaintiff must show "facts particular to his case" indicating sex discrimination. *Id.* That is, a plaintiff must put forward "facts creating an inference that, in *his specific case*, the institution treated him differently because of his sex." *Johnson*, 829 F. App'x at 732 (emphasis in original).

The decisions in *Columbia College* and *Johnson* illustrate how Cephus cannot meet his burden here. In *Columbia College*, the Seventh Circuit determined that such general allegations were deficient at the pleading stage. There, a male student brought a Title IX claim against his college regarding its handling of his sexual misconduct investigation and hearing. 933 F.3d at 852. The plaintiff alleged that the Department of Education pressured the college to adopt various procedures and standards regarding allegations of sexual misconduct, most notably through a 2011 "Dear Colleague" letter. *Id.* at 855. The plaintiff also alleged that these standards— including the publication of grievance procedures and the adoption of a preponderance of the evidence standard—demonstrated an anti-male bias. *Id.* Further, the plaintiff alleged that the college had screened films about sexual assault and made social media posts depicting men as the perpetrators of sexual assault. *Id.* Finally, the plaintiff alleged that because of these external pressures and on-campus awareness efforts, the college "implement[ed] anti-male policies to increase convictions of male students." *Id.*

The Seventh Circuit held that the allegations concerning external pressure and general campus climate did not state a Title IX claim. *Id.* Specifically, the court held that a plaintiff "cannot rely on these generalized allegations alone [] but must combine them with facts particular to his case to survive a motion to dismiss." *Id.* That is, a plaintiff must show a "particularized 'something more'" beyond the general climate to substantiate a sex discrimination claim. *Id.* at 856. Because the plaintiff had not met that burden, the court affirmed dismissal of his Title IX claim. *Id.*

In *Johnson*, the plaintiff cited the 2011 "Dear Colleague" letter, the university having been the subject of a recent investigation by the Office for Civil Rights—a sub-agency of the Department of Education—into the university's handling of sexual assault complaints, as well Title IX training materials and campus sexual assault awareness events that featured accounts of mostly female accusers. *See Johnson*, 829 F.3d Appx. at 732. Plaintiff argued that he was entitled to get to a jury because these factors "conditioned" the university's "Title IX administrators to favor female complainants and discriminate on the basis of sex." *Id.*

While acknowledging the potential relevance of such evidence, the *Johnson* court confirmed that a plaintiff must combine it with sufficient facts that, "in *his specific case,* the institution treated him differently because of his sex." *Id.* (citations omitted). The *Johnson* court found that plaintiff's "general allegations about the school administration's perceived anti-male culture" insufficient to create a triable issue on sex discrimination without further analysis. *Id.* at 733. In *Johnson*, the plaintiff needed "evidence of mistreatment in his particular case to get over the summary judgment hump and land at trial." *Id.* at 40, 64-65.

Following *Johnson* and *Columbia College*, district courts have consistently applied these principles to reject the type of argument Cephus makes here. In *Doe v. Hamilton College*, the male plaintiff brought a Title IX claim regarding his disciplinary proceedings for sexual misconduct. No. 621CV0436GTSCFH, 2023 WL 8782020, at *23 (N.D.N.Y. Dec. 19, 2023). Relevant here, the plaintiff argued that the college was "motivated by gender" in part because "outside pressure from the federal

government and student groups created a general 'anti-male bias [that] pervaded the sexual misconduct investigation.'" *Id.* (brackets in original). The court rejected that argument. Specifically, the court ruled, "Plaintiff cannot survive summary judgment by simply arguing that policy changes from the federal government and pressure from student groups created gender bias in an individual disciplinary decision." *Id.* The court accordingly granted summary judgment on the Title IX claim. *Id. See also Doe v. Loyola Univ.-Chicago*, No. 20 CV 7293, 2021 WL 2550063, at *7 (N.D. Ill. June 22, 2021) ("general allegations about the climate at [a university] do not support an inference that the university discriminated against [plaintiff] because of his sex"); *Gash*, 2023 WL 5852258, at *2 (dismissing complaint at the pleadings stage and collecting cases).

Here, the University served discovery requiring Cephus to "put up" all of his evidence that the campus climate, trainings, media attention or other general allegations showed the University discriminated against him, specifically, because of his sex. Cephus provided no evidence. (Bachhuber Decl. Ex. 597, Interrog. No. 6-9.) Cephus has not shown the "particularized 'something more'" required to survive summary judgment. In sum, Cephus has *no* evidence that he was treated differently from female students. He has *no* evidence that the University favored the Complainants during the disciplinary proceedings. And he has *no* evidence that any alleged flaws in the disciplinary proceedings related to his sex. Because Cephus provides no evidence that the University discriminated against him because of his sex, the Court should grant summary judgment to the University. *See Johnson*, 829

F. App'x at 732 (plaintiff must show that "in *his specific case*, the institution treated him differently because of his sex" (emphasis in original)).

## CONCLUSION

For the reasons set forth above, defendant is entitled to summary judgment in its favor and dismissal of the Title IX claim with prejudice.

Dated: March 15, 2024.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

s/Jonathon M. Davies
JONATHON M. DAVIES
Assistant Attorney General
State Bar #1102663

s/Sarah A. Huck
SARAH A. HUCK
Assistant Attorney General
State Bar #1036691

Attorneys for Defendant

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188 (Bachhuber)
(608) 261-8125 (Davies)
(608) 266-7971
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
daviesjm@doj.state.wi.us
hucksa@doj.state.wi.us