IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUINTEZ CEPHUS,

      Plaintiff,

v.                              Case No. 21-cv-00126

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

      Defendant.

---

**PLAINTIFF'S BRIEF IN RESISTANCE TO MOTION OF SUMMARY
JUDGEMENT**

---

Table of Contents

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF RELEVANT FACTS .........................................................2

   A.  Plaintiff's Background. ......................................................................3

   B.  The Night of April 21-22, 2018. ...................................................... 4

   C.  The University's Investigation ........................................................ 7

   D.  UW-Madison admits its mistake .................................................. 11

ARGUMENT .................................................................................................13

   I.    LEGAL STANDARD—SUMMARY JUDGMENT ....................... 13

   II.   DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT
   ON PLAINTIFF'S TITLE IX CLAIM ............................................. 14

      1.   The Dear Colleague Letter/Pressure on UW to Protect Female Students
      on Campus from Sexual Assault ................................................ 18

         A.  The 2011 Dear Colleague Letter ......................................... 18

         B.  The Department of Education Rescinds the 2011 DCL ...................... 23

      2.   UW's Disciplinary Process was Replete with Procedural Irregularities,
      All of Which Disfavored the Male Student ...................................... 29

         A.   UW Rushed to Judgment at The Sole Request of, And in Favor Of, The
         Female Complainants ............................................................ 31

         B.   UW Failed to Allow Plaintiff to Have the Advisor of His Choice ......... 36

         C.   Plaintiff Was Denied the Opportunity to Question the Complainants 40

         D.   UW Presumed Plaintiff Guilty from the Start ...................................... 41

         E.   UW Failed to Appoint a Properly Trained Investigator Who Was Free
         from Conflict ........................................................................ 43

      3.   The Collective Evidence Supports a Finding of Gender Bias. ................. 45

      4.   The Deposition of Rebecca Blank Must Be Stricken from Defendant's
      Motion for Summary Judgment ...................................................... 46

CONCLUSION ..............................................................................................47

## Cases

*1616 Second Ave. Rest., Inc. v. New York State Liquor Auth.,*
  75 N.Y.2d N.E.2d 910 (1990) ...............................................................................48

*Alexander M. v. Cleary,*
  188 A.D.3d (N.Y. App. Div. 2020) .....................................................................48

*American Univ.,*
  2020 WL 5593909, at *7-8 ...................................................................................35

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. (1986) ................................................................................................ 13, 14

*Campus Rape Victims: A Struggle for Justice,*
  National Public Radio (Feb. 24, 2010) ...............................................................21

*Celotex Corp. v. Catrett,*
  477 U.S. (1986) .....................................................................................................13

*Conery v. Bath Associates,*
  803 F. Supp. (N.D. Ind. 1992) .............................................................................13

*Derrico v. Bungee Int'l Mfg. Co.,*
  989 F.2d (7th Cir. 1993) .......................................................................................14

*Doe v. American Univ.,*
  2020 WL 5593909 (D.D.C. Sept. 18, 2020) .........................................................15

*Doe v. Baum,*
  903 F.3d (6th Cir. 2018) .................................................................................28, 44

*Doe v. Bd. of Regents,*
  615 F. Supp. 3d (W.D. Wis. 2022) .......................................................................50

*Doe v. Columbia Coll. Chicago,*
  299 F. Supp. 3d (N.D. Ill. 2017), aff'd, 933 F.3d (7th Cir. 2019) ........................32

*Doe v. Columbia Univ.,*
  831 F.3d (2d Cir. 2016) ..................................................................................19, 29

*Doe v. Grinnell Coll.,*
  473 F. Supp. 3d (S.D. Iowa 2019) ............................................................ 18, 19, 35, 50

*Doe v. Marymount U.,*
  297 F. Supp. 3d (E.D. Va. Mar. 14, 2018) ..........................................................32

*Doe v. Miami U.,*
  882 F.3d (6th Cir. 2017) .......................................................................................28

*Doe v. Oberlin College,*
  963 F.3d (6th Cir. 2020) .......................................................................................35

*Doe v. Purdue Univ.,*
  928 F. 3d (7th Cir. 2019) ..........................................................................15, 20, 33

*Doe v. Syracuse,*
  2019 WL 2021026 (N.D.N.Y. May 8, 2019) ........................................................31

*Doe v. Univ. of Arkansas - Fayetteville,*
  974 F.3d (8th Cir. 2020) ................................................................................16, 50

*Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado,*
  255 F. Supp. 3d (D. Colo. 2017) .........................................................................23

*Doe v. Univ. of Denver,*
   1 F.4th (10th Cir. 2021) ................................................................................ 17, 33

*Doe v. Univ. of Sciences,*
   961 F.3d (3d Cir. 2020) ........................................................................................ 15

*Doe v. University of Arkansas-Fayetteville,*
   974 F.3d (8th Cir. 2020) ....................................................................................... 15

*Does 1-2 v. Regents of the Univ. of Minnesota,*
   999 F.3d (8th Cir. 2021) ...................................................................... 18, 19, 32, 50

*Gebser v. Lago Vista Indep. Sch. Dist.,*
   524 U.S. (1998) ...................................................................................................... 14

*GPM Se. LLC v. Riiser Fuels LLC,*
   647 F. Supp. 3d (E.D. Wis. 2022) ......................................................................... 23

*Lee v. Univ. of N. Mexico,*
   449 F. Supp. 3d (D.N.M. 2020) ............................................................................ 35

*Levan v. Capital Cities/ABC Inc.,*
   190 F.3d 1230, 1235 n.12 (11th Cir. 1999) .......................................................... 21

*Menaker v. Hofstra Univ.,*
   935 F.3d (2d Cir. 2019) ................................................................................... 17, 35

*Missourians for Fiscal Responsibility v. Klahr,*
   830 F.3d 789, 793 (8th Cir. 2016) ........................................................................ 21

*Moe v. Grinnell Coll.,*
   556 F. Supp. 3d (S.D. Iowa 2021) ................................................................. passim

*Neal v. Colorado State Univ.-Pueblo,*
   No. 16-CV-873 (RM) (CBS), 2017 WL 633045 (D. Colo. Feb. 16, 2017) ............. 28

*Reinebold v. Bruce,*
   18 F.4th (7th Cir. 2021) ........................................................................................ 14

*Rossley v. Drake Univ.,*
   979 F.3d (8th Cir. 2020) ................................................................................... 16, 17

*Schwake v. Arizona Bd. of Regents,*
   967 F.3d (9th Cir. 2020) ....................................................................................... 15

*Setting the Record Straight on "1 in 5",*
   Time Magazine (Dec. 14, 2015) ............................................................................ 22

*Syquia v. Bd. of Educ. of Harpursville Cent. Sch. Dist.,*
   180 A.D.2d 579 N.Y.S, *aff'd,* 80 N.Y.2d N.E.2d 1387 (1992) ............................. 48

*Univ. of Arkansas-Fayetteville,*
   974 F.3d at 864 ..................................................................................................... 35

iii

## PRELIMINARY STATEMENT

Plaintiff Quintez Cephus was a junior at the University of Wisconsin-Madison ("UW" or the "University") in the Spring of 2019 when Defendant wrongfully found him responsible for sexual assault and expelled him from the University. When the University received complaints from two female students that wrongfully accused Plaintiff of sexual misconduct, the University immediately presumed the female complainants to be helpless victims and the male respondent to be a calculated predator, and treated Plaintiff accordingly. The University then subjected Plaintiff to a nightmarish process whereby he was rushed to judgment, precluded from meaningfully responding to any of the information to be used against him or else waive his Fifth Amendment right against self-incrimination in the on-going parallel criminal prosecution, summoned to a "hearing" that had a predetermined outcome where he was precluded from having the advisor of his choice present, and purportedly given an avenue for appeal that in reality never stood a chance of success, as the University openly skewed the entire process against Plaintiff.

Throughout this time, Plaintiff and his advisors requested, multiple times, that the University stay the Title IX proceedings in light of relevant, exculpatory evidence collected by the District Attorney's Office in the criminal prosecution, and which would not be available until the conclusion of the criminal trial. Despite this knowledge, the University proceeded with the Title IX investigation and adjudication in the absence of relevant evidence, and rushed to find Plaintiff responsible at the female Complainants' request. The University and its employees continually

1

disregarded their obligations under federal law and regulations, violated UW's own policies, and deprived Plaintiff of a fair and meaningful opportunity to be heard. Plaintiff therefore brought this action to right the wrongs occasioned by Defendant's egregiously bad-faith, fundamentally unfair, gender-biased conduct.

