IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUINTEZ CEPHUS,

                              Plaintiff,                    OPINION AND ORDER

    v.                                                        21-cv-126-wmc

REBECCA BLANK, LAUREN HASSELBACHER
and BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

                              Defendants.

---

After an investigation and disciplinary hearing into sexual assault allegations made against plaintiff Quintez Cephus by a fellow student, the University of Wisconsin-Madison expelled him from school. Plaintiff subsequently filed this Title IX action claiming that the University, through its Board of Regents and two of its officials, discriminated against him during the investigation and disciplinary process because he is male. Defendants have filed a motion for summary judgment. (Dkt. #41.) Because plaintiff has failed to submit sufficient evidence from which a jury could find that defendants discriminated against him because of his sex, the motion will be granted.

## UNDISPUTED FACTS

Before recounting the material, undisputed facts here, the court must address a preliminary matter regarding plaintiff's proposed "evidence" at summary judgment. Specifically, plaintiff submitted multiple documents in opposition to defendants' summary judgment motion but failed to comply with the court's basic summary judgment procedures provided to both sides at the outset of this lawsuit. Most fundamentally, many of the

documents cited in plaintiff's briefing on summary judgment were neither offered to dispute defendants' proposed findings of fact nor in support of any additional, proposed findings by plaintiff.  As set forth in its written procedures, the court "will not search the record for evidence," and "[i]f a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts."  (Summary Judgement Proc. § II.D & II.E, attached to Pretrial Conference Ord. (dkt. #16).)  Nor will the court consider facts "contained only in a brief."  (*Id.* §IB.4.)  *See also Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (court entitled to enforce summary judgment procedures and consider only evidence set forth in a proposed finding of fact with proper citation); *Jeffers v. Commissioner*, 992 F.3d 649, 653 (7th Cir. 2021) (the court is not required to "scour the record" to discern whether a genuine dispute of fact exists).  Therefore, the court has considered only evidence that plaintiff properly submitted to dispute defendants' proposed findings of fact.[1]

---

[1] In particular, by affidavit and in briefing at summary judgment, plaintiff provides his own detailed version of events, including both Complainants' active, coherent and voluntary initiative of romantic and sexual interactions, save for consenting to their picture being taken by one of plaintiff's roommates, which according to plaintiff, caused Complainant 1 immediately to get up, begin yelling at the roommate and plaintiff, then showing both how to delete the photo, including from the "recently deleted" folder.  (Dkt. #56 at p. 4-7.)  Unfortunately, even if properly considered, perhaps for understandable strategic reasons, plaintiff and his counsel chose not to share most of this information with the University during the investigation and subsequent hearing until after his criminal trial, even though much of the corroborating evidence, including additional video tapes, text and many of the statements by third-party witnesses to events were already known to the prosecution. Regardless, that strategic decision appears partially responsible for the University's seemingly one-sided version of the facts, along with the prosecution's similar decision not to share information, whether inculpatory or exculpatory, rather than the University's bias, much less bias against plaintiff because of his sex.  In fairness, the court has also ignored the deposition and declaration of the University's former Chancellor Rebecca Blank in a different proceeding despite her untimely death because: (1) all of her involvement happened after the decisions plaintiff is challenging had been made; and (2) both were offered in a separate civil suit

Of equal significance, as defendants point out, much of the evidence plaintiff submitted in opposition to summary judgment was never identified as required during discovery. In particular, under Federal Rule of Civil Procedure 37(c)(1), plaintiff may not rely on evidence that should have been disclosed in response to discovery requests. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (exclusion of evidence not disclosed during discovery is "automatic and mandatory"). Thus, the court has not considered several of plaintiff's exhibits, including media articles relating to other sexual assault investigations, because that evidence should have been and was not disclosed in response to defendants' interrogatories asking him to "identify all facts and/or evidence" to support his allegations regarding media coverage, public and government scrutiny of the University, potential Title IX lawsuits, or student protests relating to sexual assault investigations. (Dkt. #51-50, Dfts.' Interrog. No. 4, 7, 9.) The court has similarly disregarded exhibits that would have been responsive, but were not disclosed, to defendants' discovery requests asking for all facts and evidence supporting plaintiff's "contention that the University treated you differently during the University's disciplinary process against you because of your sex or gender." (*Id.* Interrog. No. 13.) This includes plaintiff's exhibits 2–3, 5–8, 10–15, 17–18, 22–27, and 39–46 attached to the Declaration of Kristen Mohr (dkt. #60), which were neither provided during discovery nor set forth in any proposed finding of fact.

---

in which the plaintiff appears to have had no "opportunity and similar motive to develop" her testimony for the truth of the matters asserted. Fed. R. 804(b)(1)(B).

With these important caveats, the court finds the following facts to be material and undisputed, based on defendants' proposed findings of fact, plaintiff's responses, and the underlying evidentiary record as appropriate, while construing the record in the light most favorable to plaintiff as the nonmoving party. *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014).

### A. Sexual Assault Reports

On April 21, 2018, plaintiff Quintez Cephus, a UW-Madison student and member of the UW football team, had a sexual encounter with two other UW students (Complainant 1 and Complainant 2). Cephus maintained that the encounter was consensual, while Complainants accused Cephus of sexually assaulting them while they were incapacitated by alcohol and unable to provide consent.

On April 23 and 24, 2018, each Complainants' father separately contacted the Dean of Students Office and reported a sexual assault off campus. On April 25, Complainant 1's father further met in person with Lauren Hasselbacher, the Title IX coordinator at UW-Madison, to address his daughter's allegations against Cephus and another student, who was also on the UW football team ("Teammate 2"), as well as the process for initiating a formal investigation.

UW-Madison's Policy on Sexual Harassment and Sexual Violence establishes the procedures used to investigate claims of sexual harassment and sexual assault. Relevant here, the Policy states that when the respondent is a student, UW-Madison uses the investigatory and disciplinary procedures outlined in the Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726). Under those procedures, the Title IX

Coordinator handles the investigation of allegations concerning sexual harassment or sexual assault.  Wis. Admin. Code. UWS § 17.05.  In 2017, Hasselbacher was hired for this role at UW-Madison, having previously worked as an advocate for women experiencing domestic and sexual violence.

At the request of both Complainants, Hasselbacher issued a no-contact order, prohibiting contact between them and Cephus or Teammate 2. Meanwhile, the Madison Police Department opened a criminal investigation into the allegations made against Cephus.  The Department then notified the UW-Madison Athletics Department of the investigation, who suspended Cephus from the football team on April 26, 2018.