Defendant Board of Regents of the University of Wisconsin System (the "Board") now moves for summary judgment. Relying on self-serving affidavits that contradict their own testimony and documents, and a highly misleading cherry-picking of the facts in evidence, Defendant asserts that it is entitled to judgment as a matter of law. However, the evidence Defendant offers at the "put up or shut up" stage in this litigation does nothing more than highlight the slew of genuine disputes as to nearly every material fact at issue here, precluding summary judgment entirely.

As set forth in detail below, there is sufficient evidence in the record from which a rational juror could find that UW discriminated against Plaintiff on the basis of sex throughout his Title IX disciplinary process, resulting in a wrongful finding of sexual assault and unjustified dismissal. Considering the evidence in the record and the presence of significant disputed material facts, summary judgment is inappropriate, and Defendant's motion should be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

Plaintiff refers the Court to Plaintiff's Complaint for a detailed recitation of all relevant facts in this matter. *See* ECF No. 1. For the Court's convenience, a summary of relevant facts follows:

2

### A. Plaintiff's Background.

Plaintiff grew up in a disadvantaged area of Macon, Georgia, and was raised by a single mother and grandmother alongside two siblings. Cephus Decl. ¶ 4. Plaintiff attended an underperforming public school and, due to his quiet demeanor and eagerness to learn, his school guidance counselor felt that he would be hindered by the school's culture and lack of educational opportunities, and suggested that he apply to a college preparatory school. Cephus Decl. ¶¶ 5-6. Plaintiff's mother worked two jobs and often had no other option but to drop Plaintiff off at school late, so the preparatory school's basketball coach took Plaintiff under his wing and picked Plaintiff up for school every day at 6:00 a.m., which allowed him to excel both academically and athletically. Cephus Decl. ¶ 8. Plaintiff's exceptional athletic abilities were noticed by UW-Madison, and Plaintiff was recruited to be a wide receiver for the University's football team with the class of 2020. Cephus Decl. ¶ 9.

While attending UW-Madison, and until Complainant 1 and Complainant 2 (the "Complainants") falsely accused him of sexual misconduct, Plaintiff had a bright future ahead, projected to be a high pick in the National Football League ("NFL") draft. Cephus Decl. ¶¶ 68-69. Plaintiff's aspirations were sidelined, however, when UW-Madison wrongly found him responsible for sexual assault and sexual harassment relating to a consensual sexual encounter that the Complainants apparently later regretted. Cephus Decl. ¶ 58.  As a result of the University's deficient, gender-biased, and deliberately one-sided disciplinary process, which violated its own policies and state and federal regulations, Plaintiff was expelled from

the University, hindering his ability to practice and compete with the University's football team, thereby impacting his position in the NFL draft. Cephus Decl. *Id*.

### B. The Night of April 21-22, 2018.

On April 21, 2018, Plaintiff went bowling with two of his teammates, Teammate 1 and Teammate 2. Cephus Decl. ¶ 11. Teammate 1 brought along Complainant 1, whom he was "on-again, off-again" dating. Cephus Decl. ¶ 12. While bowling, Complainant 1 insisted upon "setting up" Plaintiff with her friend, Complainant 2, and Teammate 2 with her other friend, Friend 1. Cephus Decl. ¶ 13. Later that night, Complainant 1 and Plaintiff exchanged Instagram messages and text messages, arranging for Complainant 1 and her friends to meet Plaintiff and Teammate 2 at a local bar. Cephus Decl. ¶ 14. When they met at the bar, Complainant 2 was immediately drawn to Plaintiff and was extremely physical with him, telling him to kiss her in the bar, which he refused to do, and trying to put her hand down Plaintiff's pants. Friend 1 also spent time with Teammate 2, leaving Complainant 1 by herself. Cephus Decl. ¶ 15. Complainant 1 texted Teammate 1 multiple times trying to get him to come to the bar, but he stood her up. Given Teammate 1's past of not remaining loyal to Complainant 1, she was, on information and belief, upset that Teammate 1 was once again cheating on her. Cephus Decl. ¶ 16.

Complainant 2 then suggested that they go have a "sleepover," so Plaintiff, Complainant 2, Complainant 1, Teammate 2, and Friend 1 left the bar and Plaintiff drove them back to Plaintiff and Teammate 2's apartment. Cephus Decl. ¶ 17. While leaving the bar and upon arrival at Plaintiff's apartment, Complainant 1 and

Complainant 2 were fully awake and oriented, lively, coherent, able to walk with steady gait, did not stumble, and did not appear incapacitated in any way. Cephus Decl. ¶ 18. Indeed, Complainant 1 was even able to give Teammate 2, a six-foot tall football player, a *piggyback ride without stumbling*. Cephus Decl. ¶ 19. Additionally, while walking ahead of the group and holding hands with Plaintiff, Complainant 2 looked back at Complainant 1 and Friend 1 and made a "victory" sign with her hand as they headed to Plaintiff's apartment. Cephus Decl. ¶ 20.

Upon entering Plaintiff's apartment, Plaintiff showed Complainant 1 and Complainant 2 around, and Friend 1 went with Teammate 2 into Teammate 2's room. Cephus Decl. ¶ 21. Complainant 2 walked into Plaintiff's room and gestured with her hand for Plaintiff to come in. Cephus Decl. ¶ 22. Complainant 1 was going to be by herself in the living room if Plaintiff went into his room with Complainant 2, so Plaintiff asked Complainant 1 if she wanted to come into his room. *Id.* Plaintiff then walked into his room and Complainant 1 freely followed. Cephus Decl. ¶¶ 23-24. Complainant 1 and Complainant 2 proceeded to remove their own clothes, and both engaged in sexual intercourse with Plaintiff. Cephus Decl. ¶ 25. Both Complainant 1 and Complainant 2 were active participants and asked Plaintiff to retrieve a condom before engaging in intercourse, and Plaintiff put on a new condom before he had intercourse with Complainant 1 and Complainant 2. *Id.*

After the encounter, Roommate 2 came to Plaintiff's room and took a picture of the two girls in Plaintiff's room. Cephus Decl. ¶ 26. Complainant 1 immediately got up and began yelling at Roommate 2 and Plaintiff about the photo. Cephus Decl. ¶

5

27. Complainant 1 then meticulously showed Plaintiff and Teammate 2 how to delete the photo from the "recently deleted" folder on the phone, clearly aware of her surroundings and in full control of her faculties. *Id.*

Complainant 1, apparently upset and embarrassed at her own infidelity to Teammate 1, and jealous that Plaintiff was giving Complainant 2 more attention, then left the room, stating that Plaintiff and Teammate 2 were going to think she was a "slut;" Plaintiff told her to calm down. Cephus Decl. ¶ 28. Complainant 1 then urged Complainant 2 to get out of Plaintiff's bed by pulling her arm and saying, "are you going to have sex with someone that just talked to me like that?" Cephus Decl. ¶ 29. Complainant 1 and Complainant 2 then got into an argument, which was not uncommon in their friendship dynamic, and this argument prompted Complainant 2 to get out of Plaintiff's bed and leave. Cephus Decl. ¶ 30. Complainant 2, despite later claims of being incapacitated, was able to navigate a steep and winding back staircase out of Plaintiff's apartment, find her way back to the street, and order herself an Uber to her dorm room utilizing a smartphone application. Cephus Decl. ¶ 31. Notably, Complainant 1 chose to voluntarily stay in Plaintiff's apartment. *Id.*

Plaintiff was concerned about Complainant 2 and searched his apartment building to find her. Cephus Decl. ¶ 32. When Plaintiff could not find Complainant 2, he advised Complainant 1, Friend 1, and Roommate 2 that they needed to leave. *Id.* Plaintiff and Roommate 2 then drove Complainant 1 and Friend 1 back to their dorm rooms, looking for Complainant 2 to make sure that she was not walking alone on the street. Cephus Decl. ¶ 33. Friend 1 lived in the same dorm room as Complainant 2,

so she took Plaintiff and Roommate 2 to Complainant 2's room to ensure that Complainant 2 made it home safely. Cephus Decl. ¶ 34. Complainant 2 was in her room, and she spoke with Plaintiff for a few minutes before exchanging phone numbers with him, upon which she texted him a heart and a kiss face emoji. Cephus Decl. ¶ 35.