For the next couple of weeks, Hasselbacher received no further information from the Complainants or Madison Police Department, so she could not proceed with any investigation. Then, on May 18, 2018, Hasselbacher learned that the Madison Police Department had referred charges on May 17 to the District Attorney's Office, one for each Complainant.  On May 18, Complainant 1's attorney also notified Hasselbacher that she was ready to move forward with the student disciplinary process.  Complainant 1 then submitted a written statement to the University alleging that Cephus had sexually assaulted her.

On behalf of Complainant 2, Jaime Sathasivam, Director of Client Programming at the Rape Crisis Center, notified Hasselbacher that while Complainant 2 did not have any recollection of what occurred that night, she, too, believed she had been sexually assaulted. After sharing Complainant 1's written statement with Complainant 2, Hasselbacher asked if she also wanted to proceed with her own potential claims.  Hasselbacher later emailed a

5

summary and list of charges for Complainant 2's review, asking Sathasivam to confirm with Complainant 2 that the summary and list of charges were accurate or whether they needed any edits or additions.  Given her limited memory, Sathasivam responded that Complainant 2 had reviewed Complainant 1's written statement and was unsure what more she could add, but she would speak with Hasselbacher and answer questions.

On May 29, 2018, Hasselbacher determined that she had enough information to initiate an investigation.  On May 31, Hasselbacher then formally notified Cephus and Teammate 2 that they were being charged and investigated under the University's administrative code for sexually assaulting and harassing Complainants.  Specifically, Cephus was informed that he was being investigated for engaging in sexual activity with two women, while they were incapacitated by alcohol and without their consent, and for taking photographs of the two, undressed women without their permission.  An "Amended Notice of Charge" against Cephus further stated that he was being investigated for possible violations of the University of Wisconsin Administrative Code (UWS Chapter 17), specifically including:  second degree sexual assault; third degree sexual assault; violation of criminal law; and sexual harassment of both Complainant 1 and 2.  Hasselbacher also notified Cephus of her hope "to schedule a meeting with you to discuss the information referenced above and to give you an opportunity to respond to the allegations[,]" and of his right to "provide a written statement about or response to the alleged misconduct, or additional materials you deem relevant for the Office of Compliance to consider during its investigation."  (Dkt. #47-8.)

**B. Hasselbacher's Investigation**

Between May 30 and October 9, 2018, Hasselbacher proceeded to investigate the allegations against Cephus, including conducting interviews with several witnesses, one of whom chose to provide a written statement instead.  Hasselbacher also collected the following evidence:  surveillance footage from Cephus's apartment of Cephus, Teammate 2, and the Complainants leaving the apartment building on the morning of the incident; surveillance footage from the Complainants' residence halls; text messages between the Complainants; text messages between Complainant 2 and Cephus; text messages between Complainant 1 and witnesses; an Instagram photograph and message from Cephus to Complainant 2; photographs of Complainant 2 and Cephus; snapchat messages from Complainant 1; Complainant 2's Uber receipt; notes from a review of the UW-Madison Police Department report; the criminal complaint filed in Dane County Circuit Court; and records from Complainant 1's so-called SANE report prepared by a Sexual Assault Nurse Examiner.

During this time, Hasselbacher was aware of but unable to obtain the following, additional documentation:  the Madison Police Department reports; surveillance footage of the parties arriving at Cephus's apartment building; surveillance footage from a bar where Cephus and the Complainants were before the incident; additional surveillance footage from city cameras; and records from Complainant 2's SANE report also prepared by a Sexual Assault Nurse Examiner.[2]  Hasselbacher also tried to contact another woman who had been present at Cephus's apartment during the alleged assault (identified as P1),

_____

[2] Complainant 2 refused to provide Hasselbacher with any records from her SANE report.

but she refused to participate in the process. Hasselbacher was similarly unable to obtain a statement from Cephus or Teammate 2, although she did invite Cephus "to participate" in the investigation.

As to the latter in particular, after notifying Cephus of the charges against him, Hasselbacher requested on May 31, 2018, that he contact her to schedule a meeting, during which he could respond to the allegations against him. Moreover, Cephus's attorney, Stephen Meyer, emailed Hasselbacher that same day to schedule the requested meeting. (Dkt. #47-3, at 1.) While Hasselbacher promptly responded that she would be willing to meet with both Cephus and his counsel to discuss the investigation process, such a meeting could wait until her investigation had progressed further, when she would likely have more questions for Cephus.

On June 4, 2018, Hasselbacher emailed Attorney Meyer and Cephus again, asking if they would like to meet and discuss the investigative process. Hasselbacher further advised that if they did not want to meet at that time, she could schedule a later meeting to discuss the allegations with Cephus. Cephus's attorney wrote back two days later, on June 6, stating that law enforcement had obtained critical and exculpatory evidence refuting the allegations of both Complainants, including toxicology reports, security camera footage, a forensic examination of Cephus's phone, and the results of a search of Cephus's apartment. (Dkt. #47-3, at 3.) On June 19, Hasselbacher responded that she had requested the relevant police report, which she should be able to obtain once cleared for release. Hasselbacher further advised that Cephus could provide information at any time, including evidence and witness names, and could participate in an interview. She

also stated that it was her "intention to alert you when I am nearing the conclusion of the investigation and provide an opportunity to meet with me at that time." (*Id.* at 5.)

Cephus's attorney responded to Hasselbacher's June 19 email with two more letters on June 21.  First, he attached a copy of his letter to the Assistant District Attorney's office, asking that specific evidence be preserved, including video footage and text messages.  (*Id.* at 7–9.)  Second, he attached a letter to Hasselbacher, again explaining that the police had more evidence than solely the police report that Hasselbacher had not obtained.  Cephus's attorney also expressed concern about the level of coordination between the Complainants about the details of the incident, particularly because they were by then represented by the same attorney.  (*Id.* at 10–11.)  On June 28, 2018, Cephus's attorney sent Hasselbacher yet another letter that included a screenshot of a text message exchange between Cephus and Complainant 2, which was sent around 3:00 a.m. on April 22, after the alleged assault, and to which Complainant 2 included a heart and kiss emoji to Cephus.  (*Id.* at 14.)  Finally, around this same time, a private investigator working with Cephus's legal team provided Hasselbacher with written summaries of interviews with two additional witnesses.