When Complainant 1 arrived back at her dorm however, she was visibly upset following her argument with Complainant 2. Cephus Decl. ¶ 36. A student who lived on the same floor approached Complainant 1 in the hallway, and initially Complainant 1 said that nothing was wrong, but after being pried for information by the student, she eventually fabricated that she had been sexually assaulted by Plaintiff. *Id.* The student then called the police himself, and the police drove Complainant 1 to the hospital for a sexual assault examination. Cephus Decl. ¶ 37. When Complainant 1 was in the hospital, she texted Complainant 2 a string of text messages, claiming that Plaintiff had sexually assaulted both of them, and eventually convinced Complainant 2 to go along with her story. *Id.*

## C. The University's Investigation

On April 22, 2018, the Madison Police Department executed a search warrant of Plaintiff's apartment and informed him that the Complainants accused him of sexually assaulting them the night prior. Cephus Decl. ¶ 38. The next day, on April 23, 2018, Complainant 1's father contacted the University, alleging that Plaintiff had sexually assaulted his daughter. Cephus Decl. ¶ 39. Plaintiff retained criminal defense attorney Stephen Meyer ("Meyer") on April 27, 2018. Cephus Decl. ¶ 40.

On May 24, 2018, over one month after the alleged incident, Complainant 1 submitted a written statement to the University alleging that Plaintiff sexually assaulted her. Cephus Decl. ¶ 41. The statement contained the incorrect date of the alleged incident. *Id*. Complainant 2 did not submit a statement to the University, but rather, Defendant Hasselbacher merely showed Complainant 2 the statement that Complainant 1 wrote and asked Complainant 2 to "confirm the accuracy of the statement to the best of her recollection." Cephus Decl. ¶ 42.  Plaintiff did not receive formal notice of the allegations from the University until May 28, 2018, five full weeks after the University first became aware of the allegations against Plaintiff. Cephus Decl. ¶ 43.

On June 6, 2018, Meyer advised Defendant Hasselbacher of critical, exculpatory information obtained by law enforcement, but which was not yet available to Plaintiff, including toxicology reports, security camera footage, a forensic examination of Plaintiff's phone, and the results of the search warrant of Plaintiff's apartment. Cephus Decl. ¶ 44. Hasselbacher stated that while Plaintiff could provide relevant information to the investigation, her intention was to interview Plaintiff "when [she was] nearing the conclusion of the investigation," treating Plaintiff's statement as a mere afterthought. Cephus Decl. ¶ 45. Accordingly, Plaintiff requested that Hasselbacher stay the proceedings until the close of the criminal matter as the evidence obtained in that matter would be critical to the University proceedings as well. Cephus Decl. ¶ 46. However, the University refused to stay the proceedings and continued with the investigation, despite Plaintiff's inability to fully participate in

8

the investigation, as speaking to the University investigators would force Plaintiff to waive his Fifth Amendment rights in the concurrent criminal matter, the consequences of which were obviously much more serious than a University proceeding. Cephus Decl. ¶ 47.

On or around October 9, 2018, Defendant Hasselbacher issued the Final Investigative Report and provided it to the Office of Student Conduct and Community Standards for decision-making. Cephus Decl. ¶ 48. Notably, the Final Investigative Report was one-sided and created solely to garner a finding of responsibility against Plaintiff. For example, Defendant Hasselbacher felt it appropriate to attach the Dane County Criminal Court Complaint - a document that was not created by the University, was created for the express purpose of prosecuting Plaintiff, and was deliberately written to include only inculpatory evidence in order to initiate the criminal proceedings. Cephus Decl. ¶ 49. At the same time, Defendant Hasselbacher refused to accommodate Plaintiff's request to attach his Motion to Dismiss the Criminal Complaint and the accompanying documents submitted on Plaintiff's behalf in the criminal proceeding. Cephus Decl. ¶ 50. Additionally, Hasselbacher allowed the Complainants to cherry-pick evidence to be included in the report, including blatantly incomplete text message strings, but never asked the Complainants for their phone records, which would have clearly shown them collaborating on their claims and also would have undermined their version of events from the night in question. Cephus Decl. ¶ 51.

On October 30, 2018, based on the completely one-sided and deliberately skewed investigative report, Assistant Dean Ervin Cox issued a letter finding it more likely than not that Plaintiff was responsible for sexual assault and sexual harassment regarding both Complainants. Cephus Decl. ¶ 52. According to the finding letter, Cox enlisted two unidentified colleagues to review and analyze the Final Investigative Report with him and reach the determination of responsibility, in violation of University Policy. *Id.* The matter was then referred to a hearing. *Id.*

Plaintiff requested that the hearing take place during the Spring semester, rather than over winter break Cephus Decl. ¶ 53. However, Cox stated that the Complainants did not want to wait until the Spring semester and unilaterally elevated their wishes over Plaintiff's, in direct contravention to University policy. *Id.* Cox then scheduled the hearing for January 15, 2019, a date on which Plaintiff's chosen advisor would not be available; Cox then refused to reschedule the hearing for a date when Plaintiff would be able to attend with his advisor. Cephus Decl. ¶ 54. Because of the University's deliberate scheduling of the hearing on a date when Plaintiff's Title IX advisor was not available, Plaintiff had to scramble to have someone else appear at the hearing with him, and ended up asking one of his criminal attorneys to step in. Cephus Decl. ¶ 55. As his counsel made clear to the Panel, however, she was not familiar with the Title IX process. *Id.* In sum, the University deliberately scheduled the hearing to accommodate only the Complainants' requests and to preclude Plaintiff from receiving the assistance and support that he was promised and entitled to.

The University further hamstrung Plaintiff's defense and violated its own policies and relevant state regulations by refusing to permit his attorney to cross-examine the witnesses. Cephus Decl. ¶ 56. Instead, they directed Plaintiff's counsel to submit her questions through the hearing Chairperson, who then materially altered the questions and presented them in a way that directly instructed the Complainants on how to best answer in order to prove their claims. *Id*. Additionally, throughout the hearing, Cox repeatedly cited to the Criminal Court Complaint, despite its obviously skewed and one-sided nature—a complaint is not evidence, it is merely allegations and has no evidentiary value. Cephus Decl. ¶ 57.

As a result of the University's biased and flawed investigation and hearing, the hearing panel found Plaintiff responsible for sexual assault and sexual harassment with respect to both Complainants and Plaintiff was expelled from the University. Cephus Decl. ¶ 58. Plaintiff timely filed an appeal to Defendant Blank. Blank, however, merely rubberstamped the findings of the hearing panel. Cephus Decl. ¶ 59. Plaintiff submitted a request for review to the Board, which was summarily denied. Cephus Decl. ¶ 60.

### D. UW-Madison admits its mistake

On August 2, 2019, after a week-long criminal trial in which Plaintiff was able to present the extensive, material, exculpatory evidence—which the University previously knew existed, but refused to wait for—Plaintiff was acquitted on all charges. Cephus Decl. ¶ 61. In fact, the evidence so plainly demonstrated Plaintiff's

11

innocence that the jury deliberations only took a mere thirty minutes. Cephus Decl. ¶ 62.

Following the acquittal, Plaintiff petitioned the University for readmission. Cephus Decl. ¶ 63.  Faced with the abundant evidence clearly demonstrating Plaintiff's innocence, and that the girls had fabricated their story entirely, Defendant Blank reversed Plaintiff's expulsion and readmitted Plaintiff to the University on August 21, 2019. Cephus Decl. ¶ 64. The University statement announcing Plaintiff's readmission expressly noted that the information relied upon in making the decision to readmit Plaintiff was the same evidence that the University knew existed and could have had if the University had stayed the proceedings, as Plaintiff had repeatedly requested (and as they knew directly from Taffora's conversations with the District Attorney). Cephus Decl. ¶ 65. However, the statement also asserted that "there were findings of responsibility of the student non-academic misconduct code that were upheld," without specifying what was reversed or what was upheld. Cephus Decl. ¶ 66.

Because of the University's wrongful findings and expulsion, based on a knowing and deliberate refusal to wait for exculpatory evidence or even attempt to question the female Complainants' credibility, Plaintiff was removed from the football team for almost eight months, severely impacting his ability to develop his skills and be in top shape for the professional recruiting season that would follow. Moreover, even though he was acquitted in his criminal trial, the University's false and wrongful initial findings and expulsion, and its deliberately vague readmission

statement asserting that Plaintiff was still responsible for violations, severely tainted Plaintiff's reputation and created hesitation in the NFL to draft him.  As a result, even though Plaintiff did ultimately re-join the football team and was drafted to the NFL, he was drafted many rounds later than scouts had initially predicted, resulting in a material loss of salary and potential lifetime earnings. Cephus Decl. ¶¶ 67-69.