On July 26, 2018, Hasselbacher again emailed Attorney Meyer and his client Cephus, notifying them that her office still did not have access to the Madison Police Department report, but she was going to proceed with the investigation anyway.  Thus, she asked:  if Cephus "would like to provide any additional information via an interview, written statement (or answers to questions via email) or other evidence that may be relevant (text messages, photos, etc.)" and "If there are any specific witnesses you would like me to contact, please let me know that as well."  (Dkt. #44-6, at 24.)  On August 1,

2018, Cephus's attorney met with Hasselbacher and presented a PowerPoint presentation of surveillance footage of the parties leaving Cephus's apartment after the incident. That same day, Cephus's suspension from the UW-Madison football team was lifted.[3]

A week later, on August 8, 2018, Hasselbacher and another Title IX investigator, Jennifer Horace, met with Attorney Meyer and Cephus to discuss accommodations for an interview. During this meeting, they tentatively scheduled an interview with Cephus for August 23, 2018, but the attorneys who would represent Cephus on any criminal charges later advised that they, too, wanted to attend any interview and asked that it be rescheduled to a different date due to a scheduling conflict. Hasselbacher granted this request as well, moving Cephus's interview to Monday, August 27, while notifying Cephus and his counsel that if there was any other information that Cephus would like her to consider as part of the UW-Madison investigation, they should provide it by August 20, 2018.

Before Cephus's interview actually took place, however, the Dane County District Attorney's Office notified Cephus that it would be filing formal criminal charges against him. At that point, Cephus issued a public statement that he was being forced to take a leave of absence from the football team while criminal charges were being pursued. The Athletics Department then suspended Cephus from the football team. The district attorney's office further notified Hasselbacher that it would not be releasing any evidence

---

[3] The Athletics Department has a separate Student-Athlete Discipline Policy that applies to student athletes. Hasselbacher did not participate in the decision-making related to Cephus's suspension from the football team, nor did Hasselbacher participate in the decision-making related to lifting the suspension.

beyond the criminal complaint until after the trial was completed. On August 22, Hasselbacher emailed Cephus's legal team, asking whether he still planned to participate in an interview, stating that he remained welcome to do so. She also provided information about confidential support and mental health services available on campus for Cephus. (Dkt. #47-3, at 20.)

On August 23, 2018, Cephus's criminal defense counsel sent a letter to Hasselbacher, asking that she delay issuing the investigative report now that Cephus had been charged criminally.[4] The attorney stated that "significant, critical evidence will now become available in the next two (2) months," and further stated that if the University proceeded, "it would be infringing upon Mr. Cephus's Fifth Amendment rights" in the criminal proceedings. (Dkt. #47-14.) The next day, Hasselbacher responded that she would "respond to your letter in full next week," but asked in the meantime whether Cephus intended to participate in the interview still scheduled for August 27. (Dkt. #47-14, at 4.) Cephus's counsel emailed back stating for the reasons set forth in the August 23 letter that Cephus would not attend the interview then scheduled for August 27. (*Id.* at 3.)

On August 30, 2018, Vice Chancellor for Legal Affairs, Raymond Taffora, responded to Cephus's attorneys, characterizing Cephus as "refusing to participate in the University's Title IX investigation while the criminal process is ongoing." (Dkt. #47-24.)

---

[4] Plaintiff also asserts that the Complainants' parents and counsel contacted Hasselbacher urging her to complete her investigation more quickly, but plaintiff failed to identify the relevant emails during discovery, and failed to submit them in opposition to summary judgment as required by this court's procedures. Regardless, those emails are ultimately immaterial because there is no evidence that Hasselbacher rushed her investigation at the urging of the Complainants.

Similarly, Taffora acknowledged the District Attorney's refusal to provide relevant evidence to the University until after the resolution of the criminal proceedings. At the same time, Taffora wrote that the administrative investigation under UWS Chapter 17 was "expected to move more swiftly than criminal proceedings," so the University would make its decision based on the information available at that time. In particular, Taffora explained that "promptness" is required by the U.S. Department of Education's "2017 Q&A on Campus Sexual Misconduct," and that the Department of Education's "2001 Revised Sexual Harassment Guidance" specifies that the University's Title IX obligation to investigate sexual harassment and sexual assault promptly is independent of any law enforcement proceedings. (*Id.* at 4.)

On August 31, 2018, the day after Taffora's letter, Hasselbacher issued a draft of her "Initial Investigative Report" to the attorneys for the Complainants, Cephus and Teammate 2, to which she asked that any information or comments be provided by September 10. In addition to the Complainants' statements, the draft report included statements from six witnesses, none of which Cephus had seen or responded to. Although Cephus requested an extension of time to respond until September 17, Hasselbacher granted an extension only until September 14. On September 10, Complainant 2's attorney emailed Hasselbacher, advising that she had no changes to the Initial Investigative Report. She also challenged Cephus's and Teammate 2's right to respond to the report, given their asserted lack of participation in the investigation up to that point. (Dkt. #48-19.) Complainant 1's attorney, Lester Pines, also sent Hasselbacher a letter objecting to

the inclusion of Cephus's and Teammate 2's statements in the investigative report based on their lack of participation in the investigation. (Dkt. #48-22.)

On September 11, Teammate 2's attorney provided additional information and a letter in response to the draft report. The attorney also requested the identification of the witnesses discussed in the report and objected that Hasselbacher had failed to mention the video footage showing both Complainants walking out of Cephus's apartment after the alleged assault without any indication of impairment. (Dkt. #48-20.) On September 13, Cephus also submitted a response to the Initial Investigative Report with a letter objecting to the University's decision to proceed with the investigation despite the pending criminal case. (Dkt. #48-21.) In particular, he pointed to his willingness to participate in the investigation as evidenced by his attending the informational meeting with Hasselbacher and scheduling a subsequent interview, but argued that the criminal charges affected his ability to speak freely. Cephus also argued that Hasselbacher's report should include footage from his apartment building, as well as the results of Complainants' toxicology reports. Finally, Cephus attached his motion to dismiss in the criminal matter, an attorney affidavit, and an exhibit, which he similarly requested be incorporated into the report.

On September 21, Senior University Legal Counsel Rachel Jeris sent a letter to Cephus's attorneys addressing his September 13 submission. (Dkt. #47-25.) Specifically, Jeris explained to the attorneys that Cephus's denial of the allegations and assertion that his sexual encounter with Complainants was consensual would be included in Hasselbacher's final investigative report, but that his decision to remain largely silent during the investigation was a voluntary choice, having been given opportunities to provide

13

a verbal or written statement and any other information. Jeris further noted that UW-Madison had an independent legal obligation to move forward with its Title IX investigation and student non-academic misconduct process even though concurrent law enforcement proceedings were occurring. Thus, she advised that UW-Madison would make a determination about the pending charges based upon the information Hasselbacher had been able to gather during her investigation.