## ARGUMENT

## I.    LEGAL STANDARD—SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the Court may grant summary judgment only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists where the issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A party moving for summary judgment "cannot rest on mere allegations in the pleadings or upon conclusory allegations in affidavits." *Conery v. Bath Associates*, 803 F. Supp. 1388, 1393 (N.D. Ind. 1992) (internal citations removed). In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson.,* 477 U.S. at 255; *see also Derrico v. Bungee Int'l Mfg. Co.*, 989 F.2d 247, 249 (7th Cir. 1993). The Court does not "weigh the evidence, or decide which inferences to draw from the facts when ruling on a motion for summary judgment." *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) (citations omitted). Instead, the Court's sole directive is to determine whether a dispute about a material fact is

genuine. *Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *Id.* at 250.

## II.   DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S TITLE IX CLAIM

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Private parties may enforce Title IX through an implied right of action. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). A number of federal courts, including the Seventh Circuit, have adopted a simpler approach to Title IX sex discrimination cases involving college disciplinary proceedings, simply asking the direct question of whether a college or university has disciplined a plaintiff on the basis of sex—that is, because he is male. *See Doe v. Purdue Univ.,* 928 F. 3d 652, 667-68 (7th Cir. 2019); *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Doe v. American Univ.*, 2020 WL 5593909, at * 7 (D.D.C. Sept. 18, 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020). To survive summary judgment, Plaintiff need only to set forth sufficient evidence to allow a reasonable jury to find that UW disciplined him on the basis of sex; or in other words, that there is a "genuine dispute of material fact whether being male was a

motivating factor" in the school's decision to discipline him. *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020). Here, a reasonable jury could find that the College disciplined Plaintiff on the basis of sex, and, accordingly, Defendant's Motion for Summary Judgment should be denied.

In the context of Title IX claims brought by male university students who were disciplined for sexual misconduct, courts around the country employ a searching review of the record as a whole, and consistently hold that circumstantial evidence of gender bias precludes summary disposition. By way of example, in *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020), the Eighth Circuit held that allegations of a university's disciplinary decision being made against the weight of the evidence, combined with external pressure on the school to better protect female students on campus from sexual assault, were sufficient indicia of gender bias to preclude dismissal on the pleadings. *Id.* at 865–66.

Courts have also found that "clear procedural irregularities" in the disciplinary process that all disfavor the male student, evidence that decisionmakers made credibility determinations without having met with the parties first, and university publications that insinuate men are the cause of sexual violence, are all plausible indicia of gender bias that may preclude summary judgment. *See Rossley v. Drake Univ.*, 979 F.3d 1184, 1193–94 (8th Cir. 2020), cert. denied, 141 S. Ct. 1692 (2021); *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 930 (S.D. Iowa 2021) ("[a] university's procedural deficiencies in a Title IX investigation and adjudication may also indicate sex bias" and prohibit summary judgment). *See also Doe v. Univ. of Denver*, 1 F.4th

822, 834 (10th Cir. 2021) (reversing district court's grant of summary judgment in favor of school, where disciplinary process was "replete with procedural deficiencies, all of which favored [the female student] and disfavored [the male plaintiff]."); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination"; pressure from students or media coverage concerning sexual assault at the school need not "reach a particular level of severity" in order to make a prima facie discrimination claim).

Courts across the country have further clarified that although pressure from the federal government by way of the 2011 Dear Colleague Letter, *standing alone*, cannot suffice to show gender bias, the 2011 Dear Colleague Letter *can* be considered as a background factor that, combined with other circumstantial indica of bias, does support an inference of gender discrimination precluding summary disposition. *See Does 1-2 v. Regents of the Univ. of Minnesota,* 999 F.3d 571, 578 (8th Cir. 2021).

Further, the District Courts of Iowa have stated that "[d]iffering treatment of similar sexual behavior by men and women may indicate sex bias in Title IX proceedings," precluding summary judgment. *Moe v. Grinnell Coll.*, 556 F. Supp. 3d at 929–930; *see also Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 927 (S.D. Iowa 2019) (denying college's motion for summary judgment where male student plaintiff "presented sufficient evidence from which a reasonable jury could deduce the

determinations of responsibility relied upon by Grinnell to dismiss Doe were based on a biased perspective regarding the behavior of women during sexual encounters."). Similarly, a school's failure to engage with evidence of consent by the female student, or its disregarding of behavior by the female student that is incongruous with archaic sex stereotypes about women being chaste/sexually naïve, is also considered evidence of gender bias precluding summary judgment. *Moe v. Grinnell Coll.*, 556 F. Supp. 3d at 930; Doe v. Grinnell Coll., 473 F. Supp. 3d at 922.

Finally, a defendant school's claim that it merely harbored "anti-respondent" bias, rather than anti-male bias, is insufficient to merit summary disposition because "[s]ex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 579 (8th Cir. 2021) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 54 (2d Cir. 2016)). In *Moe v. Grinnell College*, the District Court for the Southern District of Iowa cited to *Does 1-2 v. Regents of the Univ. of Minnesota* in denying summary judgment, where, although the school's disparate treatment may not have been based on sex, a rational juror could have found that it was, and it was not the court's role to decide which motive was more likely to be true. 556 F. Supp. 3d at 932.[1]

---

[1] Similarly, the Department of Education's Office for Civil Rights ("OCR") declared in September 2017 that "any school that uses a system biased toward finding a student responsible for sexual misconduct … **commits discrimination**." Plaintiff's Supplemental Appendix ("PSA"), at PSA 0163; *see also* PSA 0155 ("Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX"). See also 34 C.F.R. § 106.45(b)(8) (requiring schools to permit student appeals where the decision-maker(s) harbored "bias for or against complainants or respondents generally").

Consistent with case law in this circuit and throughout the country, the record evidence in this matter, addressed point-by-point below, is sufficient to permit a rational factfinder to conclude that Defendant was motivated by Plaintiff's male gender when they investigated and found him responsible for sexual assault and expelled him from the University. Defendant's motion for summary judgment on Plaintiff's Title IX gender bias claim should be denied.

### 1. The Dear Colleague Letter/Pressure on UW to Protect Female Students on Campus from Sexual Assault
#### A. The 2011 Dear Colleague Letter

As stated by the Seventh Circuit, the 2011 DCL "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim." *Doe v. Purdue Univ.*, 928 F.3d at 669. In the years leading up to Plaintiff's disciplinary proceeding, UW was under pressure from the federal government, local media, and its own students to protect female students on campus from sexual assault. On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "2011 DCL"). Exhibit 1, 2011 DCL.[2] The DCL advised recipients that sexual violence constitutes sexual harassment within the

---

[2] Plaintiff requests the Court to take judicial notice of all Department of Education documents and publications cited herein, pursuant to F.R.E.201.  *See Missourians for Fiscal Responsibility v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (taking judicial notice of IRS website); *Levan v. Capital Cities/ABC Inc.*, 190 F.3d 1230, 1235 n.12 (11th Cir. 1999) (taking judicial notice of Federal Reserve Board's website for prime interest rate).

meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." Exhibit 1. The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Exhibit 2, Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010). The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunken hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.  *See* Exhibit 2. The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide— that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." *See* Exhibit 1.

The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Exhibit 3, Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*,

Time Magazine (Dec. 14, 2015). Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low "more likely than not" burden of proof in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard. *See* Exhibit 1. The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy. For example, it stated that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. *See* Exhibit 1. On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").  *See* Exhibit 4, 2014 Q&A.

Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." The 2014 Q&A advised schools to adopt a "trauma-informed" approach[3], advising, for

---

[3] Plaintiff objects to the University's classification of a trauma-informed approach as "sex-neutral," as the surrounding evidence set forth in this brief calls into question the gender-neutral application of this technique by the Title IX Coordinator. In any event, whether Hasselbacher applied a trauma-informed approach in a sex-neutral manner or not is left up to her testimony at trial, the credibility of which is a question for the jury. *See GPM Se. LLC v. Riiser Fuels LLC*, 647 F. Supp. 3d 674, 680 (E.D. Wis. 2022). Further, the evidence set forth in section I.C., *Supra*, demonstrates that the University views females as "victims" and males as "perpetrators." As such,

example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." Exhibit 4, 2014 Q&A at 31, PSA 0073. The Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights . . . a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX *to the complainant*." Exhibit 4, 2014 Q&A at 13 (emphasis added). In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* Exhibit 5, White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014). The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX. *Id.* To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.   To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See* Exhibit 6, *Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

---

Defendant's victim-centered process is, in reality as well as in application, biased against males accused and in favor of female complainants.  *See e.g. Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado,* 255 F. Supp. 3d 1064, 1076 (D. Colo. 2017) ("if enforcement officials are regularly presented with a scenario involving the same two potential classifications—nurse and female, taxi driver and ethnic minority, sexual assault suspect and male—there must come a point when one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally.")