That same day, September 21, Hasselbacher sent a copy of an "Amended Initial Investigative Report" by email to both Complainants, as well as Cephus and Teammate 2. (Dkt. #47-26.) On September 26, Teammate 2's attorney provided his additional factual statement. (Dkt. #47-28.) In addition, Complainant 1 submitted a redacted copy of her forensic nurse examination. On October 2, Hasselbacher next emailed the parties a "Second Amended Initial Investigative Report," giving the parties until 9:00 a.m. on Monday, October 8, to submit clarifications, additions, or any other thoughts they wished to share. (Dkt. #47-26.)

On October 7, Cephus submitted another written statement to Hasselbacher, incorporating his original September 13 response to the draft Initial Investigative Report and asking again that the investigation be held in abeyance. Counsel for Complainants also continued to object to Cephus's and Teammate 2's participation in the investigation process at all, as well as their presence on campus. Ultimately, on October 9, 2018, Hasselbacher issued what she characterized as her "Final Investigative Report" to the Office of Student Conduct and Community Standards, which attached the Dane County criminal complaint. Despite Cephus's requests, however, Hasselbacher declined to attach his

14

motion to dismiss that complaint or accompanying documents filed by Cephus in the criminal proceeding.

## C. Office of Student Conduct and Community Standards' Findings and Scheduling of the Misconduct Hearing

Assistant Dean of Students/Director for Division of Student Life Ervin ("Kipp") Cox was named as the investigating officer for decision making purposes in the misconduct investigation against Cephus.  On October 30, 2018, Cox issued a decision, finding it "more likely than not" that Cephus was responsible for third, but not second, degree sexually assault and harassment of Complainant 1.  (Dkt. #44-2, at 30–43.)  Cox further found Cephus "more likely than not" responsible for second- and third-degree sexual assault, as well as sexual harassment, of Complainant 2.  In his report, Cox noted that Cephus had provided no alternative version of events during the UW's Title IX investigation, other than a general assertion that the sexual encounter was consensual, from which he purported not to draw any adverse inference.  Nevertheless, Cox proposed that Cephus be expelled.[5]

Because Cephus was entitled to a hearing on his findings and recommendations, Cox emailed Cephus's attorneys on October 31, 2018, to ask about for their availability on five, proposed hearing dates: November 27, November 30, December 4, December 5, and December 10.  Cox stated that the hearing date should be scheduled and held within 15 to 45 days of his October 30 findings, but that those deadlines could be extended by

---

[5] Cox also found Teammate 2 more likely than not responsible for the allegations related to Complainant 1, but not to Complainant 2.

agreement of all parties. Cephus's attorneys requested that the hearing be delayed until the beginning of the UW-Madison's spring semester, on a date when his chosen advisor could be available, while Complainant 1 and Complainant 2 requested that the hearing *not* be delayed so long. On November 14, therefore, Cox proposed several dates during the weeks of January 14 and January 21, 2019, specifically suggesting January 15.

By November 26, Cephus's attorneys had failed to identify any preferred date, so Cox emailed them again to confirm Cephus's and their availability on January 14, 15, 16, and 18. After Cephus's attorneys again failed to respond, Cox notified the parties on December 5 that the hearing had been scheduled for January 14 and 18, 2019, respectively, since at that time it was the intention to hold separate hearings relating to each Complainant. Cox further arranged a committee for the hearings, noting that they would occur the week before spring term classes began, so none of the students involved would have to miss any class time.

In response to Cox's December 5 email, two of Cephus's attorneys responded that they had conflicts on January 11, 12, 14 and 24 because they would be in California attending a hearing in another matter. Cox responded that the hearing for Complainant 1 could be moved to January 15 or possibly to January 16 to accommodate their conflict. On December 11, Cox emailed Cephus's counsel again, stating that the hearings had been rescheduled for January 15 and January 18. Cox also provided additional information regarding the hearing process.

On December 21, 2018, Cephus's attorneys once more asked that the January 15 and 18 hearing dates be adjourned and rescheduled at a mutually convenient time for

Cephus's attorneys and the University sometime after Cephus's pending criminal matter was concluded. Cephus's counsel also objected to the January dates as unworkable given counsel's involvement in a complex matter in California and argued that Cephus would be deprived of his chosen adviser if the hearings were not rescheduled. Nevertheless, on December 27, 2018, counsel for the University denied Cephus's request to postpone the hearings. Jeris also advised that Cephus was entitled to be accompanied by one advisor at the hearings, and that the chosen advisor must make themselves reasonably available and respond to attempts to schedule hearings.

On January 4, 2019, Cephus's attorneys sent Cox another letter objecting to the use of two, separate hearing committees, particularly in light of Hasselbacher conducting only a single investigation and issuing a single investigative report. (Dkt. #50-6.) He also objected to the chosen hearing dates on the grounds that: the criminal matter was ongoing; Cephus could not participate fully without potentially incriminating himself; his chosen advisors would be unavailable to attend; the committee still had not been provided with his motion to dismiss the criminal matter, despite being provided with the criminal complaint against him; and the University's choice not to provide his motion to dismiss displayed favoritism toward the Complainants. Finally, he objected to the lack of any African American individuals on the hearing committee; accused the University of showing favoritism toward the Complainants; and asked for accommodations under the ADA to include *two* advisors of his choosing during the hearings and the ability to take breaks. In response, the University agreed to consolidate the Complainants' allegations into a single hearing, and Cox provided the committee with Cephus's January 4, 2019, written

submission, as well as his motion to dismiss his criminal case and an affidavit from Cephus's attorney.

### D. Misconduct Hearing, Appeals and Cephus's Expulsion

A formal misconduct hearing was held by the University's appointed committee on January 15, 2019.[6]  Cephus was represented by one of his criminal defense attorneys, Attorney Kathy Stilling, despite her lack of familiarity with Title IX proceedings.  He was not permitted to have a "religious support person" at the hearing, despite being told earlier by Hasselbacher that he would be permitted to do so because of his learning disabilities.