The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . . It's really a surreal situation, I think." *See* Exhibit 7, Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention,"* National Public Radio (Aug. 12, 2014), PSA at 0122–0128. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." *Id.* Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" **for female students specifically**.  *See* Exhibit 8, Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), PSA 0136–0143. For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

22

### B.  The Department of Education Rescinds the 2011 DCL

On September 22, 2017, the OCR rescinded the DCL and the 2014 Q&A and put in place interim guidance for how schools should address sexual misconduct in compliance with federal Title IX regulations (the "2017 Q&A"). *See* Exhibit 9, Dep't of Ed., Q&A on Campus Sexual Misconduct (Sept. 2017). As then-Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  See Exhibit 10, Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017). As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter."  See Exhibit 11, Sarah Asch, Federal Changes to Title IX on Sexual Assault Could Impact Middlebury, The Middlebury Campus (Sept. 20, 2017).

The 2017 Q&A, in a significant departure from the 2011 DCL, emphasized the need for equal rights under Title IX proceedings, mandating that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."  Exhibit 9. The 2017 Q&A directs that colleges "must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  Exhibit 9. In that regard, the "elements in evaluating whether

a school's grievance procedures are prompt and equitable[] includ[e] whether the school (i) provides notice of the school's grievance procedures, . . . ; (ii) applies the grievance procedures to complaints filed . . . ; [and] (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence."   Exhibit 9. With respect to the investigation and decision-making process, the 2017 Q&A requires "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party [to] lead the investigation on behalf of the school." *Id.*

The 2017 Q&A also requires investigators to "synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* (emphasis added). The 2017 Q&A directs that, once a school "decides to open an investigation that may lead to disciplinary action against the responding party, [the] school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview." *Id.* As the 2017 Q&A goes on to explain, "[s]ufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." Id.   In addition, "[e]ach party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. *Id.* (emphasis added). The 2017 Q&A further directs that "the

investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings." Id. (emphasis added) (citing to federal regulations, 34 C.F.R. § 668.46(k)(3)(i)(B)(3)).

On September 23, 2017, *a mere six months* before the University received the Complainants allegations against Plaintiff, UW's then-Chancellor, Rebecca Blank, stated that UW-Madison would not change its policies and procedures in light of the 2017 Q&A. *See* Exhibit 12, *Update from Chancellor Rebecca Blank on Title IX*, University of Wisconsin-Madison, available at https://news.wisc.edu/update-from-chancellor-rebecca-blank-on-title-ix/.

Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students by over-correcting, provides a "backdrop" for gender bias. *Doe v. Baum*, 903 F.3d 575, 585-586-587 (6th Cir. 2018) (external pressure combined with hearing board's credibility determinations in favor of females raised plausible inference of gender bias); *see also Neal v. Colorado State Univ.-Pueblo*, No. 16-CV-873 (RM) (CBS), 2017 WL 633045, at *12 (D. Colo. Feb. 16, 2017) (allegations that university under OCR pressure to enforce "Dear Colleague Letter" in a gender-skewed manner sufficient to plead gender bias); *Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017) (plausible inference of gender bias where *inter alia* university faced pressure to zealously

"prosecute" male respondents after facing lawsuit by female student); *Columbia U.*, 831 F.3d at 58 (gender bias inferred where university was motivated to accept female accusation of sexual assault and reject male's claim of consent to avoid further public criticism that it did not protect female students).

### C. UW's Policies and Publications Embraced Gender Bias, Including Stereotypes of Female Victimhood and Male Assailants, and UW Faced Pressure to Protect Women on Campus.

For years, the University has directly made biased statements embracing gender stereotypes, and painting males as perpetrators of sexual misconduct. On January 15, 2016, UW released its Sexual Assault Climate Survey Task Force Report. *See* Exhibit 13, UW-Madison Sexual Assault Climate Survey Task Force Report (Jan. 15, 2016), available at https://kb.wisconsin.edu/images/group171/63714/602-ReportfromUW-MadisonSexualAssaultClimateSurveyTaskForce.pdf (the "Task Force Report"). The Task Force Report was singed off by Chancellor Blank, and included an introduction message authored by Blank. *Id.* The Task Force Report pushed UW's gender-biased views, highlighting that "more than one in four (27.6 percent) undergraduate *female* students reported experiencing nonconsensual penetration or sexual touching" and that "*perpetrators were overwhelmingly identified as fellow students who are male*, often a friend or acquaintance." *Id.* (emphasis added). The Task Force Report goes on to make the recommendation: "Addressing potential perpetrators must remain a priority. Continue to engage men as allies to prevent gender-based violence." *Id.* Further, in September of 2015, the University implemented ongoing efforts to reduce sexual violence through promoting

the "Don't Be That Guy" campaign, which portrayed men as the perpetrators of sexual violence and women as the victims. *See* Exhibit 14, Don't Be That Guy Campaign, available at https://www.youtube.com/watch?v=e0R2jhxZ6Ls. The Task Force Report shows the University's support for the message conveyed in the Don't Be That Guy campaign, further recommending: "Support evidence-based programming and social norming efforts that foster healthier expressions of masculinity, reduce homophobia and increase empathy for victims of genderbased violence. Continue to implement public awareness efforts such as 'It's On Us' and 'Don't Be That Guy'." *See* Exhibit 13.

In May 2017, UW-Madison drew national attention in People Magazine for its handling of sexual assault cases, when a Washington D.C. attorney spoke out about her experience of reporting a sexual assault to the University and having it dropped due to lack of evidence. *See* Exhibit 15 Natasha Stoynoff, *D.C. Attorney Fights Back on Behalf of Women Everywhere After She Was Sexually Assaulted in College: 'I Fought for Myself'*, People Magazine (May 24, 2017), available at https://people.com/human-interest/laura-dunn-fights-back-after-sexually-assaulted-college/#:~:text=D.C.%20Attorney%20Fights%20Back%20on%20Behalf%20of%20Women%20Everywhere%20After,where%20it's%20someone%20I%20knew.%22. That same year, after drawing massive media attention, UW-Madison hired Lauren Hasselbacher as its Title IX coordinator and investigated the Complainants allegations against Plaintiff in this case. *See* Exhibit 16, Hasselbacher CV. Hasselbacher has extensive experience as an advocate for women who have experienced domestic violence and sexual assault. Prior to her time at UW-Madison,

Defendant Hasselbacher worked as a senior investigator at CU Boulder, where she investigated allegations of sexual misconduct on campus and worked with campus partners, one of which was the Office of Victim Assistance. *Id.* Hasselbacher also worked at Domestic Abuse Intervention Services in Dane County as a legal advocate and worked in a variety of advocacy settings that addressed issues related to sexual assault during law school. *Id.* Hasselbacher's extensive experience as a women's advocate coupled with the evidence set forth herein supports an inference of gender bias. *See Doe v. Syracuse*, 2019 WL 2021026 at **7**-8 (N.D.N.Y. May 8, 2019).

Chancellor Blank, who oversaw the university's Title IX efforts as well as played a role in deciding Plaintiff's appeal, authored an ongoing column called "Blank's Slate" throughout her time at UW-Madison. *See* Exhibit 17, *Blank's Slate*. Blank's Slate included a March 5, 2016 article entitled Moving Forward: Campus diversity and cultural change, which stated "I've heard similar stories from women students who have put up with crude sexual comments just walking down a public sidewalk after dark, often from intoxicated students…When you hear something, say something, even if it isn't directed at you. Let those who are the targets know that others in the community are with them. It should not be up to women alone to stand up to crude comments; men have to join them." *Id.*

Further, when the Director of L&S Academic Deans' Services emailed Hasselbacher and other UW administration regarding Plaintiff's reinstatement, stating "we NEED to be EQUALLY OR MORE concerned about the women involved and the University community…They say boys will be boys, but men will be boys too

unless they face consequences for their actions," it was met with approval and a suggestion from Meredith McGlone, communications manager, that "the suggestion about sharing survivor voices (in some way) with the coach is a good one." Exhibit 18.

Evidence that Defendant was motivated by federal and local pressure to respond more vigorously to reports of sexual assault (and specifically, to protect female students), is indicative of gender bias. *See, e.g., Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d at 578. Additionally, statements from pertinent university demonstrating gender biased views can support an inference of sex discrimination. *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 586 (E.D. Va. Mar. 14, 2018); *see also Doe v. Purdue Univ.,* 928 F.3d at 670.

Plaintiff has demonstrated more than sufficient information to create an inference of gender bias under this standard.