Both Complainants testified at the hearing by video and their attorneys offered argument.  Hasselbacher also testified as a witness, while neither Cephus nor Teammate 2 testified.  Further, Cephus's attorney was not allowed to cross-examine Complainants; rather, she was allowed to provide a list of questions in writing to the committee's chairperson before the hearing, which he then used to question the Complainants.[7]  Finally,

---

[6] Plaintiff alleges that the hearing's chairperson, Parker Conover, was significantly biased against him based on Facebook posts from 2014 sharing links to two articles from *The Onion*.  (Plt.'s Br. (dkt. #56) 45.)   However, plaintiff's assertions are not supported by admissible evidence. Moreover, Conover's Facebook posts have no connection to plaintiff's case, nor are they sufficient to create a disputed issue of fact regarding any alleged bias.  *See Johnson v. Marian Univ.*, 829 F. App'x 731, 733 (7th Cir. 2020) (affirming summary judgment in favor of university in Title IX case where decisionmaker's "unrelated social media musings" -- including an endorsement of "Dr. Christine Blasey Ford as a hero for accusing now-Justice Kavanaugh of sexual misconduct" and a defense of a woman who complained of having to be selective about reporting harassment -- had no connection to plaintiff's case, did not "call into question" the university decisionmaker's ability to review the allegations objectively and did not create an inference of gender bias).

[7] Plaintiff asserts that the University "materially changed the questions" to favor Complainants, but submitted no admissible evidence in support this assertion either.  (Dkt. #1, ¶ 282.)  Plaintiff also refused to respond to defendants' interrogatory specifically asking *which* questions were changed based on facially specious assertions of lack of personal knowledge and assertions of

during the hearing, Dean Cox referred repeatedly to the criminal complaint, to which Cephus's counsel objected that the evidence being presented was incomplete.

Following the hearing, on January 29, 2019, the committee found Cephus responsible for third-degree sexual assault and sexual harassment of both Complainants, though not responsible for second degree sexual assault of Complainant 2. As a result, Cephus was expelled from the University. The next day, January 30, one of Cephus's counsel, Attorney Bernstein, emailed to chancellor@wisc.edu a letter regarding the Title IX investigation of Cephus. (That letter was also sent via first class mail to the Chancellor.) In the letter, Attorney Bernstein stated that there had been a leak of the committee's findings to the district attorney's office already, and any decision on appeal should be delayed until the end of Cephus's criminal trial, so as to not affect the trial generally or jury in particular. Bernstein further noted that Cephus's criminal trial was scheduled to commence on February 11, 2019 -- the day before his scheduled appeal of the hearing committee's decision -- and stated, "In our view, every decision made to date regarding [Cephus's] Title IX investigation has been decided adversely against him based solely on the concerns and wishes of the Complainants." (Dkt. #42-1, at 1–4.)

Associate Vice Chancellor for Legal Affairs Nancy Lynch responded to Bernstein's letter on February 1, 2019, informed him that Chancellor appeals are processed according to Wisconsin Administrative Code § UWS 17.13, which requires the Chancellor to issue a decision within 30 days of receiving an appeal. (*Id.* at 6.) In a follow up letter on February

---

attorney-client privilege and the work-product doctrine. (Bachhuber Decl. (dkt. #51-50 and dkt. #51-51) Ex. 597 and Ex. 598 at Interrog. No. 14.)

4, Bernstein wrote to Lynch to confirm that Chancellor Blank was denying Cephus's request that an appellate decision will be held in abeyance until the conclusion of Cephus's criminal trial.  Bernstein then asked whether Chancellor Blank would at least agree not to release any decision until the 30th day following the filing of Cephus's appeal.  (*Id.* at 10.)

On February 12, 2019, Cephus submitted his appeal to the Office of the Chancellor. In his appeal, Cephus argued the process was unfair, arbitrary, and subject to bias such that he was unable to present an adequate defense to the allegations against him without prejudicing his concurrent criminal case.  In response to an email confirming receipt of the appeal, Cephus's counsel Attorney Miltenberg also asserted as follows:  "the lack of judgment on the part of UW is absolutely stunning.  UW has made so many significant missteps that it is truly mystifying.  Keep this email handy, I will remind you of it in the near future."  (Dkt. #42-2, at 1.)

Chancellor Blank's review of Cephus's appeal is governed by § UWS 17.13, which expressly required her to sustain the committee's decision unless she found that: (1) the information in the record did not support the findings or decision; (2) appropriate procedures were not followed which resulted in material prejudice to the respondent or complainant; *or* (3) the decision was based on factors proscribed by state or federal law. Wis. Admin. Code § UWS 17.13(3)(c).  On March 13, 2019, Chancellor Blank issued her decision affirming the committee's decision, including Cephus's recommended expulsion. (Dkt. #42-2, at 8–23.)  The Chancellor's decision was the final institutional decision in the matter, so Cephus's expulsion from the University became effective as of that date.

The same day, Cephus filed a formal request for appeal of the Chancellor's decision to the Wisconsin Board of Regents, arguing that the Board should accept his request for review because UW-Madison's disciplinary process violated his due process rights by depriving him of a meaningful opportunity to be heard and forcing him to choose between abdicating his Fifth Amendment rights to a fair criminal trial or prejudicing his nonacademic misconduct case. UW-Madison and the Complainants responded by asking the Board to deny Cephus's request for review. On June 7, 2019, the Board issued its decision denying Cephus's request.

### E. Cephus's Criminal Acquittal and Reinstatement As a Student

Meanwhile, the criminal proceedings against Cephus were rescheduled for the summer, and a week-long jury trial commenced on July 29, 2019. In his defense case, Cephus testified and presented exculpatory evidence, including photographs, video footage, text messages, toxicology reports, and expert testimony. On August 2, the jury deliberated for just 35 minutes before finding the government had not proven Cephus guilty beyond a reasonable doubt as to any of the charges.

A few days after his acquittal, August 6, 2019, Cephus's attorneys sent Chancellor Blank a petition for restoration of rights. The written petition was 242 pages, including exhibits. The petition also included a "jump drive," which contained approximately 70 video clips, including all of the video played during the criminal trial. The Chancellor's review of the petition was also governed by § UWS 17.18, which allows an expelled or suspended student to submit a written petition for readmission. However, that section does not specify how the Chancellor is to decide a petition for restoration of rights, and

21

unlike an appeal, the Chancellor's decision is not limited to the record of the disciplinary proceeding. In matters dealing with "sexual harassment, sexual assault, dating violence, domestic violence, and stalking cases" in particular, § UWS 17.18 states that "the readmission decision should be made in consultation with the Title IX Coordinator, and the complainant should be notified of any change to the disciplinary outcome."

The Chancellor intended to make her decision quickly because Cephus was asking for readmission to the University for the fall semester, football practice had already begun, and school was going to start soon. As a result, then UW-Madison Chancellor Blank spent a substantial amount of time during a vacation considering Cephus's petition. She also had many daily phone calls with University legal and other staff about the petition.