## 2. UW's Disciplinary Process was Replete with Procedural Irregularities, All of Which Disfavored the Male Student

As set forth fully below, evidence in the record reflects procedural irregularities in UW's investigation and adjudication of Plaintiff's case that were so severe, egregious, and one-sided, that standing alone they would be sufficient evidence of gender bias; certainly, when combined with all of the other evidence of gender bias

set forth herein, they preclude summary judgment. *Moe v. Grinnell Coll.*, 556 F. Supp. 3d at 930; *Doe v. Univ. of Denver*, 1 F.4th at 834.

**First**, the University refused to stay the Title IX proceeding as requested by Plaintiff, in spite of having full knowledge that the District Attorney's Office was in possession of evidence relevant to the allegations, which would not become available until after the conclusion of the criminal proceeding. Likewise, University similarly refused to stay the Title IX proceeding as requested by Plaintiff, in spite of having full knowledge that Plaintiff would be unable to meaningfully participate in the Title IX process, including participating in interviews and testifying on his behalf at the Title IX hearing, without waiving his Fifth Amendment right against self-incrimination in the ongoing criminal proceeding.

**Second**, the University refused to reschedule the Title IX proceeding to a day when his advisor of choice would be present. Instead, the University consulted with the Complainants and scheduled a date for the hearing which worked for the Complainants' chosen advisors.

**Third**, at the Title IX hearing, the advisor that Plaintiff did have was unable to directly question the Complainants, as required by University Policy, and instead, the questions were filtered through a Chairperson, who materially altered the questions asked.

**Fourth,** evidence in the record demonstrates that the individuals involved in the investigation and adjudication of Plaintiff's case presumed him guilty from the outset of the investigation.

**Fifth,** the University failed to appoint an investigator to Plaintiff's case that was free from any actual or perceived conflict of interest.

The extensive procedural irregularities in this case raise serious questions about Defendant's conduct and intent, and preclude summary judgment. *Cf. Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020) (noting that procedural irregularities may indicate gender bias, but finding no material procedural deficiencies where the plaintiff received advanced written notice of the charges and his interview; was affirmatively advised of his right to an advisor/support person; received access to the investigative materials prior to the hearing; had a hearing before a separate adjudicator where he could make an opening statement, cross-examine the accuser and witnesses, and make a closing statement; and was permitted an appeal to another adjudicator before whom he could personally appear to argue his appeal); *see also See Univ. of Arkansas-Fayetteville,* 974 F.3d at 864*; American Univ.,* 2020 WL 5593909, at *7-8; *Lee v. Univ. of N. Mexico,* 449 F. Supp. 3d 1071, 1144-45 (D.N.M. 2020); *Grinnell College,* 473 F. Supp. 3d at 927-31; *Doe v. Oberlin College*, 963 F.3d 580, 586-87 (6th Cir. 2020) (citing *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).

## A. UW Rushed to Judgment at The Sole Request of, And in Favor Of, The Female Complainants

The University showed a clear preferential treatment to the female Complainants throughout Plaintiff's Title IX case, making crucial decisions based solely on the Complainants' wishes. Indeed, Plaintiff requested *multiple times* that the University stay its Title IX proceedings until the conclusion of the ongoing

31

criminal prosecution in light of critical, exculpatory evidence that would not become available until after the criminal trial. Exhibit 19. The University's legal counsel even informed Plaintiff's advisors that the University had been in contact with the District Attorney's Office, who explicitly informed the University that there *was evidence that would not be available* until the criminal trial finished. Exhibit 20. Additionally, Plaintiff informed the University that he would not be able to participate in an interview to defend himself until after the conclusion of the criminal trial, so as to not waive his Fifth Amendment right against self-incrimination. Further, Plaintiff *could not* provide any information to the University obtained in the criminal prosecution without severely impacting the outcome of the criminal trial, where he was facing up to 40 years in prison for the crimes alleged. The University was well aware of this implication as it was reiterated to the University by the District Attorney's Office in a July 18, 2018 email which stated that "providing reports to any witness severely harms the criminal case." Exhibit 21. Notwithstanding this knowledge, the University proceeded forward with the Title IX investigation, even though the allegations surrounding the criminal prosecution and the Title IX investigation were the same.

Evidence demonstrates that the University's sole reason for refusing to stay the proceedings until after the criminal proceeding was due to the female Complainants' pressure on the University to reach a conclusion. Indeed, multiple emails demonstrate the Complainants' urgency to have a finding rendered, as well as their dissatisfaction with any delays in the process. For example, on August 10, 2018,

Complainant 1's father sent an email to Hasselbacher stating, "At this juncture I am having a hard time understanding what is holding this up, especially since Cathy assured me again last week that your report would be done this week…And this is not about simple frustration, it is about the health, welfare and safety of our daughter. She will be returning to school soon. The athletic department has already shown that it could care less about victims and anything beyond having a good media day for Chryst and Alvarez, especially since it failed to follow its own policies as I read them. In my opinion, they are no better than Joe Paterno and the culture at Wisconsin is looking like Penn State and Michigan State." Exhibit 22. On August 15, 2018, after receiving a scathing email from Complainant 1's father regarding a media article that featured Plaintiff, Cathleen Trueba emailed back "I understand that seeing such a story is distressing for you and your family. I appreciate and regret the impact that it has had on your family and the other student involved. I know having a resolution to the sexual assault investigation as soon as possible is of primary importance to you." Exhibit 23. On October 9, 2018, Complainant 1's mother emailed Hasselbacher stating "Please confirm that the report has been sent to the Dean for review and that there will be no further delays. Please also give us an idea of when we can expect to receive his decision." Exhibit 24. On October 29, 2018, Complainant 2's attorney emailed "I was just speaking to Jaime Sathasivam and we were very concerned and surprised that we have not received the Final Letter. As I am sure you are aware, this is extremely difficult on the complainant/victim and her family. Please reassure us that receipt of the Final letter will take place in the very near future.

(This week)." Exhibit 25. The *very next day* after the University received this letter from Complainant 2's attorney, the Final Letter finding Plaintiff responsible and recommending expulsion was sent to the parties.

Interestingly, however, evidence demonstrates that the University *would have* been willing to wait where it benefited the Complainants. On May 18, 2018, Hasselbacher emailed Complainant 1's attorney stating "To summarize our conversation, you will be speaking with [Complainant 1] about whether she would like to wait until the MPD report is available to initiate the investigation, or whether she would like to move ahead and meet with me to participate in an interview." Exhibit 26. Notably, the University was not willing to wait for information which Plaintiff indicated was relevant, but was willing to do so when the Complainants indicated that there was relevant information in the MPD report. *See* Exhibit 47 ("All the parties indicated that there was relevant information in the MPD police report including information the university could otherwise not independently receive.").

Likewise, when Complainant 2's advocate inquired as to whether there was a specific timeline by which Complainant 2 needed to submit evidence, Hasselbacher stated "No, there is not a specific deadline." Exhibit 27. Further, after Complainant 1's father told the University that he wanted the University to obtain the police reports for the investigation, not only did the University email the District Attorney's office for the police reports, but Hasselbacher stated in an email on June 21, 2018, "Please note that I cannot guarantee either that the investigation will be completed nor the outcome be determined prior to the start of the Fall Semester. A variety of

factors – including the availability of the police report – may impact the completion date of the investigation. Exhibit 28.

While the University has tried to *claim* that the urgency was to stay within a 45-day time period proscribed by the Policy, this timeframe had already been long exceeded by the time the Title IX hearing took place. Further, the Policy explicitly states that this time frame can be extended at the mutual agreement of the respondent and the investigating officer. Exhibit 29, UWS Chapter 17.12(2).

In other words, the University refused to stay the Title IX proceeding, even in light of the fact that the District Attorney's Office was in possession of relevant evidence, at the request of the female Complainants, and at the expense of Plaintiff, the male respondent. Proceeding forward without all available evidence did not benefit Plaintiff. Proceeding forward without all available evidence benefited the Complainants, as well as the University, to paint a false narrative of responsibility for Plaintiff. While the University devotes pages to harping on the fact that they "offered" Plaintiff opportunities to participate in an interview or speak at the hearing, an opportunity means nothing if it is not a *meaningful* opportunity. Facing up to 40 years in prison in the concurrent criminal prosecution, the University *knew* that Plaintiff had his hands tied and could not speak in the Title IX investigation without jeopardizing his freedom in the long run in the criminal prosecution.