On August 19, 2019, the Chancellor issued a written decision granting Cephus's petition and readmitting him to the University. By way of explanation, Chancellor Blank noted that additional information from the criminal trial that Cephus submitted in connection with his petition, as well as the Madison Police Department (MPD) reports, had been unavailable to the University at the time of its initial investigation report, findings by the committee, and administrative appeals. Chancellor Blank further found that the newly supplied information -- in particular the Madison Police Department reports and certain video clips presented at the criminal trial -- called into question the committee's third-degree sexual assault finding. For the first time, she also noted that the University had access to statements of all major witnesses to the incident, including Teammate 2, another witness (P1), and Cephus himself, while Complainants 1 and 2 had provided different *and* less information to the University during the Title IX investigation than they

provided to the police after reporting the alleged assaults.  Accordingly, Chancellor Blank concluded a preponderance of the evidence no longer supported a finding that Cephus had committed third-degree sexual assault.  Still, she concluded that a preponderance of the evidence *did* show that Cephus had sexually harassed Complainant 2 by enlisting Teammate 2 to photograph Complainants without their consent.  Finally, she concluded that Cephus's suspension from March 13 to August 19, 2019, was an appropriate punishment for his sexual harassment violation, as the impact of that suspension alone was the loss of an entire semester worth of credits.  As a result, Cephus was readmitted to the University and reinstated to the UW football team in time for its fall season.

Following the 2019–2020 football season, Cephus entered the National Football League draft process, during which NFL scouts expressed skepticism about him due to the allegations of sexual assault, related media coverage, and his having missed an entire football season.  Ultimately, Cephus was not selected until the 5th round of the draft, which he alleges caused his salary to be drastically lower than what it would have been had he been exonerated of the UW's sexual assault findings sooner.  Finally, both Complainant 2 and Cephus sued the Chancellor and the Board of Regents.  *Doe v. Bd. of Regents*, 615 F. Supp. 3d 877 (W.D. Wis. 2022); *Cephus v. Blank,* No. 21-CV-126-WMC, 2022 WL 17668793 (W.D. Wis. Dec. 14, 2022).  This court granted summary judgment to defendants in Complainant 2's lawsuit, although that decision was initially reversed by a Seventh Circuit panel and is now undergoing *en banc* review by all active judges on the Seventh Circuit.  *Arana v. Bd. of Regents of Univ. of Wisconsin Sys.*, 142 F.4th 992 (7th Cir.

2025), *reh'g en banc granted, opinion vacated,* No. 22-2454, 2025 WL 2726022 (7th Cir. Sept. 22, 2025).

## OPINION

Plaintiff contends that the University violated his rights under Title IX by discriminating against him based on gender. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because there is no dispute that the University receives federal funding and that it excluded or denied plaintiff educational benefits by expelling him, the sole question for the court at summary judgment is whether a reasonable juror could conclude that the University discriminated against plaintiff on the basis of his sex when it investigated the sexual assault allegations against him, found him responsible, and expelled him.

"A plaintiff bringing a Title IX claim can show discrimination on the basis of sex in many ways." *Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 962 (7th Cir. 2024). Although the factors assessed are case dependent, the "ultimate inquiry must consider the totality of the circumstances." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022); *see also Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924 (7th Cir. 2020). To survive defendants' motion for summary judgment, plaintiff must set forth sufficient evidence to allow a reasonable jury to conclude that the University disciplined him because of his sex. In his summary judgment response, plaintiff points to several instances supporting a finding the university discriminated against him based on sex.

24

First, he argues that a reasonable jury could find that the presence of public pressure and inappropriate federal guidance on "Title IX and Sexual Violence" in 2011 and 2014 caused universities, including UW-Madison, to adopt policies making it easier for victims of sexual assault to make and prove their claims, particularly under threat of rescission of federal funding.  Second, plaintiff argues several details regarding the manner of investigation and disciplinary process further support a reasonable jury finding sex discrimination.  The court addresses each of plaintiff's arguments in turn below.

## I.  Evidence of Public Pressure and Reliance on Education Department Guidance

To begin, plaintiff maintains that external pressure from the federal government—embodied in policy documents such as the United States Department of Education Office of Civil Right's 2011 "Dear Colleague Letter" and its 2014 "Questions and Answers on Title IX and Sexual Violence" (the "2014 Q&A")[8]—caused the University to take an overzealous approach in investigating and punishing sexual misconduct by students and implement policies that specifically discriminated against men.  Certainly, those documents encouraged a more rigorous approach to campus sexual misconduct claims by, among other things, defining "sexual harassment" broadly and instructing schools to: prioritize the speedy investigation and resolution of harassment claims; minimize the questioning and cross-examination of complainants to avoid re-traumatization; and adopt a lenient "more likely than not" burden of proof, rather than a "clear and convincing"

---

[8]  The Department's "Dear Colleague Letter" is available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf and the 2014 Q&A can be found at Questions and Answers on Title IX and Sexual Violence.

standard in adjudicating sexual misconduct claims.  The U.S. Department of Education further stated that a school's federal funding was at risk if it could not show vigorous investigation of and punishment for sexual misconduct.  Moreover, many courts, including the Seventh Circuit, "have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim."  *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019); *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 855 (7th Cir. 2019).

However, evidence of "[p]ublic pressure is not enough *on its own* to support a claim of discrimination."  *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 792 (7th Cir. 2022) (emphasis added); *see also Columbia Coll.*, 933 F.3d at 855 (a plaintiff must combine general allegations about public pressure "with facts particular to his case").  While "[t]he letter and accompanying pressure gives [the plaintiff] a story about why [the University] might have been motivated to discriminate against males accused of sexual assault," specific facts are required to support an inference that a university's disciplinary decision was in fact motived at least partly by the plaintiff's sex.  *Purdue Univ.*, 928 F.3d at 669; *see also Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020) ("[A] plaintiff cannot rely on such generalized information alone; he must combine it with facts creating an inference that, in his specific case, the institution treated him differently because of his sex.").

This would appear particularly true here, given that the 2011 and 2014 guidance documents had already been formally rescinded before any investigation or proceedings involving plaintiff were even initiated.  Specifically, the Department of Education revoked the Dear Colleague letter in 2017, acknowledging that it had placed improper pressure on universities to adopt procedures that did not afford fairness for accused students.  The

Department further replaced them with guidance emphasizing that "[a]ny rights or opportunities that a school makes available to one party... should be made available to the other party on equal terms[.]" (DOE's 2017 Q&A (dkt. #60-9).) Even at the pleading stage, the Seventh Circuit has explained in another Title IX case that allegations about the 2011 and 2014 guidance since "rescinded and replaced do not assist [plaintiff] in crossing 'the line between possibility and plausibility of entitlement to relief,'" especially where the plaintiff does not allege that "university officials involved in his due process were accountable in any way to the previous guidance." *Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 963 (7th Cir. 2024).