Proving how crucial the evidence was that the University willingly chose to proceed without, Plaintiff was not only acquitted of all charges at his criminal trial after a mere 30-minute jury deliberation, but once Plaintiff was able to provide all

available evidence to the University the expulsion was *overturned* by Chancellor Rebecca Blank, with the reasoning being that "*UW-Madison obtained information following the criminal proceeding that was not provided to the university during the student conduct process*." Exhibit 30. Blank explicitly stated that her decision was "based on the availability of substantial new information that wasn't made available to us during the earlier process." *Id*. The University's claim that there was no additional information available at the conclusion of the criminal process that was not available during the Title IX proceeding is expressly contradicted by Blank's public statement regarding Plaintiff's readmission to the University.

Further, when faced with criticism regarding Plaintiff's readmission, Charles Hoslet, Vice Chancellor for University Relations at UW, stated in an email, "I think you need to reiterate that significant new information was provided to the university after the court case that was not available when the initial decision was made." Exhibit 31. This evidence, as pointed out in Plaintiff's Petition for Reinstatement, included numerous surveillance videos demonstrating that the Complainants were not incapacitated, and instead, fully able to consent, as well as a videotaped deposition that was viewed at the criminal trial. Exhibit 32, Plaintiff's Petition for Reinstatement.

### B. UW Failed to Allow Plaintiff to Have the Advisor of His Choice

UWS 17.12(4)(b) states:

The respondent shall have the right to question adverse witnesses, the right to present information and witnesses, the right to be heard on his or her own behalf, ***and the right to be accompanied by an advisor of the respondent's choice***. The advisor may be a lawyer. In cases

where the recommended disciplinary sanction is identified in s. UWS 17.10 (1) (a) to (h), the advisor may counsel the respondent but may not directly question adverse witnesses, present information or witnesses, or speak on behalf of the respondent except at the discretion of the hearing examiner or committee. ***In cases where the recommended disciplinary sanction is identified in s. UWS 17.10 (1) (i) or (j), or where the respondent has been charged with a crime in connection with the same conduct for which the disciplinary sanction is sought, <u>the advisor may question adverse witnesses, present information and witnesses, and speak on behalf of the respondent.</u>*** In accordance with the educational purposes of the hearing, the respondent is expected to respond on his or her own behalf to questions asked of him or her during the hearing. The complainant shall have all the rights provided to the respondent in this subsection. Exhibit 29. (Emphasis added)

Due to the University's focus on bowing to every wish of the Complainants, the University refused to schedule the Title IX hearing for a date in which the advisor of his choice would be present, and instead accommodated the availability of the Complainants and their chosen advisors.

Further, UWS 17.12(2) states: "The hearing shall be conducted within 45 days of receipt of the request or written report, *unless a different time period is mutually agreed upon by the respondent and investigating officer*, or is ordered or permitted by the hearing examiner or committee." *Id.* (emphasis added).

Significantly, nowhere in the University's policy does it mandate that the Complainants are consulted regarding the rescheduling of a hearing date. Ervin Cox, however, stated that it was the University's "practice" outside of the Policy to consult the Complainants, demonstrating a bias in favor of the female complainants in bending backwards to accommodate their wishes.

37

Ervin Cox originally emailed Plaintiff's advisors on November 9, 1028, and set the hearing dates for January 14 and January 18. Exhibit 33. Plaintiff's advisors then objected to the hearing date, stating that they would be in California for another matter on January 11, 12, 14, and 24. *Id.* Ervin Cox then consulted the Complainants, and unilaterally set the hearing date to January 15, the *day* after Plaintiff's advisors informed Cox they would be in California, and January 18. *Id.* Cox further stated that these dates were set because "The complainants consented to your request to have these hearings being postponed until the New Year, but do not consent to delaying them into the start of the spring semester." *Id.* Plaintiff's advisor then emailed Cox, again objecting to the January 15 hearing date, stating, in pertinent part:

> Initially, please note that we take exception to your characterization, in your December 11, 2018 e-mail, that we *have not identified conflicts* with your having unilaterally set January 15 and January 18 as the dates for the hearings. We immediately advised you that Mr. Miltenberg and I, as Mr. Cephus' lawfully selected advisors for these proceedings, would be in California attending a Privilege and Tenure Hearing on January 11,12, 14 and 24.
>
> Your demand and expectation that one of us could fly across the country and be present and provide effective counsel to Mr. Cephus, after being submersed in another complicated matter is simply ridiculous. I appreciate that you may not be an attorney and litigator, but your expectations are exceptionally unreasonable. At worst, yours is a deliberate effort to put us at a disadvantage, and/or otherwise deprive Mr. Cephus of his choice of counsel.
> …
> In our discussions, you continually mentioned the University's need not to prolong these proceedings. We remind you of the fact that the University is required to provide the Respondent with due process and a fair hearing. The University is well aware of Mr. Cephus' upcoming trial which is set for February 11, 2019 and that he cannot properly defend himself at the Title IX hearing due to his constitutionally protected 5th Amendment right. This matter has been pending for over eight (8) months and the 45-day hearing period has long passed.

The simple question remains, why is the University of Wisconsin at Madison so
interested in trampling on Mr. Cephus' rights while at the same time bowing         to         the         Complainants'         every         whim?

We are confident that upon your review of this correspondence and UWS 17.12 (2) you will agree that the Complainants "consent" or "wishes" play no role in scheduling the hearing.

Mr. Cephus remains committed to taking an active role during his Title IX hearing, and we remain committed to providing Mr. Cephus with an opportunity address the charges. To that end, we look forward to rescheduling these hearing with you for a mutually convenient time to the Respondent and the UW.

Exhibit 34. Despite this objection, Cox refused to reschedule the hearing. In contrast, Cox consulted with the Complainants' chosen advisors every step of the way. For example, Cox emailed Complainant 2's advisor on January 7, 2019, stating "I believe you had told me that [Complainant 2] was not available prior to the 18th due to being out of the country, this the case?" Further, Cox asked in this email, "would there be an objection to combining her hearing on the 18th with the other complainants case and do both on the 18th?" Exhibit 35. The hearing date was only confirmed once Complainant 2's advisor approved.

As a result, Plaintiff, as the male accused, was unable to have the advisor of his choice present at the Title IX hearing, while the female Complainants were. The University's blatant breaches of its policies to benefit only the female complainants are indicative of gender bias. This yet again set Plaintiff at a disadvantage, and allowed the University to paint their own narrative and have Plaintiff found responsible as the male accused.

### C. Plaintiff Was Denied the Opportunity to Question the Complainants

UW's Policy assures that "[i]n cases where the recommended disciplinary sanction is identified in s. UWS 17.10 (1) (i) or (j), or where the respondent has been charged with a crime in connection with the same conduct for which the disciplinary sanction is sought, *the advisor may question adverse witnesses*, present information and witnesses, and speak on behalf of the respondent." Exhibit 29. (emphasis added). A university's denial of the opportunity for cross-examination where credibility is at stake can also be indicative of gender bias. *Doe v. Baum*, 903 F.3d at 585-586.

However, this theoretical opportunity to propose questions for witnesses does not translate into practice as Plaintitff's advisor was not permitted to directly question the Complainants at the hearing, but rather, was forced to funnel her questions through a chairperson. Worse, as demonstrated in the hearing transcript, the chairperson materially altered the questions asked and biased the proceeding in favor of the female Complainants.

For example, at the hearing Plaintiff's advisor asked Complainant 1 whether she had a blood alcohol test done at any point when the nurses came in to give her medication. The chairperson then asked Complainant 1, "Okay. I know your—your recollection of the hospital is--is fuzzy. Do you recall interacting with any nurses or receiving medication or anything to that effect?" Exhibit 36, Hearing Transcript. Not only did this rewording materially alter the substance of the proposed question–which was asking about blood alcohol–it also effectively suggested to Complainant 1 an excuse for not remembering critical details of events.

Significantly, the University failed to acknowledge that this chairperson, Parker Conover, demonstrated significant bias which should have rendered him unfit to adjudicate this matter. Indeed, Conover's own public Facebook posts included the reposting of two satire articles entitled "NFL Announces New Zero-Tolerance Policy on Videotaped Domestic Violence" and "Temple University Receives Anonymous Donation To Build Center For Discrediting Rape Allegations." Exhibit 37, 38. The University's failure to properly appoint unbiased adjudicators was a fatal flaw, because, as noted by the University, the Hearing Committee recommended to uphold Cox's decision recommending expulsion by a two(yea)-to-one(nay) vote (DPFOF ¶208), and therefore, the appointment of properly trained adjudicators may have altered the sanction imposed on Plaintiff from the outset.