In fairness, plaintiff does argue generally that UW-Madison retained policies adopted during the so-called "Dear Colleague" era, even after that guidance was revoked, but he cites no actual evidence supporting this assertion. To the contrary, plaintiff points solely to a 2017 statement from Chancellor Blank that: UW-Madison's procedures already "incorporate[d] the due process elements discussed in [the new] guidance from the Department of Education," that the University would "work to ensure that our process is prompt, fair, and impartial," and that "[b]oth parties have equal participation rights throughout any investigation and disciplinary procedures." (Dkt. #60-12.) More importantly, plaintiff cites *no* specific example in which the University's handling of his case deviated from the revised 2017 Q&A, nor in which the University's Title IX procedures *before or after* the updated guidance could be deemed evidence of sex discrimination by a reasonable jury.

27

More broadly, plaintiff argues that evidence of University campaigns, publications and other activities support finding a "general campus climate of gender bias."  As addressed above, plaintiff failed to disclose most of this evidence during discovery, but even if the court considered all of it, plaintiff again fails to offer admissible evidence from which a jury could reasonably infer that the campus climate materially affected his specific disciplinary proceedings.  For example, plaintiff suggests that before the investigation involving him, Chancellor Blank had endorsed a campaign called "Don't Be That Guy," which was launched initially by UW Police and allegedly suggested that men and masculinity were to blame for sexual assaults on campus.  He also points out that UW-Madison hired Hasselbacher six months after an article came out in People Magazine about a campus sexual assault in 2004 (dkt. #60-15 and dkt #60-16), asserting that this somehow is sufficient evidence for a reasonable jury to find Hasselbacher's personal bias against males, having had extensive experience working as an advocate at Domestic Abuse Intervention Services and as a sexual misconduct investigator at another university.

Neither of these examples remotely support an inference of sex discrimination in violation of Title IX.  In particular, public awareness programs regarding sexual assault "are not gender-biased and instead are legitimate preventative education programs and resources that [the Department of Education's Office of Civil Rights] explicitly instructed universities to provide for survivors and victims of all genders."  *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017); *see also Columbia Coll.*, 933 F.3d at 855 ("generalized allegations" of sexual assault awareness programing, a campus screening of the "Hunting Ground," and school-sanctioned social media posts regarding male "sexual

entitlement," were insufficient to state a claim for gender discrimination without more). Similarly, Hasselbacher's background as an advocate for victims of sexual assault and domestic violence does not show bias against men any more than a background in criminal prosecution or defense would alone support a claim of bias against a sitting judge in a criminal matter. Indeed, both men and women can be perpetrators and victims of sexual assault, and "the fact that [the Title IX Coordinator] has experience working with survivors of domestic violence does not establish she harbors pro-female biases." *Doe v. Univ. of Denver*, No. 16-CV-00152-PAB-KMT, 2018 WL 1304530, at *11 (D. Colo. Mar. 13, 2018); *see also Gash*, 117 F.4th at 965 (emphasizing that being "pro-victim" does not equate to "anti-male").

In sum, plaintiff has failed to show that public pressure, Department of Education guidance, or an atmosphere of anti-male bias at the University somehow infected his Title IX proceedings and, therefore, Hasselbacher discriminated against plaintiff on the basis of his sex.

## II.    Investigative and Disciplinary Process

Turning to arguments specific to the relevant Title IX investigation and disciplinary proceedings, plaintiff points to numerous actions by the University that he says are evidence of sex discrimination during the investigation, hearing, and disciplinary decision-making process. As an initial matter, "a plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process." *S. Indiana*, 43 F.4th at 793 *(citing Samford University*, 29 F.4th at 688 (11th Cir. 2022)) ("A deviation from a Title IX policy is not, in and of itself, a violation of Title IX."). At the same time, "if procedural

irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination." *Id.* (*citing Purdue University*, 928 F.3d at 669; accord, *Doe v. University of Denver*, 1 F.4th 822, 831–34 (10th Cir. 2021).)

For example, in the *Purdue University* case, the plaintiff claimed the school's Title IX committee found he committed sexual assault despite never hearing directly from the accusing party. 928 F.3d at 669. Instead, the panel relied solely on a letter submitted on the accuser's behalf by a university employee to find that the charge was more credible than the plaintiff's denial. In addition, the Title IX coordinator apparently failed to give the plaintiff a copy of the investigative report or share its contents with him; rather, he allegedly received only a redacted version of the investigative report, and even then only received it a few minutes before his hearing, meaning he first learned then that it "falsely claimed … he had confessed to [the other party's] allegations." *Id.* at 657. Further, the investigative report failed to include favorable evidence that he had submitted; he was barred from presenting witnesses at the hearing; and two of the three administrators on the panel admitted that they had not even read the investigative report. In reversing dismissal on plaintiff's pleadings, therefore, the Seventh Circuit held such significant and slanted procedural irregularities could, if proven, support an inference of sex bias. *Id.* at 669–70.

However, the purported procedural irregularities discussed by plaintiff here do not come close to those alleged in *Purdue University* or in any other case like it. *E.g., Menaker v. Hofstra University*, 935 F.3d 20, 34–35 (2d Cir. 2019) (plaintiff alleged, among other things, that school did not interview potential witnesses, provide plaintiff the investigative

report, allow him to file a written response, or produce a written decision of responsibility);
*Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 951 (9th Cir. 2020) (plaintiff alleged school provided him only an oral account summarizing the complainant's allegations, "failed to consider his version of the alleged assault," did not follow up with any of his suggested witnesses or other "evidence he offered in his defense," found the plaintiff responsible without providing him "any access to evidence or considering his exculpatory evidence," and finally, suspended him based on additional accusations "to which he was not given an opportunity to respond").   In contrast, plaintiff proffered "irregularities" based only on seemingly ordinary actions and decisions by University officials during the course of their investigation, hearing, and rulings, none of which begin to show bias against him *because of his sex*.   Nonetheless, the court will briefly address each of plaintiff's arguments.