The University alleges there was no policy violation because Plaintiff's advisor was still allowed to ask questions at the hearing. However, UW's policy explicitly states that Plaintiff's advisor would be permitted to ask questions of adverse witness. Further, nowhere in the policy does it provide for a middleman through which questions will be filtered. It is inconceivable that the University could claim that this was a proper, let alone "fair," adjudication of the allegations, without a *meaningful* opportunity to be heard given the parallel criminal investigation, and without the opportunity to even cross-examine the Complainants. This was a strategic move by the University to downplay any inconsistencies in the female Complainants' stories and to have Plaintiff found responsible.

### D. UW Presumed Plaintiff Guilty from the Start

UW deprived Plaintiff of a fair process when the University and its officials, including Hasselbacher, investigated the Complainants' allegations under the presumption that Plaintiff was responsible for a policy violation. UW claims in its policies that it does not form any opinion as to a respondent's guilt or innocence until the final verdict is rendered. However, internal communications produced by Defendant call that practice into question. Lauren Hasselbacher, Title IX Coordinator, affirmatively claimed, to the Complainants' professors, before there had been any hearing or decision on the allegations, that the Complainants had "experienced sexual misconduct (which can include sexual harassment, sexual assault, dating violence, or stalking)" and requested reasonable accommodations for the Complainants to that they could "heal in the aftermath of traumatic event(s)." Exhibit 39. This letter from Hasselbacher came attached to an email from Catherine Dougherty in the Dean of Students Office, which also affirmatively claimed that the Complainants had "been a victim of a sensitive crime." Exhibit 40. Further, Hasselbacher demonstrated her presumption of guilt against Plaintiff when Cathy Trueba asked "Is there ever a situation where the T9 investigation might not go forward because there is a reason to believe on the part of the investigator that the allegations were manufactured?" In response, Hasselbacher stated, "I think it would be very rare to have sufficient information prior to an investigation beginning to be able to conclude the allegations did not have merit." Exhibit 41. Worse, even after Plaintiff was acquitted in the criminal trial, this was still insufficient to overcome the University's perpetuated presumption of guilt against a male accused, as Catherine

Dougherty, Dean of Students Office, emailed Complainant 2, stating "I am aware that the verdict came out late on Friday afternoon and I wanted to check in to see how you are doing even though I likely know that answer. I can only imagine how upsetting and frustrating it is for you right now. You are not alone!" Exhibit 42.

UW also failed to ensure fairness in the investigatory process when Ervin Cox, prior to the adjudication hearing in the matter, sought information *outside* of the final investigation report provided by Hasselbacher. For example, on December 3, 2018, Cox emailed Chris Verhaeghe at the University and inquired as to Plaintiff's prior disciplinary record, stating: "Below is the narrative from the old case that I mentioned last week. Was a while ago, back in June of '16. The report indicates he put his hand close to her face and you noticed and confronted him. Do you remember any details of what you saw regarding how he had his hand close to her face?" Exhibit 43. Importantly, the *alleged* incident for which Cox independently sought out information resulted in *no finding of responsibility* and *no sanction whatsoever*. Further, prior conduct, *especially* unfounded allegations, played no role in assessing the Complainants' allegations. Cox's email demonstrates the deliberate motive of UW officials to paint their own narrative according to their presumption of guilt in order to have Plaintiff found responsible.

**E. UW Failed to Appoint a Properly Trained Investigator Who Was Free from Conflict**

43

"It is beyond dispute that an impartial decision maker is a core guarantee of due process, fully applicable to adjudicatory proceedings before administrative agencies" *Alexander M. v. Cleary*, 188 A.D.3d 1471 (N.Y. App. Div. 2020) (quoting *1616 Second Ave. Rest., Inc. v. New York State Liquor Auth.,* 75 N.Y.2d 158, 161, 550 N.E.2d 910 (1990)). "No single standard determines whether an administrative decision maker should disqualify himself from a proceeding for lack of impartiality." *Id.* "Many concepts are embraced under the heading of bias, including advance knowledge of facts, personal interest, animosity, favoritism and prejudgment." *Id.* (official making public statements regarding the matter in advance of the hearing warranted disqualification). The inquiry is not whether there was actual bias, but rather, whether there is an appearance of impropriety. *Syquia v. Bd. of Educ. of Harpursville Cent. Sch. Dist.*, 180 A.D.2d 883, 884, 579 N.Y.S.2d 487, 488, *aff'd,* 80 N.Y.2d 531, 606 N.E.2d 1387 (1992).

The University failed to afford Plaintiff fundamental fairness when it failed to appoint an investigator that was free from conflict or bias. As Title IX Coordinator, Hasselbacher's responsibilities included ensuring that the University responded to complaints in an equitable manner, acting in a neutral and impartial manner as to both complainants and respondents, and treating both parties to a disciplinary matter fairly. Hasselbacher failed in this regard when she investigated the Complainants' allegations against Plaintiff while she maintained a conflict of interest in favor of the female Complainants and against Plaintiff, as the male accused. For example, Hasselbacher's emails revealed a longstanding relationship with an

attorney named John Clune, who emailed Hasselbacher on July 28, 2017, stating that he was "very excited for [Hasselbacher]" in her new position as Title IX Coordinator at UW. Exhibit 44. Interestingly, On August 15, 2018, *after* Hasselbacher had already had contact with Complainant 1 regarding the allegations against Plaintiff, Complainant 1 emailed Hasselbacher stating, "[t]his is to confirm I give you permission to talk to John Clune about my sexual assault matter. He's been added to my team of lawyers." Exhibit 45.

Further, Hasselbacher improperly influenced the corroboration of stories between Complainant 1 and Complainant 2 throughout the investigation. Indeed, on April 30, 2018, nearly one month before the Notice of Investigation was issued to Plaintiff, Hasselbacher emailed Complainant 1's father, asking, "would [Complainant 1] have an interest in coordinating communication with the other *female* student involved in this matter? If both parties agree to some combined communication it may be helpful to better discuss how everyone would like to move forward with a potential investigation." Exhibit 46.

### 3.  The Collective Evidence Supports a Finding of Gender Bias.

Based upon the foregoing, there are substantial material disputes of fact that preclude summary judgment on Plaintiff's Title IX claim that he was wrongfully found responsible sexual assault and unduly sanctioned with a dismissal due to his male gender. A reasonable juror could easily conclude that UW's gender-biased programming, the pressure on the University to protect women on campus from sexual assault, the questionable reliability of UW's findings, and the consistent disparate treatment between Plaintiff and the female Complainants were due to, or

motivated by, Plaintiff's male gender. *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916; *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909; *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571; *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858.

As this Court stated with regard to one of the Complainants' lawsuits against UW after reviewing the record in its entirety, "If anything, a reasonable trier of fact would seem compelled to find that the UW was predisposed to rule against Player 1 permanently, given that he was immediately suspended and then expelled." *Doe v. Bd. of Regents*, 615 F. Supp. 3d 877, 888 (W.D. Wis. 2022).

Defendant's motion for summary judgment should be denied.

### 4. The Deposition and Declaration of Rebecca Blank Must Be Stricken from Defendant's Motion for Summary Judgment

Defendant improperly relies on the testimony of Rebecca Blank taken *during a different proceeding* throughout its Motion for Summary Judgment. While Defendant points to Rule 804 of the Federal Rules of Evidence to admit this testimony, Defendant has entirely, and frivolously, misstated the Federal Rules of Evidence. FRE 804(a)(3) states that "a declarant is considered to be unavailable as a witness if the declarant… cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." Rebecca Blank, now deceased, fits squarely into this category of an unavailable declarant. FRE 804(b) then goes on to state the *exceptions* to the rule against hearsay, stating:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> (1) Former Testimony. Testimony that:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; *and*

(B) is now offered against a party who had — or, in a civil case, whose predecessor in interest had — an opportunity and similar motive to develop it by direct, cross-, or redirect examination. (emphasis added).

Clearly, the admission of Blank's testimony from a separate civil suit is improper. Plaintiff was not a party to the other litigation, and accordingly was not present at Blank's deposition and had no opportunity or similar motive to question Blank. Therefore, Blank's deposition transcript and declaration are hearsay, and must be excluded from Defendant's argument in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety along with such other and further relief as the Court deems just and proper.

**Dated: April 5, 2024**
**New York, New York**

                        **NESENOFF & MILTENBERG, LLP**

                        By: ***<u>/s/ Andrew T. Miltenberg</u>***
                        Andrew Miltenberg, Esq. (pro hac)
                        Stuart Bernstein, Esq.
                        Kristen Mohr, Esq.
                        363 Seventh Avenue, Fifth Floor
                        New York, New York 10001
                        (212) 736-4500
                        amiltenberg@nmllplaw.com
                        sbernstein@nmllplaw.com
                        kmohr@nmllplaw.com