### A. Refusal to Stay Title IX Proceedings until Resolution of Criminal Proceedings

First, plaintiff points to the University's refusal to stay its Title IX proceedings as requested by plaintiff, despite knowing that he could neither participate in interviews nor testify during that process without waiving his Fifth Amendment right against self-incrimination.   Likewise, the University knew the District Attorney's Office had relevant evidence that would not be shared until after the conclusion of plaintiff's criminal proceeding.   Plaintiff further argues that the *sole* reason for refusing to stay administrative proceedings until after plaintiff's criminal trial was the pressure on the University to reach a conclusion, pointing to multiple emails from Complainants' counsel describing their

31

urgent need to have a finding rendered, as well as their dissatisfaction with delays in that process.

Even acknowledging this outside pressure, however, plaintiff offers no inherent connection between his sex or gender and the University's decision to move forward with a Title IX proceeding despite a concurrent criminal prosecution. More specifically, plaintiff identifies no circumstances in which the University agreed to adjourn a misconduct hearing because a woman had requested adjournment based on potential or pending criminal charges, nor does plaintiff present any authority that a decision to proceed under Title IX in these circumstances is evidence of gender bias. Plaintiff has also failed to challenge in any material way the apparent legitimate, non-discriminatory reason the University provided for moving forward despite criminal proceedings: the obligations imposed by Title IX itself to investigate and resolve such allegations promptly. Finally, plaintiff was never precluded from disputing Complainants' allegations, submitting written statements and other evidence, or participating in the hearing. Indeed, plaintiff did so despite the concurrent criminal proceedings.

At most, the University's refusal to delay proceedings until after resolution of the criminal proceedings *might* be evidence of some pro-victim or complainant bias, but the Seventh Circuit has held that such a bias is *not* sufficient to prove an anti-male bias. *See Gash*, 117 F.4th at 964; *Johnson*, 829 F. App'x at 733; *see also Doe v. Loyola Univ.-Chicago*, No. 20 CV 7293, 2021 WL 2550063, at *7 (N.D. Ill. June 22, 2021) ("a pro-victim bias is not sex bias—both women and men can commit or be victims of sexual assault").

**B. Hasselbacher's Allegedly Biased Investigation**

Plaintiff next argues that Hasselbacher's investigation demonstrated bias against him in various ways.  He points out that she encouraged collaboration between Complainants 1 and 2, even showing Complainant 1's statement to Complainant 2 before commencing her Title IX investigation.  The court agrees that Hasselbacher likely should not have permitted Complainant 2 to read Complainant 1's statement before obtaining an independent statement from Complainant 2.  However, this arguable error does not show that Hasselbacher discriminated against plaintiff on the basis of his sex.  To the contrary, at the time, Complainant 2 had already communicated to Hasselbacher, albeit through an advocate, that she had no recollection of what occurred that night.  Thus, in determining whether to open a Title IX investigation at all, Hasselbacher had reason to determine whether Complainant 1's statement might jog Complainant 2's memory, including whether a sexual assault occurred at all.  Moreover, all of this information was eventually made available to plaintiff and to the hearing panel before any decision on Complainants' allegations was made.

Plaintiff also argued that Hasselbacher's failure to obtain evidence from the District Attorney's Office or Madison Police Department is evidence of anti-male bias.  Unfortunately for plaintiff, however, the record actually shows that Hasselbacher and other University officials attempted to obtain the evidence but were unable to do so.  Hasselbacher also disclosed that fact to plaintiff and his attorneys as part of her multiple attempts to obtain evidence from plaintiff instead.  Nevertheless, plaintiff's counsel declined to provide *any* of the additional evidence in his possession.  Finally, once again,

plaintiff fails to explain how Hasselbacher's or other University officials' actions in this regard would support a finding of discrimination against plaintiff on the basis of his sex.

In fact, Hasselbacher's actions throughout the investigation do not support a finding of anti-male bias. The record shows that Hasselbacher provided all copies of the investigative materials to plaintiff at the same time as she provided them to the Complainants. Hasselbacher also gave plaintiff multiple opportunities to submit other evidence, including in the notices of charges and throughout her investigation. Similarly, plaintiff was provided with all of Hasselbacher's draft investigative reports and was permitted to submit information in response. In short, plaintiff has submitted no evidence from which a jury could reasonably infer that Hasselbacher's investigation was tainted by discrimination on the basis of his sex.

### C.  Failure to Reschedule Hearing for Plaintiff's Chosen Advocate

Finally, plaintiff argues that the University refused to reschedule the Title IX proceeding to a day when plaintiff's advisor of choice could be present, but instead consulted with the Complainants and scheduled the hearing on a date that worked for their chosen advisors. He also references the University's Title IX policies giving him the right to have the advisor of his choice present. *See* UWS 17.12(4)(b).

The court agrees with plaintiff that the University likely should have rescheduled the hearing to a date when his chosen advocate would be present. However, the record does not support plaintiff's assertion that the University *intentionally* scheduled the hearing date so that his preferred advocate could not attend in deference to the Complainants'

requests. Instead, the facts show that the University, through Dean Cox, repeatedly attempted to schedule the hearing for a date that would work for all parties, witnesses, hearing officials, and staff. In particular, Cox provided the relevant timelines for scheduling under Wis. Admin. Code § UWS 17.12, and accommodated the requests of plaintiff's attorneys' regarding scheduling multiple times, eventually scheduling the hearing for a date in which his counsel appeared to have no scheduling conflict based on weeks of emails as to the best dates for all parties. Even then, plaintiff's attorneys repeated their request that the hearing be adjourned altogether until after the criminal matter, or at least to a different date that would be more convenient for them. While Dean Cox refused to reschedule the hearing again, citing the University's duty to promptly resolve the matter, this is not evidence of sex discrimination, but rather evidence of a purported, last-minute scheduling conflict by one of plaintiff's counsel that the University determined was insufficient to further delay the proceedings.

Finally, plaintiff *was* able to attend the hearing with counsel representing him, even if not his top choice of counsel. He was also allowed to submit a written statement and other evidence to be considered by the hearing panel, along with his counsel's submitted questions for use by the panel in cross-examination of other witnesses. As a result, even if the investigation, hearing, and disciplinary decisions were imperfect, plaintiff has failed to show that they were so flawed as to deny him due process, much less so flawed that they were the product of any anti-male bias. Accordingly, plaintiff has failed to show that he was discriminated against on the basis of his sex in violation of Title IX, and defendants are entitled to summary judgment.

35

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Board of Regents of the University of Wisconsin System, Rebecca Blank and Lauren Hasselbacher (dkt. #41) is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 30th day of October, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

36